## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

AMAZON WEB SERVICES, INC.,

Plaintiff,

v.

UNITED STATES OF AMERICA,
by and through the U.S. Department of Defense,

Defendant,

and

MICROSOFT CORPORATION,

Defendant-Intervenor.

Case No. 19-cv-01796

Judge Campbell-Smith

[REDACTED]

**FINAL REDACTED
VERSION**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF AMAZON WEB SERVICES, INC.'S
RENEWED MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ................................................................................................................ 1

QUESTION PRESENTED ................................................................................................... 3

STATEMENT OF FACTS ................................................................................................... 3

  A.  President Trump Has Consistently Interfered with the Administration of
     Governmental Functions—Including Government Procurements—to Advance
     His Personal Agenda ................................................................................................. 3

  B.  President Trump's Long-Standing Hostility Towards Amazon and Mr. Bezos
     and the President's Efforts to Influence the JEDI Contract Award Process .................. 7

  C.  The Unusual Circumstances Surrounding DoD's Award of the JEDI Contract to
     Microsoft ................................................................................................................. 12

  D.  AWS Files Bid Protest After DoD Fails to Respond to AWS's Debriefing
     Questions in Violation of Procurement Law .............................................................. 14

LEGAL STANDARD ........................................................................................................ 15

ARGUMENT ...................................................................................................................... 17

  A.  AWS Has Made Well-Grounded Allegations of Bias and Bad Faith that
     Require Supplementation of the Administrative Record .............................................. 18

     1.  *The President's Overt Bias Infected DoD Officials' Decisions and
        Motivated Them to Act in Bad Faith.* ................................................................ 19

     2.  *DoD's Award Decision Cannot Be Explained Absent Bad Faith.* ...................... 25

  B.  The Court Should Supplement the Administrative Record with AWS's
     Evidence Relating to Bias and Bad Faith .................................................................. 28

  C.  The Court Should Grant AWS Leave to Supplement the Administrative Record
     with Targeted Discovery Regarding AWS's Bias and Undue Influence Claims ......... 31

CONCLUSION .................................................................................................................. 38

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*AshBritt, Inc. v. United States,*
  87 Fed. Cl. 344 (2009) ...............................................................................................................31

*ATX, Inc. v. Dep't of Transp.,*
  41 F.3d 1522 (D.C. Cir. 1994) ............................................................................................16, 21

*Axiom Res. Mgmt., Inc. v. United States,*
  564 F.3d 1374 (Fed. Cir. 2009)..................................................................................................15

*BayFirst Sols., LLC v. United States,*
  102 Fed. Cl. 677 (2012) ..............................................................................................................19

*Beta Analytics Int'l, Inc. v. United States,*
  61 Fed. Cl. 223 (2004) ....................................................................................3, 15, 17, 19, 24

*Clinton v. Jones,*
  520 U.S. 681 (1997).....................................................................................................................34

*Connecticut v. Dep't of Interior,*
  363 F. Supp. 3d 45 (D.D.C. 2019).............................................................................................21

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019).................................................................................................................15

*Galen Med. Assocs., Inc. v. United States,*
  369 F.3d 1324 (Fed. Cir. 2004)..................................................................................................30

*Inforeliance Corp. v. United States,*
  118 Fed. Cl. 744 (2014)...............................................................................................................33

*Int'l Res. Recovery, Inc. v. United States,*
  61 Fed. Cl. 38 (2004).......................................................................................................15, 16, 31

*J.C.N. Constr. Co. v. United States,*
  60 Fed. Cl. 400 (2004).................................................................................................................32

*Jarrott v. Scrivener,*
  225 F. Supp. 827 (D.D.C 1964)..................................................................................19, 20, 23

*Knight First Amendment Inst. at Columbia Univ. v. Trump,*
  928 F.3d 226 (2d Cir. 2019)..........................................................................................................9

*L-3 Commc'ns Integrated Sys., L.P. v. United States,*
 91 Fed. Cl. 347 (2010) ..........................................................................15, 16, 17, 18, 21, 30, 33

*New Dynamics Found. v. United States,*
 70 Fed. Cl. 782 (2006) ........................................................................................................30

*Orion Int'l Techs. v. United States,*
 60 Fed. Cl. 338 (2004) ........................................................................................................16

*Palantir USG, Inc. v. United States,*
 129 Fed. Cl. 218 (2016) ................................................................................................18, 33

*Pitney Bowes Gov't Sols., Inc. v. United States,*
 93 Fed. Cl. 327 (2010) ............................................................................................15, 16, 32

*Starry Assocs., Inc. v. United States,*
 125 Fed. Cl. 613 (2015) ..............................................16, 17, 19, 20, 22, 24, 32, 37

*United States v. AT&T,*
 310 F. Supp. 3d 161 (D.D.C. 2018) ...................................................................................5

*United States v. AT&T,*
 916 F.3d 1029 (D.C. Cir. 2019) ........................................................................................5

*Veg-Mix, Inc. v. Dep't of Agriculture,*
 832 F.2d 601 (D.C. Cir. 1987) ........................................................................................30

**Statutes**

10 U.S.C. § 2305(b)(5) ......................................................................................................14, 35

18 U.S.C. § 208 .........................................................................................................................13

**Rules**

Rules of the United States Court of Federal Claims, Rule 30 .......................................33

**Regulations**

48 C.F.R. § 3.401 .....................................................................................................................19

48 C.F.R. § 15.506(a)................................................................................................................14

## INTRODUCTION

Plaintiff Amazon Web Services, Inc. ("AWS") respectfully moves to supplement the administrative record ("AR") submitted by the Defendant, the United States of America, acting by and through the Department of Defense ("DoD"), in connection with AWS's protest of the award of the Joint Enterprise Defense Infrastructure ("JEDI") Contract, Solicitation No. HQ0034-18-R-0077, to Microsoft Corporation ("Microsoft").

This case demands an expanded AR so that the Court may fully assess AWS's well-grounded claims of bias and bad faith. President Donald J. Trump has repeatedly demonstrated his willingness to use his position as President and Commander in Chief to disrupt the orderly administration of government functions—including federal procurements—to advance personal motives. There is no question he did so here.

President Trump's bias against Jeffrey P. Bezos, founder of AWS's parent company, Amazon.com, Inc. ("Amazon"), is a matter of public record. Even before taking office, President Trump campaigned on a promise that Amazon would "have problems" if he became President. When it came time for DoD to select a cloud-services provider to fulfill the important JEDI Contract, the President made crystal clear—both to the public at large, and by clear implication to senior DoD officials (including his political appointees)—that he did not want his Administration to award the contract to AWS. In addition to his public tweets and statements criticizing Amazon and Mr. Bezos, he directed DoD to "screw Amazon" out of the JEDI Contract, and in July 2019, again ordered DoD to "look very closely" into the JEDI procurement based on his own claim of "tremendous ... complaints" about AWS. Upon receiving that instruction, Secretary of Defense Mark T. Esper embarked upon an "examination" of the procurement and met multiple times with procurement personnel tasked with evaluating the JEDI proposals. During this time period, DoD

evaluators' reports shifted in favor of Microsoft and against AWS, ultimately culminating in a recommendation for the Source Selection Authority to award the JEDI Contract to Microsoft.

In awarding the JEDI Contract to Microsoft, DoD committed numerous and compounding prejudicial errors. These errors pervaded nearly every evaluation factor to systematically disfavor AWS, including DoD arbitrarily relying on an outdated, superseded version of AWS's proposal; contradicting its own earlier factual determinations; misstating facts from AWS's proposal; downplaying gross deficiencies and failures in Microsoft's proposal and demonstrations; and fabricating areas of superiority in the final stages of evaluation to favor Microsoft. These errors ultimately resulted in DoD awarding the JEDI Contract to a technologically inferior proposal that did not present the best value to the Government.

At a minimum, these errors reveal a process that was fatally flawed and highly unusual. But the clear, public record of the Commander in Chief's personal animus toward Amazon and Mr. Bezos, his campaign pledge to ensure that Amazon would "have problems" if he became President, and his unprecedented interference in the JEDI award process with the DoD leadership team all demand that DoD's errors be assessed in light of a full record of that bias and pressure. Accordingly, AWS seeks discovery and supplementation that are narrowly tailored to include the public record of bias and to develop facts not currently known or accessible to AWS demonstrating exactly how President Trump's order to "screw Amazon" was carried out during the decision-making process.

Without supplementation, the Court cannot objectively and fully evaluate AWS's credible and well-grounded allegations about bias and bad faith. Moreover, even the unquestionable *appearance* of bias in this case alone requires a supplemented AR to dispel any doubts about the true basis for DoD's action. The rule of law, the preservation of public confidence in the nation's

procurement process, and AWS's right to fully present its case for effective judicial review compel targeted discovery and supplementation of the AR.

## QUESTION PRESENTED

In light of AWS's well-grounded and credible allegations of bad faith and bias, should the Court permit targeted discovery and supplementation of the AR to ensure that all material facts are presented to the Court and to allow the Court to objectively and fully evaluate the bid protest?

