# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

| | |
|---|---|
| AMAZON WEB SERVICES, INC.<br><br>       Plaintiff,<br><br>  v.<br><br>THE UNITED STATES,<br><br>      Defendant,<br><br>and<br><br>MICROSOFT CORPORATION,<br><br>     Intervenor-Defendant. | Case No. 19-1796<br><br>Judge Patricia E. Campbell-Smith<br><br>█████████████████<br><br>**FINAL REDACTED VERSION** |

## INTERVENOR-DEFENDANT MICROSOFT CORPORATION'S
## PARTIAL MOTION TO DISMISS THE COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

QUESTION PRESENTED ....................................................................................................4

STATEMENT OF THE CASE ..............................................................................................5

    A.    Cloud Computing and DoD's Information Technology Needs ...............................5

    B.    DoD Seeks a Modern Cloud Computing Solution...................................................8

    C.    Oracle Protests and Alleges Pro-AWS Bias in the Procurement...........................11

    D.    DoD Enters into Discussions with Microsoft and AWS........................................13

    E.    DoD Selects Microsoft's "Technically Superior" and Lower Priced Cloud
        Computing Solution...............................................................................................16

    F.    AWS Files This Bid Protest, Belatedly Raising Challenges to the
        Solicitation and Alleging Bias ..............................................................................19

STANDARD OF REVIEW .................................................................................................21

ARGUMENT ......................................................................................................................21

I.      *BLUE & GOLD* BARS A PROTESTOR FROM RAISING ISSUES IN A POST-
        AWARD PROTEST THAT COULD HAVE BEEN RAISED PRE-AWARD...............21

II.     COUNTS III, V, VI, AND VII ARE WAIVED UNDER *BLUE & GOLD* .....................25

    A.    AWS Waived Count III (Wrongful Deprivation of Competitive
        Advantage).............................................................................................................25

    B.    AWS Waived Count V (Bias and Bad Faith) .......................................................29

    C.    AWS Waived Count VI (Violation of Procurement Law and Regulation) ...........36

    D.    AWS Waived Count VII (Breach of Implied Contract of Good Faith and
        Fair Dealing) .........................................................................................................39

CONCLUSION....................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adams and Associates, Inc.*,
   B-417120; B-417125, 2019 CPD ¶ 21, 2019 WL 245909 (Comp. Gen. Jan.
   16, 2019) .......................................................................................................................24, 32, 33

*Allied Tech. Grp., Inc. v. United States*,
   649 F.3d 1320 (Fed. Cir. 2011).........................................................................................33

*Analytical & Research Tech., Inc. v. United States*,
   39 Fed. Cl. 34 (1997) .......................................................................................................27

*Anham FZCO v. United States*,
   144 Fed. Cl. 697 (2019) ...................................................................................................23

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).........................................................................................................21

*Bannum, Inc. v. United States*,
   779 F.3d 1376 (Fed. Cir. 2015).........................................................................21, 22, 27, 36

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).........................................................................................................21

*Blue & Gold Fleet, L.P. v. United States*,
   492 F.3d 1308 (Fed. Cir. 2007)................................................................................ *passim*

*Castle-Rose, Inc. v. United States*,
   99 Fed. Cl. 517 (2011) .....................................................................................................40

*Cent. Ark. Maint., Inc. v. United States*,
   68 F.3d 1338 (Fed. Cir. 1995)...........................................................................................39

*COMINT Sys. Corp. v. United States*,
   700 F.3d 1377 (Fed. Cir. 2012).........................................................................3, 23, 29, 36

*Commc'n. Constr. Servs., Inc. v. United States*,
   116 Fed. Cl. 233 (2014) ...............................................................................................24, 38

*Concourse Grp., LLC v. United States*,
   131 Fed. Cl. 26 (2017) .................................................................................................24, 38

*CRAssociates, Inc. v. United States*,
   102 Fed. Cl. 698 (2011), *aff'd*, 475 Fed. App'x 341 (Fed. Cir. 2012)
   (unpublished) .............................................................................................................24, 37, 38

*Glenn Def. Marine (Asia) PTE Ltd. v. United States*,
   97 Fed. Cl. 568 (2011) .........................................................................................................28

*Honeywell Tech. Solutions, Inc.*,
   B-400771, B-400771.2, 2009 CPD ¶ 49, 2009 WL 564602 (Comp. Gen. Jan.
   27, 2009) ..............................................................................................................................24

*iAccess Technologies, Inc. v. United States*,
   143 Fed. Cl. 521 (2019) ..................................................................................................23, 25

*IBM U.S. Fed.*,
   B-407073.3, *et al.*, 2013 CPD ¶ 142 (Comp. Gen. June 6, 2013) ...........................................28

*Integrated Bus. Solutions, Inc. v. United States*,
   58 Fed. Cl. 420 (2003) .........................................................................................................33

*Intelligent Waves, LLC v. United States*,
   135 Fed. Cl. 299 (2017) .......................................................................................................26

*Jacobs Tech. Inc. v. United States*,
   131 Fed. Cl. 430 (2017) .......................................................................................................34

*Lindsay v. United States*,
   295 F.3d 1252 (Fed. Cir. 2002)............................................................................................21

*Lion Raisins, Inc. v. United States*,
   52 Fed. Cl. 115 (2002) .........................................................................................................40

*Martin v. United States*,
   96 Fed. Cl. 627 (2011) ...........................................................................................................5

*McTech Corp. v. United States*,
   109 Fed. Cl. 28 (2013) .........................................................................................................34

*Metro. Van & Storage v. United States*,
   92 Fed. Cl. 232 (2010) .........................................................................................................40

*Office Depot, Inc. v. United States*,
   95 Fed. Cl. 517 (2010) .........................................................................................................26

*Oracle Am., Inc. v. United States*,
   144 Fed. Cl. 88 (2019) .............................................................................................11, 12, 35

iii

*Per Aarsleff A/S v. United States*,
    829 F.3d 1303 (Fed. Cir. 2016)................................................................27

*Peraton, Inc. v. United States*,
    144 Fed. Cl. 59 (2019) ...........................................................................39

*Peraton Inc. v. United States*,
    No. 19-932C, 2019 WL 6871790 (Fed. Cl. Dec. 17, 2019)...................22, 23, 30, 33

*Seventh Dimension, LLC*,
    B- 415311.4, 2018 CPD ¶ 412 (Comp. Gen. Nov. 29, 2018)................................34

*Southfork Sys., Inc. v. United States*,
    141 F.3d 1124 (Fed. Cir. 1998)................................................................39

*Synergy Sols., Inc. v. United States*,
    133 Fed. Cl. 716 (2017) ..................................................................3, 23, 25, 36

*Unified Architecture & Eng'g, Inc. v. United States*,
    46 Fed. Cl. 56 (2000) ............................................................................40

*Unisys Corp. v. United States*,
    89 Fed. Cl. 126 (2009) ...........................................................................21

## STATUTES

10 U.S.C.
    § 111.........................................................................................27
    § 2304a(d) ..................................................................................11
    § 2305(a)(1)(A)(i) ...........................................................................11

18 U.S.C.
    § 208.........................................................................................37
    §208(a) ......................................................................................37
    §216.........................................................................................37

28 U.S.C.
    § 1491(b).....................................................................................40
    § 1491(b)(3) .................................................................................21
    § 1941(b)(2) .................................................................................34

41 U.S.C. § 2103 ..................................................................................11

## RULES

Fed. R. Evid. 201 ...................................................................................5

iv

RCFC 12(b)(6) ...................................................................................................................21

## REGULATIONS

4 C.F.R. § 21.2(a)(1) ...............................................................................................22, 24, 33

4 C.F.R. § 21.8 .................................................................................................................34

5 C.F.R. § 2635.403(c) ....................................................................................................37

48 C.F.R. 3.101-1 ............................................................................................................38

48 C.F.R. § 9.504(a) ........................................................................................................35

48 C.F.R. 15.305 ..............................................................................................................38

## OTHER AUTHORITIES

Amanda Macias, *Pentagon will not award JEDI cloud contract until new Defense
     secretary completes review*, CNBC, Aug. 11, 2019,
     https://www.cnbc.com/2019/08/09/pentagon-delays-jedi-cloud-contract.html......................15

Christian Davenport and Aaron Gregg, *IT Companies Press Pentagon to Pick
     More than One Winner in Cloud Competition,* Washington Post, (Dec. 10,
     2017), https://www.washingtonpost.com/business/economy/it-companies-
     press-pentagon-to-pick-more-than-one-winner-in-cloud-
     competition/2017/12/10/2f94a416-db67-11e7-b859-fb0995360725_story.html ....................8

David Morris, *Amazon Executive on Fight Over Huge Defense Contract: 'The
     Process Was Not Rigged'*, FORTUNE, (Oct. 23, 2019 12:27 PM),
     https://fortune.com/2019/10/23/amazon-teresa-carlson-jedi-bidding/...................................36

HEIDI M. PETERS, CONG. RESEARCH SERV., R45847, THE DEPARTMENT OF
     DEFENSE'S JEDI CLOUD PROGRAM at 1-2 (2019), *available at*
     https://fas.org/sgp/crs/natsec/R45847.pdf....................................................................5

Jeff Bezos (@JeffBezos), Twitter (Aug. 10, 2017, 2:31 PM),
     www.twitter.com/JeffBezos/status/895714205822730241 ......................................................8

Microsoft, *What is Cloud Computing? A Beginner's Guide*,
     https://azure.microsoft.com/en-us/overview/what-is-cloud-computing (last
     visited January 23, 2020) ...........................................................................................6

U.S. Dep't of Com., NIST Special Publication (SP) 800-145, The NIST
     Definition of Cloud Computing: Recommendations of the National Institute of
     Standards and Technology...........................................................................................6

Terri Moon Cronk, *Defense Secretary Plans West Coast Trip,* Dep't of Defense,
    Aug. 7, 2017,
       www.defense.gov/Explore/News/Article/Article/1270899/defense-secretary-
       plans-west-coast-trip ................................................................................................8

U.S. Dep't of Defense, *Accelerating Enterprise Cloud* Adoption (Sept. 13, 2017)
       https://www.nextgov.com/media/gbc/docs/pdfs_edit/090518cloud2ng.pdf. ...........8

U.S. Dep't of Defense, *DoD Cloud Strategy* (Dec. 2018),
    https://media.defense.gov/2019/Feb/04/2002085866/-1/-1/1/DOD-cloud-
    strategy.pdf..........................................................................................................7, 8

U.S. Dep't of Defense, Secretary of Defense Esper Media Engagement En Route
    to Sydney, Australia (Aug. 2, 2019),
       https://www.defense.gov/Newsroom/Transcripts/Transcript/Article/
       1925072/secretary-of-defense-esper-media-engagement-en-route-to-sydney-
       australia/ ...............................................................................................................15

## INTRODUCTION

This case was brought up in sensationalist and politicized rhetoric designed to distract from the fundamental weakness of its underlying bid protest claims.  Amazon Web Services ("AWS") protests the source selection decision of the U.S. Department of Defense ("DoD") in the Joint Enterprise Defense Infrastructure ("JEDI") Cloud procurement.  DoD awarded the JEDI contract to Microsoft after conducting a painstaking, multi-year process in which teams of technical and procurement experts scrutinized competing bids and concluded that Microsoft's cloud-computing solution was both technologically superior █████ less expensive than AWS's competing proposal.  As Microsoft's eventual motion for judgment on the administrative record will make clear, this procurement was conducted transparently and correctly.  DoD fairly evaluated the competing proposals and Microsoft deservedly won the competition.  AWS's belabored second-guessing of DoD's technical judgments is entirely without merit.

