## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST

| | |
|---|---|
| AMAZON WEB SERVICES, INC.<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>THE UNITED STATES,<br><br>　　　　　　Defendant,<br><br>and<br><br>MICROSOFT CORPORATION,<br><br>　　　　　Intervenor-Defendant. | Case No. 19-1796<br><br>Judge Patricia E. Campbell-Smith<br><br>███████████████<br><br>**FINAL REDACTED VERSION** |

## INTERVENOR-DEFENDANT'S OPPOSITION TO AMAZON WEB SERVICES, INC.'S
## MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

███████████████████████████

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

QUESTIONS PRESENTED..................................................................................................3

STATEMENT OF THE CASE...............................................................................................4

    A.    The JEDI Procurement Process Was Designed To Meet The Needs Of Warfighters And Ensure A Fair Assessment Of Parties' Proposals .......................4

    B.    Oracle's Bid Protest Raised Significant Public Controversy Over Whether The Procurement Process Was Biased In Favor Of AWS ........................................5

    C.    Secretary Esper Agreed To Review The Efficacy Of The JEDI Program In Response To Concerns From Multiple Stakeholders...............................................7

    D.    Deputy Secretary Norquist Affirmed The Efficacy And Fairness Of The JEDI Program, And Microsoft Received The Award.............................................10

    E.    This Litigation............................................................................................................12

ARGUMENT ........................................................................................................................12

I.    AWS HAS FAILED TO OFFER "HARD FACTS" OF BIAS OR BAD FAITH WARRANTING SUPPLEMENTATION ...........................................................................13

    A.    Supplementation Is Not Allowed Unless AWS Presents "Hard Facts" Showing Bias In The Actual Procurement Decision ...............................................13

    B.    AWS Has Not Presented "Hard Facts" That The Procurement Officials Responsible For The JEDI Contract Award Were Biased......................................17

          1.    The Statements From President Trump Do Not Show Bias By The Responsible DoD Procurement Officials.......................................................18

          2.    AWS Has Failed To Show That Agency Officials Took Improper Action Based On These Statements...........................................................22

    C.    The Mere Fact That DoD Concluded Microsoft's Proposal Was Superior Is Not Evidence Of Bias Or Bad Faith.......................................................................25

II.    SUPPLEMENTATION IS NOT APPROPRIATE BECAUSE AWS WAIVED ITS BIAS CLAIMS UNDER *BLUE & GOLD*...................................................................31

III.     AWS'S SUPPLEMENTATION AND DISCOVERY REQUESTS ARE
         IMPROPER AND ARE MERELY INTENDED FOR DELAY ....................................... 35

CONCLUSION ............................................................................................................................ 38

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AgustaWestland N. Am., Inc. v. United States*,
    880 F.3d 1326 (Fed. Cir. 2018)..................................................................................14

*ATX, Inc. v. U.S. Department of Transportation*,
    41 F.3d 1522 (D.C. Cir. 1994)...............................................................................22, 23

*Axiom Res. Mgmt. Inc. v. United States*,
    564 F.3d 1374 (Fed. Cir. 2009).......................................................................... *passim*

*Bannum, Inc. v. United States*,
    779 F.3d 1376 (Fed. Cir. 2015)..................................................................................31

*Beta Analytics v. United States*,
    61 Fed. Cl. 223 (2004) ...................................................................................... *passim*

*Blue & Gold, Fleet, L.P. v. United States*,
    492 F.3d 1308 (Fed. Cir. 2007)..........................................................................3, 31, 32

*Camp v. Pitts*,
    411 U. S. 138 (1973) (per curiam).......................................................................13, 14

*CHE Consulting, Inc. v. United States*,
    125 Fed. Cl. 234 (2016) ...............................................................................15, 16, 21, 36

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)..................................................................................................14

*COMINT Systems Corporation v. United States*,
    700 F.3d 1377 (Fed. Cir. 2012)..................................................................................32

*CRAssociates, Inc. v. United States*,
    102 Fed. Cl. 698 (2011), *aff'd*, 475 F. App'x 341 (Fed. Cir. 2012) ........................................34

*CYIOS Corp. v. United States*,
    122 Fed. Cl. 726 (2015) .............................................................................................14

*DataMill, Inc. v. United States*,
    91 Fed. Cl. 722 (2010) .....................................................................................15, 16, 17

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019)......................................................................................13, 14

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985)............................................................................................................13

*Four Points by Sheraton v. United States*,
    63 Fed. Cl. 341 (2005) ..........................................................................................15, 16, 25

*Gulf Grp., Inc. v. United States*,
    61 Fed. Cl. 338 (2004) ................................................................................................35, 36

*iAccess Tech., Inc. v. United States*,
    143 Fed. Cl. 521 (2019) ....................................................................................................32

*Info. Tech. & Applications Corp. v. United States*,
    316 F.3d 1312 (Fed. Cir. 2003).........................................................................................25

*Inforeliance Corp. v. United States*,
    118 Fed. Cl. 744 (2014) ....................................................................................................15

*Jacobs Tech. Inc. v. United States*,
    131 Fed. Cl. 430 (2017) ......................................................................................13, 15, 16

*Jarrott v. Scrivener*,
    225 F. Supp. 827 (D.D.C. 1964)........................................................................................22

*Joint Venture of Comint Sys. Corp. v. United States*,
    100 Fed. Cl. 159 (2011) ....................................................................................................36

*Kellogg Brown & Root Services, Inc. v. United States*,
    117 Fed. Cl. 1 (2014) ........................................................................................................37

*L-3 Communications Integrated Sys. v. United States*,
    91 Fed. Cl. 347 (2010) ......................................................................................................16

*Office Depot, Inc. v. United States*,
    94 Fed. Cl. 294 (2010) ......................................................................................................17

*Oracle Am., Inc. v. United States*,
    143 Fed. Cl. 341 (2019) ......................................................................................................6

*Oracle Am., Inc. v. United States*,
    144 Fed. Cl. 88 (2019) ..........................................................................................1, 6, 20

*Oracle Am., Inc. v United States*,
    No. 18-1880C, 2019 WL 354705 (Fed. Cl. Jan. 28, 2019)...............................................16, 21

*Orion Int'l Tech. v. United States*,
    60 Fed. Cl. 338 (2004) ......................................................................................................35

*Palantir USG, Inc. v. United States,*
    129 Fed. Cl. 218 (2016) ................................................................35

*Peraton Inc. v. United States,*
    No. 19-932C, 2019 WL 6871790 (Fed. Cl. Dec. 17, 2019).....................31

*Price Gordon Servs. v. United States,*
    139 Fed. Cl. 27 (2018) ........................................................... *passim*

*Starry Associates, Inc. v. United States,*
    125 Fed. Cl. 613 (2015) .........................................................15, 16

*Synergy Sols., v. United States,*
    133 Fed. Cl. 716 (2017) .........................................................31, 32

*Tafas v. Dudas,*
    530 F. Supp. 2d 786 (E.D. Va. 2008) ................................................36

*Unified Architecture & Eng'g, Inc. v. United States,*
    46 Fed. Cl. 56 (2000) ................................................................34

*Voith Hydro, Inc. v. United States,*
    142 Fed. Cl. 233 (2019) ..............................................................14

## STATUTES

5 U.S.C. § 706.............................................................................13

10 U.S.C.
    §2304a(d) ...............................................................................5
    § 2305(a)(1)(A)(i) ......................................................................5

18 U.S.C.
    § 208.....................................................................................1
    § 208 (2) ................................................................................16
    § 216(a) ..................................................................................1

28 U.S.C. § 1491(b)(4) ....................................................................13

41 U.S.C. § 2103..........................................................................5

## RULES

RCFC, App. C, Rule 21 ...................................................................14

RCFC, App. C, Rule 22 ...................................................................14

## REGULATIONS

4 C.F.R. § 21.2(a)(1) .........................................................................................................32

## OTHER AUTHORITIES

Amanda Macias, *Pentagon will not award JEDI cloud contract until new Defense secretary completes review*, CNBC (Aug. 11, 2019, 11:20 AM), https://www.cnbc.com/2019/08/09/pentagon-delays-jedi-cloud-contract.html.........................9

*Dr. Mark T. Esper*, Secretary of Defense, U.S. Dep't of Defense, https://www.defense.gov/Our-Story/Biographies/Biography/Article/1378166/ dr-mark-t-esper/ (last visited Jan. 31, 2020) ...........................................................................7

## INTRODUCTION

The Department of Defense (DoD) spent two years on the Joint Enterprise Defense Infrastructure (JEDI) Cloud procurement, crafting the requirements for the program to suit the urgent needs of American warfighters after extensive consultation with DoD and industry experts, and carefully evaluating offerors' proposals.  Amazon Web Services (AWS)—along with Microsoft—was a leading industry participant in the effort to bring JEDI to fruition, hosting then-Defense Secretary James Mattis at AWS headquarters in August 2017 to discuss how emerging technologies can further national security, submitting a lengthy response to DoD's initial request for information in November 2017, and submitting its initial proposal in October 2018.  AWS then defended the integrity of the JEDI procurement against allegations of bias brought by Oracle, which was knocked out of the competition in the first round.  *See Oracle Am., Inc. v. United States*, 144 Fed. Cl. 88, 120 (2019).

