**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

AMAZON WEB SERVICES, INC.,    )
    )
    Plaintiff,    )
    )
    v.    )    No. 19-CV-01796
    )
UNITED STATES OF AMERICA,    )    Judge Patricia Campbell-Smith
    )
    Defendant,    )
    )
and    )
    )
MICROSOFT CORPORATION,    )
    )
    Intervenor-Defendant.    )
_____)

**BRIEF OF CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON**
**AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF'S**
**RENEWED MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD**

## INTEREST OF *AMICUS CURIAE*

Citizens for Responsibility and Ethics in Washington ("CREW") is a nonpartisan, nonprofit corporation organized under section 501(c)(3) of the Internal Revenue Code.  Through a combined approach of research, advocacy, public education, and litigation, CREW seeks to combat corrupting influences in government and to ensure the integrity of government officials and operations.  If CREW observes a violation of federal ethics laws, CREW files complaints asking appropriate government agencies to investigate and hold accountable those who violate the rules.  CREW is committed to protecting the rights of citizens to be informed about the activities of government officials and agencies, and to ensuring government integrity and accountability.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 7.1 of the Rules of the United States Court of Federal Claims, Citizens for Responsibility and Ethics in Washington certifies that it does not have a parent company and no publicly held corporation has a 10 percent or greater ownership interest in it.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iv

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................ 3

    I.    IMPARTIALITY IN PUBLIC PROCUREMENT IS INTEGRAL TO PUBLIC TRUST . 4

        A. Federal Law Requires Government Contracts Be Awarded Free from Employees'
           Personal Interests ............................................................................................ 4

        B. Failure to Act with the Required Impartiality Has Led to the Invalidation of Procurement
           Decisions and Penalties Against Government Officials ....................................... 7

    II.   PRESIDENT TRUMP HAS REPORTEDLY ENGAGED IN A PATTERN OF
       INTERFERENCE IN GOVERNMENT PROCUREMENT PROCESSES TO ADVANCE
       HIS PERSONAL OBJECTIVES ..................................................................... 9

        A. Selection of Trump National Doral to Host the G7 Summit ........................... 10

        B.  Abrupt Change in Plans for the Development of FBI Headquarters .............................. 13

        C. Award of Border Wall Construction Contract to Fisher Sand and Gravel Co. ................ 15

CONCLUSION ...................................................................................................... 18

# TABLE OF AUTHORITIES

## Cases

*Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374 (Fed. Cir. 2009) .................................... 4

*Burke, Todd v. Agric.*, MSPB No. CH-0752-14-0124-I-1, 2014 WL 6616551 (2014) (nonprecedential),
   *pet. for review den.* 122 M.S.P.R. 441 (2015) ....................................................................... 8

*Defense Tech., Inc. v. United States*, 99 Fed. Cl. 103 (2011) ....................................................... 8

*FFTF Restoration Co. v. United States*, 86 Fed. Cl. 226 (2009) .................................................. 8

*Inforeliance Corp. v. United States*, 118 Fed. Cl. 744 (2014) ..................................................... 9

*L-3 Commc'ns Integrated Sys., L.P. v. United States*, 91 Fed. Cl. 347 (2010) ................................... 3, 4, 9

*Mazzoleni, Flavio v. Fed. Deposit Ins. Corp.*, MSPB No. DC-0752-14-0573-I-1, 2016 WL 108029
   (2016) ................................................................................................................... 8

*MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503 (2011) .................................................... 7

*PGBA, LLC v. United States*, 60 Fed. Cl. 196 (2004) ................................................................ 4

*Progressive Indus., Inc. v. United States*, 129 Fed. Cl. 457 (2016) .............................................. 4, 9

*Ryan v. Dep't of Homeland Sec.*, 123 M.S.P.R. 202 (2016) ......................................................... 8

*Suarez v. Dep't of Hous. & Urban Dev.*, 96 M.S.P.R. 213 (2004), *aff'd*, 125 F. App'x 1010
   (Fed. Cir. 2005) ..................................................................................................... 8

*United States v. Miss. Valley Generating Co.*, 364 U.S. 520 (1961) ............................................. 5

## Statutes

18 U.S.C. § 208 ............................................................................................................. 6

18 U.S.C. § 216 ............................................................................................................. 9

18 U.S.C. § 610 ............................................................................................................. 6

5 U.S.C. § 7324 ............................................................................................................. 6

## Other Authorities

Dep't of Defense, Employees' Guide to the Standards of Conduct (Jan. 2019),
   https://ogc.osd.mil/defense_ethics/resource_library/employee_guide.pdf. ................................. 5

Joint Ethics Regulation, DoD Reg. 5500.7-R ......................................................................... 7

Principles of Ethical Conduct for Government Officers and Employees, Executive Order 12674, § 101(a) (1989), *as modified by* Executive Order 12731 (1990), https://bit.ly/30DnDCN......... 7

U.S. Dep't of Defense Standards of Conduct Office, Encyclopedia of Ethical Failure (Oct. 2019), https://bit.ly/30l3BgQ......................................................................................... 8

