# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

| | |
|---|---|
| AMAZON WEB SERVICES, INC.,<br><br>               Plaintiff,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br>by and through the U.S. Department of Defense,<br><br>               Defendant,<br><br>    and<br><br>MICROSOFT CORPORATION,<br><br>               Defendant-Intervenor. | Case No. 19-cv-01796<br><br>Judge Campbell-Smith<br><br>████████████████<br><br>**FINAL REDACTED VERSION** |

## PLAINTIFF'S ██████ REPLY IN SUPPORT OF ITS
## RENEWED MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

## TABLE OF CONTENTS

Page

**TABLE OF AUTHORITIES** ......................................................................................................... iii

**INTRODUCTION** .......................................................................................................................... 1

**ARGUMENT** .................................................................................................................................. 3

    A.   Supplementation Is Necessary for Full and Fair Judicial Review of AWS's
           Claims ................................................................................................................................ 3

          1.   *Defendants Apply the Wrong Legal Standard—Supplementation Does Not
                Require AWS to Prove the Merits of Its Claims.* ...................................................... 3

          2.   *The Court Should Require Supplementation in Light of AWS's Well-
                Grounded Allegations of Bias and Bad Faith.* ......................................................... 4

          3.   *The Waiver Doctrine of* Blue & Gold *Is Not Before the Court in this
                Motion.* ..................................................................................................................... 8

    B.   Effective Judicial Review of AWS's Claims Requires Supplementation of the
           AR with AWS's Appendix ................................................................................................ 9

    C.   AWS Is Entitled to Investigate Bias and Bad Faith Through Discovery ...................... 12

          1.   *Defendants Have Failed to Show How DoD's Evaluations and Award
                Decision Can Be Explained Absent Bad Faith.* ...................................................... 12

          2.   *AWS's Discovery Requests Are Targeted to Uncover Evidence Regarding
                Bias and Bad Faith, Which Will Aid this Court's Review.* .................................... 14

**CONCLUSION** ............................................................................................................................ 20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*ARKRAY USA, Inc. v. United States*,
   No. 14-233, 2014 WL 2905127 (Fed. Cl. June 26, 2014) ......................................................3

*Axiom Res. Mgmt., Inc. v. United States*,
   564 F.3d 1374 (Fed. Cir. 2009).........................................................................................4, 10

*Bannum, Inc. v. United States*,
   779 F.3d 1376 (Fed. Cir. 2015).................................................................................................8

*Beta Analytics Int'l v. United States*,
   61 Fed. Cl. 223 (2004) ..........................................................................................2, 13, 14

*DataMill, Inc. v. United States*,
   91 Fed. Cl. 722 (2010) ..............................................................................................................5

*Gadsden v. United States*,
   111 Ct. Cl. 487 (1948) ..............................................................................................................5

*Galicia v. Trump*,
   109 N.Y.S.3d 857 (Sup. Ct. 2019).........................................................................................17

*InfoReliance Corp. v. United States*,
   118 Fed. Cl. 744 (2014) .................................................................................................2, 3, 5

*Int'l Res. Recovery, Inc. v. United States*,
   61 Fed. Cl. 38 (2004) ..........................................................................................................11, 15

*Jarrott v. Scrivener*,
   225 F. Supp. 827 (D.D.C. 1964) ..............................................................................................7

*Joint Venture of Comint Sys. Corp. v. United States*,
   100 Fed. Cl. 159 (2011) ............................................................................................................8

*L-3 Commc'ns Integrated Sys., L.P. v. United States*,
   91 Fed. Cl. 347, 354 (2010) ...............................................................................1, 2, 3, 6, 15, 18

*Madison Servs., Inc. v. United States*,
   92 Fed. Cl. 120 (2010) ..............................................................................................................7

*Nixon v. Admin. of Gen. Servs.*,
   433 U.S. 435 (1977)................................................................................................................16

*Office Depot, Inc. v. United States,*
  94 Fed. Cl. 294 (2010) ............................................................................................................6

*Orion Int'l Techs. v. United States,*
  60 Fed. Cl. 338 (2004) ............................................................................................................3

*Pitney Bowes Gov't Sols., Inc. v. United States,*
  93 Fed. Cl. 327 (2010) ........................................................................................................2, 11

*Price Gordon Servs. v. United States,*
  139 Fed. Cl. 27 (2018) ............................................................................................................6

*In re Sealed Case,*
  121 F.3d 729 (D.C. Cir. 1997) ....................................................................................15, 18, 20

*SEC v. Comm. on Ways & Means of the U.S. House of Representatives,*
  161 F. Supp. 3d 199 (S.D.N.Y. 2015).....................................................................................17

*Starry Assocs., Inc. v. United States,*
  125 Fed. Cl. 613 (2015) .................................................................................................3, 12, 19

*In re United States (Bernanke),*
  542 F. App'x 944 (Fed. Cir. 2013) ..................................................................................16, 17

**Statutes**

18 U.S.C. § 208..............................................................................................................................6

**Rules**

Rule 5.4(b)(3), Rules......................................................................................................................8

**Regulations**

48 C.F.R. § 15.305(a).....................................................................................................................19

## INTRODUCTION

This Court has recognized that "well[-]grounded allegations of bad faith and bias are serious allegations" for which "supplementation is warranted." *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 91 Fed. Cl. 347, 354 (2010) (internal quotation marks omitted). That standard is easily satisfied here.

