# In the United States Court of Federal Claims

No. 19-1796C

(E-filed: March 6, 2020)[1]

|  |  |  |
|---|---|---|
| AMAZON WEB SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Bid-Protest; Temporary Restraining |
| v. | ) | Order; Preliminary Injunction; |
| | ) | Requirement of Security; RCFC 65. |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MICROSOFT CORP., | ) | |
| | ) | |
| Intervenor-defendant. | ) | |

Kevin P. Mullen, Washington, DC, for plaintiff.  J. Alex Ward, Daniel E. Chudd, Sandeep N. Nandivada, Caitlin A. Crujido, Alissandra D. Young, Andrew S. Tulumello, Daniel P. Chung, Theodore J. Boutrous, Jr., Richard J. Doren, and Eric D. Vandevelde, of counsel.

Anthony F. Schiavetti, Trial Attorney, with whom appeared Joseph H. Hunt, Assistant Attorney General, Robert E. Kirschman, Jr., Director, and Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.  Michael G. Anderson and Benjamin M. Diliberto, Washington Headquarters Service & Pentagon Force Protection Agency; and Tyler J. Mullen, Defense Information Systems Agency; of counsel.

---

[1] This opinion was issued under seal on February 13, 2020.  Pursuant to ¶ 4 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged.  The proposed redactions were acceptable to the court.  All redactions are indicated by brackets ([ ]).

Robert S. Metzger, Washington, DC, for intervenor-defendant.  Jeffery M. Chiow, Neil H. O'Donnell, Lucas T. Hanback, Stephen L. Bacon, Deborah N. Rodin, Cassidy Kim, Eleanor M. Ross,  Kathryn H. Ruemmler, Abid R. Qureshi, Roman Martinez, Anne W. Robinson, Dean W. Baxtresser, Genevieve Hoffman, Riley Keenan, Margaret Upshaw, of counsel.

OPINION AND ORDER

CAMPBELL-SMITH, Judge.

On January 22, 2020, plaintiff filed a motion for temporary restraining order (TRO) and preliminary injunction (PI), pursuant to Rule 65 of the Rules of the United States Court of Federal Claims (RCFC).[2]  See ECF No. 130.  In ruling on the motion, the court has also considered:  (1) the administrative record (AR), ECF No. 107 (notice of filing the AR);[3] (2) intervenor-defendant's response in opposition to plaintiff's motion, ECF No. 137; (3) defendant's response in opposition to plaintiff's motion, ECF No. 139; and (4) plaintiff's reply in support of its motion, ECF No. 144.  The motion is ripe for ruling, and the court deems oral argument unnecessary.  For the following reasons, plaintiff's motion for a preliminary injunction is **GRANTED**.

I. Background

This protest action was filed on November 22, 2019.  See ECF No. 1.  The case involves considerable detail, but for purposes of deciding this motion, the court will relate only those details that are necessary to the instant analysis.

Plaintiff filed this action to protest the United States Department of Defense's (DOD) decision to award the Joint Enterprise Defense Infrastructure (JEDI) contract to

---

[2] The court notes that RCFC 65 differentiates between preliminary injunctions (PI) and temporary restraining orders (TRO) primarily on the basis of notice to the opposing parties.  Specifically, when the opposing party has notice, the relief requested is a PI.  See RCFC 65(a).  When no notice is given, the relief requested is a TRO with a duration limited to fourteen days, absent an extension.  See RCFC 65(b).  Although plaintiff has nominally requested both a PI and a TRO, the court considers its motion as a request for a PI because defendant and intervenor-defendant have each been afforded an opportunity to respond to plaintiff's arguments.  As such, any separate request for a TRO is moot.

[3] The administrative record (AR) in this case is comprised of an unusually large number of files in a variety of formats, some of which were incompatible with filing through the court's case management/electronic case filing (CM/ECF) system.  The court, therefore, departed from its usual practice of requiring defendant to file the AR through CM/ECF, and ordered defendant to file the AR on encrypted external hard drives.  See ECF No. 98 (order).

2

intervenor-defendant, under Solicitation No. HQ0034-18-R-0077 (solicitation). See id. at 1; ECF No. 130 at 1 (identifying the resulting contract as Contract No. HQ0034-20-D-0001). As alleged by plaintiff in the complaint, the JEDI program is DOD's "plan to upgrade and consolidate its cloud computing infrastructure across [DOD], which would enable [DOD] to employ 'emerging technologies to meet warfighter needs' and maintain 'our military's technological advantage.'"[4] Id. at 17 (citation omitted).

DOD issued the JEDI solicitation on July 26, 2018. Id. at 18. After reviewing proposals, the source selection authority was to make an award determination on a best-value basis. The source selection plan stated: "The objective of this source selection is, through a competitive solicitation process, to select the Offeror whose proposed solution for JEDI Cloud represents the best value to the Government." See AR at 64340. Following the evaluation process, DOD publicly announced, on October 25, 2019, that it had awarded the JEDI contract to intervenor-defendant. See ECF No. 1 at 90.

