███████████████████████████████████████

REDACTED VERSION

No. 19-1796C
(Judge Patricia E. Campbell-Smith)

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

AMAZON WEB SERVICES, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

and

MICROSOFT CORPORATION,

Intervenor-Defendant.

## DEFENDANT'S REPLY IN SUPPORT OF ITS
## MOTION TO DISMISS, IN PART, PLAINTIFF'S COMPLAINT

OF COUNSEL:

MICHAEL G. ANDERSON
BENJAMIN M. DILIBERTO
Assistant General Counsel
Washington Headquarters Service &
Pentagon Force Protection Agency
Office of General Counsel
Department of Defense

TYLER J. MULLEN
CCPO Legal Advisor
Assistant General Counsel
Defense Information Systems Agency
Office of the General Counsel

March 6, 2020

JOSEPH H. HUNT
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

PATRICIA M. McCARTHY
Assistant Director

ANTHONY F. SCHIAVETTI
RETA BEZAK
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044

Attorneys for Defendant

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS, IN PART, PLAINTIFF'S COMPLAINT ........................................................................... 1

I.  AWS's Attempts To Narrow The Blue & Gold Fleet Waiver Rule Are Unavailing .......................................................................................... 2

    A.  AWS Fails to Meaningfully Distinguish The Court's Numerous Applications Of The *Blue & Gold Fleet* Waiver Rule To Alleged Procurement Defects Other Than Solicitation Terms ................................. 2

    B.  The Cases AWS Cites Do Not Support Its Narrow Construction Of The *Blue & Gold Fleet* Waiver Rule ..................................................... 10

II.  Counts Three, Five, Six, And Seven Of AWS's Complaint Are Waived ............ 13

    A.  In These Counts, AWS Challenges Not The Evaluations But Terms Of The Solicitation And Terms Of The Competition ..................... 13

        1.  Counts Five, Six, And Seven ......................................................... 13

        2.  Count Three .................................................................................. 15

    B.  AWS Could Have Brought Its Bias Allegations Prior To Evaluation And Award ............................................................................. 16

        1.  AWS Could Have Brought Its Bias Allegations Prior To Award ...................................................................... 17

        2.  AWS's Own Allegations Demonstrate That Any Defect Was Patent ................................................................... 19

        3.  No Flood Of Litigation Would Result From A Finding Of Waiver ...................................................................... 20

CONCLUSION .................................................................................................. 20

# TABLE OF AUTHORITIES

## CASES

*ATSC Aviation, LLC v. United States,*
141 Fed. Cl. 670 (2019) ................................................................................ passim

*Adams and Associations, Inc.,*
B-417125, 2019 CPD ¶ 21 (Comp. Gen. Jan. 16, 2019) ................................................ 8, 9, 18

*C.A.C.I., Inc.-Fed. v. United States,*
719 F.2d 1567 (Fed. Cir. 1983) ................................................................................ 17

*Caddell Constr. Co. v. United States,*
125 Fed. Cl. 264 (2016) ................................................................................ 10, 11

*CBY Design Builders v. United States,*
105 Fed. Cl. 303 (2012) ................................................................................ 17

*COMINT Sys. Corp. v. United States,*
700 F.3d 1377 (Fed. Cir. 2012) ................................................................................ 2, 6

*Communication Construction Services v. United States,*
116 Fed. Cl. 233 (2014) ................................................................................ 6

*Concourse Group, LLC v. United States,*
131 Fed. Cl. 26 (2017) ................................................................................ 5, 6

*CRAssociates, Inc. v. United States,*
102 Fed. Cl. 698 (2011) ................................................................................ 5

*Distributed Solutions, Inc. v. United States,*
539 F.3d 1340 (Fed. Cir. 2008) ................................................................................ 17

*Draken Int'l, Inc. v. United States,*
120 Fed. Cl. 383 (2015) ................................................................................ 10, 11

*iAccess Techs., Inc. v. United States,*
143 Fed. Cl. 521 (2019) ................................................................................ 7

*Info. Tech. & Application Corp. v. United States,*
316 F.3d 1312 (Fed. Cir. 2003) ................................................................................ 19

*Jacobs Technology Inc. v. United States*,
  131 Fed. Cl. 430 (2017) ................................................................................................ 4

*L-3 Commc'ns Integrated Sys., L.P. v. United States*,
  79 Fed. Cl. 453 (2007) .......................................................................................... 17, 18

*Nat'l Am. Ins. Co. v. United States*,
  498 F.3d 1301 (Fed. Cir. 2007)..................................................................................... 2

*Peraton Inc. v. United States*,
  146 Fed. Cl. 94 (2019) .................................................................................................. 3

*Sotera Defense Solutions, Inc. v. United States*,
  118 Fed. Cl. 237 (2014) .............................................................................................. 11

*Synergy Solutions, Inc. v. United States*,
  133 Fed. Cl. 716 (2017) ....................................................................................... 3, 6, 7

