**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

AMAZON WEB SERVICES, INC.,

       Plaintiff,

   v.

THE UNITED STATES,

       Defendant,

and

MICROSOFT CORPORATION,

       Intervenor-Defendant.

**REDACTED VERSION**

Case No. 19-1796

Judge Patricia E. Campbell-Smith



**INTERVENOR-DEFENDANT MICROSOFT CORPORATION'S**
**REPLY IN SUPPORT OF ITS PARTIAL MOTION TO DISMISS PLAINTIFF'S**
<u>**COMPLAINT**</u>

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................1

ARGUMENT ........................................................................................................3

I.     COUNT III'S CHALLENGE TO THE EXPRESS TERMS OF THE
       SOLICITATION IS WAIVED ...................................................................3

II.    COUNTS V, VI, AND VII'S BIAS AND BAD FAITH CLAIMS ARE WAIVED .........6

       A.     *Blue & Gold* Bars A Protestor From Raising Any Claim That Could Have
              Been Raised And Resolved Prior To The Contract Award ....................7

       B.     AWS Knew About The Alleged Bias Well Before It Learned Of The
              Award To Microsoft And The Results Of DoD's Evaluation ..............13

       C.     If AWS Had Filed A Timely Protest, Its Claims Would Have Been Ripe
              And Effective Redress Would Have Been Available ...........................16

       D.     AWS's Bias Claims Challenge Patent Errors .......................................20

CONCLUSION....................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adams and Associates, Inc.*,
   2019 WL 245909 (Comp. Gen. Jan. 16, 2019) ................................................................11, 12

*ATSC Aviation, LLC v. United States*,
   141 Fed. Cl. 670 (2019) ........................................................................................................12

*Axiom Resource Mgt., Inc. v. United States*,
   564 F.3d 1374 (Fed. Cir. 2009) ............................................................................................20

*Bannum, Inc. v. United States*,
   115 Fed. Cl. 257 (2014) ..........................................................................................................8

*Bannum, Inc. v. United States*,
   779 F.3d 1376 (Fed. Cir. 2015) ..............................................................................................7

*Blue & Gold Fleet, L.P. v. United States*,
   492 F.3d 1308 (Fed. Cir. 2007) ..................................................................................... *passim*

*Brocade Commc'ns Sys., Inc. v. United States*,
   120 Fed. Cl. 73 (2015) ..........................................................................................................17

*C.A.C.I., Inc.-Fed. v. United States*,
   719 F.2d 1567 (Fed. Cir. 1983) ............................................................................................18

*Caddell Constr. Co. v. United States*,
   111 Fed. Cl. 49 (2013) ..........................................................................................................13

*CBY Design Builders v. United States*,
   105 Fed. Cl. 303 (2012) ........................................................................................................17

*Ceres Gulf, Inc. v. United States*,
   94 Fed. Cl. 303 (2010) ..........................................................................................................18

*COMINT Sys. Corp. v. United States*,
   700 F.3d 1377 (Fed. Cir. 2012) .................................................................................7, 8, 9, 12

*Commc'n Constr. Servs., Inc. v. United States*,
   116 Fed. Cl. 233 (2014) .....................................................................................................9, 13

*Concourse Grp., LLC v. United States*,
   131 Fed. Cl. 26 (2017) .......................................................................................................9, 10

*CRAssociates, Inc. v. United States*,
  102 Fed. Cl. 698 (2011), *aff'd*, 475 Fed. App'x 341 (Fed. Cir. 2012)
  (unpublished) ......................................................................................................................9, 13

*Draken Int'l, Inc. v. United States*,
  120 Fed. Cl. 383 (2015) ...................................................................................................13

*iAccess Technologies, Inc. v. United States*,
  143 Fed. Cl. 521 (2019) (Campbell-Smith, J.) .............................................................9, 12, 13

*Integrated Bus. Solutions, Inc. v. United States*,
  58 Fed. Cl. 420 (2003) .....................................................................................................12

*Itility, LLC v. United States*,
  124 Fed. Cl. 452 (2015) ...................................................................................................16

*Jacobs Tech., Inc. v. United States*,
  131 Fed. Cl. 430 (2017) ...............................................................................................17, 18

*Kortlander v. United States*,
  107 Fed. Cl. 357 (2012) ...................................................................................................14

*McGrath v. United States*,
  85 Fed. Cl. 769 (2009) .....................................................................................................14

*Michels v. United States*,
  72 Fed. Cl. 426 (2006) .....................................................................................................14

*Oracle Am., Inc. v. United States*,
  144 Fed. Cl. 88 (2019) .....................................................................................................18

*Per Aarsleff A/S v. United States*,
  829 F.3d 1303 (Fed. Cir. 2016).........................................................................................20

*Peraton, Inc. v. United States*,
  146 Fed. Cl. 94 (2019) ...............................................................................................10, 17

*Sotera Def. Sols., Inc. v. United States*,
  118 Fed. Cl. 237 (2014) ...................................................................................................13

*Square One Armoring Serv., Inc. v. United States*,
  123 Fed. Cl. 309 (2015) .............................................................................................17, 20

*Synergy Sols., Inc. v. United States*,
  133 Fed. Cl. 716 (2017) .............................................................................................. *passim*

*Sys. Application & Techs. v. United States*,
  691 F.3d 1374 (Fed. Cir. 2012).....................................................................................16, 19

*Technatomy Corp. v. United States*,
　144 Fed. Cl. 388 (2019) ...............................................................................................8

*Tenica & Associates, LLC v. United States*,
　123 Fed. Cl. 166 (2015) .............................................................................................17

## STATUTES

5 U.S.C. § 704.................................................................................................................17

18 U.S.C. § 208...............................................................................................................18

28 U.S.C. § 1491(b)(1) ...................................................................................................17

28 U.S.C. § 1491(b)(3) ...................................................................................................21

## REGULATIONS

4 C.F.R. § 21.2(a)(1)......................................................................................................11

████████████████████████████████████████████

## INTRODUCTION

AWS's response turns the theory of its own complaint on its head.  Whereas the complaint alleges bias in the procurement process by citing a long line of anti-Amazon statements by President Trump, stretching back even before the 2016 election, the response attempts to evade the conclusion that logically follows from those allegations—that AWS was obliged to have filed its bias claims in a pre-award protest.  This transparent attempt to avoid waiver under *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007), cannot succeed.

