# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

| | |
|---|---|
| AMAZON WEB SERVICES, INC., | |
|         Plaintiff, | Case No. 19-cv-01796 |
| v. | Judge Campbell-Smith |
| UNITED STATES OF AMERICA, by and through the U.S. Department of Defense, | █████████████ |
|         Defendant, | **FINAL REDACTED VERSION** |
| and | |
| MICROSOFT CORPORATION, | |
|         Defendant-Intervenor. | |

**PLAINTIFF'S ████ REPLY IN SUPPORT OF ITS MOTION
FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

ARGUMENT ..... 1

I. AWS'S LIKELIHOOD OF SUCCESS ON THE MERITS IS UNREBUTTED. ..... 2

A. DoD Unreasonably Evaluated the Offerors' Approaches to Price Scenario 6, Cloud Demonstrations, and Tactical Edge Solutions. ..... 2

1. DoD Misevaluated Microsoft's Technical Approach for Price Scenario 6. ..... 3

2. DoD Misevaluated Microsoft's Demonstration. ..... 9

3. The Government and Microsoft Fail to Offer a Plausible Explanation for DoD's Disparate Tactical Edge Evaluation. ..... 16

B. DoD's Unreasonably Evaluated the Offerors' Logical Isolation, Information Security, and Marketplace Capabilities. ..... 22

1. DoD Improperly Minimized the Cloud Security Benefits of AWS's Nitro Hypervisor under Factors 2 and 4. ..... 23

2. DoD Misevaluated AWS's Third-Party Offerings under Factor 5. ..... 24

II. THE BALANCE OF HARMS AMONG THE PARTIES AND THE PUBLIC WEIGHS HEAVILY IN FAVOR OF INJUNCTIVE RELIEF. ..... 25

A. AWS's Motion Is Timely. ..... 25

B. AWS Will Suffer Irreparable Harm Absent Injunctive Relief. ..... 26

C. The Balance of Harms and the Public Interest Weigh in Favor of Granting Injunctive Relief. ..... 27

D. The Government Has Failed to Propose a Reasonable Cost Estimate. ..... 29

CONCLUSION AND PRAYER FOR RELIEF ..... 30

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*2M Research Servs., LLC, v. United States*, 139 Fed. Cl. 471 (2018) ....13

*Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365 (Fed. Cir. 1999) ....10, 15

*ANHAM FZCO v. United States*, 144 Fed. Cl. 697 (2019) ....28

*BCPeabody Constr. Servs., Inc. v. United States*, 2013 WL 3225844 (Fed. Cl. 2013) ....28

*CDW LLC v. NETech Corp.*, 722 F. Supp. 2d 1052 (S.D. Ind. 2010) ....29

*Facility Services Management v. United States*, 140 Fed. Cl. 323 (2018) (Campbell-Smith, J.) ....26

*FMS Inv. Corp. v. United States*, 136 Fed. Cl. 439 (2018) ....1

*Gen. Dynamics Mission Sys., Inc. v. United States*, 136 Fed. Cl. 355 (2018) ....29

*Gentex Corp. v. United States*, 58 Fed. Cl. 634 (2003) ....4

*Greenland Contractors I/S v. United States*, 131 Fed. Cl. 216 (2017) ....4

*Heritage of Am., LLC v. United States*, 77 Fed. Cl. 66 (2007) ....4

*Info. Scis. Corp. v. United States*, 73 Fed. Cl. 70 (2006) ....22

*Mission1st Grp., Inc. v. United States*, 144 Fed. Cl. 200 (2019) ....7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 2

*Nortel Gov't Sols., Inc. v. United States*,
84 Fed. Cl. 243 (2008) .......... 27

*Peraton Inc. v. United States*,
144 Fed. Cl. 59 (2019) (Campbell-Smith, J.) .......... 27, 28

*Red River Holdings, LLC v. United States*,
87 Fed. Cl. 768 (2009) .......... 7, 8

*Serco, Inc. v. United States*,
101 Fed. Cl. 717 (2011) .......... 1, 29

*Sheridan Corp. v. United States*,
94 Fed. Cl. 663 (2010) .......... 26

*V.I. Paving, Inc. v. United States*,
103 Fed. Cl. 292 (2012) .......... 2

**Other Authorities**

48 C.F.R. § 9.503 .......... 27

48 C.F.R. § 15.001 .......... 9

48 C.F.R. § 52.233-3 .......... 28

**Regulations**

FAR 52.233-3 .......... 28

[redacted]

Plaintiff Amazon Web Services, Inc. files this Reply in support of its Motion for a Temporary Restraining Order and Preliminary Injunction ("Motion"), which asks the Court to order Defendant United States and Defendant-Intervenor Microsoft Corporation to cease performance of the JEDI Contract, pending the Court's resolution of this bid protest.

**ARGUMENT**

AWS demonstrated in its Motion that it is entitled to a temporary restraining order and preliminary injunction. In response, the Government and Microsoft downplay the numerous, fundamental errors that plagued DoD's evaluation, calling them "minutiae of the procurement process" that the Court should not "second guess." Def.'s Resp. Opp'n Pl. s Mot. TRO & Prelim. Inj. at 12, 25, 52, 55, ECF No. 139, ("Gov. Op."); Intervenor Def.'s Mem. Opp'n Pl.'s Mot. TRO & Prelim. Inj. at 20, 48-49, ECF No. 137 ("Int. Op."). But these errors—evaluations that flatly contradicted solicitation requirements and resulted in flawed ratings in favor of Microsoft—are hardly "minutiae," and are unquestionably beyond the discretion afforded to procurement officials. These errors led to the award of a contract that, if performed, compromises the very national security interests the Government and Microsoft claim they seek to protect. Moreover, the Government and Microsoft fail to rebut the clear and irreparable harm to AWS from continued performance, and the reality of DoD's current multi-cloud environment exposes the fallacy of the Government's claimed urgency. Because neither the Government nor Microsoft has rebutted AWS's entitlement to relief based on the record evidence, the Court should grant AWS's Motion. *See FMS Inv. Corp. v. United States*, 136 Fed. Cl. 439, 442 (2018); *see also Serco, Inc. v. United States*, 101 Fed. Cl. 717, 720 (2011).