## STATEMENT OF FACTS

DoD's decision to award the JEDI Contract to Microsoft resulted from numerous and compounding prejudicial errors that systematically overlooked critical aspects of AWS's and Microsoft's proposals to skew the best-value determination in Microsoft's favor. These troubling errors alone are enough to require reversal of the award. But this case also raises a more fundamental and disturbing concern about the integrity of the JEDI procurement process and how President Trump used his position as President and Commander in Chief to improperly influence that process in furtherance of his personal and political interests.[1]

## A.  President Trump Has Consistently Interfered with the Administration of Governmental Functions—Including Government Procurements—to Advance His Personal Agenda

This bid protest does not occur in a vacuum or on a blank slate. It takes place against the backdrop of President Trump's repeated intervention in the full spectrum of governmental functions to make a point to his perceived critics or to advance some personal agenda. In just the procurement space alone, President Trump has interfered in a series of significant government

---

[1]  The Court may rely on the extra-record evidence cited herein, which supports requests for supplementation where there are allegations of bad faith and bias. *See Beta Analytics Int'l, Inc. v. United States*, 61 Fed. Cl. 223, 226 (2004) ("[A] party may rely on extra-record evidence to support its claim that discovery regarding bad faith conduct is necessary.").

contract awards. For example, his role in the U.S. Army Corps of Engineers' award of a $400 million border wall construction contract to Fisher Industries in December 2019 has raised serious concerns about the propriety of that procurement decision. Although the Army initially found that Fisher Industries' proposal failed to even meet specifications for the construction contract, after a months-long campaign by Fisher Industries (including repeated television appearances on Fox News targeted to President Trump), President Trump stated that Fisher Industries had been "recommended strongly" for the contract and "immediately brought up Fisher [Industries]" during meetings with DoD officials regarding the border wall. *See* Appendix ("APP") 399; APP 413. Soon after, the Army awarded a $400 million border wall construction contract to Fisher Industries—a decision that prompted the DoD Inspector General to investigate "the possibility of inappropriate influence" on the contracting decision." APP 482.

Similarly, President Trump reportedly intervened in the General Services Administration's ("GSA") solicitation of bids to move the Federal Bureau of Investigation's headquarters away from the nearby Trump International Hotel in downtown Washington, D.C., to a new consolidated campus in suburban Maryland or Virginia. Preparations for the move had been underway for nearly a decade and GSA appeared poised to announce its award. However, following several meetings with the President and White House officials, GSA and the FBI announced that FBI headquarters would in fact remain at its current site, effectively ensuring that the site would not be redeveloped by potential competitors to the Trump International Hotel. While the GSA Administrator had testified to Congress that the decision to remain at its current location "came from the FBI," a GSA Inspector General investigation later concluded that this testimony was "incomplete and may have left the misleading impression that she had no discussions with the President or senior White House officials in the decision-making process about the project."

APP 323. The GSA Inspector General's investigation also identified nonpublic emails that referenced "what POTUS directed everyone to do" and "POTUS's orders" regarding the project. APP 312. The Department of Justice Inspector General has launched its own investigation into President Trump's interference in the FBI headquarters consolidation project. *See* APP507.

This pattern of interference extends beyond procurements, and the parallels are clear. In another very public example, President Trump has gone to extraordinary lengths to attack CNN, a news outlet that, like the *Washington Post*, President Trump perceives as hostile toward his Administration and political views. First, he pushed to block a merger between CNN's parent company (Time Warner) and AT&T, which before President Trump was elected, was well on its way to obtaining clearance from the DOJ. *See* APP 269–71.[2] But soon after President Trump entered office—and reportedly at President Trump's request—the Department of Justice reversed its position, eventually filing suit to block the merger that it previously said it was prepared to support.[3] The courts ultimately rejected the lawsuit and allowed the merger to close. *See United States v. AT&T*, 916 F.3d 1029 (D.C. Cir. 2019); *United States v. AT&T*, 310 F. Supp. 3d 161 (D.D.C. 2018).

Second, in November 2018, the Trump White House and Secret Service abruptly revoked the press credential of CNN's Chief White House correspondent Jim Acosta just hours after a

---

[2] Experts long believed that the merger would easily receive government approval. APP 235. Even President Trump's future head of the DOJ Antitrust Division, Makan Delrahim, believed that the merger did not pose "a major antitrust problem." APP 230; *see also* APP 239.

[3] APP 388 ("[I]n the late summer of 2017, a few months before the Justice Department filed suit, Trump ordered Gary Cohn, then the director of the National Economic Council, to pressure the Justice Department to intervene. According to a well-informed source, Trump called Cohn into the Oval Office along with John Kelly, who had just become the chief of staff, and said in exasperation to Kelly, 'I've been telling Cohn to get this lawsuit filed and nothing's happened! I've mentioned it fifty times. And nothing's happened. I want to make sure it's filed. I want that deal blocked!'").

contentious press conference, during which President Trump called the reporter a "rude, terrible person" and accused him of "report[ing] fake news." APP 344–45. The press credential was restored only after CNN sued President Trump and other officials in his Administration and a federal court ordered the immediate restoration of Acosta's credential. *See* APP 360–64. Rebuffed but undeterred by the courts, the President then called for a boycott of AT&T in attempt to force CNN to change its reporting. *See* APP 418.

Finally, this bid protest also occurs against the background of impeachment—the third in the history of the United States, and which is grounded in the President's repeated refusal to separate his personal interests from the national interest. Even though all of the relevant, high-level officials from DoD and the White House—including Secretary of Defense Esper, Secretary of State Mike Pompeo, and then-National Security Advisor John Bolton—believed that providing military aid to Ukraine in its fight against Russian-backed separatists was critically important to U.S. national security. *see* APP 499, President Trump nonetheless gave "[c]lear direction … to continue to hold" the congressionally mandated aid, reportedly in order to persuade the President of Ukraine to investigate one of President Trump's political rivals, APP 483. And while President Trump's subordinates initially resisted his demands, they ultimately gave in and were forced to develop dubious legal and post-hoc justifications for withholding the aid. *See generally* APP 484–98. Government officials confirmed they did not "fe[el] they could" stop the President, and those that did try to stop him were removed from relevant positions or from government altogether. APP 455.[4]

---

[4] In yet another public example—and one again involving Secretary Esper—President Trump's intervention in the case of Chief Petty Officer Edward Gallagher further shows the risk to government officials who disagree with him. President Trump overruled the judgment of top

The JEDI procurement took place in the midst of this pattern of Presidential interference, which in the absence of any other facts would, at the very least, prompt questions about the regularity of the high-profile JEDI procurement.

**B.    President Trump's Long-Standing Hostility Towards Amazon and Mr. Bezos and the President's Efforts to Influence the JEDI Contract Award Process**

But there are more facts.  President Trump's personal dislike of Mr. Bezos, Amazon, and the *Washington Post* (which is owned by Mr. Bezos) is no secret, and originates at least in part from his dissatisfaction with the *Washington Post*'s coverage of him from before and since he assumed office.  *See* Compl. ¶¶ 15–21, 84–86.  Long before the inception of the JEDI source selection process, President Trump regularly lashed out against the *Washington Post*, and over time has extended his attacks to Mr. Bezos and Amazon, often conflating the three.  For example, in late December 2015, he publicly complained that the *Washington Post* gave Mr. Bezos "power to screw [the] public," and that he hoped Amazon "would crumble [*sic*] like a paper bag."  *Id.* ¶ 84; APP 002; APP 003.  When then-candidate Trump made his foray into the political sphere, he made clear that if he became President he would use his power to disadvantage Amazon and the *Washington Post*: "[B]elieve me, if I become president, oh do they have problems.  They're going to have such problems."  Compl. ¶¶ 16, 84; APP 005.

---

Navy officials who called for an administrative review board to decide whether Gallagher should be expelled from the Navy SEALs for his alleged misconduct.  *See* APP 463.  After then-Secretary of the Navy Richard Spencer raised concerns about President Trump's interference in internal military disciplinary affairs, President Trump instructed Secretary of Defense Esper to demand Spencer's resignation.  Secretary Esper obeyed President Trump's directive, explaining that regardless of how he felt about President Trump's actions, "[t]he president is the commander in chief," that the President "has every right, authority and privilege to do what he wants to do," and that he would "[a]bsolutely" follow the President's directives.  APP 474–75.

7

By the time DoD launched its search for a cloud services provider to fulfill the JEDI Contract, the President—emboldened by allies who also were Amazon's competitors—put AWS in the crosshairs of his campaign against Mr. Bezos and Amazon by deliberately influencing DoD's procurement decision. For instance, in early 2018, President Trump held a private dinner with Safra Catz, co-CEO of AWS-competitor Oracle and a member of President Trump's presidential transition team. During that dinner, Ms. Catz advocated against awarding AWS the JEDI Contract. Compl. ¶ 88; APP 084; APP 218. In the days surrounding his dinner with Ms. Catz, President Trump increased his negative public rhetoric toward Amazon. Compl. ¶ 89; APP 017; APP 020; APP 021.

Similarly, it was reported in April 2018 that President Trump discussed with his advisors ways to "escalate his Twitter attacks on Amazon to further damage the company," with advisors stating that "[President Trump]'s obsessed with Bezos" and that "Trump is like, how can I f**k with [Mr. Bezos]?" Compl. ¶ 90; APP 019. So President Trump's advisors encouraged him to "cancel Amazon's pending multi-billion contract with the Pentagon to provide cloud computing services." APP 019. President Trump's discussions with Ms. Catz and his advisors culminated in the summer of 2018, when he ordered his then-Secretary of Defense James Mattis to "screw Amazon" out of the JEDI Contract. Compl. ¶¶ 19, 91; APP 069. But after Secretary Mattis demurred, President Trump fired him six months later—a predictable move given the parade of individuals, like Secretary Mattis, who were forced from their positions after disagreeing with the President. Compl. ¶¶ 21, 91; APP 043.