Without a compelling case on the merits of a traditional bid protest, AWS tries to make this case all about President Trump.  AWS points to various statements and tweets that show President Trump criticizing AWS's parent company or its CEO, Jeffrey Bezos.  Virtually none of the statements have anything to do with the JEDI procurement whatsoever.  Many of them actually preceded the November 2016 election.  Most relate to other disagreements between President Trump and Mr. Bezos.  *None* of the statements AWS identifies are directed to the DoD procurement officials responsible for making the final selection decision.  AWS has alleged zero facts—nothing—plausibly indicating that any DoD official involved in the JEDI procurement, at any level, was actually influenced by the alleged anti-Bezos statements in any way.

Because DoD properly conducted the JEDI selection process, and made a completely justified decision to select Microsoft for its superior and lower-priced proposal, all of AWS's

protest claims ultimately will fail on their merits.  But some of them should not get that far.  This partial motion to dismiss is directed to the wide swaths of AWS's complaint which are untimely and thus waived under the Federal Circuit's landmark decision in *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007).  Much of the complaint, and specifically Counts III, V, VI, and VII rely entirely on events which AWS *affirmatively concedes* it knew about months before final proposals were due on September 5, 2019, and before the final award was made on October 25.  This includes all of AWS's challenges to the express terms of the solicitation, all of their bias allegations relating to the statements from President Trump and others, and their objections to the actions of Secretary of Defense Mark Esper to review the procurement.  AWS could have raised all of these alleged flaws at appropriate times during the procurement *before* DoD received final proposals from the offerors, but it did not.  Instead, it waited until *after* DoD made the award to Microsoft—exactly the type of belated action which, under *Blue & Gold*, requires dismissal of such untimely contentions.

AWS concedes it was aware of President Trump's statements directed towards Amazon and its owner.  AWS concedes it was aware of the July 18, 2019 press conference, in which President Trump referenced the JEDI procurement and said he would be "asking [DoD] to look at it very closely to see what is going on."  Compl. ¶ 20.  AWS plainly knew that Secretary Esper first called for a review of the JEDI process in early August.  Compl. ¶ 21.  At neither time, and at no time, did AWS complain or protest that bias might affect the selection decision.  Confident it was the "consensus frontrunner," Compl. at 1, AWS kept silent as the procurement proceeded.  That silence speaks for itself, for purposes of the *Blue & Gold* doctrine.  But it also strongly

intimates that AWS went forward in the procurement because it recognized that President Trump's statements would have no bearing or effect upon the actual selection and award process.

Indeed, if AWS had actually believed—as its complaint now asserts—that the President's public expressions rendered the procurement fundamentally biased, it had both avenues and opportunities to raise and pursue its concerns.  AWS would not have sat on its hands, expecting to win the competition, if it really thought then that Presidential bias had pre-ordained the selection of Microsoft.  Indeed, during the same period, AWS intervened in the pre-award protest brought by Oracle to *defend* the integrity of the JEDI procurement.

AWS cried foul only *after* DoD concluded that Microsoft—not AWS—would provide superior cloud computing services at a superior price.  Settled precedent prohibits this sort of wait-and-see approach.  In *Blue & Gold*, the Federal Circuit squarely held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims."  492 F.3d at 1315.  Subsequent cases have correctly recognized that this waiver rule extends to "any defects that could potentially be raised and resolved prior to the contract award."  *Synergy Sols., Inc. v. United States*, 133 Fed. Cl. 716, 740 (2017) (citing *COMINT Sys. Corp. v. United States*, 700 F.3d 1377 (Fed. Cir. 2012)).

Here, *Blue & Gold* requires dismissal of Counts III, V, VI, and VII.  Count III belatedly objects to three evaluation criteria evident on the face of the JEDI solicitation documents, as amended over the course of the procurement: (1) that DoD's classified data must be physically separated from any other classified data, (2) that offerors must make certain uniform assumptions when pricing their offerings, and (3) that offerors' prior performance with other agencies would

3

carry no weight in this first-of-its-kind cloud computing procurement. AWS easily could have brought a timely challenge to any or all of these items, but it did not object until after award of the contract. *Blue & Gold* also independently requires dismissal of Counts V, VI, and VII, because those counts arise from statements by President Trump and other actions that AWS concedes it knew of long before the close of bidding and DoD's final award. Counts VI and VII in the end are nothing more than forced attempts to shoehorn Count V's allegations into other, even less plausible legal theories. AWS cannot "roll the dice" and wait to bring these claims only after it lost. *See Blue & Gold*, 492 F.3d at 1314.

This case perfectly illustrates the importance of *Blue & Gold*'s waiver rule. AWS is not entitled to wait until after it loses in a competitive government process to raise protest grounds that were known to it earlier. Nor can it simply point to an unrelated dispute between President Trump and its CEO as acceptable for post-award protest. There is no exception to *Blue & Gold* for such extraordinary allegations, especially here where there were discrete events that could have prompted timely protest if AWS had been so disposed (as obviously it was not). AWS could have raised all of the arguments in Counts III, V, VI and VII at or near the time of the underlying events, certainly *before* the bidding closed and undoubtedly before award was made. It failed to do so, and those claims must therefore be dismissed.

## QUESTION PRESENTED

Whether Counts III, V, VI, and VII of the complaint should be dismissed as waived under *Blue & Gold, Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007).

## STATEMENT OF THE CASE[1]

This case involves a challenge to Microsoft's successful bid to provide cloud computing services to DoD under the JEDI procurement.  Microsoft is one of the world's leading software and technology companies.  For years, it has successfully operated its commercial cloud solution, Azure, for many of America's largest and most successful corporations, including ninety percent of the Fortune 500.  DoD selected Microsoft for the JEDI contract after a rigorous competition in which it concluded that Microsoft offered a superior JEDI solution at a lower price.

### A.    Cloud Computing and DoD's Information Technology Needs

Modern business and government increasingly require the ability to store, process and access mass quantities of information, at a moment's notice.  Over the past decade, cloud computing has emerged as a cutting-edge method for businesses and other organizations to store, access, and process their digital information.[2]

Cloud computing is an alternative to a traditional, "on-premises" IT infrastructure, which consists of servers and other hardware that an organization owns and operates itself.  With such traditional infrastructure, individuals can store information either locally, on their personal computers, or on the organization's servers, which they can access through an internal intranet connection.  With a cloud computing service, by contrast, an organization rents storage space and

---

[1] The facts recited here are drawn either from AWS's complaint, from documents referenced in the complaint, or "from sources whose accuracy cannot reasonably be questioned," including the Administrative Record (AR).  Fed. R. Evid. 201; *see also Martin v. United States*, 96 Fed. Cl. 627, 631 (2011) (on a motion to dismiss, courts consider "documents that are referenced in the complaint or that are properly subject to judicial notice").

[2] *See* Compl. ¶ 40; *see also* HEIDI M. PETERS, CONG. RESEARCH SERV., R45847, THE DEPARTMENT OF DEFENSE'S JEDI CLOUD PROGRAM at 1-2 (2019), *available at* https://fas.org/sgp/crs/natsec/R45847.pdf.

processing power from a cloud service provider, like Microsoft, which owns and operates physical hardware that can be accessed remotely, over the internet, from any computer or device anywhere in the world.  Users can store information on the cloud provider's servers, process that information using the provider's other hardware, and even take advantage of special software, like database programs and machine learning tools.

Cloud computing offers several key advantages over an on-premises IT model.[3]  Whereas organizations bear the costs of on-premises hardware and software even when those resources lie dormant, cloud users pay only for the storage space and processing power that they actually use. This saves the user money and allows it to scale its usage of the cloud services depending upon its needs.  In other words, if a user needs more computing resources, the provider can assign those resources to the user instantaneously, without having to purchase additional physical hardware.[4] Cloud computing also offers key security advantages, as providers continuously address vulnerabilities with system-wide security updates that require no action on the user's part.  Cloud computing even offers flexibility to perform computing functions when the internet is temporarily unavailable: so-called "edge" devices—portable units that perform cloud computing functions without an internet connection—allow users to run cloud software while disconnected, and then

---

[3] *See generally* Microsoft, *What is Cloud Computing? A Beginner's Guide*, https://azure.microsoft.com/en-us/overview/what-is-cloud-computing (last visited January 23, 2020).

[4] In a standard definition of cloud computing, the National Institute of Standards and Technology (NIST) identifies five "essential characteristics" to cloud computing.  One is "rapid elasticity," which includes the statement "Capabilities can be elastically provisioned and  released, in some cases automatically, to scale rapidly outward and inward commensurate  with  demand." U.S. Dep't of Com., NIST Special Publication (SP) 800-145, The NIST Definition of Cloud Computing: Recommendations of the National Institute of Standards and Technology, at 2 (2011).

to seamlessly integrate with the cloud once connectivity is reestablished.