Having lost the award, AWS now protests and raises sensational allegations that rampant bias tainted the JEDI procurement process and channeled the award to Microsoft.  AWS alleges, in essence, that President Trump's statements criticizing AWS's parent company (Amazon) and its CEO (Jeffrey Bezos) somehow prove that anti-AWS bias infected the entire JEDI procurement.  Even more incredibly, AWS alleges that DoD procurement officials were driven by these statements to place their careers on the line—and commit criminal conduct punishable by up to 5 years in prison—in order to throw the competition in favor of Microsoft.  Compl. ¶¶ 219-234 (alleging, among other things, that the procurement officials violated 18 U.S.C. § 208 by carrying out the procurement in face of President Trump's statements); *see also* 18 U.S.C. § 216(a).

AWS has had nearly a month to scrutinize the administrative record support for its bias allegations.  It has found *nothing*.  AWS's renewed motion to supplement is devoid of any

reference to the record that establishes bias had any actual effect upon the procurement process or the selection.[1]

AWS nonetheless doubles down on the empty proposition that the JEDI award is explained only by operation of bias and insidious presidential influence. Its request to supplement the administrative record flies in the face of the rules governing bid protests and review of agency action more generally. Review in protest actions is limited to the administrative record, and agency officials are entitled to a strong presumption of good faith with respect to their official acts. Here, the presumption of regularity fits the facts very well. The responsible officials are military officers, career civil servants, and technical experts with decades of experience in their respective fields. AWS impugns, demeans, and discredits government personnel at all levels, despite the utter absence of any support for their accusations in the administrative record.

Supplementation is only appropriate in extraordinary situations, and never upon mere supposition and wild accusation. The presumption of regularity can be overcome—and supplementation can be ordered—but only when there are "hard facts" supporting the allegations of bias. AWS has identified no such "hard facts" here, even after its review of the administrative record. Accordingly, this Court should deny AWS's motion to supplement, and thereby uphold traditional principles of Administrative Procedure Act (APA) review. There are several powerful reasons to deny supplementation here.

*First*, AWS has not identified the "hard facts" of bias necessary to displace the presumption of good faith and justify supplementation. *See Axiom Res. Mgmt. Inc. v. United States*, 564 F.3d

---

[1] On January 22, 2020, AWS filed a motion for preliminary injunction. *See* ECF 130. Notably, the bias claims underlying the motion to supplement here are completely absent from the merits allegations that AWS presents to justify an injunction.

1374, 1380 (Fed. Cir. 2009); *see also, e.g.*, *Beta Analytics v. United States*, 61 Fed. Cl. 223, 226 (2004). AWS identifies no events, documents, or other details showing bias on the part of agency decisionmakers; nor has it identified any basis to suspect, much less conclude, that procurement officials acted improperly based on President Trump's statements. AWS claims that the award to Microsoft can only be explained by bad faith, but its allegations amount to nothing more than disagreement with the evaluation results and, in any case, are easily rebuttable. Such allegations are insufficient to overcome the presumption of good faith. *Beta Analytics*, 61 Fed. Cl. at 226.

*Second*, supplementation of the record and discovery on the bias claims is unnecessary because these claims are untimely and should be dismissed. *See generally* Microsoft Partial Mot. to Dismiss, ECF 133. All the statements on which AWS bases its bias claims were "overt and public" and "known to all" largely before the RFP was issued, and certainly before the parties submitted their final proposals on September 5, 2019. *See* Renewed Mot. to Suppl., ECF 124-1, at 24 (internal quotations omitted); *see, e.g.*, Compl. ¶¶ 94, 175. These claims are waived under *Blue & Gold, Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) because they were not raised until after award.

*Third*, and finally, AWS's specific discovery requests are overbroad, exceptionally burdensome and not likely to result in evidence necessary to have a record sufficient for review.

## QUESTIONS PRESENTED

1.      Whether AWS showed that its bias allegations are "sufficiently well-grounded" and supported by "hard facts" to warrant supplementation of the administrative record.

2.      Whether AWS's supplementation and discovery requests are overbroad and improper.

## STATEMENT OF THE CASE

Microsoft has already discussed the background of this case in its motion to dismiss, ECF 133, and its opposition to AWS's motion for preliminary injunction, ECF 137. Here Microsoft addresses specific facts that concern AWS's motion to supplement.

### A. The JEDI Procurement Process Was Designed To Meet The Needs Of Warfighters And Ensure A Fair Assessment Of Parties' Proposals

AWS's motion spends much time recounting statements made by those who were uninvolved in the procurement, but little time discussing the actual procurement process and the steps DoD took to ensure the integrity of the award.

The JEDI acquisition process began in 2017, when DoD first determined to adopt an enterprise cloud. Tab 440, AR176308. The solicitation requirements were specifically driven by the needs of the warfighter. To develop those requirements, DoD sought input widely from across the agency, and from industry, to inform the agency's market research and its Request for Proposal ("RFP"). *See* Tab 335, AR151360; Tab 440, AR176308-09; *see also* Tab 453, AR176336. Finally, DoD sought to learn from the ████████████ experience with commercial cloud computing, specifically the ██████████████████████████████████████ ███. Tab 161, AR22852. DoD identified areas where JEDI ████████████. *See* Tab 161 (white paper identifying "lessons learned" ██████).

DoD released the final JEDI RFP in July 2018. Tab 1, AR1. It then organized a source selection team ████████████████████████ The evaluation process was "multi-layered, multi-phased, and structured so that no one person or one team c[ould] unduly influence the outcome." Tab 440, AR176310; *see also generally* Tab 305 (Source Selection Plan). As AWS concedes, then-Secretary of Defense Mattis instructed his staff that the procurement was to be done "by the book, both legally and ethically." Compl. ¶ 91. "All evaluation findings and

results" were "in writing," and "the rationale for all decisions [was] exhaustively documented."
Tab 440, AR176310.

All evaluation reports were reviewed by the higher-level boards—the Source Selection
Evaluation Board, the Price Evaluation Board, and the Source Selection Advisory Council—who
were "required to use independent judgment and [were] not beholden to lower level findings."
Tab 440, AR176310. Evaluators were instructed to give "preferential treatment [to] none," to
"[b]e consistent in application of the evaluation criteria," to "[o]nly base evaluations on the
proposals," and not to consider their own "personal opinions regarding particular contractors,
personnel, facilities, etc." Tab 192, AR24174; *see also* Tab 305, AR64350-51 (rules of conduct).
All relevant personnel were required to sign non-disclosure agreements and affirm that they had
no conflicts of interest. *See* Tab 188. The entire process was managed by the Contracting Officer
and accountable to the Cloud Computing Program Office, and ultimately, DoD's Chief
Information Officer. Tab 440, AR176310.

### B.    Oracle's Bid Protest Raised Significant Public Controversy Over Whether The Procurement Process Was Biased In Favor Of AWS

DoD knew to "expect award protests" based on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Tab 161, AR22853. And indeed, in August 2018 Oracle filed a pre-
award bid protest before the Government Accountability Office (GAO), challenging the terms of
the JEDI solicitation and alleging that the procurement was biased in favor of AWS.[2] *See* Tab 67,

---

[2] Oracle's GAO protest alleged that: (1) certain DoD employees had sought employment with AWS while working on the JEDI procurement, in violation of 41 U.S.C. § 2103; (2) DoD failed to justify its decision to award the JEDI Cloud contract to a single offeror, as required by 10 U.S.C. §2304a(d); and (3) DoD's use of gate criteria rendered the procurement insufficiently competitive, in violation of 10 U.S.C. § 2305(a)(1)(A)(i). *See* Tab 67, AR4880-87.

AR4880-87; Tab 440, AR176313.  In November 2018, GAO denied Oracle's protest.  Tab 83, AR5918.  Oracle then filed a protest in this Court.  *See Oracle*, 144 Fed. Cl. at 101.

AWS intervened and offered a lengthy defense of the integrity of the procurement, emphasizing all the steps DoD took to ensure that the JEDI procurement was fair and appropriate. *See* AWS Resp. & Cross-Mot. for J. on Admin. R., *Oracle*, No. 18-1880C, ECF 88, at 14-31 (June 18, 2019).  AWS defended the procurement process as "entirely rational," repeatedly asserted that "no conflicts negatively impacted the JEDI procurement," and denied "any bad faith on the part of the actual agency decision-makers."  *Id.* at 19, 23, 44, 61.

In April 2019, DoD narrowed the competitive range to AWS and Microsoft, finding that IBM and Oracle could not satisfy the gate criteria.  Compl. ¶ 101; *see* Tab 457, AR176398.  DoD began evaluating AWS's and Microsoft's initial proposals under Factors 2 through 9 of the RFP, which the agency used to evaluate the technical merits of each offer.  DoD found both initial proposals ███████████████████████████████.  Tab 459, AR176412.  Accordingly, DoD initiated discussions with Microsoft and AWS to clarify the agency's vision for the JEDI Cloud and to make sure that the offerors fully understood DoD's objectives.  *See id.* AR176413.  In June 2019, both offerors submitted Interim Proposal Revisions (IPRs).  Compl. ¶¶ 102-03; Tabs 309, 316.

While DoD was engaged in these discussions with AWS and Microsoft, Oracle's bid protest proceeded.  On July 12, 2019, the Court rejected Oracle's bid protest, and publicly released its opinion two weeks later.  *See Oracle Am., Inc. v. United States*, 143 Fed. Cl. 341 (2019) (order). The court agreed with Oracle that "at least two DoD officials disregarded their ethical obligations by negotiating for AWS employment while working on this procurement," but nonetheless concluded that no party suffered prejudice.  *Oracle*, 144 Fed. Cl. at 120-21.