U.S. Office of Gov't Ethics, Ethics & Procurement Integrity: What You Need to Know as a Federal Employee Involved in the Procurement and Acquisition Process 3 (July 2007), https://bit.ly/2TaFAHM......................................................................................... 6

**Regulations**

5 C.F.R. § 734.101 .............................................................................................................. 6

5 C.F.R. § 734.306 .............................................................................................................. 6

5 C.F.R. § 2635.101 ..................................................................................................... 5, 6, 7

5 C.F.R. § 2635.106(a) ........................................................................................................ 8

5 C.F.R. § 2635.402(c) ........................................................................................................ 6

5 C.F.R. § 2635.502(a) ........................................................................................................ 6

48 C.F.R. § 1.102-2(c) .................................................................................................. 4, 5, 7

48 C.F.R. § 1.602-2(b) ........................................................................................................ 5

48 C.F.R. § 3.101-1 ............................................................................................................. 5

## INTRODUCTION

This is not an ordinary bid protest.  Plaintiff Amazon Web Services, Inc. ("Plaintiff" or "AWS") alleges not only that the U.S. Department of Defense ("DoD") inaccurately evaluated the technical aspects of its proposal for the Joint Enterprise Defense Infrastructure ("JEDI") contract—but also that DoD did so because President Donald J. Trump engaged in a "[b]latant and sustained effort to direct the outcome of [the] procurement" in order to "pursue his own personal and political ends."  ECF No. 26 ("Compl."), Introduction, ¶ 32.  Such allegations raise serious concerns about conflicts of interest, loss of impartiality, and unethical conduct.  The issue presented by Plaintiff's motion to supplement the record is whether these allegations of impropriety may be fully investigated.[1]  CREW believes that public confidence in the integrity of the JEDI procurement process depends on such an investigation.

Impartiality is a bedrock of federal ethics and public procurement law.  Government officials must be free from bias and conflicts of interest in order to make decisions in the best interest of the government and, by extension, the American taxpayer.  In this way, evenhanded treatment of bidders for government contracts provides for the effective and efficient management of public funds.  As the then-Acting DoD Inspector General explained, "integrity in DoD contracting is indispensable and . . . the American public deserves no less than honest government and aggressive vigilance over the expenditure of the nation's resources."  Press Release, Dep't of Justice, Boeing to Pay United States Record $615 Million to Resolve Fraud Allegations (June 30, 2006), https://bit.ly/2QR9ijC.

Given the importance of impartiality to the public trust, it is imperative that the Court

---

[1] CREW takes no position on the merits of DoD's technical evaluations or whether the JEDI contract was properly awarded.  This *amicus* brief is limited to Plaintiff's motion to supplement the record.

have all relevant information before it when determining whether the JEDI contract was awarded in accordance with federal law.  Plaintiff asks that the record include tweets and public statements by President Trump and his associates about the JEDI procurement, AWS's parent company Amazon.com, Inc. ("Amazon"), and its founder Jeff Bezos, all of which bear upon AWS's claims of bias and partiality.  ECF No. 146 ("Mot. to Supplement") at 29; *see also, e.g.*, Compl. ¶¶ 16, 20, 86, 89, 96–97, 117.  Plaintiff also asks that the record include additional materials—including deposition testimony and any internal communications—that demonstrate President Trump's and his associates' communications to and impact on the DoD officials involved in the JEDI procurement.  Mot. to Supplement at 29–30, 33–38; *see also, e.g.*, Compl. ¶¶ 91, 95, 176, 183.  Such materials will shed light on DoD's procurement process and are necessary for effective judicial review of whether that procurement was subject to improper influence.  Supplementation of the record is accordingly appropriate.

A complete record in this case is particularly important in light of other recent ethically-questionable public procurements.  Over the last several years, President Trump has repeatedly interfered in federal procurements to promote his own personal objectives.  He attempted to award a multi-million dollar federal contract to his for-profit business, Trump National Doral, for an event that he was leading; participated in decision-making related to the construction of a new headquarters for the Federal Bureau of Investigation despite a potential conflict of interest; and advocated directly for the selection of a particular company for an Army Corps of Engineers project.  CREW is concerned that these incidents represent a pattern of disregard for ethics and procurement law in the Trump Administration.  Such incidents also bolster the credibility of Plaintiff's allegations of similarly improper interference by President Trump in the JEDI procurement.  These well-grounded allegations deserve to be judged in light of all relevant

2

information.

## ARGUMENT

Plaintiff's motion shows that supplementation is warranted with respect to its allegations of bias and bad faith.  The complaint sets forth a number of allegations about President Trump's involvement in the JEDI procurement that raise concerns about lack of impartiality, conflicts of interest, and unethical conduct.  According to AWS, President Trump has at least twice explicitly directed DoD officials on how to proceed with the procurement process: first, when the President told then-Secretary of Defense James Mattis to "screw Amazon" out of the JEDI contract, Compl. ¶ 19; and second, when President Trump told newly appointed Secretary of Defense Mark Esper to conduct an "independent" examination of the procurement, *id.* ¶¶ 21, 176. President Trump also allegedly used press conferences, Twitter, and other public fora to express disparaging views about AWS, Mr. Bezos, and Amazon as well as to convey disapproval about the potential award of JEDI to Plaintiff.  *Id.* ¶¶ 16, 20, 86, 89, 96–97, 117.  These allegations demonstrate that Plaintiff's claims of bias and bad faith have a "reasonable factual predicate" and "appear to be sufficiently well grounded" to warrant supplementation.  *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 91 Fed. Cl. 347, 355 (2010).