The Government and Microsoft Corporation seek to prevent supplementation by arguing Amazon Web Services, Inc. ("AWS") has not presented "hard facts" suggesting bias in the procurement and that AWS cannot "connect the dots" between the President's statements and "the decisions of procurement officials." Def.'s Opp'n Pl.'s Mot. Suppl. at 8, 15–23, ECF No. 140 ("Gov. Op."); Intervenor Def.'s Opp'n Pl.'s Mot. Suppl. at 25–29, ECF No. 141 ("Int. Op.").[*] Those arguments are meritless. Never before has a President of the United States privately directed his Secretary of Defense to "screw" a specific company out of a defense procurement. This is an unprecedented "hard fact." And so are the many facts recited in AWS's Motion, including: reports that the President's advisors encouraged him to "cancel Amazon's pending multi-billion contract with the Pentagon," APP 019; the Internet bile heaped upon Amazon by the President and his surrogates as the procurement process reached its culmination, APP 001–115; the irregular "recusal" of Secretary of Defense Mark Esper after he intervened in the procurement for reasons known to the Secretary for months beforehand, APP 110–13; and the misleading press release issued by DoD about the future timing of the JEDI award after it already had been awarded, APP 110. These hard facts overwhelmingly amount to "well[-]grounded allegations of bad faith

---

[*] All citations to docket entries use the pagination that has been assigned by the Court's electronic case filing system, which appears at the top of each page of the electronically filed documents. *See* ECF No. 15 at 2–3.

and bias" necessitating supplementation. *L-3 Commc'ns*, 91 Fed. Cl. at 354.

Especially unpersuasive are the Government's argument that supplementation must be denied because "the evidence the Court should consider is appropriately limited to the agency's administrative record already in existence," Gov. Op. at 12, and Microsoft's argument that supplementation should be denied because the existing administrative record ("AR") "is devoid of any reference … that establishes bias had any actual effect upon the procurement process or the selection," Int. Op. at 8–9. These arguments put the cart before the horse. At this stage, AWS must only raise credible allegations of bias, which it has amply done. AWS need not "irrefragably prove" its bias case *on the merits* in order to justify supplementation. *See, e.g.*, *InfoReliance Corp. v. United States*, 118 Fed. Cl. 744, 748 (2014) (plaintiff "need not … meet the same burden of proof that it ultimately must carry on the merits"); *L-3 Commc'ns*, 91 Fed. Cl. at 354 (plaintiff need not show "clear and convincing evidence of bad faith or bias in order to supplement the administrative record"). As this Court has repeatedly held, "rare indeed would be the occasions when evidence of bad faith will be placed in an administrative record." *Beta Analytics Int'l v. United States*, 61 Fed. Cl. 223, 226 (2004). Supplementation exists precisely *because* in a case involving allegations of bias or bad faith the "administrative record frequently will not be complete or suffice to prove or disprove the allegation." *Pitney Bowes Gov't Sols., Inc. v. United States*, 93 Fed. Cl. 327, 332 (2010).

AWS has made credible allegations of bias and bad faith based on concrete facts. Its Motion to Supplement should be granted.

**ARGUMENT**

A. **Supplementation Is Necessary for Full and Fair Judicial Review of AWS's Claims**

    *1.*    *Defendants Apply the Wrong Legal Standard—Supplementation Does Not Require AWS to Prove the Merits of Its Claims.*

As an initial matter, neither Defendant cites the correct standard for supplementing the record. The well-settled standard is whether AWS has made "allegations [that] appear to be sufficiently well grounded." *L-3 Commc'ns*, 91 Fed. Cl. at 355; *see also Starry Assocs., Inc. v. United States*, 125 Fed. Cl. 613, 621 (2015) (granting supplementation where plaintiff had made "credible allegation of bias"). The Government gets this wrong, suggesting (over and over) that demonstrating entitlement to supplementation requires AWS to show "well-nigh irrefragable proof" of bias or bad faith. *See, e.g.*, Gov. Op. at 13, 25, 29, 46. Microsoft repeatedly invokes "the presumptions of regularity and of good faith conduct" (*see, e.g.*, Int. Op. at 22), but of course supplementation is necessary when credible allegations suggest evidence, once uncovered, could rebut that presumption (which is, after all, merely a *presumption*). *ARKRAY USA, Inc. v. United States*, No. 14-233, 2014 WL 2905127, at *4 (Fed. Cl. June 26, 2014) ("Supplementation may be appropriate … where the record raises serious questions concerning the rationality of the award decision ... or where the additional evidence is likely probative of potential agency bias or bad faith." (internal citations omitted)).

Under the correct legal standard, AWS "need not … meet the same burden of proof that it ultimately must carry on the merits." *InfoReliance Corp.*, 118 Fed. Cl. at 748; *see L-3 Commc'ns*, 91 Fed. Cl. at 355. Rather, supplementation is warranted "to give Plaintiff an *opportunity to prove* such allegations." *L-3 Commc'ns*, 91 Fed. Cl. at 354 (emphasis added) (internal quotation marks omitted); *see also Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 343 (2004) ("[T]he record may be supplemented with (and through discovery a party may seek) relevant information that by

its very nature would not be found in an agency record—such as evidence of bad faith.").

### 2. The Court Should Require Supplementation in Light of AWS's Well-Grounded Allegations of Bias and Bad Faith.

Applying the correct legal standard crystallizes why AWS's allegations are more than

sufficient to warrant supplementation, which is necessary to ensure "effective judicial review."

*Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (internal quotation

marks omitted). In particular, AWS has identified multiple "hard facts" that credibly allege the

JEDI procurement evaluation process was marred by bias. *See* Pl.'s Mot. Suppl. at 11–18, 23–28,

ECF No. 124-1 ("Pl. Mot.").

#### a. AWS Has Made Credible Allegations of Bias.

Neither the Government nor Microsoft disputes the veracity of the core facts recounted by

AWS in its Motion and Complaint, including that:

- President Trump's anti-Amazon rhetoric and campaign, including on Twitter and television, made "widely known to everyone" his desire that "DoD should not award the JEDI Contract to AWS." Complaint ¶13, ECF No. 1 ("Compl.").