In both its complaint and its motion for injunctive relief, plaintiff describes the solicitation's evaluation factors and alleges a host of errors in their application. See generally, ECF No. 1, ECF No. 130-1. The factor most critical to the court's present analysis, however, is Factor 5, which addresses "the Offeror's proposed approach to application and data hosting." AR at 151496, 151506. As part of the technical proposals under Factor 5, the offerors were instructed to submit price proposals based on various factual scenarios. See id. at 151496. The agency was then to evaluate the proposals for each Price Scenario to determine whether the proposal was a "technically feasible approach when considering the application and data hosting requirements in Section L for this Factor and the specific scenario requirements in Attachment L-2." Id. at 151506. See also id. at 151496 (Section L requirements); id. at 198-217 (Attachment L-2 Price Scenarios requirements).

Plaintiff's allegations of improper evaluation analyzed in this opinion relate specifically to Price Scenario 6, in which each offeror is instructed to propose prices on facts related to its "Containerized Data Analysis Framework." See ECF No. 130-1 at 16-20; AR at 215. The Price Scenarios were revised through Amendment 005, which

---

[4] Plaintiff offers the following definition of the term cloud computing:

"Cloud Computing" refers to a shared pool of configurable computing resources (e.g., networks, servers, storage, applications, and services) that can be rapidly provisioned and released with minimal management effort or service provider interaction. Cloud computing is an alternative to traditional "on-premises" information technology resources, which require users to plan, procure, manage, and maintain physical computing resources (i.e., servers).

ECF No. 1 at 17.

instructed offerors to "[a]ssume that all data in these price scenarios is highly accessible unless otherwise stated." AR at 64310.  The amended version of Price Scenario 6 did not expressly state that the "highly accessible" assumption did not apply.  See id. at 64327-29.  It did, however, use the similar term "highly available" in several instances.  Id.

> After DOD issued Amendment 005, an offeror sought the following clarification:
>
> The Government has introduced a new term "highly accessible" without definition.  Could the government confirm that the term "highly accessible" is defined as either "Online Storage" or "Nearline Storage" as defined in Attachment J-8?

Id. at 64332.  In response, DOD stated:  "The term 'Highly Accessible' is meant to be understood as online and replicated storage."  Id. (emphasis added).

The solicitation defines online storage as "[s]torage that is immediately accessible to applications without human intervention." Id. at 650.  And it defines nearline storage to mean "[s]torage not immediately available, but can be brought online quickly without human intervention."  Id.  The solicitation does not define the term "replicated storage," but plaintiff reads this to be a separate characteristic of the required storage from its designation as online, based on its understanding of the term as a reference to "the practice of storing data more than once so that there are multiple copies of the data." ECF No. 130-1 at 17.  Neither defendant nor intervenor-defendant offers an alternative definition for "replicated storage" in their responses.  See ECF No. 137, ECF No. 139.

Plaintiff alleges that intervenor-defendant's proposal under Factor 5, Price Scenario 6 proposed [ ] storage rather than online storage, in contravention of the solicitation requirement reflected in Amendment 005 and the subsequent DOD clarification.  See ECF No. 130-1 at 18.  Intervenor-defendant's proposal for Price Scenario 6 proposes [ ] storage, see AR at 174754-57.  And as defined in intervenor-defendant's proposal, [ ] storage is [ ] storage, [ ].  Id. at 173315.

In its source selection report, the Price Evaluation Board (PEB) stated that plaintiff proposed online storage for Price Scenario 6, and that intervenor-defendant proposed [ ] storage for Price Scenario 6.  The PEB attributed the price difference between the two proposals, in part, to this difference.

> 5.5.6.1.  [Plaintiff] proposed a total price of $[ ] for Price Scenario 06.  Approximately [ ]% of [plaintiff's] price before adjustments was in the Storage category with a value of $[ ].  [Plaintiff's] proposed discounting strategy resulted in an adjustment of $[ ], or a [ ]% decrease in price.  The significant variance in price from [intervenor-defendant] was attributed to a technical approach where [plaintiff] proposed their [ ] **online storage**

4

> in so [sic] they could [ ]. A separate MFR was completed to document their rationale and was identified in the IPR Memo.
>
> 5.5.6.2. [Intervenor-defendant] proposed a total price of $[ ] for Price Scenario 06. Approximately [ ]% of [intervenor-defendant's] price before adjustments was in the Storage category with a value of $[ ]. [Intervenor-defendant's] proposed discounting strategy resulted in an adjustment of $[ ], or a [ ]% decrease in price. The significant variance in price from [plaintiff] was attributed to the technical approach where [intervenor-defendant] proposed their [ ] **storage** solution which meets the technical feasibility requirements and offers a [ ] unit price.