## STATUTES

28 U.S.C. § 1491(a) .................................................................................................... 18

28 U.S.C. § 1491(b)(1) ............................................................................................... 17

28 U.S.C. § 1491(b)(3) ............................................................................................... 12

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

| | | |
|---|---|---|
| AMAZON WEB SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | ▮▮▮▮▮▮▮▮ |
| | ) | |
| v. | ) | No. 19-1796C |
| | ) | (Judge Patricia E. Campbell-Smith) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| and | | |
| MICROSOFT CORPORATION, | ) | |
| Intervenor-defendant. | ) | |

## DEFENDANT'S REPLY IN SUPPORT OF ITS
## MOTION TO DISMISS, IN PART, PLAINTIFF'S COMPLAINT

Defendant, the United States, respectfully submits this reply in support of its request that this Court dismiss Counts Three, Five, Six, and Seven of the complaint filed by plaintiff, Amazon Web Services, Inc. (AWS), pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), because AWS has waived the allegations contained therein. AWS's response to our motion misconstrues the law and contorts its allegations in an attempt to escape the consequences of its decision to withhold its allegations of bias affecting the Department of Defense's (DoD) Joint Enterprise Defense Infrastructure (JEDI) contract until after the award decision was made. But AWS's efforts are in vain, as even if it were correct that each of the Court's previous applications of the waiver rule to bias and conflict of interest claims could be fit within the framework of challenges to the solicitation, then so too could AWS's claims at issue here. Because AWS was aware of the basis for those claims prior to submitting its final proposal and prior to award, those claims are now waived and should be dismissed.

I.    AWS's Attempts To Narrow The *Blue & Gold Fleet* Waiver Rule Are Unavailing

    A.    AWS Fails to Meaningfully Distinguish The Court's Numerous Applications Of The *Blue & Gold Fleet* Waiver Rule To Alleged Procurement Defects Other Than Solicitation Terms

In its response, AWS attempts to narrow the scope of the *Blue & Gold Fleet* waiver rule, painting a misleading picture of the law by focusing on the facts of the cases decided by the Court of Appeals for the Federal Circuit and this Court. But AWS downplays or ignores significant statements from the Federal Circuit explaining the rationale for the rule, which plainly extends to the untimely allegations from AWS presented here. Pl. Resp. at 10. And it attempts to narrowly cabin and distinguish a large and growing body of cases applying the waiver rule in circumstances extending beyond the terms of a solicitation. *Id*. at 11-14. These efforts are inconsistent with the law, as we explained in our motion and as we detail further below.

As AWS acknowledges, the Federal Circuit has made clear that the rationale underlying the *Blue & Gold Fleet* waiver rule extends to "all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so." *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012). In *COMINT*, the Court held that "[t]he same policy underlying *Blue & Gold* supports its extension to all pre-award situations." *Id*. at 1382. It also confirmed that the rationale for the waiver rule rests in part on the need for congruity with the timeliness rules for bid protests before the Government Accountability Office (GAO). *Id*. at 1383 ("It would be incongruous to bar later GAO protests but to permit a later court challenge."). AWS seeks to dismiss this language as dicta, Pl. Resp. at 10, but the Federal Circuit's analysis provides important insight into the rationale for the waiver rule. *See Nat'l Am. Ins. Co. v. United States*, 498 F.3d 1301, 1306 (Fed. Cir. 2007) ("Dicta . . . are . . . not

precedential (although [they] may be considered persuasive).") (internal quotation marks and citation omitted).

AWS nevertheless argues that *Blue & Gold Fleet* and its progeny still bar only post-award challenges to a patent defect in the terms of a solicitation or amendments thereto.  Pl. Resp. at 11.  Contrary to AWS's misleading account, this Court has repeatedly applied the *Blue & Gold Fleet* waiver rule to protest allegations challenging procurement defects other than the terms of a solicitation, as we demonstrated in our motion.  Def. Mot. to Dismiss, ECF No. 132 (Def. Mot.), at 8-12.  Far from being limited to "three narrow circumstances," the Court has repeatedly implemented the rule in accordance with the broad conception described by the Federal Circuit in *COMINT* based on the rationale outlined in *Blue & Gold Fleet*.  As this Court aptly summarized, "the language in *COMINT Systems* expresses a clear, practical intent to expand the reach of the *Blue & Gold Fleet* waiver rule to include any defects that could potentially be raised and resolved prior to the contract award."  *Synergy Solutions, Inc. v. United States*, 133 Fed. Cl. 716, 740 (2017).