AWS's new strategy is to claim that it discovered the facts underlying its bias claims only after DoD gave allegedly nonresponsive answers to its debrief questions.  But this blatantly contradicts the complaint, which alleges that "the President made it widely known to everyone—including on publicly broadcast television and through his prolific tweets—that DoD should not award the JEDI contract to AWS."  Complaint ¶ 13, ECF No. 1 ("Compl.").  Indeed, the complaint alleged that President Trump's comments irretrievably tainted the entire solicitation, asserting that those comments "would have been virtually impossible for anyone involved in JEDI to ignore." *Id.* ¶ 20.  Even AWS's debriefing questions show that AWS was aware of the alleged bias before the contract award.  *See, e.g.*, Tab 488, AR 180050-61 (asking whether specific procurement officials had communicated with President Trump or were aware of his anti-Amazon statements).  AWS's assertion that it only suspected bias after the award was made is implausible.

AWS also distorts the legal standard for waiver under *Blue & Gold*.  As Microsoft explained in its motion (at 21-25), this Court applies a simple and straightforward rule: A protestor must challenge any procurement error of which it becomes aware during the procurement process "as early as possible and at a minimum, prior to the agency's award of the contract." *Synergy Sols., Inc. v. United States*, 133 Fed. Cl. 716, 740 (2017).  To muddy the waters and save its untimely bias claims, AWS rejects this authority and proposes a distinction between challenges to

the "solicitation" (which AWS concedes are subject to waiver), and challenges to the "evaluation process" (which AWS claims are not).   But this Court has repeatedly rejected that precise distinction, noting that it does little to serve *Blue & Gold*'s underlying policy rationale: to discourage bidders from sitting on their rights as to procurement errors and then raising an objection later, after the contract is awarded to a competitor, in an attempt to restart the procurement. *See, e.g.*, *Synergy*, 133 Fed. Cl. at 740 (rejecting protestor's proposed "distinction between perceived defects in the solicitation versus perceived defects in the evaluation process").

Even if AWS's misplaced solicitation/evaluation distinction made any sense, its claims would still fail.  Count III alleges that DoD took three "affirmative steps" to deprive AWS of its competitive advantage.  *All* of these steps were accomplished by the express terms of either the original solicitation or Amendment 0005.  Count III plainly challenges the terms of the solicitation—not the evaluation—and it is waived under *any* interpretation of *Blue & Gold*, including AWS's.

Counts V, VI, and VII fare no better.  Those counts allege that President Trump's bias tainted the entire "procurement process."  Compl. ¶ 220.  According to AWS, the President's alleged intervention created a "*fundamental defect*" in the procurement that "destroyed the requisite impartial discharge of the government *procurement process*." *Id.* ¶ 12 (emphasis added).  AWS's theory—pled in the complaint—is that once President Trump made his statements, it would have been "impossible" for DoD evaluators to ignore them.  *Id.* ¶ 20.  AWS thus had all the information it needed to bring those claims before the award, or sooner.  And although AWS asserts that any pre-award bias claims would not have been ripe, that is simply not true.  If AWS truly believed that President Trump's tweets actually infected the solicitation, it could have brought a pre-award protest.  If successful with a timely pre-award protest, AWS would have been

entitled to the same relief that is available now—presumably, an order directing DoD to remove any biased evaluators.  The purpose of *Blue & Gold*, however, is to discourage post-award relief that can be avoided because it is costly and disruptive to the Government's procurement process and unfair to the awardee, whose price and other technical proposal details have been revealed.

For all these reasons, Counts III, V, VI, and VII should be dismissed in their entirety.

## ARGUMENT

### I.    COUNT III'S CHALLENGE TO THE EXPRESS TERMS OF THE SOLICITATION IS WAIVED

AWS's response tries to paint Count III as a bias claim, but really it alleges patent defects in the solicitation.  This Court should not be misled:  Count III is a straightforward challenge to the express terms of the original RFP and Amendment 0005.  AWS was aware of those terms when the RFP was issued or, at the latest, on May 13, 2019, when DoD issued Amendment 0005.  And, at the latest, AWS was required to have raised any objections prior to June 12, 2019, the deadline set for submission of revised proposals in response to Amendment 0005.  Count III is waived under any theory of *Blue & Gold*.

In arguing that Count III is not subject to waiver, AWS concedes that under any reading of *Blue & Gold*, a challenge to the express terms of a solicitation is waived unless asserted prior to the close of bidding.  *See Blue & Gold*, 492 F.3d at 1313-14; Pl.'s Sealed Response in Opp'n to Defendants' Partial Mot. to Dismiss at 6, ECF No. 168 ("Response") (acknowledging that *Blue & Gold* applies "where an offeror fails to challenge patent defects in a solicitation prior to the close of bidding").  Hoping to avoid the fatal consequence of that rule, AWS seeks to recast Count III as a challenge to "biased conduct . . . which AWS could not have known until after contract award." *See* Response at 8-9.  That mischaracterizes Count III.

Count III identifies three actions, which it characterizes as "affirmative steps," that DoD

allegedly took to deprive AWS of its "competitive advantage" in the procurement. Compl. ¶ 211. The substance of each of those actions was evident in the original solicitation or Amendment 0005. The first "step"—DoD's decision not to evaluate past performance—was apparent from the original solicitation, which did not mention past performance, and from DoD's written answer to a question from an offeror, which confirmed that "Past Performance will *not* be evaluated."  *See* Intervenor-Def. Microsoft Corporation's Partial Motion to Dismiss the Complaint at 25-26, ECF No. 133 ("Microsoft Motion"). The second "step"—the prohibition on using existing classified infrastructure—was clear both from the original solicitation, which stated the prohibition, and from Amendment 0005, which reiterated it. *Id.* at 26-27. And the third "step"—barring both offerors from relying on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in calculating their responses to the Price Scenarios—occurred in Amendment 0005, which prohibited ▮▮▮▮▮▮▮ and required "highly accessible" data storage. *Id.* at 28-29.