## I. AWS'S LIKELIHOOD OF SUCCESS ON THE MERITS IS UNREBUTTED.

AWS identified three crucial errors that undermine DoD's source selection: (1) misevaluation of Microsoft under Factor 5, Price Scenario 6; (2) misevaluation of Microsoft's demonstration under Factor 8; and (3) misevaluation of AWS's and Microsoft's tactical edge solutions under Factor 3.[1] The Government and Microsoft fail to identify record evidence to rebut AWS's assertions, offering instead *post hoc* justifications for DoD's inexplicable evaluations. These explanations, however, are untethered to the Administrative Record ("AR") and deserve little, if any, weight—especially when compared to AWS's allegations, each of which is confirmed by the AR. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983); *see also V.I. Paving, Inc. v. United States*, 103 Fed. Cl. 292, 306 (2012).

### A. DoD Unreasonably Evaluated the Offerors' Approaches to Price Scenario 6, Cloud Demonstrations, and Tactical Edge Solutions.

The AR shows DoD committed three errors that undermine the award to Microsoft. First, DoD misevaluated Microsoft's technical approach for Factor 5, Price Scenario 6, by concluding Microsoft's [redacted] storage satisfied the solicitation's ("RFP") requirement for online storage. This error allowed Microsoft to avoid elimination and claim an illusory price advantage. Second, DoD ignored Microsoft's [redacted] under Factor 8 by concluding Microsoft completed all requirements successfully, despite clear evidence to the contrary. Third, Microsoft drew false parity between the offerors' tactical edge solutions by minimizing AWS's technical advantages and Microsoft's clear deficiencies. The AR belies the Government's *post hoc* explanations for these prejudicial evaluation discrepancies.

[1] The Government and Microsoft suggest that AWS has abandoned its bias-related claims. This is not true, as AWS made clear in its opening motion. Pl. Mot. at 6 n.1.

1. DoD Misevaluated Microsoft's Technical Approach for Price Scenario 6.

Neither the Government nor Microsoft disputes that Price Scenario 6 required online storage, or that Microsoft proposed only ████ storage. Gov. Op. at 27-28; Int. Op. at 18-19. Instead, they claim that Microsoft's proposed storage qualifies as online and therefore is technically feasible, notwithstanding the RFP's requirement for online storage, Microsoft's proposal of *only* ████ storage, and DoD's recognition that Microsoft proposed *only* ████ storage. Gov. Op. at 28-29; Int. Op. at 18-19. The Government and Microsoft take the position that it does not matter what Microsoft proposed because the Government and Microsoft can now attest that what Microsoft proposed satisfied DoD's needs. *See* Gov. Op. at 28-29; Int. Op. at 18-19. These *post hoc* rationalizations, however, are contrary to the evidence in the AR.

a. Price Scenario 6 Required "Highly Accessible" Storage, Which the RFP Defined as Online and Replicated Storage.

The RFP established three storage tiers for the JEDI Cloud: online, nearline, and offline. AR Tab 27 at 614. Offerors were required to identify "at least one online object storage offering that can support data on the order of Petabytes," as well as options for "'nearline' (versus online/offline) storage solutions" and "'offline' storage solutions." *Id.*

The Government and Microsoft concede that Price Scenario 6, as modified by Amendment 0005, required "highly accessible" storage. Gov. Op. at 27-28; Int. Op. at 18-19; *see also* AR Tab 302 at 64327-29. Amendment 0005—issued on May 22, 2019, after offerors submitted their initial proposals on October 12, 2018 designating their storage solutions as online, nearline, or offline—defined "highly accessible" as "*online* and replicated storage." AR Tab 304 at 64332 (emphasis added). Thus, *after* the offerors defined their storage solutions as online, nearline, or offline, DoD used one of those designations—online storage—to define "highly accessible." *Id.*

The Government and Microsoft suggest the Court should ignore the RFP's precise definition of "highly accessible" and instead focus on [redacted], which the Government contends—without citation to the AR—is "the real measure of the accessibility of the data." Gov. Op. at 28-29; Int. Op. at 19. But the Court should not rely on new definitions proposed during a bid protest when the RFP states exactly what was intended. *See Greenland Contractors I/S v. United States*, 131 Fed. Cl. 216, 227 (2017) ("If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning."). DoD could have defined "highly accessible" storage in terms of [redacted] or any other metric, but it chose to define it only as "online and replicated storage." AR Tab 304 at 64332. DoD stated exactly what it wanted: the solutions the offerors had described as online storage in their proposals.[2] Microsoft's failure to comply with the online storage requirement was a deficiency that should have precluded award.

AWS's understanding of "highly accessible," which was based on the RFP's explicit definition, is the only reasonable reading. But even if the Court were to find that the Government's and Microsoft's *post hoc* interpretations are also reasonable, then the RFP must be held to contain a latent ambiguity as to the definition of "highly accessible" that the Court must construe against the Government. *See Heritage of Am., LLC v. United States*, 77 Fed. Cl. 66, 76 (2007). Moreover, given Microsoft and AWS clearly adopted differing interpretations of "highly accessible," it was incumbent on DoD to raise the matter through discussions to ensure the competition proceeded on a fair and level playing field. *See Gentex Corp. v. United States*, 58 Fed. Cl. 634, 653 (2003). DoD's decision to do neither, and instead allow Microsoft alone to deviate from the RFP, was improper.

[2] As further proof, in other Price Scenarios, DoD identified the type of storage by tier designation rather than performance metric. *See e.g.*, AR Tab 302 at 64319.

       b. Microsoft Proposed Noncompliant Storage, Whereas AWS Proposed Compliant Online Storage.

Because neither the Government nor Microsoft can dispute that Microsoft proposed noncompliant storage for Price Scenario 6, they fall back on the claim that DoD's misevaluation did not prejudice AWS because AWS also proposed storage for this Scenario. Gov. Op. at 29-30; Int. Op. at 17-18. This is misleading.

Microsoft's technical proposal identified for each tier. It identified . AR Tab 408 at 173317, 173319-20. . *Compare* AR Tab 196a at 54117, 54119 *with* AR Tab 408 at 173317, 173319-20. Microsoft never indicated its storage also qualified as online.