Against this backdrop, during a July 18, 2019 press conference, President Trump announced that he was looking "very seriously" into the JEDI procurement (which he mistakenly referred to as "The Amazon" process) and that he "w[ould] be asking [DoD] to look at it very

closely" because of supposed "complaints about the contract with the Pentagon and with Amazon." Compl. ¶ 95; APP 059. That same day, President Trump's son alleged in a tweet that Mr. Bezos and Amazon had engaged in "shady and potentially corrupt practices," and he ominously predicted that it "may come back to bite them" with respect to the JEDI Contract—a sentiment that President Trump echoed a few days later on July 22, 2019, when he retweeted television coverage decrying the JEDI Contract as the "Bezos Bailout." Compl. ¶¶ 96–97; APP 062; APP 079; *see also* APP 200.

Twitter—President Trump's preferred tool for broadcasting his directives, and which are considered official White House statements[5]—was not the only means by which President Trump injected his bias and influence into the JEDI award process. President Trump also exerted his influence over DoD political appointees overseeing the JEDI procurement, who serve at his pleasure and facilitated his improper influence over the JEDI procurement personnel.

Secretary of Defense Esper is one such official. Appointed by President Trump and replacing ousted Secretary Mattis in July 2019, Secretary Esper has recently reiterated his commitment to the President, stating his belief that as Commander in Chief, the President "has every right, authority and privilege to do what he wants to do," and that he would "[a]bsolutely" follow whatever the President told him to do. *See infra*, pp. 21–22; APP 474–75. And as Secretary of Defense, Secretary Esper has direct authority over DoD's Chief Information Officer, who is

---

[5]  *See* APP 233 (White House Press Secretary Sean Spicer stating that President Trump's tweets are "considered official statements by the President of the United States"); APP 432 (reporting that President Trump told two senior advisors that "[i]f I don't tweet it, don't listen to my staff"). *See also Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 236 (2d Cir. 2019) (noting that "the President … acts in an official capacity when he tweets").

responsible for running the JEDI procurement through the Defense Digital Service ("DDS"). *See* AR Tab 25 at 476.

On August 1, 2019, Secretary Esper announced that he would be taking a "hard look" at the JEDI procurement after "hear[ing] from folks in the administration." Compl. ¶ 176; APP 083.[6] The following day, Secretary Esper confirmed that he had "heard from people from the White House" that he should take a "good, thorough look" at the JEDI procurement, adding that he would potentially "go in a different direction" from "what has transpired over the last … months or years on this project." APP 100.  Consistent with Secretary Esper's comments, DoD later confirmed that "[n]o decision w[ould] be made on the [JEDI] program until [Secretary Esper] has completed his examination"—even though just days earlier, a DoD spokesperson had told reporters that DoD would be awarding the JEDI Contract in August.  Compl. ¶ 175; APP 088; APP 217.  After Secretary Esper's announcement that he would personally intervene in the JEDI proposal evaluation process, Donald Trump, Jr., publicly hinted that AWS would not be the awardee, tweeting that "the democrats aren't buying the BS coming from Bezos Inc." and that it "[s]ounds like the corrupt #BezosBailout is in trouble." Compl. ¶ 177; APP 105–06.

Although at least two senators urged Secretary Esper "to resist political pressures that might negatively affect the implementation of sound acquisition practices and of the cloud strategy" those concerns appear to have gone unheeded. *See* APP 201.  Public records indicate that Secretary Esper met with President Trump at least six times from August 1 to October 8, 2019. APP 213–16; APP 229; APP 499.  Additionally, the AR shows that Secretary Esper met with

---

[6] Behind the scenes, Secretary Esper's review of JEDI had in fact already begun, including in a one-on-one "Read Ahead" meeting with the DoD Chief Information Officer on July 29. *See* AR Tab 335 (Read Ahead for July 29, 2019 Information Session "SD/CIO 1v1 meeting").

procurement personnel tasked with evaluating the JEDI proposals during a series of at least five "informational sessions" from July to September 2019. *See* AR Tabs 335, 439, 440, 453, 462. The AR omits critical information and includes only limited documentation surrounding these "informational sessions." But what little has been provided demonstrates that, contrary to DoD Chief Information Officer Dana Deasy's congressional testimony, the procurement officials were *not* in fact shielded from the President's influence.[7] To the contrary, at least four of Secretary Esper's "information sessions" were attended by, and the "read aheads" for those briefings prepared by, the chair of the Source Selection Evaluation Board ("SSEB"),           *See* AR Tabs 335, 439, 440, 453.

The close contact between Secretary Esper and the SSEB Chairperson           is particularly concerning. As the sole person comprising the SSEB,           had considerable responsibility in the procurement process.           was tasked with "summariz[ing] the findings of" the Technical Evaluation Board responsible for evaluating the technical elements of each of the offerors' proposals, interfacing between the technical evaluators and the Source Selection Advisory Committee ("SSAC") and Source Selection Authority ("SSA"), and preparing the SSEB Report, upon which the SSAC relied on "to provide an award recommendation to the SSA." AR Tab 305 at 64344–45. In short,           had the ability to directly influence the award

---

[7] During an October 29, 2019, Senate confirmation hearing, Senators Jack Reed and Angus King—members of the Senate Armed Services Committee—asked Mr. Deasy about whether the White House had tried to influence the JEDI award. APP 145–47; APP 180–81. When Senator King asked Mr. Deasy if he could "categorically assure us that there was no influence by the White House or the President," Mr. Deasy equivocated, explaining only that he did not believe the "team members that actually took the source selection" were influenced by the White House and noting that he did not share with the Secretary or CIO "any proprietary source information." APP 180. Of course, no sharing of source selection information is necessary if the directive from above is to *not* award the contract to one offeror.

recommendation of the SSAC to the SSA. And here, ⬛⬛⬛ participated personally in meetings with the Secretary of Defense during the period that President Trump was directing him to take a "hard look" at the JEDI procurement to further his personal and political bias against Amazon.

The timing of ⬛⬛⬛ meetings with Secretary Esper aligns strikingly with the execution of his source selection responsibilities. After participating in a meeting with Secretary Esper on September 26, ⬛⬛⬛ prepared his Summary Report to the SSAC on September 27 (though the document was not signed until October 3). *See* AR Tab 453; AR Tab 456 at 176395. And notably, while the majority of the technical factors had been evaluated by the respective factor Technical Evaluation Boards between September 11 to 13, the TEB did not issue evaluations for Factor 2 (the technical factor to be afforded the most weight under the solicitation criteria) for Microsoft until September 26, and for AWS until September 27—*after* ⬛⬛⬛ meetings with Secretary Esper. AR Tabs 441–52. The SSEB Report reflected numerous errors which were only compounded upon the later review and partial adoption of the Report by the SSAC. The SSEB Chair briefed the SSAC on his evaluation on September 30 (AR Tab 457 at 176396), and the SSAC met from September 30 through October 3 before issuing the award recommendation to the SSA on October 3 (*id.* at 176407).

## C.   The Unusual Circumstances Surrounding DoD's Award of the JEDI Contract to Microsoft

Barely three months after President Trump called for DoD to "look … very closely" into complaints about AWS's proposal and Secretary Esper's announcement that he would be "examining" the process, the SSA signed a Source Selection Decision Document on October 17, 2019, concluding that Microsoft's proposal represented the "best value" to the Government. Compl. ¶ 186.

DoD waited more than one week before it publicly announced its award decision. During this interim period, DoD announced on October 22, 2019, that Secretary Esper was recusing himself from the JEDI procurement process because of an alleged personal conflict of interest relating to his son's preexisting employment with IBM—an offeror no longer in the running for the JEDI award. Compl. ¶¶ 30, 187; APP 110–11. In the announcement, DoD further stated that "[t]he JEDI procurement will continue to move to selection through the normal acquisition process run by career acquisition professionals." APP 110.

Secretary Esper's recusal was unusual and suspect for at least two reasons. First, Secretary Esper had actually submitted a memorandum recusing himself from the review of the JEDI acquisition on October 7, 2019—months *after* having followed President Trump's request to investigate the JEDI procurement process, several days *after* the SSAC had issued its recommendation to the SSA to award the contract to Microsoft, and *after* Secretary Esper had met with procurement personnel tasked with conducting the analyses underlying this recommendation. *See* AR Tab 458. Notably, the recusal memorandum was hand-dated (suggesting it had been prepared earlier but purposely not dated) and did not specify a reason for the recusal other than "an abundance of caution and to avoid any concerns regarding my impartiality." *Id.*[8] Second, even though the SSA had already signed the Source Selection Decision Document five days earlier

---

[8] Secretary Esper's recusal memorandum is in stark contrast to the recusal memorandum filed days earlier by another senior DoD official, Principal Deputy Assistance Secretary of Defense, Acquisition Enablers Stacy Cummings, who specified in her "Disqualification Statement"— submitted after nearly two months of substantive engagement on the JEDI procurement—that she had "░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░ AR Tab 454 at 176346. Secretary Esper did not characterize the basis for his recusal as a "covered relationship" with IBM, likely because his adult son's employment with IBM does not require recusal. *See* 18 U.S.C. § 208 (requiring government employees to refrain from participating in matters in which "he, his spouse, [or] *minor child* … has a financial interest." (emphasis added)).

(on October 17), by stating the procurement "will continue to move to selection," DoD's October 22 announcement regarding Secretary Esper's recusal falsely suggested to the public that the award decision had not yet been made.

On October 25, 2019, DoD publicly announced its award—in fact, made more than a week earlier—of the JEDI Contract to Microsoft, much to the shock of industry analysts and experts who had long considered AWS the frontrunner for the award. *See* Compl. ¶¶ 31, 188.