The U.S. Armed Forces have long depended on the rapid, secure transfer of information to achieve our national-security objectives, both in peacetime and when fighting the Nation's wars. To this end, DoD has created a massive information technology infrastructure—a network of data centers, servers, personal computers, and other devices—to manage and store digital information. Many of the Department's applications, for soldiers at the "tactical edge" as well as for enterprise business systems, have been operated on separate premises systems. As the sheer quantity of that information has grown, DoD's existing infrastructure has grown inadequate to the task of processing that information and making it available to the warfighter when and where it is needed most. Further, technologically-driven advancements in hyperscale, secure enterprise cloud computing have rendered DoD's legacy infrastructure increasingly obsolete and insufficient.

For DoD, there are important prospective advantages of advanced cloud computing.[5] Cloud computing can allow DoD to expand its computing resources at a moment's notice—a critical need given the agency's national-security mission—without constantly needing to maintain a physical computing infrastructure whose capacity far exceeds the agency's day-to-day needs.[6] Cloud computing can provide significant security benefits by centralizing DoD's computing functions and enabling a cloud provider to monitor and update the cloud infrastructure continuously, without the need for any action by DoD.[7] Edge devices can also provide a significant

---

[5] *See generally* U.S. Dep't of Defense, *DoD Cloud Strategy* (Dec. 2018), https://media.defense.gov/2019/Feb/04/2002085866/-1/-1/1/DOD-cloud-strategy.pdf.

[6] *Id.* at 1, 3-4; *see also* Tab 241 at AR060090.

[7] *See DoD Cloud Strategy*, *supra*, at 3-4; *see also* Tab 241 at AR060091.

tactical advantage by minimizing the disruption caused by the lack of connectivity at the "tactical edge"—that is, in battlefields and other remote areas across the globe.[8]  These improvements are "critical to maintaining our military's technological advantage" and can "empower the warfighter" to fight the data-driven conflicts of the twenty-first century.[9]

### B.    DoD Seeks a Modern Cloud Computing Solution

For all these reasons, and more, cloud computing has become a central priority for DoD. In August 2017, then-Secretary of Defense James Mattis held initial meetings with representatives of several of the nation's leading technology companies to discuss "new commercial technologies" that could improve the military's warfighting capabilities.[10]  On that visit, Secretary Mattis chose specifically to visit Amazon headquarters in Seattle, where he met with Amazon CEO Jeffrey Bezos.[11]  The following month, DoD announced its intention to acquire a "modern enterprise cloud services solution" that would leverage "pioneering technologies" in the commercial space while remaining secure enough to host unclassified, secret, and top secret information.[12]  At the time, press reports speculated that the DoD contract could ultimately be worth "billions of dollars."[13]

---

[8] *See DoD Cloud Strategy*, *supra*, at 6; Tab 241 at AR060089.

[9] *See DoD Cloud Strategy*, *supra*, Foreword.

[10] *See Defense Secretary Plans West Coast Trip,* Aug. 7, 2017, www.defense.gov/Explore/ News/Article/Article/1270899/defense-secretary-plans-west-coast-trip.

[11] *Id.*; *see also* Jeff Bezos (@JeffBezos), Twitter (Aug. 10, 2017, 2:31 PM), www.twitter.com/JeffBezos/status/895714205822730241.

[12] *See* U.S. Dep't of Defense, *Accelerating Enterprise Cloud* Adoption (Sept. 13, 2017) https://www.nextgov.com/media/gbc/docs/pdfs_edit/090518cloud2ng.pdf.

[13] *See* Christian Davenport and Aaron Gregg, *IT Companies Press Pentagon to Pick More than One Winner in Cloud Competition,* Washington Post, (Dec. 10, 2017),

Six weeks later, DoD issued a request for information (RFI) that clarified its vision and requested "targeted feedback" from industry and other stakeholders. *See* Tab 89 at AR005935. The RFI explained that DoD wanted "technical parity with the commercial cloud, even if private or hybrid cloud services are part of the final solution"—meaning that even if some of DoD's computing functions remained on traditional, on-premises infrastructure, the agency wanted its cloud infrastructure to be just as functional as the commercial cloud. *Id.* at AR005936. DoD spent the next few months giving careful consideration to the responses to its RFI. Tab 459 at AR176410.

In March 2018, DoD announced its intention to solicit formal proposals for the JEDI Cloud and issued a draft Request for Proposals (RFP). *Id.* Once again, DoD considered and responded to over a thousand questions that industry and other stakeholders submitted in response to the draft. *Id.* After revising the draft RFP twice, DoD issued its third and final RFP on July 26, 2018. *See* Tab 1 at AR000001-98.

The final RFP described the procurement process and enumerated nine factors that the agency would consider when evaluating proposals (*see* Tab 1 at AR000088-95):

- *Factor 1: Gate Evaluation Criteria.* The RFP set out seven "gate evaluation criteria" that an offeror would have to satisfy under "Phase One" of the procurement. Tab 1 at AR000088. These criteria were generally designed to ensure that the offeror had sufficient infrastructure to accommodate DoD's significant computing needs. Only offerors that satisfied each of these gate criteria would proceed to Phase Two of the procurement. *Id.* at AR000088.

- *Factor 2: Logical Isolation and Secure Data Transfer.* The RFP's second factor addressed security concerns. "Logical isolation" refers to how the provider stores information separately. *See* Tab 1 at AR000078. "Secure data transfer" refers to

https://www.washingtonpost.com/business/economy/it-companies-press-pentagon-to-pick-more-than-one-winner-in-cloud-competition/2017/12/10/2f94a416-db67-11e7-b859-fb0995360725_story.html.

9

the transfer of data to and from the JEDI Cloud securely. *See id.* Of the seven Phase Two non-price factors (i.e., all Phase Two factors except Factor 9), Factor 2 was the most important. *Id.* at AR000088.

- *Factor 3: Tactical Edge.* The third factor addressed the offeror's edge devices. Offerors were required to "balance portability with capability" and demonstrate that their edge devices would function in both disconnected and fully connected environments. *Id.* at AR000079.

- *Factor 4: Information Security and Access Controls.* This fourth factor addressed security features that are visible to DoD. "Information security" refers to updating of hardware and software to guard against security vulnerabilities. *Id.* at AR000080. "Access controls" refers to the tools that DoD can use to control access to information stored on the JEDI Cloud to ensure that only authorized DoD personnel can access certain information. *Id.* at AR000081.

- *Factor 5: Application and Data Hosting and Portability.* The fifth factor addressed the fundamentals: the ability to host data and applications. *Id.* It also evaluates the provider's ability to export that data from the cloud when necessary. *Id.*

- *Factor 6: Management and TO 001.* The sixth factor addressed the offeror's ability to manage the JEDI Cloud program. *Id.* at AR000082. This includes the offeror's proposed approach to addressing performance and security issues, its risk management process, and its quality assurance plan. *Id.*

- *Factor 7: Small Business Participation.* This factor addressed the offeror's commitment to use small business in the performance of the JEDI contract. *Id.*

- *Factor 8: Demonstration.* This factor addressed the offeror's performance at in-person demonstrations of the offeror's proposed solution. Tab 1 at AR000083.

- *Factor 9: Price.* The final factor listed in the RFP was price. Offerors were required to give an overall description of their pricing proposals, and also to provide prices for specific scenarios detailed in the RFP. *Id.* at AR000083-86. The pricing scenarios included various technical assumptions that offerors were to follow to prepare their price proposals. *See* Tab 8 at AR000198. During the course of the procurement, DoD refined these assumptions to ensure that the offerors were evaluated on a common basis. *See, e.g.*, Tab 302 at AR064310.

The RFP also listed several "special contract requirements," including that the contractor would be "prohibited from reusing classified infrastructure for another non-JEDI user tenant or at a different classification level" without prior permission and would be "prohibited from transferring

any classified infrastructure to a non-JEDI user." Tab 1 at AR000023.  This figures importantly in the present Motion, because in Count III AWS attempts to protest requirements that were present in the initial RFP, such as this prohibition.

Between August and October 2018, DoD made a handful of technical amendments to the JEDI Cloud RFP.  *See* Tabs 43, 49, 52 at AR000953-58, 004304, 004438-39.  Amendment 0003 directed offerors to submit their initial proposals by October 12, 2018.  Tab 49 at AR004304.  Four offerors submitted initial proposals: Microsoft, AWS, Oracle, and IBM.[14]

### C.       Oracle Protests and Alleges Pro-AWS Bias in the Procurement

In August 2018, shortly after DoD released the final RFP for the JEDI procurement, Oracle filed a pre-award bid protest with the Government Accountability Office (GAO).  Among other grounds, Oracle alleged that AWS had improperly influenced the procurement process.  Tab 67 at AR004886.[15]  On November 14, 2018, GAO denied Oracle's protest, finding "no merit in any of Oracle's allegations."  Tab 83 at AR005916.

Oracle proceeded to re-file its protest in this court on December 6.  *See Oracle Am., Inc. v. United States*, 144 Fed. Cl. 88, 101 (2019).  AWS intervened and opposed Oracle's protest.  In its

---

[14] Microsoft proposed to adapt its highly successful commercial cloud solution, Azure, to the special needs of a large government organization like DoD.  *See* Tab 196 at AR054003.  Azure integrates seamlessly with an organization's existing software and is uniquely equipped to offer "hybrid" solutions that blend existing on-premises capabilities with cloud-based computing functions.  *Id.*

[15] Specifically, Oracle alleged that: (1) certain DoD employees had sought employment with AWS while working on the JEDI Cloud procurement, in violation of 41 U.S.C. § 2103; (2) DoD had not adequately justified its decision to award the JEDI Cloud contract to a single offeror, as required by 10 U.S.C. § 2304a(d) and its implementing regulations; and (3) DoD's use of certain gate criteria rendered the procurement insufficiently competitive, in violation of 10 U.S.C. § 2305(a)(1)(A)(i).  *See Oracle Am., Inc. v. United States*, 144 Fed. Cl. 88, 112-25 (2019).

cross-motion for judgment on the administrative record, AWS offered a lengthy and detailed explanation of all the steps DoD procurement officials had taken to ensure that the JEDI procurement was fair and appropriate.  AWS's Response To Oracle America, Inc.'s Supplemental Motion For Judgment On The Administrative Record And Cross-Motion For Judgment On The Administrative Record (AWS Oracle Response) at 5-22, *Oracle Am., Inc. v. United States*, No. 18-1880C, (Fed. Cl. June 18, 2019), ECF No 88.  AWS defended the procurement as "entirely rational," repeatedly asserted that "no conflicts negatively impacted the JEDI procurement," and denied "any bad faith on the part of the actual agency decision-makers."  *Id.* at 10, 14, 35, 52.