**C.     Secretary Esper Agreed To Review The Efficacy Of The JEDI Program In Response To Concerns From Multiple Stakeholders**

Although Oracle's bid protest failed, its sensational allegations that the procurement was biased in favor of AWS—coupled with the size and significance of the potential award—generated much public scrutiny and media attention.  *See, e.g.*, Compl. ¶¶ 92-93 & n.38, ¶ 175.  Multiple members of Congress publicly expressed concern about the procurement and the JEDI program more generally, repeatedly reaching out to Mark Esper, who assumed leadership of DoD in June 2019 and was confirmed as Secretary of Defense near the end of July.  *Id.* ¶¶ 93, 176.[3]

On June 12, 2019, Representative Steve Womack of Arkansas wrote President Trump, criticizing the single award and expressing concern that the procurement process was not sufficiently competitive.  Compl. ¶ 93; AWS Appendix, ECF 124-2, at 205-06.[4]  Senator Ron Johnson of Wisconsin wrote then-Acting Secretary Esper on June 24, 2019, requesting that the procurement be delayed until the agency completed its investigation into the conflicts of interest identified by Oracle.  Compl. ¶ 176; ECF 124-2, at 207-08.  Representative Mark Meadows of North Carolina wrote Esper on July 3, noting that he had recently reviewed "documents and information" related to JEDI that raised "concerns there are systemic conflicts of interest and ethics violations stemming from Amazon Web Service's [sic] involvement in the contract."  Tab 453, AR176340.  In July 2019, Senator Marco Rubio of Florida wrote both Esper and the National Security Advisor, questioning the wisdom of the single award and whether the procurement was

---

[3] *See also Dr. Mark T. Esper*, Secretary of Defense, U.S. Dep't of Defense, https://www.defense.gov/Our-Story/Biographies/Biography/Article/1378166/   dr-mark-t-esper/ (last visited Jan. 31, 2020).

[4] Pursuant to the Court's instruction, references to the appendix to AWS's motion to supplement are indicated herein by ECF page number.  For the Court's information, the page number from the ECF is higher by 10 than the corresponding "APP" page number used by AWS; e.g., the first document in the Appendix, labeled APP 001, is ECF page 11.

sufficiently competitive, and noting the contracting officer's findings that two individuals with ties to AWS may have violated federal procurement law. Compl. ¶¶ 93, 176; ECF 124-2, at 87-88, 91. His letter acknowledged this Court's *Oracle* decision but requested that the JEDI award be postponed until DoD's Inspector General finished investigating these two individuals and until Congress had a chance to review the findings. Compl. ¶ 176; ECF 124-2, at 91. President Trump weighed in at a press conference in mid-July, stating that he was looking "very seriously" into the JEDI procurement and that he would be "asking [DoD] to look at it very closely," because of the "tremendous complaints" he had been hearing. Compl. ¶¶ 20, 95 (alterations in original).

In early August 2019, Secretary Esper "committed to conduct a comprehensive review of the [JEDI] Cloud acquisition program to ensure that the Department's cloud based computing and artificial intelligence needs are met and that the acquisition process is fair and impartial." Tab 458, AR176408. As part of this review, Esper asked the DoD Chief Information Officer (CIO) to "identify options for how the Department could proceed with its cloud computing requirements," as potential alternatives to the existing JEDI program. Tab 458, AR176408; *see also* Tab 462, AR176426. Esper explained that "as the new guy coming in," he wanted to take a "hard look" at the procurement to "make sure make sure I understand all the different factors." Compl. ¶ 176. He based his decision on "concerns I've heard from members of Congress, both parties, both sides of the Hill," as well as comments "from people from the White House" and press reporting on concerns raised by "companies and industry." *Id.*; ECF 124-2, at 111. Esper clarified, however, that the White House had "not directed [him] to do" the review, but that he made the decision on his own, emphasizing that he "would do it with any program that raised this much consternation."

8

ECF 124-2, at 111.  Days later, CIO Dana Deasy confirmed that President Trump had no role in Esper's review or in the source selection process.[5]

Between the end of July and mid-September, Secretary Esper participated in a series of "educational sessions" to better understand the JEDI program.  *See, e.g.*, Tab 453, AR176333; Tab 462, AR176426.  Attendees at these meetings included Deasy and others, including ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮  *See e.g.*, Tab 335, AR151351; Tab 439, AR176304; Tab 440, AR176307.  Topics covered in the meetings included: (1) DoD's enterprise cloud strategy and the importance of JEDI to the warfighter; (2) consequences if JEDI does not stay the course; (3) an action plan to improve DoD's messaging on the program, and address misinformation and the surrounding political dynamics;  (4) arguments raised by opponents of JEDI and DoD's cloud program; (5) the ongoing *Oracle* litigation; (6) the development of the requirements for the JEDI RFP and the evaluation process; and (7) how JEDI would address gaps in DoD's cloud capabilities. *See* Tab 335, AR151352-69; Tab 339, AR176304-05; Tab 440, AR176307-18.  On September 26, DoD also hosted an information session for members of Congress, to give them "an opportunity to express their concerns directly to the Secretary of Defense" as part of his review of the program, and to address each "myth" that had arisen around the procurement.  *See* Tab 453, AR176333-37. Crucially, however, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮"  Tab 462, AR176426 (emphasis added).

---

[5] Amanda Macias, *Pentagon will not award JEDI cloud contract until new Defense secretary completes review*, CNBC (Aug. 11, 2019, 11:20 AM), https://www.cnbc.com/2019/08/09/pentagon-delays-jedi-cloud-contract.html.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

After carefully reviewing the facts, Secretary Esper decided that proceeding with the JEDI procurement was in the public interest.  He "████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████"  Tab 462, AR176426.  However, given his son's employment with IBM, he concluded following the informational meetings that he ought to recuse himself from any "decision briefings" or "from otherwise making a determination concerning the JEDI Cloud acquisition," including the decision about whether to proceed with the procurement at all.  Tab 458, AR176408; *see also* Tab 462, AR176426; Compl. ¶ 187; ECF 124-2, at 120-21.  Accordingly, on October 7, 2019, "[o]ut of an abundance of caution and to avoid any concerns regarding [his] impartiality," Secretary Esper delegated "his authority to the Deputy Secretary [of Defense, David Norquist] to consider options on how to proceed with the JEDI acquisition."  Tab 458, AR176408; Tab 462, AR176426.

### D. Deputy Secretary Norquist Affirmed The Efficacy And Fairness Of The JEDI Program, And Microsoft Received The Award

That same day, October 7, Deputy Secretary Norquist met with ████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████  to discuss options for whether and how to move forward with the JEDI procurement.  Tab 462, AR176426.  In addition to maintaining the path for JEDI laid out in the RFP, Norquist considered six additional options, falling into two rough categories: (1) options that would change some aspect of the JEDI contract, and (2) options that involved pursuing the JEDI award and pursuing an additional contracting option.  *Id*.  There is no evidence any source selection sensitive material was discussed during this meeting.  *Id*.  After assessing the options

based on the business and legal risks, the Deputy Secretary "approved the DoD CIO to finalize the JEDI source selection and award in accordance with the current Request for Proposals." *Id.*

Several weeks earlier, on September 5, 2019, Microsoft and AWS had submitted their final proposal revisions ("FPRs"). Compl. ¶ 108; Tab 459, AR176411. While Secretary Esper's review had been ongoing throughout September 2019, DoD's Technical Evaluation Boards (TEBs) reviewed the FPRs and updated the factor-by-factor evaluations of both parties' initial proposals. Tab 457, AR176396; Tab 459, AR176413. On September 27, the Source Selection Evaluation Board (SSEB) issued its report summarizing the TEB reports, Tab 456, AR176366-95, and on September 29, the Price Evaluation Board (PEB) issued its report concluding that the parties had appropriately priced their proposals, Tab 455, AR176347-65. On October 3, the Source Selection Advisory Committee (SSAC) issued its recommendation, drawing on the SSEB and PEB reports. Tab 457, AR176396-407. The SSAC's report recommended that the contract be awarded to Microsoft. *Id.* AR176406. The report gave both proposals ███████, but concluded that Microsoft's proposal was "significantly superior" as to overall non-price factors and also had a ███████ lower price. *Id.* AR176398-400, 176404, 176406.

After reviewing the recommendations of the TEBs, SSEB, PEB and SSAC, the Source Selection Authority (SSA), ████████████████████████████████████ ████████████████████████████████ issued her final decision on October 17. ████ ██████████ accepted the SSAC's recommendation and awarded the JEDI Cloud contract to Microsoft. Her decision echoed the SSAC's findings that Microsoft was "significantly superior" to AWS in terms of Factors 5 and 6 and "superior" as to price. Tab 459, AR176415-17. DoD informed Microsoft and AWS of the SSA's award decision on October 25. Compl. ¶ 188.

###### E.     This Litigation

On November 22, 2019, AWS filed this bid protest.  In Counts V through VII of its complaint, AWS makes the extraordinary allegation that the entire JEDI Cloud procurement process was biased against it, based largely on a series of public statements and tweets made by President Trump before the RFP was ever issued.  Almost none of the public statements the complaint relies upon actually address the JEDI procurement— they simply express (albeit in colorful terms) President Trump's general criticisms of AWS's parent company, Amazon, its CEO and founder, Jeff Bezos, and the *Washington Post* (which Mr. Bezos owns).  *See, e.g.*, *id.* ¶¶ 85-87, 89-90, 97.  Some of the statements were made by President Trump before the November 2016 election.  *See id.* ¶ 84.  Many others predate the issuance of the solicitation in July 2018.  *See id.* ¶¶ 84-86, 89.  Of the few statements that do pertain to the JEDI procurement, only two were made by President Trump.  *See id.* ¶¶ 20, 95, 97.