*Amicus*'s analysis below reinforces the seriousness of Plaintiff's allegations and the corresponding importance of analyzing them on a fulsome record.  The types of ethical lapses alleged by Plaintiff have provided grounds to review and invalidate procurement decisions in the past.  In addition, the below analysis reinforces the plausibility of Plaintiff's allegations, which is bolstered by President Trump's apparent pattern of improper interference in public procurements.  Based on its years of experience monitoring government officials' compliance with ethical standards and filing complaints where those standards are violated, CREW

respectfully submits that the Court cannot effectively review Plaintiff's allegations without a fuller record that sheds more light on how President Trump's communications were understood and acted upon by the DoD officials with decision-making authority over the JEDI contract. *Id.* at 354 (noting supplementation is appropriate when "the omission of extra-record evidence precludes effective judicial review" (quoting *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009))). Only then will the Court be able to judge whether there were violations of the ethics and procurement regulations on impartiality described below.

## I.   IMPARTIALITY IN PUBLIC PROCUREMENT IS INTEGRAL TO PUBLIC TRUST

### A.  Federal Law Requires Government Contracts Be Awarded Free from Employees' Personal Interests

Impartiality and fairness are foundational principles of government ethics and federal procurement law. Decisions made free from bias help prevent waste, fraud, and corruption in public procurement, allowing for the effective and efficient management of public resources. Moreover, corruption in public procurement "isn't just about money"—"[i]t also reduces the quality of work or services" and "can cost lives." *Public Procurement*, Transparency Int'l, https://bit.ly/33Zl93B (last visited Feb. 6, 2020). This court has accordingly recognized that "[t]he public has a strong interest in ensuring that the government procurement process is fair." *Progressive Indus., Inc. v. United States*, 129 Fed. Cl. 457, 486 (2016); *see also PGBA, LLC v. United States*, 60 Fed. Cl. 196, 221 (2004) ("[I]t is well established that the public interest is well-served by ensuring that the government procurement process is fair.").

In service to this principle, federal law, regulations, and executive branch and agency standards of conduct all mandate impartiality on the part of government employees. The Federal Acquisition Regulation ("FAR") requires federal procurement officials to "[c]onduct business with integrity, fairness, and openness." 48 C.F.R. § 1.102-2(c). Contracting officers must

4

accordingly "[e]nsure that contractors receive impartial, fair, and equitable treatment." *Id.* § 1.602-2(b). The requirement for fair and impartial treatment is also reflected in FAR § 1.102-2(c)(3), which demands that "[a]ll contractors and prospective contractors shall be treated fairly and impartially." *Id.* § 1.102-2(c)(3). It is reiterated in FAR § 3.101-1, which provides "[t]ransactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct." *Id.* § 3.101-1. The regulation emphasizes, "[t]he general rule is to avoid strictly any conflict of interest or even *the appearance* of a conflict of interest in Government-contractor relationships." *Id.* (emphasis added).

Procurement-specific rules in the FAR build upon the 14 principles of government ethics incorporated in the Standards of Ethical Conduct for Employees of the Executive Branch. Much like FAR § 3.101-1, they provide that executive branch employees "shall act impartially and not give preferential treatment to any private organization or individual." 5 C.F.R. § 2635.101(b)(8). The Department of Defense confirms in its Employees' Guide to the Standards of Conduct that a "general principle[] of public service" is to "[a]ct impartially to all groups, persons, and organizations." Dep't of Defense, Employees' Guide to the Standards of Conduct (Jan. 2019), https://ogc.osd.mil/defense_ethics/resource_library/employee_guide.pdf.

Specific rules about financial conflicts of interest further mandate that government officials discharge their duties impartially and fairly. As the Supreme Court has recognized, a conflict of interest is "an evil which endangers the very fabric of a democratic society, for a democracy is effective only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption." *United States v. Miss. Valley Generating Co.*, 364 U.S. 520, 562 (1961). Thus, a government official should not hold financial interests that

"conflict with the conscientious performance of duty."  5 C.F.R. § 2635.101(b)(2).  Nor should a government official use public office to benefit herself personally.  *Id.* § 2635.101(b)(7).

Section 208 of the U.S. criminal code specifically prohibits government employees from participating "personally and substantially" in a matter—like a contract—that would affect their financial interests or those of their spouses, minor children, or certain other persons.  18 U.S.C. § 208; *see also* 5 C.F.R. § 2635.402(c); U.S. Office of Gov't Ethics, Ethics & Procurement Integrity: What You Need to Know as a Federal Employee Involved in the Procurement and Acquisition Process 3 (July 2007), https://bit.ly/2TaFAHM.  Even outside these circumstances, however, federal regulations dictate that a government employee should generally not participate in a matter when the "circumstances would cause a reasonable person with knowledge of the relevant facts to question his impartiality in the matter."  5 C.F.R. § 2635.502(a).