- President Trump directed his then-Secretary of Defense James Mattis to "screw Amazon" out of the JEDI Contract. *Id.* ¶¶ 19, 32, 91; APP 069.

- President Trump instructed DoD to "look at [JEDI] very closely" because of "complaints" he had received about AWS, followed by his tweeting of a video that described the JEDI Contract as the "Bezos Bailout." Compl. ¶¶ 20, 95, 97; APP 059, 079.

- Days later, newly appointed Secretary of Defense Mark Esper stated DoD would not award the JEDI Contract until he had taken a "hard look" at it, citing instructions he had received from "folks in the administration" and "from the White House." Compl. ¶ 176; APP 083–84, 100.

- Following President Trump's order for DoD to re-review JEDI, President Trump met privately with Secretary Esper at least six times. *See* APP 211–16, 229, 499. In turn, Secretary Esper met with members of the Source Selection Team at least six times from July to September. *See* AR Tab 462 at 176426.

- When DoD publicly announced Secretary Esper's recusal, the DoD misleadingly stated that the "JEDI procurement will continue to move to selection through the normal

acquisition process"—even though the Source Selection Authority had already made the award decision five days earlier. *See* Pl. Mot. at 16–17; APP 110.

Despite these facts, Microsoft and the Government nonetheless contend that AWS has not "connect[ed] the dots" between President Trump's statements and "the decisions of procurement officials." Gov. Op. at 8; Int. Op. at 25–29. Those arguments are specious. To begin with, the law does *not* expect or require such materials to be in the AR. *See InfoReliance Corp.*, 118 Fed. Cl. at 747 (materials relating to bias and bad faith are "information that by its very nature would not be found in an agency record"). But more significantly, AWS has demonstrated that the "decisions of the procurement officials" (Gov. Op. at 8) are replete with substantial and pervasive errors that permeate nearly every evaluation factor, and include egregious missteps like ignoring critical aspects of AWS's technical proposal and overlooking key shortcomings in Microsoft's proposal, all of which had the effect of creating a false parity between the offers. *See, e.g.*, Compl. ¶¶ 2–9, 110–73. Proof of political pressure and interference can be direct, such as the President's command to Secretary Mattis (and no doubt others) to "screw Amazon out of the JEDI contract." But it also manifests in precisely these types of slipshod and inexplicable errors by procurement officials, which all run in one direction to favor Microsoft, and which all appear strained to reach a pre-determined outcome. The gravity and scope of the evaluation errors adds further strength to AWS's credible allegations of bias. *See Gadsden v. United States*, 111 Ct. Cl. 487, 490 (1948) ("[I]f the decision is arbitrary or capricious or so grossly erroneous as to imply bad faith, it will be set aside.").

The case law cited by Defendants does not reflect a different legal standard for supplementation, nor suggest AWS has failed to meet that standard. For example, in *DataMill, Inc. v. United States*, 91 Fed. Cl. 722, 733 (2010) (*see* Int. Op. at 23–24), the court denied the plaintiff's discovery requests because they were based solely on the fact that the "name, emails

and documents" of one competitor's employee appeared in the administrative record, and that employee had allegedly stolen trade secrets from the plaintiff. Similarly, in *Price Gordon Services v. United States*, 139 Fed. Cl. 27, 54 (2018) (*see* Int. Op. at 24 & n.7), the facts the protestor alleged to support supplementation for its bias and bad faith claim were "attributable to the self-inflicted deficiencies in plaintiff's proposal rather than improper motives on the part of the [agency]."[1] Unlike in these cases, the hard facts underlying AWS's request for supplementation have nothing to do with "self-inflicted deficiencies in [AWS's] proposal," and are grounded in indisputable evidence of bias with respect to this very contract, not merely some "passing reference" in the AR.[2] The AR contains evidence of significant procurement errors, all detrimental to AWS, that are inconsistent with the solicitation and the offerors' proposals—and that are understandable only when viewed through the prism of political pressure, bias, and bad faith.

Indeed, AWS's particular facts are directly aligned with cases where supplementation has been granted. *See* Pl. Mot. at 23–25. Just as *Starry Associates* involved an agency official who had "recused" himself after having already exerted pressure to guide the agency's award (*see* Int. Op. at 22–24), that appears to be *exactly* what happened here:  Secretary Esper purported to

---

[1] Likewise, in *Office Depot, Inc. v. United States*, 94 Fed. Cl. 294, 299 (2010) (*see* Int. Op. at 24 n.7), the court denied supplementation because the plaintiff's protest was based on the "merits of whether the procurement decision … was flawed," rather than "any allegations of bias or favoritism."  By contrast, AWS's claims of bias and bad faith are not only based on meritorious allegations of procurement errors, but also facts in the public record and the AR that raise serious concerns about whether DoD's JEDI evaluations were biased as a result of undue pressure from President Trump and others.

[2] Microsoft also argues AWS has not met its burden for supplementation under *L-3 Communications*, because no DoD official has pled guilty to violating 18 U.S.C. § 208 and DoD has not internally identified any anomalies in the JEDI procurement. Int. Op. at 22 (citing *L-3 Commc'ns*, 91 Fed. Cl. at 352). But *L-3 Communications* obviously did not hold these circumstances are *required* for supplementation; and indeed, the court reasoned that supplementation "may illuminate the propriety of [the agency's] decision or the procurement process" in light of the "unusual circumstances" presented in that case. 91 Fed. Cl. at 357.