Id. at 176363 (emphasis added). The crux of plaintiff's argument on this point is that the PEB erred in concluding that intervenor-defendant's [ ] storage met "the technical feasibility requirements," because, pursuant to Amendment 005 and DOD's clarification thereof, offerors were required to propose online storage. ECF No. 130-1 at 17-18. Plaintiff contends that as a result of intervenor-defendant's "noncompliant storage solution," DOD "should have found [intervenor-defendant's] technical approach unfeasible, assigned a deficiency, and eliminated Microsoft from the competition." Id. at 19.

For this reason, among others, plaintiff asks the court to issue a preliminary injunction, "to prevent Defendant United States from proceeding under Contract No. HQ0034-20-D-0001, which was awarded under Solicitation No. HQ0034-18-R-0077-0002 to [intervenor-defendant], until [plaintiff's] protest is resolved." ECF No. 130 at 1.

II.    Legal Standards

　　A.    Bid Protests

In its complaint, plaintiff invokes this court's bid protest jurisdiction. See ECF No. 1 at 15-16. This court's bid protest jurisdiction is based on the Tucker Act, which gives the court authority:

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. . . . without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1) (2012). The Tucker Act also states that the court may grant "any relief the court considers proper . . . including injunctive relief." 28 U.S.C. § 1491(b)(2).

5

The court's analysis of a "bid protest proceeds in two steps." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). First, the court determines, pursuant to the Administrative Procedure Act standard of review, whether the "agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law." Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907-08 (Fed. Cir. 2013) (citing 28 U.S.C. § 1491(b)(4) (adopting the standard of 5 U.S.C. § 706)). If the court finds that the agency acted in error, the court then must determine whether the error was prejudicial. See Bannum, 404 F.3d at 1351.

To establish prejudice, "a protester must show 'that there was a substantial chance it would have received the contract award but for that error.'" Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996)). "In other words, the protestor's chance of securing the award must not have been insubstantial." Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003). The substantial chance requirement does not mean that plaintiff must prove it was next in line for the award but for the government's errors. See Sci. & Mgmt. Res., Inc. v. United States, 117 Fed. Cl. 54, 62 (2014); see also Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract."). But plaintiff must, at minimum, show that "had the alleged errors been cured, . . . 'its chances of securing the contract [would have] increased.'" Precision Asset Mgmt. Corp. v. United States, 125 Fed. Cl. 228, 233 (2016) (quoting Info Tech., 316 F.3d at 1319).

Given the considerable discretion allowed contracting officers, the standard of review is "highly deferential." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000). As the Supreme Court of the United States has explained, the scope of review under the "arbitrary and capricious" standard is narrow. See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974). "A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," and "[t]he court is not empowered to substitute its judgment for that of the agency.'" Id. (quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971)); see also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1368-69 (Fed. Cir. 2009) (stating that under a highly deferential rational basis review, the court will "sustain an agency action 'evincing rational reasoning and consideration of relevant factors'") (citing Advanced Data Concepts, 216 F.3d at 1058).

B.   Injunctive Relief

Injunctive relief before trial is a "drastic and extraordinary remedy that is not to be routinely granted." Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd., 357 F.3d 1319, 1324

(Fed. Cir. 2004) (citation omitted).  As the United States Court of Appeals for the Federal Circuit has held:

> To determine if a permanent injunction is warranted, the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief.

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)).  The court considers the same factors in evaluating whether a preliminary injunction is warranted.  See Am. Signature, Inc. v. United States, 598 F.3d 816, 823 (Fed. Cir. 2010) (citations omitted).  The decision of whether injunctive relief is appropriate falls within the court's discretion.  Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 991 (Fed. Cir. 2018) (citing PGBA, 389 F.3d at 1223).

III. Analysis

    A. Preliminary Injunction Factors

        1. Likelihood of Success on the Merits

In order to succeed on the merits of its bid protest, plaintiff must demonstrate:  (1) that the "agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law," Glenn Def., 720 F.3d at 907-08; and (2) that the error was prejudicial, see Bannum, 404 F.3d at 1351.

            a. Plaintiff Is Likely to Show Defendant Erred in Evaluating Intervenor-Defendant's Factor 5, Price Scenario 6

Plaintiff argues that it is likely to succeed on the merits with regard to its allegations that the DOD improperly evaluated intervenor-defendant's Price Scenario 6 based on a plain reading of the requirements and definitions in the solicitation, the relevant amendment thereto, and the clarification issued by the DOD, as recited above. More specifically, plaintiff alleges that intervenor-defendant's Price Scenario 6 proposal fails to comply with the requirement that storage be "highly-accessible," a term defined as "online and replicated storage."  AR at 64332.  Had the DOD properly evaluated intervenor-defendant's proposal of [ ] storage in Price Scenario 6, according to plaintiff, the DOD would have concluded that the proposal was "noncompliant," and "should have found [intervenor-defendant's] technical approach unfeasible, assigned a deficiency, and eliminated [intervenor-defendant] from the competition."  ECF No. 130-1 at 19.