Notably, for example, in *Peraton Inc. v. United States*, 146 Fed. Cl. 94, 102-03 (2019), this Court held that allegations of bad faith conduct were waived.  AWS attempts to shoehorn this case into its "solicitation-limited scope" for *Blue & Gold Fleet* waiver, noting that the Court was reviewing a corrective action.  Pl. Resp. at 12.  But the allegation of bad faith at issue in that case did not involve solicitation terms or even the scope of the corrective action – instead, the plaintiff there alleged "an intent by the [agency] to ensure that [the intervenor-defendant] receives the resulting contract under the pretext of a competitive award," and that "the primary thrust of plaintiff's allegations [in the relevant count] is that the agency has acted in bad faith in

that procurement." *Peraton*, 146 Fed. Cl. at 98.  Peraton's allegations thus mirror AWS's here, and involved not solicitation terms but rather the fairness of the competition under which evaluations and an award decision would be made.  If those allegations fit within AWS's proposed "solicitation-limited scope" for *Blue & Gold Fleet* waiver, then so too do AWS's allegations.

Likewise, AWS alleges that *Jacobs Technology Inc. v. United States*, 131 Fed. Cl. 430 (2017), may be crammed within its preferred framework because there the allegations were raised in the context of a decision to take corrective action.  Pl. Resp. at 13.  But AWS ignores that the allegations the Court examined in that case – prior to an award decision pursuant to the corrective action – went well beyond the terms of the solicitation or the scope of the corrective action.  The Court examined allegations of bad faith conduct by the agency evidencing a preference for another offeror, allegations thematically similar to AWS's allegations in this case. 131 Fed. Cl. at 454-55.  The Court in *Jacobs* found that bias allegations raised after the award decision had been made would have been waived and, thus, were appropriately considered (and, in that case, rejected) prior to award.  *Id*. at 447-48.  So too were AWS's allegations required to be raised, if at all, prior to award.

AWS's attempt to distinguish the Court's applications of the *Blue & Gold Fleet* waiver rule in the context of conflict of interest allegations similarly falls flat.  AWS relies on *ATSC Aviation, LLC v. United States*, 141 Fed. Cl. 670, 696 (2019), to argue that the organizational conflict of interest (OCI) claims in the cases we cited in our motion were actually challenges to the solicitation terms.  Pl. Resp. at 12.  But a careful examination of these cases establishes that most of the OCI allegations at issue were no more related to the solicitation terms than are

AWS's allegations here.  It is true that in *CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 712 (2011), *aff'd* 475 F. App'x. 341 (Fed. Cir. 2012), the plaintiff had requested amendments to the solicitation to address an unequal access to information OCI that it alleged had arisen, and that the Court found that the plaintiff was required to file its protest when the agency refused to include such amendments.  *Id.*  But the Court also went further, explaining that the plaintiff could not "escape this waiver rule by asserting that, wholly apart from the terms of the RFP, the Army should have identified and mitigated an unequal information OCI," because "the rationale of *Blue and Gold* leads to the conclusion that a contractor should not be allowed to protest an agency's failure to identify and mitigate an OCI when the contractor knew about the alleged OCI from the start, but failed to assert it, via protest, prior to the award."  *Id.*  This description of the application of the *Blue & Gold Fleet* rationale would logically encompass AWS's allegations here, about which it was aware prior to award, and which include both conflict of interest claims, *see* Compl. ¶ 226, and bias and bad faith claims that are a close analog to OCI allegations.[1]

AWS alleges that the Court's decision in *Concourse Group, LLC v. United States*, 131 Fed. Cl. 26, 29-30 (2017), fits within its strained framework because the plaintiff in that case "challeng[ed] individuals involved in the solicitation process."  Pl. Resp. at 12.  This vague assertion is neither illuminating nor does it distinguish Concourse's allegations from AWS's own bias and bad faith allegations.  In *Concourse*, the plaintiff alleged that the "unusually close" relationship between procurement officials and personnel of the incumbent contractor created all three types of OCI – biased ground rules, unequal access to information, and impaired

---

[1]  Notably, AWS has not attempted to distinguish its bias and bad faith allegations from OCI allegations on a substantive basis.

objectivity.  131 Fed. Cl. at 29, 30.  In no way was this broad OCI allegation specifically tied to any terms of the solicitation – the plaintiff in that case alleged that relationships between the agency and the incumbent tainted the entire procurement.  *Id*.  And, of course, AWS alleges in the instant case that "individuals involved in the solicitation process" – that is DoD source selection and other procurement officials – were biased against it by President Trump's public comments.  *See, e.g.*, Compl. ¶¶ 221, 226.  If the tenuous connection to solicitation terms in *Concourse* is enough to satisfy AWS's "solicitation-limited scope" test for *Blue & Gold Fleet* waiver, then the allegations that we ask the Court to dismiss here also meet that test.

In *Communication Construction Services v. United States*, 116 Fed. Cl. 233, 263-64 (2014), the Court recognized that the Federal Circuit in *COMINT* had "expanded *Blue & Gold* by applying its reasoning 'to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so,'" and had "recognized that '[t]he same policy underlying *Blue & Gold* supports it extension to all pre-award situations.'" *Id*. at 259 (quoting *COMINT,* 700 F.3d at 1382).  The Court applied the waiver rule in holding that the plaintiff's OCI allegations, which claimed that a conflict of interest affected not only the development of the solicitation but also the *evaluation of proposals* through participation on the Source Selection Committee, was waived because the plaintiff was aware of the basis of its allegations prior to the deadline for receipt of proposals.  *Id*. at 263-64.  This analysis once again refutes AWS's "solicitation-limited scope" framework.  Put another way, to the extent that the allegations in that case may be linked back to the solicitation, so too may AWS's allegations.