AWS claims (Response at 8-9) that it could not have challenged these patent solicitation errors prior to the award because it did not know the "underlying basis" or "primary motivation" for them, i.e., President Trump's alleged bias. That argument fails for two independent reasons.

*First*, whether or not AWS was aware of the alleged bias is irrelevant to Count III. AWS's complaint does not argue that the "affirmative steps" challenged in Count III appeared rational until AWS discovered the President's anti-Amazon bias; rather, it claims that they were "arbitrary and capricious"—that is, lacking *any* rational justification—from the outset. Compl. ¶ 214. AWS has no excuse for failing to raise that challenge earlier. *Id.* ¶ 213. AWS could have challenged the original solicitation before the submission of initial proposals (on October 12, 2018), and it could have challenged Amendment 0005 before submission of revised proposals (on June 12, 2019). Its failure to do so constitutes waiver under *Blue & Gold*.

AWS's contrary position would dramatically narrow the *Blue & Gold* waiver rule. Under AWS's theory, a protestor could challenge a patent solicitation defect for the first time in a post-award protest, simply by alleging that (1) the defect was *motivated* by bias, and (2) even though the defect itself was patent, the *bias* was not apparent until after the award was made. Such a rule would subvert *Blue & Gold*'s core rationale, which is to prevent a bidder from sitting on its rights during the procurement process and only raising errors later as a means to reopen a competition that it has lost. *See Blue & Gold*, 492 F.3d at 1313-14; Microsoft Motion at 21-22. This Court should not allow losing bidders to resuscitate waived challenges to patent requirements that are known to all bidders simply by questioning the evaluators' motives after the award is made.

*Second*, even if Count III is a bias claim, the complaint itself makes clear that AWS was aware of the alleged bias well before the submission of initial proposals on October 12, 2018 and revised proposals on June 12, 2019. No less than *nineteen* of the anti-Amazon statements cited in the complaint were made before October 2018—including a statement reported in April 2018 that the President was "obsessed" with Amazon's owner and founder, Jeffrey Bezos, and had asked his advisors how he could "f\*\*\* with him." Compl. ¶ 90; *see also id.* ¶¶ 16-17, 19, 84-89; *see* Microsoft Motion at 29-32.[1]

Well before the evaluation process even began, AWS thus knew about *both* (1) the

---

[1] Even if AWS was somehow not on notice of the alleged bias as of June 2019, it was certainly on notice by the time final proposals were due on September 5, 2019. By then, numerous other statements that AWS relies on in its Complaint to establish bias had been made. *See, e.g.*, Compl. ¶ 20 (discussing July 20, 2019 press conference in which President Trump said his administration would "look at [the procurement] very closely"); *see also id.* ¶ 93 (Senator Marco Rubio's July 19, 2019 tweet urging the President to "delay awarding [the] cloud computing contract to @amazon"; *id.* ¶ 97 (President Trump's July 22, 2019 retweet of a Fox News segment calling the JEDI contract the "Bezos Bailout"); *id.* ¶ 176 (Secretary Esper's August 1, 2019 announcement that he intended to take a "hard look" at the JEDI procurement); *id.* ¶ 177 (citing several tweets about the procurement from the President's son in August 2019).

allegedly defective solicitation "steps" that it now challenges in Count III, *and* (2) the bias allegedly motivating DoD's improper taking of those "steps". AWS could have filed a bid protest challenging the terms of the original solicitation and, if successful, it would have been entitled to modification of those terms. Likewise, AWS could have protested Amendment 0005, which it now blames for its higher price. Compl. ¶ 213. AWS has no excuse for sleeping on its rights.

## II.   COUNTS V, VI, AND VII'S BIAS AND BAD FAITH CLAIMS ARE WAIVED

Counts V, VI, and VII broadly allege that the *entire procurement* was tainted by bias and conflicts of interest. Compl. ¶¶ 182-84, 219-34. Count V alleges that presidential bias "undermined the procurement process" and impeded the evaluators' "abilities to rationally evaluate the proposals." *Id.* ¶¶ 220-21. Count VI points to "a series of dismissals by the Trump Administration" that allegedly created conflicts of interest by showing that "Executive Branch employees who do not follow President Trump's directives are at risk of losing their jobs." *Id.* ¶ 226; *see also id.* ¶¶ 91, 179, 226 (citing dismissal of Secretary Mattis). And Count VII alleges that "President Trump induced DoD to conduct the procurement in a manner that breached the implied contract of good faith and fair dealing." *Id.* ¶ 233.

AWS's theory is that the President's anti-Amazon statements irretrievably tainted the procurement. The complaint asserts that it was "virtually impossible" for DoD evaluators to "ignore" President Trump's statements, that those statements "inherently impacted" DoD political appointees who then necessarily "imparted the President's bias" to the evaluators, and that "[n]o amount of compartmentalization, segregation, or anonymization could have isolated the decision-makers from the clear and unmistakable conflict of interest that stemmed from the very highest levels of power in DoD and that were made known to all." Compl. ¶¶ 20, 183-84.

Counts V, VI, and VII are waived: AWS was fully aware of the alleged presidential bias before the deadline for final proposals (September 5, 2019), or at the very least, before DoD

awarded the contract to Microsoft (October 25, 2019).  Nothing prevented AWS from filing a pre-award protest to eradicate such bias.  *See Microsoft* Motion at 25-39; *Synergy*, 133 Fed. Cl. at 740.