AWS adopted a similar approach in its technical proposal, identifying for each storage tier. AWS proposed . AR Tab 367 at 152665-66. However, whereas Microsoft as Microsoft concedes, Int. Op. at 17; *compare* AR Tab 196a at 54117, 54119 *and* AR Tab 408 at 173317, 173319-20 *with* AR Tab 378 at 155003, 155008-09, 155011, 155029. Based on this difference in the offerors' proposals, the PEB recognized (although the Factor 5 TEB inexplicably did not) that AWS proposed *online* storage, and that Microsoft proposed storage, for Price Scenario 6. AR Tab 455 at 176363.

The Government and Microsoft sidestep this fundamental distinction by claiming Microsoft's [redacted] storage must be online because it has the same [redacted] as Microsoft's [redacted]. Gov. Op. at 28-29; Int. Op. at 18-19. But neither the RFP nor Microsoft connected those metrics to high accessibility. *See* AR Tab 304 at 64332. For example, although the Government contends that Microsoft's proposal "makes plain, in a chart comparing the different Azure Blob storage tiers, that [redacted]" (Gov. Op. at 28-29), Microsoft's proposal does no such thing. The chart to which the Government refers simply states [redacted]. AR Tab 408 at 173459. And, given the Government and Microsoft assert [redacted] and "highly accessible" are not synonyms, it is unclear how having similar [redacted] is relevant to whether Microsoft's [redacted] storage tiers are "highly accessible" online storage. Gov. Op. at 29; Int. Op. at 19-20.

Making matters worse, to "prove" that Microsoft's [redacted] storage qualifies as online, both the Government and Microsoft bizarrely refer to *AWS's proposal*. Gov. Op. at 29-30; Int. Op. at 17-18. They suggest that because AWS proposed [redacted] for Price Scenario 6, it must necessarily follow that Microsoft's separate and distinct [redacted] offering also qualifies as online. Gov. Op. at 29-30; Int. Op. at 17-18. AWS's proposal, however, discussed *only AWS's offerings* and did not [redacted]. It certainly did not speak to whether Microsoft's [redacted] storage, which Microsoft only ever described as [redacted] is online.

Regardless, even if the Court were to conclude that [redacted], AWS's technical approach would still be feasible, whereas Microsoft's would not, because AWS proposed [redacted] AWS's proposal explained that (1) [redacted]

[redacted]



[redacted]; (2) [redacted]; and (3) [redacted]. AR Tab 371 at 152866-67. AWS explained the [redacted]. AR Tab 378 at 155011. *Thus, unlike Microsoft, AWS's approach to Price Scenario 6 definitively proposed online storage.*

The AR plainly shows Microsoft proposed noncompliant [redacted] storage for Price Scenario 6. If Microsoft believed its [redacted] storage also qualified as online storage, Microsoft bore the burden to submit a well-written proposal. *See Mission1st Grp., Inc. v. United States*, 144 Fed. Cl. 200, 213 (2019). Microsoft's failure to do so is fatal to its standing as the JEDI awardee.

c. Microsoft's Technical Narrative Was Deficient.

Microsoft also failed to describe its technical approach adequately. Pl.'s Mem. Supp. Mot. TRO & Prelim. Inj. at 19, ECF No. 120-1 ("Pl. Mot."). The Government and Microsoft effectively concede this fact by failing to allege Microsoft [redacted] in its technical narrative, failing to cite a single example of Microsoft describing its [redacted] storage as "highly accessible" or online, and relying on *AWS's* description of its [redacted] storage to claim *Microsoft's* [redacted] storage is online. Gov. Op. at 27-31; Int. Op. at 17-18. Faced with this deficient approach, the TEB could not have rationally concluded that Microsoft's technical approach was feasible.[3] *See Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768, 787 (2009) (holding inquiry is whether record shows offeror complied with RFP, not whether agency doubted offeror's capability).

[3] The Government and Microsoft suggest the TEB considered Microsoft's proposed storage for Price Scenario 6 and found the approach feasible (Gov. Op. at 29; Int. Op. at 21), but the evaluation does not mention storage (AR Tab 332 at 151327-28). The TEB's conclusion is unexplained and indeed inexplicable.

[redacted]

The Government does not attempt to prop up Microsoft's deficient technical approach. Gov. Op. at 27-31. Microsoft attempts to do so, but rather than confront the deficiencies of its proposal, its rebuttal rests on a mischaracterization of AWS's proposal, claiming "there is no difference in narratives that matters." Int. Op. at 19. But the difference does matter, because only AWS provided sufficient information to allow for a reasonable technical feasibility evaluation.[4]

Although Microsoft claims "AWS's Factor 5 proposal for Price Scenario 6 mentions [redacted], and contains a discussion of capability similar to that in Microsoft's proposal," this is demonstrably false. *Id.* [redacted] AR Tab 371 at 152866-67. The AR therefore firmly refutes Microsoft's attempt to equate its technical narrative with AWS's, and Microsoft's failure to describe its approach adequately was a deficiency that should have precluded award. *See Red River*, 87 Fed. Cl. at 787.

d. DoD's Misevaluation Materially Prejudiced AWS.

DoD's erroneous evaluation had a material impact on the ultimate award decision. Had DoD evaluated Microsoft's technical approach to Price Scenario 6 consistently with the RFP, it would have assigned Microsoft deficiencies not only for proposing a noncompliant storage solution, but also for failing to describe its technical approach sufficiently. Either one of these deficiencies would have been sufficient to eliminate Microsoft from the competition.[5]

---

[4] For example, the Government suggests [redacted]. Gov. Op. at 28 (noting [redacted]). If that is true, [redacted]. AR Tab 430 at 175808-11 ([redacted]).

[5] Microsoft disputes it would be ineligible for award, but—as the RFP indicates and the Government concedes—a deficiency renders a proposal ineligible for award. AR Tab 342 at 151510; Gov. Op. at 46.

[redacted]

DoD's errors also affected the total evaluated price calculation. Although the Government and Microsoft suggest the [redacted] delta (a total calculated by the PEB) in storage cost is overstated, they ignore that the Government made Microsoft's cost proposal available in native Excel format only two days before this filing, denying AWS the opportunity to evaluate Microsoft's pricing in further detail.[6] They also ignore that Microsoft's technical approach is too deficient to even understand what Microsoft proposed. Regardless, the precise price increase is not material where deficiencies in Microsoft's proposal render it ineligible for award. *See* 48 C.F.R. § 15.001; AR Tab 305 at 64355.