**D.     AWS Files Bid Protest After DoD Fails to Respond to AWS's Debriefing Questions in Violation of Procurement Law**

DoD provided AWS a written debriefing that detailed the evaluation results. In response to that debriefing, AWS timely submitted numerous detailed written debriefing questions pursuant to 10 U.S.C. § 2305(b)(5), to better understand how DoD reached its award decision. This is a fundamental element of the procurement process.[9] But in blatant violation of applicable law, DoD did not provide a substantive response to *any* of AWS's debriefing questions. *See* Compl. ¶¶ 189–91.

AWS filed its bid protest Complaint on November 22, 2019, to challenge DoD's decision to award the JEDI Contract to Microsoft. AWS's Complaint includes seven counts that challenge the substance of DoD's decision (Counts 1–4 and 6–7) and alleges bias and bad faith (Count 5). DoD produced the AR on January 3, 2020. Despite the Court's December 13, 2019 Order, which required DoD to "include all materials developed and considered by the government in making its

---

[9] *See* 10 U.S.C. § 2305(b)(5) (requiring debriefings to include, at a minimum, "reasonable responses to relevant questions posed by the debriefed offeror as to whether source selection procedures set forth in the solicitation, applicable regulations, and other applicable authorities were followed by the agency; and [] an opportunity for a disappointed offeror to submit … additional questions related to the debriefing," and requiring DoD to "respond in writing to any additional question submitted … within five business days after receipt of the question"); *see also* 48 C.F.R. § 15.506(a).

award decision," including "any informal documents reflecting factors considered in the agency's decision-making process, such as email communications and communications made through Slack channels and the like," (Dkt. 55 at 2), the AR contains very few such informal materials. Rather, the Government included in the AR only a highly curated set of Slack communications from a narrow time period from *before* AWS had even submitted its initial proposal. The government produced *nothing* in terms of internal communications from the period in which DoD procurement officials were evaluating the offerors' proposals. Similarly, the Government included only internal email exchanges related to the Contracting Officer's Procurement Integrity Act/Organizational Conflict of Interest investigations into DoD employees who later sought employment with AWS. It produced *none* of the internal DoD emails related to the actual JEDI procurement decision.

**LEGAL STANDARD**

The AR should be supplemented if the "omission of extra-record evidence precludes effective judicial review." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009). Where a case involves an allegation of bias or bad faith, the "administrative record frequently will not be complete or suffice to prove or disprove the allegation." *Pitney Bowes Gov't Sols., Inc. v. United States*, 93 Fed. Cl. 327, 332 (2010).[10] Because such "well grounded allegations of bad faith and bias are serious allegations which cannot be rebutted within the confines of the existing Administrative Record, supplementation is warranted to give Plaintiff an opportunity to prove such allegations." *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 91 Fed. Cl. 347, 354 (2010) (internal quotation marks and citation omitted); *see also Dep't of*

---

[10] *See also Beta Analytics Int'l*, 61 Fed. Cl. at 226 ("[R]are indeed would be the occasions when evidence of bad faith will be placed in an administrative record."); *Int'l Res. Recovery, Inc. v. United States*, 61 Fed. Cl. 38, 41–42 (2004) ("Allegations of bias, prejudice and bad faith … cannot be subsumed within the record of a challenged award decision.").

*Commerce v. New York*, 139 S. Ct. 2551, 2573–74 (2019) (affirming lower court's granting "extra-record discovery" in administrative challenge to action by Trump Administration's Department of Commerce, holding that extra-record discovery was "ultimately justified" upon a "strong showing of bad faith or improper behavior").

Accordingly, "the record may be supplemented with (and through discovery a party may seek) relevant information that by its very nature would not be found in an agency record—such as evidence of bad faith." *Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 343 (2004); *see also Int'l Res. Recovery*, 61 Fed. Cl. at 42 (collecting cases) ("This Court and other fora resolving bid protests have traditionally considered extra-record evidence in assessing alleged bias or bad faith."). Such supplementation is especially important where there is an "appearance of bias," because a "full scale administrative record" can "dispel any doubts about the true nature of [the agency's] action." *ATX, Inc. v. Dep't of Transp.*, 41 F.3d 1522, 1528 (D.C. Cir. 1994).

To supplement the AR, a bid protestor need only make "allegations [that] appear to be sufficiently well grounded." *L-3 Commc'ns Integrated Sys.*, 91 Fed. Cl. at 355; *see also Pitney Bowes Gov't Sols.*, 93 Fed. Cl. at 332 ("The test for supplementation is whether there are sufficient well-grounded allegations of bias to support [supplementation]."). At the supplementation stage, a protestor does *not* need to establish the "clear and convincing evidence of bad faith or bias" that is necessary "to prevail on the merits." *L-3 Commc'ns Integrated Sys.*, 91 Fed. Cl. at 355. Additionally, a protestor is "entitled to investigate bias" through discovery—including document requests, interrogatories, and depositions—and to supplement the AR where the protestor has made a "credible allegation" that the decision-makers had a motivation to act in bad faith, or whose conduct otherwise is "hard to explain absent bad faith." *Starry Assocs., Inc. v. United States*, 125 Fed. Cl. 613, 622–23 (2015); *L-3 Commc'ns Integrated Sys.*, 91 Fed. Cl. at 355. A party seeking

discovery need only demonstrate that the requested discovery "*could* lead to evidence which would provide the level of proof required to overcome the presumption of regularity and good faith," and "may rely on extra-record evidence" to support its request. *Beta Analytics Int'l*, 61 Fed. Cl. at 226 (emphasis added).

## ARGUMENT

The need to supplement the AR in this case is clear. AWS's allegations of bad faith and bias are more than "sufficiently well grounded" to warrant supplementation: they are based on public statements that establish the President's unequivocal bias against AWS and show how the President took affirmative steps to instruct his subordinates—in both private and public fora—to interfere with DoD's procurement decision. The allegations also establish how those instructions manifested in an award of the JEDI Contract to an objectively inferior competitor. The limited documentation in the AR (even though the AR is deficient) serves to bolster what the public record alluded to: that the Source Selection Team was influenced by the President's bias, which was communicated through the chain of command during a series of meetings that took place during the crucial final proposal evaluation stage of the procurement.

But the public record and AR are not sufficient and cannot fully explain DoD's pervasive and compounding evaluation errors, nor its shift toward Microsoft and against AWS during the eleventh hour of the evaluation period. Indeed, because courts have recognized that evidence relating to bias and bad faith are unlikely to be included in the Government's AR (*see supra*, p. 15 n.10), AWS must be given "an opportunity to prove [its] allegations" through supplementation. *L-3 Commc'ns Integrated Sys.*, 91 Fed. Cl. at 354. Moreover, in light of AWS's credible allegations of bias and bad faith, AWS is "entitled to investigate [this] bias" through targeted discovery that will permit the full and fair adjudication of these claims. *Starry Assocs.*, 125 Fed. Cl. at 622.

A.     **AWS Has Made Well-Grounded Allegations of Bias and Bad Faith that Require Supplementation of the Administrative Record**

As an initial matter, the evidence of President Trump's animosity towards AWS—including in connection with the JEDI procurement process—is alone sufficient to warrant supplementation of the AR. At this preliminary stage, to supplement the AR, AWS need not "establish clear and convincing evidence of bad faith or bias to prevail on the merits." *L-3 Commc'ns Integrated Sys.*, 91 Fed. Cl. at 355. Rather, a "lesser showing suffices—that the allegations appear to be sufficiently well grounded" and supported by a "reasonable factual predicate." *Id.* (internal quotation marks omitted). AWS's allegations—including regarding the specific, incontrovertible public examples of the Commander in Chief's bias and efforts to influence DoD's JEDI award—are well-grounded examples of bias at the very highest levels of authority within the Government and provide a strong factual predicate for AWS's claims.

But the bias did not end with President Trump, and AWS's allegations further provide a more-than-reasonable factual predicate for how his bias ultimately affected the officials charged with carrying out the procurement decision. The existing AR supports AWS's allegations of bias and how that bias infected the procurement—for example, it links the "who" (Secretary Esper and ███████ the sole member of the SSEB), the "what" (discussions concerning the JEDI procurement), the "where" (in a series of meetings at the Pentagon), the "when" (following President Trump's July 2019 directive that Secretary Esper review the JEDI acquisition based on his anti-Amazon bias), and the "why" (the last minute erroneous evaluation determinations by the SSEB and SSAC can only be explained by the relaying of President Trump's directive to *not* award the contract to AWS). "The presumption that government officials act in good faith … is rebuttable and not automatically accepted." *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 244–45 (2016). To overcome this presumption, a protestor simply must allege facts establishing

"a motivation for the Government employee in question to have acted in bad faith," or otherwise show "conduct that is hard to explain absent bad faith." *Beta Analytics Int'l*, 61 Fed. Cl. at 226. Here, AWS's well-grounded allegations and the information gleaned from the existing AR do both.

### 1. *The President's Overt Bias Infected DoD Officials' Decisions and Motivated Them to Act in Bad Faith.*

Although AWS is not yet privy to all the specific internal maneuverings that took place within DoD regarding the JEDI award, AWS has made specific and concrete allegations that demonstrate the President's deep bias against Amazon. These include allegations about how the President affected the senior political appointees overseeing DoD and its procurement functions and how he pressured DoD decision-makers at all levels to award the JEDI Contract to a competitor whose proposal was inferior to AWS's proposal on the majority of the evaluation factors—all of which show how DoD's award did not present the best value to the Government. *See BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 694 (2012) ("A tradeoff analysis based on significantly flawed evaluation ratings is itself irrational.").