On July 19, 2019, the Court rejected Oracle's bid protest, although it agreed with Oracle that "at least two DoD officials disregarded their ethical obligations by negotiating for AWS employment while working on this procurement."  *Oracle*, 144 Fed. Cl. at 120.  Nevertheless, the court concluded, those conflicts did not taint the procurement because the individuals were "bit players," although their conduct was "certainly sufficient to raise eyebrows."  *Id.* at 120-121.[16]  Oracle appealed the Court's decision, and the appeal is currently pending before the Federal Circuit.  *See Oracle Am., Inc. v. United States*, No. 19-2326 (Fed. Cir. filed Aug. 26, 2019).

When defending the JEDI procurement against Oracle's protest alleging pro-AWS bias, AWS was willing to credit procurement officials with the well-established presumption that they act in good faith.  *See, e.g.*, AWS Oracle Response at 51 n. 27 (urging "that Government officials are presumed to act in good faith").  In its response brief at the Federal Circuit, AWS advances many of the same arguments it raised in the Court of Federal Claims, again defending aspects of

---

[16] The Court also concluded that the procurement's gate criteria were valid and that Oracle lacked standing to challenge DoD's decision to use a single-award approach, since it had not shown prejudice resulting from that decision.  *Id.* at 115-20.

the procurement as "rational" and denying the existence of any conflict of interest in its favor. *See generally*, Response Brief of Appellee AWS at 28-44, *Oracle Am., Inc. v. United States*, No. 19-2326, (Fed. Cir. Dec. 26, 2019), ECF No. 33.

### D.      DoD Enters into Discussions with Microsoft and AWS

On April 10, 2019, DoD announced that Microsoft and AWS were the only offerors who had satisfied the RFP's gate criteria.  Compl. ¶ 101; *see* Tab 457 at AR176398.  As a result, DoD began evaluating their initial proposals under Factors 2 through 9 of the RFP.  Initially, ████

████████████████████████████████████████████████████████████  Tab 459 at AR176412.

Accordingly, DoD invited Microsoft and AWS to enter into discussions with the agency to clarify the requirements for the RFP and the agency's vision for the DoD Cloud.  *See Id.* at AR176413.  During this time, Microsoft and AWS also participated in demonstrations of their proposed cloud solutions.  Compl. ¶ 66.

On May 13, 2019, following DoD's discussions with AWS and Microsoft, DoD issued Amendment 0005 to the RFP.  Compl. ¶ 102; *see* Tab 338 at AR151400.  Consistent with provisions of the original RFP, which were "clear and unambiguous" (*id.*) that the JEDI Cloud provider would be "prohibited from transferring any classified infrastructure to a non-JEDI user" (Tab 1 at AR000023), Amendment 0005 defined "classified infrastructure" and "non-JEDI users" for the avoidance of doubt.[17]  Amendment 0005 also amended the pricing scenarios to "further clarify" their requirements (Tab 303 at AR064331), including an instruction that offerors assume

---

[17] *See* Tab 301 at AR064233 (defining "classified JEDI Cloud infrastructure" to include "encryption devices and individuals [sic] pieces of classified JEDI infrastructure behind the encryption devices, but [not] infrastructure on the black or unclassified side of the encryption devices that may be used for joint tenancy" and defining "JEDI tenants" to include "all of DoD as defined in 10 U.S.C. § 111").

13

████████████████████████████████████████████████████

that ███████████████████████ and that ████████████████████████████ (Tab 302 at

AR064310).  This change addressed a discrepancy between the offeror's initial proposals.  ████

████████████████████████████████████████████████████████████████████

███████████████████████████████████ Different understandings on this point had

skewed the price proposed by each offeror at that stage, because ████████████████████████

███████████████████████ See Tab 206 at AR057930.  Correcting the ambiguity

therefore ensured that DoD would be able to make an apples-to-apples comparison of the offerors'

capabilities.  DoD expressly stated that "none of these changes provided any advantage to an

Offeror."  Tab 338 at AR151400.

DoD set a deadline of June 12, 2019 for the submission of Interim Proposal Revisions

(IPRs) in response to Amendment 0005.  *See* AR Tabs 299, 300.  On June 12, 2019, Microsoft and

AWS submitted their IPRs.  Compl. ¶ 103.  ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ Compl.

¶¶ 105, 108.  DoD held discussions with AWS throughout July and August, and AWS submitted

four updates to its IPR throughout July and August.  *Id.* ¶ 103.  But AWS chose not ████████

████  Nor did it raise any objections to Amendment 0005 or any other change to requirements or

ground rules of the procurement.

As Oracle's bid protest moved forward in this Court, where AWS defended the

procurement against allegations it was biased in AWS's favor, external events (according to AWS

here) revealed that the Government had changed it course.  *See* Compl. ¶¶ 174-75.  AWS refers to

"the very public comments by the Commander in Chief and others questioning the procurement

process." Compl. ¶ 175. AWS is referring to the July 18, 2019 press conference, in which President Trump said he would be "asking [DoD] to look at [the JEDI procurement] very closely to see what's going on." Compl. ¶ 20. AWS did nothing to protest whatever bias it might then have feared would compromise the win it expected in the JEDI competition.

In early August 2019, newly-confirmed Secretary of Defense Mark Esper announced that he would take a "hard look" at the procurement, to "understand all the different factors." *Id.* ¶ 176. Secretary Esper based his decision to undertake such review on "concerns I've heard from members of Congress, both parties, [and] both sides of the Hill," as well as comments "from people from the White House" and press reporting on concerns raised by "companies and industry."[18] Secretary Esper clarified, however, that the White House had "not directed [him] to do" the review, but rather that he made the decision on his own, noting that he "would do it with any program that raised this much consternation."[19] Secretary Esper's comments were reiterated days later by DoD Chief Information Officer Dana Deasy, who confirmed that President Trump had no role in the source selection process or in Esper's review.[20]

On September 5, 2019, both offerors submitted their final proposal revisions (FPRs) to DoD. AWS's price was still ▮▮▮▮▮▮▮▮▮▮ than Microsoft's total evaluated price of

---

[18] U.S. Dep't of Defense, *Secretary of Defense Esper Media Engagement En Route to Sydney, Australia* (Aug. 2, 2019),
https://www.defense.gov/Newsroom/Transcripts/Transcript/Article/ 1925072/secretary-of-defense-esper-media-engagement-en-route-to-sydney-australia/.

[19] *Id.*

[20] Amanda Macias, *Pentagon will not award JEDI cloud contract until new Defense secretary completes review*, CNBC, Aug. 11, 2019, https://www.cnbc.com/2019/08/09/pentagon-delays-jedi-cloud-contract.html

$678 million. *Id.* ¶ 108.[21]  AWS said nothing in or accompanying its FPR expressing concern or asking for inquiry or investigation into any possible bias affecting the selection process.

### E.   DoD Selects Microsoft's "Technically Superior" and Lower Priced Cloud Computing Solution

Throughout September 2019, DoD's Technical Evaluation Boards (TEBs) and its Small Business Evaluation Board (SBEB) reaffirmed the factor-by-factor evaluations of both parties' IPRs that they had submitted earlier, between late July and mid-September, before the offerors' FPRs had been submitted.  Tab 457 at AR176396; Tab 459 at AR176413.  On September 27, the Source Selection Evaluation Board (SSEB) issued a report summarizing the TEB and SBEB reports.  Tab 456 at AR176366-95.  On September 29, the Price Evaluation Board (PEB) issued its report, which concluded that the parties had appropriately priced their proposals.  Tab 455 at AR176347-65.  And on October 3, the Source Selection Advisory Committee (SSAC) issued its report, drawing on the SSEB and PEB reports.  Tab 457 at AR176396-407.  The TEBs, SBEB, SSEB, PEB, and SSAC were all staffed by DoD personnel who were screened for conflicts of interest before being allowed access to offerors' confidential information.  *See* Tab 305 at AR064343.

After a careful and balanced analysis, the SSAC's report recommended that the contract be awarded to Microsoft.  Tab 457 at AR176406.  The report gave both proposals ▇▇▇▇▇, assigning ratings ▇▇▇▇▇▇▇▇▇ as to various technical factors, and concluding that the risks posed as to each factor were either ▇▇▇▇▇▇▇  *Id.* at AR176398-99.  But the SSAC concluded that Microsoft's proposal was "superior" as to Factors 5 and 6—and thus

---

[21] The September 5 deadline was set by Amendment 0006, the final amendment to the solicitation, which otherwise made only administrative changes.  *See* Tab 459 at AR176411.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

"significantly superior" as to overall non-price factors.  Tab 457 at AR176404, 176406.  The SSAC also observed that Microsoft's proposal was ███████████ less expensive under Factor 9.  The SSAC recommended awarding to Microsoft because it found that "Microsoft's proposal is superior to AWS's in terms of both price and non-price factors."  Tab 457 at AR0176406.  The Source Selection Authority (SSA), ████████████████████ agreed and concluded that "Microsoft's proposal represents the best value to the Government."  Tab 459 at AR0176417.

As to Factor 5 (Application and Data Hosting and Portability), the SSAC concluded that Microsoft's proposal was ██████████████ because Microsoft, unlike AWS, ████████████████

███████████████████████████████████████████████

██████████ AWS, by contrast, ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████ The SSAC

concluded ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████

As to Factor 6 (Management and TO 001), the SSAC found that Microsoft's proposal was ██████████ because it offered several advantages in terms of program management.  For example, Microsoft offered ██████████████████████████████████████████

████████████████████████ Microsoft also offered ████████████████████

███████████████████████████████████████████████

███████████████████████████████

███████████████████████████████████████████████

Although the SSAC assigned ███████████████████████████████
███████████████████ (*see* Tab 457 at AR176399-400), it noted ██████████████
█████████████████████ In its discussion of Factor 2 (Logical Isolation and Secure Data
Transfer), the SSAC concluded ███████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████

As to Factor 9 (Price), the SSAC agreed with the PEB that the offerors' price assessments
were accurate and complete. *Id.* at AR176404. Again, Microsoft's total evaluated price was
approximately $678 million—████████████████ less than AWS's total evaluated price of
████████████████████ Because Microsoft offered DoD a superior product at a better
price, the SSAC recommended that the JEDI Cloud contract be awarded to Microsoft. *Id.* at
AR176406.