Based on these statements, AWS contends that Microsoft could not have been awarded the JEDI contract absent bad faith on the part of the many DoD officials involved in the procurement, and that these officials must have been motivated by President Trump's statements.  ECF 124-1, at 5-6.  AWS further argues that it is necessary to supplement the administrative record in this case with over 500 pages of material, principally consisting of Twitter statements and news articles.  And in an extraordinary and unprecedented request, it also demands depositions and discovery from President Trump, former Secretary of Defense James Mattis, and Secretary of Defense Esper, along with many other military officers and career civil servants involved in the procurement.

### ARGUMENT

AWS's request to supplement the record fails for two reasons: (1) AWS has only provided *speculation* of bias, with nothing approaching the "hard facts" necessary to warrant

supplementation; and (2) AWS has waived its bias claims by not timely raising them.  And even
if supplementation were somehow justified, AWS's discovery requests are fatally overbroad.

## I.    AWS HAS FAILED TO OFFER "HARD FACTS" OF BIAS OR BAD FAITH WARRANTING SUPPLEMENTATION

Courts have consistently held that, in order to obtain supplementation of the administrative
record based on allegations of bias or bad faith, a protestor must show that their allegations are
"sufficient[ly] well-grounded" and supported by "hard facts."  *See, e.g.*, *Price Gordon Servs. v.
United States*, 139 Fed. Cl. 27, 50 (2018); *Jacobs Tech. Inc. v. United States*, 131 Fed. Cl. 430,
454-55 (2017).  AWS has failed to make that showing.  The statements by President Trump it cites
are insufficient to show that procurement officials were motivated to act in bad faith; nor has AWS
demonstrated that procurement officials took improper action based on those statements.  Finally,
the record does not support contentions that the evaluation results cannot be explained "but for"
the alleged bias.  *See, e.g.*, *Beta Analytics*, 61 Fed. Cl. at 226.

### A.    Supplementation Is Not Allowed Unless AWS Presents "Hard Facts" Showing Bias In The Actual Procurement Decision

"[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's
contemporaneous explanation in light of the existing administrative record." *Dep't of Commerce
v. New York*, 139 S. Ct. 2551, 2573 (2019); *see also Fla. Power & Light Co. v. Lorion*, 470 U.S.
729, 744 (1985); *Camp v. Pitts*, 411 U. S. 138, 142-143 (1973) (per curiam).  "That principle
reflects the recognition that further judicial inquiry into 'executive motivation' represents 'a
substantial intrusion' into the workings of another branch of Government and should normally be
avoided." *New York*, 139 S. Ct. at 2573 (citation omitted).

This rule fully applies to bid protests, which are subject to the same APA standard of
review.  *See* 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706; *Axiom*, 564 F.3d at 1381.  In bid protests, the

administrative record generally consists of materials "already in existence, not some new record made initially in the reviewing court." *Axiom*, 564 F.3d at 1379 (quoting *Camp*, 411 U.S. at 142); *see also* RCFC App. C (Procurement Protest Rules 21-22).  The rule ensures that courts do not use new evidence to "convert the 'arbitrary and capricious' standard into effectively de novo review." *Axiom*, 564 F.3d at 1380 (quotation marks omitted).

The Supreme Court has recognized a "narrow exception to the general rule against inquiring into 'the mental processes of administrative decisionmakers.'" *New York*, 139 S.Ct. at 2573 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)).  That exception requires a "strong showing of bad faith or improper behavior" by the responsible agency officials.  In such extraordinary cases, an expansion of the record may be appropriate, but only if "the omission of extra-record evidence precludes effective judicial review." *Axiom*, 564 F.3d at 1380.  The party seeking such supplementation of the record "bears the burden of demonstrating why the existing record is insufficient." *Price Gordon*, 139 Fed. Cl. at 50.  And it is a high burden, with courts frequently rejecting requests for supplementation based on conclusory statements, which are not enough to show that supplementation is necessary for effective judicial review. *See, e.g.*, *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (applying *Axiom* standard and finding supplementation improper where court failed to explain why omitted evidence frustrated judicial review); *Voith Hydro, Inc. v. United States*, 142 Fed. Cl. 233, 235-40 (2019) (denying request for record supplementation where consultant report was not found to preclude effective judicial review); *CYIOS Corp. v. United States*, 122 Fed. Cl. 726, 740 (2015).

Even where a party meets the high burden of showing that the existing record is insufficient, supplementing an administrative record is only appropriate when the party comes forth with "'sufficient well-grounded allegations of bias to support supplementation' that 'rest on

14

hard facts.'" *Price Gordon*, 139 Fed. Cl. at 50 (emphasis added; citation omitted); *see also, e.g.*, *Jacobs Tech.*, 131 Fed. Cl. at 454-55 (denying discovery under this standard); *CHE Consulting, Inc. v. United States*, 125 Fed. Cl. 234, 241 (2016) (same); *DataMill, Inc. v. United States*, 91 Fed. Cl. 722, 729-32 (2010) (same); *Four Points by Sheraton v. United States*, 63 Fed. Cl. 341, 344-45 (2005) (same); *Beta Analytics*, 61 Fed. Cl. 223 at 226 (same).  The party seeking supplementation must overcome the "presumptions of regularity and of good faith conduct" generally afforded to government officials.  *See Inforeliance Corp. v. United States*, 118 Fed. Cl. 744, 747 (2014).  To do so, the party must: (1) "make a threshold showing of either a motivation for the Government employee in question to have acted in bad faith or conduct that is hard to explain absent bad faith;" and (2) demonstrate that "discovery could lead to evidence which would provide the level of proof required to overcome the presumption of regularity and good faith."  *Beta Analytics*, 61 Fed. Cl. at 226.

The "hard facts" standard is exceedingly difficult to satisfy.  "Suspicion or innuendo" is not enough, and "[m]ere disagreement with evaluation results or identification of agency errors is insufficient to warrant supplementation."  *Price Gordon*, 139 Fed. Cl. at 50-51 (quoting *Inforeliance Corp.*, 118 Fed. Cl. at 748, and *Jacobs Tech. Inc.,* 131 Fed. Cl. at 455); *see also, e.g.*, *Beta Analytics*, 61 Fed. Cl. at 226.  Rather, courts have found allegations of bias sufficient to warrant discovery only where plaintiffs have identified facts indicating that bias *actually influenced* agency decision makers, or where the agency process appeared so irregular that further discovery was warranted to understand what the agency actually did.

The relatively few cases which allow supplementation, in order to expand the record for decision on bias allegations, are very different factually from the circumstances here.  In *Starry Associates, Inc. v. United States*, for example, the court allowed discovery where a *recused* agency

official nevertheless: (1) helped select members of the Technical Evaluation Panel; (2) was kept informed about the procurement by those members; (3) expressed a preference that his former employer receive the award; (4) attempted to bias a performance rating; and (5) ultimately canceled the award after the agency was unsuccessful in repeatedly trying to award the contract to the official's former employer. 125 Fed. Cl. 613, 623 (2015). The court in that case also noted that there were months-long gaps in the administrative record, and repeated procedural irregularities in the procurement that were never remedied. *Id.* at 615-18, 620. No such gaps are present here.

Likewise, in *L-3 Communications Integrated Sys. v. United States*, 91 Fed. Cl. 347, 352 (2010), the court allowed discovery where: (1) the contracting officer directly overseeing the procurement had pled guilty to violating 18 U.S.C. § 208; (2) an internal agency investigation had identified anomalies in the procurement; and (3) there was evidence that the contracting officer had rescinded the original Source Selection Authority, appointed herself in that role, and then changed evaluation ratings. No such conduct is present here.

Because the test is so demanding, the Court of Federal Claims regularly denies motions to supplement alleging that agency bias warrants discovery.[6] For instance, in *DataMill*, 91 Fed. Cl. at 729-32, the court found that discovery based on allegations of bad faith was not warranted. There, in an Army procurement for logistics and supply database management support, the protester claimed that two government employees and an employee of the awardee improperly influenced the decision to award a sole source contract without competition. DataMill sought to supplement the record with documents and testimony that it believed would expose bad faith and

---

[6] *See, e.g.*, *Oracle Am., Inc. v United States*, No. 18-1880C, 2019 WL 354705, at *3-6 (Fed. Cl. Jan. 28, 2019); *Jacobs Tech.*, 131 Fed. Cl. at 454-55; *CHE Consulting*, 125 Fed. Cl. at 241; *Four Points*, 63 Fed. Cl. at 344-45 (2005); *Beta Analytics*, 61 Fed. Cl. at 226.

bias, but the court found that "DataMill's discovery requests are based entirely upon innuendo and suspicion." *Id.* at 731. The court denied the discovery request, concluding that "DataMill has not made a threshold showing of either a motivation for Army personnel to have acted in bad faith or conduct that is hard to explain absent bad faith." *Id.*[7]

AWS's request to supplement the record is no different from the requests denied by the court in *DataMill* and the other cited cases. AWS's claims are "based entirely upon innuendo and suspicion," just as were DataMill's. *DataMill, Inc.*, 91 Fed. Cl. at 731. Its numerous allegations of flaws in DoD's technical evaluation are merely disagreement, as shown by the record, and do not raise serious questions as to the rationality of the contracting officer's decision. *See Office Depot, Inc.*, 94 Fed. Cl. at 297. And, as in *Price Gordon*, AWS's claims of bias are in fact "attributable to the self-inflicted deficiencies in plaintiff's proposal" and not to improper actions of experienced government evaluators. *See Price Gordon*, 139 Fed. Cl. at 54.