Much as conflict of interest laws prohibit government officials from advancing their personal financial interests, the Hatch Act bars federal employees from using their public positions to pursue political objectives.  The Hatch Act prohibits federal employees from engaging in "political activity" while on duty or in any U.S. government building.  5 U.S.C. § 7324; 5 C.F.R. § 734.306.  Political activity includes any activity "directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group."  5 C.F.R. § 734.101.  The Hatch Act also prohibits federal employees from coercing others to engage in political activity.  18 U.S.C. § 610.

These rules are important in protecting the integrity of public procurement.  Indeed, DoD obliges its employees to go beyond the above requirements in an attempt to safeguard its procurement processes.  DoD specifically directs its employees to "[a]void any activity that would affect the public's confidence in the integrity of the Federal Government, even if it is not

an actual violation of the law."  Joint Ethics Regulation, DoD Reg. 5500.7-R, ch. 8, ¶ 8-500(c).

The Department's Joint Ethics Regulation establishes "integrity" and "fairness" as "primary

ethical values" for DoD employees—both of which require acting impartially.  Another of

DoD's primary ethical values, "accountability," includes "avoiding even the appearance of

impropriety because appearances affect public confidence."  *Id.* ch. 12, ¶ 12-401.

Ultimately, an "essential consideration" in "every aspect" of the federal acquisition

system is "maintaining the public's trust."  48 C.F.R. § 1.102-2(c)(1); *cf.* Principles of Ethical

Conduct for Government Officers and Employees, Executive Order 12674, § 101(a) (1989), *as

modified by* Executive Order 12731 (1990), https://bit.ly/30DnDCN ("Public service is a public

trust.").  Only when federal officials act in accordance with ethics laws—including those

requiring impartiality in decision-making—can the public trust the integrity of government.  *See*

5 C.F.R. § 2635.101.  Plaintiff's allegations strike at the heart of the public trust:  AWS claims

that DoD officials who should have been acting impartially, with a focus on the best interest of

the public, instead unfairly evaluated AWS's proposal because of President Trump's personal

bias.  *See* Compl. ¶¶ 220–23, 226–28.  If true, President Trump's conduct undermines both the

integrity of the JEDI contract award and the regulatory scheme dedicated to maintaining

impartiality in public procurement.  Plaintiff's allegations are sufficiently serious to require

investigation on a complete record.

> **B.  Failure to Act with the Required Impartiality Has Led to the Invalidation of
> Procurement Decisions and Penalties Against Government Officials**

Unethical behavior on the part of government employees may provide grounds to

review—and invalidate—a procurement decision.  *See, e.g., MORI Assocs., Inc. v. United States*,

102 Fed. Cl. 503, 525, 545–46 (2011) (noting "[m]any of our opinions have considered alleged

violations of FAR section 3.101-1 as grounds for a bid protest," and invalidating solicitation

decision based, in part, on involvement of a potentially biased employee); *FFTF Restoration Co. v. United States*, 86 Fed. Cl. 226, 240 (2009) (noting that the court may review the plaintiff's claims that an agency "failed to act with integrity, fairness, and openness or to treat bidders fairly" as required by the FAR); *Defense Tech., Inc. v. United States*, 99 Fed. Cl. 103, 130, 132 (2011) (concluding that the government violated the FAR's requirements that it treat bidders fairly and honestly, and awarding losing bidder its bid preparation and proposal costs).

Violations of ethics rules can also subject government employees to administrative, civil, and criminal sanctions. 5 C.F.R. § 2635.106(a). The Merit Systems Protection Board has upheld disciplinary action based on charges that included violations of ethical principles, including those at 5 C.F.R. § 2635.101(b) and FAR § 3.101-1. *See, e.g.*, *Ryan v. Dep't of Homeland Sec.*, 123 M.S.P.R. 202, 207 (2016) (upholding charge based on § 2635.101(b)(14) and stating "the agency could prove its charge by establishing that the appellant's conduct created the appearance of a conflict of interest under the standards of ethical conduct, even if it failed to prove an actual conflict of interest"); *Suarez v. Dep't of Hous. & Urban Dev.*, 96 M.S.P.R. 213, 220 (2004), *aff'd*, 125 F. App'x 1010 (Fed. Cir. 2005) (violation of impartiality principle at § 2635.101(b)(8)); *Mazzoleni, Flavio v. Fed. Deposit Ins. Corp.*, MSPB No. DC-0752-14-0573-I-1, 2016 WL 108029 (2016) (nonprecedential) (discipline based partly on § 2635.101); *Burke, Todd v. Agric.*, MSPB No. CH-0752-14-0124-I-1, 2014 WL 6616551 (2014) (nonprecedential), *pet. for review den.* 122 M.S.P.R. 441 (2015) (Table) (citing FAR § 3.101-1 and declaring the "government clearly has an interest in prohibiting the appearance of a conflict of interest and insuring its agents and employees are not compromised by outside influences"). In addition, government employees convicted of conflict of interest offenses have been sentenced to years in prison, millions of dollars in restitution, and fines. *See* U.S. Dep't of Defense Standards of

Conduct Office, Encyclopedia of Ethical Failure (Oct. 2019), https://bit.ly/30l3BgQ; *see also* 18 U.S.C. § 216.