"recuse" himself after he had already taken several actions to influence the JEDI award. *See* Compl. ¶¶ 30–31; Pl. Mot. at 17–18. And the "*ex parte*" and "secret" nature of the statements evidencing bias in *Jarrott v. Scrivener*, 225 F. Supp. 827, 834 (D.D.C. 1964) (*see* Gov. Op. at 19–20), only underscore why supplementation is necessary, where AWS has similarly alleged "*ex parte*" and "secret" statements made by President Trump to DoD, including his instruction to Secretary Mattis to "screw Amazon" out of the JEDI contract and the President's subsequent meetings with Secretary Esper. *See* Pl. Mot. at 24–25.

Defendants propose explanations for why some of the events warranting investigation by AWS are purportedly innocuous. *See, e.g.*, Int. Op. at 29–32 (claiming Secretary Esper had "sought [the SSEB chairperson's] help to get up to speed on the procurement"); Gov. Op. at 18 (claiming that Secretary Esper's review "did not discuss the source selection … but instead examined whether the entire procurement might be placed in a different posture"). But these assertions are not facts; they are advocacy. The Government will always defend its actions with facially neutral explanations, but as the Government's own authority holds, an agency's ability to offer a potentially "pretextual" explanation is no bar to supplementation that allows this Court to *fully* evaluate claims of bias and bad faith. *See Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120, 130 (2010). That is what the Court should do here by directing supplementation and discovery.

       b.     The *Oracle* Litigation Is Irrelevant to Supplementation in this Case.

Defendants next criticize AWS's request for supplementation by suggesting that "AWS objected to Oracle's request to supplement the administrative record on virtually the same grounds that AWS itself raises here." Int. Op. at 27; Gov. Op. at 17. This is distraction and suggests a false equivalence between the supplementation issues raised in this case and those at issue in the *Oracle* litigation. *See Oracle Am., Inc. v. United States*, No. 18-1880 (Fed. Cl.). The *Oracle*

litigation involved an entirely different set of factual issues (Oracle's pre-award protest regarding the solicitation terms and the propriety of DoD's organizational conflict of interest investigation), concerning different people (two specific DoD employees that Oracle alleged had connections with AWS), and during a different time period (the period leading up to DoD's decision to pursue a single award in July 2018).  Put simply, while the legal standards remain the same, the facts of this protest are entirely different.

### 3.    *The Waiver Doctrine of* **Blue & Gold** *Is Not Before the Court in this Motion.*

Both Defendants also attempt to turn the supplementation question into one about waiver. As a threshold matter, Defendants violate this Court's rules by incorporating arguments that they briefed in their previously filed Partial Motions to Dismiss.  *See* Gov. Op. at 14 (incorporating ECF No. 132); Int. Op. at 10, 38, 40 (incorporating ECF No. 133).  The Court must "disregard any such incorporation."  Rule 5.4(b)(3), Rules of the Court of Federal Claims.

Nevertheless, this Court need not resolve the waiver issue (which concerns the *timeliness* of AWS's claims) before it grants AWS's request for supplementation (which concerns whether AWS's claims are *well-grounded*).  AWS will fully address Defendants' claims of waiver at the appropriate time: in response to their Partial Motions to Dismiss.  *Cf. Joint Venture of Comint Sys. Corp. v. United States*, 100 Fed. Cl. 159, 169 (2011) ("Timeliness of plaintiffs' protests is an entirely separate and distinct matter that bears no relation to the requirement that the [agency] produce a complete agency record.").  For now, it suffices to note that the Federal Circuit has aptly stated: "[A] bidder cannot be expected to challenge an agency's evaluation of bids, in contrast to the terms of solicitation, *until the evaluation occurs*."  *Bannum, Inc. v. United States*, 779 F.3d 1376, 1381 (Fed. Cir. 2015) (emphasis added).  When AWS saw the award decision, the thin and tortured analysis of the evaluation factors, DoD's post-award decision not to provide an in-person debriefing, DoD's refusal to respond in any meaningful way to AWS's post-debriefing questions,

and the post-award revelation that the President had instructed General Mattis to "screw Amazon"

out of the JEDI Contract, it became apparent that the evaluation process was marred by taint.[3]

The Government's and Microsoft's view that AWS should have filed a protest immediately

after every presidential tweet (including those before the election) makes no practical sense, and

conflates knowledge of the President's dislike of Mr. Bezos, Amazon, and the *Washington Post*

with knowledge that the *actual evaluation process for the JEDI procurement* was actually biased

as a result of improper influence—a fact AWS did not "know" in the pre-award period.

**B.      Effective Judicial Review of AWS's Claims Requires Supplementation of the AR with AWS's Appendix**

The materials in AWS's supplementary appendix (ECF No. 124-2) are relevant and

necessary to fully evaluate AWS's claims of bias and bad faith. Defendants' argument that the

materials "have no relevance to the procurement decisions at issue in this case" is wishful thinking.

Gov. Op. at 25.[4] To the contrary, these materials are highly probative because they demonstrate

the existence, origin, and impact of bias against AWS. The Government's conclusory arguments

either misunderstand AWS's claims, confuse the legal standard, or both.

First, the Government argues the record should not be supplemented because, it contends,

source selection officials never viewed or considered these statements during their evaluation. *See,*

*e.g.*, Gov. Op. at 26–27. This argument confuses the standard for *completion* of the AR with the

---

[3] It is not remotely credible to believe, as Microsoft suggests, that the President ceased trying to exert political pressure on the JEDI procurement process after General Mattis refused him. Int. Op. at 29–30. No reasonable observer would believe that the President thereafter would become a dispassionate neutral and refrain from airing his passionate and vehement opinions to Secretary Esper and to other DoD and executive branch officials.