7

As an initial matter, neither defendant nor intervenor-defendant dispute that the solicitation required the proposals under Price Scenario 6 to include "highly-accessible," or online, storage. See ECF No. 139 at 27 (defendant stating that "[f]or Price Scenario 6, [plaintiff] is correct that the solicitation did not specify a storage type, and that, under the terms of Amendment 0005, offerors were to "'[a]ssume that all data in these price scenarios is highly accessible unless otherwise stated'"); ECF No. 137 at 18 (intervenor-defendant arguing that its "proposed solution to Price Scenario 6 meets the [solicitation's] requirement for 'highly accessible' storage").

Rather than dispute the applicable storage requirement, defendant makes two arguments. First, defendant contends that plaintiff "seeks to elevate superficial labels over technical performance," and second, that if correct, plaintiff "would have been as technically deficient as [intervenor-defendant], and so would be in no position to complain of prejudice." ECF No. 139 at 27.[5]

With regard to its first argument, defendant claims that plaintiff "fails to recognize that the storage that [intervenor-defendant] proposed for Price Scenario 6, despite parts of it being marketed by [intervenor-defendant] as '[ ] storage,' meets the solicitation definition of 'online storage'—that is, it is immediately accessible to applications without human intervention." Id. at 28. In support of this assertion, defendant cites to specific features of intervenor-defendant's proposal that, it argues, amount to immediate access, but defendant does not identify any part of the record in which the DOD made such an equivalence determination during the evaluation process. See ECF No. 139 at 28-29.

Defendant cites instead to the Technical Evaluation Board's (TEB) Consensus Report in which the TEB determines that intervenor-defendant's Price Scenario 6 is "technically feasible," and argues that such a determination was within the DOD's discretion. See id. at 29. (citing AR at 151327-28). The cited section of the report, however, does not discuss the application of the terms "highly accessible," "highly available," "online," or "nearline," to intervenor-defendant's proposal. See AR at 151327-28. Thus, defendant has not identified any evidence in the record that the DOD's decision to deem intervenor-defendant's proposal as "technically feasible" resulted from an exercise of discretion, nor does it explain how the DOD's discretion could extend so far as to allow it to depart from the precise and explicit definition of the term "highly accessible."

---

[5]  The court has carefully reviewed intervenor-defendant's arguments relating to its inclusion of [ ] storage in its proposal for Price Scenario 6. See ECF No. 137 at 17-23. In the interest of honoring the parties' request for an expedited ruling on this motion, the court will only address intervenor-defendant's arguments that are both material and substantively different from defendant's.

8

Defendant's second argument—that if intervenor-defendant's proposal is deficient so is plaintiff's—likewise fails to effectively address plaintiff's claims. As an initial matter, the assertion that plaintiff's proposal suffered from the same deficiency as intervenor-defendant's does not necessarily lead to the conclusion that either deficiency should be overlooked. Moreover, the record appears unlikely to support this argument. Plaintiff cites to evidence in the record that, while [ ] storage was part of its Price Scenario 6 proposal, its proposal primarily relied on, and certainly included, online storage. See ECF No. 144 at 10-11 (citing AR at 152866-67).

The court concludes that—based on the portions of the record cited by the parties and the arguments made thereon—plaintiff is likely to demonstrate that defendant erred in determining that intervenor-defendant's Factor 5, Price Scenario 6 was "technically feasible" according to the defined terms of the solicitation.

### b. Plaintiff Is Likely to Show Prejudice

In addition, the court finds that plaintiff is likely to demonstrate that defendant's error was prejudicial, i.e., that plaintiff's chance of securing the award was not insubstantial absent the error. See Info. Tech., 316 F.3d at 1319. To show prejudice, plaintiff is not required to prove it was next in line for the award but for defendant's errors. See Data Gen., 78 F.3d at 1562 ("To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract."). But plaintiff must, at a minimum, show that "had the alleged errors been cured, . . . 'its chances of securing the contract [would have] increased.'" Precision Asset Mgmt. Corp. v. United States, 125 Fed. Cl. 228, 233 (2016) (quoting Info Tech., 316 F.3d at 1319).

Plaintiff takes the position that upon a finding that intervenor-defendant's proposal of [ ] storage was "noncompliant," defendant "should have found [intervenor-defendant's] technical approach unfeasible, assigned a deficiency, and eliminated [intervenor-defendant] from the competition." ECF No. 130-1 at 19. Plaintiff also argues that this improper evaluation resulted in a skewed price analysis. See id. at 20-22.

Under the terms of the Source Selection Plan, a "deficiency" is defined as: "A material failure of a proposal to meet a Government requirement or a combination of significant weakness[es] in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." AR at 64355. The court has concluded that it is likely plaintiff will demonstrate that intervenor-defendant proposed [ ] storage when the solicitation explicitly required online storage. In the context of a procurement for cloud computing services, the court considers it quite likely that this failure is material. As such, plaintiff likely is correct that defendant should have assigned a deficiency to intervenor-defendant's proposal for Factor 5, Price Scenario 6.