Similarly, in *Synergy Solutions*, the Court found that a protest alleging that the procuring agency had failed to conduct required discussions following its assessment of a weakness against

the plaintiff was waived under *Blue & Gold Fleet*.  133 Fed. Cl. at 739-40.  Like AWS here, the

plaintiff in that case argued that *Blue & Gold Fleet* did not apply because the plaintiff did not

challenge solicitation terms, and that a challenge brought before award would not have been ripe.

*Id*. at 737.  The Court rejected these arguments, expressly rejecting the dichotomy that AWS

proposes between defects in the solicitation and those in the evaluation process.  *Id*. at 740.

AWS attempts to distinguish *Synergy* by noting that the plaintiff in that case had previously filed

a protest before the GAO, and the GAO had found the same claim to be waived under its

timeliness rules.  Pl. Resp. at 13-14.  But the Court did not rely on the GAO's rules or decision,

but only stated that it agreed with the GAO's reasoning that the plaintiff should have raised its

allegation in a previous protest.  133 Fed. Cl. at 739.  The Court in *Synergy* based its holding on

Federal Circuit guidance in *Blue & Gold Fleet* and *COMINT*, though these cases recognized that

GAO practice informs the *Blue & Gold Fleet* waiver rule.  *Id*. at 739-40.  AWS argues that this

Court has limited *Synergy* to its facts, but this is an over-reading of two subsequent cases that

expressly distinguished *Synergy* based on the unusual facts of those cases, rather than anything

unusual about the facts in *Synergy*.  Pl. Mot. at 14; *ATSC*, 141 Fed. Cl. at 696 (explaining that

*Synergy*'s application of *Blue & Gold Fleet* and *COMINT* did not bar ATSC's claim given the

"somewhat unusual setting of [that] case"); *iAccess Techs., Inc. v. United States*, 143 Fed. Cl.

521, 532 (2019) (finding that, although the decisions in both *Synergy* and *ATSC* employed

"reasonable interpretations of the holding in *COMINT*, . . . [t]he facts of iAccess's protest align

more closely with those in *ATSC*.").

    Although the facts in the instant case mirror neither those in *Synergy* nor *ATSC*, they do

track closely with the facts in the OCI cases discussed above, and bear striking similarity to the

facts in the GAO protest of *Adams and Associations, Inc.*, B-417120; B-417125, 2019 CPD ¶ 21

(Comp. Gen. Jan. 16, 2019).  In a vain attempt to avoid the clear parallels with *Adams* that we

described in our motion, AWS tries to recast its protest allegations.  Recognizing that the

protestor in *Adams* had alleged that the procurement was "irredeemably flawed in that any

agency official . . . who reasonably could have been involved in this procurement is incapable of

fairly evaluating the protester's proposals," AWS alleges that this is "clearly not what AWS is

alleging here."  Pl. Resp. at 15.  But AWS's complaint and other filings in this case contradict

this assertion – that the President's public comments allegedly exhibiting bias against Amazon

rendered DoD evaluators unable to fairly evaluate AWS in this procurement is *exactly* what

AWS is alleging here.  *See, e.g.,* Compl. ¶ 20 ("Each of these messages [from President Trump

and his son] came while DoD was evaluating the JEDI proposals and it would have been

virtually impossible for anyone involved in JEDI to ignore them"); Compl. ¶ 33 ("it was

impossible to shield DoD from the bias exhibited and undue influence exerted by President

Trump and others"); Compl. ¶ 221 ("The SSA and SSAC's abilities to rationally evaluate the

proposals and to award the JEDI Contract were tainted by President Trump's repeated statements

against Amazon at key decision points during the proposal evaluation process"); Compl. ¶ 226

("The fact that the decision makers knew that their continued employment likely depended on

selecting Microsoft created a conflict [of interest]"); Pl. Memo in Support of its Mot. to

Supplement the AR, ECF No. 124-1, at 23-24 ("The actual evaluators and decision-makers at

DoD . . . could not have missed the unmistakable public instructions from their Commander in

Chief to not award the JEDI Contract to AWS.").  AWS argues that it did not know that the bias

it alleges was exhibited through these public statements would harm it until it became aware that

DoD had selected Microsoft for award, but this is exactly the argument that the GAO rejected in *Adams*, and is exactly the "roll the dice" approach that the Federal Circuit instituted the waiver rule to preclude.