A.     ***Blue & Gold* Bars A Protestor From Raising Any Claim That Could Have Been Raised And Resolved Prior To The Contract Award**

AWS's defense of Counts V, VI, and VII misinterprets the basic *Blue & Gold* legal framework that requires dismissal of its untimely bias claims.  Instead of applying the straightforward rule that a bidder must challenge known procurement errors before the contract is awarded (*see* Microsoft Motion at 21-25), AWS urges the Court to adopt a distinction between challenges to the *terms of a solicitation*, which AWS concedes are generally subject to waiver, and challenges to the *evaluation process*, which it argues are immune.  *See* Response at 10-16. Crucially, AWS argues that *all* claims of bad faith, bias, and conflicts of interest fall into the latter category—and so cannot be waived no matter how obvious they were prior to the award.

AWS's position is at odds with *Blue & Gold*'s policy rationale and settled precedent.  As the Federal Circuit has said time and again, the *Blue & Gold* waiver rule serves a very specific purpose: It prevents a bidder from remaining silent about an obvious error in a procurement, waiting to see who wins the contract, and then raising the error later in litigation if it loses.  *See Blue & Gold*, 492 F.3d at 1313-14; *see also COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1383 (Fed. Cir. 2012) (refusing to allow the protestor to "get a second bite at the apple"); *Bannum, Inc. v. United States*, 779 F.3d 1376, 1380 (Fed. Cir. 2015) (waiver rule prevents "inefficient and costly" agency rebidding).  By foreclosing this disruptive tactic, the waiver rule incentivizes bidders to raise errors early, prevents them from "taking advantage of the government and other bidders," and "avoids costly after-the-fact litigation."  *Blue & Gold*, 492 F.3d at 1314.

AWS's interpretation of *Blue & Gold* subverts this underlying rationale.  Under AWS's theory, a protestor need not object to an obvious, even notorious "fundamental defect" in the

procurement process prior to award (*see* Compl. ¶ 12) so long as that "fundamental defect" is not apparent within the four corners of the solicitation itself.   But if bias is apparent before the evaluation takes place, *Blue & Gold*'s logic requires the bidder to bring his protest then—when the bias can be addressed and mitigated.   *See COMINT*, 700 F.3d at 1382 ("The same policy underlying *Blue & Gold* supports its extension to all pre-award situations."); *Bannum, Inc. v. United States*, 115 Fed. Cl. 257, 274 (2014) (explaining "that the *Blue & Gold* waiver rule should be broadly applied in bid protests"); *Technatomy Corp. v. United States*, 144 Fed. Cl. 388, 391 (2019) (noting that "many of our court's judges, including the undersigned, have recognized that the [waiver] rule should be applied in additional circumstances").

AWS's argument conflicts with many decisions of this Court.   In *Synergy*, for example, a bidder filed a post-award protest challenging the agency's refusal to engage in meaningful pre-award discussions, as required by applicable regulations.   *See* 133 Fed. Cl. at 740.   The Court held that the challenge was waived, and it expressly declined to rely on the protestor's proposed "distinction between perceived defects in the solicitation versus perceived defects *in the evaluation process.*"   *Id.* (emphasis added).   Such a rule, the court explained, was inconsistent with the Federal Circuit's "clear, practical intent to expand the reach of the *Blue & Gold Fleet* waiver rule to include any defects that could potentially be raised and resolved prior to the contract award."   *Id.* (citing *COMINT*, 700 F.3d at 1383).   AWS's rule would have yielded a contrary result in *Synergy*, because the protestor there challenged the procurement process, not an express term of the solicitation.

AWS tries to marginalize *Synergy*, emphasizing that the protestor there had also failed to raise its claim in a prior GAO protest and asserting that this Court has "limited *Synergy* to its facts." Response at 13-14.   But *Synergy*'s reasoning did not turn on the prior GAO proceedings; rather, the court expressly considered and rejected the distinction, which AWS here proposes, between

solicitation and evaluation. *See* 133 Fed. Cl. at 740. Nor has *Synergy* been "limited" "to its facts"; to the contrary, as recently as 2019, this Court endorsed *Synergy* as a "reasonable interpretation" of *Blue & Gold* and *COMINT* under the circumstances presented there. *iAccess Technologies, Inc. v. United States*, 143 Fed. Cl. 521, 531-32 (2019) (Campbell-Smith, J.).

AWS's proposed rule is also inconsistent with *CRAssociates*, where the Court applied *Blue & Gold* to an organizational-conflict-of-interest (OCI) claim alleging that a competitor had obtained inside information from its prior partial performance of the contract. *CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 712 (2011), *aff'd*, 475 Fed. App'x 341 (Fed. Cir. 2012) (unpublished). As the Court explained: "[T]he rationale of *Blue and Gold* leads to the conclusion that a contractor should not be allowed to protest an agency's failure to identify and mitigate an OCI when the contractor knew about the alleged OCI from the start, but failed to assert it, via protest, prior to the award." *Id.* The OCI claim at issue in *CRAssociates*, like AWS's bias and bad faith claims here, was not a challenge to an express term of the solicitation. Indeed, AWS's theory of *Blue & Gold* implies that OCI claims can never be waived—despite this Court's repeated statements that they can. *See, e.g.*, *Concourse Grp., LLC v. United States*, 131 Fed. Cl. 26, 29-30 (2017); *Commc'n Constr. Servs., Inc. v. United States*, 116 Fed. Cl. 233 (2014).

AWS seeks to distinguish *CRAssociates* as well, arguing that the case really involved a solicitation challenge because the protestor there had "asked the Army to amend the RFP to address" the alleged OCI. 102 Fed. Cl. at 712. But again, AWS misreads the decision. *CRAssociates* expressly held that the protestor's claims were waived to the extent that they challenged the agency's evaluation process, explaining that "CRA cannot escape [the] waiver rule by asserting that, wholly apart from the terms of the RFP, the Army should have identified and mitigated an unequal information OCI, as required by the FAR." *Id.* And, like *Synergy*, it

expressly rejected the solicitation/evaluation distinction on which AWS now relies, emphasizing that "[a] number of cases hold that arguments that should have been raised prior to an award are waived, even if they do not relate to ambiguities or errors in the solicitation." *See id.* at 712 n.12.