2. <u>DoD Misevaluated Microsoft's Demonstration.</u>

The Government and Microsoft downplay the importance of the offerors' demonstrations under Factor 8, arguing the demonstrations lacked specific evaluation requirements. Gov. Op. at 32; Int. Op. at 23. The record refutes this *post hoc* rationalization. In reality, DoD developed specific demonstration scenarios to identify, for evaluation purposes, a "representative sample" of the activities DoD expected to encounter "during the course of normal usage of the solution." AR Tab 554 at 181201. Consistent with this purpose, the RFP required DoD to evaluate "the extent to which the scenarios are successfully demonstrated using the proposed approach for Factors 1 through 6." AR Tab 342 at 151507. It also required DoD to provide instructions to the offerors for the "specific scenarios to be demonstrated for evaluation purposes." *Id.* at 151497. These instructions identified the specific requirements to complete each scenario fully and successfully.[7]

---

[6] AWS received access to the documents filed by the Government to complete the record on February 3, 2020, and therefore has not had sufficient time to review their contents.

[7] DoD did not include the scenario instructions in the RFP to ensure offerors did not adapt their proposals to the instructions, and thereby defeat the demonstrations' purpose. AR Tab 554 at 181201.

*See* AR Tab 287; *see also* AR Tab 290 at 64206. Because of the importance of the demonstrations, the RFP required DoD to eliminate from the competition any offeror that received a Marginal or Unacceptable technical rating, or a High risk rating, under Factor 8. AR Tab 342 at 151503. DoD did not have discretion to depart from the RFP's requirements, even if application of those requirements meant Microsoft would be eliminated from the competition. *See Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367-68 (Fed. Cir. 1999).

a. DoD Ignored Microsoft's Clear Failures under Scenario 8.2.

To complete Scenario 8.2 successfully, the offerors had to scale servers in response to load changes; that is, as load increased, the system should create new servers to respond to the increased load, and as load decreased, the system should respond by shutting down no-longer-needed servers. *See* AR Tab 287 at 64186. This ability to scale servers automatically and elastically to respond to demand, especially under adverse conditions, is fundamental to the cloud and is emphasized by the RFP. *See, e.g.*, AR Tab 342 at 151488-90; AR Tab 27 at 608. The Government and Microsoft admit this was the purpose of Scenario 8.2. *See* Gov. Op. at 33; Int. Op. at 24.

Microsoft [REDACTED] Pl. Mot. at 24-25. In response, the Government and Microsoft argue that the end-of-phase data that AWS cited was "cherry picked," and that the overall data shows that Microsoft managed to scale its servers in response to increased load. *See* Int. Op. at 25-26; Gov. Op. at 34.

Microsoft's and the Government's representations, however, are demonstrably false. Although the TEB Report only notes Microsoft's scaling capability at specific snapshots in time (AR Tab 308 at 64414), [REDACTED]. The below image is an annotated screenshot of Microsoft's healthy server count

[REDACTED]

during the complete Scenario 8.2 demonstration, taken from the demonstration video at AR Tab 291 at 2:02:57:

[redacted]

As evident from the chart,[8] Microsoft's [redacted]. That is, [redacted]

Microsoft argues [redacted] Int. Op. at 25. This too is false. The video portion that Microsoft cites shows Microsoft was [redacted]. As shown above, it was only after [redacted] Thus, the problem is not just that Microsoft [redacted]

---

[redacted]

[redacted]

[redacted] but rather that Microsoft [redacted]. AR Tab 287 at 64173-74.

This failure had a tangible consequence: [redacted]. Specifically, [redacted]. *See* Tab 291 at 01:50:21. [redacted] *See id.* at 01:51:56; *see also* App. Exh. 2 [redacted]). The DoD evaluators clearly were aware of this issue in real time—[redacted] (AR Tab 291 at 01:54:09)—yet DoD inexplicably determined Microsoft was [redacted] *See* AR Tab 308 at 64415.

The Government and Microsoft seek to explain away the test by arguing that it was "difficult," because DoD programmed the servers to self-destruct at various times. Gov. Op. at 33-34; Int. Op. at 26. But DoD cannot walk back its decision to rigorously test the offerors before handing over control of DoD's entire cloud operation just because Microsoft could not meet DoD's requirements. The indisputable fact is that AWS passed this rigorous test, while Microsoft [redacted] demonstration.

b. DoD Ignored a Significant Risk Increase During [redacted] for Scenario 8.3.

Scenario 8.3 required the offerors to test features of the tactical edge devices, including by [redacted]. *See* AR Tab 287 at 64178. [redacted] "the warfighting environment will involve a lot of repeated stress and impact to TE devices, and [DoD] need[s] to have confidence in the ruggedness of the TE

[redacted]

design. . . . [This] is an important component to evaluate on." AR Tab 554 at 181202. The AR shows [redacted]. *See* AR Tab 291 at 03:33:30-52:36.

The Government and Microsoft admit there was a [redacted], but they argue DoD's evaluation was rational because the cause of the [redacted]. Gov. Op. at 38; Int. Op. at 27-28. [redacted]. [redacted].[9] *See* AR Tab 291 at 03:50:32-51:03 [redacted]); *id.* at 03:51:37-46 [redacted]).

Thus, the Government's and Microsoft's responses mischaracterize AWS's argument and the factual record. The point is not that Microsoft failed any particular step of the test, but rather, that Microsoft's [redacted]. This should have been a significant risk increase. Yet, DoD refused to acknowledge this issue, and arbitrarily assigned Microsoft's Factor 8 a Low risk rating, contrary to the RFP. *See 2M Research Servs., LLC, v. United States*, 139 Fed. Cl. 471, 479 (2018).

---

[9] The Government incorrectly states [redacted] Gov. Op. at 38. [redacted]. *See* AR Tab 291 at 03:50:32–52:26.

[redacted]

   c. Microsoft's Scenario 8.4 Was Not [redacted]

The Government and Microsoft similarly attempt to minimize DoD's evaluation errors for Scenario 8.4, ignoring the evaluation criteria and the evidence before DoD during the evaluation.