Courts have recognized that motivation to act in bad faith exists where a superior "exert[s] influence to guide the award," such as by "ma[king] known [a] preference for one offeror." *Starry Assocs.*, 125 Fed. Cl. at 616, 623; *see also* 48 C.F.R. § 3.401 (defining "improper influence" in context of contingent fees as "*any* influence that induces or *tends to induce* a Government employee or officer to give consideration or to act regarding a Government contract on any basis other than the merits of the matter" (emphasis added)). For example, one federal court found improper influence when civilian decision-makers were "made to know that a favorable decision would be pleasing, and an unfavorable decision displeasing, to persons in very high governmental brackets." *Jarrott v. Scrivener*, 225 F. Supp. 827, 834 (D.D.C 1964). As that court aptly explained: where "officials possess vast power to bestow or not to bestow benefits of various kinds upon

subordinate employees," "the pressures were nevertheless real"—even if "[t]he pressures were not crudely or indelicately exerted," "[t]here was no threat or command," and "[t]here was no promise of reward." *Id.*

President Trump's open bias against Amazon is a textbook example of such improper influence. As recounted above and further in AWS's Complaint, President Trump wields vast power over DoD and its employees, and his overt and public outbursts against Mr. Bezos and Amazon "made known" to all—including DoD officials and decision-makers in the SSA, SSAC, and SSEB—"his preference" that AWS not secure the JEDI Contract. *Starry Assocs.*, 125 Fed. Cl. at 623. In these circumstances, even absent a specific "threat" or "promise of reward," such pressures are "nevertheless real." *Jarrott*, 225 F. Supp. at 834.

Moreover, President Trump exerted his influence by overtly intervening in DoD's procurement functions on multiple occasions. In the summer of 2018, he ordered his then-Secretary of Defense Jim Mattis to "screw Amazon" out of the JEDI Contract. Compl. ¶¶ 19, 91; APP 069. Unable to convince Secretary Mattis to do his bidding, President Trump replaced Secretary Mattis just months later with Mark Esper, and declared during a July 2019 press conference that he "w[ould] be asking [DoD] to look at [the JEDI Contract] very closely" because of "tremendous complaints about the contract with the Pentagon and with Amazon." Compl. ¶¶ 20, 95; APP 059. The President later retweeted a news video decrying the JEDI Contract as the "Bezos Bailout," Compl. ¶ 97; APP 062; APP 200, and his son, Donald Trump, Jr., suddenly began calling Mr. Bezos "No Bid Bezos" on Twitter, Compl. ¶ 96; APP 079. These public instructions to Secretary Esper were likely repeated in off-the-record instructions, which could have occurred

at any one of the many meetings between President Trump and Secretary Esper in the summer and early fall of 2019.[11]

The President's statements were not lost on Secretary Esper. His abrupt August 1, 2019 decision—consistent with President Trump's instruction to "look … very closely" into the JEDI procurement—to reverse course and delay the award decision so that he could take a "hard look" at the JEDI award process also is compelling evidence that President Trump's bias actually and irrevocably tainted the procurement process. *See, e.g., L-3 Commc'ns Integrated Sys.*, 91 Fed. Cl. at 356 (holding that an unexplained "change[] [in] ratings" to affect a "selection decision" gives rise to a "sufficiently well grounded" allegation of bias warranting supplementation); *see also Connecticut v. Dep't of Interior*, 363 F. Supp. 3d 45, 64–65 (D.D.C. 2019) (acknowledging that a "sudden[] revers[al of] course creates the plausible inference that political pressure may have caused the agency to take action it was not otherwise planning to take"); *ATX*, 41 F.3d at 1529 ("If the decision maker were suddenly to reverse course or reach a weakly-supported determination … we might infer that pressure did influence the final decision.").

Secretary Esper has since confirmed his unwavering commitment to carrying out the President's preferences, stating his belief that "the president is the commander in chief" who has "every right, authority and privilege to do what he wants to do," and that he "absolutely" follows the President's instructions. APP 474–75. The inference is clear—Secretary Esper followed

---

[11] *See, e.g.*, APP 211–16 (identifying meetings occurring between President Trump and Secretary Esper on July 23, July 25, August 1, September 3, September 13, and October 1, 2019); APP 204 (reporting on meeting between Secretary Esper and President Trump in June 2019); APP 499 (reporting on previously undisclosed meeting between Secretary Esper, President Trump, and others); APP 229 (Secretary Esper October 8, 2019 tweet: "Thank you @POTUS & @FLOTUS for hosting me & @DeptofDefense leadership for dinner yesterday at the @WhiteHouse").

President Trump's clear directives by intervening at the eleventh hour to halt the award when it appeared imminent that AWS was likely to win the JEDI Contract. Indeed, this Court has previously recognized that a credible allegation of bad faith arises when an "official step[s] in to cancel a solicitation" when it appears the company the official favored would not win the award. *Starry Assocs.*, 125 Fed. Cl. at 623.

The AR provides additional—but insufficient—detail on some of the opportunities Secretary Esper had to ensure that his orders from President Trump were carried out by the procurement officials charged with evaluating Microsoft's and AWS's proposals. In a series of meetings between when the President ordered Secretary Esper to "review" the acquisition in late July 2019, through the crucial period involving evaluation of the offerors' final proposals in late September 2019, Secretary Esper met on at least three occasions with███████, the sole member of the SSEB—the part of the Source Selection Team responsible for "summariz[ing] the findings of" the Technical Evaluation Boards and interfacing between the evaluation boards and the SSAC and the SSA. AR Tab 305 at 64345.

DoD's subsequent announcement of Secretary Esper's recusal from the JEDI procurement process on October 22, 2019—ostensibly based on his adult son's employment with IBM, a former offeror that was no longer in the running for the award—only confirms the strong likelihood that bias and bad faith marred the procurement process. Indeed, it was Secretary Esper himself who ordered a delay in the JEDI award process in August 2019 so that he could take a "hard look" at it—and then, only *after* he had already influenced the process did he recuse himself. *See* Compl. ¶¶ 30, 187; APP 083; APP 110. The AR reveals that Secretary Esper recused himself starting on October 7—one week after ███████ (with whom he had met on at least four separate occasions)

briefed the SSAC, and four days after the SSAC recommended award of the contract to Microsoft. *See* AR Tabs 456, 457, 458.

DoD's post hoc explanation that "[b]efore the review progressed to a discussion about the way forward, the Secretary determined that, though not legally required, he would recuse himself from that decision[-]making process," raises further concerns about the impropriety of the decision -making process, where the "way forward" had already been determined by the time of the Secretary's recusal. APP 187. And it remains highly unusual that DoD waited more than two weeks to announce the recusal—especially because DoD had already made its formal award decision when the SSA signed the SSDD on October 17, and its public announcement of the award was imminent. Additionally, DoD's official announcement on October 22 regarding the recusal stating that the "JEDI procurement will continue to move to selection through the normal acquisition process," APP 110, is at best misleading, given that DoD had already internally made its award decision five days earlier. The timing, circumstances, and announcement of Secretary Esper's recusal raise more questions than they answer, and strongly suggest pretextual efforts by DoD to attempt to cleanse the award process of taint.

President Trump's bias did not end with the high-level DoD officials that he appointed. The actual evaluators and decision-makers at DoD—the SSA, SSAC, SSEB, PEB, SBEB, and TEB—could not have missed the unmistakable public instructions from their Commander in Chief to not award the JEDI Contract to AWS. *See Jarrott*, 225 F. Supp. at 834 (decision-makers "could not fail to be aware that they would incur administrative displeasure if they" made a decision considered "unfavorabl[e]" by those in the high governmental brackets). Even though DoD has claimed that these individuals were "anonymized," "segregated," and "compartmentalized," these assurances are in fact no assurance at all—the President's directives and biases were broadcast to

the entire nation, including to everyone within DoD, through his official presidential statements on Twitter, his preferred platform for pronouncing policy. Moreover, the assurances were false, as the SSEB Chairperson, ▇▇▇▇, participated in meetings with the Secretary of Defense during the same time period ▇▇▇▇ was responsible for evaluating AWS's and Microsoft's proposals. Thus, even if President Trump and his senior DoD appointees did not know the identities of the individuals tasked with evaluating the JEDI proposals (as DoD has claimed), there is no question that the Commander in Chief's "preference for one offeror" was known to all, and that this message—and pressure—was exerted on decision-makers who then acted in accordance with that message. *See Starry Assocs.*, 125 Fed. Cl. at 623.

This Court has ordered extra-record supplementation in the face of far less egregious allegations of bad faith. For example, in *Starry Associates*, this Court granted supplementation where the bidder had alleged that a supervisor who was not involved in the procurement "had a hand" in selecting the officials overseeing the procurement and "stepped in" to prevent the award. 125 Fed. Cl. at 622–23. So too here. President Trump "had a hand" in selecting the leadership overseeing the JEDI procurement process, such as Secretary Esper and DoD CIO Dana Deasy. And President Trump repeatedly "stepped in" with clear statements meant to interfere with DoD's procurement functions, including his command to his Secretary of Defense to "screw Amazon," APP 069, his admission that he was "looking very seriously" into the award, APP 059, and his request for DoD "to look at [the award] very closely" because of "tremendous complaints about the contract with the Pentagon and with Amazon," *id.* AWS has more than sufficiently demonstrated a well-grounded basis to supplement the record. *See Beta Analytics Int'l*, 61 Fed. Cl. at 226.