On October 17, the SSA, ████████████████, issued her decision accepting the SSAC's
recommendation and awarding the JEDI Cloud contract to Microsoft. In so doing, she echoed the
SSAC's findings that Microsoft was ████████████████ to AWS in terms of Factors 5 and 6
and ████████████████ as to price. Tab 459 at AR176415-17. DoD informed Microsoft and
AWS of the SSA's award decision on October 25. Compl. ¶ 188.

18



### F.     AWS Files This Bid Protest, Belatedly Raising Challenges to the Solicitation and Alleging Bias

On December 9, 2019, AWS filed this bid protest alleging—for the very first time—assorted defects in the JEDI Cloud procurement process.

AWS's complaint asserts seven counts.  Counts I and II allege that DoD failed to evaluate the competing AWS and Microsoft proposals in accordance with the terms of the RFP.  *See* Compl. ¶¶ 192-209.  These counts allege various technical errors with the procurement and amount to little more than disagreement with DoD's determination that Microsoft's offering was superior and represented the best value for the government.  *See, e.g., id.* ¶ 198 (alleging that, contrary to the findings of selection officials, AWS's offering was "more advanced").

Count III challenges the express terms of the solicitation itself, arguing that DoD's failure to identify "past performance" as an evaluation metric was contrary to applicable regulations and unfairly prejudicial to AWS.  *Id.* ¶¶ 23, 210-14.  Count III also singled out RFP Amendment 0005. *Id.* ¶ 212.  AWS claims "DoD's directed changes" explain AWS's higher price.  *Id*. ¶ 213.  And according to AWS, but for "DoD's arbitrary and capricious conduct," AWS would not have needed to revise its technical approach and would have been the lowest priced offeror.  *Id.* ¶ 214.  Each of the alleged "affirmative steps," *id.* ¶ 211-212, and all of the "directed changes," *id.* ¶ 213, were known at the time of their issuance to AWS and Microsoft.  AWS failed to make a timely challenge to any of the conduct about which it complains in Count III.  For example, AWS complains about Amendment 0005, *id*. ¶ 212, but did not inform DoD of its objections by June 12, 2019, which was the deadline set for IPRs in response to Amendment 0005.

Count IV claims that the errors alleged in Counts I, II, and III cumulatively led to an irrational decision as to which proposal represented the best value for DoD.  *Id.* ¶¶ 215-18.

In Counts V through VII, AWS pivots to the remarkable allegation that the *entire* JEDI Cloud procurement process was biased against AWS, based largely on public statements and tweets by President Trump. Count V alleges that, as a result of this bias, the award was made in bad faith and so was arbitrary and capricious. *Id.* ¶¶ 219-223. Count VI then alleges various statutory and regulatory violations flowing from the alleged bias, including extraordinary allegations that because of President Trump's statements, DoD selection officers violated the prohibition on participating in a procurement in which a selection officer has a "financial interest" (here, allegedly, the officials' interest in "continued employment"), and the requirements that selection officials treat offerors impartially and evaluate proposals using only the criteria stated in the RFP. *Id.* ¶¶ 224-229. And Count VII, essentially a rephrasing of Count V, alleges that the bias resulted in a breach of the implied contract of good faith and fair dealing. *Id.* ¶¶ 230-34.

Virtually none of the public statements cited by AWS in its complaint mentions the JEDI procurement in any way.[22] Nor does the complaint make even a *single* factual allegation that President Trump ever spoke directly to *any* identified DoD procurement officers about the JEDI procurement, much less instructed them to award the contract to Microsoft. The complaint also does not plausibly allege that such officials ever acted upon President Trump's statements.

---

[22] Many of the cited statements were made by President Trump before the November 2016 election. *See id.* ¶¶ 84-98, 174-84. For example, the complaint notes President Trump's criticism of Jeff Bezos, the CEO of Amazon, AWS's parent company—who also owns the *Washington Post*—on various grounds, including Amazon's low cost of shipping provided by the U.S. Postal Service, and the Post's adverse commentary on his candidacy and presidency. *See, e.g., id.* ¶¶ 84-86, 89-90. The complaint offers no plausible explanation of how those statements on unrelated matters would have influenced the highly technical evaluation of proposals by the responsible DoD civil servants and technical experts.

## STANDARD OF REVIEW

A complaint is subject to dismissal under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl.*, 550 U.S. at 555. In other words, the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* A plaintiff cannot state a claim under RCFC 12(b)(6) if it has waived its right to relief under the *Blue & Gold* rule. *See, e.g.*, *Unisys Corp. v. United States*, 89 Fed. Cl. 126, 136–37 (2009).

## ARGUMENT

## I.   *BLUE & GOLD* BARS A PROTESTOR FROM RAISING ISSUES IN A POST-AWARD PROTEST THAT COULD HAVE BEEN RAISED PRE-AWARD

Congress has directed the federal courts to "give due regard to . . . the need for expeditious resolution" of bid protests. 28 U.S.C. § 1491(b)(3). To implement this statutory command, the Federal Circuit's decision in *Blue & Gold* held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Blue & Gold*, 492 F.3d at 1313; *see also Bannum, Inc. v. United States*, 779 F.3d 1376, 1379–80 (Fed. Cir. 2015).

*Blue & Gold*'s waiver rule promotes Congress's goal of fairly and efficiently resolving bid protests in several ways.  For one thing, it "avoids costly after-the-fact litigation" by affording the procuring agency an opportunity to correct errors early on, before going to the trouble of evaluating bidders' proposals.  *Blue & Gold*, 492 F.3d at 1313.  Requiring parties to assert objections when they arise "reduces uncertainty about whether the issue is joined and must be resolved, and thereby prevents both the wasted and duplicative expenses (of all bidders and the government) and the delayed implementation of the contract that would likely follow from laxer standards of timely presentation of solicitation challenges."  *Bannum*, 779 F.3d at 1380.

*Blue & Gold* also removes any incentive for a protestor to ignore an obvious error in a solicitation and then, after the contract is awarded to a competitor, strategically assert it to reopen the procurement.  Otherwise, as the Federal Circuit has explained, "a contractor with knowledge of a solicitation defect could choose to stay silent when submitting its first proposal," and then, "[i]f its first proposal loses to another bidder," the contractor could "come forward with the defect to restart the bidding process, perhaps with increased knowledge of its competitors."  *Id.* at 1314. A waiver rule "thus prevents contractors from taking advantage of the government and other bidders."  *Id.*  As this Court has recognized, "it is fundamentally unfair for offerors to postpone their challenge to a solicitation, sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive [an] award."  *Peraton Inc. v. United States*, No. 19-932C, 2019 WL 6871790, at *12  (Fed. Cl. Dec. 17, 2019) (Campbell-Smith, J.) (internal quotation marks omitted).

Finally, *Blue & Gold* also parallels—and reinforces—the waiver rule governing bid protests before the GAO, set forth at 4 C.F.R. § 21.2(a)(1).  *Blue & Gold*, 492 F.3d at 1314-15.

22

That regulation specifically provides that protests based on the underlying ground rules of a competition must be brought prior to the close of the bidding process.  Like GAO's timeliness rule, *Blue & Gold* promotes fairness and efficiency in the competitive process by preventing a contractor from staying silent only to later raise an alleged defect in an effort to restart the bidding process when it potentially has increased knowledge of its competitors.  *Id.* at 1314.

In *COMINT Sys. Corp. v. United States*, 700 F.3d 1377 (Fed. Cir. 2012), the Federal Circuit made clear that *Blue & Gold*'s waiver rule applies not merely to challenges that could have been raised before the close of bidding, but to "all situations in which the protesting party had the opportunity to challenge a solicitation before the *award* and failed to do so."  *Id.* at 1382 (emphasis added).  As the court explained, "[t]he same policy underlying *Blue & Gold*"—discouraging the strategic, untimely assertion of procurement challenges—"supports its extension to *all pre-award situations*."  *Id.* at 1382 (emphasis added).  The court refused to allow the protester to "come forward with [its objections] to restart the bidding process, and get a second bite at the apple."  *Id.* at 1383 (internal quotation marks omitted).

Subsequent decisions confirm that *Blue & Gold*'s waiver rule applies to "any defects" in the procurement "that could potentially be raised and resolved prior to the contract award." *Synergy,* 133 Fed. Cl. at 740.  This Court itself has endorsed *Synergy*'s broad formulation of the waiver rule.  *See iAccess Technologies, Inc. v. United States*, 143 Fed. Cl. 521, 531-32 (2019) (Campbell-Smith, J.) (describing *Synergy* as a "reasonable interpretation" of *COMINT* and approving its application to the facts of that case).  Indeed, it has regularly applied *Blue & Gold* to a broad range of alleged errors—including allegations of bias and bad faith.  *See, e.g.*, *Peraton*, 2019 WL 6871790 (2019) (applying *Blue & Gold* to bar claims of bias and bad faith); *Anham*

*FZCO v. United States*, 144 Fed. Cl. 697, 718-19 (2019) (Campbell-Smith, J.) (applying *Blue & Gold* to a protestor's claim that the agency had improperly failed to consider certain risks associated with a competitor's proposal when taking corrective action, explaining that the plaintiff was "aware of the issue prior to corrective action").

This Court's broad application of the waiver rule also finds support in decisions that have applied *Blue & Gold* to untimely organizational conflict of interest ("OCI") claims. In *Concourse Grp., LLC v. United States*, 131 Fed. Cl. 26 (2017) (Wheeler, J.), for example, the court applied *Blue & Gold* to an OCI claim that the protestor had failed to raise "prior to the award of the contract despite the opportunity to do so and its easy access to the knowledge upon which it now relies." *Id.* at 30; *see also Commc'n. Constr. Servs., Inc. v. United States*, 116 Fed. Cl. 233, 264 (2014) (Williams, J.) (also applying *Blue & Gold* to an OCI claim). And in *CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 711-712 (2011), *aff'd*, 475 Fed. App'x 341 (Fed. Cir. 2012) (unpublished), the court explained that "the rationale of *Blue and Gold* leads to the conclusion that a contractor should not be allowed to protest an agency's failure to identify and mitigate an OCI when the contractor knew about the alleged OCI from the start, but failed to assert it, via protest, prior to the award." *Id.* at 712.