**B.     AWS Has Not Presented "Hard Facts" That The Procurement Officials Responsible For The JEDI Contract Award Were Biased**

AWS has a core problem in this case, which explains why it filed this motion; there is no evidence in the administrative record supporting its theory that President Trump's statements infected the procurement with anti-AWS bias or caused an anti-AWS result. That theory rests on a series of statements by President Trump and others—virtually all unrelated to the JEDI procurement—criticizing Amazon, and Mr. Bezos. *See, e.g.*, Compl. ¶¶ 16, 84-87, 89-90, 97.

---

[7] *See also Office Depot, Inc. v. United States*, 94 Fed. Cl. 294, 299 (2010) (bias allegations raised by protestor largely based on disagreement with the agency's award decision, and the court noted it "does not see here the rare case where an award decision is not explained in the administrative record of a bid protest."); *Price Gordon*, 139 Fed. Cl. at 54 (because all of the protestor's "hard facts" could be explained absent bad faith, the court denied the request for discovery).

AWS claims that as a result of those statements, "the actual evaluator and decision-makers at DoD"—i.e., the SSA, SSAC, and SSEB, *see* First Mot. to Suppl., ECF 7-1, at 20; ECF 124-1, at 22-28—improperly evaluated AWS's proposal, and therefore deliberately violated federal procurement laws and regulations, ECF 124-1, at 29-32.  AWS also alleges that Defense Secretary Esper's review of the procurement upon taking office was improperly motivated, and then incompetently concealed.  *Id.* at 25-27.

These bias allegations are entirely unsupported by any "hard facts" in the existing administrative record or anywhere else.  Indeed, AWS has not identified a single statement by President Trump or others that was directed to the DoD procurement experts—the SSA, the SSAC, the SSEB, or anyone else—responsible for making the procurement decisions.  Nor has AWS identified improper action by agency officials that impacted the award.  On the contrary, the record shows that AWS was treated fairly:  It became one of two finalists in the competition in April 2019, and generally received high marks.  Compl. ¶ 101; Tab 457, AR176398-400; Tab 459, AR176412-14.  Because AWS has no actual facts supporting its bias allegations, it relies exclusively on the kind of "innuendo and suspicion" that courts have consistently found lacking.  *See Beta Analytics*, 61 Fed. Cl. at 226.  AWS's supplementation request should be denied.

### 1. The Statements From President Trump Do Not Show Bias By The Responsible DoD Procurement Officials

AWS alleges that a series of tweets and other statements made by President Trump and others persuaded procurement officials to act improperly and bias the process against AWS.  But AWS shows no connection between these statements and DoD procurement officials, and there is no reason to believe that these statements would have motivated those officials to act improperly.

Most of the statements AWS relies on have nothing to do with the JEDI procurement, and they largely predate the events at issue here.  Of the statements AWS identifies in its complaint, six predate Mr. Trump's election to the presidency, Compl. ¶¶ 16, 84 (citing statements from December 2015, February 2016, and May 2016), and a majority of the others predate DoD's first Request for Proposal for the JEDI procurement in July 2018.  *See, e.g., id.* ¶¶ 84-90 (citing statements from June, July, August and December 2017, and March and April 2018).  It is entirely implausible that those statements—and especially those from before the election—somehow influenced either the mechanics or the outcome of a procurement process that occurred much later.

Moreover, all but two of the statements by President Trump that AWS identifies do not relate to the JEDI procurement at all—they address disagreements between President Trump and Mr. Bezos concerning Amazon's pricing arrangements with the U.S. Post Office, and the *Post*'s coverage of Mr. Trump.  *See, e.g., id.* ¶¶ 85-87, 89-90.  While AWS makes much of the fact that the statements were public, ECF 124-1, at 27-28, there is no indication that procurement officials were actually aware of the tweets, let alone interpreted these statements as a presidential directive to violate federal law and disfavor AWS in a highly technical DoD procurement.[8]

Of the few statements AWS identifies that actually address the procurement, several were tweets by the President's son, Donald Trump Jr., who is not a government official and had no involvement in the procurement.  *See, e.g.,* Compl. ¶¶ 20, 96, 177.  Again, AWS has neither alleged nor offered "hard facts" that any procurement officials saw or acted on those tweets.

---

[8] Indeed, AWS was named as one of two JEDI finalists in April 2019, after President Trump made many of these allegedly biased statements, strongly suggesting no connection between these statements and the actions of procurement officials.  Compl. ¶¶ 16, 84-90, 101.

That leaves AWS with only two statements by President Trump actually touching on the procurement.  One is a statement at his July 18, 2019 press conference, acknowledging that other companies had "complain[ed]" about the procurement.  *Id.* ¶¶ 20, 95.  The other is a July 22, 2019 "retweet" of a Fox News segment criticizing the procurement process as unfairly biased *in favor of* AWS.  *Id.* ¶¶ 20, 97.  Both statements were made after multiple members of Congress had publicly expressed concern—including directly to the President—over the allegations of a pro-AWS bias in the procurement that arose in the *Oracle* case.  *See id.* ¶ 93 (noting Representative Womack's letter to President Trump on June 12, 2019); *supra* at 7.  The statements also came before the court's opinion denying Oracle's protest became public.  But neither statement reflects bias against AWS—rather, they appear to acknowledge the multiple allegations that were made suggesting the procurement process was biased *in AWS's favor*.

As AWS has recognized, concerns about the propriety of the process came not only from the private sector, but also from multiple members of Congress.  *See* Compl. ¶¶ 93, 176 (Rep. Steve Womack, Senators Ron Johnson and Marco Rubio); Tab 453, AR176340 (Rep. Mark Meadows); *supra* at 7-8.  Mr. Trump's decision to ask DoD to look "very closely" at the procurement in light of these allegations was entirely reasonable.  On its face, this statement is a legitimate response to serious concerns that a major DoD acquisition was tainted by pro-AWS bias.  AWS makes a tremendous—and unsupported—leap of logic in suggesting that procurement officials took President Trump's comments as an instruction to act unethically in evaluating procurement proposals—against AWS.

AWS knows better than to seek supplementation based on statements by individuals not directly involved in the procurement.  In the *Oracle* bid protest, AWS objected to Oracle's request to supplement the administrative record on virtually the same grounds that AWS itself raises here.

There, Oracle sought to introduce a blog post and tweet by a DoD official who participated in the early stages of the procurement but was forced to recuse because he was negotiating employment with AWS at the same time. *See Oracle*, 144 Fed. at 103-08 (describing conflicts of interest). The official's conflicts were a major focus of Oracle's allegations; his tweets and blog posts described himself as an "Amazonian" who was "leading the effort to accelerate adoption of the [DoD] cloud." *See* Mot. to Complete & Suppl. Admin. R., *Oracle*, No. 18-cv-1880, ECF 38-1, at 9, 12-13, 36 (Fed. Cl. Jan. 10, 2019).

AWS objected, arguing that these statements were "irrelevant," because they "were not considered by the Agency decision-makers at issue, do nothing to call into question the veracity of the official determinations, and are not necessary for this Court to review the rationality of those official determinations." *See* AWS Resp. to Mot. to Suppl., *Oracle*, No. 18-cv-1880, ECF 46, at 9 (Fed. Cl. Jan. 18, 2019); *see also id.* at 34-35 (citing *Axiom*, 564 F.3d at 1380). The court agreed with those arguments, and ultimately denied the motion to supplement, finding that the additional evidence Oracle offered was not needed to determine whether the agency's assessment of the conflicts issues was reasonable. *Oracle*, 2019 WL 354705, at \*4-6.

So too here. The events and information that AWS relies upon indicate nothing about the attitudes of the actual agency decision makers in this case, much less any actions that might have been influenced by those attitudes. AWS has not even attempted to show that agency decision makers were aware of these statements or acted on them. This case is therefore quite different from those cited by AWS in support of its motion, where outside officials made statements directly

21

to agency decision makers expressing a preference for a particular outcome.  *See* ECF 124-1, at 27-28.[9]

  This case is much closer to *ATX, Inc. v. U.S. Department of Transportation*, 41 F.3d 1522, 1530 (D.C. Cir. 1994), where the court concluded that the connection between "the pressure exerted and the actual decision makers" was too "tenuous" to find that the agency's decision was improperly influenced.[10]  Statements by President Trump and others on Twitter are simply not sufficient to credibly allege that agency decisionmakers acted with bias or in bad faith.

    **2.**  **AWS Has Failed To Show That Agency Officials Took Improper Action Based On These Statements**

  AWS alleges that President Trump directly sought to influence DoD officials.  But again, AWS presents no "hard facts" showing any impact on the procurement whatsoever.

  AWS repeatedly cites a statement in a "tell-all" book by a former speechwriter to then-Secretary of Defense Mattis, claiming that the President instructed Mattis in the summer of 2018 to "screw Amazon" out of the JEDI contract.  Compl. ¶¶ 19, 91.  According to the book, however, Secretary Mattis declined to do so, and instead instructed his staff to proceed "by the book, both

---

[9] In *Starry Associates*, for example, the agency official who was supposedly recused from the procurement hand-picked members of the Technical Evaluation Panel, was kept informed about the progress of the procurement by them, and made it known that he preferred his former employer receive the award.  *Starry Assocs.*, 125 Fed. Cl. at 622-23.  Similarly, in *Jarrott*, the court found that the plaintiff had not received a fair hearing where members of the five-person D.C. Board of Zoning Adjustment had been contacted by outside officials and informed that the federal government preferred a particular result in the proceeding.  *Jarrott v. Scrivener*, 225 F. Supp. 827, 831-34 (D.D.C. 1964).  Here, there is no indication that procurement officials even knew of President Trump's statements, let alone acted on them.