The multitude of laws, regulations, and standards requiring impartial and fair conduct by federal officials, as well as the potential invalidation of procurement decisions and the harsh penalties faced by those officials should they break the law, demonstrate the public's "strong interest" in "ensuring that the government procurement process is fair." *Progressive Indus., Inc.*, 129 Fed. Cl. at 486. Because of the confidential nature of much of the JEDI procurement and these proceedings, *see* ECF Nos. 8, 17, neither CREW nor the public are able to fully scrutinize the merits of AWS's allegations that President Trump wielded improper influence over DoD's award of the JEDI contract. This Court is the only entity in a position to hold the government accountable, if the evidence warrants it, and to "ensur[e] that the government procurement process is fair." It is accordingly critical that the Court supplement the record and judge Plaintiff's allegations of bias, bad faith, and conflict of interest based on all relevant evidence.

## II.   PRESIDENT TRUMP HAS REPORTEDLY ENGAGED IN A PATTERN OF INTERFERENCE IN GOVERNMENT PROCUREMENT PROCESSES TO ADVANCE HIS PERSONAL OBJECTIVES

Public reporting suggests that President Trump has inserted himself into several recent procurement processes. Each of these incidents raises concerns about impartiality, conflicts of interest, and violations of the laws and regulations described above. Moreover, the President's reported pattern of attempts to influence the contracting decisions of multiple federal agencies suggests a disregard for the requirements of federal ethics and procurement law, and bolsters the conclusion that AWS's allegations of improper interference here are based upon a "reasonable factual predicate" and "appear to be sufficiently well grounded" to warrant supplementation of the record. *L-3 Commc'ns Integrated Sys., L.P.*, 91 Fed. Cl. at 355; *see also Inforeliance Corp. v. United States*, 118 Fed. Cl. 744, 748–50 (2014) (granting motion for depositions and

production of documents in post-award bid protest based on "sufficient well-grounded allegations of bias" on the part of a member of the Source Selection Evaluation Board (internal quotation and citation omitted)).

### A. Selection of Trump National Doral to Host the G7 Summit

Among the most egregious examples of President Trump's involvement in a procurement process is the President's attempt to award his own for-profit business a multi-million-dollar contract to host the 2020 Group of Seven ("G7") Summit.[2]  The G7 Summit is an annual meeting of the leaders of seven of the largest industrialized economies: France, Germany, Italy, the United Kingdom, Japan, the United States, and Canada.  As host of the 2020 G7 Summit, the United States must undertake major procurement processes to support logistics for the meeting. The federal government selected President Trump's Miami resort, Trump National Doral ("Doral"), as the site for the event—after President Trump intervened in the procurement to advocate for his property.

The *Washington Post* first reported in June 2019 that President Trump wanted Doral to host the 2020 G7 Summit.  David A. Fahrenthold, Josh Dawsey, Jonathan O'Connell, and Michelle Ye Hee Lee, *When Trump Visits His Clubs, Government Agencies and Republicans Pay to Be Where He Is*, Wash. Post (June 20, 2019), https://wapo.st/31EgsuO.  Then, on August 26, 2019, President Trump delivered a public sales pitch for hosting the G7 Summit at Doral— discussing what he perceived as the benefits of hosting the event there and describing features of the resort and its environs as "wonderful," "magnificent," "very luxurious," "incredible,"

---

[2] In 2019, France reportedly spent $23 to $40 million for the G7 Summit in Biarritz.  Asian News International, *G7 Summit in Biarritz to Cost France Around 36.4 Million Euros*, Business Standard (Aug. 21, 2019), https://bit.ly/2PgRDmz; Associated Press, *G7 Leaders Make Joint Statement on Fair Trade*, ABC News (Aug. 26, 2019), https://abcn.ws/2Lnzpeb.  Canada paid several times that amount for the 2018 G7 Summit in La Malbaie.  Kevin Nielson, *Taxpayers to Shell Out $605M for G7 Meeting*, Global News (Feb. 28, 2018), https://bit.ly/2NzelnF.

"beautiful," "fantastic," "brand new" and a "great place to be."  *Remarks by President Trump and President Macron of France in Joint Press Conference*, White House (Aug. 26, 2019), https://bit.ly/328d7Uc.  President Trump also asserted that competing facilities were "good" but "[s]ome didn't allow this, or they didn't allow that."  *Id.*

On October 17, Acting White House Chief of Staff Mick Mulvaney announced that Doral had been selected to host the G7 Summit.  *Press Briefing by Acting Chief of Staff Mick Mulvaney*, White House (Oct. 17, 2019),  https://bit.ly/2MYOTG1.  During the press conference, Mr. Mulvaney provided minimal details of the procurement.  Of note, however, he admitted that President Trump had access to the list of finalists and persuaded officials to add his own Doral resort to it: "We sat around one night.  We were back in the dining room and I was going over it with a couple of our advance team. We had the list, and he goes,  'What about Doral?'  And it was like, 'That's not the craziest idea. It makes perfect sense.'"  *Id.*