[4] Microsoft devotes just a single footnote to oppose AWS's request for supplementation with the materials in AWS's appendix, offering only conclusory statements about why Microsoft believes such materials are not necessary. *See* Int. Op. at 42 n.16.

standard for *supplementation* of the AR. The applicable standard for *supplementation* is simply whether the Court's consideration of the materials is necessary to ensure "effective judicial review." *Axiom Res. Mgmt.*, 564 F.3d at 1380 (internal quotation marks omitted). Moreover, DoD *did* consider as part of its JEDI decision making at least one anti-Amazon news story. *See* AR Tab 550. In a June 2019 *Fox News* video segment attached to the read-ahead memorandum for the September 26, 2019 Secretary of Defense meeting (*see* AR Tab 453), Tucker Carlson and Representative Mark Meadows (R-NC) discussed JEDI, which they called "the Amazon deal." AR Tab 550 at 181193. Mr. Carlson characterized JEDI as a "$10 billion non-competitive contract" and questioned whether "we trust Amazon to provide this service to keep the Pentagon's data? Amazon is not an American company, it's a publicly held multinational with ties to China." *Id.* at 181194.[5] It is unclear why ███████ who prepared the briefing materials, included this inflammatory video in Secretary Esper's materials.[6] And the record does not explain *how* this video (and likely others like it) was considered by DoD procurement officials. Supplementation is required to reflect the existence and consideration of other materials like this video; discovery is warranted to answer the impact this video and those like it had.

---

[5] Although this video was not included in AWS's appendix, it is indisputably in the same vein as those materials with which AWS seeks to supplement the AR. *See, e.g.*, APP 005, 006, 059, 200.

[6] The Government argues that AWS has not demonstrated well-grounded allegations of bias because AWS did not allege that the Source Selection Evaluation Board ("SSEB") chairperson's written report itself evidenced bias. Gov. Op. at 22–23. But in doing so, the Government again misses the point that such bias is not likely to be reflected in the written materials included in the AR. Although the Government claims an "extravagant plot" of communicating bias outside the formal record documents is "not borne out by facts AWS can identify" (*id.*) is precisely why supplementation of the record and targeted discovery is required. And given the concerning scope and timing of the SSEB chairperson's meetings with Secretary Esper, the Court and AWS are not required to merely accept the Government's alternative post hoc explanation, which has no basis in the record.

Facts establishing the President's bias are also a predicate to the bias and bad faith that via political pressure devolved upon senior DoD officials and the source selection team.  Moreover, these materials are publicly available, and therefore accessible to everyone within DoD, and AWS has specifically alleged that the DoD evaluation personnel were actually affected by these statements. *See, e.g.*, Compl. ¶ 184.

Next, the Government argues that materials should not be supplemented if they are "not related to the JEDI procurement."  Gov. Op. at 26.  This argument is flawed because a fact or document obviously can be relevant—and necessary for effective judicial review—even if it does not facially relate to the JEDI Contract.  For example, materials reflecting hostility towards Amazon, Mr. Bezos, and the *Washington Post* are relevant because bias and bad faith claims "depend upon a Government official's past conduct toward a bidder." *Int'l Res. Recovery, Inc. v. United States*, 61 Fed. Cl. 38, 42 (2004).  Defendants' suggestion that the Court must turn a blind eye to materials simply because they do not mention the word "JEDI" is shallow and would deny this Court the context to fairly and fully evaluate the basis and context for AWS's claims.

Nor should the Court credit the Government's self-serving conclusion that the AR contains "sufficient" documentation about Secretary Esper's involvement in JEDI, nor its opinion that the supplementary materials regarding his role are "unremarkable" and not "connect[ed] to the JEDI procurement."  Gov. Op. at 27.  The Government's cherry-picked inclusion in the AR of *some* materials regarding Secretary Esper's role in the procurement is not a reason to deny supplementation, as the AR will necessarily "not be complete or suffice to prove or disprove" allegations regarding bias and bad faith.  *Pitney Bowes Gov't Sols.*, 93 Fed. Cl. at 332. Furthermore, even if some of these materials do not, on their face, reference JEDI, they are nonetheless necessary for effective judicial review of the claims because they demonstrate the

opportunities the President had to discuss JEDI with DoD personnel, and thereby bear on the mechanisms through which bias was imparted upon DoD.

Finally, the Government argues that materials relating to the President's interference with other government procurements and operations are "completely inappropriate for supplementation" because they have "absolutely nothing to do with this procurement." Gov. Op. at 27. Again, the Government is wrong to insist that this Court adjudicate this protest in a vacuum, or exclude powerful evidence of this President's pattern of interference into and disruption of government functions. These materials are necessary to understand the context in which this bid protest arises and probative of the manner in which the President has commandeered government functions to advance personal agendas, which is precisely what AWS alleges occurred in this case. *See* Pl. Mot. at 34. Defendants are free to contest the significance of the materials on the merits, and for the Court to accord it appropriate weight, but it is improper to deny the Court the opportunity to consider these facts in the first instance.

**C.      AWS Is Entitled to Investigate Bias and Bad Faith Through Discovery**

In addition to supplementing the AR with AWS's appendix, the Court should grant AWS's request to take targeted discovery regarding bad faith and bias, which will enable the full and fair adjudication of these claims. *Starry Assocs.*, 125 Fed. Cl. at 621–22 (plaintiff that has made "credible allegation[s]" is "entitled to investigate bias" through discovery).