In making its case that it was prejudiced by this evaluation error, plaintiff does not only rely on its allegation that this deficiency should have resulted in defendant eliminating intervenor-defendant from competition. Plaintiff also points to the PEB evaluation, which specifically attributes a price difference of $[ ] between plaintiff's and intervenor-defendant's proposals to the fact that plaintiff proposed online storage while intervenor-defendant proposed [ ] storage. Defendant claims that "while demonstrating that [intervenor-defendant's] proposed storage costs for this price scenario were [ ] than [plaintiff's], [plaintiff] does not illuminate <u>why</u> that is the case." ECF No. 139 at 31. According to defendant, the price difference is attributable to the different discounts offered by each offeror. <u>See id.</u> The PEB, however, explained the reasons for the price difference in its source selection report:

> 5.5.6.1. [Plaintiff] proposed a total price of $[ ] for Price Scenario 06. Approximately [ ]% of [plaintiff's] price before adjustments was in the Storage category with a value of $[ ]. [Plaintiff's] proposed discounting strategy resulted in an adjustment of $[ ], or a [ ]% decrease in price. **The significant variance in price from [intervenor-defendant] was attributed to a technical approach where [plaintiff] proposed their [ ] online storage** in so [sic] [ ]. A separate MFR was completed to document their rationale and was identified in the IPR Memo.
>
> 5.5.6.2. [Intervenor-defendant] proposed a total price of $[ ] for Price Scenario 06. Approximately [ ]% of [intervenor-defendant's] price before adjustments was in the Storage category with a value of $[ ]. [Intervenor-defendant's] proposed discounting strategy resulted in an adjustment of $[ ], or a [ ]% decrease in price. **The significant variance in price from [plaintiff] was attributed to the technical approach where [intervenor-defendant] proposed their [ ] storage solution which meets the technical feasibility requirements and offers a [ ] unit price.**

AR at 176363 (emphasis added).

After considering the portions of the record identified by the parties and the argument made thereon, the court considers it likely that plaintiff's chances of receiving the award would have increased absent defendant's evaluation error. Even if what appears to be a deficiency did not result in intervenor-defendant's elimination from competition, a reduction in the $[ ] price advantage attributed by the PEB to intervenor-defendant's use of [ ] storage likely would affect the price evaluation, which in turn, would affect the best value determination.

Accordingly, the court concludes that plaintiff is likely to succeed on the merits of its argument that the DOD improperly evaluated intervenor-defendant's Factor 5, Price Scenario 6.

        2.        Irreparable Harm

"A preliminary injunction will not issue simply to prevent a mere possibility of injury, even where prospective injury is great. A presently existing, actual threat must be shown." Qingdao Taifa Grp. v. United States, 581 F.3d 1375, 1379 (2009) (quoting Zenith Radio Corp. v. United States, 710 F.2d 806, 809 (Fed. Cir. 1983)). Here, plaintiff argues that it "will suffer irreparable harm without injunctive relief" because it has no "'adequate remedy in the absence of an injunction.'" ECF No. 130-1 at 57 (quoting NetStar-1 Gov't Consulting, Inc. v. United States, 101 Fed. Cl. 511, 530 (2011), aff'd, 473 F. App'x 902 (Fed. Cir. 2012)). According to plaintiff, "in the absence of a temporary restraining order and preliminary injunction, [plaintiff] could lose the opportunity to perform the JEDI Contract, earn the revenue and profits resulting from contract performance, ensure its technology is widely used by [the DOD], and gain additional experience working for the Government." Id.

In support of these assertions, plaintiff has filed the declaration of Jennifer Chronis. Ms. Chronis is plaintiff's General Manager for its business with the DOD. See ECF No. 130-2 at 13. She declares, in relevant part, that intervenor-defendant's

> continued performance of the JEDI Contract would provide [intervenor-defendant] with an unfair competitive advantage in any recompetition of the JEDI Contract resulting from [plaintiff's] protest. Any additional contract performance would give [intervenor-defendant] access to further non-public information that would allow [intervenor-defendant] (but not [plaintiff]) to better tailor any revised proposal submitted in a JEDI recompetition.

Id. at 14. She adds that plaintiff "has already begun to feel the impact of the JEDI award with the [ ]. Id. This delay will harm plaintiff because it [ ]. Id. at 14-15. Ms. Chronis further states that plaintiff will lose customers to the JEDI program, starting with customers who will participate in the pilot stage of the program during the contract transition period.[6] Id. at 15.

---

[6] Defendant disputes plaintiff's claim that plaintiff will lose customers during the pilot stage of the JEDI program. See ECF No. 139-1 at 5-6 (declaration of Sharon Woods, Director and Program Manager for the Cloud Computing Program Office at the DOD). The court does not have sufficient facts to resolve this dispute, and as such, will not weigh this alleged harm in its analysis.