AWS attempts to shoehorn the diverse series of cases applying the waiver rule into a cramped framework that suits its own purposes but displays little fidelity to the actual facts or reasoning in those decisions. Moreover, even under its strained reading of these decisions, AWS' argument fails – because AWS's allegations in this case mirror the allegations in many of those cases, if those other allegations fit within AWS' interpretation of the *Blue & Gold Fleet* waiver rule, so too must AWS' allegations. As we describe in our motion, AWS challenges the "terms of the competition" in the same way that the plaintiffs in the cases discussed above challenged the framework under which the competition would be held, or the "ground rules of the competition" in the GAO's terminology. AWS in this case has alleged that President Trump's alleged bias against AWS rendered it unable to receive a fair evaluation from DoD source selection officials. Although AWS now denies that this is the thrust of its allegations and attempts to recast them as solely evaluation challenges, this new spin contradicts AWS's complaint and other briefing in this case, as we further demonstrate in Section II.A below. Either way, the crucial fact remains that AWS was aware of the (scant) factual basis for its allegations of bias prior to award and prior to the deadline for receipt of final proposals. Just as the plaintiffs in the other cases were required to promptly bring challenges to an evaluation and award decision proceeding under circumstances that allegedly advantaged one offeror over another rather than waiting to see if they would be selected for award, AWS was not permitted to

hedge its bets by waiting to see how the procurement turned out and then crying foul only if it was not selected.

B.     The Cases AWS Cites Do Not Support Its Narrow Construction Of The *Blue & Gold Fleet* Waiver Rule

In addition to its misreading of the numerous instances in which this Court has applied the *Blue & Gold Fleet* waiver rule to protest allegations to claim that the rule only applies to "solicitation" related challenges, AWS takes language from a small number of cases out of context in an attempt to support its failed framework.  None of these cases supports the overly narrow interpretation that AWS urges, however.

AWS first cites *Draken Int'l, Inc. v. United States*, 120 Fed. Cl. 383, 393 (2015), arguing that the Court in that case held that "the waiver rule only 'prevents [p]laintiff[s] from challenging solicitation *terms*.'"  Pl. Resp. at 10 (emphasis added by AWS).  But the Court made no such broad holding in *Draken*.  Rather, in a brief analysis of the application of the *Blue & Gold Fleet* waiver rule to the facts of that case, the Court merely concluded that a challenge to delay in the procurement process that was not apparent from the solicitation, along with resultant unduly restrictive requirements, was timely under *Blue & Gold Fleet*.  120 Fed. Cl. at 393.  The facts of *Draken* bear no resemblance to those presented here, and the Court in *Draken* engaged in no lengthy analysis of the limits of the waiver rule that might prove persuasive here.

Similarly, AWS's reliance on *Caddell Constr. Co. v. United States*, 125 Fed. Cl. 264 (2016), is misplaced.  The Court in that case, again in a brief analysis of little persuasive value outside the facts of that case, found that the waiver rule was inapplicable because the plaintiff had raised a "straightforward challenge to [the agency's] evaluation."  *Id*. at 272.  As with

*Draken* and unlike the cases on which we rely, the allegation at issue in *Caddell* bears no resemblance to the allegations at issue in our motion to dismiss.

Likewise, in *Sotera Defense Solutions, Inc. v. United States*, 118 Fed. Cl. 237 (2014), the Court relied on factors not present here, such as "the uncertainty as to the appropriate deadline for avoiding waiver of a corrective action protest," *id*. at 255, in finding that, although it was a "close question" that could have come out the other way "[i]f the facts were slightly different," no waiver occurred in that case. *Id*. at 257. As with the *Draken* and *Caddell*, the facts of this case are much more than "slightly different" – AWS's allegations at issue here share little to nothing in common with the allegations at issue in *Sotera*, which challenged the scope of the agency's decision to take corrective action, specifically the decision to re-evaluate proposals and an allegedly arbitrary cost evaluation. *Id*. at 248.

Additionally, AWS relies on the Court's decision in *ATSC*, discussed above, despite the Court's express caveat that it found the claims in that case not to be waived given the "somewhat unusual setting of [that] case." 141 Fed. Cl. at 696. One key distinction between the decision in *ATSC* and the facts presented here is that ATSC challenged a competitive range determination in which it alleged that the agency "deviat[ed] from the solicitation's ground rules" in a way that "did not become apparent until after the [agency's] award decision." *Id*. at 693-94. In this case, AWS's own allegations demonstrate that it was well aware of the basis of the allegations at issue prior to the award decision. *See* Def. Mot. at 13-18. Moreover, the result in *ATSC* was largely driven by the nature of the relief requested in that case – the Court found that because relief would involve only adding the plaintiff to a pool of contractors eligible to compete for task orders and would not restart the bidding process or disrupt the performance of a contract,

consideration of allegations that might otherwise be deemed waived was appropriate because it did not implicate the Tucker Act's imperative to "give due regard to . . . the need for expeditious resolution" of bid protests, and important foundation of the waiver rule. 141 Fed. Cl. at 696; 28 U.S.C. § 1491(b)(3). No such facts exist in the instant case, where AWS requests permanent injunction of the award to Microsoft and a reevaluation of proposals.