AWS's approach was also rejected in *Concourse Group*, where the issue was the "'unusually close' relationship" between the agency and the incumbent contractor—a defect in the fairness of the procurement process, not the terms of the solicitation. 131 Fed. Cl. at 30. In holding that the protestor waived its OCI challenge by failing to raise it prior to the award, the court specifically rejected the theory of bias that AWS advances here, noting that it contravened *Blue & Gold*'s policy rationale:

> [The protestor] argues . . . that "Count I does not stand on the existence of the OCIs itself, but rather on the Army's failure to identify and evaluate the OCIs and avoid, neutralize, or mitigate them." Under this logic, [the protestor] only knew about the Army's failure to mitigate the OCIs when the Army awarded the contract to [a competitor]. *This is not the law.* If it were, then protesters like CRAssociates could simply sit on their rights until they knew whether or not they had won the contract.

*Id.* at 30 n.3 (emphasis added). Like the protestor in *Concourse*, AWS urges this Court to pin the timeliness of its bias claims on when it claims the *effects* of the bias were revealed. But as the Court said in *Concourse*, "[t]his is not the law." *Id.*

AWS also tries (Response at 12) to distinguish *Peraton, Inc. v. United States*, 146 Fed. Cl. 94 (2019) (Campbell-Smith, J.), on grounds that that case involved a corrective action that amended the original solicitation "and thus fit easily within *Blue & Gold*'s solicitation-limited scope." Not so. *Peraton* was a challenge to the agency's "bad faith *conduct*" throughout the procurement. *Id.* at 102-03. That "conduct" included actions that could not possibly be interpreted as amendments to the terms of the solicitation, such as the agency's award of a separate "bridge contract" to a competitor. *Id.* at 98. *Peraton* directly refutes AWS's position that bias and bad faith claims are categorically exempt from *Blue & Gold*.

The GAO's opinion in *Adams and Associates, Inc.*, 2019 CPD ¶ 21, 2019 WL 245909 (Comp. Gen. Jan. 16, 2019), also rejected the waiver argument AWS makes here. Like AWS here, the protestor in that case made the "sweeping assertion that no [agency] personnel would fairly and impartially evaluate its proposals." *Id.* at *3. The GAO explained that "our timeliness rules," like the ones applied by this Court, "do not allow a protester to wait to raise a fundamental flaw with the procurement process until after an award decision has been made." *Id.* Thus, the GAO ruled that the protest was a "quintessential challenge[] to the ground rules of the procurement[] that had to be challenged prior to the closing dates for proposals" and dismissed it as untimely. *Id.*

AWS tries to distinguish *Adams and Associates* (Response at 15) by stating that here, "AWS presumed that DoD officials were capable of carrying out their source selection obligations in accordance with the presumption of good faith." But AWS's own complaint refutes the present assertion that AWS presumed the good faith of DoD officials. The complaint asserts exactly (and repeatedly) the opposite: that President Trump's public statements before the award irretrievably tainted the procurement process in a way that would necessarily infect the ultimate award. *See* Compl. ¶¶ 20, 182-84; *supra* at 5-6. Indeed, the complaint cites "the President's public campaign against Amazon" and "DoD's suspect last-minute efforts to 'review' the JEDI proposal [in August 2019]" as reasons to conclude that the presumption has been "*rebut[ted]*." Compl. ¶ 221.

AWS also attempts to discount *Adams and Associates* because it is a GAO decision. Like *Blue & Gold*, however, the GAO waiver rule requires that a challenge to the underlying ground rules of a competition—such as a bias claim—must be brought prior to the close of the bidding process. 4 C.F.R. § 21.2(a)(1). Indeed, *Blue & Gold* itself relied on the GAO waiver rule as a reason for courts to recognize an analogous waiver rule. *See Blue & Gold*, 492 F.3d at 1314-15. For this reason, *Adams and Associates* is especially entitled to the "due regard" that this Court

ordinarily accords GAO decisions in light of "GAO's longstanding expertise in the bid protest area." *Integrated Bus. Solutions, Inc. v. United States*, 58 Fed. Cl. 420, 427 n.7 (2003).

In support of its proposed solicitation/evaluation distinction, AWS relies heavily (Response at 12-13) on *ATSC Aviation, LLC v. United States*, 141 Fed. Cl. 670 (2019). But as this Court made clear in *iAccess*, the rule stated in *Synergy*—not *ATSC*—applies where a protestor is aware of the basis for its challenge prior to the award. 143 Fed. Cl. at 531-32 (concluding that *Synergy* and *ATSC* were both "reasonable interpretations of the holding in *COMINT*, as applied to the facts of each of those protests"). As this Court observed, in *ATSC* "the 'evaluative error was not evident before the final award.'" *iAccess*, 143 Fed. Cl. at 531-32 (quoting *ATSC*, 141 Fed. Cl. at 694). In *Synergy*, by contrast, it was "undisputed" that the agency had failed to engage in discussions with the protestor (the alleged evaluation error) before awarding the contract to its competitor. 133 Fed. Cl. at 737. Here, as in *Synergy* (and not as in *ATSC*), AWS was aware of the alleged bias well before the contract was awarded. *See, e.g.*, Compl. ¶ 33 (alleging "it was impossible to shield DoD from the bias exhibited and undue influence exerted by President Trump and others"); *see also id.* ¶¶ 13, 18, 20, 182-84. Under *iAccess*, *Synergy*'s reading of *COMINT* and *Blue & Gold* is the "reasonable" one here. 143 Fed. Cl. at 532.

Notably, AWS fails to cite a *single* post-award protest in which the court declined to apply *Blue & Gold* where the protestor *knew* of the alleged defect ***prior to the submission of proposals***. On the contrary, in several of the cases AWS cites, the protestor discovered the alleged error *after* that deadline had passed. For example, as noted, *ATSC* declined to find waiver in a post-award protest, where the protestor claimed that the error was "not evident" prior to the award. 141 Fed. Cl. at 694. That is a claim that AWS cannot make here, given the allegations of its complaint. AWS's attempt now to claim it only learned of the bias post-award is a self-serving contrivance.