Step 2 of Scenario 8.4 required the offerors to grant and revoke user access to the cloud portal, attempt to log into the portal after access is revoked, and show that these subsequent attempts failed. AR Tab 287 at 64179-80. The Government and Microsoft discuss at length how Microsoft's solution was the [redacted] (*see* Gov. Op. at 35-36; Int. Op. at 29-30), but this misses the point.[10] [redacted]. *See* AR Tab 291 at 04:45:01-04:50:37. This is an important distinction because Microsoft did not [redacted] as required by the demonstration instructions. *Id.*

Additionally, Step 3 required the offerors to manage access controls by [redacted]. AR Tab 287 at 64180. The Government and Microsoft claim that Microsoft [redacted] (Gov. Op. at 36; Int. Op. at 31), but this is not the same thing. There is a difference in the level of granular [redacted]

---

10 [redacted] Int. Op. at 31-32. As the AR shows, AWS explained that, normally, [redacted]. *See* AR Tab 295 at 04:18:09-23:49. However, [redacted] *Id.* [redacted] (*id.* at 04:39:45), [redacted] (*id.* at 04:29:59), which DoD acknowledged. *See* AR Tab 307 at 64399. [redacted] *See* AR Tab 295 at 04:30:18, 04:39:45. In every respect, AWS successfully completed demonstration Scenario 8.4.

[redacted]

[redacted]. Moreover, during the demonstration, Microsoft admitted the [redacted], noting [redacted] AR Tab 291 at 04:59:01-04:59:28. Contrary to their assertions, the TEB Report never addressed Microsoft's supposed [redacted], or [redacted]. AR Tab 308 at 64419-23.

Finally, both the Government and Microsoft try to deflect from DoD's irrational explanation that Microsoft's [redacted] were not a cause for concern because the TEB stated it had confidence in Microsoft's ultimate ability to [redacted].[11] Gov. Op. at 36-37; Int. Op at 32-33. Their justifications are flatly inconsistent with the entire purpose of the demonstration: to evaluate the offeror's ability to *demonstrate* what its proposal claimed it could do and not merely accept those claims at face value. AR Tab 342 at 151507. DoD was not authorized to re-write the requirements after seeing Microsoft's performance. *See Alfa Laval Separation, Inc.*, 175 F.3d at 1367-68. For the foregoing reasons, Microsoft was not entitled to a [redacted] rating for Scenario 8.4.

d. AWS Was Prejudiced by DoD's Factor 8 Evaluation.

The prejudice to AWS arising from DoD's misevaluation is clear. Had DoD properly evaluated the demonstrations, Microsoft would have been disqualified,[12] and AWS would have

---

[11] Microsoft also argues that [redacted]. Int. Op. at 32. This is not true. The test required Microsoft to [redacted] AR Tab 287 at 64191.

[12] Given that DoD found [redacted], had DoD properly evaluated Microsoft's second, more heavily weighted [redacted] demonstration, it would have come to the same conclusion.

[redacted]

received the Contract. *See id.* Even if the Court concludes Microsoft was eligible for award, Microsoft's failures in Scenarios 8.2 and 8.4, and the significant risk increase in Scenario 8.3, do not support its Good and Low risk ratings. Thus, at minimum, AWS should have received higher ratings than Microsoft for Factor 8, which would have offset Microsoft's erroneous higher rating under the less-important Factor 6, and forced a tradeoff based on AWS's technical superiority.

3. <u>The Government and Microsoft Fail to Offer a Plausible Explanation for DoD's Disparate Tactical Edge Evaluation.</u>

DoD's disparate treatment of the offerors' tactical edge solutions is yet another example of how DoD unfairly tilted the evaluation in Microsoft's favor. DoD's disparate treatment spanned from its evaluation of portability and dismounted operations, to the offerors' [REDACTED], to the offerors' battery power capabilities. In each instance, DoD arrived at an evaluation conclusion that defied reason and unfairly masked AWS's technical superiority.

a. DoD Misevaluated Portability and Dismounted Operations.

The Government concedes that DoD [REDACTED] Gov. Op. at 40.[13] A starker example of disparate treatment is hard to imagine.

The Government, however, claims this disparate treatment was warranted because AWS [REDACTED]. Gov. Op. at 40. But Microsoft's proposal plainly states its [REDACTED]

[13] The TEB also assigned [REDACTED] AR Tab 324 at 151175-76.

[REDACTED]



[redacted] AR Tab 410 at 173639 (emphasis added). Microsoft's proposal thus directly contradicts the Government's explanation.

The Government next claims that, although only [redacted], this disparate treatment does not matter because the SSAC observed that, [redacted] Gov. Op. at 40 (citing AR Tab 457 at 176401-02).[14] This also is false. As the TEB recognized but the SSAC ignored, [redacted] AR Tab 369 at 152808; AR Tab 324 at 151167, 151176. Thus, [redacted][15]

The Government's final defense of this disparate treatment is that both offerors provided strengths in certain areas, with AWS [redacted] and Microsoft [redacted]. Gov. Op. at 41. The Government attributes this assertion to the SSEB, but the SSEB made no such finding. *See* AR Tab 456 at 176375. This defense therefore is no more than another *post hoc* invention for this litigation.[16] In any event, the possibility that each offeror had particular strengths does not excuse [redacted]

---

[14] Microsoft raised a similar argument, which suffers from the same defects. Int. Op. at 35-36.

[15] The Government does not explain why the SSAC thought [redacted] (AR Tab 369 at 152805) [redacted] (AR Tab 410 at 173643)— [redacted] AR Tab 330 at 151279-80.

[16] It also is incorrect. [redacted] (AR 369 at 152805),

[redacted]

        b. DoD Penalized Only AWS for [redacted].

The TEB assigned [redacted] AR Tab 324 at 151169, 151171; AR Tab 456 at 176376-77. The Government, however, concedes that the RFP did not require offerors to [redacted] Gov. Op. at 42; AR Tab 342 at 151494; AR Tab 410 at 173642-43. The [redacted] thus are indisputably contrary to the RFP and improper. *See* Gov. Op. at 42.

To distract from this error, the Government argues that [redacted] were justified because [redacted]. Gov. Op. at 42. There are two problems with this contention. First, it is yet another *post hoc* invention: [redacted]. AR Tab 456 at 176376-77.[17] Second, [redacted] *Compare* AR Tab 369 at 152805, 152809 *with* AR Tab 410 at 173643.