### 2.    *DoD's Award Decision Cannot Be Explained Absent Bad Faith.*

Even if there were any doubt as to how bias and bad faith infected DoD's procurement process, the numerous significant and obvious errors in DoD's evaluation process are further indicative of bad faith, as these errors cannot be squared with a reasoned and lawful decision-making process. Taint manifests itself in various forms, but one obvious way is through shoddy analysis calculated to reach a predetermined outcome. DOD's evaluation is replete with these kinds of errors, which pervaded nearly all of DoD's evaluation factors, including but not limited to the following:

**Factor 2 (Logical Isolation and Secure Data Transfer).** Factor 2 required DoD to evaluate the offerors' proposed approaches to logical isolation and secure data transfer, and was afforded the most weight under the RFP evaluation criteria. The TEB



AR Tab 323 at 151129. The SSEB

AR Tab 456 at 176369. Because both offerors were ████ on the secure data transfer component, the SSEB concluded that ████

*Id.* However, the SSAC ████

concluded the offerors' solutions for Factor 2 were equally valued, both downplaying the benefits of ████ (

) and erroneously concluding ████ AR Tab 457 at 176400–01. The SSAC's reasoning on both issues was flatly wrong from a technical perspective, ignored the stated RFP requirements, and invented issues out of whole cloth. The SSA adopted SSAC's explanations without analysis. AR Tab 459 at 176416.

**Factor 3 (Tactical Edge).** Factor 3 required DoD to evaluate the portability and capability of the offerors' tactical edge devices (*i.e.*, devices designed to be used in environments with limited connectivity and storage availability). In deciding that neither proposal was superior, DoD incorrectly stated AWS had ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ *See* AR Tab 324 at 151166. *See also* Compl. ¶¶ 2, 53–55, 122–31.

███████████████ ██████████████████████████████████████████

████████████████████████████████████████████████████. AR Tab 324 at

151175–76; AR Tab 330 at 151290. DoD also improperly assessed ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ AR Tab 324 at 151169, 151171; AR

Tab 330 at 151278–84.

**Factor 5 (Application and Data Hosting and Portability).** Factor 5 required DoD to consider the offerors' approaches to application and data portability. In finding that Microsoft's proposal was technically superior to AWS's proposal, the SSAC and SSA irrationally concluded for the first time in October 2019—contrary to the earlier findings of the TEB—████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ *Compare* AR

Tab 457 at 176402–03, AR Tab 459 at 176416 (SSAC and SSA erroneously concluding that ██

████████████████████████████████████████████████████████████

██████ "), *with* AR Tab 309 at 67032 (████████████████████████████████████

██████████████████████ ). Additionally, starting in August 2019, the evaluators began to

inexplicably omit from their reports previously assessed strengths regarding AWS's █████ ███████████████████████████████████████████. *See* Compl. ¶¶ 7, 59–62, 140–52; *see also* AR Tab 212 at 58033, 58035.

**Factor 6 (Information Security and Access Controls).** Factor 6 required DoD to evaluate the offerors' program management approach, including whether they could offer unclassified services in three physical data centers. By relying on a prior and long superseded version of AWS's proposal, DoD incorrectly concluded AWS ██████████████████████ ████████████████████████████████. *See* AR Tab 327 at 151216 (TEB concluding ███████████████████████████████████████████ ███████████████████████████████████████████ *See* Compl. ¶¶ 3, 63–64, 153–67; *see also* AR Tab 367 at 152595. Additionally, in August 2019, the TEB dramatically upgraded its rating of Microsoft's proposal from ███████████ ████████████ █████ ███████████ *See* AR Tab 456 at 176391–92; AR Tab 196 at 53811–82, 54018, 54469, 54472 (████████████████████████████████). ███████████████ ███████████████████████████████████████████ ███████████████████████████████████

**Factor 8 (Demonstration).** Factor 8 required Microsoft to pass four live demonstration tests. ██████████████████ ████████████████████ ██ ███████████████████████████████████████████ ████████ One of the tests required Microsoft to demonstrate its ability to scale servers automatically—that is, to increase or decrease the number of servers available in response to the changing volume of requests being generated by the tests. █████████████████████████

27

██████████████████████████████████████████ ████████████████████████



*     *     *     *     *

These numerous and compounding errors (among many others) created a false parity with Microsoft's technical capabilities, despite AWS's objectively superior technology and proposal. There is simply no plausible explanation—other than bad faith and bias—for botching a procurement of this magnitude and importance. Before and after the JEDI award announcement, countless industry observers voiced concern that the award decision was impermissibly tainted by President Trump's influence.[12] And as set forth above, members of Congress echoed the same concerns throughout the procurement process. *See supra*, pp. 10–11 & n.7. Effective judicial review requires a complete record of that bad faith.

**B.**   **The Court Should Supplement the Administrative Record with AWS's Evidence Relating to Bias and Bad Faith**

Supplementation is necessary for effective judicial review in this case because evidence of President Trump's bias and its effect on DoD officials necessarily would not be—and in fact is not—contained within DoD's record of the procurement. The materials AWS seeks to add to the AR are directly relevant to the allegations of bias and bad faith and necessary to the Court's

---

[12] *See, e.g.*, APP 205 (noting that President Trump's "involvement would be an unusual Oval Office intervention"); APP 224 (reporting that President Trump's "intervention in a contract is considered to be rare, bringing a political taint to a contest that by law should be decided based on technical merits and price alone").

independent determination of how these improper influences affected the JEDI procurement process. Specifically, AWS requests supplementation for the following categories of materials:

- **President Trump's Tweets and Other Statements About Amazon, Mr. Bezos, and the Washington Post (APP 001–072).** These materials contain the direct statements made by President Trump, the Commander in Chief of the Armed Forces, and are therefore highly probative to show the origins of, motivation for, and existence of bias. These statements include a directive President Trump gave to his then-Secretary of Defense Mattis to "screw Amazon," APP 069; President Trump's tweets calling Mr. Bezos, Amazon, and the *Washington Post* "the true Enemy of the People!," "Jeff Bozo," and the "Amazon no-tax monopoly," APP 055; APP 052; APP 011; and statements that Amazon would "have problems" if he "bec[a]me president," APP 005, that he "can't let [Mr. Bezos] get away" with using "political power against [him]," APP 026, and that he would be looking "very seriously" into the JEDI Contract award process following receipt of complaints from competitors about AWS, APP 059. These unfiltered statements—straight from the Commander in Chief himself, who has a penchant for making policy via Twitter (*see supra* p. 9 n.5)—are critically important to understanding the bias that permeated the procurement process from the top of the chain of command.

- **Statements from Persons Affiliated with President Trump and DoD Officials Regarding the JEDI Contract (APP 073–188).** In addition to President Trump's own statements, there are other statements made by persons affiliated with President Trump, as well as other high-level senior DoD officials, that show the effect of President Trump's animus against Amazon on the procurement. These statements include Secretary Esper's August 2019 statements that he would be taking a "hard look" at the JEDI procurement because of what he had "heard from folks in the administration," APP 083, and "from people from the White House," APP 101, as well as Donald Trump, Jr.'s tweets that the "corrupt #BezosBailout is in trouble," APP 106, and that "the shady and potentially corrupt practices from @amazon and No Bid Bezos may come back to bite them," APP 079. As with President Trump's own statements, these statements reflect the President's influence and corroborate the view that his personal animus towards Amazon tainted decision-makers within DoD.

- **Materials Relating to the JEDI Contract that President Trump, His Affiliates, and DoD Officials Saw (APP 189–202).** The AR should also be supplemented with materials that President Trump and others within his Administration reviewed relating to the JEDI Contract, which are relevant to understanding the sources of the bias and bad faith, as well as the motivations of the President another decision-makers. For instance, the AR should be supplemented with the March 2018 *New York Post* advertisement, addressed to President Trump, which read: "President Trump: Your Defense Department is set to award a no-bid, ten-year contract for all its IT infrastructure to Administration-enemy Jeff Bezos' Amazon," APP 194, as well as a *Fox News* video segment, retweeted by President Trump, deriding the JEDI Contract as the "Bezos Bailout," APP 062; APP 200. Furthermore, there are multiple letters from members of Congress, sent to senior DoD officials, that raise various concerns regarding the JEDI procurement process, thereby further corroborating

the well-founded allegations of impropriety in DoD's selection decision. *See, e.g.,* APP 195; APP 197; APP 199; APP 201.

- *Other Materials Illustrating the Fact and the Effect of President Trump's Bias and Influence Within DoD and on the JEDI Award Decision* **(APP 203–229).** As described above, there are additional materials—including statements made by DoD officials and spokespersons (*e.g.,* APP 217)—that directly bear on, and are evidence of, the facts surrounding the bias and undue influence described in AWS's Complaint. These documents also contain materials evidencing the multiple private meetings that took place between President Trump and Secretary Esper (*e.g.,* APP 211–16), which demonstrate a further avenue through which the President's bias was communicated to DoD at the highest levels of authority.

- *Materials Illustrating the Fact and the Effect of President Trump's Bias and Influence Throughout the Government and Administration* **(APP 230–507).** The AR should be supplemented with materials evidencing that President Trump's intervention in the JEDI procurement is part of a larger pattern of behavior demonstrating his willingness to abuse his position for personal gain. As explained above, President Trump's previous interferences in governmental processes involving perceived political enemies (the First Amendment and antitrust cases involving CNN) and perceived political supporters (the Navy SEAL) demonstrate that governmental decision-makers consider presidential pressure in the execution of their duties, which is directly relevant to whether and to what extent the DoD procurement officials charged with the evaluation and award of JEDI responded to similar presidential pressure. *See supra,* pp. 3–7 (citing materials).