Likewise, GAO has applied its analogous waiver rule, 4 C.F.R. § 21.2(a)(1), to bar untimely bias and OCI claims that were known to the protester prior to award. *See Adams and Associates, Inc.*, B-417120; B-417125, 2019 CPD ¶ 21, 2019 WL 245909, at *1-3 (Comp. Gen. Jan. 16, 2019) (citing *Blue & Gold*, 492 F.3d at 1313-14); *Honeywell Tech. Solutions, Inc.*, B-400771, B-400771.2, 2009 CPD ¶ 49, 2009 WL 564602, at *5-6 (Comp. Gen. Jan. 27, 2009) (holding that "the protester cannot wait until an award has been made to file its protest of an

impermissible OCI, but instead must protest before the closing time for receipt of proposals" where the protester "was on notice, prior to the initial closing date, of the facts necessary to argue that [the awardee] had an impermissible OCI").

The import of these authorities is clear: The *Blue & Gold* waiver rule applies to *any* challenge to *any* "agency[] action" of which the protestor knew or should have known "before [the] contract award." *iAccess*, 143 Fed. Cl. at 531; *see also Synergy*, 133 Fed Cl. at 736.

## II.    COUNTS III, V, VI, AND VII ARE WAIVED UNDER *BLUE & GOLD*

### A.    AWS Waived Count III (Wrongful Deprivation of Competitive Advantage)

Count III alleges that DoD took various "affirmative steps to deprive AWS of its competitive advantage" in the procurement.   Compl. ¶ 211.   According to AWS, "[t]hese affirmative steps included [1] not evaluating past performance, [2] prohibiting AWS from leveraging its existing classified infrastructure for the JEDI contract, and [3] precluding AWS from ██████████████████████████████ to streamline operations and lower costs under the Price Scenarios." *Id.* at ¶ 212.   Each "affirmative step" that allegedly deprived AWS of its competitive advantage was apparent on the face of either the original RFP or Amendment 0005. Thus, under *Blue & Gold*, AWS had an obligation to raise all of the allegations in Count III either before the receipt of initial proposals or, in the case of changes made by Amendment 0005, before the deadline for IPRs set by that Amendment.   Because AWS did not, Count III should be dismissed in its entirety.

*First*, although AWS contends that it was competitively harmed as a result of DoD's decision not to evaluate past performance, this feature of the solicitation was clear to all offerors from the inception of the procurement.   The RFP *never* indicated that DoD intended to evaluate

25

past performance. *See* Tab 1 at AR000088-97 (RFP § M evaluation criteria). And, in fact, when one potential offeror responded to the draft RFP by asking DoD to "clarify how Past Performance will be evaluated and its relative importance within the stated evaluation criteria," DoD replied in no uncertain terms: "Past Performance will *not* be evaluated." Tab 105 at AR006422 (emphasis added). Despite this unequivocal announcement of DoD's intentions, AWS failed to challenge DoD's decision not to evaluate past performance prior to the October 12, 2018 deadline for initial proposals. *See* Tab 48 at AR004303. AWS cannot suddenly raise that objection now for the first time. *See Intelligent Waves, LLC v. United States*, 135 Fed. Cl. 299, 314 (2017) (challenge to agency's treatment of past performance waived where not raised in a pre-award protest); *Office Depot, Inc. v. United States*, 95 Fed. Cl. 517, 530 (2010) (dismissing plaintiff's claim under *Blue & Gold* and holding that, "[i]f [plaintiff] wished to challenge an evaluation scheme that omitted any requirement for and placed no emphasis on past performance, the time to have done so was before [the proposal submission deadline]").

*Second*, although AWS complains that it was prohibited from leveraging its existing, non-JEDI classified infrastructure ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ AWS knew about that prohibition well before award and chose not to object. The original RFP was clear that offerors were "prohibited from reusing classified infrastructure for another non-JEDI user tenant" without prior permission and would be "prohibited from transferring any classified infrastructure to a non-JEDI user." Tab 1 at AR000023. AWS thus knew or should have known, based on the express terms of the RFP, that it would be prohibited from "leveraging" ▮▮▮▮▮ classified cloud infrastructure for the JEDI Contract. If AWS believed that DoD's prohibition was improper or unfair, it had to raise that issue in a pre-award protest prior to the October 12, 2018 deadline for

26

initial proposals. AWS has no excuse for waiting more than a year to bring this objection only *after* losing to Microsoft. And, "having failed to follow any of the various protest procedures available to bidders for swiftly resolving objections to the terms of the solicitation, [AWS] cannot raise the same challenge in the Court of Federal Claims now that an award has been made." *Bannum*, 779 F.3d at 1381.

To the extent AWS is claiming that the initial RFP was somehow unclear as to whether it would be allowed to leverage non-JEDI classified infrastructure, it still had an obligation to protest prior to the initial proposal deadline because the alleged "defect" in the RFP was, for AWS, a patent defect that could have been easily "discovered by reasonable and customary care." *Analytical & Research Tech., Inc. v. United States*, 39 Fed. Cl. 34, 46 (1997) (citations and quotations omitted); *see also Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1313 (Fed. Cir. 2016) ("A patent defect triggers the obligation to challenge the solicitation language and failure to do so generally constitutes waiver.") In any event, Amendment 0005 completely removed any possible doubt as to whether AWS would be prohibited from leveraging its existing classified infrastructure for JEDI. Amendment 0005 reiterated that the JEDI contractor would need DoD's "approval prior to allowing non-JEDI tenants to use classified JEDI Cloud infrastructure," and explicitly defined "JEDI tenants" to include "all of DoD as defined in 10 U.S.C. § 111." Tab 301 at AR064233. ███████████████████████████████ and thus not a "JEDI tenant" under the clear terms of Amendment 0005. As such, AWS was required to protest the prohibition on leveraging non-JEDI classified infrastructure no later than June 12, 2019, the deadline set for IPRs in response to Amendment 0005. *See* Tab 299. AWS's untimely objection to this alleged defect in the RFP is waived and should be dismissed.

*Finally*, AWS has similarly waived its right to object to the changes in Amendment 0005 that allegedly increased the total evaluated price of its proposal. The original RFP pricing scenarios did not specify whether offerors could rely ███████████████████████████ ████████████ to price their proposals. *See generally* Tab 8 at AR000198. AWS ███████ ███████████████████████████████████████████████████████████ ███████████████████████ *See* Compl. ¶ 24; *see also id.* at ¶ 212; Tab 194a at AR025723-25 (█████████████████████████████). By contrast, Microsoft ███████████████ ███████████████████████████████████████████████████████████

DoD recognized this discrepancy and was rightly concerned that it needed to establish a common basis to evaluate offeror pricing. *See* Tab 343 at AR151586; *see also* Tab 206 at AR057930 (DoD evaluators noting that █████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████).

DoD thus leveled the playing field in Amendment 0005. Specifically, DoD expressly clarified that ████████████████████████████████████████████████████ ████████████ form, thereby eliminating AWS's ability to use so-called ██████████ ████████ Compl. ¶ 24; *see also* Tab 302 at AR064310. DoD's clarification was not only appropriate but, in fact, necessary because the "agency's chosen method of evaluation must include some reasonable, common basis for evaluating or comparing the relative costs of proposals." *IBM U.S. Fed.*, B-407073.3, *et al.*, 2013 CPD ¶ 142 at 6 (Comp. Gen. June 6, 2013); *see also Glenn Def. Marine (Asia) PTE Ltd. v. United States*, 97 Fed. Cl. 568, 578 (2011) (same).

AWS was well aware of the important clarifications to the pricing assumptions made in

Amendment 0005 as these changes were discussed explicitly, including the reasons for them, between DoD and AWS. *See* Tab 343 at AR151586 (DoD explaining to AWS that ███████████ ████████████████████████████████████████████████████ ). AWS now alleges that the changes in Amendment 0005 reflected DoD's "targeted efforts to drive up AWS's price." Compl. ¶ 11. But if AWS believed that these changes were somehow improper or unfair in any respect, the law required AWS to protest no later than June 12, 2019. Indeed, AWS "had ample time and opportunity to raise its objections to Amendment 5, but chose instead to wait and see whether it would receive an award of the contract," and that approach is expressly forbidden by *Blue & Gold*. *COMINT*, 700 F.3d at 1383. As a result, all of AWS's allegations challenging Amendment 0005 are waived.

For these reasons, AWS's claim in Count III that it was wrongfully deprived of competitive advantage, whether based on DoD's treatment of past performance or the changes to the RFP made in Amendment 0005, should be dismissed as untimely.[23]

### B.    AWS Waived Count V (Bias and Bad Faith)

AWS broadly alleges that "President Trump's bias against AWS improperly influenced DoD officials responsible for the JEDI solicitation, undermined the procurement process, resulted in an unreasonable evaluation, and unfairly deprived AWS of the JEDI award." Compl. ¶ 220. AWS's core theory is that "the President made it widely known to everyone—including on publicly broadcast television and through his prolific tweets—that DoD should not award the JEDI contract to AWS." Compl. ¶ 13. But even if AWS's overblown assertions were accurate—which

---

[23] To the extent any other count of AWS's Complaint may be read to encompass an objection to Amendment 0005 or any other term of the RFP, such allegations should be dismissed for the reasons set forth above.

they are not—it would only *confirm* that AWS's bias allegations are waived.  AWS claims that the

President's statements and tweets "came while DoD was evaluating the JEDI proposals and it

would have been virtually impossible for anyone involved in JEDI to ignore them."  Compl. ¶ 20.

By not protesting, however, AWS did ignore those statements and made a conscious decision to

"roll the dice" to see whether it would ultimately win the JEDI contract.  *Blue & Gold*, 492 F.3d

at 1314.  AWS's sandbagging is "fundamentally unfair" and directly at odds with the policies

underlying *Blue & Gold*.  *Peraton*, 2019 WL 6871790 at *6 (quoting *Blue & Gold*, 492 F.3d at

1314).

AWS concedes that the factual predicate for its claims of bias and bad faith "have been on

full display for the whole country to see" for many months prior to DoD's award of the JEDI

contract.  Compl. ¶ 18.  AWS generally claims that "President Trump has made no secret of his

personal dislike for Mr. Bezos, Amazon, and the *Washington Post*, or of his express desire to harm

them," dating back to "before he even was elected President."  Compl. ¶ 15; *see generally id.* at

¶¶ 15–21, 84–86.  And it asserts that the President "has used his office to prevent AWS from

winning the JEDI Contract."  Compl. ¶ 18.