[10]  The Court in *ATX* denied a petition for review of an agency order denying application to open a new airline even though one or more members of Congress had: (1) lobbied the Secretary of Transportation to deny the requested license; (2) proposed legislation that would have prohibited an involved individual from entering the airline industry; and (3) testified in the agency's evidentiary hearing.  41 F.3d. at 1528-30.

legally and ethically"— as AWS concedes.  *See id.* ¶ 91.  AWS's own source thus makes clear that President Trump's alleged attempt to influence the procurement through Mattis was a *failure*.  Indeed, DoD advanced AWS to the competitive range for the JEDI procurement in April 2019— months after the President's alleged directive to Mattis.  *Id.* ¶ 101.

AWS also claims that President Trump's statements motivated Secretary Esper to take a "hard look" at the JEDI procurement.  *Id.* ¶ 176; ECF 124-1, at 25-26.  But there is nothing improper in a newly confirmed Secretary of Defense choosing to review—at a strategic level—a procurement of this size and importance, with critical national security implications.

As noted above, Secretary Esper acknowledged that he had "heard from folks in the administration" expressing concern about the procurement, Compl. ¶ 176, and that he had likewise heard from "members of Congress, both parties, both sides of the Hill," and further noted all the "noise" being made by the defense industry and reported in the press.  *Supra* at 7-9.[11]  In light of these concerns, it is hardly surprising that Secretary Esper felt that he "owe[d], as the new guy coming in, a fresh look at" JEDI, to "study it, make sure I understand all the different factors."  Compl. ¶ 176.  Conducting oversight of key DoD initiatives *was his job*; Secretary Esper's decision to carefully review the procurement is not evidence of improper conduct.  *See Price Gordon*, 139 Fed. Cl. at 51 (denying discovery where "all of the conduct upon which plaintiff relies can be explained absent bias or bad faith"); *see also ATX*, 41 F.3d at 1528-29 (agency Secretary's decision to set hearing on a license application was "an appropriate response to [congressional] pressure").

---

[11]  In the weeks surrounding Esper's confirmation, multiple members of Congress expressed misgivings about the procurement, questioning the fairness of the process and whether the JEDI program, with its single large award, was the right path for DoD to take.  Several of these members reached out to Esper directly.  Tab 453, AR176340; *see also* Compl. ¶ 176; *supra* at 7-8 (noting letters from Senators Rubio and Johnson).

AWS makes much of the fact that, in the course of his review, Secretary Esper met with

████████████████████████████████████████████████████████████████

███████████████████████████████████████ ECF 124-1, at 26.  But ██████ attended the

information sessions with Secretary Esper in his capacity as █████████████████████████

████████████████████████████████████████████████████████████████

He also ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████ Given his responsibilities, it is

entirely reasonable that Esper sought ██████ help to get up to speed on the procurement.  *See*

*Price Gordon*, 139 Fed. Cl. at 51.

In any event, the record does not show that source selection material was discussed during

these meetings, Tab 462, AR176426, and thus provides strong reason to believe that ███████

presence at these information sessions (along with ██████████████████████) was entirely

appropriate. ██████ in fact, was complimentary of several aspects of AWS's proposal ████████

████████████████████████████████████████████████████████████████

██████████████████████████ Critically, █████████████████████ *after* the meetings with Secretary

Esper had taken place. ███████████████████████████████████████ This strongly

suggests that ██████ was not under pressure from Esper or anyone else to influence the procurement

against AWS and in favor of Microsoft.

Finally, there was nothing improper in Secretary Esper's decision to recuse himself from

the procurement.  AWS makes the bizarre assertion that this recusal is in fact evidence of bias;

according to AWS, the Secretary's recusal based on his son's connection to IBM was somehow

████████████████████████████████████████████████████████████████

pretextual, and intended to cover up anti-AWS bias in the procurement. ECF 124-1, at 26-27. That charge makes no sense. Secretary Esper's recusal memo notes that he recused "[o]ut of an abundance of caution and to avoid any concerns regarding [his] impartiality," not because DoD conflicts rules demanded recusal. Tab 458, AR176408. Given the public perception of impropriety that surrounded the procurement, Secretary Esper's decision to exercise "an abundance of caution" was entirely appropriate. Esper and (following his recusal) Deputy Secretary Norquist, were reviewing the JEDI program not only to ensure fairness in the acquisition but to determine whether to proceed with the program on its current path. Tab 458; Tab 462. IBM had also filed a pre-award bid protest at GAO, contesting, among other things, the propriety of the single award, which IBM claimed unfairly limited the competition. *See, e.g.*, Tab 440, AR176313; ECF 124-2, at 94-95. Had Esper not recused—and had DoD determined either to scrap the JEDI program or alter the RFP in a way that widened the field of competitors—the JEDI program could once again have been subject to allegations of improper influence because of Esper's IBM connection. There is no reason to attribute to the Secretary any motive other than a desire to protect the integrity of the procurement and preserve DoD's options.

The bottom line is that AWS has presented no "hard facts" supporting its bias claims. None of the evidence AWS cites justifies AWS's request for discovery or supplementation of the record.

### C. The Mere Fact That DoD Concluded Microsoft's Proposal Was Superior Is Not Evidence Of Bias Or Bad Faith

AWS also claims that supposed "errors" in the agency's technical evaluations are evidence of bad faith, and that the award cannot be explained without that bad faith. ECF 124-1, at 29-32. But a party seeking discovery must do more than just argue that the agency erred in evaluating its bid. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1324 n.2 (Fed. Cir. 2003)

(noting that "merely reiterate[ing] . . . contentions that the [government] erred in evaluating the proposals . . . is not evidence of bias); *Four Points*, 63 Fed. Cl. at 344 (denying discovery where "sole basis" for plaintiff's allegation of bias "is its disagreement with [the] evaluation"); *Beta Analytics*, 61 Fed. Cl. at 226.

In any event, AWS's vague, thinly-sourced, and scattershot attacks on DoD's technical judgments all fail. The DoD determinations AWS criticizes were reasonable, well-supported by the record, and fully consistent with the presumption of good faith afforded agency decisions.

**Factor 2 (Logical Isolation and Secure Data Transfer).** AWS briefly claims that with respect to Factor 2, the SSAC "ignored the stated RFP requirements," █████████████ ████ regarding the benefits of AWS's Nitro architecture, and "erroneously" concluded that ██████████████████████████ ECF 124-1, at 29. AWS also questions the SSA's evaluation as lacking analysis. *Id.* AWS is wrong across the board. AWS fails to identify the RFP requirements the SSAC supposedly ignored.[12] It mischaracterizes the role of the SSAC, which is required to conduct its own, independent "comparative analysis" of the technical factors; it cannot and did not simply "rubber-stamp" the findings of the SSEB and TEBs. Tab 305, AR64344; Tab 192, AR24166-69; Tab 457, AR176400.[13] Further, rather than identifying an actual error, AWS appears to simply disagree with the rational trade-offs made by the agency. Contrary

---

[12] AWS places a great deal of emphasis on the supposed security benefits of its hypervisor solution. ECF 124-1, at 29. In fact, under the RFP, hypervisor security was only one of the *eight* sub-factors that offerors were required to address for logical isolation architecture—itself just one of *four* higher-level subfactors under Factor 2. *See* Tab 1, AR78-79.

[13] Similarly, the SSA did not simply adopt the SSAC's findings without analysis. The SSA ████████████████████ and concluded, based on an independent assessment, that Microsoft's solution was superior based on ██████████████████████. Tab 459, AR176414-15; *see also* Tab 192, AR24164.

to AWS's contention that the "SSAC ███████████████████████ regarding AWS's

hypervisor approach, ECF 124-1, at 29, the SSAC ████████ ██████████████

████████████████████████████████████████. Tab 457, AR176400-01. The

SSAC nonetheless explained that ████████████████████████████████

███████████████████████████████ ██████████████████████

██████████████████████████ Tab 457, AR176400-01; *see also*

Microsoft Opp'n to Mot. for Prelim. Inj., ECF 137, at 43-44.

As to AWS's claim that the SSAC "erroneously conclud[ed] [it] ████████████

█████████ it offers no citation to its proposal and fails to identify specifically where the

SSAC's analysis ██████████████████ errs. ECF 124-1, at 29. In fact, the SSAC

recognized that AWS met the requirement for ████████████████████. Tab 457,

AR176401. But the SSAC also noted that, whereas AWS ██████████████ ██████████

██████████████████████████, Microsoft █████████████ █

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ Tab 457, AR176401; *see also* Tab 323, AR151122; Tab 368, AR152797.

AWS fails to show why the SSAC's assessment of this perceived benefit of Microsoft's █████

██████████████, over AWS's ████████████, was irrational. ECF 137, at 44-45.

**Factor 3 (Tactical Edge).** As to Factor 3, AWS argues that "DoD incorrectly stated AWS

had ████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ ECF 124-1, at 30 (citing Tab 324, AR151166). AWS's argument is both misguided

27

██████████████████████████████████████████████████

██████████████████████████████████████████

and misleading. The TEB clearly found █████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████. Tab 324, AR151166-67. The

TEB recognized that AWS's ███████████████████████████████████████

████████████████████████████████████████████████████████

█████████ Tab 324, AR151167. The SSAC, in turn, recognized ████████████

██████████████████████████████████████. Tab 457, AR176401-02. But under

the terms of the RFP, ███████████████████████████████████████████

████████████████████████, and it was therefore reasonable for the SSAC to focus more

on the offerors' █████████████. Tab 301, AR64303; *see also* ECF 137, at 33-36, 37-40.