An email later released by the Secret Service confirmed that Doral had been added to the list of potential G7 Summit sites at the last minute.  *See Secret Service Records Contradict Trump's Claim on Doral G-7*, Citizens for Responsibility & Ethics in Wash. (Nov. 15, 2019), https://www.citizensforethics.org/secret-service-docs-contradict-trump-doral-g-7/.  The email, signed by a member of the Dignitary Protective Division's Special Events team, indicates that Doral was not one of the sites included in the initial survey done by the Secret Service in May and June 2019.  *Id.*  Rather, the email suggests Doral was added to the list of finalists in July.  "By departure, they had already cut two (California and North Carolina) and added Miami on the back end," the July 12, 2019 email states, apparently referencing Doral.  *Id.*  The email continues: "[y]esterday was the first time we put eyes on this property."  The email indicates that President Trump would be personally involved in the site selection, noting that the findings from

the Secret Service's visits to the finalist properties "will be presented to the President on Tuesday for a final decision."  *Id.*

Mr. Mulvaney's announcement that Doral would host the G7 prompted a wave of public outrage, and the selection of President Trump's resort was rescinded two days later.  Toluse Olorunnipa, Josh Dawsey, and David A. Fahrenthold, *Trump Reversed Course on Hosting G-7 at His Club After Learning that Impeachment-Weary Republicans Were Tired of Defending Him*, Wash. Post (Oct. 20, 2019), https://wapo.st/2pwrTqh.

CREW requested an investigation into the G7 Summit procurement from the State Department Inspector General.  Letter from Noah Bookbinder, CREW Exec. Dir., and Walter M. Shaub, CREW Senior Advisor, to Steve A. Linick, Inspector Gen., U.S. Dep't of State (Sept. 10, 2019), https://bit.ly/2N9GJeM ("Letter to State IG"); Letter from Noah Bookbinder, CREW Exec. Dir., and Walter M. Shaub, CREW Senior Advisor, to Steve A. Linick, Inspector Gen., U.S. Dep't of State (Oct. 23, 2019), https://bit.ly/2QCvldy.  As CREW noted then, "a presidential administration awarding a costly and highly sensitive contract to a company owned by the President, in support of an event that he will lead, undermines the credibility of the federal procurement system."  Letter to State IG at 12.  CREW highlighted how President Trump had placed "extraordinary pressure" on the State Department's procurement officials when he "touted [his resort's] virtues in what has been described as an infomercial for the resort," noting "[n]o State Department procurement official could miss President Trump's strongly expressed desire to hold the G7 summit at his Trump National Doral resort."  *Id.* at 1, 6–7.  CREW added that the award to Doral "directly implicates the FAR's strict mandate to avoid conflicts of interest or the appearance of conflicts of interest in federal procurements."  *Id.* at 5.  CREW— and the public—await a response from the State Department Inspector General and a full

accounting of the G7 procurement process.

**B.  Abrupt Change in Plans for the Development of FBI Headquarters**

In another potentially concerning procurement, President Trump participated directly in decision-making regarding construction of a new headquarters for the Federal Bureau of Investigation ("FBI")—despite a potential conflict of interest arising from his ownership of the Trump International Hotel.

In 2012, the General Services Administration ("GSA") announced its plan to relocate the FBI's headquarters from the J. Edgar Hoover building (the "Hoover Building") in downtown Washington, D.C. to a to-be-constructed facility in the suburbs.  *See* Office of Inspector Gen., U.S. Gen. Services Admin., Review of GSA's Revised Plan for the Federal Bureau of Investigation Headquarters Consolidation Project 3 (Aug. 27, 2018), https://bit.ly/384jgny ("GSA IG Report").  In early 2017, GSA received proposals from several bidders to build the new suburban headquarters in exchange for title to the Hoover Building.  *Id.*  The new owners of the Hoover Building could then redevelop the property.

The potential redevelopment of the Hoover Building into a commercial property has reportedly been a longtime interest of President Trump and his company.  The *New York Times* reported that, in 2015, an executive at President Trump's business "expressed concern to a congressional aide about the redevelopment project creating potential competition for Mr. Trump's hotel."  Thomas Kaplan, *Trump's Focus on a Washington Building Project Draws Scrutiny*, N.Y. Times (Oct. 18, 2018), https://nyti.ms/2NpdnJL.  After President Trump took office, the *Washington Post* reported that he "took a personal interest" in the FBI headquarters project, "frequently raised the issue of the FBI building and his desire for it be torn down," and was "dead opposed" to plans to move the building out of downtown D.C.  Jonathan O'Connell,

*Trump Intervenes in FBI Headquarters Project*, Wash. Post (July 30, 2018),

https://wapo.st/2RcR7E3.

Several months after President Trump took office, GSA cancelled the procurement for a new FBI headquarters, citing a lack of funding.  GSA IG Report at 4.  GSA then decided—after meeting several times with White House officials, including at least twice with President Trump himself—not to relocate the FBI headquarters.  *Id.* at 5–9.  Instead, in February 2018, GSA proposed demolishing the Hoover Building and building new FBI facilities in its place.  *Id.* at 10.