**1.      *Defendants Have Failed to Show How DoD's Evaluations and Award Decision Can Be Explained Absent Bad Faith.***

Defendants argue that discovery is not warranted because AWS "must do more than just argue that the agency erred in evaluating its bid," and they claim that "[t]he DoD determinations … were reasonable, well-supported by the record, and fully consistent with the presumption of good faith." Int. Op. at 32–33. But what AWS has demonstrated here goes far beyond minor

quibbles with the evaluation. The errors that AWS has identified *cannot* be explained as mere technicalities or oversights. Rather, they are fundamental errors—like ignoring clearly stated, objective solicitation criteria, misinterpreting the substance of the offerors' proposals, and creating false equivalence between offerors—that call into question the integrity of the procurement process. Although it is not AWS's burden at this juncture to exhaustively identify and explain the many ways that DoD's award decision was fundamentally erroneous (which it has previewed in its Motion for Temporary Restraining Order and Preliminary Injunction, ECF No. 130, and will do on the merits), AWS has more than met the threshold of identifying blatant errors on multiple evaluation factors that are "hard to explain absent bad faith." *Beta Analytics Int'l*, 61 Fed. Cl. at 226; *see* Pl. Mot. at 29–32. The Government has not troubled to address in its brief *any* of AWS's arguments that the evaluation errors were so egregious as to indicate the influence of bias, and Microsoft's conclusory responses do no supply any adequate alternative explanation for DoD's multiple evaluation errors.

As just one of many examples, in its Motion, AWS explained Microsoft's objective ▮▮▮▮ of the Factor 8 Demonstration. Pl. Mot. at 31–32. The "second test scenario," Scenario 8.2, required offerors to scale servers in response to load changes; that is, as load increased, the system should create new servers to respond to the increased load, and as load decreased, the system should respond by shutting down no-longer-needed servers. *See* AR Tab 287 at 64186. ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮. AR Tab 308 at 64414. And yet, despite this ▮▮▮▮ ▮▮▮▮ ▮▮▮▮ on other demonstration scenarios, DoD inexplicably found that Microsoft ▮▮▮▮ and assessed a Factor 8 rating of "Good" and a risk rating of "Low." *Id.* at 64403. Such an egregious flouting of the terms of the RFP is difficult to

comprehend, and begins to make sense only when considered in the context of the bias that infected this procurement.

In response, Microsoft argues the overall . Int. Op. at 37. That is false.

(see AR Tab 291 at 2:02:57)

confirms that Microsoft's

. See id. at

1:44:19–1:53:30.

, or make DoD's evaluation any less inexplicable. This illustrative example supports AWS's argument that supplementation is required because DoD's evaluation errors are "hard to explain absent bad faith." *Beta Analytics Int'l*, 61 Fed. Cl. at 226.

### 2. AWS's Discovery Requests Are Targeted to Uncover Evidence Regarding Bias and Bad Faith, Which Will Aid this Court's Review.

AWS has taken great efforts to ensure the discovery requests are not unduly burdensome, and none of Defendants' arguments regarding scope, burden, or privilege is a basis to deny AWS's entitlement to discovery.

#### a. Depositions.

The Court should give short shrift to the Government's arguments about the scope and burden of the requested depositions. With regard to the scope of the topics, the Government has conceded that many of the topics are proper. *See, e.g.*, Gov. Op. at 37–38 (Topic (c), testimony about whether the official "was aware of the President's public statements" and "whether those statements impacted the … evaluation of the bids," "comes close[] to a relevant inquiry"); *id.* at 38 (Topic (e), "communications among source selection team officials [regarding] the President's comments about AWS, Amazon, Mr. Bezos, or the JEDI procurement," is a "relevant inquiry");

*id.* (Topic (g), "whether the source selection officials considered information outside the record related to the President's public comments about AWS," is "appropriate").

The Government's argument that Topics (d) and (f) are inappropriate because materials relating to those topics are already contained in the AR fundamentally misunderstands the nature of bias and bad faith claims—the evidence of which "necessarily cannot be subsumed within the record of a challenged award decision." *Int'l Res. Recovery*, 61 Fed. Cl. at 41–42. Accordingly, courts have recognized that discovery is warranted in these situations in order to give the plaintiff "an opportunity to prove such allegations." *L-3 Commc'ns*, 91 Fed. Cl. at 354.

To the extent that Defendants argue depositions would be burdensome, AWS reiterates its commitment to working with Defendants to minimize any disruption and burden. Just like any other litigants, AWS and Defendants can meet and confer in good faith to reach an acceptable solution on deposition and other protocols, and if necessary, seek Court guidance. AWS's discovery requests already limit the depositions to specified topics, and AWS is committed to scheduling the depositions in a timely manner that is mutually convenient to all parties. AWS is also willing to consider any reasonable limitations to the topics, provided that the limitations do not unduly curtail its ability to investigate its well-grounded claims of bias and bad faith, or the Court's ability to effectively review such claims.

Defendants' passing references to privilege are not enough to prevent these depositions, either. *See, e.g.*, Int. Op. at 43; Gov. Op. at 37. As the Government's own cited case points out, the deliberative process privilege is a "qualified" privilege that does not apply when "there is reason to believe the documents sought may shed light on government misconduct," since "shielding internal government deliberations in this context does not serve the public's interest in honest, effective government." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (internal

quotations omitted). That is precisely the case here, where AWS's allegations are that bias and bad faith compromised the integrity of DoD's award decision, and it is improper for the Government to use privilege to shield that misconduct from scrutiny. And any potential national security concerns about confidentiality can be addressed by the Protective Order approved by the Court—indeed, the Government has already produced classified materials in this litigation.[7] General references to potential privileges cannot defeat the entirety of discovery requests *ex ante*.