11

Defendant argues that plaintiff's claims of irreparable harm are too speculative and generic to support an injunction, and insists that any harm plaintiff may suffer would not be irreparable. See ECF No. 139 at 60-62. The court disagrees. Plaintiff has identified specific losses reasonably expected during the transition period including the loss of competitive advantage in any renewed competition, and damage to plaintiff's ability to serve its customers. These are precisely the types of injuries that this court has previously found to constitute irreparable harm. See, e.g., NetStar-1, 98 Fed Cl. 735 (holding that the loss of competitive advantage during a transition period constitutes irreparable harm and justifies preliminary injunctive relief); Serco, Inc. v. United States, 81 Fed. Cl. 463, 502 (2008) (noting that loss derived "from a lost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm") (citations omitted); Hospital Klean of Tex., Inc. v. United States, 65 Fed. Cl. 618, 624 (2005) (stating that lost profits "stemming from a lost opportunity to compete for a contract on a level playing field [have] been found sufficient to constitute irreparable harm." (citations omitted)).

Defendant also argues that any damage plaintiff may suffer is not irreparable because the DOD "has broad discretion to take action during any renewed competition to neutralize any unfair competitive advantage that may then exist." ECF No. 139 at 61. The court, however, cannot accept an agency's prospective offer to use its discretion to mitigate what otherwise appears to be irreparable harm caused by an abuse of that discretion. The court is constrained to make its ruling based on the record before it, not based on actions that may be taken in future.

Intervenor-defendant objects to a finding of irreparable harm, in part, because plaintiff "waited nearly 90 days before asking the Court to take the extraordinary step of issuing a temporary restraining order and preliminary injunction." ECF No. 137 at 60. According to intervenor-defendant, this delay "undercut[s] [plaintiff's] claim of irreparable harm." Id. Intervenor-defendant does not identify the date on which it begins its 90-day calculation, but the record in the case shows that plaintiff filed its complaint on November 22, 2019, see ECF No. 1 (complaint); the parties filed an agreed-upon briefing schedule, which includes deadlines for plaintiff's instant motion, on January 13, 2020, see ECF No. 111 (joint status report); and the motion was filed on January 22, 2020, see ECF No. 130.

The court agrees that the delay weakens plaintiff's claim of irreparable harm, but does not find that it invalidates plaintiff's position altogether. Whatever harm defendant and intervenor-defendant may have suffered as a result of its delay, plaintiff has demonstrated that it will continue to suffer irreparable harm between now and the time that the merits of this dispute are finally resolved. As such, the court concludes that this factor weighs in plaintiff's favor.

3.     Balance of Hardships

Plaintiff argues that neither defendant nor intervenor-defendant will suffer if the court issues the requested injunction. See ECF No. 130-1 at 59. Plaintiff summarizes its argument as follows:

> All of [DOD's] cloud computing needs, include those for the pilot program agencies, are being satisfied today by existing cloud contracts with [plaintiff, intervenor-defendant], and other providers. And a host of existing contract vehicles for cloud computing services are available for the military's immediate and approaching requirements. In fact, [DOD] has at its disposal more than 600 cloud initiatives across the Department. Contrary to the Government's insinuations, no [DOD] command or agency is waiting for the JEDI Contract to fulfill current cloud computing needs. A brief delay in JEDI Contract performance during the pendency of the protest to allow for the adjudication of serious claims of procurement irregularities will not deprive [DOD] of the means to satisfy its cloud computing needs.

Id. at 59-60 (internal citations omitted).

According to defendant, however, the balance of hardships factor weighs heavily against issuing an injunction due to the impact a delay in the JEDI program would have on national security, and the attendant cost. See ECF No. 139 at 62-68. In support of this assertion, defendant submits the declarations of several military officers.[7] Mr. David Spirk, [ ]. See ECF No. 139-2 at 1-3. Lieutenant General Bradford J. Shwedo, Director for Command, Control, Communications, and Computers/Cyber (C4), Chief Information Officer, Joint Staff, refers to cloud computing services as "critical," and states that they are currently non-existent "across most of DOD." ECF No. 139-4 at 2-3.

Defendant also argues that an interruption in the JEDI program will result in "unrecoverable financial harm totaling between five and seven million dollars per month of delay." ECF No. 139 at 67 (citing ECF No. 139-3 at 6 (declaration of [ ])). [ ], who serves as [ ] submitted a declaration to support that estimated loss. See ECF No. 139-3. Therein, [ ] details the methods that he used to calculate the loss by piecing together the

---

[7]     Defendant also filed several classified declarations from "senior leaders of the [DOD] Joint Artificial Intelligence Center (JAIC), Army Special Forces, and Project Maven [who] attest to the specific impact that any injunction would have on the critical missions of those organizations." ECF No. 139 at 65; ECF No. 114 and ECF No. 138 (notices of filing classified information). Defendant includes no substantive discussion of these classified declarations. The court has reviewed the declarations, and has determined that their content does not alter the court's analysis. As such, the court omits specific discussion of these classified declarations, as defendant did.

services that would be available under the JEDI program from other available products. See id. at 3-6.  [ ] explains that:

> if [DOD] customers were to use [plaintiff's] contracts instead of JEDI, the cost to [DOD] would be nearly double.  Spread across JEDI's two[-]year base period, . . . result[ing] in a projected cost increase of $198.76 million. Likewise, if [DOD] were to use current [intervenor-defendant's] government contract offerings (other than JEDI) instead of [plaintiff's], the escalation, factored over the two-year base period of the JEDI contract, results in a projected cost increase of approximately $115.4 million.  [DOD] would reasonably expect cost to range somewhere between these two figures.  The ultimate harm to [DOD] would depend upon what share of cloud services that would have been provided under JEDI that are ultimately provided by [plaintiff] or [intervenor-defendant] under other already-available contracts.