One other aspect of the *ATSC* decision that AWS declines to highlight is the Court's statement, summarizing a review of cases in which the Court found waiver, including two of the OCI cases we discuss above, that "these cases, like *Blue & Gold* and *COMINT*, involve protests of issues extrinsic to the offerors' proposals." 141 Fed. Cl. at 695. Should the Court be persuaded to apply such a test here, it is plain that the alleged bias stemming from political influence that AWS asserts tainted the procurement in this case would, if true, be extrinsic to AWS's and Microsoft's proposals, unlike the challenges to DoD's technical evaluations of these proposals that we have acknowledged are timely, if incorrect.

Finally, AWS cites a number of cases in which the Court has considered timely bias and bad faith claims while finding other claims to be waived. Pl. Resp. at 16. But we do not contend that *all* bias and bad faith claims must be brought pre-award. Unlike the cases cited by AWS, the facts claimed by AWS to support its bias and bad faith allegations were known to AWS prior to final proposal submissions and prior to award. AWS was, therefore, required to bring these claims at that time, rather than wait to see if it would be selected for award, only to raise its bias allegations in the event it was not selected.

II.    Counts Three, Five, Six, And Seven Of AWS's Complaint Are Waived

    A.    In These Counts, AWS Challenges Not The Evaluations But Terms Of The
        Solicitation And Terms Of The Competition

        1.    Counts Five, Six, And Seven

In its response to our motion, AWS attempts to recast its allegations in Counts Five, Six, and Seven as challenges to DoD's proposal evaluations and award decision, rather than to bias, bad faith, and conflicts of interest that tainted the procurement process as a whole.  Pl. Resp. at 6-9.  As we demonstrate with examples above, this attempted spin is contradicted by the language of AWS's complaint and other filings.  Moreover, if the Court were to allow AWS to avoid the effect of the *Blue & Gold Fleet* waiver rule merely by recasting its allegations as evaluation challenges, the rule would collapse, as nearly any plaintiff could reframe its challenge as not taking issue with the terms of a solicitation or competition, but with the way the agency applied those terms in evaluating its proposal or that of its competitor.

AWS's challenges to DoD's technical evaluation judgments and best value tradeoff are timely, and we have not requested their dismissal on waiver grounds.  In the counts we have asked the Court to dismiss, however, AWS challenges not evaluations or tradeoff decisions, but the circumstances under which these decisions were made, which AWS alleges were systematically biased against it through public statements by the President and his associates of which AWS was aware in advance.  To the extent that the Court finds any evaluations or tradeoffs to be flawed, it can address those concerns through the counts that challenge those decisions directly.  But AWS has waived its bias, bad faith, and conflict of interest claims in Counts Five, Six, and Seven, as it was aware of the basis of those claims well prior to submitting its final proposal and chose to "roll the dice" rather than promptly assert its allegations.  These

claims are conceptually identical to the bias and OCI cases we discuss above, where the challenge is to an alleged atmosphere that resulted in an award decision tainted by bias or a conflict of interest.  AWS's analysis conflicts with all of these cases – there as here any *effect* of the bias or OCI would necessarily *manifest* in evaluations and the award decision, but that does not mean that these allegations are "evaluation challenges" that can only be raised post-award.

Finally, the information AWS alleges that it learned after award does not actually support its bias and bad faith allegations.  AWS takes issue with the extent of the responses that DoD provided to AWS's debriefing questions but, leaving aside other flaws with this argument, nothing about DoD's alleged lack of fulsome debriefing responses indicated that the President's alleged antipathy toward Amazon biased this procurement against AWS.  This argument is emblematic of AWS's effort to string together totally unconnected facts with vague, unsupported allegations of causality – that the President has been publicly critical of AWS's parent company and its chief executive and that Microsoft was selected for award of the JEDI contract in no way proves or even implies that the former caused the latter.

Similarly, the post-award publication of a book that alleges that the President urged then-Secretary of Defense James Mattis to "screw Amazon" in connection with the JEDI contract lends no direct support to AWS's bias theory, as the book and AWS's own allegations acknowledge that the former Secretary instead instructed his subordinates that the procurement would be "done by the book, both legally and ethically."  Compl. ¶ 91.  To the extent that the reporting of the alleged statement itself indicated a preference by the President related to the procurement, it was, as AWS alleges, made public only after the award decision was already made.  *Id.*; Pl. Resp. at 4.  AWS makes no credible allegation that procurement officials were

somehow aware of this alleged conversation prior to award, nor does it in any other way connect the President's comments to JEDI procurement officials.

And AWS's argument regarding the recusal of Secretary of Defense Mark Esper from the JEDI procurement does not support its bias or bad faith allegations.  AWS has still not successfully explained how the Secretary's decision *not* to be involved in the JEDI procurement could evidence bias against AWS.  And, as we have demonstrated in other briefing, the administrative record clearly demonstrates that the review initiated by the Secretary and completed, following his recusal, by the Deputy Secretary did not involve the source selection and did not in any way evidence bias against AWS or any other offeror.