12

Similarly, in *Caddell Construction Co. v. United States*, 111 Fed. Cl. 49 (2013), a post-award protest, the Court found no waiver and noted that "the record [did] not establish that plaintiff had sufficient information to raise its claims prior to the submission of . . . proposals." *Id.* at 76; *see also Sotera Def. Sols., Inc. v. United States*, 118 Fed. Cl. 237, 255 (2014) (finding no waiver but noting that in that case, unlike in *CRAssociates* and *Communication Construction*, there was no "protestor that possessed knowledge of an alleged procurement defect" and yet "waited for the results of an evaluation process before protesting the alleged defect"). Other cases involved protestors who knew of the alleged error prior to the award, but who *filed their challenges* before the contract was awarded. *See iAccess*, 143 Fed. Cl. at 532; *Draken Int'l, Inc. v. United States*, 120 Fed. Cl. 383, 390 (2015). None of AWS's cases refutes the central holding of *Synergy*, which is that *Blue & Gold* applies to "any defects that could potentially be raised and resolved prior to the contract award." 133 Fed. Cl. at 740.

In sum, AWS's novel position—that the *Blue & Gold* waiver rule applies only to challenges to the express terms of a solicitation—has no grounding in the rule's policy rationales, and it directly conflicts with various decisions of this Court applying the rule to bias and bad faith claims, as well as to other challenges ranging beyond the four corners of the solicitation. The Court should refuse AWS's invitation to save its untimely bias claims by narrowing *Blue & Gold*.

## B. AWS Knew About The Alleged Bias Well Before It Learned Of The Award To Microsoft And The Results Of DoD's Evaluation

AWS also tries (Response at 7-8) to side-step *Blue & Gold*'s waiver rule by characterizing Counts V, VI, and VII as challenges to DoD's *evaluation* of the parties' proposals, which AWS could not have brought until DoD made the contract award. Again, this position is contrary to AWS's own complaint, which alleges the President's claimed bias affected the *entire procurement process*, not merely the evaluation process. *See supra* at 5-6. AWS plainly knew of the alleged

bias *well* before the award to Microsoft; it did not need to know the *results* of the evaluation to protest what it has described as a "fundamental defect" in the "procurement process" created by the President's alleged bias.  Compl. ¶ 12; *see supra* at 5-6.

AWS now claims (Response at 9) that it was DoD's answers to AWS's *debriefing questions*—not President Trump's public statements—that first led it to suspect that the procurement was biased.  This story directly contradicts AWS's own complaint, which repeatedly alleges that the President's bias was "on full display for the whole country to see" throughout the procurement process.  Compl. ¶ 18; *see also id.* ¶¶ 13, 20, 33.  "[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."  *Kortlander v. United States*, 107 Fed. Cl. 357, 374 (2012) (finding that an issue first raised in response to defendant's motion to dismiss "may not cure a defect in the complaint") (internal quotation and citation omitted); *see also McGrath v. United States*, 85 Fed. Cl. 769, 772 (2009) ("This court does not possess jurisdiction to hear claims presented for the first time in responsive briefing.") (citation omitted); *Michels v. United States*, 72 Fed. Cl. 426, 431-32 (2006) (refusing to consider a claim presented in plaintiff's brief opposing a motion to dismiss where not included in the complaint).

AWS's emphasis on the debriefing results—and what it supposedly learned only as a consequence of how DoD responded to its questions—cannot be reconciled with the facts in the Administrative Record.  AWS suggests that DoD's refusal to answer certain of its debriefing questions is proof of DoD bias.  *See* Response at 2, 3, 7, 9.  But as AWS well knows, DoD only refused to answer questions that were based on AWS's review of sensitive details of Microsoft's proprietary JEDI proposal that inadvertently had been provided to AWS at the time of award.[2]

---

[2] On October 25, DoD provided AWS with an extensive debriefing report, including several hundred pages of documents.  *See* Tab 480, AR176608-972.  Four days later, AWS submitted 265 debriefing questions.  *See* Tab 489.  The content of the questions made clear that

██████████████████████████

Ironically, despite AWS's complaints that DoD's insufficient response to debriefing questions justifies its bias allegations (Response at 2-3), AWS in fact received an extraordinary amount of information. DoD answered AWS's debriefing questions *except* those "based on or emanating from the inadvertent disclosure of proprietary information belonging to Microsoft, or [that] otherwise ask about Microsoft's proposal and evaluation." Tab 491, AR180078.

On inspection, AWS's debriefing questions confirm that AWS was fully aware of the alleged presidential bias well *before* receiving DoD's answers. For example, Question 224 asked "who was involved in any capacity in the evaluation process" and whether they had "communicated . . . with President Trump." *See* Tab 488, AR 180049. Questions 225 through 230 asked detailed questions about specific procurement officials and their interactions with President Trump, including any communications with the President and awareness of the President's July 2019 press conference, tweets, and videos. *See* Tab 488, AR 180050-61.[3] DoD's response to these questions—while ignored by AWS—expressly stated that "*[t]here were no*

---

the debriefing report provided to AWS had inadvertently included sensitive source selection information and proprietary details regarding Microsoft's JEDI solution, including the evaluation reports of Microsoft's interim and final proposals. Tab 480, AR 176646-673, 679-692, 726-738, 759-777, 862-899 (initial evaluation reports); Tab 480, AR 17611-12, 614, 616, 618, 622-23, 795-816 (final evaluation reports). AWS's debriefing questions were clearly informed by its review of Microsoft's evaluation reports, going so far as, in some instances, to specifically refer to them, and even quote them. Questions 80, 81, 87, 97, 100-03, 105-06, 108-09 did so as to Factor 5 alone. Once the inadvertent disclosure of Microsoft information became clear, DoD initiated an immediate inquiry and instructed AWS to destroy the disclosed materials.