Microsoft's attempt to rebut AWS's allegation fares no better. Microsoft provides a different *post hoc* explanation for DoD's disparate evaluation, asserting its devices [redacted]

---

[redacted] AR 410 at 173642).

[17] Although the TEB mentioned [redacted]. *See* AR Tab 459 at 176409 ([redacted]).

[redacted]

[redacted] Int. Op. at 37. But, as Microsoft's lack of citation reveals, this is pure fiction. The AR makes clear that [redacted]. *Compare* AR Tab 369 at 152805 [redacted]) *with* AR Tab 410 at 173645 ([redacted] And, in any event, there is nothing to prevent [redacted].

c. <u>DoD Wrongly Concluded AWS Did Not Propose a [redacted]</u>.

As noted above, the SSAC erroneously concluded that AWS did not propose a [redacted]. The Government and Microsoft struggle mightily to explain this error, but they do not succeed.

The Government begins by claiming "DoD did not find that AWS failed to propose a [redacted] Gov. Op. at 43. But that is *exactly* what the SSAC stated. AR Tab 457 at 176401 (noting [redacted]"). Although the TEB acknowledged [redacted] (AR Tab 324 at 151167, 151176), the SSAC erased this capability from the record, denying the SSA—[redacted]—this information when making the source selection decision. AR Tab 459 at 176409.

The Government next argues that, when [redacted]. Gov. Op. at 43. But

[redacted]

it is incorrect that a [redacted].[18] *See id.*; Pl. Mot. at 36; AR Tab 369 at 152805-06. Furthermore, the SSAC's statement that [redacted] ignores the fact that [redacted]. AR Tab 324 at 151171; AR Tab 369 at 152809; AR Tab 457 at 176401 ([redacted]).

Finally, the Government attempts to rationalize DoD's evaluation by noting that [redacted]. Gov. Op. at 44.[19] But while those [redacted] might be reasons to give it less weight in the evaluation, they were not valid excuses for the SSAC to tell the SSA that [redacted], which misrepresented what AWS actually proposed and created a false equivalency between the offerors.

d. DoD Irrationally and Disparately Penalized AWS for Proposing an [redacted].

DoD also irrationally and disparately penalized AWS for proposing [redacted]—[redacted]—and for proposing a [redacted] AR Tab 324 at 151170-71, 151174-75 ([redacted]); AR Tab 456 at 176376.

[18] Microsoft's assertion that [redacted] Int. Op. at 38 n.15. *See* AR Tab 369 at 152804, 152809.

[19] Microsoft similarly argues that the SSAC's statement "plainly" refers [redacted]. Int. Op. at 37. But the SSAC's blanket statement contained no such caveat, leaving the SSA with the misimpression that AWS [redacted].

[redacted]

Regarding [redacted], the Government suggests DoD's evaluation was reasonable because [redacted] Gov. Op. at 44. Referring to [redacted] is questionable. In any event, this argument ignores that the RFP required offerors to address "the full range of military operations," AR Tab 342 at 151505, and that the TEB described "the full range of military operations" as including [redacted] AR 324 at 151166. Thus, however [redacted] was, [redacted]—a fact disputed by neither the Government nor Microsoft. Moreover, although it is true [redacted]. Yet, [redacted] (AR Tab 456 at 176377), while Microsoft received a free pass.

The Government's defense of DoD's conclusion that [redacted] also does not hold water. [redacted]. AR Tab 410 at 173639-40. Thus, to the extent it made sense [redacted], Microsoft and AWS should have been similarly penalized.

e. DoD Minimized the Importance of Battery Power and Wrongly Concluded [redacted].

DoD disparately evaluated the offerors with respect to battery power as well. The RFP required offerors to demonstrate that their tactical edge devices have "[t]he ability to be powered by battery." AR Tab 342 at 151494. The Government does not dispute that AWS has [redacted]. *See* Gov. Op. at 46. Instead, it suggests that battery power was unimportant, and that DoD rationally placed greater emphasis on [redacted]. Gov. Op. at 46.

Agencies, however, do not have the discretion to deviate from RFP requirements, especially where the justification for the deviation is to tailor the evaluation to one offeror's solution. *See Info. Scis. Corp. v. United States*, 73 Fed. Cl. 70, 115-16 (2006). By trivializing battery power, the evaluation deviated from the RFP, minimized the importance of AWS's [redacted], and hid Microsoft's [redacted]

The Government's argument, like DoD's evaluation, only confirms that Microsoft's [redacted] for the tactical edge environment. The fact that Microsoft's devices are [redacted] is hardly an advantage. To the contrary, the ability [redacted] is important because, as the TEB recognized, [redacted] AR Tab 208 at 57972. By minimizing the importance of battery power in the final evaluation, DoD violated both the letter and the spirit of the RFP's tactical edge requirements.

f. DoD's Evaluation Materially Prejudiced AWS.

DoD's errors materially prejudiced AWS. Factor 3 was the second most important factor in DoD's evaluation. AR Tab 342 at 151502. The AR, however, shows that DoD's evaluation was disparate and unreasonable. Under a rational evaluation, DoD would have concluded AWS deserved higher ratings under Factor 3, which, given the relative weighting of the factors, would have resulted in AWS being found technically superior and forced a best value tradeoff.

**B. DoD's Unreasonably Evaluated the Offerors' Logical Isolation, Information Security, and Marketplace Capabilities.**

The Government and Microsoft have similarly failed to rebut AWS's challenges to DoD's evaluation with respect to logical isolation, information security, and marketplace offerings.

[redacted]

1. DoD Improperly Minimized the Cloud Security Benefits of AWS's Nitro Hypervisor under Factors 2 and 4.

AWS demonstrated in its Motion that its hardware-backed Nitro hypervisor, which the SSAC concluded was [REDACTED] to Microsoft's [REDACTED], warranted a superior evaluation under Factors 2 and 4.[20] AR Tab 467 at 175400. The Government and Microsoft respond that AWS's assertions reflect mere disagreement with DoD's judgments. Gov. Op. at 47; Int. Op. at 42. The AR, however, shows Nitro' superiority was an objective truth.

The Government and Microsoft contend that the offerors' proposed hypervisor solutions were only a part of the logical isolation and information security evaluations and that the remainder of the evaluation justified the ratings assigned. Gov. Op. at 47; Int. Op. at 42-43. But as the TEB expressly found, the hypervisor is central to logical isolation and security in the cloud. AR Tab 323 at 151129. Moreover, the SSEB explicitly stated [REDACTED] AR Tab 456 at 176369-70. Thus, DoD itself emphasized the importance of the hypervisor.