These materials are necessary for the Court's assessment of AWS's claims of bias and bad faith, which must consider "*all* circumstances surrounding the procurement." *Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1332 (Fed. Cir. 2004) (internal quotation marks omitted).[13]

The Court should accordingly supplement the AR to reflect these materials.

---

[13] AWS need not establish, at this stage, all the bases for the admissibility of these materials. Rather, "[a]ny oral or documentary evidence may be received" into the AR as long as they are "relevant, material, and unrepetitious." *L-3 Commc'ns Integrated Sys.,* 91 Fed. Cl. at 356; *see also Veg-Mix, Inc. v. Dep't of Agriculture,* 832 F.2d 601, 606 (D.C. Cir. 1987) (same); *see also New Dynamics Found. v. United States,* 70 Fed. Cl. 782, 796–98 (2006) (permitting supplementation of administrative record with hearsay and non-authenticated documents). In any event, the Government cannot seriously dispute the authenticity of these materials—many of which are online, publicly accessible, and self-authenticating under the Federal Rules of Evidence (including, for example, as party-opponent admissions, official publications, and judicially noticeable facts), or which DoD actually relied on in reaching its decision. To the

C.     **The Court Should Grant AWS Leave to Supplement the Administrative Record with Targeted Discovery Regarding AWS's Bias and Undue Influence Claims**

The publicly available documents speak for themselves and constitute credible and concrete evidence of bias and bad faith. AWS's allegations are more than sufficient to meet the legal thresholds to overcome the presumption of good faith and to obtain discovery. *See supra,* pp. 18–28. But it would be naïve to believe that what has been curated by the Government for public consumption, or the particular anti-Amazon sentiments President Trump happened to tweet, are sufficient to paint a full picture of the bias and undue influence that affected the JEDI procurement, or that such information represents the full extent of the President's communications to DoD regarding the JEDI Contract. Similarly, the existing AR is insufficient to demonstrate what transpired between Secretary Esper and the SSEB Chairperson, ▮▮▮▮ during several briefings, as well as the extent to which ▮▮▮▮ discussions with Secretary Esper may have impacted the drafting of the SSEB Report or his briefing of the SSAC, or otherwise affected the SSAC's recommendation to the SSA and the SSA's ultimate best value determination. Thus, to effectively review AWS's allegations of bias and bad faith, this Court must know "what actually transpired" within DoD as a result of the President's interference, lest an incomplete AR "perpetuate error and impede and frustrate effective judicial review." *AshBritt, Inc. v. United States,* 87 Fed. Cl. 344, 366 (2009); *see also Int'l Res. Recovery,* 61 Fed. Cl. at 41–42 (bid protests involving "[a]llegations of bias, prejudice and bad faith" "are not amenable to record review," since these allegations "necessarily cannot be subsumed within the record of a challenged award decision" (internal quotation marks omitted)).

---

extent the Government contends there are specific materials in the Appendix that must be admissible to be eligible for supplementation, the Court should grant AWS leave to take discovery to establish a foundation for the admissibility of the facts contained therein.

Indeed, some of the clearest evidence of bias and bad faith to date—like President Trump's statement to Secretary Mattis to "screw Amazon" out of the JEDI Contract, or his asking advisors "how can I f\*\*k with [Mr. Bezos]"—occurred behind closed doors, hidden from public view. *See* APP 019; APP 069. That these incidents happened to surface in the public record through reporting only underscores the significant likelihood there is additional evidence and testimony directly bearing on issues of bias and bad faith that will only be uncovered through discovery. And the limited information in the AR prompts more questions than it answers. For example, the "read ahead" documentation for the July 29, 2019, meeting attended by both ▮▮▮▮ and Secretary Esper included an "assumption" that DoD will "[h]ave to compete with a narrative on undue pressure from third party entities." AR Tab 335 at 151364. Discovery is necessary to determine, *inter alia*, whether this reference to "undue pressure" relates (as it appears) to President Trump's public campaign against AWS and the efforts of Amazon's competitors to influence the President to wield his power to ensure that AWS did not receive the JEDI Contract.

To that end, AWS respectfully seeks targeted discovery to ensure that it has the opportunity to uncover the facts necessary for this Court to conduct effective judicial review over AWS's claims of bias and bad faith. In particular, AWS seeks leave to serve three narrow categories of discovery at this time, which are highly probative of AWS's allegations of bad faith and bias, proportional to the needs of this case, and consistent with discovery that this Court has permitted in other protests involving similar allegations.[14] Far from being speculative, AWS's discovery

---

[14] *See, e.g., Starry Assocs.*, 125 Fed. Cl. at 624 (granting supplementation through depositions in light of "credible allegations of bias and spotty explanations of agency conduct"); *Pitney Bowes Gov't Sols.*, 93 Fed. Cl. at 334 (allowing supplementation through depositions where plaintiff had made "'sufficiently well grounded'" allegations of bias); *J.C.N. Constr. Co. v. United States*, 60 Fed. Cl. 400, 404 n.8 (2004) (allowing depositions to explore allegations of

requests are targeted to elicit evidence relating to the core issues of bias and bad faith, and how that bias and bad faith was propagated throughout DoD to result in an unsupportable award decision—evidence that will be crucial if AWS is to have an "opportunity to prove [its] allegations," as is its right. *L-3 Commc'ns Integrated Sys.*, 91 Fed. Cl. at 354. Additionally, the need for discovery is heightened given the JEDI Cloud Source Selection Plan's instruction to "shred or place all working papers/rough drafts not required for retention … in a burn bag for immediate destruction" "[p]rior to award," AR Tab 114 at 6731, which strongly suggests there is additional, relevant information about the procurement process that is not reflected in the documentary evidence, and which will only be uncovered through targeted depositions and interrogatories.

1.   *Depositions* (Exhibit A)[15]

AWS seeks leave to notice the depositions of seven individuals who were instrumental in the JEDI source selection and played pivotal roles in the ultimate JEDI Contract award.  The specific areas of inquiry for each proposed deposition are described in greater detail below:

- *President Donald J. Trump.* President Trump has well-documented personal animus towards Mr. Bezos, Amazon, and the *Washington Post*.  He specifically instructed then-Secretary Mattis to "screw Amazon" out of the JEDI Contract, and he has made other public and private statements reflecting his desire that AWS not be awarded the contract. President Trump has unique knowledge about his involvement in the bid process, including private conversations with and instructions to others about the process and the award. While other individuals can testify about specific conversations he had with them

bias); *Palantir*, 129 Fed. Cl. at 240 (allowing document discovery and depositions to facilitate effective review of allegations of bias and bad faith); *Inforeliance Corp. v. United States*, 118 Fed. Cl. 744, 749–50 (2014) (permitting discovery to investigate allegations of bias and bad faith so that "the merits of [plaintiff's] claim may be tested on a complete record").

[15]  To the extent DoD is unable or unwilling to accept AWS's Notice of Depositions to ensure the appearance of these individuals for deposition, AWS seeks leave to serve, pursuant to Rule 30 of the Rules of the United States Court of Federal Claims, subpoenas that are consistent with the attached proposed deposition notices.

individually, President Trump is the only individual who can testify about the totality of his conversations and the overall message he conveyed. Moreover, President Trump has unique knowledge about whether he had other, previously undisclosed conversations with individuals not previously identified, and who therefore do not appear on the deposition list.   AWS seeks leave to depose President Trump about conversations or other involvement he had regarding the JEDI bid process or efforts to harm Amazon or AWS.[16]

- *Former Secretary of Defense James Mattis.*  Secretary Mattis has highly relevant, first-hand knowledge about President Trump's animus towards Mr. Bezos and Amazon, and the efforts President Trump took to pressure DoD officials—including Secretary Mattis himself—into altering the JEDI award decision.  Additionally, because Secretary Mattis served as Secretary of Defense during the inception of the JEDI project and solicitation, he has knowledge about the drafting and launch of the JEDI Contract solicitation process, and internal DoD discussions regarding AWS and other competitors. AWS seeks leave to depose Secretary Mattis about conversations or other involvement he had regarding the JEDI bid process or presidential efforts to influence the procurement.

- *Secretary of Defense Mark Esper.*  Secretary Esper's public statements indicate that he had been involved in discussions with President Trump, other White House officials, and politicians regarding the JEDI procurement process.  Additionally, Secretary Esper was the individual who intervened in the JEDI award process so that he could conduct an "examination" at President Trump's behest, and AWS has identified several facts surrounding the unusual timing of his recusal in October 2019. AWS seeks leave to depose Secretary Esper about the facts regarding his involvement in the review of the JEDI procurement process, his interactions with President Trump and other White House officials, his interactions with members of the Source Selection Team, and the circumstances surrounding his decision to recuse himself from the JEDI source selection process.

- *DoD Chief Information Officer Dana Deasy.*  Mr. Deasy, as DoD CIO, has indicated that he has intimate knowledge about the JEDI Contract and procurement process, both from a technical and procedural perspective, including the supposed measures that DoD took to insulate the decision-makers from outside influence.   AWS seeks leave to depose Mr. Deasy about his involvement in the JEDI procurement process, the steps that DoD took to ensure a lawful and unbiased procurement decision, and his interactions with President Trump, who had nominated Mr. Deasy to his position in June 2019.