In advancing these claims, AWS relies on a series of statements and tweets from President

Trump and others, all of which were made *before* the offerors' final proposals were due on

September 5, 2019. Specifically:

- Six of AWS's alleged statements were made *before* November 2016 election, when President Trump was a private citizen and candidate for office.  *See* Compl. ¶¶ 16, 84 (citing statements from December 2015, February 2016, and May 2016).

- Four of AWS's alleged statements came after President Trump was sworn in, but *before* DoD launched the JEDI procurement in September 2017.  *See* Compl. ¶¶ 84-86 (citing statements from June, July, and August 2017).

30

- Nine of AWS's alleged statements came after the procurement was launched, but *before* the due date for offerors to submit initial proposals on October 12, 2018. *See* Compl. ¶¶ 17, 19, 86-90 (citing statements from December 2017, March and April 2018, and the summer of 2018).

- Seventeen of AWS's alleged statements were made after the submission of initial proposals, but *before* the submission of final proposals on September 5, 2019. *See* Compl. ¶¶ 20, 85, 93, 95-97, 175-177 (citing statements from March, June, July, and August 2019).

None of these public statements plausibly alleges bias or improper influence on the JEDI contract award. But for *Blue & Gold* waiver purposes, though, the key point is that *all* of them were made before the close of bidding in September 2019.

AWS places especially strong emphasis on a press conference President Trump gave on July 18, 2019, where he said he had been getting "tremendous complaints" about the JEDI procurement and indicated he "[would] be asking [DoD] to look at [the JEDI procurement] very closely to see what's going on." Compl. ¶¶ 20, 95. AWS claims that the President's press conference "[made] clear to DoD (and the world) that [the President] did not want AWS to get the JEDI Contract." *Id.* at ¶ 94. Days after his July 18 press conference, the President "tweeted a video from a Fox News segment calling the JEDI Contract the 'Bezos Bailout.'" *Id.* at ¶ 97. During this same time period, the President's son, Donald Trump Jr., also published various tweets critical of Mr. Bezos. *Id.* at ¶ 94. According to AWS, one of Mr. Trump Jr.'s tweets was an "ominous[] prediction" of the President's alleged efforts to influence the outcome of the JEDI procurement. Compl. ¶ 20.

AWS also alleges that the President "intervened directly in the very final phases of the two-year procurement process" when he "essentially fired" Secretary Mattis and "directed his newly appointed Secretary of Defense, Mark Esper…to conduct an 'independent' examination" of the

31

procurement.  Compl. ¶ 21.  In AWS's telling, "Secretary Esper's appointment [on June 18, 2019] marked an important turning point" that "reflect[ed] the culmination of President Trump's improper interference and express direction to officials responsible for overseeing the award of the JEDI Contract." *Id.* at  ¶¶ 178-179.  Shortly after the announcement of Secretary Esper's review, AWS alleges that Mr. Trump Jr. "tweeted several times, bluntly, that AWS would not be awarded the JEDI Contract upon completion of the re-review process." *Id.* at ¶ 177.

In short, AWS is arguing that the President's public statements, as well the timing and circumstances surrounding Secretary Esper's review, establish that DoD's decision to award the JEDI contract to Microsoft must have been improperly influenced by the President's bias. *See generally* Compl. ¶ 221.  But even accepting that extraordinarily speculative allegation as true, there is no question that AWS knew the factual basis for the claims in Count V well before award because—as AWS alleges—these events unfolded "on publicly broadcast television and through [the President's] prolific tweets."  Compl. ¶ 13.  If AWS truly believed that these events tainted the fundamental fairness the procurement, it had to raise those allegations in a timely pre-award protest filed no later than the deadline set for FPRs (September 5, 2019), which occurred well after the President's public statements regarding JEDI in July and the announcement of Secretary Esper's review in early August.

AWS claims that it was impossible for ***any DoD official*** to conduct a fair and impartial evaluation as a result of the President's publicly expressed bias against AWS.  Compl. ¶ 221.  AWS's "sweeping assertion that no [DoD] personnel would fairly and impartially evaluate its proposal[]" is nothing more than a "quintessential challenge[] to the ground rules of the procurement[] that had to be challenged prior to the closing dates for proposals." *Adams and*

*Associates*, 2019 CPD ¶ 21, 2019 WL 245909 at *3.  Where, as here, "there is no question that the

factual predicates for [the protester's] bias and retaliation allegations were reasonably known to

the protester prior to the closing time[] for proposals," those allegations are subject to the *Blue &*

*Gold* waiver rule and GAO's analogous timeliness regulation, 4 C.F.R. § 21.2(a)(1).  *Adams and*

*Associates*, 2019 CPD ¶ 21, 2019 WL 245909 at *2.[24]

The allegations made by the protester in *Adams and Associates* and those made by AWS

here "are essentially untimely challenges to the fundamental grounds rules for the procurement[]."

*Id.* at 2.  Just like in *Adams and Associates*, AWS is alleging here "that the procurement process is

irredeemably flawed in that any agency official…who reasonably could have been involved in this

procurement is incapable of fairly evaluating the protester's proposals."  *Id.* at *2.

Allegations of bias based on facts known to the protester "should be resolved as early as

practicable during the solicitation process, but certainly in advance of an award decision if

possible, not afterwards."  *Id.* at *3.  The waiver rule bars an offeror, such as AWS, "from taking

advantage of the government as well as other offerors, by waiting silently only to spring forward

with an alleged defect in an effort to restart the procurement process, potentially armed with

increased knowledge of its competitors' position or information."  *Id.* at *3 (citing *Blue & Gold*,

492 F.3d at 1313-14).  In *Peraton*, this Court dismissed the plaintiff's bias claim under *Blue &*

*Gold* because it similarly failed to "actively prosecute the bad faith claim" prior to award "in hopes

of receiving the…contract" at issue.  *Peraton*, 2019 WL 6871790, *8.  AWS adopted the same

---

[24] Although GAO decisions are not binding, "the Court recognizes GAO's longstanding
expertise in the bid protest area and accords its decisions due regard." *Integrated Bus. Solutions,
Inc. v. United States*, 58 Fed. Cl. 420, 427 n.7 (2003); *see also Allied Tech. Grp., Inc. v. United
States*, 649 F.3d 1320, 1331 n.1 (Fed. Cir. 2011) (stating that Federal Circuit "may draw on GAO's
opinions for its application of [its] expertise.")

"wait and see" approach here when it learned of the factual basis for the allegations in Count V months before the award decision, but did not object in a timely pre-award protest.

At any time before September 5, AWS could have filed a pre-award bid protest with DoD, GAO, or this Court. Had it done so, its allegations of bias could have been fairly considered by the appropriate adjudicators *before* DoD completed the evaluation and made a final award decision. *See Blue & Gold*, 492 F.3d at 1314 (noting that "[i]t would be inefficient and costly" to remedy procurement errors "after offerors and the agency had expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation"); *see also Jacobs Tech. Inc. v. United States*, 131 Fed. Cl. 430, 446-47 (2017) (holding that a pre-award bias claim based on facts known to the protester is not premature, and that the same claim would be untimely under *Blue & Gold* if brought after award).

To the extent AWS was able to prove, by clear and convincing evidence, that any member of the JEDI source selection team was actually biased as a result of the President's conduct, it would have been entitled to appropriate relief. *See* 28 U.S.C. § 1941(b)(2) (in a bid protest, the Court "may award any relief that the court considers proper, including declaratory and injunctive relief"); *see also* 4 C.F.R. 21.8 (describing remedies GAO may recommend if a protest is sustained). For example, DoD could have been ordered to take appropriate action, potentially including removal of any affected personnel. *McTech Corp. v. United States*, 109 Fed. Cl. 28, 31 (2013) (in response to a pre-award bid protest alleging bias on the part of agency procurement officials, the agency implemented a corrective action plan that "replaced all key procurement personnel" who may have been biased against the plaintiff); *Seventh Dimension, LLC*, B-415311.4, 2018 CPD ¶ 412 (Comp. Gen. Nov. 29, 2018) (finding the removal and replacement of

evaluators, and reevaluation of technical proposals to sufficiently mitigate any potential conflicts). Indeed, any relief that AWS can *now* request in order to counteract President Trump's alleged anti-AWS bias could have been ordered by the Court, or recommended by GAO, prior to the completion of DoD's evaluation and award decision.[25]

AWS's failure to raise its allegations of bias prior to award is inexplicable, particularly given that DoD and AWS have, for nearly 18 months, litigated a pre-award protest alleging that the JEDI procurement was biased in *favor* of AWS.   *See generally* Tabs 54-85, AR004442-AR005922 (GAO protest materials); *Oracle Am., Inc. v. United States*, 144 Fed. Cl. 88 (2019). Consistent with the mandate of *Blue & Gold*, the FAR requires that contracting officers must "[i]dentify and evaluate potential [OCIs] as *early in the acquisition process as possible*" and, if necessary, "[a]void, neutralize or mitigate significant potential conflicts *before contract award*." 48 C.F.R. § 9.504(a) (emphasis added).  AWS surely understands that these mechanisms were available to address its allegations of anti-AWS bias prior to award.  It has spent more than a year *defending* the JEDI contracting officer's various OCI determinations made in response to a litany of issues raised by Oracle's pre-award claims.  *See generally Oracle*, 144 Fed. Cl. at 120-125 (denying Oracle's OCI claims).[26]

_____

[25] Notwithstanding AWS's inexcusable failure to raise its allegations prior to award, the record confirms that DoD took proactive measures to insulate the JEDI source selection team from any attempted outside.  *See, e.g.*, Tab 440 at AR176310 ("read ahead" brief for Secretary Esper noting that "[t]he specific names of evaluators are not releasable" and explaining that "the evaluation process is multi-layered, multi-phased, and structured so that no one person or team can unduly influence the outcome").