AWS also argues that DoD's decision to assign ███████████████████████████ is

somehow evidence of bias. Microsoft proposed ████████████████████ while AWS

proposed ██████████████████████████████. Tab 410, AR173643;

Tab 369, AR152805. The TEB reasonably concluded that Microsoft's unique solution deserved █

████████████████████████████████████████████████████████

████████████████████████████████████████████. Tab 330,

AR151283; ECF 137, at 36-37.

Factor 5 (Application and Data Hosting and Portability). AWS argues that the SSAC

and SSA "irrationally concluded . . . ████████████████████████████████

████████████████████████████████████. ECF 124-1, at 30. AWS, however, had revised its

---

[14] ████████████████████████████████████████████████

████████████████████████████████████████████████ Tab 369,

AR152804. In contrast, Microsoft's TEA device ████████████████████████

████████████████████████████. Tab 410, AR173642.

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

proposal to say ███████████████████████████████████████

███████████████████████████████████████████ Tab 309,

AR67032 (emphasis added); Tab 384 (███████████████████████████

███████████████████████████████████). That statement led to a

reasonable conclusion that ██████████████████████████████████

███████████████████ *See* ECF 137, at 46-48. AWS also claims that evaluators

inexplicably omitted previously assessed strengths for ████████████████

██████████ ECF 124-1, at 30-31. Microsoft has identical or better capabilities in these areas.

*Compare* Tab 412, AR173678-79 (discussing Microsoft ability to ████████████

███████████████████████████████████████████████████

████████████████ ) *with* Tab 212, AR58035 (assigning strength to AWS'

███████████████████████████████████████ ). AWS fails to

establish that bias is present here.

**Factor 6 (Information Security and Access Controls).** AWS claims that by relying on

the wrong version of its proposal, DoD "incorrectly concluded AWS ████████████

████████████████████████████████ ECF 124-1, at 31. But the

record shows that █████████████████████████████████," Tab 491,

AR180080 (emphasis added), and AWS cites no evidence to the contrary. And although AWS

complains that evaluators did not reward AWS for ████████████████████████

██████, it identifies nothing in the RFP requiring DoD to give an offeror extra credit for ████

████████ DoD properly noted ███████████████████. Tab 327, AR151216.

AWS also claims that ████████████████████████████████████

███████████████████████████████ but it fails to substantiate that

████████████████████████████████████████████████

███████████████████████████████████████████

allegation. ECF 124-1, at 31. It is expected that a proposal will change over the course of a procurement. Additionally, DoD and offerors engaged in discussions which, in addition to providing clarification to the offerors, also identified places the offerors needed to clarify for DoD. *See* Tab 343 (outlining the detailed and numerous discussions which took place between April and August 2019). It is therefore unsurprising, and not evidence of bias, that both proposals and evaluations would change as a result.

**Factor 8 (Demonstration).** AWS's allegation that Microsoft ▮ is not supported by the record. In fact, ▮ ▮. Tab 308, AR64403-04. In the second test scenario, DoD tested the ability to scale up and scale down the number of available resources based on the number of incoming requests. The TEB noted ▮ ▮ AWS claims that Microsoft's system ▮ ▮ ECF 124-1, at 31-32. But AWS's conclusory statement misrepresents both the intention of the test and the overall results of the test, as shown ▮ ▮ (showing that Microsoft ▮ ▮). ▮ ▮ ▮ DoD thus properly found ▮ ▮ Tab ▮

30

308, AR64410; Tab 287, AR64173; *see also* ECF 137, at 23-27.  AWS fails to substantiate any other allegation in its motion.

## II.     SUPPLEMENTATION IS NOT APPROPRIATE BECAUSE AWS WAIVED ITS BIAS CLAIMS UNDER *BLUE & GOLD*

AWS's motion to supplement the record is intended to bolster Counts V, VI, and VII of the complaint, all of which raise allegations of bias stemming from President Trump's purported improper influence on the procurement.  But as Microsoft has made clear in its pending partial motion to dismiss, those allegations have been waived and must be dismissed under *Blue & Gold*. *See* ECF 133, at 28-32, 36-47.  They provide no basis to supplement the record or take discovery.[15]

In *Blue & Gold*, the Federal Circuit held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."  *Blue & Gold*, 492 F.3d at 1313; *see also Bannum, Inc. v. United States*, 779 F.3d 1376, 1379–80 (Fed. Cir. 2015); ECF 133, at 28-32.

*Blue & Gold*'s waiver rule is intended to prevent a protestor from ignoring an obvious error in a solicitation and then, after the contract is awarded to a competitor, strategically asserting it to reopen the procurement.  *Bannum*, 779 F.3d at 1380.  As this Court has noted, "it is fundamentally unfair for offerors to postpone their challenge to a solicitation, sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive [an] award."  *Peraton Inc.*

---

[15] In its currently pending motion to dismiss, Microsoft has explained why all of Count III of the complaint should be dismissed.  ECF 133, at 32-36.  To the extent that Count III, which alleges a wrongful deprivation of competitive advantage, is understood to encompass these bias allegations, those contentions are waived on the same bases that require dismissal of the Count as a whole.  *Id.*; *see also Blue & Gold*, 492 F.3d at 1313; *Synergy Sols., v. United States*, 133 Fed. Cl. 716, 740 (2017).

*v. United States*, No. 19-932C, 2019 WL 6871790, at *12  (Fed. Cl. Dec. 17, 2019) (Campbell-Smith, J.) (internal quotation marks omitted).  *Blue & Gold* also parallels—and reinforces—the waiver rule governing bid protests before the GAO, set forth at 4 C.F.R. § 21.2(a)(1), which specifically provides that protests based on the underlying ground rules of a competition must be brought prior to the close of the bidding process.  *See Blue & Gold*, 492 F.3d at 1314-15.

In *COMINT Systems Corporation v. United States*, 700 F.3d 1377 (Fed. Cir. 2012), the Federal Circuit made clear that *Blue & Gold*'s waiver rule applies to "all situations in which the protesting party had the opportunity to challenge a solicitation before the *award* and failed to do so." *Id.* at 1382 (emphasis added).  Subsequent decisions confirm that *Blue & Gold*'s waiver rule applies to "any defects" in the procurement "that could potentially be raised and resolved prior to the contract award." *Synergy*, 133 Fed. Cl. at 740; *see also iAccess Tech., Inc. v. United States*, 143 Fed. Cl. 521, 531-32 (2019) (Campbell-Smith, J.) (describing *Synergy* as a "reasonable interpretation" of *COMINT* and approving its application to the facts of that case).

The import of these authorities is clear: The *Blue & Gold* waiver rule applies to *any* challenge to *any* "agency[] action" of which the protestor knew or should have known "before [the] contract award." *iAccess*, 143 Fed. Cl. at 531; *see also Synergy*, 133 Fed Cl. at 736.

Here, the express allegations of AWS's complaint make clear that AWS has waived Counts V, VI and VII.  Count V of the complaint broadly alleges that "President Trump's bias against AWS improperly influenced DoD officials responsible for the JEDI solicitation, undermined the procurement process, resulted in an unreasonable evaluation, and unfairly deprived AWS of the JEDI award."  Compl. ¶ 220.  AWS's core bias theory is that the President made it "known to all" through his "overt and public" tweets and other statements that DoD should not award the JEDI contract to AWS.  ECF 124-1, at 24; *see also* Compl. ¶ 13.  AWS claims that the President's

statements "came while DoD was evaluating the JEDI proposals and it would have been virtually impossible for anyone involved in JEDI to ignore them." Compl. ¶ 20. The statements and tweets from President Trump and others on which AWS relies were all made *before* the offerors' final proposals were due on September 5, 2019. *See id.* ¶¶16-20, 84-90, 93, 95-97, 175-177; *see also supra* at 18-20; ECF 133, at 37-38. AWS also alleges that the President "intervened directly in the very final phases of the two-year procurement process" when he "'essentially fired'" Secretary Mattis and "directed his newly appointed Secretary of Defense, Mark Esper . . . to conduct an 'independent' examination" of the procurement in mid-2019. Compl. ¶ 21.

There is thus no question that AWS knew the factual basis for the claims in Count V well before award because—as AWS alleges—these events unfolded "on publicly broadcast television and through [the President's] prolific tweets" from 2015 through mid-2019. *Id.* ¶ 13. If AWS truly believed that these events tainted the fundamental fairness of the procurement, it had to raise those allegations in a timely pre-award protest filed no later than the deadline set for FPRs (September 5, 2019). But AWS failed to do so, and so this bias claim is waived.

In Count VI, AWS repackages its allegations of bias and bad faith into a baseless and speculative organizational conflict of interest (OCI) claim. *See id.* ¶¶ 224-229; ECF 133, at 43-46. AWS alleges that "[t]he Administration created a conflict of interest by demonstrating through repeated conduct that Executive Branch employees who do not follow President Trump's directives are at risk of losing their jobs." Compl. ¶ 226. According to AWS, the entire JEDI source selection team was tainted by a conflict of interest because they "knew that their continued employment likely depended on selecting Microsoft." *Id.* Putting aside the sheer implausibility of this allegation, the claims in Count VI are waived under *Blue & Gold* because they rest on the same publicly available facts that form the basis for Count V. *See* ECF 133, at 44-46.

To the extent AWS believed that the President's statements created an actual conflict of interest for any member of the JEDI source selection team, or any DoD official with oversight responsibility for the JEDI procurement, it had to raise that allegation in a pre-award protest. *CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 712 (2011), *aff'd*, 475 F. App'x 341 (Fed. Cir. 2012). AWS did not do so, and so its OCI claim is waived.