GSA's change of plans for the FBI's headquarters prompted an investigation by GSA's Inspector General.  As the GSA Inspector General explained in a report, "[w]hen GSA subsequently presented its new plan to raze and rebuild the FBI headquarters at the Hoover site rather than continue with the suburban campus plan to which GSA had devoted years of planning and taxpayer funds, the change drew widespread public attention and bipartisan concern expressed at multiple congressional hearings."  *Id.* at B-1.  The report found that GSA officials misrepresented to Congress the cost of the revised plan—incorrectly making it seem as though the demolish-and-rebuild plan was less expensive than the original plan to construct a suburban headquarters.  *Id.* at 11–15.

The GSA IG Report also highlighted two concerns related to President Trump's involvement in the procurement.  First, the Report concluded that the GSA Administrator's testimony to Congress about the project "may have left the misleading impression that she had no discussions with White House officials in the decision-making process about the project."  *Id.* at 2, 18–21.  Second, the Report noted that during the investigation, GSA witnesses, at the direction of the White House Counsel's Office via GSA's Acting General Counsel, refused to disclose any statements made by President Trump in their meetings about the FBI headquarters.

*Id.* at 1–2.  The extent of President Trump's involvement in the procurement, and the details of the meetings in which he participated, remain unknown.

After the release of the GSA Inspector General's Report, several members of Congress requested that the Department of Justice Inspector General investigate President Trump's involvement in the decision not to relocate the FBI headquarters.  Letter from Elijah Cummings, Chairman, U.S. House of Representatives Comm. on Oversight & Reform, et al., to Michael Horowitz, Inspector Gen., Dep't of Justice (May 17, 2019), https://bit.ly/2TlAOYg.  Their request highlighted President Trump's potential conflict of interest, given that redevelopment of the Hoover Building "would have allowed commercial developers to compete directly with the Trump Hotel."  *Id.*  On July 2, 2019, the Department of Justice Inspector General announced that it would undertake the requested investigation into the FBI headquarters procurement process.  Letter from Michael Horowitz, Inspector Gen., Dep't of Justice, to Elijah Cummings, Chairman, U.S. House of Representatives Comm. on Oversight & Reform, et al. (July 2, 2019), https://bit.ly/2FLhLi3.

### C. Award of Border Wall Construction Contract to Fisher Sand and Gravel Co.

In December 2019, the Army Corps of Engineers awarded a $400 million contract to Fisher Sand and Gravel Co. ("Fisher") to construct a portion of the border wall between the United States and Mexico.  *Contracts for Dec. 2, 2019*, U.S. Dep't of Defense, https://www.defense.gov/Newsroom/Contracts/Contract/Article/2030017/#FSG120219 (last visited Feb. 7, 2020).  The Department of Defense Inspector General is now investigating allegations that President Trump improperly influenced the award.  Letter from Glenn A. Fine, Principal Deputy Inspector Gen., Dep't of Defense, to Bennie G. Thompson, Chairman, U.S. House of Representatives Comm. on Homeland Sec. (Dec. 12, 2019), https://bit.ly/2TlRONW.

Fisher's top executive, Tommy Fisher, met President Trump after attending the 2018

State of the Union at the invitation of North Dakota Republican Senator Kevin Cramer.  *Fisher*

*Industries Newsletter: Special Edition* (Feb. 2018), https://bit.ly/2Tu6evD.  Mr. Fisher is a

frequent donor to Republican politicians, *see Individual Contributions*, Federal Election

Commission, https://bit.ly/2NkFD03 (search in Contributor Details, Name for "Tommy Fisher"

and "Thomas Fisher," and Contributor Details, Employer for "Fisher Industries") (last visited

Feb. 7, 2020), and a repeat contributor to Fox News, *see, e.g.*, *Fox & Friends First: Construction*

*CEO on His Company's Proposal to Build the Wall* (Fox News television broadcast Apr. 4,

2019), https://bit.ly/2Nr6OX1; *FOX & Friends: Company Pitches Building 234 Miles of Border*

*Fence, High-Speed Roadways by 2020 Election* (Fox News television broadcast Mar. 5, 2019),

https://video.foxnews.com/v/6010184201001#sp=show-clips.  Mr. Fisher's connections to

President Trump extend to his company's work with We Build the Wall, a group whose board is

led by the President's former chief strategist Stephen K. Bannon.  *We Build the Wall Team*, We

Build the Wall, https://webuildthewall.us/ourteam/ (last visited Feb. 7, 2020); *Important Updates*

*from the Founder Brian Kolfage*, We Build the Wall (Jan. 1, 2020),

https://webuildthewall.us/update/.