Finally, Defendants' primary objection relates to AWS's requests for depositions of certain high-ranking government officials. *See* Gov. Op. at 29–36. Specifically, the Government argues that AWS must demonstrate "exceptional circumstances" before it may depose such officials, including that the officials possess essential information that cannot be obtained from another source. *Id.* (citing *In re United States (Bernanke)*, 542 F. App'x 944, 947 (Fed. Cir. 2013)). The Government effectively concedes this argument does not apply to AWS's request to depose the Source Selection Authority or the chairpersons of the Source Selection Advisory Council and Source Selection Evaluation Board, and there is therefore no reason to delay depositions of these individuals. *See* Gov. Op. at 36. Additionally, AWS has met the legal standards underlying its requests for seeking the depositions of high-ranking government officials:

- **President Donald J. Trump.** AWS should be permitted to depose President Trump to probe the extent to which he exerted undue influence over the JEDI procurement. Although Defendants invoke the "exceptional circumstances" rule, it does not apply here because according to the Government, President Trump was acting in an *ultra vires* capacity to his office and to the executive function when he sought to preclude AWS from winning the

---

[7] The Government's brief contains vague references that discovery may "implicate the presidential communications privilege" (*see, e.g.*, Gov. Op. at 37, 42, 46), but that privilege is not absolute and must yield to a showing of need. *See Nixon v. Admin. of Gen. Servs.*, 433 U.S. 435, 446 & n.9 (1977). Moreover, the presidential communications privilege only applies to "communications [made] in performance of the President's responsibilities," and the Government argues that the President did *not* officially interfere in the JEDI procurement, as that would be a plain violation of the applicable federal regulations. *Id.*

JEDI contract. *See, e.g.*, Int. Op. at 27; Gov. Op. at 32. Therefore, AWS is entitled to depose him without establishing that "exceptional circumstances" exist, and need only make reasonable accommodations for the schedule and location of the deposition due to his official duties as President of the United States. *See Galicia v. Trump*, 109 N.Y.S.3d 857, 860–61 (Sup. Ct. 2019) ("exceptional circumstances" rule is "inapplicable" to President Trump when he was being "called upon to answer for unofficial conduct"); *see also SEC v. Comm. on Ways & Means of the U.S. House of Representatives*, 161 F. Supp. 3d 199, 252 (S.D.N.Y. 2015) (when "the rationales for the 'exceptional circumstances' doctrine do not apply" then "the 'exceptional circumstances' doctrine would not prevent the [deposition]"). If Defendants were to pivot and argue that President Trump was, in fact, acting in his official capacity when he attempted to influence the JEDI procurement (in order to secure the protections of the "exceptional circumstances" doctrine), then they would be all but admitting that the procurement was officially biased against AWS. That, in turn, would be an exceptional circumstance warranting President Trump's deposition. Defendants cannot have it both ways.[8]

- **Former Secretary of Defense James Mattis.** The Government's invocation of the "exceptional circumstances" standard is not a basis to deny AWS's request to depose Secretary Mattis. Secretary Mattis no longer holds his Cabinet position, so his deposition would not prevent him from "perform[ing] [his] official tasks without disruption or diversion." *Bernanke*, 542 F. App'x at 948–49. In *Bernanke*, the court invited the plaintiff to depose Chairman Bernanke after his then-imminent departure from office (*id.* at 949), and indeed, that is exactly what happened. *See* Leslie Scism & Pedro da Costa, *Bernanke Set to Make Legal First: Former Fed Chief Will Give a Deposition Thursday in a Suit Over the AIG Bailout*, Wall St. J. (Feb. 26, 2014), https://www.wsj.com/articles/bernanke-set-to-make-legal-firstbernanke-set-for-legal-first-1393456074. While *Bernanke* acknowledged that "the process-inquiry rationale … hardly becomes inapplicable upon an official's departure from his office," it suggested that the court's weighing of that rationale against a plaintiff's right to relevant evidence might shift after Chairman Bernanke left office. 542 F. App'x at 949.

- **Secretary of Defense Mark Esper and Chief Information Officer Dana Deasy.** AWS has established that there are "extraordinary circumstances" to depose Trump appointees Secretary Esper and Mr. Deasy: (i) both Secretary Esper and Mr. Deasy had private interactions with President Trump, and they, in turn, met with members of the Source Selection Team; (ii) absent a deposition of President Trump, Secretary Esper and Mr. Deasy are the only individuals with first-hand knowledge of their discussions with the President regarding JEDI; and (iii) only Secretary Esper and Mr. Deasy can testify about

---

[8] AWS respects that President Trump needs to "perform [his] official tasks without disruption or diversion." *Bernanke*, 542 Fed. App'x at 948. AWS made clear its willingness to work with the Executive Office of the President to ensure a mutually acceptable time, date, and manner for this deposition in its opening brief, and the Government has not addressed why AWS's offer is insufficient to address concerns about convenience and burden. *See* Pl. Mot. at 38 n.16.

what they did (or did not do) in response to President Trump's statements and directives regarding the JEDI procurement process.

      b.      <u>Interrogatories.</u>

Defendants also fail to provide any compelling reason why AWS's proposed interrogatories should be denied, and the Government in fact *acknowledges* the very "lack of clarity [provided to AWS] during debriefing" that necessitates these interrogatories. Gov. Op. at 40.

- **Interrogatories 1, 2, and 3.** The Government's primary contention is that these interrogatories are unnecessary for effective judicial review because "the record contains documentation describing the options considered during the review as well as the final decision." Gov. Op. at 40. This is a repeat of the error that the Government makes throughout its brief—ignoring that the requests address allegations of bias and bad faith, the facts of which, by their very nature, would not be subsumed or reflected in the agency's self-curated AR, *see L-3 Commc'ns*, 91 Fed. Cl. at 354 ("allegations of bad faith … cannot be rebutted within the confines of the existing Administrative Record"); and conflating the merits of the claims with the threshold issue of supplementation through discovery, *see id.* (faulting defendants for "confus[ing] the burden of proof required to demonstrate bad faith or bias on the merits with the lower standard necessary for supplementing the administrative record"). The Government also cannot invoke the deliberative process privilege to avoid scrutiny in the face of allegations of government misconduct, such as bias and bad faith. *See In re Sealed Case*, 121 F.3d at 737.