Id. at 6.

For its part, intervenor-defendant argues that the balance of hardships factor weighs against plaintiff because intervenor-defendant has invested "hundreds of millions of dollars to prepare for JEDI's imminent operational date," ECF No. 137 at 60, and "[o]ther efforts that [intervenor-defendant] has invested in over the past three months of JEDI contract performance will also be wasted if an injunction issues," id. at 63.

The court does not question the importance of the JEDI program, and understands the urgent desire to have the services thereunder made available to defendant as soon as possible.  The national security implications certainly weigh in defendant's favor.  See Aero Corp., S.A. v. United States, 38 Fed. Cl. 237, 241-42 (1997) (stating that when national security issues are implicated, it "clearly places the weight of the balance-of-harms factor on defendant's side of the scale").  As defendant itself acknowledges, however, this procurement is complex and conducting it correctly is necessarily time-consuming.  It states that:

> [DOD] has consistently moved expeditiously to acquire and field this new capability, while vigilantly insisting on a fair competition to obtain the best product, serving the interests of the nation and the competitors.  Irrespective of the urgency, a procurement of this magnitude cannot be conducted overnight.  The time [DOD] took to validate its requirements and issue a solicitation accurately describing its needs supported, rather than detracted from, the urgent need to field the right capabilities.

ECF No. 139 at 66.  In the court's view, a delay now—in order to ensure the procurement was properly conducted—serves the same ends as those that defendant has thus far worked so hard to achieve.

Moreover, defendant indicates that the primary harm it will suffer will be inconvenience and expense, rather than the inability to carry out national security functions. It states:

> although any injunction will cause significant harm to national security, [DOD] will, of course, seek to mitigate that harm and achieve its mission to protect the Nation. If necessary, it will pursue inferior alternative measures to fill in for the capabilities it is unable to obtain through JEDI. Such alternatives come with a significant financial cost to American taxpayers, however—[DOD] calculates that delayed performance of the JEDI contract will result in unrecoverable financial harm totaling between five and seven million dollars per month of delay.

Id. at 67 (citing ECF No. 139-3 at 6 (declaration of [ ])).

Taken together the parties' arguments make clear that the benefits of the JEDI program, while no doubt significant, are prospective. Put another way, a delay in the JEDI program would simply require defendant to continue using the means by which it is presently accomplishing its important missions until the court can determine whether the procurement at issue was properly conducted. The court recognizes the considerable potential cost—to both defendant and intervenor-defendant—involved in such a delay. A mechanism to ameliorate such damages, however, is found in RCFC 65(c), which provides: "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The court will require such security in this case to protect defendant and intervenor-defendant, and will address the amount it deems proper below.

In the final analysis, the balance of harms weighs against plaintiff, but for the most part, the harms that defendant or intervenor-defendant may suffer can be offset by the continued use of presently-available technology and the requirement for plaintiff to give adequate security pursuant to RCFC 65(c).

### 4. Public Interest

"There is an overriding public interest in preserving the integrity of the procurement process by requiring the government to follow its procurement regulations." Turner Constr. Co. v. United States, 94 Fed. Cl. 561, 586 (2010) (citation and internal quotation marks omitted), aff'd, 645 F.3d 1377 (Fed. Cir. 2011). Here, the court has concluded that plaintiff is likely to succeed on the merits of its claim that defendant improperly evaluated intervenor-defendant's Factor 5, Price Scenario 6. Both defendant and intervenor-defendant argue, however, that the public interest in national security

should outweigh plaintiff's concern for the integrity of the procurement process. See ECF No. 137 at 63-65; ECF No. 139 at 64-66.

The court takes seriously the national security concerns implicated by the JEDI program. But the fact that defendant is operating without the JEDI program now cuts against its argument that it cannot secure the nation if the program does not move forward immediately. The court does not find, under the present circumstances, that the benefits of the JEDI program are so urgently needed that the court should not review the process to ensure the integrity of the procurement.

For this reason, the public interest factor weighs in favor of plaintiff.

### 5. Balancing the Factors

In considering whether injunctive relief is warranted, the court must balance the relevant factors. No single factor is determinative, as "the weakness of the showing regarding one factor may be overborne by the strength of the others." FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993).