2. <u>Count Three</u>

AWS's response related to Count Three clearly demonstrates that AWS's view of the *Blue & Gold Fleet* waiver rule is so narrow as to reduce the rule to a dead letter, and is thus plainly inconsistent with the law.  AWS alleges that "Count 3 is a challenge to the biased conduct that steered the contract toward Microsoft, which AWS could not have known until after contract award."  Pl. Resp. at 8.  But although AWS could not have known that Microsoft would receive the contract until after award, that is always the case in analyzing waiver, and is no bar to claims being found waived.  What is important is whether AWS was aware of the allegedly biased conduct and had the opportunity to challenge it prior to final proposal submission and/or award.  In the case of the allegations in Count Three, AWS incontrovertibly was aware of the express and implied solicitation terms it now challenges prior to submitting its final proposal, and its challenges in this count are thus plainly waived.

15

AWS makes no attempt to defend the portion of Count Three that challenges DoD's long established decision not to evaluate past performance.  And AWS admits that it challenges the terms of Amendment 0005 which informed offerors of, in AWS's view, a changed interpretation of the solicitation's classified infrastructure requirements.  Pl. Resp. at 8.  AWS was aware of the terms of the solicitation, and was aware of the impact on its proposal, which it alleges included increasing its price by nearly █████████.  *Id.*  It is difficult to imagine a more square application of the *Blue & Gold Fleet* waiver rule, or a more patent solicitation term, than a change effected by a solicitation amendment that has such a dramatic impact on an offeror's proposal.

AWS attempts to distinguish its case by alleging that it could not have known until after award that this amendment to the solicitation was actually motivated by bias favoring Microsoft.  *Id*. at 9.  Leaving aside the utter lack of evidence for this claim, apart from the public statements of the President of which AWS admits it was well aware and which AWS continues to fail utterly to connect to actual procurement decisions, the "motivation" for the amendment is of no moment to the waiver analysis.  AWS was indisputably aware of the solicitation term and the effect on its proposal, and if the term was arbitrary, capricious, or otherwise subject to challenge, AWS had an opportunity and responsibility to challenge it before it submitted its revised proposal accounting for the change.

> B.   AWS Could Have Brought Its Bias Allegations Prior To Evaluation And Award

Finally, AWS attempts to avoid the consequences of its waiver by arguing that it could not have brought its allegations of bias earlier because they were not ripe until Microsoft was awarded the contract, and because any defects were latent, not patent.  AWS also foretells a

parade of horribles if the Court were to grant our motion, foreseeing an imaginary flood of premature protests.  These allegations do not accord with the law, with the facts, or even with AWS's own complaint allegations.

      1.      <u>AWS Could Have Brought Its Bias Allegations Prior To Award</u>

AWS argues that it could not have brought its bias allegations prior to award, because only the award decision was a "final agency action" that could give rise to a ripe bid protest.  Pl. Resp. at 17-19.  But many bid protest actions that fall within the scope of this Court's jurisdiction over protests of "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement" do not involve what AWS describes as "final agency action."  28 U.S.C. § 1491(b)(1); *Distributed Solutions, Inc. v. United States,* 539 F.3d 1340, 1344 (Fed. Cir. 2008); *see also CBY Design Builders v. United States*, 105 Fed. Cl. 303, 336 (2012) ("Congress has specifically placed matters within our bid protest jurisdiction that seem incompatible with an APA 'final agency action' definition that rules out the 'tentative or interlocutory.'").

Among countless other examples of protests that the Court has considered ripe challenges short of a final award decision are the OCI and bias cases discussed above, in many of which the challenge was to the *absence* of an action by the agency to identify and mitigate a conflict of interest or bias that was alleged to have impacted the fairness of the evaluation.  This line of cases, into which AWS's bias allegations neatly fit, essentially challenge whether the agency has upheld its duty to treat offerors fairly and honestly.  *See C.A.C.I., Inc.-Fed. v. United States*, 719 F.2d 1567 (Fed. Cir. 1983); *see also L-3 Commc'ns Integrated Sys., L.P. v. United States*, 79 Fed. Cl. 453, 462 (2007) ("Plaintiff's claim of a breach of the implied duty to consider its

proposal fairly and honestly is quintessentially a challenge to the procurement process."); *Adams and Associations, Inc*., B-417120; B-417125, 2019 CPD ¶ 21 (Comp. Gen. Jan. 16, 2019) ("[W]e find no merit to the protester's argument that any protest would have been premature prior to its loss of the procurements."); Compl. ¶¶ 230-34.  In these cases, whether brought under section 1491(a) or (b), a plaintiff's claim accrues when the events that fix the Government's alleged liability have occurred and the plaintiff was or should have been aware of their existence.  *L-3 Commc'ns*, 79 Fed. Cl. at 461.  AWS was aware of the facts upon which it bases its claims of bias before it submitted its final proposal and well before the award decision.  That its claims are speculative is a function of their inherent weakness and lack of factual substantiation, not an indication that they suddenly ripened into actionable claims in the wake of a decision to award the contract to Microsoft.