[3] In addition, Questions 232 and 259-63 asked about Secretary Esper's review, including who "in the administration" he had "heard from" about the JEDI contract, how the review was conducted, and whether "any guidance or evaluation/source selection instructions or directives" were provided to the evaluators as a result of the review. *See* Tab 488, AR 180061, 180065. Question 245 specifically asked whether "DoD receive[d] any reports from evaluators of improper influence from any official, whether from within the DoD, or from within the White House, Senate, or House of Representatives." Tab 488, AR 180064. And Question 233 asked whether President Trump had directed DoD to "'screw' Amazon out of the JEDI contract or otherwise frustrate or prevent the award of the JEDI contract to Amazon." Tab 488, AR 180062.

███████████████████████████████████

*external influences on the source selection decision*." Tab 491, AR 180079 (emphasis added).

AWS cannot credibly claim that it suspected bias for the first time only when it received responses

to its debriefing questions.

### C.     If AWS Had Filed A Timely Protest, Its Claims Would Have Been Ripe And Effective Redress Would Have Been Available

AWS also argues that *Blue & Gold* cannot bar its bias claims because any pre-award claims

would have been unripe.  AWS claims that until the award was made, there was no "final agency

action" that AWS could have challenged.  *See* Response at 17-20.  AWS's argument misconceives

how the ripeness inquiry and bias claims are addressed in bid protests.

The ripeness doctrine focuses on ensuring that courts adjudicate live controversies rather

than "abstract disagreements." *Sys. Application & Techs. v. United States*, 691 F.3d 1374, 1383

(Fed. Cir. 2012) (citation omitted).  To assess ripeness, a court considers "the fitness of the issues

for judicial decision" and "the hardship to the parties of withholding court consideration." *Id.* at

1383-84.  In *Systems Application*, a challenge to agency corrective action, the Federal Circuit

assessed the first factor by asking "whether the challenged conduct constitutes a final agency

action." *Id.* at 1384.  Borrowing from an Administrative Procedure Act (APA) case, the court

explained that the challenged action must not be "of a merely tentative or interlocutory nature"

and must be one "from which 'legal consequences will flow.'" *Id.* (citation omitted).

Unlike the APA, however, the Tucker Act does not superimpose a "final agency action"

requirement onto its broad grant of bid protest jurisdiction to the Court of Federal Claims.  *See*

*Itility, LLC v. United States*, 124 Fed. Cl. 452, 461 n.12 (2015) (recognizing that the APA's "final

agency action" requirement "was not incorporated into" the bid protest statute); *CBY Design*

*Builders v. United States*, 105 Fed. Cl. 303, 336 (2012) (observing that "Congress has specifically

placed matters within [the Court of Federal Claim's] bid protest jurisdiction that seem

incompatible with an APA 'final agency action'" requirement).  Indeed, the APA itself recognizes that "agency action made reviewable by statute" is reviewable even if it is *not* "final agency action" (5 U.S.C. § 704), and here the Tucker Act expressly authorizes jurisdiction over pre-award "object[ions] to a solicitation."  28 U.S.C. § 1491(b)(1); *see also CBY Design*, 105 Fed. Cl. at 336. Moreover, applying a "final agency action" requirement to preclude pre-award bias claims would be "contrary to Federal Circuit precedent" under *Blue & Gold*.  *CBY Design*, 105 Fed. Cl. at 334.

Notably, all of the bid protest cases AWS cites that rely on the APA "final agency action" requirement involve challenges to anticipated errors in the agency's implementation of proposed corrective action.  *See Brocade Commc'ns Sys., Inc. v. United States*, 120 Fed. Cl. 73, 79 (2015); *Square One Armoring Serv., Inc. v. United States*, 123 Fed. Cl. 309, 329 (2015); *Tenica & Associates, LLC v. United States*, 123 Fed. Cl. 166, 170-72 (2015) (Campbell-Smith, J.).  These cases hold that a challenge to "the implementation or execution" of a corrective action is not ripe until the action is complete.  *Square One*, 123 Fed. Cl. at 329-30.  Bias claims are different: once a protestor concludes that bias has affected the procurement process, it has a sufficient basis to assert a violation and a pre-award protest may be brought that is ripe for review.  *See Peraton*, 146 Fed. Cl. at 103.  In this sense, a bias claim is more analogous to a challenge to the "scope" of a corrective action—which this Court *has* found to be ripe prior to the corrective action's completion.  *Jacobs Tech., Inc. v. United States*, 131 Fed. Cl. 430, 448 (2017).

Further, AWS's argument that bias claims can never ripen before a final award is inconsistent with precedent, AWS's own conduct, and common sense.  For example, *Jacobs Technology* involved a pre-award protest alleging, as AWS does here, that the agency's "failure to enforce [certain] common [standards] indicates bias and has unfairly disadvantaged [the protestor.]"  *Jacobs Tech.*, 131 Fed. Cl. at 443.  The court held that this bias claim was ripe, in part

17

██████████████████████████████

because forcing the protestor to wait until after the award was made would expose it to waiver under *Blue & Gold*. *Id.* at 447; *see also Ceres Gulf, Inc. v. United States*, 94 Fed. Cl. 303 at 317-18 (2010) (holding that protestor's challenge to corrective action was ripe for review because it would be untimely under *Blue & Gold* if brought after the new award decision).[4]

AWS's proposal to impose a "final agency action" on bias claims also makes little sense as a policy matter. When a protestor claims that a procurement cannot be conducted in an impartial manner—whether because of an evaluator's conflict of interest or bias, or because of an OCI—that claim is ripe, even if no final "action," such as a contract award following the completion of the selection process, has yet been taken. *See, e.g.*, *C.A.C.I., Inc.-Fed. v. United States*, 719 F.2d 1567, 1571-72 (Fed. Cir. 1983) (considering a pre-award bid protest alleging a conflict of interest by four individuals involved in the procurement process); 18 U.S.C. § 208 (prohibiting executive branch employees from "participat[ing] personally and substantially" in matters in which they have a financial interest). Thus, if the protestor is *aware* of the bias—even before award—it must promptly raise its bias or OCI claim. *See supra* at 7-13; Microsoft Motion at 21-25.[5]

Even if AWS were right to apply the "final agency action" framework here (which it is not), there would still be sufficiently final action by DoD to permit the Court's review. Specifically, AWS alleges that "[t]he SSA and SSAC's abilities to rationally evaluate the proposals

---

[4] AWS itself has recognized—in this very procurement—that ripeness does not foreclose pre-award protests alleging bias. Oracle's pre-award protest of the JEDI procurement, filed in December 2018, claims (among other things) that AWS improperly influenced the procurement process, including by negotiating for employment with individual evaluators, which led to impermissible conflicts of interest. *See Oracle Am., Inc. v. United States*, 144 Fed. Cl. 88, 112-25 (2019). But neither AWS nor the Government argued that Oracle's protest was unripe for review.