Moreover, the SSAC based its conclusion that AWS and Microsoft were equal under Factor 2 on Microsoft's [REDACTED]. AR Tab 457 at 176401. The AR, however, shows that AWS has this capability too. AR Tab 368 at 152797. The SSAC therefore had no basis to claim that AWS [REDACTED]

[20] Microsoft claims Factor 4 did not evaluate hypervisors (Int. Op. at 46), but Factor 4 required DoD to evaluate physical and logical isolation capability, which is the hypervisor's responsibility (AR Tab 342 at 151505). Microsoft also argues that [REDACTED] (AR Tab 323 at 151129-30).

[redacted][21] AR Tab 467 at 175401 (emphasis added). Had the SSAC not manufactured a "discriminator" to offset AWS's [redacted], DoD would have concluded AWS was superior under Factor 2, and technically superior overall.

2. DoD Misevaluated AWS's Third-Party Offerings under Factor 5.

The Government and Microsoft similarly fail to demonstrate that DoD's evaluation of the offerors' third-party marketplace offerings was fair and reasonable.

First, the Government and Microsoft contend that not all of AWS's third-party marketplace offerings are available at award because [redacted]. Gov. Op. at 51; Int. Op. at 47. However, neither acknowledges the [redacted] AR Tab 375 at 154075. Nor do they acknowledge that the PEB recognized that [redacted] AR Tab 455 at 176356.

Second, Microsoft contends there is [redacted] Int. Op. at 47. The RFP, however, included a specific process for adding new services that "are not already listed in the JEDI Cloud catalogs" during contract performance. AR Tab 342 at 151435. Given this process for adding new services not listed in the JEDI Cloud catalogs, AWS's inclusion of the third-party marketplace offerings in its price catalogs was proof that they were, in fact, available at award.

[21] The Government and Microsoft note that AWS [redacted]. Gov. Op. at 49-50; Int. Op. at 44-45.

[redacted]

*See* AR Tabs 380-385. And, again, the PEB understood that [redacted] AR Tab 455 at 176356 (emphasis added).

Finally, the Government and Microsoft claim AWS has failed to cite the AR for its discussions allegation. *See* Gov. Op. at 52; Int. Op. at 47-48. But the Government only produced evaluation notices on February 3, 2020. Nevertheless, it is clear DoD advised at least AWS that [redacted]. *See* AR Tab 455 at 176356.

But for DoD's unreasonable evaluation, DoD would have recognized AWS's superior third-party marketplace and, at minimum, determined the offerors were equal under Factor 5.[22]

## II. THE BALANCE OF HARMS AMONG THE PARTIES AND THE PUBLIC WEIGHS HEAVILY IN FAVOR OF INJUNCTIVE RELIEF.

AWS has shown the balance of harms among the parties and public weigh in favor of immediate injunctive relief. The Government's and Microsoft's attempts to suggest otherwise—including the claim that AWS's Motion is untimely—ignore reality and this Court's precedent.

### A. AWS's Motion Is Timely.

The Government's and Microsoft's attempts to portray AWS's Motion as untimely are undermined by the parties' prior representations. Gov. Op. at 58-59; Int. Op. at 56-57. In November 2019, the Government stated that its proposed briefing schedule "will permit the Court to resolve your client's protest prior to [Feb. 11, 2020], *without the need for preliminary injunctive relief.*" App. Exh. 3 (email attaching Pl. Mot. App. Exh. 1, ECF No. 130-2). The Government characterized the JEDI activities planned through February 11 as the "activities that DoD intends to engage in during the pendency of any protest to be filed by AWS at the U.S. Court of Federal

[22] The Government and Microsoft also have failed to rebut the numerous other errors identified in AWS's Motion. Pl. Mot. at 50-55. Due to page limits, AWS does not address those errors here.

Claims." *Id.* In reliance on the Government's representations about the nature of the activities and its intent to litigate expeditiously, AWS agreed to delay filing for injunctive relief, while expressly reserving its right to do so.[23] *See, e.g.*, Joint Mot. Am. Schedule, ECF No. 54; Joint Status Report, ECF No. 111. Rather than proceed on an expedited schedule, the Government delayed the case significantly by seeking an extension to file what remains an incomplete AR, and then waiting over two months to file a motion for partial dismissal. *See* Joint Mot. Am. Schedule; Def.'s Mot. Dismiss, ECF No. 132. AWS timely filed its Motion to prevent the irreparable harm that will occur if DoD proceeds with performance beyond the identified limited activities.

**B. AWS Will Suffer Irreparable Harm Absent Injunctive Relief.**

Neither the Government nor Microsoft has rebutted the irreparable harms to AWS that would result absent injunctive relief. In fact, by initially agreeing to limit performance during the protest to enumerated "preparatory activities" that "do[] not harm [AWS]," Pl. Mot. App. Exh. 1 at 3-4; *see also* Gov. Op. at 60 (citing Decl. of Sharon Woods ¶ 8, ECF No. 139-1), the Government conceded that "full performance" beyond those activities would harm AWS. Moreover, neither party disputes that Microsoft would glean non-public information through further performance. Gov. Op. at 61; Int. Op. at 59. And, despite claims that AWS's harms are "speculative" (Gov. Op. at 61, Int. Op. at 60), DoD confirmed that AWS is likely to lose work absent an injunction (Woods Decl. ¶ 6), which is precisely the type of irreparable harm this Court has determined can justify injunctive relief. *See Sheridan Corp. v. United States*, 94 Fed. Cl. 663, 669 (2010).

[23] For this reason, Microsoft's reliance upon *Facility Services Management v. United States*, 140 Fed. Cl. 323, 326 (2018) (Campbell-Smith, J.), is inapposite. Unlike the Plaintiff in *Facility Services Management*, AWS reserved its right to seek immediate injunctive relief from the outset, and informed the Government, Microsoft, and the Court of that fact.