---

[16] AWS acknowledges that there are sensitivities with deposing President Trump. While it is clear that a President can be subject to judicial process while in office, *see Clinton v. Jones*, 520 U.S. 681, 694–95, 703–06 (1997), AWS will work with the Court and the Department of Justice to develop appropriate protocols and safeguards, including to evaluate alternative methods, to ensure that the testimony is procured in a manner sensitive to the unique position of the Executive Office of the President.

- *Source Selection Authority,* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ as the SSA, executed the October 17, 2019 Source Selection Decision Document, which awarded the JEDI Contract to Microsoft. As the person charged with selecting Microsoft as the awardee of the JEDI Contract, and who drafted the Source Selection Decision Document, ▓▓▓▓▓▓▓ has singular knowledge of the circumstances of the final award decision to Microsoft. Given that the Source Selection Decision Document would obviously not include any facts or statements about bias, bad faith, or undue influence, AWS seeks leave to depose ▓▓▓▓▓▓▓▓ regarding the circumstances surrounding her decision to award the JEDI Contract to Microsoft, including any additional factors that influenced the process that are not discussed in the Source Selection Decision Document.

- *Chairpersons of the Source Selection Advisory Council and Source Selection Evaluation Board.* The chairpersons of the SSAC and SSEB, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ have unique insight into the evaluation and analyses of the JEDI proposals, which the SSA considered in reaching its decision. Depositions of these individuals will clarify the recommendations the SSAC and SSEB gave to the SSA pertaining to the AWS and Microsoft proposals, and illuminate how bias and bad faith influenced the evaluators' analyses and final decision. Additionally, AWS seeks leave to depose these chairpersons about how President Trump's biased statements against AWS may have affected or influenced their decision-making, and the extent to which discussions with senior DoD officials relayed President Trump's directives.

### 2. *Interrogatories* (Exhibit B)

In addition to depositions, supplementation of the record would be facilitated through nine targeted interrogatories, which will ensure AWS has a written explanation from DoD for some of the most troubling aspects of the JEDI procurement process, which give rise to AWS's allegations of bad faith and bias. As noted above, AWS had requested such written responses from DoD through its written debriefing questions, which AWS submitted pursuant to 10 U.S.C. § 2305(b)(5). *See supra*, p. 14. DoD has refused to provide any substantive response to these questions, making court-ordered discovery all the more appropriate. Requiring DoD to provide written responses now will aid the parties and the Court in narrowing the issues, ensuring the record is adequately developed with respect to the key factual issues, and thus facilitate an efficient and effective adjudication of AWS's bias and bad faith claims. AWS accordingly seeks leave to propound the following nine interrogatories:

- ***Interrogatories 1, 2, and 3.*** Interrogatories 1, 2, and 3 request targeted responses regarding Secretary Esper's participation and recusal in the JEDI source selection process. Secretary Esper's admission that he had ordered an examination of the JEDI award based on discussions with the White House—coupled with President Trump's statement that he was "very closely looking" into the JEDI award—confirm Secretary Esper's central role in injecting President Trump's bias against AWS into DoD's decision-making process. His meetings with a member of the Source Selection Team during final proposal evaluations demonstrate the opportunities for him to communicate that bias and directive to those most deeply involved in the source selection decision.

- ***Interrogatory 4.*** Interrogatory 4 asks for information regarding the selection and composition of the TEB, PEB, SSEB, SSAC, and SSA, who are the individuals charged with evaluating proposals and selecting the awardee of the JEDI Contract. Given the amount of discretion that they wielded over the evaluations and award decision, it is critically important that AWS understand how the members of the SST were selected (and any potential ways in which their appointment was influenced by pressure from President Trump and/or senior DoD officials).

- ***Interrogatory 5 and 6.*** Interrogatories 5 and 6 ask DoD to identify facts regarding the SSA's award of the JEDI Contract, including whether and why the SSA modified the recommendations of the SSAC and/or SSEB, and any relevant facts occurring between when the SSA executed the Source Selection Decision Document and when DoD publicly announced the award decision. Because AWS's claims focus on how bias and bad faith had an undue influence on the evaluations, recommendations, and award decision of evaluators and decision-makers, understanding how these individuals reached their conclusions are critical factual issues that merit discovery.

- ***Interrogatories 7, 8, and 9.*** Interrogatories 7, 8, and 9 seek facts that directly bear on AWS's claims of bias and bad faith. Interrogatories 7 and 8 relate to the mechanisms of interactions between DoD and President Trump, which will reflect how President Trump's bias was propagated throughout DoD. And Interrogatory 9 is tailored to elicit specific interactions between DoD and other JEDI solicitation offerors that relate to Mr. Bezos, Amazon, AWS, and President Trump, which will develop evidence of the ways in which AWS's competitors—like Oracle—leveraged President Trump's known bias against Amazon to influence the decision-making process.

### 3.   *Requests for Production* (Exhibit C)

Finally, the Court's adjudication of AWS's bias and bad faith claims requires supplementation of the AR through targeted requests for production that are calculated to yield documents relating to the key issues regarding bias and bad faith. In addition to requesting documents directly concerning the bias and bad faith that was prevalent at the highest levels of the

Administration, these requests focus on uncovering specific evidence about how DoD decision-makers' assessment of AWS and other proposals changed over time in response to external pressures from their leadership, including the President.

Because it is neither reasonable nor logical to expect DoD to have included such documents in the AR (and it did not) (*see supra*, p. 15 n.10), and because such documents are non-public and created, used, and circulated only within DoD (and thus inaccessible to AWS), the only way that these materials may be surfaced and considered by the Court is through document production. Specifically, AWS seeks leave to propound the following ten requests for production on the topics listed below.[17]

- *Requests 1 and 2.* Requests 1 and 2 seek critically important documents to understand how bias and bad faith influenced the DoD's evaluation and decision-making procurement functions. In particular, production of interim drafts and working documents (which the Government was required to, but did not, provide in the AR) will reveal the candid, contemporaneous opinions of decision-makers regarding AWS's and Microsoft's offerings and demonstrations, and show how those assessments evolved over time in response to outside pressures and influences. To the extent such opinions contrast from DoD's final decision reports, these differences directly demonstrate how bias and bad faith altered the opinions of those directly evaluating the proposals.

- *Requests 3 and 4.* Requests 3 and 4 seek documents bearing on how external bias and pressure affected the SSA, SSAC, and SSEB. In particular, Request 3 seeks all external communications that members of the SSA, SSAC, and SSEB had regarding the JEDI Contract. By seeking external-facing communications, this request is tailored to identify the sources of external pressure that may have affected the SSA, SSAC, and SSEB's internal deliberations. Request 4 seeks communications involving SSA, SSAC, and SSEB members that discuss President Trump. These documents will be relevant because they

---

[17] AWS drafted its proposed requests to specifically target evidence of bias and bad faith, to minimize any burden and disruption to DoD, and to ensure that these proceedings can be completed in as expeditious a manner as possible. *Cf. Starry Assocs.*, 125 Fed. Cl. at 623 (acknowledging that discovery may be "necessary for the court to resolve the issues presented" regarding "allegations of bias and unexplained agency action"). AWS is willing to work with DoD on ways to accomplish those objectives, including, for example, stipulating to a set of custodians and search terms to ensure DoD can respond in a timely manner and with reasonable effort.

will demonstrate the evaluators' views and reactions to President Trump, including his statements regarding Mr. Bezos, AWS, Amazon, and the JEDI Contract.

- *Request 5.* Request 5 seeks documents relating to DoD's internal reviews, evaluations, and analyses of potential conflicts of interest regarding JEDI (e.g., those of Secretary Esper and Principal Deputy Assistance Secretary Cummings). Given the numerous reports and concerns, including from senior members of Congress, that the JEDI Contract procurement process was biased, DoD's internal documents discussing these alleged conflicts of interest are clearly relevant to assessing whether there actually existed any bias within DoD relating to the award.

- *Requests 6, 7, 8, and 9.* Requests 6, 7, 8, and 9 call for production of communications with President Trump regarding the JEDI Contract and Mr. Bezos, Amazon, AWS, and the *Washington Post*. Because AWS's allegations of bias and bad faith originate from President Trump, his statements and communications regarding the JEDI Contract are highly probative of bias and will establish how his bias was communicated to those within DoD.

- *Request 10.* Request 10 calls for documents within DoD that relate to highly specific phrases (*e.g.*, "screw Amazon," "Bezos Bailout," and "No Bid Bezos") that, on their face, embody bias and bad faith against AWS, and are therefore inherently probative of AWS's bias and bad faith allegations in this case.

## CONCLUSION

AWS's allegations of bad faith and bias are credible and well supported, and these claims cannot be fairly considered and evaluated without supplementation. In order to achieve a full and fair evaluation of this bid protest, the Court should grant AWS's Motion to Supplement the Administrative Record with the materials in the attached Appendix. The Court also should grant AWS leave to take targeted discovery that will allow a complete presentation AWS's claims of bad faith and bias.

Dated:  January 17, 2020

Respectfully submitted,

By: _Kevin P. Mullen_ (signature)

Kevin P. Mullen
MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., NW
Washington, DC  20006-1888
Telephone: 202.887.1500
Facsimile: 202.887.0763

*Attorney of Record for Plaintiff
Amazon Web Services, Inc.*

*Of Counsel:*

J. Alex Ward
Daniel E. Chudd
Sandeep N. Nandivada
Caitlin A. Crujido
Alissandra D. Young
MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., NW
Washington, DC  20006-1888

Andrew S. Tulumello
Daniel P. Chung
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., NW
Washington, D.C.  20036-5306

Theodore J. Boutrous, Jr.
Richard J. Doren
Eric D. Vandevelde
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA  90071-3197