[26] *See also* Tab 261 at AR061061-63 (correspondence between AWS and the JEDI contracting officer, Ms. Chanda Brooks, regarding the OCI investigation); Tab 251 at AR60700-04 (letter from AWS to Ms. Brooks, intended to "clarify" and "ensure that the factual record [for the OCI investigation] is accurate and complete"); AR Tabs 252-254, 259 (providing additional

AWS's failure to avail itself of the bid protest process prior to the deadline for proposal submissions—or at *any* point prior to award—is fundamentally at odds with the rationale for the waiver rule articulated by the Federal Circuit in *Blue & Gold*, *Bannum*, *COMINT* and their progeny. Instead of bringing its bias claims at the appropriate time, AWS chose to move forward with the procurement. It presumably did so because it expected that President Trump's statements, while colorful, would have precisely zero impact on the procurement in real life. Indeed, just days before DoD announced the award to Microsoft, a high-level AWS executive publicly defended DoD's conduct of the JEDI procurement in a media interview, explaining that "[t]he process was not rigged" in favor of AWS and urging the public "to get beyond" the President's colorful statements about the procurement to focus on DoD's long term objectives.[27]

Things look different now, of course. Microsoft prevailed and so AWS has decided to belatedly spring forward with meritless allegations of bias that "could [have been] raised and resolved prior to the contract award." *Synergy*, 133 Fed. Cl. at 740. AWS has no excuse for failing to raise its allegations in a pre-award protest. Accordingly, the allegations of bias and bad faith set forth in Count V are waived and should be dismissed in their entirety.

### C.   AWS Waived Count VI (Violation of Procurement Law and Regulation

In Count VI, AWS merely repackages its allegations of bias and bad faith into a baseless and speculative OCI claim. *See* Compl. ¶¶ 224-229. AWS alleges that "[t]he Administration created a conflict of interest by demonstrating through repeated conduct that Executive Branch

---

information for OCI investigation); Tab 260 at AR061008-24 (directly rebutting OCI claims made by Oracle in a 17-page letter).

[27] David Morris, *Amazon Executive on Fight Over Huge Defense Contract: 'The Process Was Not Rigged'*, FORTUNE, (Oct. 23, 2019 12:27 PM), https://fortune.com/2019/10/23/amazon-teresa-carlson-jedi-bidding/ (see video at 8:11-9:00; 12:18-14:18)

employees who do not follow President Trump's directives are at risk of losing their jobs." Compl. ¶ 226. According to AWS, the entire JEDI source selection team was tainted by a conflict of interest because they allegedly "knew that their continued employment likely depended on selecting Microsoft." *Id.* at ¶ 226 (citing 18 U.S.C. § 208; 5 C.F.R. § 2635.403(c)). Putting aside the sheer implausibility of this allegation, the claims in Count VI are waived under *Blue & Gold* because they are premised on the same publicly available facts that form the basis for Count V.[28]

To the extent AWS believed that the President's statements created an actual conflict of interest for any member of the JEDI source selection team, or any DoD official with oversight responsibility for the JEDI procurement, it was required to raise that allegation in a pre-award protest. *Blue & Gold*'s waiver rule dictates "that a contractor should not be allowed to protest an agency's failure to identify and mitigate an OCI when the contractor knew about the alleged OCI from the start, but failed to assert it, via protest, prior to the award." *CRAssociates, Inc.* 102 Fed. Cl. 698 at 712. In cases where, as here, the plaintiff is aware prior to award of "the predicate for its claim that the Government violated" a statutory or regulatory provision intended to prevent conflicts of interest, it must raise that issue in a pre-award protest or else the claim is waived under *Blue & Gold*. *Commc'n Constr.*, 116 Fed. Cl. at 262. The waiver rule applies whether the OCI

---

[28] Under 18 U.S.C. § 208, employees who participate in procurements despite an unmitigated conflict of interest are subject to *criminal penalties*, including fines and up to a years' imprisonment. *See id.* §§ 208(a), 216. In other words, AWS's reading of the statute suggests that a government employee could *go to prison* for continuing to participate in a procurement whenever a supervisor expresses a preference for one offeror or another. This cannot be—and is not—the import of § 208. Nothing in the statute or its implementing regulations suggests that mere pressure from a superior could amount to a disqualifying "financial interest" in the procurement. *See* 5 C.F.R. § 2635.403(c) (limiting the term "financial interest" to include "financial interests that are *owned*" by the employee or certain other individuals, such as "stocks, bonds," etc., but not the contingent prospect of employment).

claim is apparent from the RFP, or based on publicly available materials "that make them subject to the *Blue & Gold* patent ambiguity test." *Concourse*, 131 Fed. Cl. 26, 30 (2017) (dismissing plaintiff's untimely allegation "that the Army and the incumbent's 'unusually close' relationship gave rise to multiple OCI claims" because the plaintiff "knew or should have known" of this fact prior to award based on public information).

AWS's OCI claim is no different from those dismissed as untimely in *CRAssociates*, *Commc'n Constr.*, and *Concourse*. Just like the plaintiffs in those cases, AWS had pre-award knowledge of the facts that gave rise to the alleged conflict. The core factual predicate of the OCI claim centers on the President's public statements and other publicly announced actions, such as Secretary Esper's review, that allegedly created a conflict of interest for every member of the JEDI source selection team. AWS was undoubtedly aware of these facts in real time prior to award and, in fact, prior to the deadline set for receipt of FPRs. To be sure, the complaint alleges that it was "virtually impossible for anyone involved in JEDI"—including AWS—"to ignore" the facts that now form the basis for AWS's allegations. Compl. ¶ 20. AWS has therefore waived the OCI claims alleged in Count VI. *See Concourse*, 131 Fed. Cl. at 30 (rejecting the plaintiff's "unconvincing" contention that it was "ignorant" of the factual basis for its OCI claim where "publically display[ed]" information put it on notice of its potential claim prior to award).

The remaining regulatory violations alleged in Count VI are also waived because they too are based on facts that AWS knew prior to award. AWS claims that it received unfair treatment, in violation of FAR 3.101-1 and FAR 15.305, based on an alleged improper directive from President Trump that "AWS not be awarded the JEDI Contract." *Compl.* at ¶ 228. Because these

claims are also based on the President's public, pre-award conduct, they are necessarily waived under *Blue & Gold*. As such, the Court should dismiss the untimely claims alleged in Count VI.

### D.  AWS Waived Count VII (Breach of Implied Contract of Good Faith and Fair Dealing)

In Count VII, AWS alleges a breach of the implied contract of good faith and fair dealing. *See* Compl. ¶¶ 230-234. An offeror's submission of a proposal gives rise to an implied contract of good faith and fair dealing that is breached where the agency does not fairly and honestly evaluate the proposal. *Cent. Ark. Maint., Inc. v. United States*, 68 F.3d 1338, 1341 (Fed. Cir. 1995). In a bid protest, an implied contract claim may encompass various types of arbitrary and capricious conduct, including allegations of "subjective bad faith on the part of the government." *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1132 (Fed. Cir. 1998).

Here, AWS claims that "DoD breached the implied contract to consider all bids fairly and honestly by conducting the procurement in an arbitrary, capricious, and irrational manner." Compl. ¶ 232. The only allegation made in support of this legal conclusion is the bare assertion that "President Trump induced DoD to conduct the procurement in a manner that breached the implied contract of good faith and fair dealing between the Government and AWS." *Id.* at ¶ 233. In essence, AWS is alleging that the JEDI source selection team was "induced" by President Trump to engage in a biased, pretextual evaluation designed to steer the contract away from AWS in bad faith. *See Peraton, Inc. v. United States*, 144 Fed. Cl. 59, 65 (2019) (noting that "the primary thrust of plaintiff's allegations is that the agency has acted in bad faith in this procurement" where plaintiff alleged that the agency engaged in "pretextual actions" designed to unfairly favor the awardee). Count VII is duplicative of Count V and should also be dismissed as untimely under *Blue & Gold*.

This court has recognized that where, as here, an implied contract claim "is comprised of precisely the same allegations supporting" another claim in the complaint, it is "unnecessary" to consider the implied contract claim "separately and independently" from that other claim. *Unified Architecture & Eng'g, Inc. v. United States*, 46 Fed. Cl. 56, 61 (2000); *see also Metro. Van & Storage v. United States*, 92 Fed. Cl. 232, 249 n.7 (2010) (concluding that plaintiff's "implied-in-fact contract theory . . . is not operative"). Here, Count VII—which alleges that "President Trump induced DoD to conduct the procurement in a manner that breached the implied contract of good faith and fair dealing between the Government and AWS," Compl. at ¶ 233—is indistinguishable from Count V, which alleges that "President Trump's bias against AWS improperly influenced DoD officials responsible for the JEDI solicitation, undermined the procurement process, resulted in an unreasonable evaluation, and unfairly deprived AWS of the JEDI award" (*Id.* at ¶ 220). Count VII is therefore duplicative of Count V and should be dismissed under *Blue & Gold* for the reasons set out above. *See supra*, at 29-36.[29]

## CONCLUSION

For the reasons set for above, the Court should grant this motion and dismiss Counts III, V, VI, and VII of AWS's complaint as waived.

---

[29] Although some judges have dismissed implied contract claims for lack of jurisdiction under the Tucker Act, the prevailing view is that the Court does have jurisdiction to decide a claim alleging breach of the duty of good faith and fair dealing. *See, e.g., Castle-Rose, Inc. v. United States*, 99 Fed. Cl. 517, 531 (2011) (holding that the court has jurisdiction to hear an implied contract claim in the context of a bid protest brought under 28 U.S.C. § 1491(b)); *but see Lion Raisins, Inc. v. United States*, 52 Fed. Cl. 115, 120 (2002) ("Because there is no benefit in bringing a bid protest claim as a an implied contract under section 1491(a)(1), no logical reason would support the presumption that Congress intended for the implied-contract cause of action to survive the enactment of the [Administrative Disputes Resolution Act of 1996].").  To the extent the Court is inclined to follow the decision in *Lion Raisins*, it may alternatively dismiss Count VII for lack of subject matter jurisdiction under RCFC 12(b)(1).

Dated:  January 24, 2020

*Of Counsel*:

LATHAM & WATKINS LLP

Kathryn H. Ruemmler
Abid R. Qureshi
Roman Martinez
Anne W. Robinson
Dean W. Baxtresser
Genevieve Hoffman
Riley Keenan

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
(202) 637-2200 (Telephone)
(202) 637-2201 (Facsimile)

Respectfully submitted,

ROGERS JOSEPH O'DONNELL, P.C.

By: */s/*
    Robert S. Metzger (Attorney of Record)

Jeffery M. Chiow
Neil H. O'Donnell
Lucas T. Hanback
Stephen L. Bacon
Deborah N. Rodin
Cassidy Kim
Eleanor M. Ross

875 15th Street N.W., Suite 725
Washington, D.C. 20005
(202) 777-8952 (Telephone)
(202) 347-8429 (Facsimile)

*Attorneys for Intervenor-Defendant,*
*Microsoft Corporation*