The remaining regulatory violations alleged in Count VI are also waived because they too are based on facts that AWS knew prior to award. *See* Compl. ¶ 227-28. Because these claims are also based on the President's public, pre-award conduct, they are necessarily waived under *Blue & Gold*. Count VI therefore does not support AWS's request for supplementation

In Count VII, AWS alleges a breach of the implied contract of good faith and fair dealing. *See id.* ¶¶ 230-234. AWS claims that "DoD breached the implied contract to consider all bids fairly and honestly by conducting the procurement in an arbitrary, capricious, and irrational manner." *Id.* ¶ 232. But the only allegation it makes in support of this legal conclusion is that "President Trump induced DoD to conduct the procurement in a manner that breached the implied contract of good faith and fair dealing between the Government and AWS." *Id.* Where an implied contract claim "is comprised of precisely the same allegations supporting" another claim in the complaint, it is "unnecessary" to consider the implied contract claim "separately and independently" from that other claim. *Unified Architecture & Eng'g, Inc. v. United States*, 46 Fed. Cl. 56, 61 (2000). Here, Count VII is indistinguishable from Count V, which alleges that "President Trump's bias against AWS improperly influenced DoD officials responsible for the JEDI solicitation, undermined the procurement process, resulted in an unreasonable evaluation, and unfairly deprived AWS of the JEDI award," Compl. ¶ 220. Therefore, it too has been waived under *Blue & Gold* and does not justify supplementation.

34

## III.   AWS'S SUPPLEMENTATION AND DISCOVERY REQUESTS ARE IMPROPER AND ARE MERELY INTENDED FOR DELAY

Relying on its baseless bias allegations, AWS seeks to engage in a wholesale fishing

expedition through DoD and White House records—and an unprecedented set of depositions of

President Trump and two Defense Secretaries (along with many others).  This Court should reject

this transparent ploy to disrupt the JEDI program, stall work on the JEDI contract and turn this

case into a circus.  *See* ECF 124-1, at 32-42.  For the reasons noted above, supplementation and

discovery are not at all appropriate.  But even if some expansion of the record were necessary,

AWS's discovery requests are wildly overbroad and unlikely to lead to any evidence of bias.  They

should be rejected for the reasons set forth below and in the Government's response to AWS's

motion to supplement.[16]

Because of the limited scope of review in bid protest cases, discovery is highly atypical.

*See Axiom*, 564 F.3d at 1379-80.  Where discovery is necessary, however, it must be narrowly

tailored to ensure it is not "more burdensome than necessary" to fill gaps in the record or explain

agency actions.  *See Gulf Grp., Inc. v. United States*, 61 Fed. Cl. 338, 348 (2004); *Orion Int'l Tech.

v. United States,* 60 Fed. Cl. 338, 345 (2004) ("The Court must carefully tailor discovery in bid

protest cases to reduce its intrusiveness and to limit it to matters that may lead to relevant

---

[16] AWS also seeks to add over 500 pages of appendix materials to the record, consisting principally of Twitter statements by President Trump and others not involved in the procurement, and a variety of press reports, some related to the procurement, and more unrelated to the procurement.  ECF 124-1, at 33-34; *see generally* ECF 124-2, at 2-10 (index).  These materials thus originate almost entirely from outside the agency, and are wholly unnecessary to the Court's effective review of the issues in this case: (1) whether procurement officials were biased against AWS; and (2) whether the agency's decision was supported by the administrative record.  *See Axiom*, 564 F.3d at 1380 (holding that the record should only be supplemented to the extent required to allow for effective judicial review).  The Court should deny AWS's request to supplement the record with these materials.

evidence."). Additionally, discovery requests must relate back to the "evidentiary footing" of the plaintiff's bias allegations. *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 235-44 (2016). Here, AWS has offered nothing to indicate that its expansive discovery requests are likely to lead to evidence of bad faith. Without room for any debate, they are facially overbroad, obviously burdensome, and otherwise inappropriate.

*First*, many of AWS's discovery requests seeking information on internal DoD communications and communications between President Trump and his advisors directly implicate core national security decision-making and fundamental questions of executive and deliberative process privileges. *See, e.g.*, AWS Exhibits, ECF 124-3, at 3-10 (deposition topics concerning internal communications, particularly between President Trump and DoD officials); *id.* at 15 (Interrogatory Requests Nos. 8, 9); *id.* at 18-19 (all requests concerning internal communications at DoD or between White House officials, including the President, and DoD). Draft documents likewise implicate deliberative process privileges. *See id.* at 18 (Request No. 1). To protect these interests, the administrative record does not typically include internal communications, drafts, or other deliberative materials, and courts do not typically allow inquiry into decisionmakers' mental thought processes. *See Joint Venture of Comint Sys. Corp. v. United States*, 100 Fed. Cl. 159, 169 (2011); *Gulf Grp.*, 61 Fed. Cl. at 347-48; *Tafas v. Dudas*, 530 F. Supp. 2d 786, 794 (E.D. Va. 2008).

*Second*, the depositions AWS seeks are burdensome and unlikely to reveal bias. Depositions are only used in bid protests as a last resort, when required to fill gaps or illuminate the record in a way that interrogatories or documentary evidence will not provide. *See Starry Assocs.*, 125 Fed. Cl. at 623-24. Here, AWS seeks to depose, among others President Trump, former Secretary of Defense Mattis, Secretary Esper, and the DoD Chief Information Officer,

36

Dana Deasy.  ECF 124-3, at 3-7.  Even leaving aside the significant separation-of-powers and privilege implications of deposing these officials, none of these depositions is likely to lead to evidence of bias sufficient to satisfy AWS's burden of proof.  Two of these people were no longer serving in their relevant roles when the award decision was announced, and none were directly involved in making the award to Microsoft.  Deposing these individuals would not only be burdensome but also fruitless, because AWS must show bias *on the part of procurement officials*, and none of the above individuals are procurement officials.

In *Kellogg Brown & Root Services, Inc. v. United States*, this Court rejected similar discovery requests intended to identify a "consensus among senior executives to deny a fee award, punish, or scapegoat [the plaintiff]" because even if such material existed, it would not be "synonymous with influence."  117 Fed. Cl. 1, 9 (2014) (Campbell-Smith, J.).  Rather, the plaintiff would have had to show that the consensus among high-level officials was "communicated to" and ultimately "persuaded" the agency decision makers.  *Id.*  AWS's requests to depose high-level government officials are likewise inappropriate, because AWS has made no showing that any bias that any high-ranking person might have harbored "reached the [agency decisionmaker] for consideration, let alone influenced him."  *Id.*

AWS also seeks to depose the SSA and the heads of the SSAC and the SSEB about "*additional factors* that influenced the process," and how President Trump's bias "*may have* affected or influenced" their decisions.  ECF 124-1, at 39 (emphases added).  AWS's speculative language only underscores that AWS does not have and has not presented the "hard facts" establishing a need for discovery, much less justified the intrusive depositions that it proposes to take of these public officials.  AWS has provided no reason to impugn the conduct of these

technical experts or to assume they violated their duty to make the award in good faith based on the technical merits.  Further inquiry as to these officials is unnecessary and inappropriate.

*Third*, many of AWS's requests are breathtaking in their scope.  AWS seeks broad categories of information and documents relating to interactions and communications between "President Trump, his advisors, White House officials, and/or any individuals employed by or acting on behalf of President Trump . . . with DoD" regarding the JEDI procurement, any of the JEDI offerors, Bezos, and the *Washington Post*.  *See* ECF 124-3, at 15 (Interrogatory Nos. 8, 9); *id.* at 18-19 (Request Nos. 6, 7, 8, & 9).  These categories are not limited by date or time, and are likely to encompass far more information than is needed to determine whether *procurement officials* were biased, given that they encompass records from the *entire* Department of Defense, not just those involved in the procurement.  These categories of information, moreover, are not targeted towards AWS's bias allegations: they encompass the procurement generally, and are so broad they will sweep in massive amounts of irrelevant information.  The absurdity of these requests belies any veneer that AWS is serious in seeking or expecting this discovery.

In short, AWS's discovery requests are overbroad and unlikely to lead to any information that would enable AWS to prove its bias allegations in this case.  AWS is grasping at straws to find support for its baseless allegations—assuming they survive the *Blue & Gold* motion to dismiss—but it must do so without the extraordinary and virtually unbounded "requests" of its motion to supplement.

## CONCLUSION

For the foregoing reasons, AWS's motion to supplement the administrative record should be denied.

Dated:  January 31, 2020

Respectfully submitted,

*Of Counsel*:

ROGERS JOSEPH O'DONNELL, P.C.

LATHAM & WATKINS LLP

By:

Kathryn H. Ruemmler
Abid R. Qureshi
Roman Martinez
Anne W. Robinson
Dean W. Baxtresser
Genevieve P. Hoffman
Riley Keenan
Margaret Upshaw

Robert S. Metzger (Attorney of Record)

Jeffery M. Chiow
Neil H. O'Donnell
Lucas T. Hanback
Stephen L. Bacon
Deborah N. Rodin
Cassidy Kim
Eleanor M. Ross

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
(202) 637-2200 (Telephone)
(202) 637-2201 (Facsimile)

875 15th Street N.W., Suite 725
Washington, D.C. 20005
(202) 777-8952 (Telephone)
(202) 347-8429 (Facsimile)

*Attorneys for Intervenor-Defendant,
Microsoft Corporation*

39