The *Washington Post* and *CNN* reported that, after seeing Mr. Fisher on Fox News,

President Trump personally and repeatedly advocated for the Army Corps of Engineers to select

the company for a border wall contract.  Nick Miroff and Josh Dawsey, *'He Always Brings Them*

*Up': Trump Tries to Steer Border Wall Deal to North Dakota Firm*, Wash. Post (May 23, 2019),

https://wapo.st/387c9L3; Priscilla Alvarez, Clare Foran, and Ryan Browne, *Company Touted by*

*Trump to Build the Wall Has History of Fines, Violations*, CNN (May 31, 2019),

https://cnn.it/2tWjONq.  President Trump reportedly raised the company directly to the head of

the Army Corps of Engineers, Lt. Gen. Todd Semonite and other government officials.  Miroff
and Dawsey, *'He Always Brings Them Up'*; Alvarez, Foran, & Browne, *Company Touted by
Trump*.  In addition, the President publicly promoted Fisher on Fox News.  In an April 2019
interview, Sean Hannity asked whether President Trump had "heard about this contractor that
said he can build a whole wall for a lot cheaper than anybody else and get it done by 2020."  Ian
Schwartz, *Full Video: Sean Hannity Interviews Trump on Biden, Russia Probe, FISA Abuse,
Comey*, RealClearPolitics (Apr. 26, 2019), https://bit.ly/2NqcrVA.  President Trump responded,
"Yes, we are dealing with him, actually.  It's Fisher . . . recommended strongly by a great new
senator as you know, Kevin Cramer.  And they are real.  But they have been bidding and so far
they haven't been meeting the bids.  I thought they would."  *Id.*  According to *Washington Post*
reporting, President Trump's advocacy for Fisher "alarmed military officials and DHS officials."
Miroff and Dawsey, *'He Always Brings Them Up.'*

Prior to President Trump's advocacy, Fisher had not received any contracts for border
wall construction.  Alvarez, Foran, & Browne, *Company Touted by Trump*.  Fisher's proposals
for earlier border constructions projects reportedly did not meet the Army Corps' requirements,
and its construction of a prototype border wall was apparently late and over budget.  Miroff and
Dawsey, *'He Always Brings Them Up.'*  The *Washington Post* reported that "Fisher was added to
a pool of competitors after the Army Corps came under pressure from the White House."  *Id.*  In
its recently announced audit, the DoD Inspector General stated that it will investigate "the
possibility of inappropriate influence" and whether the Army Corps awarded the $400 million
contract to Fisher in accordance with federal procurement law.  Letter from Glenn A. Fine,
Principal Deputy Inspector Gen., Dep't of Defense, to Bennie G. Thompson, Chairman, U.S.
House of Representatives Comm. on Homeland Sec. (Dec. 12, 2019).

* * * * *

Plaintiff's allegations of improper interference in the JEDI procurement parallel the above reports of President Trump's previous attempts to influence public procurements to advance his personal aims.  In each instance, and with JEDI if AWS's allegations are true, President Trump sought to directly influence individuals with supervisory power over the procurement—Secretary Esper and Secretary Mattis with respect to JEDI; Acting Chief of Staff Mulvaney regarding the selection of Doral as the host for the G7 Summit; the GSA Administrator overseeing the FBI headquarters relocation; and the head of the Army Corps of Engineers for the Fisher contract.  Moreover, as with his infomercial for Doral during the G7 procurement, President Trump allegedly leveraged public fora here in order to make his preferences about Mr. Bezos and Amazon known.  *See* Compl. ¶¶ 16, 20, 86, 89, 97, 117.  As CREW told the State Department Inspector General after President Trump expressed similarly public support for Doral, "[n]o State Department procurement official could miss President Trump's strongly expressed desire to hold the G7 summit at his Trump National Doral resort." Letter to State IG at 7.  President Trump's alleged attempts to pressure government officials in processes that are supposed to avoid even the *appearance* of impropriety is alarming.  It suggests a pattern of disregard for the regulations governing conflict of interest and impartiality, bolstering Plaintiff's allegations that similar conduct plagued the award of the JEDI contract.

## CONCLUSION

Plaintiff's motion to supplement the record seeks to ensure that the Court has before it all relevant information when deciding whether the public can trust the integrity of the JEDI procurement process.  The record should include information bearing on whether the federal government complied with federal ethics and procurement law in its award of the JEDI contract—including those materials related to potential conflicts of interest, loss of impartiality,

and unethical conduct.  In light of repeated instances of President Trump reportedly inserting himself in procurement processes for his own personal ends, in violation of legal guarantees of impartiality, AWS's allegations of improper influence here are "sufficiently well grounded" to warrant supplementation of the record.  For the foregoing reasons, *amicus* CREW respectfully requests the Court grant Plaintiff's motion to supplement the record.


Dated:  February 11, 2020

Respectfully submitted,


*/s/ Jessica A. Lutkenhaus*
Jessica A. Lutkenhaus
Citizens for Responsibility and Ethics
    in Washington
1101 K Street, N.W., Suite 201
Washington, D.C.  20005
Phone: (202) 408-5565
Facsimile: (202) 588-5020
jlutkenhaus@citizensforethics.org

*Counsel of Record for Amicus*
*Citizens for Responsibility and Ethics*
*in Washington*

Adam J. Rappaport
Stuart McPhail
Citizens for Responsibility and Ethics
    in Washington
1101 K Street, N.W., Suite 201
Washington, D.C.  20005

*Of Counsel*