- **Interrogatory 4.** As AWS explained in its brief, the selection of the members of the Source Selection Team is relevant to bias and bad faith because there may have been considerations related to their appointment that made them uniquely susceptible to undue pressure from DoD officials and/or the President. *See* Pl. Mot. at 40.

- **Interrogatory 5.** By arguing that AWS and the Court should be satisfied with relying on the final reports of the Source Selection Authority ("SSA"), Source Selection Advisory Council ("SSAC"), and SSEB, the Government again ignores the reality that evidence of bias and bad faith will not be subsumed within an agency's official evaluation documents. *See L-3 Commc'ns*, 91 Fed. Cl. at 354. Moreover, understanding how evaluators' analyses changed over time (and the extent to which evaluators disagreed with prior analyses) is critical to understanding how bias and bad faith steered the award decision. Nor does the deliberative process privilege apply when there are allegations of misconduct. *See In re Sealed Case*, 121 F.3d at 737.

- **Interrogatory 6.** Information regarding what occurred between the SSA's execution of the Source Selection Decision Document and the public announcement of the award are probative of bias and bad faith because of the unusual circumstances regarding Secretary

Esper's recusal, which occurred only after the SSAC had made its award recommendation, and was announced only after the SSA executed the award decision, nearly two weeks after the recusal occurred. *See* AR Tab 458. The mere fact that these events occurred after the internal award decision does not mean they are irrelevant, as these events bear on how DoD may have tried to mask the influence of bias in the procurement prior to the public announcement of the award.

- **Interrogatory 7.** Contrary to the Government's argument, whether there were any steps taken to insulate source selection officials from the President's influence is highly relevant to whether they were in fact affected by his bias, as the absence of any such safeguards would make it more likely that they were susceptible to undue influence. The Government's reliance on the Source Selection Plan does not change the calculus, as the crux of AWS's allegations is that the Source Selection Team did *not* follow the applicable procurement rules.

- **Interrogatory 8.** While the Government contends that it would be a "fishing expedition" to ask for descriptions of interactions between the White House and DoD regarding JEDI, this request would be anything but. It is neither ordinary nor lawful for the White House to interfere with agencies' procurement functions, which are carefully governed by specific regulations regarding what information may be considered and the types of factors that an agency may rely upon. *See* 48 C.F.R. § 15.305(a) (proposals shall be assessed "*solely* on the factors and subfactors specified in the solicitation" (emphasis added)). Thus, any interactions between the White House and DoD regarding JEDI and whether the substance of those interactions were considered by DoD procurement personnel are by definition out of the ordinary, and go to the heart of the bias and bad faith claims in this case.

- **Interrogatory 9.** As the Government acknowledges, AWS made specific allegations about how other offerors sought to influence the award decision through their communications with the President. *See* Gov. Op. at 43 (citing Compl. ¶¶ 88–89, 93). This information therefore bears on the origin and existence of President Trump's bias.

    c.     <u>Documents.</u>

Lastly, the Government rehashes many of its same misguided positions to argue that AWS's document requests should be denied. *First*, the Government cannot simply assert that discovery is unnecessary in light of the materials it already selected for inclusion in the AR (*see* Gov. Op. at 44), since evidence of bias and bad faith is not the type of material that would be included in the self-curated record, and for which this Court has recognized a plaintiff may use discovery to investigate. *See Starry Assocs.*, 125 Fed. Cl. at 622. *Second*, the Government's complaints about breadth and burden—including objections relating to scope, timeframe, or

custodians—should not be credited. *See* Gov. Op. at 44–45. As AWS stated in its opening brief, it is amenable to working with DoD to minimize burden, including through the use of custodians and/or search terms. Pl. Mot. at 41 n.17. *Third* and finally, any attempt to assert the deliberative process privilege is misplaced, as the privilege is "routinely denied" when there are allegations of government misconduct, and any presidential communications privilege must yield upon a showing of need. *In re Sealed Case*, 121 F.3d at 744; *see also supra*, p. 16 n.7.

*　　*　　*　　*　　*

With respect to discovery, the Court has many tools at its disposal to ensure that the process remains targeted and expedited. The Court may wish to issue an order granting AWS depositions, interrogatories, and documents requests with guidance to the parties and a directive to meet-and-confer and propose a discovery plan. Alternatively, the Court also could establish limits on the number of depositions, interrogatories, and document requests that AWS can propound. However the Court wishes to proceed, AWS will work in a serious and respectful manner with the other parties and the Court to expeditiously complete the record necessary for this Court to perform an adequate review of DoD's actions in this exceptional case.

## CONCLUSION

The Court should grant AWS's Renewed Motion to Supplement the AR.

Dated: February 7, 2020

Respectfully submitted,

By: _____

Kevin P. Mullen
MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., NW
Washington, DC  20006-1888
Telephone: 202.887.1500
Facsimile: 202.887.0763

*Attorney of Record for Plaintiff*
*Amazon Web Services, Inc.*

*Of Counsel:*

J. Alex Ward
Daniel E. Chudd
Sandeep N. Nandivada
Caitlin A. Crujido
Alissandra D. Young
MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., NW
Washington, DC  20006-1888

Andrew S. Tulumello
Daniel P. Chung
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., NW
Washington, D.C.  20036-5306

Theodore J. Boutrous, Jr.
Richard J. Doren
Eric D. Vandevelde
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA  90071-3197