Here, plaintiff's delay in filing for injunctive relief, the national security implications present in this case, and the cost of delay, weigh against plaintiff. Nonetheless, based on the evidence and argument presented by the parties, those considerations are overborne by: (1) plaintiff's likelihood of success on the merits; (2) the irreparable harm plaintiff will suffer absent a preliminary injunction; (3) the ability for defendant to continue the cloud computing solutions presently in use; (4) the public interest in protecting the integrity of the procurement process; and (5) the requirement of security as a means of ameliorating the financial risk to defendant and intervenor-defendant. The court finds that, in this case, the factors weigh in favor of a preliminary injunction.[8]

### B. Requirement of Security

Under RCFC 65(c), plaintiff is required to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The court finds that such security is warranted in this case. "'The amount of a bond is a determination that rests within the sound discretion of a trial court.'" Serco, Inc. v. United States, 101 Fed. Cl. 717, 722 (2011) (citing Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1385 (Fed. Cir. 2006)).

---

[8] Because the court finds the error with regard to defendant's evaluation of intervenor-defendant's Factor 5, Price Scenario 6 is sufficient to justify preliminary injunctive relief, the court does not evaluate in this opinion the remainder of the errors alleged by plaintiff.

Defendant suggests that the court require plaintiff to "post no less than $42 million in security to account for the potential delay." ECF No. 139 at 69. Defendant arrives at this figure by multiplying its estimate that interim services may cost "between $5 million and $7 million per month," by its estimate that a preliminary injunction "could last for six months or more." Id. (citing ECF No. 139-3 at 6 (declaration of [ ])). In its reply, plaintiff characterizes defendant's security request as "grossly overstated," and claims that defendant's "estimated financial harm is speculative and its methodology unsound," but offers no alternative estimates. ECF No. 144 at 33. Instead, plaintiff asks the court to waive the security requirement. See id.

In support of its proposed security amount, defendant cites to [ ] declaration. See ECF No. 139 at 69. In his declaration, [ ] details the methods that he used to calculate defendant's potential loss by piecing together the services that would be available under the JEDI program from other available products. See ECF No. 139-3 at 3-6. He concludes that defendant "anticipates a financial harm of between $5 and $7 million dollars every month that performance of the JEDI contract is delayed." Id. at 6. He also admits the costs are somewhat uncertain, explaining that "[t]he ultimate harm to [DOD] would depend upon what share of cloud services that would have been provided under JEDI that are ultimately provided by [plaintiff] or [intervenor-defendant] under other already-available contracts." Id. at 6. In addition, defendant notes that plaintiff's pending motion to supplement the administrative record and for discovery may extend the length of a preliminary injunction. See ECF No. 139 at 69.

In the court's view, some degree of uncertainty or speculation is inherent in defendant's attempt to quantify the harm it may suffer as a result of the preliminary injunction. Defendant appears to have made a good faith effort to identify and quantify the potential harm it could suffer as a result of the preliminary injunction if it ultimately prevails on the merits in this case. Plaintiff has not offered alternative calculations, nor does it specify the parts of [ ] analysis with which it disagrees. As such, [ ] calculations are the only evidence from which the court can determine the proper security amount.

The court concludes that considering defendant's calculations, and plaintiff's pending request to supplement the administrative record and to conduct discovery, the provision of security in an amount of $42 million to cover six months of anticipated costs, is warranted.

IV.  Conclusion

Accordingly, for the reasons explained in this opinion:

(1)  Plaintiff's motion for a PI, ECF No. 130,[9] is **GRANTED**;

(2)  The United States, by and through the Department of Defense, its officers, agents, and employees, is hereby **PRELIMINARILY ENJOINED** from proceeding with contract activities under **Contract No. HQ0034-20-D-0001**, which was awarded under **Solicitation No. HQ0034-18-R-0077**, until further order of the court;

(3)  Pursuant to RCFC 65(c), plaintiff is directed to **PROVIDE** security in the amount of **$42 million** for the payment of such costs and damages as may be incurred or suffered in the event that future proceedings prove that this injunction was issued wrongfully.  As such, on or before **February 20, 2020,** plaintiff is directed to **FILE** a **notice of filing** on the docket in this matter indicating the form of security obtained, and plaintiff shall **PROVIDE** the **original certification** of security to the Clerk of Court.[10]  The clerk shall **HOLD** the security until this case is closed; and

(4)  On or before **February 27, 2020**, the parties are directed to **CONFER** and **FILE** a **notice of filing** attaching a proposed redacted version of this opinion, with any competition-sensitive or otherwise protectable information blacked out.

IT IS SO ORDERED.

                                        s/Patricia E. Campbell-Smith
                                        PATRICIA E. CAMPBELL-SMITH
                                        Judge

---

[9]  Plaintiff's motion was filed as a combined motion for a TRO and PI, but the court previously determined the request for a TRO is moot.  See infra at 2 n.2.

[10]  The court refers plaintiff to RCFC 65.1, which provides guidance on acceptable sureties, and plaintiff is encouraged to contact the Clerk of Court, Lisa Reyes, at 202-357-6406 with any questions.  A surety bond for a preliminary injunction can be found in the court's rules, see RCFC, Appendix of Forms, Form 11.