Finally, AWS argues that no redress would have been available to it had it brought its bias claims prior to award.  Pl. Resp. at 19-20.  But had AWS raised its claims in a timely fashion, DoD could have investigated the allegations and, if appropriate, taken even further steps to insulate source selection officials from any public commentary arguably related to the procurement.  AWS instead mocks this idea and attacks a straw man, arguing that it could not have plausibly sought "removal" of the President or Secretary of Defense.  *Id*.  But that is no less true now, and is a major flaw in AWS's entire theory of this litigation – if the President's public comments created a bias and conflict of interest that infected the ability of any executive branch employee to fairly evaluate proposals in this procurement, *see* Compl. ¶ 226, then how could this Court within its authority fashion relief to address such a circumstance?  Any lack of available redress owes to the overreach of AWS's allegations, not to their timing.

2.      <u>AWS's Own Allegations Demonstrate That Any Defect Was Patent</u>

AWS tries reframing the same arguments we have refuted above by alleging that any

defect in the procurement process was latent, rather than patent, and thus could not have been

brought pre-award.  Pl. Resp. at 21-24.  But this is no more than another way of presenting

AWS's argument that it challenges not the terms of the competition overall, but the evaluations;

not the bias it alleges was injected by the President, but its manifestation in the evaluations and

award decision.  But, as we demonstrate in Section II.A above, this argument is refuted by

AWS's own allegations and by the law, which has found similar allegations of bias, bad faith,

and conflicts of interest to be waived when not brought before award.  And AWS's argument

that it could not have discovered that the bias and conflicts of interest it alleges would prejudice

it until the award to Microsoft is no different than the argument made by countless other

protesters in an attempt to avoid waiver, and rejected by this Court under the central logic of

*Blue & Gold Fleet* – that an offeror may not identify an issue, wait to see if it is selected for

award, and only if it is not selected raise the issue in a belated attempt to stop the award.  Despite

the enormous administrative record in this case, AWS has learned nothing of substance to

support its bias allegations subsequent to the award decision, except that it was not selected for

award and that it disagrees with the technical judgments of evaluators and source selection

officials.  If these judgments were in error, AWS may challenge them; but any such errors do not

themselves evidence bias and, more importantly, do not excuse AWS from failing to timely raise

claims of bias of which it was aware pre-award.  *See Info. Tech. & Application Corp. v. United*

*States*, 316 F.3d 1312, 1323 n.2 (Fed. Cir. 2003).  The central fact is that AWS's claims of bias

rely on information of which it acknowledges it was aware prior to award, and these allegations are therefore waived.

### 3.   No Flood Of Litigation Would Result From A Finding Of Waiver

Finally, AWS speculates that a "flood of litigation," challenging every Presidential tweet or negative news cycle, would result from a finding that it has waived its bias claims here.  Pl. Resp. at 17, 20-21.  But not every company is so rash as to presume that Government officials will be biased against it based on the President's public comments.  AWS once again conflates the weakness of its allegations and their lack of connection to the actual DoD personnel who made the evaluations and award decisions with their timeliness.  If it is unreasonable to expect a company to file a bid protest alleging bias following a Presidential tweet, that is not because such a claim is premature, but because there is no basis to allege that professional Government procurement officials would violate their ethical and legal duties based on a tweet, even one from the President.

## **CONCLUSION**

For these reasons, the United States respectfully requests that the Court dismiss Counts Three, Five, Six, and Seven of the complaint, because AWS has waived the allegations contained therein.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

████████████████████████████████████████████████

|  |  |
|---|---|
|  | s/ Patricia M. McCarthy |
|  | PATRICIA M. MCCARTHY |
| OF COUNSEL: | Assistant Director |
|  |  |
| MICHAEL G. ANDERSON | s/ Anthony F. Schiavetti |
| BENJAMIN M. DILIBERTO | ANTHONY F. SCHIAVETTI |
| Assistant General Counsel | RETA BEZAK |
| Washington Headquarters Service & | Trial Attorneys |
| Pentagon Force Protection Agency | U.S. Department of Justice |
| Office of General Counsel | Civil Division |
| Department of Defense | Commercial Litigation Branch |
|  | PO Box 480 |
| TYLER J. MULLEN | Ben Franklin Station |
| CCPO Legal Advisor | Washington, D.C. 20044 |
| Assistant General Counsel | Tel: (202) 305-7572 |
| Defense Information Systems Agency | Fax: (202) 305-1571 |
| Office of the General Counsel | anthony.f.schiavetti@usdoj.gov |
|  |  |
| March 6, 2020 | Attorneys for Defendant |