[5] AWS's reliance on purported errors in the evaluation as "evidence[]" of the procurement officials' hostility and bias, Compl. ¶ 222, does not change the analysis. Alleged "errors in an evaluation process do not alone suffice to demonstrate bad faith or permit discovery." *Jacobs Tech.*, 131 Fed. Cl. at 455. If AWS believed the President's public statements injected bias into the procurement process, it could not wait until it learned of the final outcome.

and to award the JEDI Contract were tainted by President Trump's repeated statements against Amazon at key decision points during the proposal evaluation process." Compl. ¶ 221; *see also id.* ¶¶ 20, 33, 182-84.  In other words, the loss of impartiality occurred when President Trump made the statements to which AWS objects, well before the final award. *See* Microsoft Motion at 30-31 (detailing timing of relevant statements).  DoD's decision to close the bidding and move forward with the procurement notwithstanding that taint was neither "tentative," nor "interlocutory," and it "set in motion several irretrievable legal consequences," including (again, according to AWS) violations of the procurement regulations and the contract's ultimate award to Microsoft. *Sys. Application & Tech., Inc.*, 691 F.3d at 1384.

Beyond its ripeness argument, AWS also complains (Response at 19) that if it had filed its protest earlier, it would not have been able to obtain effective relief.  This is not so.  Had it timely brought its claims prior to award, presumably AWS would have sought to ensure impartial evaluators would conduct a "fair" evaluation.  The remedy for alleged "bias" now is the same— replacement of "tainted" evaluators with unbiased successors.  What is different, because AWS wrongly delayed its objections until post-award, is that the remedy now would require that the entire evaluation be redone.  This is disruptive to the Government and manifestly unfair to Microsoft because it occurs after AWS has gained an asymmetric competitive advantage of being informed of Microsoft's pricing and other sensitive technical proposal details.

Finally, AWS is wrong to suggest (Response at 20-21) that applying *Blue & Gold* in this case would encourage a "cascade of protective and defensive [pre-award] protests."  AWS itself describes this case as "extraordinary," and "unprecedented," Compl. ¶¶ 12, 21, and has repeatedly alleged that the bias at issue here was "on full display for the whole country to see," *id.* ¶ 18.  Any finding that AWS waived these bias claims would have no impact on any other case in which the

basis for bias is *not* so known (or public) in advance as here.  And if a future claim is, in fact, brought too early, there will be no prejudice to anyone—such a claim can be dismissed without prejudice and raised again post-award.  *See, e.g.*, *Square One*, 123 Fed. Cl. at 328.

D.      **AWS's Bias Claims Challenge Patent Errors**

At the end of its Response, AWS half-heartedly argues (at 21-24) that its bias claims are not subject to *Blue & Gold* because President Trump's alleged bias was not "patent"—or, equivalently, that AWS had "good cause" to ignore it.  *See Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1312 (Fed. Cir. 2016) (defining a patent error as "'an obvious omission, inconsistency or discrepancy of significance'").  But again, these arguments are contradicted by AWS's complaint, which alleges that the President's bias was "widely known," "on full display for the whole country to see" and irretrievably tainted the whole procurement.  *See, e.g.*, Compl. ¶¶ 13, 18, 20, 182-84, 221; *see also supra* at 5-6, 13-16.  AWS cannot now be heard to complain that the errors it challenges were "latent," or that it had "good cause" to ignore them because they could not have been "discovered by reasonable and customary care."  Response at 23.  For essentially the same reasons discussed above, AWS cannot repackage its claims as merely a challenge to "the effect of the President's bias," when it was indisputably aware of the alleged presidential bias all along.  Response at 22-23; see generally supra at 13-16.

**CONCLUSION**

For the foregoing reasons, the Court should grant Microsoft's motion to dismiss Counts III, V, VI, and VII as waived under *Blue & Gold*.[6]

---

[6] AWS argues that the Court need not decide Defendants' motions to dismiss before it rules on AWS's pending motions to supplement and to complete the administrative record.  AWS is wrong.  It is not "necessary 'for effective judicial review,'" *Axiom Resource Mgt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009), nor would it serve "the need for expeditious resolution of the action," 28 U.S.C. § 1491(b)(3), to permit supplementation for waived claims.

Dated: March 6, 2020

*Of Counsel*:

LATHAM & WATKINS LLP

Kathryn H. Ruemmler
Abid R. Qureshi
Roman Martinez
Anne W. Robinson
Dean W. Baxtresser
Genevieve Hoffman
Riley Keenan

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
(202) 637-2200 (Telephone)
(202) 637-2201 (Facsimile)

Respectfully submitted,

ROGERS JOSEPH O'DONNELL, P.C.

By: /s/*Robert S. Metzger*
     Robert S. Metzger (Attorney of Record)

     Jeffery M. Chiow
     Neil H. O'Donnell
     Lucas T. Hanback
     Stephen L. Bacon
     Deborah N. Rodin
     Cassidy Kim
     Eleanor M. Ross

     875 15th Street N.W., Suite 725
     Washington, D.C. 20005
     (202) 777-8952 (Telephone)
     (202) 347-8429 (Facsimile)

     *Attorneys for Intervenor-Defendant,*
     *Microsoft Corporation*