### C. The Balance of Harms and the Public Interest Weigh in Favor of Granting Injunctive Relief.

There is no dispute that improvements to DoD's cyber capabilities are desirable, and that U.S. warfighters need and deserve the best. But DoD did not justify why the "critical needs for national security that are unmet by other available contracts" are so urgent as to foreclose injunctive relief, Woods Decl. ¶ 3, or explain why national security interests now require "urgent" performance while the JEDI Contract is under judicial review.[24] *See Peraton Inc. v. United States,* 144 Fed. Cl. 59, 70 (2019) (Campbell-Smith, J.) (enjoining satellite support services contract where "much of the urgency in this procurement appears to be of the [agency's] own making.").

Moreover, DoD's urgency is based on the expectation that full performance would deliver what future JEDI users were promised—a solution that would "accelerate our warfighting capabilities." *See* Decl. of David Spirk ¶ 4, ECF No. 139-2. But Microsoft's cloud offering is not that solution. Each of Microsoft's [REDACTED] translates to failures to meet the warfighter's needs. In contrast, AWS's solution offers superior logical isolation and security, tactical edge devices that support the full range of operations, and proven capability (as demonstrated under Factor 8). DoD should not press forward with a contract that jeopardizes, rather than advances, national security.[25]

---

[24] This is especially so given a delay of similar length did not counsel against Secretary Esper's review. In fact, had national security interests counseled immediate performance, DoD could have simply issued a waiver of any potential or actual conflicts of interest. *See* 48 C.F.R. § 9.503.

[25] In an analogous context, this Court has found that bald national security justifications do not support overriding a stay of performance. *See e.g., Nortel Gov't Sols., Inc. v. United States*, 84 Fed. Cl. 243, 245 (2008) (reinstating stay where agency "fails to demonstrate that abiding by the [] stay will compromise the safety and welfare of agency personnel" and did not "consider the impact . . . on competition at all").

DoD's claims of financial harm are similarly unsupported. Gov. Op. at 69. To prepare its "escalation factor," DoD compared AWS's and Microsoft's proposed JEDI pricing to their pricing on existing contract vehicles. [REDACTED] Decl. ¶ 7. DoD then applied those "factors" to the "estimated spend under the JEDI Cloud contract during FY20 and FY21." *Id.* ¶ 6. In other words, DoD calculated a price premium based on the assumption that it would have to procure cloud services at higher prices from *other* existing cloud contracts, and then applied that price premium *to its expected spend on the unavailable JEDI contract.* It is illogical, however, to measure harm based on planned orders on an enjoined JEDI Contract, rather than the cost to order from the alternative vehicles DoD components would use if the JEDI Contract were unavailable. It also is unclear how DoD calculated its estimated annual spend to determine whether the "escalation factors" were developed using the same assumptions.[26]

Microsoft's alleged harms are similarly unavailing. Although Microsoft complains about the costs it has incurred to date (Int. Op. at 61), Microsoft was obligated to "take all reasonable steps to minimize the incurrence of costs upon a post-award bid protest." 48 C.F.R. § 52.233-3; *BCPeabody Constr. Servs., Inc. v. United States*, 2013 WL 3225844, at *2 (Fed. Cl. June 21, 2013) (rejecting security bond estimate where defendant ignored FAR 52.233-3). Moreover, Microsoft's claim that it will be harmed because its [REDACTED] is a problem of its own creation. Microsoft should have anticipated the potential for a protest. *See ANHAM FZCO v. United States*, 144 Fed. Cl. 697, 724 (2019).

In any event, injunctive relief tailored to the circumstances will mitigate any potential harm to DoD or Microsoft. *See Peraton Inc.*, 144 Fed. Cl. at 70. The Court could limit JEDI

[26] The Government ignores that DoD may not incur *any* increased costs during any injunction because it could meet its needs through existing orders.

performance during this protest to only those activities to which DoD already proposed to limit itself through February 28 (Gov. Op. at 59), which would ensure that AWS will not be further harmed. And if AWS is not successful on the merits, DoD and Microsoft will be positioned to continue performance with minimal disruption to DoD's mission.[27] DoD's claims fail to tilt the injunctive relief analysis in its favor.

**D. The Government Has Failed to Propose a Reasonable Cost Estimate.**

Because AWS is entitled to injunctive relief, the Court must consider whether AWS should be required to post a security bond. RCFC 65(c). The Government proposed a grossly overstated security bond based upon its flawed assessment that delayed performance "will lead to an unrecoverable financial harm . . . totaling between $5 million and $7 million per month of delay," and its assumption that "any [PI] issued . . . could last for six months or more." Gov. Op. at 69. As detailed above, this estimated financial harm is speculative and its methodology unsound. *See Gen. Dynamics Mission Sys., Inc. v. United States*, 136 Fed. Cl. 355, 360 (2018) (declining to require security where no costs would result). Because DoD's security estimate lacks a reasonable basis, the Court should waive the requirement. *See, e.g., CDW LLC v. NETech Corp.*, 722 F. Supp. 2d 1052 (S.D. Ind. 2010) (court may waive security requirement at its discretion).

To the extent the Court is inclined to require AWS to post a security bond, it should tailor the amount to cover only the costs that DoD might actually incur during an injunction based on a realistic time estimate. *See Serco, Inc. v. United States*, 101 Fed. Cl. 717, 722 (2011). Even

[27] Indeed, the Government's willingness to stay all other activities for an additional two weeks beyond February 13 indicates that any national security concerns are not so urgent that a stay incident to an injunction would harm the warfighter.

considering the Government's pattern of delay, an additional three months is a realistic estimate to complete this litigation.

**CONCLUSION AND PRAYER FOR RELIEF**

For the foregoing reasons, AWS respectfully requests that the Court GRANT its Motion.

Dated: February 5, 2020

Respectfully submitted,

By: [signature]

Kevin P. Mullen
Morrison & Foerster LLP
2000 Pennsylvania Ave., NW
Washington, DC 20006-1888
Telephone: 202.887.1500
Facsimile: 202.887.0763

*Attorney of Record for Plaintiff Amazon Web Services, Inc.*

*Of Counsel:*

J. Alex Ward
Daniel E. Chudd
Sandeep N. Nandivada
Caitlin A. Crujido
Alissandra D. Young
Morrison & Foerster LLP
2000 Pennsylvania Ave., NW
Washington, DC 20006-1888

Andrew S. Tulumello
Daniel P. Chung
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

Theodore J. Boutrous, Jr.
Richard J. Doren
Eric D. Vandevelde
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000