## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

AMAZON WEB SERVICES, INC.,

    Plaintiff,

v.

UNITED STATES OF AMERICA,
by and through the U.S. Department of Defense,

    Defendant,

and

MICROSOFT CORPORATION,

    Defendant-Intervenor.

Case No. 19-1796

Judge Campbell-Smith

▮▮▮▮▮▮▮▮▮

**FINAL REDACTED
VERSION**

## SEALED AMENDED COMPLAINT

Kevin P. Mullen
MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., NW
Washington, DC 20006-1888
Telephone: 202.887.1500
Facsimile: 202.887.0763
*Attorney of Record for Plaintiff
Amazon Web Services, Inc.*

*Of Counsel:*

J. Alex Ward
Sandeep N. Nandivada
Caitlin A. Crujido
Alissandra D. Young
MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., NW
Washington, DC 20006-1888

Andrew S. Tulumello
Daniel P. Chung
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., NW
Washington, DC 20036-5306

Theodore J. Boutrous, Jr.
Richard J. Doren
Eric D. Vandevelde
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071-3197

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................... 1

II. JURISDICTION ................................................................................................... 9

III. PARTIES ......................................................................................................... 10

IV. FACTUAL ALLEGATIONS ............................................................................ 10

A.  DOD'S CLOUD MODERNIZATION INITIATIVE ..................................................... 10

B.  THE EVALUATION CRITERIA ............................................................................ 11

C.  INITIAL PROPOSAL EVALUATIONS, COMPETITIVE RANGE DETERMINATION, AND
    DISCUSSIONS ................................................................................................. 26

D.  ORIGINAL FINAL PROPOSAL EVALUATIONS ..................................................... 28

E.  PRESIDENT TRUMP'S INTERFERENCE WITH THE JEDI PROCUREMENT PROCESS ............... 31

F.  DOD'S ORIGINAL CONTRACT AWARD AND ANEMIC DEBRIEFING ...................................... 37

G.  AWS FILES POST-AWARD BID PROTEST TO CHALLENGE DOD'S FLAWED AND BIASED
    AWARD DECISION, AND THE COURT PRELIMINARILY ENJOINS PERFORMANCE ................. 39

H.  THE GOVERNMENT'S CORRECTIVE ACTION ..................................................... 40

I.  DOD'S RE-AWARD SOURCE SELECTION DECISION AND DEBRIEFING ................................ 43

J.  DOD'S POST-REMAND REEVALUATION IS UNREASONABLE AND PLAGUED BY DISPARATE
    TREATMENT ................................................................................................... 44

K.  DOD'S PROPOSAL REEVALUATIONS AND SOURCE SELECTION DECISION DEMONSTRATE
    THAT THE RE-AWARD WAS THE PRODUCT OF BIAS, BAD FAITH, AND UNDUE INFLUENCE
    ..................................................................................................................... 137

L.  THE WHITE HOUSE'S OBSTRUCTION OF THE DODIG INVESTIGATION INTO THE JEDI
    SOURCE SELECTION ..................................................................................... 143

M.  DOD'S RE-AWARD TO MICROSOFT IS THE PRODUCT OF AN INCREASINGLY CORRUPT
    ENVIRONMENT UNDER THE TRUMP ADMINISTRATION ...................................... 147

CLAIMS FOR RELIEF ......................................................................................... 160

PRAYER FOR RELIEF ......................................................................................... 171

Amazon Web Services, Inc. protests the decision of the U.S. Department of Defense to re-award the Joint Enterprise Defense Infrastructure Contract, Solicitation No. HQ0034-18-R-0077 ("RFP"), to Microsoft Corporation following DoD's issuance of Amendments 0007 through 0011 and reevaluation of proposals in connection with DoD's purported corrective action in response to AWS's initial protest.

In granting DoD's request for a remand, this Court gave DoD the opportunity to address the myriad prejudicial evaluation errors AWS identified in its initial protest, ensure a fair and level playing field, and ultimately expedite the conclusion of litigation. DoD rejected that opportunity. Instead, DoD's re-award to Microsoft compounds its prior errors to validate a flawed and politically corrupted decision.

## I.   INTRODUCTION

1.   In its initial protest, AWS identified flaws in nearly every aspect of DoD's evaluation and source selection decision. Based on just the *first* of those challenges—that DoD had improperly accepted Microsoft's noncompliant proposal under the RFP's Price Scenario 6—the Court halted further performance of the JEDI Contract without ruling on the numerous other fatal flaws in DoD's award decision.

2.   On remand, DoD relaxed the RFP's requirements to accommodate Microsoft's previously noncompliant technical approach to Price Scenario 6. But with the playing field now leveled on that Scenario, AWS adjusted its own proposal in response to DoD's relaxed technical requirements. As a result, the correction of the single error on which the Court enjoined the prior award had a significant impact: whereas Microsoft previously had a ████ price advantage based on its noncompliant technical approach, AWS's proposal is now ████ less expensive than Microsoft's.

3. AWS's emergence as the lowest priced offeror complicated DoD's efforts to steer the contract to Microsoft. Unable to rely on Microsoft's purported price advantage, the *only* way DoD could direct the re-award to Microsoft was to further distort the evaluation record because, aside from the offerors' technical approaches to Price Scenario 6 and the resulting total evaluated prices, *nothing else changed* in the underlying proposals. Faced with the untenable combination of Microsoft's technical inferiority and now-higher price, DoD manipulated its evaluations to a degree that belies any façade of rationality.

4. To give the appearance of a fair and considered reevaluation, DoD corrected some of the initial errors AWS identified by revising the evaluations either to acknowledge an overlooked AWS strength or to revise an improperly assessed weakness. But DoD simultaneously undertook to negate many of the advantages assessed to AWS by finding some "new" purported weakness in AWS's proposal, by identifying "new" supposed technical advantages in Microsoft's proposal, or by ignoring the RFP's evaluation criteria entirely. The net result—a technical reevaluation in which Microsoft marginally came out on top—is riddled with errors even more egregious than those that plagued the initial award. These errors require even closer scrutiny from this Court.

5. For example, under Factor 2 (Logical Isolation and Secure Data Transfer), DoD arbitrarily minimized the advantages of AWS's revolutionary Nitro hypervisor. Even though the Technical Evaluation Board ("TEB") assigned Nitro multiple strengths and the Source Selection Evaluation Board ("SSEB") recognized that Nitro gives AWS an overall ████████████

████████████ the Source Selection Advisory Council ("SSAC") inexplicably downplayed the significance of Nitro based on alleged ████████ that have no basis in reality. The SSAC then doubled down on its attempt to eliminate AWS's comparative advantage by claiming the

███████████████████████████████████

████████████████████████████████████████

████████████████████. DoD then compounded these errors by assessing AWS unreasonable weaknesses and disparately failing to recognize strengths in AWS's proposal.

6.     DoD again sought to manufacture parity under Factor 3 (Tactical Edge). DoD concluded the offerors' approaches to the tactical edge requirements were relatively equal, but it reached that decision only by ignoring the blatant deficiencies in Microsoft's approach and the clear advantages in AWS's. In particular, DoD ignored Microsoft's ████████████████

███████████████████████████████████

███████████████████. This failure should have earned Microsoft a deficiency that rendered Microsoft ineligible for award. Instead, DoD ignored it and focused on further minimizing AWS's comparative advantage. DoD assigned AWS unwarranted weaknesses and risks, while assigning strengths to Microsoft that defy logic and common sense—all the while ignoring the fundamental fact that AWS proposed tactical edge devices that are ██████████

███████████████████████████████████

7.     DoD's confounding evaluations continued under Factor 4 (Information Security and Access Controls). In the pre-remand final evaluation, the TEB, the SSEB, the SSAC, and the Source Selection Authority ("SSA") agreed that neither offeror possessed any advantage under Factor 4. ██████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████   ███████████████████

███████████████████████████████████

███████████████████████████   ████

3

███████████████████████████████████

█████████████████████████

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. DoD then went a step further by assigning AWS an unrelated risk that was not identified in the pre-remand evaluations, while continuing to overlook Microsoft's inability to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. But, even putting aside these transparent attempts to manufacture advantages for Microsoft, DoD's conclusions are simply incorrect. AWS deserved the exact same strengths that Microsoft received for its ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. AWS's proposal also patently contradicts the risk assessed by DoD at the eleventh hour. And, Microsoft itself admits ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

8.      Gross errors also compromised DoD's evaluation under Factor 5 (Application and Data Hosting and Portability), where DoD repeatedly discounted AWS's comparative advantages to conclude that AWS and Microsoft were relatively equal. In particular, the SSAC downplayed the significance of AWS's data export capability, which the SSEB concluded was ▮▮▮▮▮▮, because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The SSAC then compounded this unreasonable assessment by concluding that AWS's failover support across geographically redundant resources, which the TEB and the SSEB recognized as a strength, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Finally, the TEB, the SSEB, the SSAC, and the SSA all failed to recognize that AWS's marketplace offerings are qualitatively ▮▮▮▮▮▮ superior to Microsoft's offerings, and therefore represented yet another differentiating strength.

9.      DoD's evaluation under Factor 6 (Management and Task Order ("TO") 001) suffers from similar infirmities. Even though the RFP clearly differentiated the technical and price factors—including expressly prohibiting offerors from including pricing information in any non-price volume—the SSAC unreasonably considered the purported *pricing* benefits of Microsoft's program management support to suggest that Microsoft has a *technical* advantage under Factor 6.

All the while, the SSAC ignored the even greater pricing benefits inherent in AWS's program management support, ████████████████████████████████████████████████████████.

In addition, the SSEB, the SSAC, and the SSA ignored the significant advantages of AWS's proven and tested program management approach, especially as compared to Microsoft's theoretical and untested alternative.

10. Finally, under Factor 8 (Demonstration), DoD required the offerors to demonstrate that their proposed solutions *actually work* by satisfying four core tests designed to reflect the practical demands that would be placed on DoD's cloud systems. Microsoft ████████████

████████████████████████████████████████████████ First, Microsoft ████

████████████████████████████████████████████████████████

████████████████████████ This test implicates any number of real-world scenarios. For example, if the United States were to come under attack, it is foreseeable that the number of military personnel trying to access cloud services would spike under adverse network conditions. To handle that increased load, the awardee's solution would need to increase the number of virtual servers rapidly. Second, Microsoft ████████████████████████████

████████████████████████████████████████████████████████

████████████████████ In the post-Snowden world, this failure represents a significant risk to national security.

11. Microsoft also failed to show that its tactical edge devices are ████████

████████████████████████████████████████ ████████████

████████████████████████████████████████████████████████

████ Given the warfighter is likely to encounter far more serious threats than ████████

████████████████████████ poses yet another significant risk to national security. Rather than

5

████████████████████████████████████████████████████████

acknowledge these glaring inadequacies for the failures that they are, DoD inexplicably found Microsoft was "Completely Successful" with no risk increases across all second demonstration scenarios. The Agency's reevaluation of the Factor 8 Demonstration shows the lengths to which DoD has gone to steer the re-award of the JEDI Contract to Microsoft, irrespective of technical merit, the solicitation criteria, or the needs of the warfighter.

12.     These patent errors alone warrant invalidating the re-award. But these errors did not occur in a vacuum. Instead, they can best be explained as the latest manifestation of President Trump's determination to steer the JEDI Contract away from AWS.

13.     The President's interference in DoD's procurement decisions has been pervasive. It has destroyed the requisite impartial discharge of the procurement process by causing DoD procurement personnel to abandon their responsibility to apply the RFP's stated evaluation criteria reasonably, consistently, and fairly.

14.     President Trump has made no secret of his deep personal dislike for Mr. Bezos, Amazon, and the *Washington Post*, or of his express desire to harm them. As detailed in the original Complaint, President Trump made his feelings clear even before he entered office, when he promised voters that if he became the President, Amazon would have "such problems." Once in office, he took concrete actions to make good on his rhetoric, including with respect to AWS's participation in the JEDI procurement:

- In the summer of 2018 (a time when industry analysts widely reported that AWS was best qualified to win the JEDI Contract), President Trump reportedly directed his then-Secretary of Defense James Mattis to "screw Amazon" out of the contract.

- During a press conference held on July 18, 2019, President Trump claimed that he had been getting "tremendous complaints about the contract with the Pentagon and with Amazon," and that he would personally "ask[] [DoD] to look at it very closely to see what's going on." That same day, President Trump's eldest son, Donald Trump, Jr., alleged in a tweet that Mr. Bezos and Amazon had engaged in "shady and potentially corrupt practices," and

ominously predicted that it "may come back to bite them" with respect to JEDI. President Trump endorsed these statements a few days later, when he tweeted television coverage decrying the JEDI Contract as the "Bezos bailout."

- In early August 2019, President Trump's newly appointed Secretary of Defense Mark Esper confirmed that the Trump Administration had directed him to "take a hard look" into the JEDI Contract based on complaints the President purportedly received regarding AWS. As was widely reported at the time: "The White House reportedly directed the Department of Defense to review a \$10 billion cloud contract because it would probably go to Amazon."

15.     President Trump's campaign against an award of the JEDI Contract to AWS had its intended effect. Under overt and escalating pressure from President Trump, DoD departed from procurement rules to reject AWS's superior proposal. DoD's errors produced the flawed October 2019 award to Microsoft that was the subject of this Court's prior review.

16.     Faced with the Court's February 2020 ruling that AWS was likely to succeed on the merits, DoD undertook corrective action amidst an increasingly corrupt environment in which President Trump has made clear that anyone in the federal government who does not do his bidding will face the most severe career reprisals. From Department of Justice prosecutors, to inspectors general of numerous federal agencies, to public health officials during the COVID-19 pandemic, actions adverse or perceived to be adverse to President Trump have resulted in demotion or, more often, dismissal.

17.     DoD—inherently responsive both institutionally and Constitutionally to presidential commands—is a frequent target of President Trump's bully politics. Since DoD commenced its corrective action, President Trump and his Administration have intensified a campaign of interference and retribution against those in DoD perceived as disloyal to the President or capable of reaching conclusions at odds with his personal interests. Faced with President Trump's years-long campaign against awarding the JEDI Contract to AWS, the specter

of retribution has caused DoD procurement officials to reaffirm this fundamentally flawed award that was demonstrably crafted to reach a pre-determined and politically acceptable outcome.

18.     President Trump's grip on DoD has manifested itself throughout the JEDI procurement.   When the DoD Inspector General ("DoDIG") sought to investigate whether President Trump's bias against AWS influenced the original JEDI award, the President, the White House, and the DoD General Counsel categorically prohibited DoD officials from answering questions about communications between the White House and DoD regarding the JEDI Contract. Simply asking the questions proved career ending:  shortly before the release of the final DoDIG report, the President demoted the Acting DoDIG who oversaw the investigation.  In this instance, as in so many others, the President made clear that government employees who do not fall in line will be forced out.  Equally important, these actions by DoD and the President reveal a tacit admission that there is much to hide, and much yet to be discovered, regarding presidential interference in the JEDI procurement.

19.     It is only against this backdrop that DoD's selection of Microsoft—which has never performed a cloud computing contract of this scale or complexity, and whose proposal failed numerous critical evaluation criteria and would cost taxpayers significantly more than AWS's battle-tested solution—can be understood.   The reevaluations reveal that DoD's "corrective action" was focused on affirming its prior award to Microsoft, rather than identifying the offeror that presented the best value to the Government.

20.     DoD's errors underlying the re-award decision, individually and in the aggregate, mandate overturning the decision.  But the award must also be invalidated because it is the product of systematic bias, bad faith, and undue influence exerted by President Trump to steer the award away from AWS.  President Trump's extraordinary and unprecedented interference in the JEDI

procurement, demonstrated by the arbitrary and capricious reevaluations and award decision, provide a further and independent imperative to order DoD to terminate the award to Microsoft and reevaluate the proposals fairly and free of improper influence. AWS filed this bid protest to ensure that, consistent with the terms of the RFP, DoD awards the JEDI Contract to the offeror that presents the best value to the Government. Condoning any other outcome would create a dangerous precedent that threatens the integrity of the federal procurement system and impairs the ability of our nation's warfighters and civil servants to access the best possible products and services.

## II.   JURISDICTION

21.    This Court has jurisdiction over this post-award protest pursuant to 28 U.S.C. § 1491(b)(1), which provides that the Court of Federal Claims "shall have jurisdiction to render judgment on an action by an interested party objecting to . . . a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. [T]he United States Court of Federal Claims . . . shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded."

22.    AWS is an interested party to pursue this protest because it was an actual offeror for the JEDI Contract and, but for DoD's erroneous and flawed evaluation process, including improper influence by President Trump and DoD officials working at his direction, AWS would have received the contract award. *See* 28 U.S.C. § 1491(b)(1).

## III.   PARTIES

23.     Plaintiff is AWS, a subsidiary of Amazon. AWS is the leading provider of scalable cloud computing services to individuals, companies, and governments. AWS is located at 410 Terry Avenue North, Seattle, WA 98109.

24.     Defendant is the United States of America, acting by and through DoD.

25.     Defendant-Intervenor is Microsoft Corporation. Microsoft is located at One Microsoft Way, Redmond, WA 98052.

## IV.   FACTUAL ALLEGATIONS

### A.   DoD's Cloud Modernization Initiative

26.     Over the past several years, DoD has sought to modernize its information technology infrastructure to ensure it remains the most capable, nimble, and secure defense institution in the world. As part of this modernization initiative, in September 2017, DoD announced the JEDI program, DoD's plan to upgrade and consolidate its cloud computing infrastructure to enable "emerging technologies to meet warfighter needs" and maintain "our military's technological advantage."

27.     DoD launched its search for a cloud solution that could meet its stringent requirements, including handling complex management of unclassified, Secret, and Top Secret information, and supporting advanced data-analytic capabilities like machine learning and artificial intelligence. Over the next several months, DoD invited the public, including industry and technological leaders, to provide input on the JEDI RFP. After reviewing more than 1,500 questions and comments in response to multiple drafts of the RFP, DoD finalized the JEDI RFP on July 26, 2018. *See generally* AR Tab 1.

10

**B.    The Evaluation Criteria**

28.    The RFP, as conformed through Amendment 0011, dated August 11, 2020,

required DoD to award the JEDI Contract to the offeror whose proposal represents the best value

to the Government based on an evaluation of the following nine factors:

> Factor 1: Gate Evaluation Criteria
> Factor 2: Logical Isolation and Secure Data Transfer
> Factor 3: Tactical Edge
> Factor 4: Information Security and Access Controls
> Factor 5: Application and Data Hosting and Portability
> Factor 6: Management and Task Order ("TO") 001
> Factor 7: Small Business Participation Approach
> Factor 8: Demonstration
> Factor 9: Price

The RFP required offerors to submit a Performance Work Statement ("PWS") that would be

incorporated in the contract, along with additional Factor-specific proposal volumes addressing

the RFP's requirements. AR Tab 593 at 181396, 181458-60.

29.    The RFP specified that DoD's evaluation would proceed in phases. *Id.* at 181479.

In Phase One, DoD was to evaluate each offeror pursuant to Factor 1, Gate Evaluation Criteria.

*Id.* This Factor would determine, as an initial matter, whether an offeror was eligible for award.

*Id.* The RFP provided DoD would not evaluate further any offeror who received a rating of

"Unacceptable" under any of the Gate Evaluation Criteria subfactors. *Id.*

30.    For those offerors who cleared Phase One, DoD was to proceed with evaluating

proposals under Factors 2-6 and 9. *Id.* Based on this evaluation, and in connection with Phase

Two, DoD was to make a competitive range determination. *Id.* Offerors within the competitive

range were to submit for evaluation a Small Business Subcontracting Plan and a proposal volume

responsive to Factor 7, and to participate in a cloud solution demonstration under Factor 8. *Id.*

Offerors within the competitive range were also to be invited to engage in discussions with DoD. *Id.* The RFP stated DoD would eliminate from the competition any offeror who received a "Marginal" or "Unacceptable" rating for Technical Capability, or a Risk rating of "High," under Factor 8 (Demonstration). *Id.*

31. Upon the completion of discussions, DoD was to request a Final Proposal Revision ("FPR") from each offeror remaining in the competition, and then evaluate FPRs under Factors 2-7 and 9 of the RFP. *Id.*

a. When evaluating Factors 2-7, DoD was to consider, in addition to the RFP's specific evaluation criteria, the degree to which each offeror's proposed approach was consistent with the offeror's proposed PWS. *Id.* at 181480.

b. DoD was also to ensure that offerors' proposals reflected an understanding of DoD's requirements in Sections 3 and 5 of the Statement of Objectives ("SOO"), which was incorporated into the RFP. *Id.* In addition, the RFP stated DoD would "evaluate the degree to which any proposed desired capabilities from Section 4 of the JEDI Cloud SOO provide additional benefit to the Government as defined by the evaluation criteria under the respective Factor." *Id.* at 181480-81.

c. The RFP specified DoD would deem offerors' FPRs to include the already conducted Factor 8 demonstration. *Id.* at 181479.

d. Furthermore, Attachment L-2 to the RFP included six Price Scenarios that DoD was to use to evaluate both technical and price factors. *Id.* at 181484-85. When evaluating these Price Scenarios under the non-price factors, DoD was to focus on the degree to which the offeror's technical approach is feasible in light of JEDI requirements. *Id.* at 181481-85.

32.     DoD ranked the importance of Factors 2-8 as follows (from most to least important): Factor 2 (Logical Isolation and Secure Data Transfer), Factor 3 (Tactical Edge), Factor 4 (Information Security and Access Controls), Factor 5 (Application and Data Hosting and Portability), Factor 8 (Demonstration), Factor 6 (Management and TO 001), and Factor 7 (Small Business Participation Approach). *Id.* at 181479. Factors 2-8, when combined, were more important than Factor 9 (Price). *Id.* However, Factor 9 was to become increasingly important where offerors' proposals were essentially equal in terms of technical capability, or where an offeror's price was so significantly high as to diminish the value of the technical superiority to the Government. *Id.*

33.     For Factors 2-6 and 8, DoD was to assign technical and risk adjectival ratings in accordance with the following criteria:

| Technical Rating | Description |
|---|---|
| Outstanding | Proposal meets requirements and indicates an exceptional approach and understanding of the requirements.  The proposal contains multiple strengths and no deficiencies. |
| Good | Proposal meets requirements and indicates a thorough approach and understanding of the requirements.  Proposal contains at least one strength and no deficiencies. |
| Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements.  Proposal has no strengths or deficiencies. |
| Marginal | Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements. |
| Unacceptable | Proposal does not meet requirements and contains one or more deficiencies and is unawardable. |

| Risk Rating | Description |
|---|---|
| Low | Proposal may contain weakness(es) which have little potential to cause disruption of schedule, increased cost or degradation of performance.  Normal contractor effort and normal Government monitoring will likely be able to overcome any difficulties. |

| Moderate | Proposal contains a significant weakness or combination of weaknesses which may potentially cause disruption of schedule, increased cost or degradation of performance. Special contractor emphasis and close Government monitoring will likely be able to overcome difficulties. |
| High | Proposal contains a significant weakness or combination of weaknesses which is likely to cause significant disruption of schedule, increased cost or degradation of performance. Is unlikely to overcome the difficulties, even with special contractor emphasis and close Government monitoring. |
| Unacceptable | Proposal contains a material failure or a combination of significant weaknesses that increases the risk of unsuccessful performance to an unacceptable level. |

*Id.* at 181486-88.

34.    The RFP identified different criteria for adjectival ratings under Factor 7:

| **Adjectival Rating** | **Description** |
| --- | --- |
| Outstanding | Proposal indicates an exceptional approach and understanding of the small business objectives. |
| Good | Proposal indicates a thorough approach and understanding of the small business objectives. |
| Acceptable | Proposal indicates an adequate approach and understanding of small business objectives. |
| Marginal | Proposal has not demonstrated an adequate approach and understanding of the small business objectives. |
| Unacceptable | Proposal does not meet small business objectives. |

*Id.* at 181487.

### 1.    Factor 1: Gate Evaluation Criteria

35.    The RFP stated DoD would evaluate proposals to determine technical acceptability under each of seven Gate Evaluation Criteria subfactors: (1) Elastic Usage; (2) High Availability and Failover; (3) Commerciality; (4) Offering Independence; (5) Automation; (6) Commercial Cloud Offering Marketplace; and (7) Data. *Id.* at 181479-80.

36.    DoD determined that both AWS and Microsoft were technically acceptable under these subfactors and therefore included both offerors in its competitive range. AR Tab 219; AR Tab 227.

### 2.    Factor 2:  Logical Isolation and Secure Data Transfer

37.    Under Factor 2, the RFP required DoD to evaluate each offeror's approach to logical isolation and secure data transfer.  *Id.* at 181481.  "Logical isolation" refers to the mechanisms used to ensure that no cloud user can access the data of any other cloud user without permission.  This function is primarily controlled by a "hypervisor"—a system that controls and secures multiple, disparate cloud user environments running on the same physical machine.  In short, Factor 2 evaluates how well the offerors' respective hypervisors function.  *See id.* at 181468-69.  The Factor 2 evaluation had two main considerations:  (1) the offerors' ability to transfer information securely across classification levels (*i.e.*, CDSs); and (2) the offerors' logical isolation architecture and implementation (*i.e.*, hypervisors).  *Id.* at 181468-69, 181481.

38.    In conducting this evaluation, DoD was to assess:

a.    The "quality of the Offeror's proposed approach to achieving secure data transfer using a Transfer Cross Domain Solution that is consistent with the 2018 Raise the Bar Cross Domain Solution Design and Implementation Requirements," and "the degree to which the proposed Transfer Cross Domain Solution will address [the requirements] in Section L, Factor 2(1)(a-h)," *id.* at 181481;

b.    The "quality of the Offeror's proposed logical isolation architecture and implementation for the classified and unclassified offerings and the degree to which the proposed solution will meet the requirements in Section L, Factor 2(2)(a-h)," *id.*;

c.    The "quality of the Offeror's proposed approach to meeting the requirements for classified processing at different classification levels in accordance with section 1.3.2 in Attachment 2 [to the RFP]: Cyber Security Plan," *id.*; and

15

d.      For Price Scenario 3, "the degree to which the technical approach and Unpriced [Basis of Estimate ('BOE')] evidence a technically feasible approach when considering the secure data transfer requirements in Section L for this Factor and the specific scenario requirements in Attachment L-2," and "the degree to which the technical approach and Unpriced BOE for Price Scenario 3 and the Offeror's overall secure data transfer approach under this Factor are consistent across the documents," *id.* at 181481-82.

### 3.      Factor 3: Tactical Edge

39.      Under Factor 3, the RFP required DoD to evaluate each offeror's approach to DoD's tactical edge requirements to determine "how well the proposed approach balances portability against capability to enhance warfighting capacity across the range of military operations in support of national defense." *Id.* at 181481. The "tactical edge" refers to operational environments with limited communications connectivity and storage availability—*e.g.*, combat zones where military personnel have limited ability to connect to the cloud and must rely on portable devices for operations. In addition, DoD was to evaluate "the degree to which the proposed tactical edge devices address the requirements in Section L, Factor 3(1)(a-g) while also accounting for the practicalities of using the proposed offerings in the tactical edge environment." *Id.* The RFP explained that DoD prefers a solution that more broadly addresses the full range of military operations, rather than a solution that only addresses a subset of military operations. *Id.* It also stated DoD would place "far greater emphasis on existing solutions that meet all of the requirements in Attachment L-1, JEDI Cloud SOO." *Id.*

40.      The RFP contained further evaluation criteria depending on whether tactical edge devices fell within Category One (durable, ruggedized, and portable compute and storage) or Category Two (static, modular, rapidly deployable data centers). *Id.* at 181470-71. Offerors were

16

required to submit at least one tactical edge device in each category, and were encouraged to propose devices to satisfy the "full range of military operations." *Id.* at 181470-71, 181481.

a.      For Category One devices, DoD was to evaluate the degree to which each offeror's approach addresses the requirements in Section L, Factor 3(2)(a)(i-viii). *Id.* at 181481. In addition, for Factor 3(2)(ix), DoD was to evaluate how well the devices balance power requirements and physical dimensions in delivering capability within the range of military operations to forces deployed in support of a Geographic Combatant Commander or applicable training exercises. *Id.* Further, DoD was to evaluate how well devices balance portability with capability to enhance warfighting capacity across the range of military operations in support of the national defense. *Id.*

b.      For Category Two devices, DoD was to evaluate the degree to which each offeror's approach addresses the requirements in Section L, Factor 3(2)(b)(i). *Id.* In addition, for Factor 3(2)(b)(ii), DoD was to evaluate how well the approach for Category Two devices balances power requirements and physical dimensions in delivering capability across the range of military operations. *Id.*

c.      Unclassified tactical edge devices from Category One had to be in production by January 11, 2019, while unclassified modular data centers from Category Two had to be in production by the first day of the post-award kickoff event. *Id.* The RFP explained DoD would "consider additional tactical edge capabilities that will be in production by January 19, 2020, but with lesser weight than existing solutions that meet the requirements in Attachment L-1, JEDI Cloud SOO." *Id.*

41.     Finally, the RFP stated DoD would evaluate Price Scenarios 2, 3, and 5 under Factor 3 as follows:

17

> [T]he Government will evaluate the degree to which the technical approach and
> Unpriced BOEs evidence a technically feasible approach when considering the
> requirements for this Factor and the specific scenario requirements in Attachment
> L-2; the Government will also consider the degree to which the technical approach
> and Unpriced BOE for Price Scenarios 2, 3, and 5, respectively, and the Offeror's
> overall tactical edge approach are consistent across the documents.

*Id.* at 181481-82.

### 4.   Factor 4: Information Security and Access Controls

42.   Under Factor 4, DoD was to evaluate the quality of an offeror's approach to information security and access controls. *Id.* at 181482.

43.   With regard to information security, the RFP required DoD to evaluate the degree to which the solution met the requirements in Section L, Factor 4(1)(a-h), based on the following criteria:

a.   The frequency, accuracy, efficacy, and degree of automation of patching and vulnerability management of hardware, software, and other system components, and the degree to which patching enforcement can be controlled based on vulnerability criticality, *id.*;

b.   The quality of supply chain risk management for hardware, software, and other system components, *id.*;

c.   The degree to which the physical location and logical isolation of hosted services is discoverable and auditable, *id.*;

d.   The degree to which breach identification is automated, and the efficacy of processes for mitigation, isolation, and reporting, *id.*;

e.   The degree to which tools and automation can prevent and remediate data spills, including the efficacy of the process for locating and erasing all related data and purging all related media, *id.*;

f.     The degree to which the offeror is able to erase data in any environment, *id.*;

g.     The degree to which data generated by all intrusion detection technology, network traffic analysis tools, or any other threat detection performed is captured; the efficacy of analysis on the data generated; the degree to which users can control the manner in which notifications are communicated, and the breadth of configuration options for alerts generated by threat detection systems; and whether the offeror provides the ability to deliver raw logs to the Government for analysis, *id.*; and

h.     The efficacy and quality of the process for onboarding new services into the offeror's marketplace in a rapid and secure manner, and the degree to which the offeror is able to add offerings rapidly and securely to the marketplace in the examples provided, *id.*

44.     With regard to access controls, DoD was to evaluate the degree to which the solution met the requirements in Section L, Factor 4(2)(a-e), based on the following criteria:

a.     The range of functionality for creating, applying, and managing technical policies for one workspace and across all JEDI Cloud workspaces, *id.*;

b.     The degree of granularity of the permissions available, and the ease of discovery and assignment to roles, *id.*;

c.     The efficacy of the capability to tag data objects and resources for billing tracking, access control, and assignment of technical policy, *id.*;

d.     The range of capability, ease of implementation, and use of modern standards for federated, token-based, time-limited authentication and role assumptions, *id.*; and

e.     The degree to which the offeror has implemented modern standards for any Application Programming Interfaces ("API") and Command Line Interference ("CLI") access and

the degree to which these APIs or CLIs, if any, match or exceed the abilities of the offeror's web interfaces for user, account, workspace, identity, and access management, *id.*

### 5. Factor 5: Application and Data Hosting and Portability

45.     Under Factor 5, DoD was to evaluate each offeror's approach to application and data hosting, as well as its approach to application and data portability. *Id.*

46.     The application and data hosting assessment was to focus on "the quality of the Offeror's proposed solution and the degree to which it met the requirements in Section L, Factor 5(1)(a-e)." *Id.*

47.     The application and data portability evaluation was to focus on the requirements of Section L, Factor 5(2)(a-b) and the following criteria:

a.     Time to execute, time to extraction, ease of use, efficacy of the mechanisms, and format interoperability when exporting all data and object storage and associated schemas for each workspace scenario, *id.* at 181483; and

b.     Time to execute, time to extraction, ease of use, format interoperability of data when exporting system configurations, including, but not limited to, networking, routing, load balancing, and operating system configuration for each workspace scenario, *id.*

48.     The RFP also stated DoD would evaluate Price Scenarios 1, 4, and 6 under Factor 5.

a.     For Price Scenarios 1 and 6, DoD was to evaluate:

the degree to which the technical approach and Unpriced BOE evidence a technically feasible approach when considering the application and data hosting requirements in Section L for this Factor and the specific scenario requirements in Attachment L-2; the Government will also consider the degree to which the technical approach and Unpriced BOE for Price Scenario 1 and Price Scenario 6, respectively, and the Offeror's overall application and data hosting approach are consistent across the documents.

*Id.*

b.      For Price Scenario 4, DoD was to evaluate:

the degree to which the technical approach and Unpriced BOE evidence a technically feasible approach when considering the portability requirements in Section L for this Factor and the specific scenario requirements in Attachment L-2; the Government will also consider the degree to which the technical approach and Unpriced BOE for Price Scenario 4 and the Offeror's overall application and data portability approach under this Factor are consistent across the documents.

*Id.*

### 6.      Factor 6: Management and Task Order 001

49.     Under Factor 6, the RFP required DoD to evaluate the extent to which each offeror's proposal evidences an effective program management approach to accomplishing the requirements detailed in RFP Section C2 and the TO 001 PWS.  *Id.*

50.     This evaluation was to include an assessment of:

a.      The likelihood that the approach will achieve effective and timely communication between the offeror and the Cloud Computing Program Office, *id.*;

b.      The quality of the offeror's proposed process for timely remediation of issues and the likelihood that issues will be timely remediated, *id.*;

c.      The quality of the offeror's proposed risk management process and the likelihood that the proposed process and methods will result in preemptive mitigation for risk areas like tactical edge performance and security, *id.*;

d.      The likelihood that the proposed Quality Assurance Surveillance Plan will result in continuously meeting the performance metrics listed in Table 5.1 of the SOO through the life of the contract, *id.*; and

e.      The extent to which the proposed property management system, plan, and commercial practices and standards are likely to result in protecting, securing, and reporting the

identified Government Furnished Property in accordance with FAR 52.245-1 and DFARS 252.211-7007, *id.*

### 7.  Factor 7: Small Business Participation Approach

51.     Under Factor 7, the RFP provided DoD would evaluate the extent to which each offeror's proposal complied with small business participation requirements. *Id.* at 181483-84.

### 8.  Factor 8: Demonstration

52.     Under Factor 8, DoD was to evaluate "the extent to which the scenarios are successfully demonstrated using the proposed approach for Factors 1 through 6." *Id.* at 181484. To "facilitate fair competition," DoD "did not include any specific scenario information" in the RFP because it did not want offerors to "tak[e] measures to adapt the offering to the demonstration, rather than the demonstration being a representative sample of the usage the Department may expect during the course of normal usage of the solution." AR Tab 554 at 181201. Instead, DoD provided the offerors with specific requirements for demonstrating each scenario successfully ("Demonstration Instructions") shortly before each demonstration. AR Tab 593 at 181473; AR Tab 290 at 64205-06.

53.     DoD scheduled the first demonstration for each offeror for April 19, 2019 and April 23, 2019 and provided offerors with the Demonstration Instructions twenty-four hours in advance. AR Tab 290 at 64204-05.  However, because of Government-caused errors in the first demonstration—including providing defective instructions—DoD scheduled a second demonstration for May 8, 2019 and May 9, 2019, for which DoD provided offerors with the Demonstration Instructions seven days in advance.  *Id.* at 64206.  DoD stated the second demonstration would "be given more weight in light of it reflecting each Offeror's ability to best showcase their offerings." AR Tab 593 at 181484. After considering both demonstrations, DoD

was to assign each offeror technical capability and risk ratings consistent with the evaluation scheme for Factors 2-6. *Id.* at 181486-87. Because of the importance of the demonstrations, the RFP *required DoD to eliminate* from the competition any offeror that received a "Marginal" or "Unacceptable" technical rating, or a "High" risk rating, under Factor 8. *Id.* at 181479.

### 9. Factor 9: Price

54.    Under Factor 9, the RFP required DoD to evaluate proposed prices in accordance with FAR Subpart 12.209. *Id.* at 181484.

55.    DoD was to evaluate offerors' Price Volumes for accuracy and completeness, including verifying that figures are correctly calculated and that proposed prices, and any applicable discounts, premiums, or fees, are accurate across the entire Price Volume. *Id.*

56.    For each of the six price scenarios, offerors were to submit a Priced and Unpriced BOE, and a price build-up. *Id.* The RFP stated DoD was to evaluate the Unpriced BOEs for each price scenario under Factors 2 through 5, as specified above, rather than under Factor 9. *Id.*

57.    For TO 001 under Factor 6, DoD was to determine if each offeror's price is fair and reasonable, complete, and accurate. *Id.*

58.    The RFP provided the following Table M-1 to indicate how DoD would calculate a proposal's total evaluated price:

| Price Component | Units | Unit Price | Total Price |
|---|---|---|---|
| Price Scenario 1 Total Proposed Price | | | As proposed |
| Price Scenario 2 Total Proposed | | | As proposed |
| Price Scenario 3 Total Proposed | | | As proposed |
| Price Scenario 4 Total Proposed | | | As proposed |

| | | | |
|---|---|---|---|
| Price Scenario 5 Total Proposed | | | As proposed |
| Price Scenario 6 Total Proposed | | | As proposed |
| Portability Plan, CLIN 0005 | 4 units (assuming 2 units are ordered per year for the Base Ordering Period for purposes of TEP only) | As proposed | 4 Units X Unit Price = Total Price |
| Portability Plan, CLIN 1005 | 6 units (assuming 2 units are ordered per year for the Option 1 Ordering Period for purposes of TEP only) | As proposed | 6 Units X Unit Price = Total Price |
| Portability Plan, CLIN 2005 | 6 units (assuming 2 units are ordered per year for the Option 2 Ordering Period for purposes of TEP only) | As proposed | 6 Units X Unit Price = Total Price |
| Portability Plan, CLIN 3005 | 4 units (assuming 2 units are ordered per year for the Option 3 Ordering Period for purposes of TEP only) | As proposed | 4 Units X Unit Price = Total Price |
| Portability Test, CLIN 0006 | 4 units (assuming 2 units are ordered per year for the Base Ordering Period for purposes of TEP only) | As proposed | 4 Units X Unit Price = Total Price |
| Portability Test, CLIN 1006 | 6 units (assuming 2 units are ordered per year for the Option 1 Ordering Period for purposes of TEP only) | As proposed | 6 Units X Unit Price = Total Price |
| Portability Test, CLIN 2006 | 6 units (assuming 2 units are ordered per year for the Option 2 Ordering Period for purposes of TEP only) | As proposed | 6 Units X Unit Price = Total Price |
| Portability Test, CLIN 3006 | 4 units (assuming 2 units are ordered per year for the Option 3 Ordering Period for purposes of TEP only) | As proposed | 4 Units X Unit Price = Total Price |
| CCPO Program Management Support, CLIN 0007 | 24 units (assuming all months are ordered for purposes of TEP only) | As proposed | 24 Units X Unit Price = Total Price |
| CCPO Program Management Support, CLIN 1007 | 36 units (assuming all months are ordered for purposes of TEP only) | As proposed | 36 Units X Unit Price = Total Price |
| CCPO Program Management Support, CLIN 2007 | 36 units (assuming all months are ordered for purposes of TEP only) | As proposed | 36 Units X Unit Price = Total Price |
| CCPO Program Management Support, CLIN 3007 | 24 units (assuming all months are ordered for purposes of TEP only) | As proposed | 24 Units X Unit Price = Total Price |
| **TEP** | | | **Summation of all Total Prices** |

*Id.* at 181484-86.

24

### 10.   Best Value Award Criteria

59.     Section L of the RFP informed offerors that DoD "anticipate[d] awarding a single ID/IQ contract, for the JEDI Cloud, to the responsive and responsible Offeror whose proposal represents the best value to the Government, as set forth in Section M . . . ." *Id.* at 181454.

60.     Section M, in turn, stated that "[b]est value will be based on a detailed evaluation of all factors," and that "[i]n determining the best value, the Government may employ a tradeoff process allowing for an award to other than the Offeror proposing the lowest price or achieving the highest adjectival rating." *Id.* at 181478.

### 11.   Source Selection Team

61.     As required by DoD regulations at 48 C.F.R § 215.303(b)(2), a Source Selection Plan described the roles and responsibilities of the Source Selection Team ("SST") for proposal evaluations, the best value tradeoff determination, and the award decision. AR Tab 305. The SST for the JEDI procurement consisted of, in descending order of authority, the SSA, the SSAC, the SSEB, and the Price Evaluation Board ("PEB"). *Id.* at 64342. Reporting to the SSEB were the TEBs for each of Factors 1 through 6; a Small Business Evaluation Board for Factor 7; and a Demonstration Evaluation Board for Factor 8. *Id.* The SSAC considered the non-price and price evaluation criteria collectively. *Id.* The SST also included the contracting officer team, legal counsel team, and non-voting advisors. *Id.*

62.     Under the JEDI Source Selection Plan, the SSEB, which consists of a single Chairperson, compiles and independently analyzes the findings of the Factor TEBs (Factors 2 through 6), Small Business Evaluation Board (Factor 7), and Demonstration Evaluation Board (Factor 8) in an Executive Summary to support a best value award determination. *Id.* at 64345. The SSAC, in turn, "perform[s] a comparative analysis of the evaluations performed by the SSEB

and PEB . . . to provide an award recommendation to the SSA." *Id.* at 64344. The SSAC also provides oversight to the SSEB and PEB for their respective evaluations. *Id.* at 64345.

63.     The SSA is the individual designated to make the best value decision. The SSA makes the final source selection decision based on the results of the proposal evaluations and any advice and assistance from the SST. For the JEDI procurement, DoD assigned the SSA an Advisor, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 64381.

### C.     Initial Proposal Evaluations, Competitive Range Determination, and Discussions

64.     After evaluating initial proposals received in response to the JEDI RFP, on April 10, 2019, DoD narrowed the competitive range for the JEDI Contract to AWS and Microsoft. AR Tab 227. That same day, DoD opened discussions with both offerors. *Id.*

65.     During discussions in May 2019, DoD amended its solicitation requirements in a manner that disproportionately affected AWS's proposed technical solution and price. For example, DoD inexplicably amended the RFP's highly accessible storage requirement in the Price Scenarios, thereby preventing AWS from leveraging its substantial advantage over Microsoft with respect to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. AR Tab 302 at 64310; *compare* AR Tab 367 at 152744 *with* AR Tab 408 at 173458-59. This change created an artificial limitation on AWS's proposed technical solution and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮. It also forced AWS to increase its price by ▮▮▮▮—a ▮▮▮ increase from AWS's initial total evaluated price. Similarly, even though DoD's technical evaluators confirmed that AWS's proposed solution was "realistic and feasible," AR Tab 206 at 57930, DoD amended the RFP ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in the Price Scenarios, AR Tab 302 at 64310. This

change—which affected only AWS, ████████████████████████████—resulted in an increase of approximately ████████ in AWS's total evaluated price. Finally, at the eleventh hour—months after DoD completed its evaluation of AWS's initial proposal, and after the conclusion of all scheduled discussions—DoD arbitrarily changed its interpretation of the RFP's classified infrastructure to prevent AWS from leveraging its existing and compliant classified infrastructure (which both the ████████████ and DoD currently use). This change again affected only AWS—because AWS alone has existing classified infrastructure—and forced AWS to increase its total evaluated price by an additional ████████ and lose yet another significant competitive advantage over Microsoft. AR Tab 301 at 64233.

66. On May 13, 2019, DoD requested Interim Proposal Revisions ("IPR"). AWS submitted its first IPR on June 12, 2019. On July 3, 2019, DoD informed AWS that it intended to hold discussions related to AWS's IPR on a rolling basis. Through this process, AWS submitted its second (and final) IPR incrementally, submitting various updates to its proposal on July 15, 2019, July 25, 2019, July 30, 2019, and August 9, 2019.

67. DoD evaluated AWS's final IPR under the non-price factors (in order of importance) as follows:





*See* AR Tabs 447-52 (indicating evaluation underlying IPR was unchanged and reaffirmed).

68.    AWS's total evaluated price for its final IPR was ███████████, approximately

██████████████████████████████████. AR Tab 459 at 176413-14.

This substantial price increase was attributable to DoD's changed requirements during discussions.

### D.    Original Final Proposal Evaluations

69.    Based on the offerors' IPRs, DoD engaged in further discussions with the offerors

and, on August 28, 2019, requested FPRs from AWS and Microsoft.

70.    DoD's FPR evaluation was as follows:

| Offeror Name | Factor 2: Adjectival Rating | Factor 2: Risk Rating |
|---|---|---|
| AWS | Good | Moderate |
| Microsoft | Good | Moderate |
| | Factor 3: Adjectival Rating | Factor 3: Risk Rating |
| AWS | Good | Low |
| Microsoft | Good | Low |
| | Factor 4: Adjectival Rating | Factor 4: Risk Rating |
| AWS | Outstanding | Low |
| Microsoft | Outstanding | Low |
| | Factor 5: Adjectival Rating | Factor 5: Risk Rating |
| AWS | Good | Low |
| Microsoft | Good | Low |

| | Factor 8: Adjectival Rating | Factor 8: Risk Rating |
|---|---|---|
| AWS | Good | Low |
| Microsoft | Good | Low |
| | Factor 6: Adjectival Rating | Factor 6: Risk Rating |
| AWS | Good | Low |
| Microsoft | Outstanding | Low |
| | Factor 7: Adjectival Rating | Factor 7: Risk Rating |
| AWS | Good | N/A |
| Microsoft | Good | N/A |

*Id.*

71.     Microsoft's FPR had a total evaluated price of $678,517,417.38. *Id.* at 176414.

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ *Id.*

72.     DoD's technical and price assessments supporting the original FPR evaluation, however, were fundamentally flawed. DoD repeatedly departed from the evaluation criteria and engaged in disparate treatment to create the appearance of parity where there clearly was none. This unreasonable and disparate evaluation allowed DoD not only to manufacture advantages for Microsoft that have no basis in reality or the contemporaneous evaluation record, but also to confer an unwarranted price advantage to Microsoft by considering compliant Microsoft's plainly noncompliant technical proposal. Taken together, DoD's actions dispel any notion that AWS had a fair and equal opportunity to receive the JEDI Contract.

73.     With respect to Factor 2, DoD made at least three errors to reach its unreasonable determination that Microsoft's proposal was equal to AWS's. First, DoD deviated from the evaluation criteria to minimize AWS's advantage in logical isolation and separation. ECF No. 1 ¶¶ 116-19; ECF No. 130-1 at 41-45. Second, it arbitrarily removed previously assessed strengths

from AWS's final evaluation. ECF No. 1 ¶¶ 111-15; ECF No. 130-1 at 51-52. Third, it assessed unwarranted weaknesses and risk increases. ECF No. 1 ¶¶ 120-21.

74.     Under Factor 3, DoD deviated from the evaluation criteria and engaged in disparate treatment. Even though AWS's tactical devices are ███████████████ than Microsoft's, and ████████████████████████████████████████████████████████████, DoD inexplicably determined AWS and Microsoft deserved equal ratings, rather than finding Microsoft's deficient proposal ineligible for award. ECF No. 1 ¶¶ 122-31; ECF No. 130-1 at 31-35. DoD compounded this arbitrary decision by assigning AWS's Category One devices erroneous and disparate weaknesses and risks. ECF No. 1 ¶¶ 122-31; ECF No. 130-1 at 35-40.

75.     Under Factor 4, DoD deviated from the RFP's evaluation criteria by failing to credit AWS for its substantial information security and access control capabilities and arbitrarily concluding that Microsoft and AWS proposed comparable solutions. ECF No. 1 ¶¶ 132-39; ECF No. 130-1 at 45-46. DoD compounded these errors by also failing to recognize that Microsoft ████████████████████████████████████. ECF No. 130-1 at 44-45 n.19.

76.     Under Factor 5, DoD failed to recognize that Microsoft's proposal was not eligible for award because Microsoft proposed noncompliant cloud storage in response to Price Scenario 6, a deficiency that affected both the total evaluated price calculation and the best value determination. ECF No. 130-1 at 16-22. DoD compounded this error by also misevaluating AWS's third-party marketplace offerings and ignoring strengths in AWS's proposals, including those previously assessed. ECF No. 1 ¶¶ 141-52; ECF No. 130-1 at 47-49, 51-52.

77.     Under Factor 6, DoD arbitrarily determined that Microsoft's theoretical and unproven proposed management approach deserved a higher rating than AWS's proven and tested management approach by relying on artificial discriminators favoring Microsoft. ECF No. 1

¶¶ 159-167; ECF No. 130-1 at 53-55. For example, DoD incorrectly determined that only

Microsoft proposed ███████████████████████████████████████████████████████

███████████, when AWS also provided such capabilities. ECF No. 130-1 at 53-55. DoD also

ignored AWS's superior data center offering and AWS's directly relevant experience performing

a ███████████████████████ to build private cloud infrastructure for the ██████████████

███████████████. ECF No. 1 ¶¶ 159-167; ECF No. 130-1 at 53-55.

78.     Finally, under Factor 8, DoD erroneously concluded that AWS's and Microsoft's

respective cloud solution demonstrations were equal despite the fact that AWS successfully

completed each of the scenarios in the second demonstration conducted by DoD, while Microsoft

███████████████████████████████████████████████████████████████████████████████

███████████████. *See* ECF No. 1 ¶¶ 168-72; *see also* ECF No. 130-1 at 22-30.

79.     Each of the foregoing evaluation errors gave the false appearance of technical parity

or Microsoft advantages, and skewed the best value source selection decision in Microsoft's favor.

Indeed, DoD's evaluation of the relative merits of the offerors' proposals and the resulting best

value determination lacked any rational basis, and were inexplicable—unless considered in light

of the pervasive and improper presidential pressure that caused DoD procurement officials to allow

bias and bad faith to dictate their evaluations and award decision.

### E.     President Trump's Interference with the JEDI Procurement Process

80.     As AWS detailed in its original Complaint, President Trump's animosity toward

Mr. Bezos, Amazon, and the *Washington Post* is long standing and well known. *See* ECF No. 1

¶¶ 84-98. Even before President Trump entered office, he promised that if he became the

President, Amazon would have "such problems" because he claimed—with zero basis in fact—

Amazon was subsidizing the *Washington Post* to give Mr. Bezos "political power" against him.

*Id.* ¶¶ 16, 84. Once President Trump assumed office, he abused the Presidency to step up his attacks against Amazon, Mr. Bezos, and the *Washington Post*, including by intervening in the JEDI procurement. *Id.* ¶ 85.

81.     AWS's competitors leveraged President Trump's animosity towards Mr. Bezos, Amazon, and the *Washington Post* by encouraging President Trump to forbid his Administration from awarding the JEDI Contract to AWS. *Id.* ¶¶ 88, 92-93. Oracle co-CEO Safra Catz—a frequent advisor of the President who served on President Trump's transition team—held a private dinner with President Trump on April 2, 2018, during which she advocated against awarding JEDI to AWS.[1] *Id.* ¶ 88. Oracle's lobbying efforts also included a one-page flowchart titled "A Conspiracy to Create a Ten Year DoD Cloud Monopoly," which featured photographs of Amazon executives and DoD officials in charge of the JEDI procurement.[2] *Id.* ¶ 92 n.38.

---

[1] In June 2019, Microsoft and Oracle announced a cloud interoperability partnership that would enable customers to migrate workloads across Microsoft Azure and Oracle Cloud. *See* Janakiram MSV, *What to Expect from Oracle and Microsoft Cloud Partnership*, Forbes (June 9, 2019), https://www.forbes.com/sites/janakirammsv/2019/06/09/what-to-expect-from-oracle-and-microsoft-cloud-partnership/. The companies have continued to expand their partnership. *See* Todd Bishop, *How Microsoft and Oracle Became Cloud Buddies, and What's Next for Their Improbable Partnership*, GeekWire (Aug. 28, 2019), https://www.geekwire.com/2019/microsoft-oracle-became-cloud-buddies-whats-next-improbable-partnership/. More recently, Oracle has been the beneficiary of Trump's cronyism by receiving his "blessing" to establish a unit of the popular Chinese-owned video sharing app company TikTok. *See* David J. Lynch, *TikTok Push Showcases 'Central Planner' Trump and His Hands-on Approach to World's Largest Economy*, Wash. Post (Sept. 27, 2020), https://www.washingtonpost.com/business/2020/09/27/trump-business-involvement-tiktok/.

[2] Aaron Gregg & Jay Greene, *Pentagon Issues Forceful Rebuke of Oracle as Debate Over a Massive Federal Contract Turns Caustic*, Wash. Post (July 30, 2019), https://www.washingtonpost.com/business/2019/07/30/pentagon-issues-forceful-rebuke-oracle-debate-over-massive-federal-contract-turns-caustic/.

82.     President Trump's advisors reported that he was "obsessed" with Mr. Bezos and repeatedly asked how he could "f*** with him." *Id.* ¶ 90. Others fueled President Trump's malign personal interest in the JEDI procurement by calling for the President to "cancel" the "pending multi-billion contract" between Amazon and the Pentagon. *Id.* Senator Marco Rubio—whose political campaign received support from Oracle founder Larry Ellison and whose former chief of staff was an Oracle lobbyist—implored President Trump to "delay awarding [the] cloud computing contract to @amazon." *Id.* ¶ 93. Similarly, Representative Steve Womack urged President Trump to devote his "personal attention" to intervene in the JEDI procurement. *Id.*[3]

83.     President Trump set out to act on his obsession, jettisoning any appearance of impartiality by making clear to DoD (and to the world) that he did not want AWS to get the JEDI Contract. In the summer of 2018, President Trump privately ordered then-Secretary of Defense James Mattis to "screw Amazon" out of the JEDI Contract. *Id.* ¶ 91. Secretary Mattis reportedly demurred, requiring instead that the process to be "done by the book, both legally and ethically." *Id.* But less than six months later—after the President proclaimed publicly that he had fired Secretary Mattis—Secretary Mattis left his post as Secretary of Defense. *Id.* At the time, Secretary Mattis's departure was just the latest in a string of exits from the Trump Administration of individuals who refused to follow the President's self-interested directives.

84.     Following Secretary Mattis's exit, during a July 18, 2019 press conference, President Trump said he was "looking" into the JEDI procurement process (which he referred to

---

[3] A similar letter Representative Womack sent to the DoD was reportedly drafted by Oracle's team of lobbyists, and then circulated among Congress by a lobbyist for Microsoft. James V. Grimaldi, Brody Mullins & John D. McKinnon, *Why Are Amazon and Google in Washington's Firing Line? One Answer Is Ken Glueck*, Wall St. J. (Feb. 13, 2020), https://www.wsj.com/articles/oracles-man-in-washington-fans-the-flames-against-rival-tech-giants-11581615873.

as "The Amazon" process) "very seriously" and would "be asking [DoD] to look at it very closely" because of the "tremendous complaints about the contract with the Pentagon and with Amazon." *Id.* ¶ 95. Four days later, President Trump tweeted a video from a *Fox News* segment calling the JEDI Contract the "Bezos Bailout," and unleashed yet another series of attacks on the "Amazon Washington Post." *Id.* ¶ 97.

85.     Despite DoD's public statements in late July 2019 that it would announce its final award decision in August, *id.* ¶ 175, on August 1, 2019, DoD abruptly reversed course when President Trump's newly appointed Secretary of Defense, Mark Esper, announced that he had ordered a review of the JEDI procurement process at the President's request. Secretary Esper made clear that he was taking a "hard look" at JEDI because he had "heard from people from the White House." *Id.* ¶ 176.

86.     Following the surprise delay for that "hard look," Donald Trump, Jr. tweeted several times that, upon completion of the review, AWS would not receive the JEDI Contract—including tweeting that it "[s]ounds like the corrupt #BezosBailout is in trouble." *Id.* ¶ 177. CNN also independently reported around the same time that President Trump wanted to "scuttle" the JEDI award. *Id.*

87.     The unmistakable direction from the White House not to award the JEDI Contract to AWS was not lost on the political appointees and other individuals working on the JEDI source selection. Knowing only too well President Trump's extensive record of dismissing agency officials with whom he disagrees or perceives as disloyal, Secretary Esper, DoD CIO Dana Deasy,

and other senior political appointees overseeing the JEDI Contract procurement were uniquely susceptible to pressure from the Commander in Chief.[4]

88.     Secretary Esper, in particular, ensured the execution of the President's wishes with regard to the JEDI Contract. On October 22, 2019, before DoD publicized its flawed award decision (but after the award decision had already been made), Secretary Esper announced unexpectedly that he was recusing himself due to a personal conflict of interest arising out of his son's employment with JEDI competitor IBM. *Id.* ¶ 187. The announcement of Secretary Esper's recusal lagged well behind his October 7, 2019 submission of a recusal memorandum, his acquiescence to President Trump's request to investigate the JEDI procurement process, the SSAC's recommendation to award the contract to Microsoft, and Secretary Esper's meetings with members of the SST tasked with evaluating proposals and determining the award.

89.     The members of the SST, including the SSA, were subject to the President's influence on multiple fronts. Members of the SST have admitted they were exposed to and made aware of the President's numerous public statements regarding the JEDI Contract and his views on Amazon, Mr. Bezos, and the *Washington Post*.[5] And while that reality was not addressed

---

[4]   *See, e.g.*, Carol E. Lee & Courtney Kube, *White House Has Talked to VA Secretary About Taking Pentagon Job If Trump Fires Esper*, NBC News (Sept. 7, 2020), https://www.nbcnews.com/news/military/white-house-has-talked-va-secretary-about-taking-pentagon-job-n1239007 (quoting President Trump referring to Secretary Esper by the nickname "Yesper"); Dan Lamothe, Missy Ryan & Paul Sonne, *As Pentagon Chief Shows Some Independence, Trump Launches Attacks But Leaves Him in Office*, Wash. Post (Sept. 16, 2020), https://www.washingtonpost.com/national-security/trump-defense-secretary-election/2020/09/15/47bbd422-f2db-11ea-9279-45d6bdfe145f_story.html.

[5]   *See* Inspector General, Dep't of Defense, *Report on the Joint Enterprise Defense Infrastructure Cloud Procurement* ("DoDIG Report") at 7, 102 (Apr. 13, 2020), https://media.defense.gov/2020/Apr/15/2002281438/-1/-1/1/REPORT%20ON%20THE%20JOINT%20ENTERPRISE%20DEFENSE%20INFRASTRUCTURE%20(JEDI)%20CLOUD%20PROCUREMENT%20DoDIG-2020-079.PDF.

directly in the DoDIG Report, the members of the SST must have understood that any recommendation they made would be both subject to scrutiny from the highest levels, and much more likely to meet with approval if it pleased their superiors.

90.     Thus, it is no surprise that, in parallel with the escalating intervention in JEDI by senior DoD leadership at the behest of the President, the SST's analyses of the evaluation factors suddenly started to tip in Microsoft's favor.  For instance, the TEB's initial evaluations of AWS from early 2019 readily acknowledged significant strengths in AWS's proposal, particularly for Factors 2 and 5.  *See* AR Tabs 206, 207, 212, 213.  But in the TEB's subsequent evaluation reports of AWS's FPR in August 2019—amidst President Trump's escalating attacks on Amazon, Mr. Bezos, and the *Washington Post*, and following President Trump's and Secretary Esper's calls for an examination into the JEDI evaluation process—those previously identified strengths were noticeably absent, without any explanation for their omission.  *See* AR Tabs 441, 444, 447, 450. The SSEB, the SSAC, and the SSA relied on these less favorable evaluations in reaching their decision to award the JEDI Contract to Microsoft.

91.     Moreover, although the February 2019 Source Selection Plan did not include a designated SSA Advisor as a non-voting member of the SST, AR Tab 205 at 57898, by June 25, 2019—after President Trump's meetings with Oracle, and shortly before he announced that he would be "asking [DoD] to look at [JEDI] very closely"—DoD amended the JEDI Source Selection Plan to install ▮▮▮▮▮▮▮▮▮▮ as the SSA Advisor.  AR Tab 305 at 64381. Following ▮▮▮▮▮▮'s injection into the JEDI source selection process, the DoD procurement

team began to abandon their earlier favorable evaluations of AWS's proposal to skew the award in Microsoft's favor.[6]

92.     The raft of evaluation errors described above that steered the original award away from AWS—difficult to understand otherwise—can only be understood when viewed in light of President Trump's public statements and interference in the original JEDI source selection.

### F.     DoD's Original Contract Award and Anemic Debriefing

93.     Against this framework of improper political influence, the SSEB issued its Executive Summary Report on September 27, 2019, the PEB issued its final Report on September 29, 2019, and the SSAC made its source selection recommendation to the SSA on October 3, 2019. *See* AR Tabs 455, 456, 457.

94.     The SSA determined Microsoft's proposal presented the best value to the Government because it was allegedly technically superior and lower priced. AR Tab 459 at 176417. In particular, the SSA found that although Microsoft and AWS were relatively equal under Factors 2, 3, 4, 7, and 8, Microsoft was "significantly superior to AWS" under Factor 5 (Application and Data Hosting Portability)—despite both Microsoft and AWS receiving the same adjectival rating—and Factor 6 (Management and TO 001). *Id.* at 176415-16. Moreover, under

---

[6] In fact, although Mr. Deasy testified before Congress that "'[t]o the best of my knowledge, nobody has contacted from the White House any members of the source-selection team,'" Senate Committee on Armed Services, Tr. of Oct. 29, 2019 Hr'g at 31:4-6, https://www.armed-services.senate.gov/imo/media/doc/19-72_10-29-19.pdf, as of June 2019, ▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆. AR Tab 305 at 64381. And while DoD has attempted to evade this Court's fulsome review by failing to include relevant documentation in the AR, the DoDIG Report revealed that Mr. Deasy *himself* spoke with White House personnel about the JEDI procurement on at least four occasions during the JEDI procurement, on July 10, July 18, July 29, and August 21, 2019. *See* DoDIG Report, *supra* note 5, at 18, 36, 113-14.

Factor 9 (Price), the SSA noted that Microsoft's total evaluated price was ████████████ ████ less than AWS's total evaluated price. *Id.* at 176417. Accordingly, on October 17, 2019, the SSA selected Microsoft for award of the JEDI Contract.

95.    On October 25, 2019, DoD announced that it had awarded the JEDI Contract to Microsoft, to the shock of industry analysts and experts—and indeed, even to Microsoft itself, which was not prepared to issue a statement until the following day.[7]

96.    On the same day DoD announced its award decision, DoD provided AWS a written debriefing detailing the evaluation results and advising AWS that it had two business days to submit written questions based on the debriefing, foreclosing the opportunity for AWS to request and receive an in-person debriefing. DoD's use of a written debriefing, while permitted by the FAR, runs contrary to DoD's best practices and source selection procedures, which require that "[w]henever practicable, debriefings should be conducted in person."[8]

97.    On October 29, 2019, AWS timely submitted 265 detailed written debriefing questions, as allowed by 10 U.S.C. § 2305(b)(5), which sought a more detailed explanation for how DoD reached its unexpected decision to award the JEDI Contract to Microsoft. *See* AR Tab 488. In violation of applicable procurement regulations, DoD failed to provide "[r]easonable responses to relevant questions about whether source selection procedures contained in the solicitation, applicable regulations, and other applicable authorities were followed." 48 C.F.R.

---

[7]   Emily Birnbaum, *Amazon Poised to Escalate Pentagon "War Cloud" Fight*, The Hill (Oct. 29, 2019), https://thehill.com/policy/technology/467827-amazon-poised-to-escalate-pentagon-war-cloud-fight.

[8]   DoD Source Selection Procedures, Defense Federal Acquisition Regulation Supplement Procedures, Guidance and Information, Subpart 215.3—Source Selection § 3.11 (Mar. 131, 2016), https://www.acq.osd.mil/dpap/policy/policyvault/USA004370-14-DPAP.pdf.

§ 15.506(d). In fact, DoD did not provide a substantive response to a single one of the 265 questions that AWS timely submitted, leaving AWS in the dark about DoD's explanations for the substantive evaluation issues AWS identified in the debriefing questions.

98.     What the debriefing did reveal, however, was that the evaluation errors underlying DoD's best value determination and award decision could not be explained, except as the product of President Trump's undue influence and improper political pressure on the JEDI procurement.

### G.     AWS Files Post-Award Bid Protest to Challenge DoD's Flawed and Biased Award Decision, and the Court Preliminarily Enjoins Performance

99.     AWS filed a post-award bid protest Complaint on November 22, 2019 challenging DoD's decision to award the JEDI Contract to Microsoft. *See* ECF No. 1. AWS's Complaint alleged substantive and procedural errors in DoD's award decision based on the limited debriefing materials DoD provided to AWS and the public record documenting the bias and bad faith that, upon receiving the debriefing, AWS learned had improperly affected DoD's award decision. The Complaint accordingly brought seven counts to challenge both the technical merits of DoD's evaluation and award decision (Counts 1-4 and 6-7), as well as the bias and bad faith that motivated DoD source selection officials to improperly award the JEDI Contract to Microsoft (Count 5). *See id.* ¶¶ 192-234.[9]

---

[9] Despite AWS's well-pled allegations and the importance of the integrity of the procurement process, the Government's conduct throughout this litigation has made it difficult for the parties and this Court to evaluate the improprieties and errors in the JEDI source selection evaluation process and decision. For instance, the Government produced an administrative record that was—and remains to this day—incomplete. The administrative record continues to omit materials that this Court *twice expressly ordered be included*—namely, that the administrative record "should include any informal documents reflecting factors considered in the agency's decision-making process, such as email communications and communications made through Slack channels and the like." ECF No. 15 at 2; ECF No. 55 at 2. Rather than include these materials in the administrative record (as this Court ordered), the Government

100. On January 22, 2020, AWS filed a Motion for Temporary Restraining Order and Preliminary Injunction to enjoin the performance of the JEDI Contract pending the resolution of this bid protest. *See* ECF No. 130. In its Motion, AWS explained how even the incomplete administrative record confirmed that DoD's award of the JEDI Contract to Microsoft suffered from numerous fatal errors that implicated nearly every technical evaluation criterion, and which systematically tilted the award in Microsoft's favor.

101. On February 13, 2020, the Court granted AWS's Motion and issued a preliminary injunction prohibiting DoD from proceeding with JEDI Contract activities until further order of the Court. *See* ECF No. 164. The Court found that AWS was likely to succeed on the merits of its protest based solely on the very first error that AWS detailed in its Motion—DoD's misevaluation of Microsoft's technical approach for Price Scenario 6. *Id.* at 7-9. Because AWS had shown it was "likely that [AWS]'s chances of receiving the award would have increased absent [DoD]'s evaluation error," the Court concluded this *single* error was "sufficient to justify preliminary injunctive relief," and therefore did not reach the myriad other errors AWS had identified in its Complaint and Motion. *Id.* at 10-11, 17 n.8.

### H. The Government's Corrective Action

102. On March 12, 2020, the Government filed a Motion for Voluntary Remand in which it requested that the Court remand the case to DoD so that it could "reconsider certain aspects of the challenged agency decision." ECF No. 177 at 1. On April 17, 2020, the Court granted the

---

instead took the position that the Court's orders were mere suggestions that it could choose not to follow. *See* ECF No. 143 at 18-19. The Government's failure to complete the administrative record with these materials shields from scrutiny the very information most probative of bias and bad faith, undermines the full and effective judicial review of the allegations of bias and bad faith in this protest, and in fact is part of the very pattern of bias and bad faith that the Government seeks to conceal.

Government's Motion for Voluntary Remand. *See* ECF No. 203. In granting remand, the Court stated that it found "no evidence of frivolity or bad faith on" the part of the Government in requesting remand, but noted that AWS would "have the opportunity to challenge any corrective action proposed by the agency at a later time, once defendant has reevaluated plaintiff's various challenges and announced a comprehensive plan for addressing any errors." ECF No. 205 at 4.

103.    DoD announced its corrective action on April 21, 2020 by issuing RFP Amendment 0007. Amendment 0007 revised the requirements for Price Scenario 6 to allow storage solutions that are accessible "on the order of milli-seconds" rather than "highly accessible"—thereby making compliant the noncompliant storage that Microsoft previously proposed. AR Tab 595 at 181509; *see also* AR Tab 408 at 173459. The corrective action permitted the offerors to revise only those "Price Volume artifacts that are directly impacted as a result" of the changes to their offerings for Price Scenario 6, while also prohibiting the offerors from updating other prices. AR Tab 591 at 181374; AR Tab 592 at 181378.

104.    After reviewing Amendment 0007, AWS submitted to DoD several questions to clarify the precise parameters and requirements of Price Scenario 6 as amended. Despite the clear benefit of providing clarity to all parties regarding the requirements under Price Scenario 6 as amended, DoD refused to answer several of AWS's clarifying questions, including regarding key issues relating to access time and storage volumes, in its responses to questions from both offerors issued with Amendment 0008. AR Tab 609 at 181610. DoD's refusal to clarify this ambiguity compelled AWS to file an agency-level protest on May 4, 2020, the same day it submitted its second FPR ("FPR2"). AR Tabs 617, 618-32. In response to AWS's agency-level protest, DoD issued Amendment 0009 on May 14, 2020, which addressed AWS's concerns. AR Tabs 642-43.

105.    Thus, consistent with the Court's earlier order, AWS challenged the improper

implementation of DoD's corrective action through its agency-level protest. Once DoD corrected

those issues, AWS participated in DoD's corrective action with the expectation that DoD would

execute its proposal reevaluations in good faith. After Amendment 0009 leveled the playing field

by providing the offerors a common understanding of DoD's requirements for the Price Scenarios,

the offerors affirmed in their third FPR submissions that no changes to their FPR2 proposals were

necessary. *See* AR Tabs 646-47. On June 15, 2020, DoD issued a draft version of Amendment

0010 and a fourth request for FPRs ("FPR4"). AR Tabs 656-58. Draft Amendment 0010 required

offerors to "identify daily and monthly data volume for object storage using the dates and growth

provided in the price scenarios," and further that "[m]ethods for deriving proposed object storage

quantities require written, supporting justification." AR Tab 657 at 193459-60. DoD released the

final Amendment 0010 on June 25, 2020, which was identical to the draft version, and AWS

submitted its FPR4 on July 9, 2020. AR Tabs 663-66; *see* AR Tabs 675-83.[10]

106.    On August 7, 2020, DoD informed both offerors that it was "necessary to reopen

discussions," AR Tabs 704-05, because DoD had identified a "clerical error" in Microsoft's pricing

volume that "render[ed] the proposal inaccurate and therefore unawardable," AR Tab 706 at

---

[10] On July 30, 2020, DoD CIO Dana Deasy stated during an online press conference that DoD
intended to "do a re-announcement of our intentions to award probably sometime towards the
very end of August, barring any last-minute unforeseen additional issues that are raised."
Joseph Tsidulko, *Pentagon CIO: JEDI Cloud 'Re-Announcement' Should Come By End of
August*, CRN (July 30, 2020), https://www.crn.com/news/cloud/pentagon-cio-jedi-cloud-re-
announcement-should-come-by-end-of-august?itc=refresh. Less than a week later, and despite
being in the midst of a months-long corrective action process to address the Court's earlier
ruling and the litany of errors underlying the original award, Mr. Deasy stated that the biggest
mistake DoD made with respect to the JEDI Contract was not the gross violation of
procurement laws, but rather "let[ting] the narrative g[e]t away" from DoD. FCW Insider,
*Quick Hits*, Federal Computer Week (Aug. 6, 2020), https://fcw.com/blogs/fcw-
insider/2020/08/aug06quickhits.aspx.

209997. DoD issued Amendment 0011 on August 11, 2020 to provide Microsoft an opportunity to revise its proposal to correct the "clerical error" that made its proposal unawardable. AR Tab 710. On August 13, 2020, Microsoft submitted its final proposal revision and AWS confirmed its earlier compliant proposal submission. AR Tabs 717-22.

## I.     DoD's Re-Award Source Selection Decision and Debriefing

107.    On September 4, 2020, DoD notified AWS and Microsoft that DoD had re-awarded the JEDI Contract to Microsoft. AR Tabs 740-41. That same day, AWS submitted a written request to DoD for a formal debriefing regarding the re-award decision. AR Tab 740 at 210456.

108.    DoD opened the post-award debriefing on September 9, 2020. AR Tabs 742-43. The initial debriefing email to AWS included the TEB evaluation reports for AWS, identified Microsoft's total evaluated price, and explained that the debriefing process would be conducted via written exchanges in two rounds of debriefing questions and answers. AR Tab 742 at 210463-64. Upon receipt of the original debriefing materials, AWS requested that DoD provide redacted versions of the Source Selection Decision Document ("SSDD"), SSAC Report, SSEB Report, and PEB Report. *Id.* at 210465. The Contracting Officer provided AWS redacted versions of the SSEB Report and the addendum to the SSEB Report on September 10, 2020, AR Tabs 745-47, but declined to provide redacted copies of the SSDD, SSAC Report, and PEB Reports because the documents purportedly were "almost entirely composed of . . . point-by-point comparisons," AR Tab 742 at 210466. The Contracting Officer did not explain why DoD was able to provide redacted copies of those documents in connection with AWS's October 2019 post-award debriefing, but not with respect to the post-remand award debriefing. *Id.*; *see also* AR Tabs 480, 488.

109.    AWS submitted 282 post-award debriefing questions on September 11, 2020. AR Tabs 751-52. Although DoD represented through counsel that it intended the debriefing to close

no later than September 23, 2020, DoD did not respond to AWS's first round of debriefing questions for over two weeks, until September 28, 2020. AR Tabs 755-56. DoD responded to AWS's second round of debriefing questions and closed the post-award debriefing on October 9, 2020. AR Tabs 762-63.

## J. DoD's Post-Remand Reevaluation Is Unreasonable and Plagued by Disparate Treatment

110. DoD's post-remand source selection decision and reevaluations expose DoD's purported corrective action as an illusory exercise designed to reaffirm DoD's prior flawed award to Microsoft. Given the opportunity to right its past wrongs and evaluate the offerors fairly and equally in accordance with the RFP's evaluation criteria, DoD instead chose to paper over its patent evaluation errors to create a veneer of reasonable judgment. But this superficial reevaluation not only failed to remedy the material and prejudicial errors that plagued DoD's original award decision, but also introduced new, far graver evaluation discrepancies. These pre-existing and new evaluation errors—which span nearly every evaluation factor and are discussed below—render DoD's determination that Microsoft presented the best value to the Government untenable.

### 1. Factor 2

111. DoD failed to evaluate AWS reasonably and fairly under Factor 2, repeating and reinforcing the disparate and unreasonable evaluation judgments that plagued the pre-remand final evaluation. First, the SSAC arbitrarily minimized the significance of AWS's Nitro hypervisor architecture, which the TEB recognized and the SSEB correctly determined is ▮▮▮▮

▮▮▮▮

Second, the SSAC wrongly concluded ▮▮▮▮

▮▮▮▮. Third, the TEB assigned AWS

44

▮▮▮▮

unwarranted weaknesses and risks that are contradicted by AWS's proposal. Taken together, these evaluation errors created false parity between AWS and Microsoft under the most important evaluation factor when AWS, in fact, is technically superior by any objective measure.

### a)   The SSAC Unreasonably Downplayed the Significance of AWS's Nitro Architecture.

112.    Nitro is AWS's proprietary hypervisor that uses purpose-built hardware, firmware, and software modules to virtualize network, compute, and storage resources for DoD users. Nitro represents a substantial step forward in hypervisor technology because it moves away from the traditional bifurcated computing environment of trusted and untrusted elements by hosting trusted elements on dedicated hardware that is separate and distinct from the untrusted elements in which users operate. As a result, Nitro provides customers with unparalleled security and assurance.

113.    When evaluating AWS's and Microsoft's respective solutions for logical isolation and separation, both the TEB and the SSEB acknowledged the significance of AWS's Nitro architecture, with the SSEB also concluding that Nitro ████████████████████████████
████. AR Tab 610 at 181622, 181637; AR Tab 733 at 210375.

114.    The TEB assigned AWS several strengths related to Nitro, including finding that:



45



AR Tab 610 at 181622, 181637.

    115.    The TEB also acknowledged that:



*Id.* at 181620-21.

    116.    For its part, the SSEB—which had the ability to compare AWS's and Microsoft's

solutions and the TEB's evaluations thereof—determined:



AR Tab 733 at 210375 (emphases added).

117.    The SSEB added that AWS's "use of hardware to separate guest and host processing provides substantial security benefits that will be greatly advantageous to the Government over the entire contract term and deserves special note." *Id.* The SSEB also described AWS's solution as an "extraordinary approach to the Government's requirement in this area." *Id.* at 210375-76. Thus, for good reason, the SSEB found that AWS was superior under the most important factor.



118.    Although the SSAC ▋▋▋▋▋▋ ▋▋▋▋▋▋▋ ▋▋ AWS is superior to Microsoft under Factor 2. AR Tab 737 at 210423.  Instead, the SSAC ▋▋▋▋▋▋▋▋▋ ▋▋▋▋▋▋▋—just as it did in the pre-remand final evaluation. *Compare id. with* AR Tab 457 at 176401.

119.    First, the SSAC focused on Nitro's unique ability to ▋▋▋▋▋▋ ▋▋▋▋▋▋. *Id.* Noting that it did not have ▋▋▋▋▋▋▋ the SSAC concluded that ▋▋▋▋▋▋ ▋▋▋▋▋▋▋ *Id.* In other words, despite ▋▋▋▋ ▋▋▋▋▋▋," the SSAC ultimately concluded ▋▋▋▋▋▋▋. *Id.*

120.    In addition to being inconsistent on its face, the SSAC's rationale ▋▋▋▋ presents a classic strawman argument that contradicts the TEB's and the SSEB's evaluation findings. The SSAC concluded that because it



▮▮▮▮▮ , ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ . *Id.* But while

the SSAC speculated about the ▮▮▮▮▮▮▮▮ as the basis of finding

this false parity, the SSAC conveniently chose not to consider ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ Moreover, as shown above, neither the TEB nor the SSEB

based its findings ▮▮▮▮▮▮ ▮▮▮▮ To the contrary,

they found that AWS's ability to mitigate the ▮▮▮▮▮ ▮▮▮

▮▮▮▮▮▮▮▮▮ . AR Tab 610 at 181621-22, 181637

(TEB noting benefits of Nitro's reduced attack surface, insider threat protection, hypervisor

breakout mitigation, cryptographically integrity-checked components, and separate hardware

support); AR Tab 733 at 210375-76 (SSEB concurring with TEB's evaluation).

121.   In stark contrast, the TEB did not conclude ▮▮▮▮▮

▮▮▮▮▮ ▮▮▮▮

▮▮▮▮▮ *Compare* AR Tab 610 at 181622 *with* AR Tab 611 at 1881663-64.

Instead, ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ ▮▮ AR Tab 611 at 181664. The

TEB made no mention of any Microsoft ability to ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ *Compare* AR Tab 610 at 181620 *with* AR Tab 611 at 181663-64. Nor did the TEB

conclude that Microsoft could ▮▮▮▮▮▮



████████████████████████████████████. *Id.* The

fact is Microsoft's solution simply does not provide this level of security.

122.    The difference in the breadth of the offerors' security and defense capabilities—

███████████████████  ████████████  █████—███████████████

███████████████████████████████  and that the █████

█████████████████████████████████████  AR Tab 733 at

210375. Faced with this assessment that favored AWS, the SSAC arbitrarily and wrongly focused

on the ███████████████████████  in an attempt to draw false parity between AWS's

and Microsoft's █████████████████.

123.    Second, the SSAC unreasonably concluded Nitro had ██████  ████████

█████████████████. AR Tab 737 at 210425.

124.    On August 23, 2020—after the SSEB submitted its evaluation report on August 20,

2020—the SSAC asked the SSEB to provide additional information regarding the ████████

████████████████████████████████████████████████

████████████████████████████████████████████  AR

Tab 734 at 210408 n.1.  The SSEB informed the SSAC that ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████  AR Tab 734 at 210410.  In other words, the SSEB explained that ████████████

████████████████████████████████████████████████

███████████████████. *See id.*

49

125.   The SSAC acknowledged the SSEB's reasoning, noting ████████████

███████████████████████████████████████

██████████████████████████████████ [11]   AR Tab 737 at 210423.   The SSAC

also recognized that ████████████████████████████████████████

████████████████████████   *Id.*

126.   Nevertheless,   the   SSAC   concluded   that   although   ███████████

███████████████████████████████████████

████████████████████████████   *Id.*; *see also id.* at 210425 ("████████

███████████████████████████████████████

███████████████████████   .").

127.   The SSAC's conclusion, however, is plainly wrong.   ██████████████

███████████████████████████████████████

███████████████████████████████████████   Indeed,

the TEB recognized that ██████████████████████████████████████████

████   AR Tab 610 at 181623 ██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████ .

Discounting the significance of Nitro ██████████████████████████████████   is

akin to discounting the value of a uniquely capable airplane because it cannot also travel

underwater.

---

[11]   This   statement   further   shows   the   SSAC's   fundamental   misunderstanding   of   Nitro's
significance because, Nitro, in fact, provides substantial benefits beyond mitigating ██████
██████████████████████   as the TEB and the SSEB found and the SSAC
inexplicably ignored. AR Tab 610 at 181621-22, 181637; AR Tab 733 at 210375-76.

128.    Moreover, the SSAC's assessment glosses over the fact that ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

This necessarily means ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮

▮▮▮▮  *See* AR Tab 610 at 181623.  The SSAC was required to exercise its independent

judgment reasonably when considering the offerors' logical isolation and separation solutions, but

its conduct here fails any test of reasonableness.

        **b)**      **The SSAC Unreasonably Concluded** ▮▮▮▮▮▮▮

129.    In addition to mischaracterizing and downplaying the significance of AWS's

logical isolation and separation advantage, the SSAC unreasonably elevated the importance of

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, doubling down

on the same error the SSAC made during the pre-remand final evaluation.  *Compare* AR Tab 737

at 210423-25 *with* AR Tab 457 at 176401.

130.    On August 23, 2020, the SSAC asked the SSEB to supplement its August 20, 2020

evaluation report by providing ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ AR Tab 734 at 210410.  The SSEB reported back

that Microsoft deserved a strength ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ *Id.* at 210411.  The SSEB also indicated that AWS did not

deserve a similar strength ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮  *Id.* at 210411-12.

131.    But while the SSEB noted Microsoft deserved a strength for its ████████████,
the SSEB did not indicate that this finding affected its overall assessment ████████████

████████████████████████████████████████████████████████████

████████████████████████████  AR Tab 734 at 210408-12; AR Tab 733 at 210375.
To the contrary, the fact that the SSEB left its reevaluation assessment unchanged—even after
assigning the strength to Microsoft for its ████████████—indicates the SSEB stood by its
initial comparative assessment.

132.    Apparently unsatisfied with the SSEB's conclusion, the SSAC ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████.  The SSAC based this determination on its assessment that ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████  Id. at 210423.  The SSA then adopted this conclusion as the
basis for concluding the offerors were relatively equal under Factor 2.  AR Tab 738 at 210444-46.
The administrative record, however, refutes this attempt at false parity.

133.    First, it is wrong that AWS ████████████████████████████
████████████.  In fact, the SSEB expressly acknowledged that ████████████████

████████████████████████████████████████████████████████████

████████████  AR Tab 734 at 210412 (emphasis added).  The SSEB also acknowledged that AWS's
PWS states: ████████████████████████████████████████████████

52

████████████████████████████████████████████████████

████████████████████████████████████████  *Id.* (emphasis added).

And, the SSEB acknowledged that ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████  *Id.*

134.  Moreover, the SSEB recognized that ████████████████████████

████████████ .  *Id.*  In this regard, AWS's Factor 2 proposal states:

████████████████████████████████████████████████████

AR Tab 368 at 152797. In other words, AWS ████████████████████████

████████████████████████████████████████████████████

████████████████████████████  It therefore is simply false for the SSEB or the SSAC

to claim ████████████████████████████████████████████████

████████████  AR Tab 734 at 210411; AR Tab 737 at 210423.

135.  Second, the fact that the SSEB and the SSAC penalized AWS apparently for ██

████████████████████████████████████████  is a clear example

of disparate treatment.

136.  For  example, ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████   AR Tab 408 at

173281.  The TEB concluded—with no disagreement from the SSEB or the SSAC—that this

cursory reference to ██████████████████████████   was sufficient not only to

determine Microsoft satisfied the RFP's requirements, but also to assign Microsoft a strength.  AR

Tab 611 at 181688; AR Tab 733 at 210380; AR Tab 737 at 210422-24.

    137.   Yet, when confronted with a similarly abbreviated discussion regarding ████

█████████████████████, the SSEB and the SSAC concluded AWS did not provide sufficient

information to allow DoD to conclude that ████████████████████████████████.

AR Tab 734 at 210411 █████████████████████████████████████████

████████████████████████████████████████████████████████

AR Tab 737 at 210423 █████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████   There is no justification for

such disparate treatment.  If Microsoft's brief reference to ████████████████████

████   was sufficient to earn a strength, then AWS's comparable discussion of ████████   was

sufficient to warrant similar credit from DoD.

    138.   Third, the ████████████████████████████   was no excuse to discount

that capability.  The administrative record is replete with examples of DoD giving Microsoft credit

█████████████████████████████.  For example, under Factor 4, the TEB relied on ████

███████████████   to conclude that Microsoft's proposal meets the requirements for ████████

███████████   AR Tab 703 at 209985.  The TEB also assigned Microsoft a strength for its

████████████████████████████████████████████████████████

54

████████████████████████████████████████████████████████

████ *Id.* at 209984.  Microsoft's proposal, however, is clear that ████

████

AR Tab 408 at 173306 ████

████ AR Tab 411 at

173674 ████

████

████ ████

████

████ *Id.*  Indeed, Microsoft has conceded this fact.  ECF No. 137 at 45 n.16 ████

████

████

139.   Similarly, under Factor 5, the SSAC acknowledged that the TEB assigned AWS a strength for proposing more than ██ data centers, which exceeds the RFP's minimum requirement of three data centers and enables AWS to support failover across geographically redundant resources.  AR Tab 737 at 210427.  The SSAC then noted that although ████

████

████ *Id.* (emphasis added).

According to the SSAC, ████

████ *Id.* (emphasis added).  Thus, even though Microsoft ████

████ , the SSAC credited Microsoft for ████

████ , again concocting false parity between the offerors.  *Id.*

140.   Although DoD may have had discretion whether to credit offerors for ████ , it was required to exercise that discretion fairly and equally.

Accordingly, AWS deserved to receive full credit—just as Microsoft received for its ████████████████—for ███████. Instead, the SSAC denied AWS the credit it deserved, because to assign AWS the credit it deserved ████████ would have prevented the SSAC from █████████████████████████████████████████████████.

### c)  DoD Assigned AWS Unwarranted Weaknesses and Risks.

141.  DoD also assessed unwarranted weaknesses and risks under Factor 2 based on mischaracterizations of AWS's proposal, further distorting AWS's comparative advantage. Each of these unwarranted weaknesses and risks existed in the pre-remand final evaluation and went uncorrected in the post-remand evaluation. *Compare* AR Tab 610 at 181613, 181616, 181630, 181640-41 *with* AR Tab 323 at 151122-24, 151138, 151149.

142.  <u>First</u>, the TEB assigned AWS a risk because it allegedly ████████████████



███████████████████████ AR Tab 610 at 181613. According to the Agency, although AWS

███████████████████████

███████████████████████

███████████ *Id.* at 181613-14. This assessed risk, however, fails for multiple reasons.

143.  As a preliminary matter, the RFP did not require offerors to ████████████
███████████████. AR Tab 593 at 181468-69, 181481. DoD therefore could not assign a weakness—defined as a "flaw in the proposal that increases the risk of unsuccessful contract performance"—for AWS's failing to address a nonexistent requirement. AR Tab 714 at 210043.

144.  Moreover, AWS's PWS does address ████████████████. ████████████████
██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ AR

Tab 367 at 152602 (emphases added). AWS then echoed this commitment ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████ AR Tab 368 at 152798. ██████

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████ AR Tab 610 at 181614 n.9.

145.   In addition, the administrative record shows Microsoft provided similar statements

in its PWS regarding ███████████████████████████████████████████████

████████████. *See, e.g.*, AR Tab 408 at 173218 ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████ AR Tab 611 at 181656.   There is no rational basis for such disparate

evaluations.

146.   Finally, for the reasons described in paragraphs 53136 to 137 of this Amended

Complaint, it was unreasonable for the TEB to assign AWS a weakness based on ████████

█████████████████████████████████, when the TEB did not hold Microsoft to that

same evaluation standard ████████████████████████████████████. AR

Tab 611 at 181688; AR Tab 733 at 210380; AR Tab 737 at 210422-24.

147. Second, the TEB assessed AWS a weakness and a risk because although AWS's

proposal ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████ AR Tab 610 at 181616. This is factually incorrect. AWS's proposal explains that ███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████ AR Tab 368 at 152787 (emphasis added). AWS's

proposal thus is explicit that ██████████████████████████████████████████████

██████████████████████████████. *See id.* In other words, the ███████████

DoD cites is actually a strength ██████████████████████████████.

148. Third, the TEB assessed AWS's ██████████████████ a weakness and a risk

because AWS's proposal ████████████████████████████████████████████████

█████████████████████████ AR Tab 610 at 181630. According to the TEB, AWS's

████████████████████████████████████████████████████ *Id.* As the TEB

acknowledged, however, ████████████████████████████████████████. AWS

██████████████████ ███████████████████████████.

149. For example, AWS explained how ████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

58

████████████████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████████████████████

████ AR Tab 368 at 152760 ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

AWS also explained that ██████████████████████████████████████

███████████████████████████ *Id.* at 152792. ████████████████

███████████████████████████████████████████████████████████.

    150.   Moreover, AWS's proposal states that ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████ *Id.* at

152793 (emphases added). ████████████████████████████████████

████████████████████████████████████████████ The TEB's evaluation

therefore does not withstand scrutiny.

    151.   Fourth, the TEB assessed AWS a weakness and a risk because ██████████████

████████████████████████████████████████████████████████████

████████████████████████████ AR Tab 610 at 181640. The

TEB's only cited example ████████████████████████████████████

████████████████████████████████████████████████████████████

████ *Id.*; AR Tab 368 at 152781-82 ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████ AWS

████████████████████████████████████████████████████████████

therefore did not deserve the assessed weakness and risk. Thus, none of the foregoing weaknesses

or risks is warranted.

### d) AWS Has a Substantial Comparative Advantage over Microsoft under Factor 2.

152.    The foregoing disparate treatment and erroneous evaluation assessments masked

AWS's clear comparative advantage over Microsoft under Factor 2:

- AWS received 12 strengths and 6 weaknesses, compared to Microsoft's 5 strengths and 6 weaknesses. *Compare* AR Tab 733 at 210376-79 *with* AR Tab 733 at 210380-81.

- AWS received 6 risk reductions and 1 risk, compared to Microsoft's 4 risk reductions. *Compare* AR Tab 733 at 210376-79 *with* AR Tab 733 at 210380-81.

- And, most importantly, AWS proposed its proprietary Nitro hypervisor, which the SSEB recognized "will be greatly advantageous to the Government over the entire contract term," "deserves special note," and "represents an extraordinary approach to the Government's requirements in this area," and which the SSAC conceded is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. AR Tab 733 at 210375-76; AR Tab 737 at 210423.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   AR Tab 734 at 210411-12.

153.    Each of these facts—which are unambiguously documented in the administrative

record—undermines any notion that AWS and Microsoft are relatively equal under Factor 2.

Under a rational and fair evaluation, AWS would have received Outstanding and Low Risk ratings

under Factor 2. At minimum, AWS would have had a significant qualitative advantage over

Microsoft. Combined with AWS's price advantage, this superior evaluation would have given

AWS a substantial chance of award.

### 2. Factor 3

154.     DoD determined the offerors' tactical edge solutions are relatively equal, but DoD based this conclusion on virtually the same flawed and disparate evaluation judgments that undermined the Agency's pre-remand final evaluation. First, DoD misevaluated the offerors' abilities to satisfy all required tactical edge capabilities, erroneously ▬▬▬▬ when, in reality, Microsoft's tactical edge approach ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬ Second, DoD erroneously assigned Microsoft ▬ strengths for ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, when AWS's tactical edge devices, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Third, DoD disparately evaluated the offerors' battery capabilities to minimize the fact ▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬. Fourth, DoD assessed unwarranted risks and weaknesses to AWS, while overlooking a deficiency in Microsoft's proposed approach to Price Scenario 5 that rendered its proposal ineligible for award.

#### a) DoD Unreasonably Evaluated Each Offeror's Ability to Perform the Full Range of Military Operations.

155.     The RFP required each offeror to "describe its proposed *approach* to providing tactical edge compute and storage capabilities across the range of military operations that balance portability with capability." AR Tab 593 at 181470 (emphasis added). DoD then was to evaluate "how well the proposed *approach* balances portability against capability to enhance warfighting capacity across the range of military operations in support of national defense." *Id.* at 181481 (emphasis added).

156.    Consistent with this requirement, AWS proposed an approach that leveraged a portfolio of Category One and Category Two tactical edge devices to meet DoD's requirements. For Category One, AWS proposed the Snowball Edge ("SBE"), which comes in Storage Optimized ("SO") and Compute Optimized ("CO") variants, and the Lightweight Snowball Edge ("L-SBE"), an extremely portable device. AR Tab 369 at 152801. For Category Two, AWS proposed the ████████████████████████████████████████████████████████████ ██████. *Id.* at 152802. AWS's proposal made clear that AWS's tactical edge devices, ████ ████████████████████████████████████████████████████—could perform every type of military operation contemplated by DoD. AWS summarized this breadth of tactical edge capability in the following chart in its proposal:



AR Tab 369 at 152802.

157.    Although neither the TEB nor the SSEB recognized that ████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████████[12]  Specifically, the TEB recognized that the L-SBE is capable of performing dismounted operations (*i.e.*, foot patrols), ████████████████████

_____

[12]  The failure of the TEB and SSEB to ████████████████████████████████
████████████████████ is discussed in paragraph 171 below.

████████████████████████████ [13] AR Tab 723 at 210238 ("However, the TEB has assessed

a strength [#5] in the proposed L-SBE's ability to provide computing capacity in a device *designed*

*to support dismounted operations* or operations where a small form factor compute capability is

required." (emphasis added)); *id.* at 210243 ("The TEB has assessed this to be a strength [#8] of

the device as it can easily be transported by a human for extended periods of time across long

distances, which is *particularly beneficial in dismounted operations*." (emphasis added)).

Moreover, the SSEB concluded that "the range of [AWS's] solutions covered *the full spectrum of*

*requirements*" and that "the family of [AWS's] offerings taken as a whole provides *good coverage*

against the requirements." AR Tab 733 at 210383 (emphases added).

    158.   In stark contrast, the TEB and the SSEB concluded that ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ ████████████████████. Microsoft proposed ████

Category One devices: ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████. [14]

AR Tab 410 at 173639.

---

[13] Dismounted operations refer to operations during which military personnel dismount from their vehicles. Although dismounted operations include mobile foot patrols, they also include operations where the warfighter dismounts his or her vehicle and then finds a stationary location from which his or her unit conducts operations. Throughout its evaluation, where DoD asserts various devices are incapable—or in the case of AWS's L-SBE, capable—of dismounted operations, it appears DoD, in fact, is focusing on whether the particular device is capable of the mobile foot patrol aspect of dismounted operations. *See* AR Tab 723 at 210233 (noting that "for the device to be employed on a dismounted (foot) patrol, it would require a battery to function").

[14] Microsoft also proposed its ███████████████████████ ███████████████████.
AR Tab 410 at 173639.

████████████████████████████████████████████████████



159.   The TEB found ████████████████████████████████

████████████████████████████████████   AR Tab 612

at 181695, 181704 (emphasis added); *see also* AR Tab 733 at 210386.

160.   Similarly, the TEB found ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████   AR Tab 612 at 181705 (emphasis

added); *see also* AR Tab 733 at 210386; AR Tab 410 at 173639.

161.   In sum, the TEB and the SSEB concluded █████████████

███████████████████████, ████████████████████████████████,

████████   ████████████████████████████████████████████

AR Tab 612 at 181695, 181704-05; AR Tab 733 at 210383, 210386.

162.   By any objective measure, this conclusion should have resulted in Microsoft receiving a deficiency and an Unacceptable rating for both technical capability and risk due to its ████████████   ████████████████—a fundamental RFP requirement.  AR Tab 593 at 181470, 181481 (requiring offerors to be capable of performing the full range of military operations); *see also id.* at 181487 (requiring an Unacceptable technical capability rating where a proposal "does not meet requirements and contains one or more deficiencies and is unawardable"); AR Tab 714 at 210043 (requiring a deficiency where there is "[a] material failure of a proposal to meet a Government requirement or a combination of significant weakness in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level"); AR Tab 714 at 210043 (requiring an Unacceptable risk rating where "[a] proposal contains a material failure or a combination of significant weaknesses that increases the risk of unsuccessful performance to an

64

unacceptable level"); AR Tab 763 at 210827 ("A proposal's failure to meet requirements established in the RFP would have resulted in a deficiency."). But that is not what happened. Instead of assigning Microsoft the deficiency and Unacceptable ratings it deserved, the TEB distorted the RFP and systematically minimized AWS's clear comparative advantage.

163. First, the TEB and the SSEB deployed a contrived evaluation standard—which DoD never articulated until its post-remand reevaluation—to draw parity between Microsoft's and AWS's tactical edge devices. *Compare* AR Tab 723 *with* AR Tab 324. Rather than comply with the RFP's mandate that DoD evaluate each offeror's overall *approach* to the tactical edge requirements to determine its suitability for the range of military operations, the TEB and SSEB focused on whether each tactical edge device, *individually*, could perform every military operation contemplated by DoD. AR Tab 593 at 181470-71, 181481; AR Tab 723 at 210232 (noting "each proposed device is *individually evaluated* in the following evaluation," and that the TEB "did not evaluate the proposed solutions [*sic*] ability to be deployed *simultaneously and operationally integrated*" (emphases added)); AR Tab 733 at 210383 ■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■ and that ■■■■■■■■■■■■

■■■■■■■■■■■■■■■■ (emphases added)).

164. DoD's interpretation of the RFP, however, is directly at odds with the RFP's plain language and its focus on balancing portability and capability. *See, e.g.*, AR Tab 593 at 181481. Nowhere did the RFP require DoD to assess whether an *individual* tactical edge device is capable of performing the full range of military operations on its own. AR Tab 593 at 181470 (not including the ability to perform the full range of military operations independently among the list of "minimum" requirements "each proposed tactical edge device" must meet). Moreover, as

evident from ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████. This is precisely why the RFP focused on the offerors' *approaches* to meeting tactical edge requirements—DoD recognized that portability came at the expense of capability and therefore eschewed a one-size fits all requirement that would prevent DoD from leveraging a compliment of tactical edge devices tailored to DoD's needs.

165.    In other words, DoD's claim that each tactical device must individually be capable of performing the full range of military operations is undermined by both the RFP's unambiguous requirements and common sense. The Agency's departure from the RFP's clear requirements reveals a deliberate effort to steer the JEDI award away from AWS.

166.    Second, the TEB and the SSEB distorted the relative merits of the offerors' proposals by ████████████████████████████████████████████

████ ████████████████████████████████████████

████████. *Compare* AR Tab 723 at 210233-34, 210238 ████████████████

████████████████████ *with* AR Tab 612 at 181696 ████████

████████████████████████████; AR Tab 733 at 210381-88. By proceeding in this manner,

DoD illogically equated ████████████████████████████████████

████████████ ████████████████████████████████████████,

with AWS's clear ability to perform all military operations ████████████████

████████████.

167.    The SSA then compounded this disparate treatment by reaching a conclusion flatly contradicted by the evidence in the administrative record. Even though the TEB did not identify

a single category of military operations that AWS's family of tactical edge devices could not support as a group—and the SSEB determined that "the range of [AWS's] solutions covered the *full spectrum of requirements*" and that "the family of [AWS's] offerings taken as a whole provides *good coverage* against the requirements"—the SSA inexplicably concluded ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ *Compare* AR Tab 733 at 210383, 210386 (emphases added) *and* AR Tab 612 at 181695, 181704-05 *with* AR Tab 738 at 210446. Without any support in the record, the SSA found that: ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ AR Tab 738 at 210446 (emphases added).

The SSA then added: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* Neither of these assessments is consistent with the SSEB's evaluation, which concluded that AWS provided "good coverage" for the full range of military operations, whereas Microsoft ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮. AR Tab 733 at 210383, 210386.

168.   The implications of DoD's unreasonable assessments are significant.  Had DoD selected AWS for award, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮. This, however, is not the case with Microsoft as the JEDI Contractor.  Because DoD determined Microsoft's ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

DoD has conceded ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Not only is such a result contrary to the JEDI RFP, but it also introduces substantial risk to national security.  DoD, however, did not stop at

overlooking the fatal flaws in Microsoft's tactical edge approach; it further skewed the Factor 3 evaluation by unfairly penalizing the only device that DoD determined could perform ▮▮▮▮▮▮ ▮▮▮▮▮▮: AWS's L-SBE.

169.    AWS's L-SBE ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ It is ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as the TEB found, "provides unique warfighting capability" and is "designed to support dismounted operations or operations where a small form factor compute capability is required." AR Tab 723 at 210238. Given DoD's finding that Microsoft did not propose *any* tactical edge device that is capable of performing ▮▮▮▮▮▮▮▮▮▮▮▮, the L-SBE's unique capabilities should have been a significant discriminator in the evaluation and should have resulted in a higher rating for AWS. Instead, DoD repeatedly conjured up ways to diminish the L-SBE's value.

170.    First, the TEB claimed that "[a]lthough the proposed L-SBE could be used in all of those domains [*i.e.*, 'Dismounted / Foot-mobile Ops / Land Domain, Mobile Ops / Land Domain, Air Domain, Naval Domain, Cyber Domain, Deployed with an Individual JEDI [Cloud] User, Deployed with a Squad-level unit, and Deployed with a HQ up to [Geographic Combatant Command] GCC'] . . . the amount of information to determine if a proposed L-SBE could be used independently (*i.e.*, without other proposed tactical edge devices) *to support anything larger than squad level (~13 individuals)* is insufficient." AR Tab 723 at 210235 (emphasis added). This assessment, however, is internally inconsistent because the TEB acknowledged the L-SBE could perform in all domains, including the Geographic Combatant Command domain, which includes more than the 13 individuals DoD estimates comprise a squad. *Id.* Moreover, the TEB's requirement that the L-SBE must be able to support DoD units larger than squad level is pulled out of thin air. No such requirement exists in the RFP. AR Tab 593 at 181470. The TEB simply

manufactured this requirement to diminish the L-SBE's unique ability to support dismounted operations. In other words, DoD moved the evaluation goal posts after having reviewed the offerors' proposals.

171. Second, the TEB neutralized the advantage AWS has by virtue of its L-SBE by assigning two weaknesses and two risks, which together exceed the number of strengths (3) that the L-SBE earned. AR Tab 723 at 210238-39. In other words, even though the L-SBE offered a unique and required capability that Microsoft did not provide—the ability to support ████

████—the way the TEB evaluated the L-SBE meant AWS would have been better off not proposing the device at all.[15]

172. Such distortions of the RFP's requirements and the offerors' capabilities, which help one offeror to the detriment of another, are *per se* arbitrary and capricious.

**b)** **The TEB Unreasonably** ████

173. In DoD's pre-remand final evaluation, DoD assigned AWS's SBE and L-SBE devices two weaknesses and two risks ████ to meet the RFP's low temperature requirements ████

████ AR Tab 324 at 151169, 151171. DoD assigned these weaknesses and risks even though it recognized that the RFP did not require offerors to meet the low temperature requirements ████ and that DoD did not ████

---

[15] Although the SSEB appears to have ultimately removed the two risks that the TEB assigned to the L-SBE, that adjustment was perfunctory, as the SSEB had already concluded "further elimination of weaknesses would not affect either the adjectival or risk ratings." AR Tab 733 at 210383-85. The fact remains that the SSEB's conclusions regarding AWS's tactical edge solution under Factor 3 arbitrarily discounted the ████.

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. AR Tab 330 at

151283-84; ECF No. 139 at 42 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

174.    In its post-remand reevaluation, DoD resolved its previously disparate evaluation

by assigning Microsoft's ▬▬▬▬▬▬▬▬  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬. AR Tab 612 at 181699, 181701.  Thus, although DoD continues to impose

its unstated evaluation criterion regarding low temperature requirements, it at least is doing so

equally.  But in the course of correcting the errors in its previous evaluation, DoD created a new

one—an error that again evidences disparate treatment and DoD's concerted effort to tilt the

evaluation in Microsoft's favor.

175.    According to the TEB, although ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬ to meet low temperature requirements—which earned both offerors two weaknesses and two

risks—Microsoft also deserved two strengths because ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ AR Tab 612 at 181699-70, 181701-02.  The

TEB determined AWS's SBE device did not deserve a similar strength because ▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ AR Tab 723 at 210238.

176.    Similarly, the TEB did not assign a strength to AWS's L-SBE because ▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

██████████████████████████████████████████ AR Tab 723 at 210239-40. The

TEB's focus on ███████████████████████████████ to assess these weakness

to AWS alone, however, is absurd.

177.   <u>First</u>, even with ████████████████, both the SBE and the L-SBE have

*significantly* ██████████ than any of Microsoft's tactical edge devices. Both the SBE

and the L-SBE also have *significantly* ███████ than any of Microsoft's tactical edge devices

(and, although not mentioned by the TEB, ████████████████████████████).

The table below compares the weight, dimensions, and volume of the various Category 1 tactical

edge devices offered by AWS and Microsoft, respectively.[16]

|  | Cat 1 Device ███ | Weight | Dimensions | Volume |
|---|---|---|---|---|
| **AWS** | SBE-SO | | | |
| | SBE-CO | | | |
| | L-SBE | | | |



[16] ██████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████.███



**MICROSOFT**

AR Tab 330 at 151283-84; AR Tab 369 at 152805, 152809; AR Tab 410 at 173641, 173643.

178. ████████████████████████████████████████████████████████ [17]

|  | Cat 1 Device ███ | Weight | Dimensions | Volume |
|---|---|---|---|---|
| **AWS** | SBE-SO | | | |
| | SBE-CO | | | |
| | L-SBE | | | |
| **MICROSOFT** | | | | |



[17] ████████████████████████████████████████ AR Tab 410 at 173643.
███████████████████ . *See id.* at 173645 ███████

AR Tab 330 at 151283-84; AR Tab 369 at 152805, 152809; AR Tab 410 at 173641, 173643.

179.   Thus, there really is no comparison between AWS's devices and Microsoft's devices with respect to ███████████████—AWS's devices are decidedly ██████████ in all circumstances. In light of this fact, DoD's focus on ████████████████ ██ is particularly troublesome. In the debriefing provided to AWS, DoD explained its purported concern by claiming: "[w]hile on patrol, the amount of space available to pack supplies is extremely limited. The loss of space in a patrol pack while on dismounted patrol would require the unit's leader to determine if they want the device or ammunition/food/water/other supplies. Adding volume with extremely limited space imposes an additional logisital [*sic*] burden." AR Tab 763 at 210844.  But as the comparison above shows, Microsoft's devices ██████ ████████████████████ than AWS's devices, ██████████████ ████████.   In   other   words,   ████████  ██████  ███  █████  ██  ██ ████████████████████████████████████ ████████████████████.

180.   Second, ████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████  *Id.* Thus, Microsoft's ████████████████ ██████████████████████████████, but also puts the warfighter at greater risk. This is equivalent to rewarding an offeror for proposing ████████████ ████████████████████████████████

███████. It is inherently unreasonable.

181.    Under a rational evaluation, the TEB would not have assigned Microsoft two separate strengths for its ████████ given it confers no actual advantage to DoD over AWS's ████████ tactical edge devices. Instead, the TEB would have assigned AWS two strengths for its ████████ because of the enhanced flexibility they afford DoD. DoD's only rationale for favoring a less flexible ████████ is that it ████████, which has no basis in the RFP and, moreover, makes no sense given ████████. The post-remand evaluation smacks of deliberate disparate treatment.

### c)    DoD Minimized the Importance of Battery Power and Wrongly Concluded Microsoft and AWS Were Equal.

182.    The RFP required offerors to demonstrate that their tactical edge devices have "[t]he ability to be powered by battery." AR Tab 342 at 151494.

183.    In its evaluation of the offeror's original proposal submissions prior to the remand, the TEB ████████. AR Tab 208 at 57972. The TEB thus ████████, ████████ ████████[18] *Id.*

184.    Yet, when evaluating Microsoft's final proposal—both in the pre-remand final evaluation and in the post-remand reevaluation—DoD inexplicably minimized the importance of

---

[18] The TEB's assessment of a deficiency in this respect also is notable given the TEB's failure to penalize Microsoft for ████████. *See, e.g.,* AR Tab 612 at 181695.

battery power. AR Tab 330 at 151288; AR Tab 612 at 181705. ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ AR Tab 330 at 151288; AR Tab 612 at 181705. The

TEB made the same determination ▮▮▮▮▮▮▮▮▮▮▮▮▮. AR Tab 612 at

181706. In contrast, when evaluating ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ AR Tab 723 at 210244. Instead, the TEB explicitly noted ▮▮

▮▮▮▮▮▮ *Id.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ DoD's rationale for lowering the bar for Microsoft raises

several concerns.

185.    First, the fact that Microsoft's tactical edge devices are ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ is a significant disadvantage, given the TEB has acknowledged that ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ AR Tab 208 at 57972. And, of course, Microsoft's need for ▮▮▮▮▮ further

exacerbates its ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

186.    Second, DoD did not have the discretion to deviate from the RFP's requirements in

order to tailor the evaluation to one offeror's solution. Microsoft proposed its ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

devices as a "portable" Category One devices.  AR Tab 593 at 181470 (describing Category One

devices as ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.").  Battery power—▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇—therefore is of paramount importance.  Yet, contrary to the RFP, DoD

▇▇▇▇▇▇▇▇▇▇▇ for Microsoft's Category One devices.  AR Tab 612 at 181705-06.

187.  Third, the unexplained shift in the importance of battery power suggests that DoD

trivialized battery power to minimize the importance of AWS's ▇▇▇ battery power and obscure

Microsoft's inadequacy—yet another example of backing into a desired outcome.  Microsoft's



See id.; AR Tab 410 at 173645.  In stark contrast, AWS's ▇▇▇▇▇▇▇▇▇▇

AR Tab 369 at 152805, 152809.  AWS's battery power thus is vastly ▇▇▇ to Microsoft's.

Accordingly, DoD's evaluation of battery power is further evidence of DoD's disparate and

unreasonable evaluation conclusions.

> **d)  DoD Assigned AWS Unwarranted Risks and Weaknesses, While Overlooking a Deficiency in Microsoft's Proposal.**

188.  DoD exacerbated the evaluation errors described above by assigning additional

unwarranted risks and weaknesses to AWS's Factor 3 proposal, while ignoring a deficiency in

Microsoft's proposal.  Each of these mistakes existed in the pre-remand final evaluation and went

uncorrected in the post-remand reevaluation. *Compare* AR Tab 723 at 210240, 210247, 210249 *with* AR Tab 324 at 151171, 151178, 151180; *compare* AR Tab 612 at 181711-12 *with* AR Tab 330 at 151294.

189. First, the TEB assessed AWS's ▨ a weakness and risk because AWS



▨ AR Tab 723 at 210240. The SSEB correctly acknowledged that this weakness is unreasonable because ▨

▨. AR Tab 733 at 210383 ▨

190. Yet, despite recognizing the weakness is irrational, the SSEB did not remove the weakness because the SSEB concluded the removal would not affect the adjectival or risk rating assigned. *Id.* In reaching this conclusion, however, the SSEB never considered whether removal of the weakness would confer upon AWS a qualitative advantage over Microsoft under Factor 3. *See id.* It is difficult to imagine a scenario in which it would not. If, as the evaluation materials indicate, DoD considered the offerors to be equal under Factor 3, the removal of a weakness for AWS would have tipped the overall evaluation in AWS's favor.

191. Second, DoD assessed AWS two risks because ▨

77

████████████████████████████████████   AR Tab 723 at 210249.   These risks,

however, are unreasonable because the TEB explicitly acknowledged ███████████████████

████████████████████████████████████████████████████████

██████████████████████████   AR Tab 610 at 181650.   Thus, ██████████████

████████████████████████████████   *See id.*  Moreover, the TEB's evaluation makes

clear that it did not assess these risks because AWS failed to satisfy a particular requirement, but

because AWS proposed an approach "that is not necessarily how the Government would choose

to execute this specific scenario during contract execution." AR Tab 723 at 210249. The TEB,

however, recognized that AWS's approach "assumes things for purposes of the price scenario,

*which is required.*" *Id.* Accordingly, the TEB did not have a rational basis to assess AWS risks

for complying with the Price Scenario's mandate.

192.   Third, DoD assigned AWS a risk because ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████   AR Tab 723 at 210247.

According to DoD, ██████████████████████████████████████████

████████████████████████████████████████████   *Id.*   This risk,

however, is unreasonable because there was no specific requirement for an █████████████

██████████████████████   AR Tab 664 at 193515-18.

193.   DoD did not simply assign unwarranted risks and weaknesses to AWS; it also

inexplicably ignored a deficiency in Microsoft's proposed approach to Price Scenario 5. Price

Scenario 5 required offerors to propose a solution that "meets CNSSAM TEMPEST/01-13:

Red/Black Installation Guidance with regard to physical separation of environment where

████████████████████████████████████████████████

necessary." AR Tab 664 at 193525. TEMPEST Red/Black Separation refers to the concept of separating electrical and electronic circuits, components, equipment, and systems that handle national security information (RED), in electrical form, from those that handle non-national security information (BLACK) in the same form.[19] The TEB concluded that Microsoft ████

████████████████████████████████████████████████████████████

████████████████████████████████████████   AR Tab 612 at 181712.

Yet, the TEB inexplicably concluded that Microsoft's solution "meets the requirements" for Price Scenario 5. *Id.*

194.   Critically, this rubber-stamp stands in stark contrast to DoD's ██████████

████████ to AWS in the initial evaluation because the TEB was ██████████████

████████████████████████████████████████████████. AR Tab 208

at 57972. Whereas the TEB ████████████████████████████

████████, the TEB gave Microsoft a free pass, simply assuming—without evidence—that Microsoft's solution met the Scenario's requirements. *Compare id. with* AR Tab 612 at 181711. This is yet another example of disparate treatment and DoD's failure to evaluate Microsoft's proposal consistent with the RFP. Under a rational evaluation, Microsoft would have received a deficiency and been ineligible for award. Accordingly, DoD should not have assessed AWS the foregoing risks and weaknesses, while it should have recognized a deficiency in Microsoft's approach to Price Scenario 5.

---

[19] Information Technology Laboratory, Computer Security Resource Center Glossary, *RED/BLACK Concept*, Nat'l Inst. of Standards & Tech., https://csrc.nist.gov/glossary/term/RED_BLACK_concept#:~:text=Definition(s)%3A,BLACK)%20in%20the%20same%20form.

████████████████████████████████████████████████████████████

e) **AWS Had a Substantial Comparative Advantage over Microsoft under Factor 3.**

195.    The foregoing disparate and unreasonable evaluation assessments obscured AWS's

clear comparative advantage over Microsoft under Factor 3. An objective review of the evaluation

record shows AWS's Factor 3 proposal was superior to Microsoft's in nearly every respect:

- AWS received 13 strengths, 5 weaknesses, and 5 risks, compared to Microsoft's 12 strengths, 7 weaknesses, and 3 risks. *Compare* AR Tab 733 at 210382-86 *with* AR Tab 733 at 210386-88.

- AWS proposed substantially                          tactical edge devices than Microsoft that are, on a pound-for-pound basis, also more technically capable. AR Tab 330 at 151283-84; AR Tab 369 at 152805, 152809; AR Tab 410 at 173641, 173643. AWS's balance between portability and capability is a significant discriminator, given both offerors proposed tactical edge devices that meet DoD's basic compute and storage requirements and can be pooled, as needed, to amplify the total compute and storage available to DoD. AR Tab 593 at 181470 (requiring tactical edge devices to be "[e]xtensible such that multiple (*e.g.*, 2, 20, 200, or 2000 units) can be collected and pool resources");

- 
                                                                            AR Tab
733 at 210382-88.  In particular,
                                       . *Compare* AR Tab 723 at 210238, 210243 *with* AR
Tab 612 at 181695, 181704-05.

- Finally, Microsoft's approach to Price Scenario 5 is deficient because Microsoft's proposal—by DoD's own admission—lacked sufficient information for DoD to conclude that Microsoft satisfied the Scenario's requirements.

196.    Each of these facts—which are unambiguously documented in the administrative

record—undermine any notion that AWS and Microsoft are relatively equal under Factor 3, the

second most important evaluation factor. Under a rational and fair evaluation, AWS would have

received Outstanding and Low Risk ratings under Factor 3. At minimum, AWS would have had

a significant qualitative advantage over Microsoft. Combined with AWS's price advantage, this superior evaluation would have given AWS a substantial chance of award.

### 3. Factor 4

197. DoD failed to evaluate the offerors' proposals in accordance with the RFP's evaluation criteria for Factor 4, instead relying on disparate treatment and unreasonable evaluation conclusions ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮. First, DoD disparately evaluated the offerors' ▮▮▮▮▮▮▮▮▮ capabilities and then relied on that disparate evaluation ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ under Factor 4. Second, DoD assigned AWS an unwarranted risk ▮▮▮▮▮▮

▮▮▮▮▮. Third, DoD assigned Microsoft an unwarranted strength for a capability that, by Microsoft's own admission, ▮▮▮▮▮▮▮.



### a) The SSAC and the SSA Engaged in Disparate Treatment ▮ under Factor 4.

198. Prior to DoD's request for remand, the SSEB, the SSAC, and the SSA agreed that AWS and Microsoft were relatively equal under Factor 4. The SSEB "did not assess either of the proposal responses to this factor to be meaningfully technically superior or contain significant points of differentiations." AR Tab 456 at 176380. Similarly, the SSAC concluded that "there is not a notable difference between the two offerors." AR Tab 457 at 176402. And, the SSA found that "neither Offeror is superior to the other" with respect to Factor 4. AR Tab 459 at 176416.

199. Post-remand, neither the TEB nor the SSEB altered its prior assessment of the offerors' capabilities. The TEB assigned Microsoft *the exact same strengths* it assigned in its prior evaluation. *Compare* AR Tab 331 at 151297-98 *with* AR Tab 703 at 209976-77. Moreover the

SSEB ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

81

███████████████ and that ████████████████████████████████

███████████████████████████████████████████████████████████

*Compare* AR Tab 456 at 176380 *with* AR Tab 733 at 210388-89.

 200. Yet, despite no material changes in the underlying evaluations, ████████████████

████████████ The SSAC and the SSA ████████ ████████████████████

██████████████████████████████████████████████████████████

██████████████████████ AR Tab 737 at 210426; AR Tab 738 at 210447.  The SSAC's

and the SSA's assessments, however, are fundamentally flawed because they are predicated on the

TEB's disparate evaluation of the offerors' ██████████████████ capabilities.

   **(1) The TEB Disparately Evaluated the Offerors' ████████ Capabilities, a Critical Component of ████████████ .**

 201. In connection with its review of the offerors' ████████████████

capabilities,[20] the TEB assigned both Microsoft and AWS a strength for providing ████████████

████████████████████████████████ AR Tab 702 at 209963; AR Tab 703

at 209977.  The TEB then assigned only Microsoft three additional strengths related to ████████ ,

████████████████████████████████████ .  *Compare* AR Tab

331 at 151297-98 *with* AR Tab 703 at 209976-77.  AWS also deserved these strengths then, and

it still deserves them now.

 202. <u>First</u>, the TEB assigned Microsoft a strength for ████████████████

████████████████████████████████████████████

---
20 ████████████████████████████████████████████
████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████  AR Tab 703 at 209976-77.

203.  ███████████████████████████████████████████

███████████████████████████████████████  . FedRAMP High Control

No. RA-05 requires cloud service providers to "[e]mploy[] vulnerability scanning tools and

techniques that facilitate interoperability among tools and automate parts of the vulnerability

management process by using standards for . . . [m]easuring vulnerability impact."[21]  Control No.

RA-05 identifies potential sources of vulnerability impact data, including the Common

Vulnerabilities and Exposures ("CVE") database and the Common Vulnerability Scoring System

("CVSS").  *Id.*  Because ███████████████████████  is a basic requirement, it is

questionable whether either offeror deserved a strength for it.

204.  But if a strength was warranted, AWS also deserved one.  In a proposal subsection

entitled, ███████████████████████████████████  AWS discussed in

extensive detail how ██████████████████████

███████████████████████████████████████████████████

███████████████████████████  AR Tab 370 at 152829.

205.  Moreover, like Microsoft, AWS described ███████████████████

███████████████████  . AWS emphasized ███████████████

███████████████████████████████████████████████████

---

[21] FedRAMP Security Controls Baseline at Control No. RA-05 (July 31, 2020),
https://www.fedramp.gov/documents/ (High baseline controls) (last accessed Oct. 5, 2020).

[REDACTED] AR Tab 370 at 152827. AWS also

explained [REDACTED]

[REDACTED] *Id.* at 152827-28

(discussing patching based on criticality). Thus, DoD had no basis to assign Microsoft and not

AWS a strength for [REDACTED] AR Tab

703 at 209976-77.

206. Second, the TEB assigned Microsoft a strength related to [REDACTED]

[REDACTED]

[REDACTED] *Id.* at 209977.

207. AWS, however, also proposed to [REDACTED].

AWS's proposal discusses AWS's proprietary patching technology, which allows AWS to "hot-

patch" vulnerabilities with *zero customer downtime*. AR Tab 370 at 152827, 152829. AWS

explained how it [REDACTED]

[REDACTED]

[REDACTED] *Id.* at 152827. And, AWS explained how it [REDACTED]

[REDACTED]

[REDACTED] *Id.* Microsoft therefore enjoys no advantage with respect

to [REDACTED].

[REDACTED]

208.   Third, the TEB assigned Microsoft a strength related to

AR Tab 703 at 209977.

209.   AWS, however, also proposed to

. AWS's proposal describes

in detail AWS's ability

. AR Tab 370 at 152828.   AWS also

described

Id. at 152832.  Moreover, AWS emphasized

Id. at 152835.  Thus,

to the extent Microsoft deserved any of the foregoing strengths, AWS deserved them as well.

85

        **(2)**    **The SSAC and the SSA** ▮▮▮▮▮▮▮▮
                   **Based on the TEB's Disparate Evaluation.**

210.   Although the strengths the TEB assigned to Microsoft for its ▮▮▮▮ capability existed in the pre-remand final evaluation, during the post-remand reevaluation, the SSAC and the SSA for the first time seized upon ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮. AR Tab 737 at 210426; AR Tab 738 at 210447.

211.   Specifically, based on the strength ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ AR Tab 737 at 210426.  In particular, the SSAC emphasized that Microsoft's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*  The SSA concurred with the SSAC's assessment.  AR Tab 738 at 210448.

212.   But, as detailed above, AWS should have received the same strength as Microsoft for ▮▮▮▮▮▮▮▮▮▮▮▮.  AWS dedicated an entire section of its proposal to explaining how it ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Indeed, as a FedRAMP High authorized cloud service provider, such ▮▮▮▮▮▮▮▮ practices and capabilities are *required*. [22]  Thus, if the SSAC and the SSA emphasized Microsoft's

---

[22] *See* FedRAMP Security Controls Baseline at Control No. RA-05 (July 31, 2020), https://www.fedramp.gov/documents/ (High baseline controls) (last accessed Oct. 5, 2020).

████████████████ capability because of the strength assigned by the TEB, and the TEB

should have assigned a similar strength to AWS, it necessarily follows that ████████████

████████████████████████████████████████ .

213.   The specific details that the SSAC and the SSA highlight about Microsoft's

████████████████ capability underscore the lack of meaningful difference between the

offerors' capabilities on that issue.  For example, the SSAC and the SSA note that Microsoft's

████████████████ capability ████████████████████ . AR Tab 737 at

210426; AR Tab 738 at 210447.  But so is AWS's ████████████ capability.  AWS

proposed ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ AR Tab 702 at 209962.  The TEB

explicitly recognized that ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ AR Tab 702 at 209962-63 (emphases

added).

214.   AWS also proposed ████████████ , which the TEB, the SSEB, the SSAC, and

the SSA seemingly ignored.  *See generally* AR Tab 702; AR Tab 737; AR Tab 738. ████████

████████████████████████████████████████████████

████████████████████████ AR Tab 367 at 152750. ████████

████████████████████████████████████ *Id.* ████████

■■■■■■ *Id.* ■■■■■■

■■■■■■ *Compare* AR Tab 370 at 152827 *with* AR Tab 411 at

173659. ■■■■■■

■■■■■■ *Compare* AR Tab 370 at 152826

■■■■■■

■■■■■■ (emphasis added)) *with* AR Tab 411 at 173659 ■■■■■■

■■■■■■ (emphasis added)) *and id.* at 173660 ■■■■■■

■■■■■■

■■■■■■ (emphasis added)).

215.   The SSAC and the SSA, however, did not simply ignore the facts; they created new

ones.   Ignoring AWS's ■■■■■■ services—one of which even earned a

strength from the TEB—the SSA suggested that AWS ■■■■■■

■■■■■■.   AR Tab 738 at 210447.   As demonstrated above,

this is both false and contrary to the TEB's evaluation.   AWS, in fact, proposed ■■■■■■

■■■■■■

DoD simply ignored them.

216.   Ultimately, the SSAC's and the SSA's focus on Microsoft's ■■■■■■

■■■■■■ capability is perplexing.   At its core, ■■■■■■ is a basic cloud

capability, required of all FedRAMP High authorized cloud service providers such as AWS and

Microsoft. No cloud service provider can maintain cloud infrastructure or services at scale without

███████████████████████████████████. Accordingly, the SSAC's and the SSA's

████████████████████████████████ based on such a fundamental capability—████

███████████████████████████████████████ which was not believed at that

time to be ████████████ by the SSEB, the SSAC, or the SSA—is further evidence of the extent to

which DoD is willing to distort the record to reaffirm its award to Microsoft.

### b) DoD Assigned AWS an Unwarranted Risk.

217.    DoD also misevaluated AWS by assigning a risk to AWS's ██████████████████████,

which the TEB concluded ███████████████████████████████████████████████

███████ AR Tab 702 at 209962. According to the TEB, this █████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████ *Id.*; *see also* AR Tab 733 at 210389

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████

218.    The purported risk identified by the TEB, however, is a contrivance. Neither the

TEB, the SSEB, the SSAC, nor the SSA identified this risk in the pre-remand final evaluation. *See*

*generally* AR Tab 325; AR Tab 456 at 176381; AR Tab 457 at 176402; AR Tab 459 at 176416.

Yet now, the TEB claims—with concurrence from the SSEB, SSAC, and the SSA—that this risk

not only exists, but also affects ███████████████████████████████████████████

███████████████████████████████████████████████████ AR Tab 702 at

209962. In any event, the TEB's assessment is flatly contradicted by AWS's proposal, which

makes clear that ███████████████████████████████████████████████████████

219.   AWS proposed ███████████████████████████████

███ AWS referred to ███████ when ██████████████████████

See AR Tab 367 at 152680 ████████████████████████████

███████████ see also AR Tab 368 at 152792 ███████████

220.   With respect to █████████████████████, AWS's proposal made clear

that ████████████████████████. Specifically, AWS's proposal states: ███

███████ AR Tab 370 at 152828-29 (emphases added).  AWS's proposal also states:

███ Id. (emphasis added). ███████████████

221.   Similarly, ███████████████████████████████

███████████. As AWS's proposal explained: ███████████

90

████████████████████████████████████████████████████████████

████████████████████████████████████████████████  AR Tab 370 at

152844 (emphases added).   The reference ████████████████████████████

███████████████████████████████████████. *See id.*  Thus, the TEB had no valid

basis to conclude that ████████████████████████████████████████████

██████████████████████████████.

222.   But even if DoD were correct that ███████████████████████████

██████████████████████████, the administrative record shows AWS proposed ██

████████████████████████████. As noted above, AWS █████████████████

████████████████████████████████████████████████████████████

████████████████████   AR Tab 702 at 209971.

223.   AWS proposed ████████████ because AWS recognized ████████████

██████████████████████████████  AR Tab 369 at 152810-11.

AWS explained:

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

*Id.* at 152811 (emphasis added).  In order words, AWS proposed █████████████

████████████████████████████████████████████████████████████

██████████████████████████████████  *See, e.g.*, AR Tab 25 at 476 █████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  Yet, rather

91

████████████████████████████████████████████████████████████
██████████████████████████████████████████

than recognize this aspect of AWS's proposal for the strength that it is, DoD inexplicably penalized

AWS by assigning a risk, apparently because DoD fears its own decision-making ▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ AR Tab 763 at 210851.

224. The assessed risk is particularly confounding because the SSEB considered this

exact issue under Factor 3 and reached the opposite conclusion. Under Factor 3, the TEB assigned

AWS a weakness because ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ AR Tab 723 at 210240. The

SSEB overruled the weakness, stating:



AR Tab 733 at 210383 (emphases added). It defies logic for the SSEB to reject the weakness

assigned under Factor 3, yet accept the risk assigned under Factor 4. Accordingly, whether on the

merits or basic common sense, the assessed risk is without a rational basis.

        **c)**     **DoD Unreasonably Assigned Microsoft a Strength for Its** ▬▬▬▬▬▬▬▬▬▬▬▬**.**

225. The TEB assigned AWS and Microsoft identical strengths for ▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *Compare* AR Tab 702 at 209971 *with* AR Tab 703 at

209984. This reflects a minor improvement from the TEB's disparate treatment during the pre-

remand final evaluation, when the TEB inexplicably assigned only Microsoft a strength for ▬▬▬▬.

*Compare* AR Tab 325 at 151190 *with* AR Tab 331 at 1. But the TEB's correction is not nearly

enough.

226. According to the TEB, Microsoft earned its strength because it demonstrated "an exceptional approach to meeting the requirements in Section L, ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ is a strength [#6] of the proposal because it helps address sensitive and highly compartmentalized data that exists across DoD at all classification levels. ██

████████████████████████████████████████ AR Tab 703 at 209984.

227. Microsoft's proposal, however, makes clear that ████████████████████

████████████████ . Specifically, Microsoft's proposal states:

████████████████████████████████████████

AR Tab 411 at 173674 (emphases added). In other words, although Microsoft suggests ████████

████████████████████████████████████████████████████

████████████████████████████████████████ That is,

Microsoft ████████████████████████████████████████

████████████████████████████████████████████████████

██ AR Tab 726 at 210293 ████████████████████████████

██████

████████████████████████████████████████████████████
████████████████████████████████████████

228.   Of course, the fact that Microsoft ▮▮▮▮▮▮▮▮▮▮▮▮▮ is not, itself, improper. What is improper, however, is that DoD not only considered ▮▮▮▮▮▮▮ in its evaluation—despite ignoring ▮▮▮▮▮▮▮▮▮▮ under Factor 2—but also assigned it a strength. This is the epitome of disparate treatment.

### d)   AWS Had a Comparative Advantage over Microsoft under Factor 4.

229.   The foregoing disparate and unreasonable evaluation assessments masked AWS's comparative advantage over Microsoft under Factor 4. An objective review of the evaluation record shows AWS's Factor 4 proposal was superior to Microsoft's:

- Both offerors received the same number of strengths, but the TEB unfairly denied AWS three additional strengths for its ▮▮▮▮▮▮▮▮▮ that Microsoft received. *Compare* AR Tab 702 at 209962-63 *with* AR Tab 703 at 209976-77. Thus, AWS, in fact, had substantially more strengths than Microsoft.

- Moreover, under a rational evaluation, AWS would not have received a risk ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

- Finally, had DoD evaluated proposals properly, ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ AWS would have numerous advantages, including ▮▮▮▮▮▮▮▮▮▮▮.

230.   Each of these facts—which are unambiguously documented in the administrative record—undermine any notion that AWS and Microsoft are relatively equal under Factor 4. Under a rational and fair evaluation, AWS would have had a qualitative advantage over Microsoft despite both offerors receiving Outstanding and Low Risk ratings. Combined with AWS's price advantage, this superior evaluation would have given AWS a substantial chance of award.

### 4.   Factor 5

231.   DoD assigned AWS only a Good rating under Factor 5, rather than the Outstanding rating AWS deserved, based on a confluence of evaluation errors. First, the SSAC inexplicably

downplayed AWS's data export capability—which the SSEB ████████████

████████ —by unreasonably concluding ████████████

████████ . Second, the SSAC unreasonably minimized the significant benefit associated with

AWS's ability to support failover across geographically redundant resources—which the TEB

assigned a strength—by arbitrarily concluding that ████████████

████████████████████████████████████

Third, the SSAC irrationally failed to assess AWS a differentiating strength for its qualitatively

and ████████ superior marketplace offerings.

### a)   AWS's Data Export Capability Is a Significant Differentiator.

232.   When evaluating AWS's Factor 5 proposal, the TEB assigned AWS a strength for

its data export capabilities, noting that ████████████████

████████████████████████████████████

████████████████████████████████████ AR

Tab 715 at 210088.

233.   The SSEB acknowledged this strength and identified AWS's data export

capabilities ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████ AR Tab 733 at 210392. In contrast, the SSEB found Microsoft's

approach ████████████████████████

████████   *Id.*

234.   The SSAC, however, unreasonably trivialized AWS's superior capability.

Although it acknowledged the strength AWS received ████████████ it

dismissed AWS's capability as only ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████  AR Tab 737 at 210427 (emphases added). The

SSA arrived at the same conclusion, finding that ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████  AR Tab 738 at 210447.

235.    The SSAC's and the SSA's purported grounds for dismissing the benefits
associated with AWS's ██████████████████████, however, are unsupported by the RFP and
the SOO. The RFP *required* DoD to evaluate each offeror's proposed approach to application and
data portability, including the offeror's method for "[e]xporting all data and object storage,
including schemas, from one application, from multiple applications associated with a single
workspace, and from all applications associated with JEDI Cloud workspaces regardless of storage
type." AR Tab 593 at 181472, 181483. Moreover, the SOO *required* offerors to "demonstrate
migration of an application and data (provided by the Government for this purpose) from JEDI
Cloud to a different hosting environment," which "shall validate the Portability Plan and evidence
a reasonable ability to successfully migrate off of JEDI cloud." AR Tab 27 at 615.

236.    Elsewhere, DoD has emphasized the importance of data migration capabilities in
terms of portability. According to DoD, ████████████████████████████████████████

████████████████████████████████████████████████████████████  AR Tab 25 at 499;

AR Tab 248 at 60679. DoD's Acquisition Strategy for the JEDI Procurement stressed that

████████████████████████████████████████████████████████████████████████████

██████████  AR Tab 25 at 485, 499; AR Tab 248 at 60663. Similarly, DoD's Acquisition Plan

████████████████████████████████████████████████████████████████████████████

identified █████████████████████████████████████████████

████████████████ AR Tab 23 at 434 ( ███████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████ ).  And, in response to concerns

from Congress regarding the JEDI Contract, DoD told Congress that the JEDI Contract's

█████████████████████████████████████████████████████████

████████████████████████  AR Tab 109 at 6504.

237.    The fact that DoD, from the very beginning of the JEDI procurement, recognized

the importance of data portability and migration—and included explicit requirements in both the

RFP and the SOO to ensure DoD procured the requisite capability—exposes as contrived the

SSAC's and the SSA's suggestion that data migration is unimportant (especially when contrasted

with the strength assigned to AWS by the TEB and the SSEB).  If data export truly were

unimportant, it makes no sense that DoD would emphasize data portability not only in acquisition

planning documents, but also in the RFP and the SOO.  Instead, the SSAC's and the SSA's

assessment appears to be another example of DoD moving the goal posts after the fact to reduce

AWS's very real advantages.  This is especially so given neither the SSAC nor the SSA provides

any record support for the claim that ██████████████████████████, and the administrative

record demonstrates that DoD, in fact, had carefully considered and included a ████████

█████████████████████████████████████████████████████████

████████████████ .  But for the SSAC's and the SSA's unreasonable minimization of AWS's

superior data export capability, which flies in the face of the JEDI RFP's stated requirements, DoD

would have concluded that AWS is superior to Microsoft under Factor 5.



238. In any event, no matter ███████████████████████████

██████████████, the fact remains that the SSEB determined AWS's ████████████

████████████████, and the SSAC and the SSA disagreed only with respect to ████████████

██████████████████████ AR Tab 733 at 210392; AR Tab 737 at 210427; AR Tab 738 at

210447. Where the SSAC and the SSA concluded the offerors' proposals are relatively equal

under Factor 5, ██████████████████████████████████████████████████████.

> **b)** **The SSAC Unreasonably Dismissed the Strength AWS Received for Its Ability to Support Failover Across Geographically Redundant Resources.**

239. In addition to downplaying the significance of AWS's superior data export

capabilities, the SSAC unreasonably discounted the benefits of AWS's myriad data centers,

availability zones, and points of presence.

240. The TEB assessed AWS a strength for its proposal to "support automated regional

failover of computing, network, and storage services across data centers ███████████████

████████████████████████████████████████████████████████████████

██████[23] AR Tab 715 at 210087. The SSEB concurred with this assessed strength. AR Tab

733 at 210394. In plain English, AWS has many data centers—indeed, significantly more than

---

[23] AWS also deserved a strength for its more than ██ data centers under Factor 6. The Factor 6
TEB report states that the TEB considered AWS's compliance with SOO 3.15, which provides
that each offeror must propose "no fewer than three physical data center locations providing
unclassified JEDI Cloud services and no fewer than three physical data center locations
providing classified JEDI Cloud services within the Customs Territory of the United States,"
with "each classification level require[ing] at least three data centers." AR Tab 27 at 615.
Even though AWS proposed more than ██ unclassified data centers, the TEB unreasonably
credited AWS only for committing to deliver "at least three data centers" for unclassified
offerings. AR Tab 648 at 193409. The TEB therefore concluded AWS only "Meets the
Standard" for SOO 3.15, rather than exceeding the standard by ██████. *Id.* AWS deserved
a strength under Factor 6 for the increased resilience its more than ██ unclassified data centers
provided.

Microsoft or any other cloud service provider in the world—to support high loads and system failures.

241. Although the SSAC acknowledged the strength AWS received for its ability to support failover across geographically redundant resources, it yet again downplayed the significance of AWS's superior capability to draw false parity. The SSAC ▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ AR Tab

737 at 210427. Then, despite recognizing the ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ the SSAC concluded that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉ *Id.* The SSAC's reasoning, however, does not ring true, except as a way to create the impression of a false equivalency between the two offerors.

242. First, the SSAC's attempt to ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ is facially absurd. *Id.* The SOO required a minimum of three data centers. AR Tab 27 at 615. AWS exceeded this requirement by proposing *more than* ▉▉ unclassified data centers available on day one of contract performance. AR Tab 737 at 210427. Microsoft, by contrast, proposed ▉▉▉▉▉▉▉▉▉▉▉. *Id.*

243. Second, Microsoft's commitment to ▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉ is neither comparable to AWS's more than ▉▉ existing data centers nor ▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. *See id.* And, given DoD's refusal to credit AWS for ▉▉▉▉▉ under Factor 2 because ▉▉▉▉▉▉▉,



*id.* at 210423-25, it is wholly inconsistent for DoD to credit Microsoft for its proposal to ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

    244.   Third, the very fact that the SSAC acknowledged Microsoft's ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ shows that the SSAC does not actually believe that

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮    *Id.* at 210427. The SSAC simply discounted data centers because Microsoft cannot compete with AWS.[24]

    245.   Recognizing the importance of ensuring service reliability, the AWS JEDI Cloud solution rests upon a foundation composed of Regions, Availability Zones, and data centers. AR Tab 367 at 152594. An AWS Region is a geographical location in the world where AWS will provide multiple, physically separated Availability Zones. AR Tab 371 at 152856. An AWS Availability Zone is "an isolated location within an AWS Region [that] runs on its own physically distinct, independent infrastructure that is engineered to be highly reliable." AR Tab 367 at 152594. Each Availability Zone is composed of one or more data centers. AR Tab 371 at 152856. Each AWS Region in the United States has at least three Availability Zones. For example, ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[24] Indeed, according to Gartner, a respected independent research and advisory company and the premier firm for assessment of commercial technology including cloud computing services, "[a]t the cloud infrastructure level, AWS offers its services through a global network of data centers in 24 geographic regions in 18 countries around the world, with multiple availability zones (AZs) in each region. These regions and AZs offer a comprehensive set of cloud infrastructure services spanning compute, networking, storage, security, management and customer service. In Gartner's 270-point "Solution Criteria for Cloud Integrated IaaS and PaaS," *AWS led all competitors with an overall IaaS and PaaS solution score of 88 out of 100*. Anderson et al., *Vendor Rating: Amazon*, Gartner (July 7, 2020), https://www.gartner.com/doc/reprints?id=1-ZFLWYKW&ct=200709&st=sb?trk=ar_carousel (last accessed Oct. 13, 2020).

▮▮▮▮▮. *Id.* Additionally, the global network

of AWS Points of Presence ("PoP") consists of ▮▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮ AR Tab 367 at 152594. These PoPs are crucial in providing high-speed connectivity

and facilitating data migration into and out of the cloud.

246.    AWS's Availability Zone architecture "enables fault tolerance and high availability

for JEDI customer workloads," meaning that if an entire Availability Zone fails, "the remaining

data centers and Availability Zones in the region will accommodate workloads for the failed data

centers." AR Tab 371 at 152857. Each data center is similarly capable of "automatic failover of

workloads (within a classification level) in the event of a data center loss." *Id.* Because AWS has

numerous data centers, even if one data center goes offline, customers can still operate without

losing data, and they can still run workloads in other data centers. AR Tab 371 at 152857. The

added data centers also improves scalability, which the SOO indicates "improves computing and

storage capacity." AR Tab 27 at 611.

247.    In contrast, Microsoft's cloud is far less expansive. ▮▮▮▮▮

▮▮▮▮▮

▮▮▮▮▮

▮▮▮▮▮ AR Tab 408 at 173200, 173327.

Publicly available information, however, reveals that Microsoft only recently introduced its

Availability Zones in 2017, and they are only available for select services (approximately 17% of

Azure's generally available services) in select regions (approximately 20% of its infrastructure).

In fact, Microsoft operates just 11 Availability Zones in total. And, with respect to PoPs, Microsoft

had only ▮▮▮ PoPs at the time of proposal submission. AR Tab 408 at 173220 (Figure A-

18). Simply put, Microsoft cannot match AWS's scale or resiliency, which appears to explain why the SSAC dismissed the issue outright rather than acknowledge AWS's obvious superiority.

248.   Fourth, the SSAC's belief that having ▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ is

completely inconsistent with the RFP.  The RFP expressly requires JEDI support for the types of "catastrophic events" ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Specifically, the RFP requires "[b]uilt-in data storage redundancy for online, nearline, and offline storage that protects against data loss in the case of *catastrophic data center failure*." AR Tab 593 at 181465 (emphasis added).  The RFP further provides that DoD will evaluate whether the proposal demonstrates the data centers are sufficiently dispersed and can continue supporting the same level of DoD usage "in the case of *catastrophic data center loss*." *Id.* at 181480 (emphasis added).  In fact, DoD contemplated such support from the outset of the JEDI procurement, memorializing in the JEDI Cloud Acquisition Plan the need for a "solution that provides highly available, resilient infrastructure that is reliable, durable, and can continue to operate despite *catastrophic failure of pieces of infrastructure*."  AR Tab 23 at 431 (emphasis added).  AWS's proposal of over ▇ data centers more than met this need, whereas Microsoft's proposal of just ▇ data centers did not. AR Tab 737 at 210427.  These requirements to respond to catastrophic loss make good sense in a contract to support DoD's warfighting capabilities.  On the other hand, the SSAC's contrary view exhibits a willful blindness to the Contract's underlying purpose, and can only be understood as yet another attempt to tailor the evaluation to Microsoft's proposal.

249.   Thus, the SSAC lacked a rational basis for discounting the strength assessed by the TEB for AWS's resilient cloud solution.

c)      **AWS Deserved a Differentiating Strength for Its Extensive Marketplace Offerings.**

250.     The TEB and the SSEB compounded the evaluation errors described above by failing to assign AWS a differentiating strength for its extensive marketplace offerings.

251.     The TEB assigned AWS 12 strengths under Factor 5, which the SSEB recognized

███████████████████████████████████████████████████

████████████████████████████████   AR Tab 733 at 210393.   Yet, after recognizing that these strengths show the quality of AWS's marketplace, the SSEB inexplicability minimized each of the strengths assessed. *Id.*

252.     According to the SSEB:



*Id.*

253.     The SSA agreed with the SSEB, unreasonably concluding that



103

AR Tab 738 at 210447-48. The SSA's conclusion, however, cannot withstand scrutiny given AWS's vast marketplace offerings.[25]

254.   The RFP's SOO explicitly required offerors to "[p]rovide the ability to rapidly and securely deploy [cloud service provider] and third-party platform and software service offerings from an online marketplace with baseline template configurations." AR Tab 27 at 616. Consistent with this requirement, AWS proposed an expansive marketplace that included ███████ marketplace offerings in the CLIN x001 and x002 catalogs. AR Tab 569 at 181265. By contrast, Microsoft proposed just ███ marketplace offerings in those CLIN catalogs. *Id.* ███████

███████

███ .[26]

255.   AWS's advantage manifests itself not only in terms of ███ , but also quality. AWS proposed a more mature marketplace than Microsoft. The AWS Marketplace is the most widely used cloud infrastructure marketplace for third-party software, with almost 300,000 customers and over one million subscriptions. Over the years, AWS has continuously expanded

---

[25]   As Gartner found, "[w]hile many have tried to replicate the Amazon models, Amazon stands alone in its ability to continually sustain such a high rate of innovation and market expansion." Anderson   et   al.,   *Vendor   Rating:   Amazon*,   Gartner   (July   7,   2020), https://www.gartner.com/doc/reprints?id=1-ZFLWYKW&ct=200709&st=sb?trk=ar_carousel (last accessed Oct. 13, 2020).

[26]

AR Tab 569 at 181265.
        *See id.; see, e.g.*, AR Tab 384.

its services to support various cloud workloads. For example, AWS released over [redacted] significant services and features in 2011 and nearly [redacted] new services and features in 2018. AR Tab 371 at 152846. This dramatic increase in offerings is representative of AWS's innovative abilities as well as the maturity of its marketplace.[27] Had DoD undertaken a qualitative review accounting for maturity and pace of innovation, it could not reasonably have concluded that both offerors proposed equivalent marketplaces.

256. But instead of analyzing the quality and quantity of the offerors' marketplace offerings (which would have revealed that AWS offered advantages that Microsoft could not match), the SSEB and SSA ignored them altogether. In particular, the SSA reasoned that there was "not a significant difference" between the offerings because [redacted]

[redacted] " AR Tab 738 at 210447-48; *see also* AR Tab 733 at 210393 [redacted]

[redacted].

This reasoning effectively eliminates any meaningful consideration of the offerors' marketplaces.

257. Additionally, the SSEB's and the SSA's reasoning is inconsistent with the original award evaluation, when each had reasoned Microsoft's offering was "superior" because it

---

[27] Gartner has confirmed AWS's dominance in this regard as well, finding that "AWS continues to sustain its high level of technical innovation and feature expansion, introducing thousands of new services and features annually. AWS's extensive portfolio, deep stable of independent software vendor (ISV) customers, a curated partner program (APN Partner Programs), extensive knowledge transfer programs (AWS Training and Certification) and key commerce enablers (AWS Marketplace) add up to a strategic cloud services platform. AWS is not just a point provider of services, but more of a platform, continually industrializing new capabilities into that platform. Hence buying into AWS is like buying into innovation at scale." Anderson et al., *Vendor Rating: Amazon*, Gartner (July 7, 2020), https://www.gartner.com/doc/reprints?id=1-ZFLWYKW&ct=200709&st=sb?trk=ar_carousel (last accessed Oct. 13, 2020). Gartner notes that "[a]s the most complete cloud infrastructure and platform offering, AWS has a capability for almost every need." *Id.*

███████████████████████████████████████████████

███████████████ AR Tab 459 at 176416; AR Tab 457 at 176402-03.  Had the

Government believed that differences in marketplace offerings should be ignored because ███

████████████████████████████████████████, then that reasoning should

have applied equally in the first round.  Instead, the Government previously gave Microsoft an

advantage for ████████████████████████████████████████

█████████.”  AR Tab 457 at 176397.

258.    The SSA's obvious attempt to downplay AWS's marketplace superiority is another

example of DoD's last minute efforts aimed at creating the appearance of parity where none exists.

> ### d)    AWS Has a Substantial Comparative Advantage over Microsoft under Factor 5.

259.    The foregoing disparate and unreasonable evaluations obscured AWS's clear

comparative advantage over Microsoft under Factor 5:

- AWS's ███████████████████ represents a differentiator among the proposals that, standing alone, should have given AWS a comparative advantage under Factor 5.

- Moreover, AWS's proposal of more than ███ data centers on day one of contract performance far exceeded the RFP's requirements and ██████████████ data centers Microsoft proposed, and provided significant benefits to DoD in the form of a more capable and more resilient cloud.

- Finally, AWS proposed a more robust marketplace █████████████████ ████████████.  AWS's ████████ should have been considered yet another differentiator under Factor 5, but DoD dismissed it because it speculated—without basis—that █████████████████ ██████████and allow Microsoft to close the gap.

260.    Each of these facts—which are unambiguously documented in the administrative

record—undermines any notion that AWS and Microsoft are relatively equal under Factor 5.

Under a rational and fair evaluation, AWS would have received Outstanding and Low Risk ratings

████████████████████████████████████████

under Factor 5. At minimum, AWS would have had a significant qualitative advantage over Microsoft. Combined with AWS's price advantage, this superior evaluation would have given AWS a substantial chance of award.

### 5.    Factor 6

261.    DoD unreasonably concluded that Microsoft's proposal is superior to AWS's under Factor 6 based on a disparate and irrational evaluation that failed to reflect the relative merits of the offerors' proposals and deviated from the RFP's evaluation criteria. In particular, to find Microsoft *technically* superior under Factor 6, DoD inexplicably considered the purported *pricing* benefits of Microsoft's program management support, while ignoring similar benefits inherent in AWS's already lower-priced proposal. DoD also ignored AWS's proven and tested program management approach in favor of Microsoft's unproven and theoretical alternative. Under a rational evaluation, AWS would have received an Outstanding rating and been found qualitatively superior to Microsoft under Factor 6.

### a)    DoD Deviated from the RFP's Evaluation Criteria By Considering Price in Its Technical Evaluation.

262.    Factor 6 required DoD to evaluate each offeror's program management approach to determine (1) "the likelihood that the approach will achieve effective and timely communication between the Offeror and CCPO"; (2) the quality of the Offeror's proposed process for timely remediation of issues and the likelihood that issues will be timely remediated"; (3) "the quality of the Offeror's proposed risk management process and the likelihood that the proposed process and methods will result in preemptive mitigation for risk areas like tactical edge performance and security"; (4) "the likelihood that the proposed [Quality Assurance surveillance Plan ("QASP")] will result in continuously meeting the performance metrics listed in Table 5 .1 of the SOO through

the life of the contract"; and (5) "the extent to which the proposed property management system, plan, and commercial practices and standards are likely to result in protecting, securing, and reporting the identified GFP IAW FAR clause 52.245-1 and DFARS clause 252.211 -7007." AR Tab 593 at 181483.

263.   Nowhere did the RFP require or allow DoD to consider the pricing impacts of an offeror's technical approach under Factor 6. *See id.* To the contrary, the RFP expressly prohibited offerors from even discussing pricing outside the specified pricing volumes, stating: "[a]ll pricing information shall be included ONLY in Volume I Tab D and Volume VI Price Volume. If pricing information is included in other locations, it will result in removal of the entire page from evaluation." *Id.* at 181460.  Strict separation of technical and price information is standard in competitive solicitations to ensure that the Government's evaluation of an offeror's technical proposal is not influenced by awareness of its proposed price.  In the JEDI procurement, if an offeror wanted credit for pricing considerations, it was required to incorporate those considerations into its Total Evaluated Price for evaluation under Factor 9. *Id.*

264.   Notwithstanding the RFP's clear mandate, DoD focused on the purported *pricing* benefits of Microsoft's proposal under Factor 6 when assessing the relative technical merits of the offerors' proposals.

265.   First, when considering Microsoft's offering, the SSAC emphasized that

AR Tab 737 at 210431.

Not even attempting to hide its departure from the RFP, the SSAC then added: ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

(emphases added).

266.    Second, when comparing Microsoft and AWS under Factor 6, the SSAC again focused on the purported pricing benefits of Microsoft's approach, noting: ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ *Id.* at 210431-32.

267.    What the SSAC failed to appreciate, however, is that the RFP's restriction on considering price information in the technical evaluation did not restrict only the TEB's and the SSEB's Factor 6 evaluation—the RFP also prohibited the SSAC from importing price considerations into the technical evaluation for Factor 6. *See id.*; AR Tab 593 at 181460, 181483.

268.    Making matters worse, the administrative record shows the SSAC departed from the RFP and did so only where it benefitted Microsoft.

269.    The SSAC credited Microsoft for the ▮▮▮▮▮ described above because it determined ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ AR Tab 737 at 210431. In other words, the SSAC credited Microsoft for ▮▮▮▮▮▮▮▮ ▮▮▮▮▮. *See id.*

270.   AWS's proposal, however, is explicit that it ███████████████████

███████████████████. AWS's Price Narrative states: ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

AR Tab 677 at 193908 (emphases added).

271.   The PEB explicitly recognized that AWS ███████████████████

███████████████████████. AR Tab 727 at 210310 ██████████████

████████████████████. In contrast, Microsoft's ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████  *Id.*

272.   Any fair consideration of ████████████████ by the SSAC would have accounted

for AWS's unmatched proposal to ███████████████████████████████████

████████████  Just as Microsoft ████████████████████████████

███████████████████████████████████████████████

████████████, AWS ███████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████. There is no valid reason to

credit Microsoft ███████████ but not to credit AWS ████████████████.

273.   Thus, the SSAC's evaluation—which the SSA adopted—is fundamentally flawed

both because Microsoft's alleged advantage is predicated on purported pricing considerations that

DoD never should have considered under *technical* Factor 6 and because, in any event, those

110

pricing considerations pale in comparison to the significant savings resulting from AWS's proposal to ███████████████████████████████████████████.

274.    As detailed below, the SSAC's assessment is further undermined by several other disparate and unreasonable evaluation judgments by the TEB.

> **b)    DoD Disparately Evaluated the Offerors' Training and Quality Assurance Capabilities.**

275.    The TEB assigned Microsoft two strengths related to the ███████████████████ ███████████████████ discussed above that, at minimum, AWS should have received as well.

276.    In the pre-remand final evaluation, DoD incorrectly concluded that only Microsoft provided ██████████. AR Tab 457 at 176403 ████████████████████████████ ████████████████████████████████. Following remand, DoD corrected this error— recognizing that AWS, in fact, proposed ███████████████████████—but nevertheless assigned only Microsoft a strength. AR Tab 737 at 210430; AR Tab 649 at 193436. Specifically, the TEB assessed Microsoft a strength because ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ AR Tab 649 at 193436; AR Tab 408 at 174400 ████████████████████████████████ ████████████. The TEB's evaluation is unreasonable for two reasons.

277.    First, Microsoft should not have received a strength for its ██████ because that strength depended on Microsoft improperly including pricing information—*i.e.*, ██████████ ████████████████████████████—in a non-price proposal volume. AR Tab 408 at 1734. By the RFP's express terms, Microsoft's inclusion of this pricing information in a non-price proposal volume should have "result[ed] in removal of the entire page from evaluation." AR

Tab 593 at 181460.  As a result, Microsoft's ████████████ would not have discussed its ████

██████████████ at all, and Microsoft would not have received the strength ██████████

█████████████████████████. *See id.*

278.    Second, DoD unreasonably penalized AWS for including pricing information—

██████████████████████████████████—in the appropriate proposal volume.  As the

SSAC recognized, AWS proposed ███████ and included such information in its price volume.

AR Tab 737 at 210430; AR Tab 677 at 193912; AR Tab 380 at 155355-56.  Accordingly, the TEB,

which did not have access to the offeror's price volumes, did not consider AWS's ██████████

████████ and assign it a strength.  AR Tab 737 at 210430; *see generally* AR Tab 648.  This turns

the RFP's prohibition on its head.  Although the SSAC acknowledged AWS's ████████████

████████, it inexplicably failed to assign AWS a strength—apparently because AWS's █████

██████████████████████████, which the RFP prohibited the SSAC from

considering as part of the Factor 6 evaluation. *See* AR Tab 737 at 210430; AR Tab 593 at 181460.

As a result, Microsoft received a strength because it included noncompliant information in its non-

price proposal volume, whereas AWS did not receive a strength because it complied with the RFP.

*Compare* AR Tab 649 *with* AR Tab 648.

279.    Had AWS received the strength it deserved—████████████████████

██████████—AWS very likely would have received an Outstanding rating under Factor

6 and been found, at minimum, relatively equal to Microsoft. *See* AR Tab 737 at 210431.

280.    The TEB also assigned Microsoft a strength because ██████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████  AR Tab 649 at

█████████████████████████████████      ███████████████████

193432; AR Tab 413 at 173716 ███████████████████████████████████████████████.

According to the TEB, ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████ *Id.* The SSEB, the SSAC, and the SSA then relied on this

███████████████ in the evaluation as a unique offering of Microsoft's proposal. AR Tab 733 at

210404; AR Tab 737 at 210431; AR Tab 738 at 21049-50.

281.   AWS, however, proposed a similar ████████████—which is even more

advantageous to DoD—yet it did not receive a strength.

282.   Like Microsoft, AWS's proposal provides for ████████████████

███████. Specifically, AWS's proposal states:



AR Tab 372 at 152901 (emphasis added). AWS included this proposal in its PWS as well, making

this ████████ mechanism a clear contractual commitment. AR Tab 367 at 152726.

283.   AWS's ████████ commitment is materially superior to Microsoft's. First,

whereas Microsoft ██████████████████████ AWS did not limit the ████

████████████████. *Compare* AR Tab 413 at 173716 *with* AR Tab 372 at

152901. Second, Microsoft's proposal is clear that ███████████████

███████████, whereas AWS has ██████████████

███████████. *Compare* AR Tab 408 at 173206 *with* AR Tab 372 at 152901. Third,

Microsoft's ██████████████████, which means Microsoft could ████

███████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████. AR Tab 413 at 173741 ████████████

████████████████████████████████████████ AWS's proposal █████████

████████████████████████. In other words, Microsoft received credit for proposing █████

██████████████████████████████████████████████████████████,

whereas AWS provided ████████████████████████████████████████████████████

████████████.

284.    Yet, neither the TEB, the SSEB, the SSAC, nor the SSA even acknowledged this aspect of AWS's proposal, which deserved a strength that, at minimum, completely counters the strength Microsoft received.

        **c)**     **DoD Ignored AWS's Proven and Tested Management Approach, as Demonstrated under the ████ Contract.**

285.    DoD erroneously concluded that Microsoft offered a superior management approach despite the fact that AWS, as the contractor for the ██████████████████████

████ Contract—which supports the entire ██████████████████—was, and still is, the only contractor that has a proven approach for managing, developing, and deploying classified and unclassified cloud infrastructure and platforms at the scale contemplated by JEDI.

286.    AWS is "the only cloud service provider with experience managing a successful enterprise-wide cloud program for the US Federal Government." AR Tab 372 at 152872. AWS's program management approach leverages its extensive experience under the ████ Contract, which is the only contract remotely comparable to the size and complexity of JEDI. *See id.* ████████

████████████████████████████████████████████). As a result, AWS

████████████████████████████████████████████████████

offers DoD a *proven and tested* approach for completing contract requirements on schedule and in accordance with the JEDI Contract's quality and performance metrics.

287.    In contrast, Microsoft has never performed a cloud infrastructure contract similar to JEDI. Microsoft's proposal ████████████████████████████████████████████ ████████████████████████████████. Instead, Microsoft's proposal cites ██████████ ████████████████████████████████████████████████████████████████. AR Tab 413 at 173706, 173725. In other words, AWS's proposal is built on its experience managing similar contracts for the U.S. Government, while Microsoft's proposal is merely aspirational.

288.    This disparity in program management capability is evident from the respective levels of experience for AWS's and Microsoft's proposed Program Manager. AWS's Program Manager, ██████████, is the Program Manager on the ██████████ program. ████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████ AR Tab 372 at 152875. His experience implementing and managing government cloud programs is directly applicable to the JEDI Contract. In contrast, Microsoft's Program Manager, ██████████, is ██████████████████████████████████████████████████ ██. AR Tab 413 at 173709. ████████████████████████████████████████████████ ██████████████████. *See id.* Simply put, ██████████ experience pales in comparison to ██ ██████ program management experience.

289.    DoD nevertheless concluded Microsoft, and not AWS, deserved an Outstanding rating under Factor 6. AR Tab 737 at 210430-31; AR Tab 738 at 210448-49. This evaluation judgment was arbitrary and capricious. Indeed, it is almost impossible to explain, considering DoD did not even acknowledge AWS's experience under the ███ Contract when evaluating

AWS's program management approach. AR Tab 737 at 210430-31; AR Tab 738 at 210448-49; *see generally* AR Tab 648. Given that the ▮▮▮ has characterized the AWS cloud as the "best decision we've ever made,"[28] and has stated that it "has transformed our ability to build new capabilities and has transformed our ability to solve seemingly impossible intelligence problems,"[29] it is unfathomable DoD would overlook this aspect of AWS's offering.

### d) AWS Deserved an Outstanding Rating and Has a Substantial Comparative Advantage Over Microsoft under Factor 6.

290.    The foregoing disparate treatment and unreasonable evaluation assessments undermine any notion that Microsoft is technically superior under Factor 6. Under a rational and fair evaluation, AWS would have received Outstanding and Low Risk ratings. At minimum, AWS would have had a significant qualitative advantage over Microsoft. Combined with AWS's price advantage, this superior evaluation would have given AWS a substantial chance of award.

### 6.    Factor 8

291.    DoD failed to evaluate Microsoft's and AWS's cloud solution demonstrations reasonably and in accordance with the RFP's criteria, as reflected in the Demonstration Instructions provided to the offerors. In particular, Microsoft ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

In contrast, AWS successfully demonstrated its cloud capabilities in accordance with, and in excess of, the Factor 8 requirements during the second demonstration. Yet, DoD assigned both

---

[28] ▮▮▮▮▮▮▮▮▮▮ *Private Cloud 'The Best Decision We've Ever Made'*, FCW (June 14, 2017), https://fcw.com/articles/2017/06/14/cia-cloud-aws.aspx.

[29] ▮▮▮▮▮▮▮▮▮ *Finds Security, AI Opportunities in Cloud*, Government CIO Media & Research (June 20, 2018), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮

offerors the same ratings, ████████████████████████████████████████████████.

*See* AR Tab 737 at 210430. DoD did not have discretion to depart from the RFP's requirements
to protect Microsoft from its dismal demonstrations.

### a)   DoD Misevaluated Scenario 8.2.

292.   DoD irrationally concluded that Microsoft's second demonstration of Scenario 8.2
was "Completely Successful," ███████████████████████████████████████████████

██████████████████████   while AWS excelled.

293.   To demonstrate Scenario 8.2 successfully, offerors had to scale servers in response
to increases and decreases in server load. *See* AR Tab 287 at 64173, 64186; AR Tab 270 at 63044.
Scaling servers in response to load refers to the process of bringing additional servers online so
they can accept incoming requests and prevent system overload, or removing servers to avoid
unnecessary resource deployment. It is a capability that DoD acknowledged is fundamental to the
cloud. *See* AR Tab 27 at 608-09, 611, 613 (requiring offerors to provide "the ability for JEDI
Cloud to scale globally. Scalability improves computing and storage capacity, in an efficient and
rapid manner, to meet mission requirements," and "tools for scaling systems such as application
server load balancing").

294.   The Demonstration Instructions explained the scaling requirement as follows:

> A successful implementation of 8.2 will, at time of demonstration, create a
> dynamically created pool of compute resources *to respond to incoming requests
> from a client*. As the client increases the number of incoming requests, it is
> expected that the number of compute nodes *will seamlessly increase as the number
> of incoming requests exceed the predefined maximum requests per node*. As the
> test client reduces usage, it is expected that there will be a *seamless shutdown of
> excess nodes*.

AR Tab 287 at 64173 (emphases added).

295.    To assess whether offerors could effectively scale available servers as load increased and deceased during the second demonstration, DoD scaled loads over four phases:

Phase 1:  the 8.2(4.a) script generated 5 requests per second for 90 seconds;

Phase 2:  the 8.2(4.b) script generated 150 requests per second for 360 seconds, with a 60 second ramp up time;

Phase 3:  the 8.2(4.c) script generated 450 requests per second for 360 seconds, with a 75 second ramp up time; and

Phase 4:  the 8.2(4.d) script generated 60 requests per second for 360 seconds, with a 60 second ramp up time.

AR Tab 287 at 64174.  At the end of each phase, the Demonstration Instructions required DoD to record the number of online servers before starting the next load phase.  AR Tab 287 at 64174-75. After the four phases, DoD was to implement a four-minute cool down period during which there would be no load.  *Id.* at 64174.

296.    Before beginning the load phases, the Demonstration Instructions required the offerors to set a minimum and a maximum number of servers that were healthy and taking requests. *Id.*  It also required the offerors to set the maximum number of concurrent requests to 3 per server. *Id.*  If the number of requests per server exceeds 3 requests, "a scale up event is expected" where the offeror must bring online additional servers.  *Id.*  If the number of requests per server "remains significantly below this value, a scale down event is expected" where the offeror must take servers offline.  *Id.*  Additionally, the Demonstration Instructions required the offerors to run health checks on the servers every 5 seconds to identify and remove any servers that fail to accept incoming requests on two occasions.  *Id.*  Thus, the Demonstration Instructions gave *specific* details about

each load phase, when DoD would take a count of servers that were online, when DoD expected scale up and down events, and the required health state of the servers.[30]

297.     Although not mentioned in the Demonstration Instructions, the code DoD provided to the offerors in advance of the second demonstration activity contained a "kill switch" to attack servers. *See* AR Tab 725 at 210257-58; AR Tab 726 at 210279-80. The purpose of this kill switch was for DoD to assess the offerors' ability to remove unhealthy servers while scaling up and down under the stress of both varying load amounts and a randomized kill command. *See* AR Tab 725 at 210257-58; AR Tab 726 at 210279-80. Notwithstanding the Demonstration Instructions' silence, both offerors were aware of DoD's kill switch because it was clearly visible in the code provided to offerors before both the first and second demonstrations. *Compare* AR Tab 725 at 210257-58 and AR Tab 726 at 210279-80, *with* AR Tab 743 at 210875 (quoting the relevant section of the code provided to the offerors in advance of the demonstrations).

298.     Microsoft ▮▮▮▮▮▮▮▮▮▮▮▮ by Scenario 8.2. In fact, Microsoft's

---

[30] As a result of these specific instructions, the offerors could calculate with precision what the desired number of servers would be for the end of each phase:

299.  Microsoft's ████████████████████. The TEB found that Microsoft had ██

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████[31]  AR Tab 726 at 210284-85; *see also* AR Tab 291 at 01:35:33-02:02:16.  In

other words, ███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████  AR Tab 726 at 210284-85.  Similarly, when ████

████████████████████████████████████████████████████████████████████████

████████████████████████████[32]  *Id.*

████████████████████████████████████████████████████████████████████████

300.  Faced  with  Microsoft's  poor  performance,  the  TEB  departed  from  the

Demonstration Instructions' mandate ███████████████████████████████████████.

Instead, the TEB simply declared that ████████████████████████████████████

████████████████████████████████████████████████████████████████  and that

████████████████████████████████████████████████████████████████████████

---

[31]  In contrast, AWS's reported server count during its second demonstration of Scenario 8.2
reflected the intended performance: ███

████████████████████████████████████████████████████████████████████████

████████████████████████████████████  AR Tab 725 at 210260.

[32]  The TEB reports ████

████████████  AR Tab 291 at 1:58:18-31.

████████████  AR Tab 287 at 64174.  Specifically, because

████████████  *See id.*; *see also* AR Tab 725 at 210261 (showing

██████).

████████████████████████████████████████████████████████████████████████

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇ *Id.* at 210285. However, the TEB's improper pivot away from the Demonstration Instructions, toward a more forgiving analysis of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, was insufficient to justify rubber stamping Microsoft's Scenario 8.2 performance.

301.    The image below is an annotated screenshot of Microsoft's ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇ taken from the demonstration video at AR Tab 291 at 2:02:57:



302.    As evident from the chart, [33] ▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[33] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

████████████████████████████████████████. *See* AR Tab 732 at 210368-71. Furthermore,

████████████████████████████████████████████████████

████████████████████████████████████████. In other words, ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████. Thus, ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ AR Tab 287 at 64173-74.

303.   Microsoft's failure had a tangible consequence: ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ *See* Tab 291 at 01:50:21. ████████████████████

████████████████████████████████████████ *See id.* at 01:51:56-

01:53:50. ████████████████████████████ (AR Tab 291 at

01:54:09), ████████████████████████████████████████

████████████████████████████████████████████████ AR Tab

726 at 210285-86.

304.   The TEB attempted to explain away this deficiency in Microsoft's performance by

suggesting that the ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

 *Id.* (emphasis added).  The TEB further noted that

*Id.* at 210286.

305.    When the SSAC and the SSEB pressed the TEB about this assessment, the TEB

added an addendum to Microsoft's evaluation, which explained:



AR Tab 732 at 210369.[34]

306.    The TEB's explanation, however, ignores the plain language of the Demonstration

Instructions.

a.    The requirement for "seamless" scaling necessarily means that servers must

be added and removed ████████████ established by the Demonstration Instructions, and

that any added servers are ██████████████████████████ AR Tab

287 at 64173 (noting "a successful implementation of 8.2 will, at time of demonstration, create a

dynamically created pool of compute resources *to respond to incoming requests from a client*"

(emphasis added)).  Indeed, during AWS's debriefing, DoD even conceded that "the response 'to

---

[34]   Adding to the TEB's tortured interpretation of "seamless," DoD also improperly relied on

████████████████████████  This argument irrationally and unreasonably ignores the requirements
of Scenario 8.2, including the Demonstration Instructions, DoD's evaluations, and the stated
purpose of the test.  AR Tab 732 at 210370.

incoming requests' was considered in the evaluation of scaling," AR Tab 763 at 210876, which is

consistent with DoD's stated intent that Scenario 8.2 require offerors to "*respond* to the incoming

requests," and "*replace* crashed programs *as* they fail health checks," AR Tab 554 at 181202

(emphases added).  Furthermore, the Demonstration Instructions clearly state that, "as the client

increases the number of incoming requests, it is expected that the number of compute nodes [(*i.e.*,

servers)] *will seamlessly increase as the number of incoming requests exceed the predefined

maximum requests per node.*"[35]  AR Tab 287 at 64173 (emphasis added).  In other words, the

increase in available servers ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   *See id.*

      b.    DoD's new interpretation of Scenario 8.2's requirements also contradicts

DoD's prior justification for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   When DoD made that change after the first

demonstration, it explained:



---

[35] DoD claimed during the debriefing that "no tolerance or standard as to increasing node count with increasing load and decreasing node count with decreasing load was necessary, as this was not the purpose of the scenario." AR Tab 763743 at 210872. However, DoD, also stated that it "did consider the correlation between load and node count," *id.* at 210875, that it "evaluated the Offeror's ability to add and remove nodes from the application load balancer based on load and without human intervention," *id.*, and that "the response 'to incoming requests' was considered in the evaluation of scaling." *Id.* at 210875-76. DoD's attempt to diminish the importance of scaling servers based on load therefore rings hollow. *Id.* at 210876.

AR Tab 290 at 64207 (emphases added).[36] Thus, DoD ▇▇▇▇▇▇▇ for the second demonstration to ensure the offerors had adequate time to complete Scenario 8.2 in accordance with the Demonstration Instructions' precise parameters— ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Id.*

    c.    In other words, had DoD intended, as it now suggests, to only test ▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, then there would have been no need for the Second Demonstration Instructions to (1) require a specific maximum number of requests per server; (2) require servers to be counted at the end of each phase; (3) provide detailed information for each load phase; or (4) increase the time available to scale servers in accordance with demand for each load phase. But the Demonstration Instructions did provide these detailed requirements. DoD did not have the discretion to ignore them.

    307.    The TEB also ignores the practical reality of service disruptions caused by complex cyber attacks. DoD's claim that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇ ignores the fact that the kill switch, in fact, is a fair simulation of denial of service attacks, misconfigured code, and software memory leaks—any one of which could cause an application to fail at any given time. Software failing at random due to malicious attacks or user error is common, and DoD acted rationally when it designed a test to assess whether Microsoft

---

[36] This memorandum is dated May 7, 2019, one day before the first second demonstration activity (May 8, 2019), and nearly a month before the TEB issued its first Factor 8 TEB Report. *See* AR Tab 290 at 64204 (memorandum dated May 7, 2019 stating Microsoft's second demonstration was scheduled for May 8, 2019 and AWS's was scheduled for May 9, 2019); *see also* AR Tab 308 (TEB Factor 8 Report for Microsoft, dated July 3, 2019, for the original award).

and AWS could scale servers while facing such adverse conditions. DoD's own contemporaneous actions speak louder than its post hoc words: DoD included the ▮▮▮▮▮ for a reason, despite its attempt now to claim that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮.

308.    Microsoft's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This result, however, is even more inescapable when juxtaposing Microsoft's Scenario 8.2 demonstration with AWS's. ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* AR Tab 725 at 210260. Moreover, as load decreased, AWS was able to remove servers ▮▮▮▮▮▮▮▮▮

▮▮▮▮  *Id.* And, AWS did so seamlessly and *notwithstanding* the ▮▮▮▮▮. *Id.*

309.    The TEB, for its part, acknowledged that AWS "was able to maintain a consistent number of hosts online in light of the [kill switch]." AR Tab 725 at 210257. It also added similar language to the description of AWS's existing strength for its use of CloudWatch: "The Application Load Balancer was able to maintain a consistent number of hosts online as demand grew and then receded regardless of the randomly induced failures by the hosted application." *Id.* at 210262.

310.    The SSEB, however, did not include these findings in its report. *See* AR Tab 733 at 210400 (listing only the first two sentences of strength #1 with no ellipses to indicate additional language was omitted). Thus, neither the SSEB, the SSAC, nor the SSA acknowledged that AWS's ▮▮▮▮▮ is a clear differentiator between the two offerors. Instead, the SSEB and the SSAC ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

126

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████████.  *See* AR Tab 733 at 210400-

01; AR Tab 737 at 210428; AR Tab 738 at 210448.

311.   Simply put, the results of the second demonstration of Scenario 8.2 indicate that

AWS can rapidly scale its servers, even when under attack, to provide the appropriate number of

servers to accept requests, during periods of high load or low load.  Providing available and

resilient services, and the capability to "scale to meet consumption *to enable rapid development

and deployment in support of mission needs*," are "primary objectives that the acquired cloud

solution must achieve." AR Tab 27 at 608-09 (emphasis added).  Microsoft ██████████████

████████████████████████████████████████████  [37]  Thus, by categorizing Microsoft's

Scenario 8.2 demonstration as Completely Successful, DoD not only departed from the terms of

the RFP, but also put the warfighter's needs at risk.

**b)     DoD Misevaluated Scenario 8.3**

312.   In addition to Microsoft's ██████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████  Scenario 8.3 required offerors to demonstrate the durability of their tactical edge

devices by "drop[ping] the powered on, functioning, rugged TE device once from a height of 24

inches, such that it strikes the ground on a corner." AR Tab 287 at 64178.

313.   The drop test was an "important component to evaluate on" because "the

warfighting environment will involve a lot of repeated stress and impact to TE devices, and [DoD]

---

[37] ██████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████

need[s] to have confidence in the ruggedness of the TE design. . . ." AR Tab 554 at 181202. DoD thus found it necessary to ensure "that whatever *internal protections* exist can survive multiple events." *Id.* (emphasis added). According to the TEB, ███████████████████████

████████████████████████████████████████████

██████████████████████████████████████ AR Tab 726 at 210288; *see also* AR Tab 291 at 3:39:08-3:46:00.

314.   ████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ *See* AR Tab 291 at 3:37:47-04:02:44; *id.* at 3:50:31-3:51:03 ████████████████████████████████

████████████████████████████████████████████

███████████ The TEB concluded that because ██████████████████████

████████████████████████████████████████████

████████████████████ AR Tab 732 at 210371.

315.   The TEB, however, is missing the forest for the trees. ███████████████

████████████████████████████████████████████

████████████████████████████████████████. *See* AR Tab 291 at 3:38:11-52:26; *see also* AR Tab 410 at 173645. The RFP required tactical edge devices to be ruggedized. AR Tab 593 at 181470. ████████████████████████

█████████████████████████

316.   Moreover, the fact that Microsoft's device ███████████████████

████████████████████████ ██ ████████████████

████████████████████████████████████████████

128

████████████████████████████████████████████

▮▮▮▮▮▮ *See* AR Tab 554 at 181202. As discussed under Factor 3,

Microsoft's tactical edge devices have ▮▮▮▮▮▮▮. *See supra* ¶ 187. Microsoft's

demonstration showed there is a material possibility that Microsoft's tactical edge devices will be

▮▮▮▮▮▮▮▮

▮▮▮▮▮. And, ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮ *See* AR Tab 291 at 3:52:25 ▮▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮▮▮▮. During AWS's debriefing, DoD claimed that ▮

▮▮▮▮▮▮▮

▮▮▮▮▮ AR Tab 763 at 210885 (emphasis added). ▮▮▮

▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮▮▮ *See* AR Tab 291 at 03:52:25. Yet, confronted with these facts,

the TEB barely blinked before concluding that Microsoft ▮▮▮▮▮

▮▮▮▮▮.

317. At minimum, the results of Microsoft's drop test should have ▮▮▮▮

▮▮▮▮▮ DoD not only failed to ▮▮▮▮

▮▮▮ but it also glossed over AWS's superior Scenario 8.3 demonstration. In particular, the

TEB ignored numerous strengths in AWS's demonstration that would have further shown there is

no parity between Microsoft and AWS under Factor 8.

318.    For example, although the TEB noted that AWS executed various AWS cloud services, it failed to recognize the breadth and depth of services it successfully demonstrated. *See* AR Tab 725 at 210265-66. Specifically, AWS executed ▮▮ AWS services and their features



). In contrast, Microsoft demonstrated approximately ▮ different services and their features during Scenario 8.3. *See* AR Tab 726 at 210287.

319.    Similarly, AWS demonstrated the ability to run code through ▮ different computational models on its tactical edge device through ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮. *See* AR Tab 725 at 210265.  In other words, AWS demonstrated flexibility beyond the services required by the Demonstration Instructions, which required the offerors to demonstrate only the ability to run code through containers.[38] AR Tab 287 at 64175. When evaluating this added flexibility under Factor 3, DoD recognized the benefit and assigned it a strength. *See* AR Tab 733 at 210383. But when AWS actually demonstrated this unique flexibility, the TEB was silent.

320.    Based on the foregoing, under a rational evaluation, the DoD would have determined that AWS' demonstration of Scenario 8.3 was qualitatively superior and less risky than Microsoft's.

---

[38]  In this regard, AWS also demonstrated more flexibility than Microsoft, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* AR Tab 726 at 210287; AR Tab 291 at 2:24:55-02:25:04.  By also providing ▮▮▮▮▮ on the tactical edge device, which allows ▮▮▮▮▮▮▮▮▮ AWS demonstrated a material differentiator between the two offerors' capabilities that DoD ignored.

### c)   DoD Misevaluated Scenario 8.4.

321.   DoD similarly concluded that Microsoft's demonstration of Scenario 8.4 was

██████████████████████████████████████████████████████████████

whereas AWS again exceeded the RFP's requirements.

322.   First, Microsoft ████████████ Step 2 of Scenario 8.4, which required offerors to

grant and revoke user access to the cloud portal, attempt to log into the portal after revoking access,

and show that these subsequent login attempts failed.  AR Tab 287 at 64179-80. ████████████

██████████████████████████████████████████████████████████████

██████████████████████████████  *See* AR Tab 291 at 4:45:01-4:50:34.  In other words,

██████████████████████████████████████████████████████████████

████████████████████████

323.   Instead of recognizing Microsoft's ████████████ Step 2 of Scenario 8.4,

upon reevaluation, the TEB simply explained away Microsoft's ████, claiming ████████████

██████████████████████████████████████████████████████████████

██████████████  and that the users ████████████████████████████████

██████████████████████████  AR Tab 726 at 210292.

324.   The TEB's justification for ████████████████, however, overlooks the

Demonstration Instructions.  It also ignores that, earlier in Step 2, Microsoft demonstrated that,

██████████████████████████████████████████████████████████████

██████████  *See* AR Tab 291 at 4:43:23-4:47:14.  Thus, ████████████████████

██████████████████████████████████████████████████████████████

████████████████████████  as required by the Demonstration Instructions.  *See*

AR Tab 291 at 4:47:35-4:48:18; *see also* AR Tab 287 at 64180 (Steps 2(g)-(h)). ████████████

██████████████████████████████████████████████████████████████

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

necessarily *increases* insider security threats—the very risk revoking access tokens to a *cloud portal* is meant to prevent.

325.   Second, Microsoft ▇▇▇▇▇▇▇▇ Step 3 of Scenario 8.4, which required offerors to manage access controls by tagging *files* and then restricting a user's access to those files based on their tags. AR Tab 287 at 64180; *see also* AR Tab 27 at 612 (requiring the offeror to "provide *automated* information security and access control tools with [the attribute of] . . . *object and resource access control management, including data and resource tagging* for billing tracking, *access control*, and technical policy management" (emphases added)); AR Tab 2 at 104 (requiring "highly granular access control configuration").

326.   As Microsoft explained during its demonstration, and as the TEB acknowledged during reevaluation, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇ AR Tab 726 at 210293; *see also* AR Tab 291 at 4:59:01-4:59:28. Microsoft, therefore, sought to demonstrate ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. AR Tab 291 at 4:59:01-5:04:54.   Microsoft's ▇▇▇▇▇▇ approach, however, ▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

327.   The goal of Step 3 was to ensure users could access the same storage locations, but not necessarily the same contents. AR Tab 287 at 64180 (step 3(h)). The purpose of tagging a *file*, and then restricting a user's access to the *file* based upon the *file's* tag, is to eliminate the need to take the extra step of sorting files into different folders. *See* AR Tab 295 at 4:35:27-4:38:16. Microsoft's approach, however, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

132

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████ For these reasons, the

Demonstration Instructions required an automatic tagging capability for files, completely

undermining the TEB's claim that ████████████████████████████████████████

████████████████████ AR Tab 726 at 210293.

328.    In any event, the TEB's claim that Microsoft ████████████████████████

████████████ is simply incorrect.  Microsoft admitted that ████████████████████

████████████, as required by the Demonstration Instructions. AR Tab 291 at 4:59:01-

4:59:28 ████████████████████████████████████████████████████████████

██████. Instead, Microsoft ██████████████████████████████████. *Id.* at 4:59:59-

5:00:37. Thus, even if ████████████████████████████████████████████████,

Microsoft █████████████████ the Demonstration Instructions because Microsoft ████████

████████████████████████. *See* AR Tab 287 at 64180; *see also* AR Tab 593 at 181471; AR Tab

27 at 612.

329.    Nonetheless, consistent with DoD's pattern of papering over Microsoft's technical

inadequacies, the TEB concluded Microsoft's ████████ approach was sufficient because ██

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████ AR Tab 726 at 210293.  Of course, the TEB's rationale is totally at odds

with the stated requirements for Step 3 of the Scenario.  This is yet another example of the TEB

moving the goal posts to avoid a Microsoft failure.

330.    Third, as acknowledged by the SSAC, Microsoft received a weakness for ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* AR Tab 737 at 210429-30. Yet, rather

than recognizing this weakness for the differentiator it was, the SSAC swept it under the rug stating

"despite this weakness . . . ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮       *Id.* The intent of Scenario 8.4, however, was to actually *demonstrate* the ability

to produce audit logs as required.  AR Tab 287 at 64178 ("a successful implementation will

demonstrate that the security controls and user Access Control Lists (ACLs) work as expected,

and *audit logs are generated during the course of any access, security, and API events during the*

*course of this exercise*, both through the GUI as well as interactively via a command line interface

(CLI)." (emphases added)).

331.    The DoD's evaluation of Microsoft's Scenario 8.4 demonstration is especially

problematic when viewed in light of AWS's demonstration, which provided a clear exemplar of

what a Completely Successful demonstration looks like, yet received the same rating as

Microsoft's materially flawed demonstration. ▮▮▮▮▮▮▮▮▮▮▮▮, during Step 2 of Scenario 8.4,

AWS *demonstrated* the ability to revoke a user's access to the *cloud portal* and ensure that the

user's subsequent attempts at regaining access to the portal and the resources therein failed. *See*

AR Tab 295 at 4:29:59-4:30:36, 4:39:45-40:46.

332.    Furthermore, ▮▮▮▮▮▮▮▮▮▮ during Step 3 of the demonstration, not only did

AWS demonstrate the ability to trigger event-based automatic tagging of documents ▮▮

▮▮▮▮▮▮▮▮▮▮▮, it also demonstrated the ability to *control access based on those tags*. *See*

AR Tab 295 at 4:44:30-4:48:20; *see also* AR Tab 725 at 210269. Rather than acknowledging this

capability gap, the TEB downplayed it, erroneously claiming that although AWS's tagging

approach ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

environments." AR Tab 725 at 210269. ████████████████████

████████████████████████ Indeed, DoD recognized this fact when it

assigned AWS a strength in Factor 5 for AWS's ability, ████████████████

████████████████, to ████████████████████

████████████████████████████████

████████████████ AR Tab 715 at 210084; *see also id.* ██████

████████████████████████████

████████████████ (emphasis added)).

Thus, DoD's statement ████████████████████████

██████ is both incorrect and internally inconsistent with its own evaluation ██████

██████ in Factor 5. ██████████ AWS's second demonstration also provided all required

audit logs. *See* AR Tab 725 at 210270.

333. Finally, the administrative record shows that AWS exceeded requirements in numerous respects that should have earned AWS additional strengths, further expanding the qualitative difference between the offerors' demonstrations. In particular, the TEB failed to assign AWS strengths for demonstrating capabilities that earned strengths under other evaluation factors.

334. For example, the TEB assigned AWS two strengths under Factor 2 for its AWS Config service, which provides automatic responses to configuration changes or monitoring alerts. *See* AR Tab 610 at 181620, 181647. Yet, even though AWS actually demonstrated this capability during Scenario 8.4, the TEB did not assign AWS a strength. This is an ████████████████

██████████████████████ ████████████████████. *See*

AR Tab 726 at 210291-93.

335. Similarly, the TEB assigned AWS's API signing approach, SigV4, a strength in Factor 2 because it is a process that "individually authenticates each action taken by account/owner/admins and significantly reduces the potential attack surface of the AWS Management Console." AR Tab 610 at 181631-32. Despite demonstrating this capability throughout the demonstration activities, and particularly during Scenario 8.4, *see* AR Tab 295 at 4:18:50-4:19:56, the TEB did not even note that AWS demonstrated this capability, let alone assign it a strength. Again, this is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *See* AR Tab 726 at 210291-93. Thus, in Scenario 8.4 alone, the DoD committed a litany of evaluation errors that undermine the DoD's conclusion that AWS and Microsoft were relatively equal under Factor 8.

### d)   AWS Had a Substantial Comparative Advantage over Microsoft under Factor 8.

336. The foregoing disparate treatment and unreasonable evaluation assessments concealed AWS's clear comparative advantage over Microsoft under Factor 8:

- First and foremost, AWS actually completed all requirements under each demonstration scenario during the second demonstration, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

- Moreover, AWS received 4 strengths and 0 weaknesses in the reevaluation, compared to Microsoft's 2 strengths and 1 weakness. *Compare* AR Tab 725 at 210253 *with* AR Tab 726 at 210274 and AR Tab 737 at 210430 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓).

- Finally, AWS deserved numerous other strengths for exceeding the RFP's requirements, many of which DoD recognized under other evaluation factors.

337. Each of these facts—which are unambiguously documented in the administrative record—undermines any notion that AWS and Microsoft are relatively equal under Factor 8. Under a rational and fair evaluation, AWS would have received Outstanding and Low Risk ratings

under Factor 8. At minimum, AWS would have had a significant qualitative advantage over Microsoft. Combined with AWS's price advantage, this superior evaluation would have given AWS a substantial chance of award.

### 7. Best Value Determination

338. Based on the fundamentally flawed evaluations discussed above, on September 2, 2020, the SSA ███████████████████████ that Microsoft presented the best value to the Government. AR Tab 738 at 210451. The SSA determined that ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████ *Id.* at 210450. This arbitrary and capricious best value determination, however, is patently inconsistent with the underlying evaluation record and can be explained only as the product of undue influence and DoD's bad faith and bias toward AWS.

### K. DoD's Proposal Reevaluations and Source Selection Decision Demonstrate that the Re-Award Was the Product of Bias, Bad Faith, and Undue Influence

339. Each of DoD's errors in the post-remand reevaluations and best value tradeoff requires setting aside the JEDI award to Microsoft. But the award also must be terminated for the independent reason that DoD's reevaluation demonstrates that the award is the product of pervasive and continuing undue influence, bias, and bad faith against AWS. Indeed, DoD's commitment to ensuring Microsoft remained the awardee notwithstanding its technical inferiority and higher price is evident in both the process and the substance of the reevaluation.

340. Procedurally, DoD developed each of the flawed technical evaluations that drove the re-award to Microsoft only *after* it learned of AWS's substantially lower total evaluated price. In its April 21, 2020 Amendment 0007, DoD conformed the RFP's requirements to Microsoft's

previously deficient approach to Price Scenario 6. AR Tabs 593-97. When AWS adjusted its pricing to the relaxed requirement in its May 4, 2020 FPR2 submission, its price dropped by nearly ████████. *Compare* AR Tab 457 at 176405 *with* AR Tab 737 at 210434. DoD ████████

████████████████████████████████████████████████████ AR Tab 727 at 210301.

341.    *After* learning that AWS was now by far the lowest price offeror, DoD recrafted the technical evaluations for all but one of the technical factors to skew the reevaluation results. *See* AR Tabs 610-12, 723; AR Tabs 648-49; AR Tabs 702-03; AR Tabs 715-16; AR Tabs 725-26. Indeed, the only factor evaluation that DoD completed before it learned AWS was the new lowest price offeror was Factor 2—the Factor for which the SSEB determined AWS's approach was a ████████████████████████████—but the SSAC eroded this differentiator *after* learning of AWS's price advantage. *Compare* AR Tab 733 at 210375 *with* AR Tab 737 at 210422-25.

342.    Moreover, neither the passage of time nor the additional record developed on remand extinguishes the taint resulting from President Trump's improper influence leading up to the original award decision. For example, although every TEB member executed a certification in connection with their respective reevaluation reports "confirm[ing] that court records and news articles relating to the JEDI Cloud procurement, contract award, or protests were not considered in his/her evaluation," *see, e.g.*, AR Tab 610 at 181652, each member of the TEB received "guidance" that provided a roadmap for the reevaluations and mirrored the very court records they claimed not to consider, *see, e.g.*, AR Tabs 587-90 (identifying "specific focus areas" for the evaluators based on AWS's protest allegations). And, notably, none of the SSEB, the SSAC, the PEB, or the SSA completed a similar certification. AR Tabs 727, 733, 737, 738. Moreover, the

record shows that the SST responsible for evaluating proposals and making the award determination ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. If the indicia of bias inherent in the reevaluation process left any doubt, the content of the reevaluations confirmed that improper political influence was behind the re-award to Microsoft. The same pressures and influences that tainted DoD's initial award drove DoD to maintain its award to Microsoft on remand.

343. Substantively, DoD's "reevaluation" cobbled together elements of Microsoft's proposal that DoD had previously disregarded to manufacture newly discovered points of distinction in support of Microsoft's proposal. DoD also ignored the RFP's evaluation criteria, concluded that the evaluation criteria did not mean what they plainly said, and sought to minimize AWS's clear advantages.

344. For example, DoD contrived a ▮▮▮▮▮▮▮▮ in Microsoft's proposal to support its new conclusion that, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ AR Tab 737 at 210426. ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In fact, during the pre-remand final evaluation, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮. AR Tab 211 at 58019; AR Tab 456 at 176382. The SSAC's original report, however, spent a mere two sentences addressing Factor 4 before concluding that there was "not a notable difference between the Offerors." Tab 457 at AR 176402.

345. By contrast, more than three months *after* the SSAC learned that AWS is the lowest price offeror by nearly ▮▮▮▮, the SSAC miraculously discovered this ▮▮▮▮▮▮▮▮ that it claimed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ AR Tab 737 at 210435. Based on this eleventh-hour "discovery," the SSAC prepared an evaluation report that devotes a full page touting ▮▮▮▮▮▮

139

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—none of which the TEB, the SSEB, the SSAC, or the SSA

had even *mentioned* in connection with the original evaluations, ▮▮▮▮▮▮▮▮▮▮, *see*

AR Tabs 211, 331, 443, 456, 457, 459—before concluding ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ AR Tab 737 at

210426. And the SSAC reached this conclusion despite the fact that the underlying TEB and SSEB

evaluation reports did not change since the pre-remand final evaluation. *Compare* AR Tab 331 at

151297-98 *with* AR Tab 703 at 209976-77; *compare* AR Tab 456 at 176380 *with* AR Tab 733 at

210388-89. In fact, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮. AR Tab 733 at 210388-89. This radically altered evaluation ▮▮▮▮▮▮▮—on

an issue that had completely eluded the TEB, the SSEB, the SSAC, and the SSA over the course

of the first evaluation—constitutes clear evidence of bias.

346.    Similarly, DoD originally attempted to create an advantage for Microsoft under

Factor 6 by citing various Microsoft program management features, such as ▮▮▮▮, that DoD

erroneously believed to represent discriminators. AR Tab 457 at 176403. On remand, DoD

acknowledged its mistake, but then pivoted to manufacture an advantage on a different basis.

Specifically, the SSAC added a new rationale for Microsoft's alleged superiority that focused on

the potential cost savings associated with Microsoft's program management support. AR Tab 737

at 210430-32. In doing so, however, the SSAC openly flouted the RFP's evaluation criteria, which

did not allow DoD to consider pricing as part of the Factor 6 technical evaluation. It also ignored

the fact that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮—which provides significant value beyond AWS's already lower price. DoD's

reliance on such a flimsy "alternative" basis to reach its original, albeit erroneous, conclusion that

Microsoft possessed an advantage under Factor 6 is powerful evidence that its reevaluation was

no reevaluation at all, but rather an attempt to "paper" new (but specious) rationales for re-awarding the contract to Microsoft.

347. But Factor 6 was not the only example of DoD ignoring the evaluation criteria to support a preordained conclusion. In its Factor 8 reevaluation, DoD ███████████ ██████ by disavowing the importance of the demonstration tests altogether. For Scenarios 8.2 and 8.4, DoD departed from the explicit Demonstration Instructions by finding that Microsoft's performance was "completely successful" ████████████████████████████ ████████ AR Tab 726 at 210285, 210294. And for Scenario 8.3, DoD opted for deliberate ignorance when confronted with ███████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████. *See generally* AR Tabs 726, 732.

348. Where Microsoft's proposal did not provide straws for DoD to grasp, and ignoring the RFP criteria would not suffice, DoD instead chipped away at AWS's previously assessed strengths to undermine its technical superiority. Confronted with AWS's protest arguments that the SSAC improperly downplayed the strengths identified by the TEB and the SSEB related to AWS's hypervisor and unreasonably determined that ███████████████████████ ██████████, *see* ECF No. 1 ¶¶ 5, 51-52, 113, 120; ECF No. 130-1 at 37-39, on remand, the SSAC manufactured purported ███████████████████ to reach the same false parity it initially strived to create between AWS and Microsoft. Now, instead of downplaying Nitro's superiority by debating only the ████████ the mission-critical attacks it prevents, the SSAC undercut Nitro by arguing its benefits ███████████████████████████████ ████████████████████████████████. AR Tab 737 at 210423. The SSAC minimized the advantages posed by Nitro, avoided acknowledging AWS's superior technology on

the most heavily weighted technical factor, and withheld a higher rating that would have mandated award to AWS.

349.    DoD employed the same tactic with respect to Factor 5.  The SSAC dismissed ▮ ▆▆▆▆▆▆ recognized by the SSEB and a strength recognized by the TEB because neither comported with the SSAC's attempt to draw parity among the offerors.  Moreover, even though DoD finally acknowledged, following a clarification on remand regarding the availability of AWS's marketplace offerings at the time of award, that AWS proposed ▆▆▆ cloud service marketplace offerings compared to Microsoft's ▆▆ offerings, AR Tab 569 at 181265, the SSA simply ignored the fact that AWS ▆▆▆▆▆▆▆▆▆▆▆▆▆ than Microsoft and concluded that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ AR Tab 738 at 210447.  In other words, DoD yet again downplayed AWS's clear technical advantage and gave Microsoft an unwarranted benefit of the doubt by presuming ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆ , as required by the RFP.

350.    Where it could not deliberately chip away at a strength in AWS's proposal or artificially inflate an aspect of Microsoft's proposal to manufacture false parity between the two offerors, DoD simply continued to ignore numerous other obvious strengths in AWS's proposal, including AWS's Content Delivery Network Points of Presence, its advanced graphics-processing unit and high-memory compute instance types, and its machine learning/artificial intelligence and managed database capabilities. *See, e.g.*, ECF No. 1 ¶¶ 7, 114, 150-51.  Recognition of any of these clear strengths would have further complicated DoD's arrival at a pre-determined outcome in favor of Microsoft.

351. DoD's re-award of the JEDI Contract to Microsoft suffers from the same, fundamental defects on nearly every evaluation factor that plagued the original award decision. Far from "correcting" its errors, DoD's re-award amplified them. DoD's evaluative gymnastics to shore up the best value determination in Microsoft's favor—without addressing the underlying substantive shortcomings in Microsoft's proposal—cannot mask the facts: AWS proposed a superior technical solution at a lower price. DoD strained at every step to ensure that Microsoft was given the benefit of the doubt, and scoured the record to invent wholly new and even more specious reasons to support maintaining the award to Microsoft where the proposals and evaluation criteria did not. The errors in DoD's re-award to Microsoft—each of which is independently sufficient to invalidate DoD's award decision—are so egregious that they again can only be explained by the impact of the President's anti-Amazon bias on DoD decisionmakers.

## L. The White House's Obstruction of the DoDIG Investigation into the JEDI Source Selection

352. The improper influence, bias, and/or bad faith evident in DoD's evaluations is magnified by DoD's efforts to evade meaningful review of how President Trump's animosity towards AWS affected the JEDI procurement. In parallel with AWS's original bid protest, the DoDIG investigated the JEDI source selection, including whether "the JEDI Cloud contract source selection was improperly influenced, including alleged influence from the White House."[39]

353. Rather than allow the DoDIG to uncover the truth, President Trump and the White House stymied the investigation. After "repeated requests for a response" to questions the DoDIG posed, the White House eventually asserted a "presidential communications privilege" to prevent

---

[39] DoDIG Report, *supra* note **Error! Bookmark not defined.**, at 3.

the DoDIG from asking key DoD officials *any* questions about communications between DoD and the White House regarding the JEDI Contract. [40]   The White House further claimed that this purported "presidential communications privilege" extended broadly to "any communications internal to the Department of Defense concerning information they have received from the White House or staff." [41]   Accordingly, senior DoD officials were instructed not to answer even the following basic questions regarding the nature and propriety of their contacts with the White House:

- What communications did you have with President Trump or anybody at the White House about the JEDI procurement?

- Did President Trump or any White House official ever suggest, imply, or directly state to you verbally or in writing as to who the contract should be awarded or not awarded to?

- Did President Trump or any White House official provide any direction on what the results of Secretary Esper's review should be?

- Did other DoD officials have any communications with the President or anybody at the White House about JEDI?

- Did anybody at the White House ever tell you who the contract should go to or not go to?

- Did anyone at the White House ever tell you that the contract should or should not go to any particular company?

- What actions or decisions related to the JEDI acquisition or procurement did you ever make based on communications with anyone at the White House?

- What impact or influence has anyone at the White House had on the JEDI Cloud source selection? [42]

---

[40]   *Id.* at 96.

[41]   *Id.* at 32.

[42]   *Id.* at 115.

As the DoDIG itself concluded, the White House's assertion of a "presidential communications privilege" to prevent disclosure to the DoDIG was baseless.[43] As other powerful documentary evidence of direct presidential interference in other procurements continues to pile up, these critical questions demand answers.

354. Contrary to DoD's suggestion in its subsequent misleading press release that the DoDIG somehow vindicated DoD's award decision,[44] the DoDIG expressly did *not* "opine on the appropriateness of the DoD's award of the JEDI Cloud contract to Microsoft rather than AWS."[45] In fact, the DoDIG stressed that it "*could not* review this matter fully" and that it "*could not* definitively determine the full extent or nature of interactions that administration officials had . . . with senior DoD officials regarding the JEDI Cloud procurement."[46]

355. Instead, the facts disclosed by the DoDIG Report confirm the concerns raised in AWS's protest. DoD's claims that the members of the SST were shielded from improper influence are a farce.[47] The AR demonstrates that the SSEB chairperson, [REDACTED], and the [REDACTED]

---

[43] *Id.* at 96 (noting that the DoDIG "informed the DoD OGC that [it] understood the concept of executive privilege, but the release of any information potentially protected by the presidential communications privilege to the DoD OIG would not waive the privilege" because "[t]he DoD OIG is part of the Executive Branch and therefore distinct from other entities outside the Executive Branch that may seek such privileged information") (citing Inspector General Act of 1978, Pub. L. No. 95-452, § 1, 92 Stat. 1101 (1978)).

[44] Dep't of Defense, *Statement on the DOD IG Report on JEDI Cloud Procurement* (Apr. 15, 2020), https://www.defense.gov/Newsroom/Releases/Release/Article/2151794/statement-on-the-dod-ig-report-on-jedi-cloud-procurement/.

[45] DoDIG Report, *supra* note 5, at 68.

[46] *Id.* at 6 (emphases added).

[47] For example, when Senators asked Mr. Deasy whether the White House had tried to influence the JEDI award, Mr. Deasy explained only that he did not believe the "team members that actually took the source selection" were influenced by the White House. Senate Committee

145

████ and advisor to the SSA, ████████, were intimately involved in developing and participating in the informational briefings for Secretary Esper that took place concurrently with the final proposal evaluations. *See* AR Tabs 335, 439, 440, 453, 462. Moreover, the DoDIG Report disclosed that ████████ and ████████—both members of the SST—met with White House personnel to discuss the JEDI Contract, including with Acting White House Chief of Staff Mick Mulvaney (on July 10, 2019), Deputy National Security Advisor Charles Kupperman (on July 18, 2019), and Mr. Chris Liddell, Assistant to the President and Deputy White House Chief of Staff for Policy Coordination (on July 29, 2019), during the period just prior to the TEB evaluators' final proposal evaluations.[48] The DoDIG Report also detailed that members of the SST admitted that they were indeed aware of "public statements from the President and 'media swirl' about the [JEDI] contract" and "the President's reported past statements that criticized Mr. Bezos and his business."[49]

356.   The White House's obstruction of the DoDIG inquiry into communications between DoD and the White House, and the DoDIG's failure to challenge the White House's dubious assertion of privilege, are even more disturbing in light of President Trump's demotion of then-Acting DoDIG Glenn A. Fine, who oversaw most of the investigation into the JEDI Contract. Just six days before the unsigned DoDIG Report was finalized, President Trump demoted Mr. Fine

---

on Armed Services, Tr. of Oct. 29, 2019 Hr'g at 65:2-5, https://www.armed-services.senate.gov/imo/media/doc/19-72_10-29-19.pdf.

[48]   DoDIG Report, *supra* note 5, at 18.

[49]   *Id.* at 7, 120.

reportedly for attempting to investigate serious allegations of White House interference.[50] As

Senator Jack Reed stated, Mr. Fine's demotion was "connected to his willingness to do his job and

ask hard questions" about improper White House influence.[51] Mr. Fine's demotion is just one

example of the Trump Administration's bully tactics to conceal misconduct related to federal

procurements and other government processes.

### M. DoD's Re-Award to Microsoft Is the Product of an Increasingly Corrupt Environment Under the Trump Administration

357. The demonstrated pattern of bias or undue influence manifest in DoD's flawed

JEDI award and re-award reflects an environment of corrupt pressure President Trump fostered

throughout his Administration. That environment has intensified in the months since the initial

award, in lockstep with DoD's increasingly irrational errors in its effort to satisfy the Commander

in Chief and re-award JEDI to Microsoft. The inexplicable defects and errors required to support

re-award to Microsoft can only be understood in the context of President Trump's consistent

violations of the laws, regulations, and norms designed to protect the lawful and impartial

functioning of government.

358. Both those within and outside the Administration have observed that the President

abuses his position of influence to put his own personal interests above the national interest. As

the former Chief of Staff of the Department of Homeland Security ("DHS") has warned, the

President "govern[s] by whim, political calculation and self-interest," ignores the advice of career

---

[50] Sydney J. Freedberg, Jr., *JEDI: Democrats Link IG's Ouster to Investigation of Trump*, Breaking Defense (Apr. 16, 2020), https://breakingdefense.com/2020/04/jedi-democrats-link-igs-ouster-to-investigation-of-trump/.

[51] *Id.*

professionals, and makes it impossible for them to carry out their duties to serve and protect the national interest.[52] The President accuses anyone who dissents of participating in a "deep state" conspiracy against him,[53] and has systematically replaced career civil servants with loyalists.[54] The results of this pressure are borne out in policy, procurement, and other decisions that elevate the President's desires over adherence to the law.

### 1. The President's Requirement for "Loyal" DoD Leadership and Interference in DoD Procurements

359. The President's efforts to influence the JEDI source selection process are one of the many dangerous examples of the elevation of the President's personal interests above the national interest, a pattern most evident in DoD, where the President has exerted significant pressure and control as both leader of the Executive branch and Commander in Chief of the armed forces. President Trump's escalating efforts to exert personal control over DoD proceeded in parallel with the remand evaluations. In May 2020, the Trump Administration appointed Michael Cutrone, a former top-aide to Vice President Mike Pence and "White House loyalist," to serve in a behind-the-scenes role within DoD to vet DoD officials for their loyalty to the President and ensure that civilian professionals serving within the Office of Secretary of Defense are replaced with

---

[52] Miles Taylor, *At Homeland Security, I Saw Firsthand How Dangerous Trump Is for America*, Wash. Post (Aug. 17, 2020), https://www.washingtonpost.com/opinions/at-homeland-security-i-saw-firsthand-how-dangerous-trump-is-for-america/2020/08/17/f10bb92e-e0a3-11ea-b69b-64f7b0477ed4_story.html.

[53] *Ex-Trump Official: Trump Calls People that Disagree with Him 'Deep State,'* CNN (Aug. 30, 2020), https://www.cnn.com/videos/politics/2020/08/30/miles-taylor-trump-deep-state-conspiracy-theory-ndwknd-vpx.cnn/video/playlists/this-week-in-politics/.

[54] Jacob Knutson, *Trump Acknowledges Lists of Disloyal Government Officials to Oust*, Axios (Feb. 25, 2020), https://www.axios.com/trump-acknowledges-disloyal-officials-list-5e7df59a-5f82-445e-8411-56fd49ef0e11.html.

individuals who are "aligned with the White House."[55]  Mr. Cutrone's installation in DoD is part

of the Trump Administration's larger pattern of ensuring "loyalty" by executive staffers.  The

President has also rejected the long-standing norm of elevating senior career professionals to serve

in an interim capacity for vacant high-level DoD positions by instead installing outside loyalists—

valuing "loyalty over expertise" and "effectively skirting the Senate confirmation process."[56]

360.  The President's handling of DoD personnel in connection with the impeachment

inquiry highlighted his determined refusal to separate his personal interests from the national

interest, and his willingness to destroy the careers of those he deems disloyal.  Just two days after

the Senate acquitted President Trump in February 2020, President Trump fired Lt. Col. Alexander

Vindman and the U.S. Ambassador to the European Union Gordon Sondland in retaliation for their

sworn testimony in response to congressional subpoenas during the impeachment proceedings

regarding President Trump's dealings with the president of Ukraine. [57]  Lt. Col. Vindman

ultimately retired from the Army in July 2020 because of a "campaign of White House intimidation

---

[55] Jack Detsche & Robbie Gramer, *Trump Taps Point Man to Remove Pentagon Officials Seen as Disloyal*, Foreign Policy (May 6, 2020), https://foreignpolicy.com/2020/05/06/trump-pence-pentagon-point-man-disloyal/.

[56] Lara Seligman, *Trump Skirting Congress to Install Loyalists in the Pentagon*, Politico (July 17, 2020), https://www.politico.com/news/2020/07/17/trump-loyalists-pentagon-366922.

[57] Peter Baker et al., *Trump Fires Impeachment Witnesses Gordon Sondland and Alexander Vindman in Post-Acquittal Purge*, N.Y. Times (Feb. 7, 2020), https://www.nytimes.com/2020/02/07/us/politics/alexander-vindman-gordon-sondland-fired.html.  Shortly before their terminations were formally announced, President Trump foreshadowed that he was "not happy" with Lt. Col. Vindman and that "maybe people should pay" for testifying during the impeachment proceedings against him.  John Harney et al., *Trump Ousts Impeachment Witnesses Sondland and Vindham*, Bloomberg (Feb. 6, 2020), https://www.bloomberg.com/news/articles/2020-02-07/white-house-weighs-ouster-of-aide-who-testified-against-trump.

and retaliation."[58] The Trump Administration also revoked the nomination of Elaine McCusker—a career professional specializing in defense budgeting and finance—for promotion to DoD Comptroller, allegedly in retaliation for Ms. McCusker telling the White House, via internal emails, that its holdup of the Ukraine aid package at issue in the impeachment proceedings might violate federal law.[59]

361.   Retaliation against those not beholden to the President's personal interests is not limited to the Fourth Estate.  President Trump overruled the judgment of top Navy officials who called for an administrative review of whether Chief Petty Officer Edward Gallagher should be expelled from the Navy SEALs for alleged wartime misconduct.[60]  When then-Secretary of the Navy Richard Spencer raised concerns about presidential interference in military disciplinary affairs, President Trump instructed Secretary Esper to demand Secretary Spencer's resignation. Secretary Esper complied and terminated Spencer, explaining that regardless of how he personally felt about President Trump's request, "[t]he president is the commander in chief," and that he has

---

[58]  Eric Schmitt & Helene Cooper, *Army Officer Who Clashed With Trump Over Impeachment Is Set to Retire*, N.Y. Times (July 8, 2020), https://www.nytimes.com/2020/07/08/us/politics/vindman-trump-ukraine-impeachment.html. President Trump also directed the firing of Lt. Col. Alexander Vindman's brother, Lt. Col. Yevgeny Vindman, who also worked on the NSC staff, in apparent retaliation for his brother's testimony.  Lauren Frias, *Trump Also Fired the Twin of Impeachment Witness Lt. Col. Alexander Vindman in Apparent Retaliation for His Brother's Testimony*, Bus. Insider (Feb. 7, 2020), https://www.businessinsider.com/yevgeny-vindman-ousted-white-house-same-time-as-alex-2020-2.

[59]  *See* Editorial Board, *Trump Is Punishing an Honorable Professional for Telling the Truth*, Wash. Post (Mar. 6, 2020), https://www.washingtonpost.com/opinions/trump-is-punishing-an-honorable-professional-for-telling-the-truth/2020/03/05/4edf2398-5e53-11ea-b014-4fafa866bb81_story.html.

[60]  Dave Philipps, *Trump Reverses Navy Decision to Oust Edward Gallagher from SEALs*, N.Y. Times (Nov. 21, 2019), https://www.nytimes.com/2019/11/21/us/trump-seals-eddie-gallagher.html.

"every right, authority and privilege to do what he wants to do," and that he would "[a]bsolutely"

follow the President's directives.[61]  Secretary Esper has continued to serve as a powerful conduit

of the President's personal directives, even urging military commanders overseas not to make

decisions related to the coronavirus that might surprise the White House or run afoul of President

Trump's messaging on the global pandemic.[62]

362.   President Trump's direct interference in DoD procurements to advance his personal

agenda has already cost taxpayers *billions*.[63]  For example, despite the U.S. Army Corps of

Engineers' determination that a South Dakota construction firm, Fisher Industries, failed to meet

the specifications for a pending $400 million border wall construction contract, Fisher Industries

---

[61]  Dep't of Defense, *Remarks by Secretary Esper in a Press Gaggle* (Nov. 25, 2019), https://www.defense.gov/Newsroom/Transcripts/Transcript/Article/2026000/remarks-by-secretary-esper-in-a-press-gaggle/.

[62]  Eric Schmitt & Helene Cooper, *Defense Secretary Warns Commanders Not to Surprise Trump on Coronavirus*, N.Y. Times (Mar. 2, 2020), https://www.nytimes.com/2020/03/02/us/politics/esper-trump-military-coronavirus.html.

[63]  President Trump also intervened in the General Services Administration's ("GSA") solicitation of bids related to a planned relocation of the Federal Bureau of Investigation's headquarters away from downtown Washington, D.C., reportedly pressuring GSA officials to cancel the solicitation to ensure the site would not be redeveloped by potential competitors to the nearby Trump International Hotel.  Although the GSA Administrator testified to Congress that the decision to remain at its current location "came from the FBI," a GSA Inspector General investigation later found this testimony "left the misleading impression that she had no discussions with the President or senior White House officials in the decision-making process about the project."  The investigation also uncovered internal emails referencing "what POTUS directed everyone to do" and "POTUS's orders" regarding the project. *See* Office of Inspector General, U.S. GSA, *Review of GSA's Revised Plan for the Federal Bureau of Investigation Headquarters Consolidation Project* (Aug. 27, 2018), https://www.gsaig.gov/sites/default/files/audit-reports/Review%20of%20GSA%27s%20Revised%20Plan%20for%20the%20FBI%20HQ%20Consolidation%20Project%20REDACTED%20-%20508%20compliant.pdf.

received that contract, and billions of dollars' worth of other government contracts, at President Trump's behest.[64]

363. After Fisher Industries' initial exclusion from the border wall contract competition because it did not meet project requirements, Fisher's Chief Executive Officer Tommy Fisher appealed directly to the President via appearances on *Fox News* by touting the need for the border wall.[65] The President endorsed Fisher Industries for the border wall construction contract during a television interview on *Fox News*, and, under pressure from the White House, Fisher was added to the pool of competitors.[66]

364. The President went on to "aggressively push[]" Fisher Industries to the commanding general of the Army Corps[67] and "'pressured' government officials to direct wall contracts to Fisher."[68] On March 7, 2019, the "[P]resident summoned DHS officials and Lt. General Todd Semonite, who ran the Army Corps of Engineers, to the Oval Office" and "'exploded

---

[64] Nick Miroff & Josh Dawsey, *North Dakota Company that Trump Touted Gets $400 Million Border Wall Contract*, Wash. Post (Dec. 2, 2019), https://www.washingtonpost.com/immigration/north-dakota-company-that-trump-touted-gets-400-million-border-wall-contract/2019/12/02/9c661132-1568-11ea-bf81-ebe89f477d1e_story.html.

[65] Sharyn Alfonsi, *Why a Private Section of the Border Wall Is Allegedly Failing*, 60 Minutes (Sept. 27, 2020), https://www.cbsnews.com/news/southern-border-wall-erosion-fisher-sand-and-gravel-60-minutes-2020-09-27/

[66] *See* Nick Miroff & Josh Dawsey, *"He Always Brings Them Up": Trump Tries to Steer Border Wall Deal to North Dakota Firm*, Wash. Post (May 23, 2019), https://www.washingtonpost.com/immigration/he-always-brings-them-up-trump-tries-to-steer-border-wall-deal-to-north-dakota-firm/2019/05/23/92d3858c-7b30-11e9-8bb7-0fc796cf2ec0_story.html.

[67] *Id.*

[68] Alfonsi, *Why a Private Section of the Border Wall Is Allegedly Failing*, *supra* note 65.

into a tirade'" over why Fisher "wasn't selected to build [the wall]."[69] The "pressure continued" after that meeting, "with a handwritten note from the [P]resident, an email from his personal secretary and calls from his son-in-law, Jared Kushner"—the very types of communications the White House blocked the DoDIG from investigating in its JEDI procurement investigation.[70]

365. Confronted by that unrelenting pressure from the top, the Army Corps reversed its earlier determination that Fisher's proposal failed to meet the solicitation requirements, and awarded Fisher the border wall contract in December 2019.[71] That procurement is now under audit by the DoDIG, which is investigating allegations strikingly similar to the allegations in this bid protest—*i.e.*, "inappropriate influence" by the Administration on the contracting decision and an award to an offeror whose initial proposal had not "met solicitation standards."[72] As with the JEDI Contract, President Trump's interference with the border wall construction contracts prioritized his personal and political agenda over the national interest. DoD officials were

---

[69] *Id.*

[70] *Id.*

[71] Miroff & Dawsey, *supra* note 64. Since the award of that initial $400 million border wall contract, the Army Corps of Engineers has awarded Fisher Industries at least two additional border wall construction contracts: a $1.3 billion deal to build 42 miles of black painted fencing in southern Arizona, and a $289 million contract for 17 miles of border wall in Laredo, Texas, awarded in August 2020. Nick Miroff, *Trump's Preferred Construction Firm Lands $1.3 Billion Border Wall Contract, the Biggest So Far*, Wash. Post (May 19, 2020), https://www.washingtonpost.com/immigration/trump-border-wall-fisher-contract/2020/05/19/d22943f2-99de-11ea-b60c-3be060a4f8e1_story.html; *see also* Nomaan Merchant, *Builder Pitched to Trump Wins New Border Wall Contract*, Associated Press (Aug. 3, 2020), https://apnews.com/article/mexico-kevin-cramer-tx-state-wire-nd-state-wire-u-s-news-2f617a0f7c5c6ebdd5a175144c5cb1fb.

[72] Letter from Glenn A. Fine, Principal Deputy Inspector General, Dep't of Defense Inspector General, to Hon. Bennie G. Thompson, Chairman, Committee on Homeland Security (Dec. 12, 2019), https://homeland.house.gov/imo/media/doc/DoD%20OIG%20response%20to%20Chairman%20Thompson.pdf.

pressured to award the contracts to a technically inferior offeror and diverted taxpayer dollars to a contractor whose product has reportedly been plagued with engineering defects.

366.     President Trump's improper interference in DoD's procurement functions beyond the JEDI Contract continues to this day. At the President's behest, White House Chief of Staff Mark Meadows has reportedly been pressuring DoD to grant a non-competitive contract to lease DoD's 5G network spectrum, worth billions of dollars, to Rivada Networks, a company in which prominent Republicans and supporters of President Trump have significant investments.[73] DoD CIO Dana Deasy has been tasked with fast-tracking this process, despite bipartisan consensus at the Federal Communications Commission against DoD's apparent push to lease a federally-owned 5G network spectrum.[74] A senior Administration official described the White House's efforts to push through the deal as "the biggest handoff of economic power to a single entity in history," which is especially troubling due to concerns over Rivada's ability to lease the spectrum for commercial use while preserving DoD's ability to use the spectrum for the national defense.[75] As with the JEDI Contract, however, the Trump Administration is prepared to run roughshod over critical national interests (and the independent government functions that protect them) where the President or his associates stand to benefit.

367.     These presidential intrusions in DoD's military and civilian operations and procurements are notable not only because they occurred, but also because they occurred publicly,

---

[73] Charlotte Klein, *Trump Reportedly Pushing Through 5G Deal That Would Enrich His Friends*, Vanity Fair (Oct. 21, 2020), https://www.vanityfair.com/news/2020/10/trump-pentagon-5g-deal-karl-rove-peter-thiel.

[74] *Id. See also* Kyle Daly, *White House pushes Pentagon to jumpstart a national 5G network*, Axios (Oct. 12, 2020), https://www.axios.com/white-house-pushes-pentagon-to-jumpstart-a-national-5g-network-c47ac4b2-628e-4d40-935b-dd98cbc601ec.html.

[75] Klein, *supra* note 73 (internal quotation marks omitted).

for the purpose of achieving political objectives rather than national security objectives, and without effective pushback or other recourse from DoD senior officials.

368. It is this extraordinary environment of corruption, interference, and retribution—seemingly without interruption throughout this bid protest—that confronted the SST responsible for administering the JEDI procurement on remand. The SST was confronted with the inescapable understanding that their jobs and reputations would be jeopardized by failing to acquiesce to the President's stated desires. [76] It is only in the light of that unenviable predicament that the SST's further contortions to justify the re-award to Microsoft despite its higher cost to taxpayers can best be understood. There is simply no other reasonable explanation for the extraordinary efforts by these procurement officials to skew the reevaluations in Microsoft's favor.

### 2. The President's Interference with Other Government Functions at the Expense of the National Interest

369. The President's demand for unfailing loyalty and willingness to interfere in the independent and professional judgment of government officials has affected seemingly all areas of government—from stymying public health experts in the Department Health and Human Services in the use of their scientific expertise to manage the COVID-19 public health crisis, [77] to

---

[76] Lawmakers have expressed their concern over the culture developing within DoD where officials act based on a desire to please President Trump, rather than based on the merits of the issue or the right thing to do. *See* Katie Bo Williams, *Pentagon's 'Willingness to Kiss the President's Ass' Worries Top Lawmaker*, Defense One (Apr. 29, 2020), https://www.defenseone.com/policy/2020/04/pentagons-willingness-kiss-presidents-ass-worries-top-lawmaker/165011/.

[77] For example, President Trump reportedly pressured the Food and Drug Administration to fast-track approval of COVID-19 therapeutics in advance of the November 2020 election and ordered changes to guidance published by the Centers for Disease Control and Prevention in response to the public health crisis. *See* Laurie McGinley et al., *Inside Trump's Pressure Campaign on Federal Scientists Over a Covid-19 Treatment*, Wash. Post (Aug. 30, 2020), https://www.washingtonpost.com/health/convalescent-plasma-treatment-covid19-fda/2020/

meddling in the DOJ's traditionally independent prosecutorial and enforcement decisions,[78] to

insisting upon taxpayer-funded litigation to halt the publication of a scathing account of instances

where the President placed his own interests above those of the country.[79]

---

08/29/e39a75ec-e935-11ea-bc79-834454439a44_story.html; Apoorva Mandavilli, *C.D.C. Testing Guidance Was Published Against Scientists' Objections*, N.Y. Times (Sept. 17, 2020), https://www.nytimes.com/2020/09/17/health/coronavirus-testing-cdc.html. Similarly, when the FDA issued new guidelines for the emergency release of a coronavirus vaccine that would impose a two-month follow-up period on vaccine testers (making it impossible for a vaccine to be released before the November election), the White House objected and President Trump referred to the move as a "political hit job." Kate Duffy, *Trump Claimed, Without Justification, that New Tighter FDA Vaccine Guidelines Were a 'Political Hit Job,' Hours After the White House Approved Them*, Bus. Insider (Oct. 7, 2020), https://www.businessinsider.com/trump-tighter-fda-covid-19-vaccine-rules-political-hit-job-2020-10; Carl Zimmer & Noah Weiland, *In Reversal, White House Approves Stricter Guidelines for Vaccine Makers*, N.Y. Times (Oct. 6, 2020), https://www.nytimes.com/2020/10/06/health/covid-vaccine-guidelines.html; Donald J. Trump (@realDonaldTrump), Twitter (Oct. 6, 2020 6:09 P.M.), https://twitter.com/realDonaldTrump/status/1313647605134614529.

[78] President Trump attacked federal prosecutors' sentencing recommendations for longtime ally Roger Stone, ordered the Attorney General to drop charges against political supporter Michael Flynn, and removed the U.S. Attorney for the Southern District of New York for investigating "politically sensitive" matters involving the President's personal lawyer and the Trump Organization's business interests in Turkey. *See* The White House, *Statement from the Press Secretary Regarding Executive Grant of Clemency for Roger Stone, Jr.* (July 10, 2020), https://www.whitehouse.gov/briefings-statements/statement-press-secretary-regarding-executive-grant-clemency-roger-stone-jr/; Sarah N. Lynch, *U.S. Moves to Drop Case Against Trump Ex-Adviser Flynn, Who Admitted Lying to FBI*, Reuters (May 7, 2020), https://www.reuters.com/article/us-usa-trump-russia-flynn/u-s-justice-department-seeks-to-drop-case-against-trump-ex-adviser-flynn-idUSKBN22J317; Rebecca Davis O'Brien & Sadie Gurman, *Trump Administration Move Disrupts U.S. Attorney's Office in Manhattan*, Wall St. J. (June 21, 2020), https://www.wsj.com/articles/trump-administration-move-disrupts-u-s-attorneys-office-in-manhattan-11592790171; Ryan Goodman & Danielle Schulkin, *Timeline: Trump, Barr, and the Halkbank Case on Iran Sanctions-Busting*, Just Security (July 27, 2020), https://www.justsecurity.org/71694/trump-barr-and-the-halkbank-case-timeline/.

[79] Ellen Knight, the former National Security Council director who conducted the pre-publication review of former National Security Advisor John Bolton's book, has detailed how she was pressured by DOJ attorneys to sign an inaccurate declaration to support the Government's lawsuit against Bolton. When Ms. Knight asked "how it could be appropriate that a designedly apolitical process had been commandeered by political appointees for a seemingly political purpose" and suggested that the litigation was happening "because the most powerful man in

370.    President Trump's demotion of the Acting DoDIG in April 2020 was one of a spate of firings of at least four other inspectors general in recent months—including U.S. Intelligence Community Inspector General Michael K. Atkinson (terminated in April 2020),[80] Department of Health and Human Services Acting Inspector General Christi Grimm (terminated in May 2020),[81] Department of State Inspector General Steven A. Linick (terminated in May 2020),[82] and Department of Transportation Acting Inspector General Mitch Behm (terminated in May 2020).[83] By systematically firing those who sought to hold the Administration accountable for alleged

the world said that it needed to happen," several DOJ attorneys agreed with her assessment. Letter from Kenneth L. Wainstein to Jennifer B. Dickey et al. (Sept. 22, 2020), https://int.nyt.com/data/documenttools/ellen-knight-bolton-book-letter/c98f11bb205df88a/full.pdf; Katelyn Polantz, *Ex-NSC Official Accuses White House of Trying to Block Bolton Book to Satisfy Trump*, CNN (Sept. 23, 2020), https://www.cnn.com/2020/09/23/politics/john-bolton-ellen-knight/index.html.

[80]   President Trump terminated Mr. Atkinson because he believed Mr. Atkinson had done "a terrible job" in escalating the whistleblower complaint that led to the impeachment inquiry. *See* Jeff Mason & James Oliphant, *"He's a Total Disgrace": Trump Defends Firing U.S. Intel Watchdog*, Reuters (Apr. 4, 2020).

[81]   President Trump fired Ms. Grimm after she released a report that found "severe shortages" of testing capabilities and protective equipment in the country's hospitals for combatting the COVID-19 pandemic. *See* Lisa Rein, *Trump Replaces HHS Watchdog Who Found "Severe Shortages" at Hospitals Combatting Coronavirus*, Wash. Post (May 2, 2020), https://www.washingtonpost.com/politics/trump-replaces-hhs-watchdog-who-found-severe-shortages-at-hospitals-combating-coronavirus/2020/05/02/6e274372-8c87-11ea-ac8a-fe9b8088e101_story.html.

[82]   President Trump reportedly fired Mr. Linick at the request of close Trump ally and Secretary of State Mike Pompeo, whom Mr. Linick had been investigating for multiple potential improprieties, including misusing government funds for personal and illegitimate purposes. *See* Edward Wong, *Inspector General's Firing Puts Pompeo's Use of Taxpayer Funds Under Scrutiny*, N.Y. Times (May 17, 2020), https://www.nytimes.com/2020/05/17/us/politics/pompeo-inspector-general-steve-linick.html.

[83]   President Trump reportedly dismissed Mr. Behm because he had been investigating Transportation Secretary Elaine Chao. *See* Sam Mintz, *Democrats Blast Removal of Acting DOT Inspector General*, Politico (May 19, 2020), https://www.politico.com/news/2020/05/19/democrats-blast-removal-of-acting-dot-inspector-general-268611.

misconduct, the President reinforced the strong message during the initial stages of DoD's remand evaluations: anyone who seeks to investigate the Administration's actions, or to contradict its desired outcomes—including the predetermined outcome of the JEDI procurement—does so at his or her professional and personal peril.

371.    As a result, the public must rely on the bravery of Administration officials willing to risk their careers to speak out against improper presidential influence. For example, a DHS whistleblower reported being pressured by senior agency officials, at the request of the White House, to stop reporting on Russian election interference and to revise intelligence reports to "make the threat of white supremacy 'appear less severe.'"[84] President Trump also reportedly instructed Federal Emergency Management Agency officials to "'stop giving money to people whose houses had burned down from a wildfire, because he was so rageful that people in the state of California didn't support him and that politically it wasn't a base for him.'"[85] In response, members of Congress called for the DHS Inspector General to investigate whether the President had ordered the allocation of disaster assistance based on the political preferences of the disaster

---

[84] All Things Considered, *Brian Murphy's Attorney on DHS Whistleblower Complaint*, NPR (Sept. 9, 2020), https://www.npr.org/2020/09/09/911277901/brian-murphys-attorney-on-dhs-whistleblower-complaint; Zolan Kanno-Youngs & Nicholas Fandos, *D.H.S. Downplayed Threats from Russia and White Supremacists, Whistle-Blower Says*, N.Y. Times (Sept. 9, 2020), https://www.nytimes.com/2020/09/09/us/politics/homeland-security-russia-trump.html; Whistleblower Reprisal Complaint, *In re Brian Murphy*, Dep't of Homeland Security Office of Inspector General (Sept. 8, 2020), https://int.nyt.com/data/documenttools/homeland-security-whistleblower/0819ec9ee29306a5/full.pdf

[85] Jimmy Tallal, *Feds May Have Denied Woolsey Fire Victims Disaster Money for Political Reasons*, Malibu Times (Aug. 30, 2020), http://www.malibutimes.com/news/article_97bcd86c-ea2b-11ea-8934-3f21f3c8be74.html.

victims.[86] Similarly, the President's COVID response was reportedly driven by the infection breakdown among "Red" and "Blue" states.[87]

372. Notably, the President's ongoing interference in governmental functions and contracts continues to target Amazon. Documents obtained from the U.S. Postal Service through a Freedom of Information Act request revealed that President Trump's repeated demands that the U.S. Postal Service raise the rates it charges Amazon "sent the leaders of the country's mail system scrambling" because of the "political bind facing the agency this spring as it sought to balance Trump's political broadsides with its own urgent need to shore up its balance sheet."[88] President Trump's attacks on Amazon came in the midst of contract negotiations between the Postal Service and its largest commercial customer—Amazon.[89]

373. These events represent the President's demonstrated record of continually and improperly inserting himself into the orderly discharge of government functions, and the immense influence his pressure has on government personnel—from senior government officials, to career civilian professionals, to those tasked with oversight and accountability in government—in the discharge of their duties. That record has put squarely in doubt the presumption of regularity and

---

[86] Letter from Rep. Ted W. Lieu et al., to Hon. Joseph V. Cuffari, Inspector General, U.S. Dep't of Homeland Security (Aug. 21, 2020), https://lieu.house.gov/sites/lieu.house.gov/files/2020-08-21%20Letter%20to%20DHS%20OIG%20re%20California%20wildfire%20assistance%20investigation.pdf.

[87] *See* Charlie Sykes, *Did Trump and Kushner Ignore Blue State COVID-19 Testing as Deaths Spiked?*, NBC (Aug. 4, 2020), https://www.nbcnews.com/think/opinion/did-trump-kushner-ignore-blue-state-covid-19-testing-deaths-ncna1235707.

[88] Jay Greene, Tony Romm & Jacob Bogage, *Postal Service Feared Trump's Rhetoric Could Cost It Billions in Amazon Business, Documents Reveal*, Wash. Post (Sept. 18, 2020), https://www.washingtonpost.com/technology/2020/09/18/trump-amazon-postal-service//.

[89] *Id.*

good faith that these government personnel typically enjoy: time and again, Administration officials, "[f]ollowing the cues of a chief executive who despises what he calls the 'deep state,' . . . have cut corners, displaced career professionals, exiled dissenters and abandoned institutional norms"—all of which "circumvent[] the very processes that justify the presumption of regularity in the first place."[90] The JEDI reevaluations and re-award decision have fallen victim to an Administration that suppresses the good-faith analysis and reasoning of career officials for political reasons—ultimately to the detriment of national security and the efficient and lawful use of taxpayer dollars. DoD has demonstrated again that it has not executed this procurement objectively and in good faith. This re-award should be set aside.

## CLAIMS FOR RELIEF

### COUNT ONE
### (Failure to Evaluate Proposals in Accordance with Solicitation)

374.    Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

375.    Government officials are required to conduct procurements in a manner consistent with the terms of the RFP and applicable law and regulations. Evaluation judgments that are unsupported in the administrative record are arbitrary and capricious and cannot form the basis of a valid award decision. 5 U.S.C. § 706(2)(A).

---

[90] George T. Conway III & Lawrence S. Robbins, *No Serious Lawyer Would Argue What Trump's Justice Department Is Arguing*, Wash. Post (Aug. 18, 2020), https://www.washingtonpost.com/opinions/2020/08/18/justice-departments-extreme-legal-arguments-are-costing-it-court/.

376.    DoD determined Microsoft's proposal was technically superior to AWS's based on

a superficial and erroneous evaluation that deviated from the RFP's stated criteria for obtaining a

cutting-edge and market-leading cloud solution.

377.    The RFP's SOO clearly outlined DoD's desire for a modern cloud solution capable

of scaling alongside increasing threats to the warfighter:

> To maintain our military advantage, DoD requires an extensible and secure cloud
> environment that spans the homeland to the global tactical edge, as well as the
> ability to rapidly access computing and storage capacity to address warfighting
> challenges at the speed of relevance.  These foundational infrastructure and
> platform technologies are needed for DoD to capitalize on modern software, keep
> pace with commercial innovation, and make use of artificial intelligence and
> machine learning capabilities at scale.

AR Tab 27 at 607.

378.    Moreover, in its report to Congress on the JEDI procurement, DoD acknowledged

that:



AR Tab 109 at 6497 (emphasis added).

379.    AWS's cloud solution exceeded the high bar set by DoD for JEDI.  AWS offered

advanced cloud capabilities that Microsoft could not match.  These capabilities included AWS's

leading Nitro architecture, tactical edge devices capable of performing the full range of DoD

operations (and that already are being used on the battlefield by DoD), and robust marketplace.

Moreover, as the current contractor for the ███ cloud contract, AWS offered a proven approach for developing and deploying cloud infrastructure and platforms at scale, which drastically reduces the risk of unsuccessful performance of the JEDI procurement. No other offeror—including Microsoft—has remotely similar capabilities or experience.

380.    Despite AWS's more advanced technology—which is widely recognized in the industry as market-leading—DoD repeatedly deviated from the RFP's evaluation criteria in its proposal evaluations in order to support its false conclusion that Microsoft's cloud solution is in the same league as AWS's market-leading solution.

381.    For example, under Factor 2, the SSEB explicitly recognized that AWS ███████ ███████████████████████████████████ to Microsoft because of AWS's "extraordinary" Nitro hypervisor. Yet, the SSAC arbitrarily minimized the importance of hypervisor security and the clear advantage Nitro gave AWS under the most important evaluation factor by ███████ ████████████████████████████████████████████████████████████████████ ██████████████████████████.

382.    Similarly, under Factor 3, despite the RFP's clear requirement that DoD evaluate each offeror's *approach* to the tactical edge requirements to determine if it is suitable for the range of military operations contemplated by DoD, DoD focused its analysis on whether *each individual tactical edge device* could perform the full range of operations. This interpretation of the RFP was inconsistent with both the RFP's plain language and its focus on balancing portability with capability.

383.    Moreover, under Factor 4, DoD inexplicably assigned AWS an unwarranted risk because AWS provided DoD increased flexibility. In addition, under Factor 5, DoD ignored the RFP's mandate that DoD evaluate offerors' data migration capability and marketplace offerings

because adherence to the RFP's evaluation criteria would have required DoD to recognize AWS's superior capabilities.

384. Under Factor 6, DoD improperly considered purported cost savings as part of the technical evaluation, in direct contravention of the RFP's requirements. Finally, under Factor 8, DoD abandoned its requirements, as reflected in the Demonstration Instructions, for successful demonstrations of various test scenarios because Microsoft ████████████████ DoD's requirements.

385. The above examples of DoD's unreasonable evaluation merely scratch the surface of the unexplainable evaluation errors in the record. There are numerous other unsupported evaluation judgments that improperly skewed the best value source selection decision in Microsoft's favor. AWS was prejudiced by these inexplicable errors: under a rational evaluation in accordance with the RFP's stated criteria, AWS would have received higher ratings under Factors 2–6 and 8, and DoD would have awarded the JEDI Contract to AWS.

## COUNT TWO
### (Disparate Treatment)

386. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

387. Agencies are required to evaluate proposals on a fair and impartial basis and in accordance with the solicitation's stated evaluation criteria. Agencies therefore may not engage in conduct that favors one offeror over another by relaxing RFP requirements for only one offeror or subjecting one offeror to greater scrutiny.

388. DoD failed to comply with this fundamental mandate by contorting the evaluation criteria and the relative merits of the offerors' proposals to create the appearance of either technical parity or an advantage for Microsoft where AWS is clearly superior.

389. For example, DoD disparately evaluated the proposals by failing to credit AWS for its ███████████████████████ under Factor 2, even though DoD credited Microsoft for ████████████ under Factors 4 and 5 ███████████████████████ ██████████████████████████████████████████ DoD also unfairly penalized AWS for allegedly ████████████████ ████████████████, but failed to fault Microsoft—and even assessed strengths—for its nearly identical ███████████████████████████████████.

390. Under Factor 3, Microsoft did not propose *any* devices capable of performing ████████████—a critical RFP requirement—whereas AWS proposed devices that could perform all operations contemplated by DoD. DoD therefore relaxed the RFP criteria for Microsoft to assign both offerors identical technical capability and risk ratings. DoD compounded this disparate treatment by manufacturing strengths for Microsoft based on the ████████ ████████████████████, while ignoring the fact that AWS's devices, ████████ █████████████████████████████████████. Moreover, DoD disparately evaluated the offerors' battery power capabilities. In the pre-remand initial evaluation, DoD ██████████████████████████████████████████ ██████████████████████████████████████████ █████████████████████████████████████. Yet, in the post-remand reevaluation, DoD inexplicably de-emphasized the importance of battery power when evaluating Microsoft's Category One devices because ████████████████████████████

164

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆

391.    Conversely, where both offerors demonstrated nearly identical advantages related

to ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ under Factor 4, DoD disparately evaluated proposals

by assigning only Microsoft strengths that AWS also deserved.  The SSAC and the SSA then used

this disparate treatment ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

392.    Under Factor 5, DoD unreasonably equated AWS's and Microsoft's marketplaces,

even though AWS's marketplace offerings ▆▆▆▆▆▆▆▆▆▆▆▆ and quality.

393.    In contrast, under Factor 6, DoD unreasonably credited only Microsoft for

capabilities that AWS also proposed, but on better terms.  Specifically, both offerors proposed

▆▆▆▆ services ▆▆▆▆▆▆▆▆▆▆▆, but DoD recognized only Microsoft's

offerings, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

Similarly, both offerors proposed ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆, yet DoD credited only Microsoft's solution ▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆.

394.    Under Factor 8, DoD disparately evaluated the offerors by concluding both

Microsoft and AWS ▆▆▆▆▆▆▆▆ all demonstration scenarios for the second

demonstration, when ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

165

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Moreover, DoD assigned AWS and

Microsoft identical technical capability and risk ratings even though AWS, by any objective

measure, had superior demonstrations.

395. The foregoing examples of DoD's blatant disparate treatment only begin to show

the myriad ways in which DoD held AWS and Microsoft to different standards that allowed

Microsoft to secure the JEDI Contract despite its inferior technical capability and higher price.

Under a fair and equal evaluation, DoD would have determined AWS presented the best value

based on its technical superiority and low price.

## COUNT THREE
### (Irrational Best Value Decision)

396. Plaintiff repeats and incorporates by reference each and every allegation contained

in the preceding paragraphs as if fully set forth herein.

397. DoD's best value source selection decision is fundamentally flawed because of the

numerous prejudicial errors described above and evident in DoD's evaluation materials. *See* 5

U.S.C. § 706(2)(A).

398. These prejudicial errors resulted in DoD arbitrarily concluding that Microsoft's

JEDI cloud solution is technically superior to AWS's when, in reality, AWS's offering provides

substantially greater capabilities and represents the best value for the Government and the

warfighter.

399. Moreover, even putting aside the numerous and compounding technical evaluation

errors, AWS's price advantage should have been dispositive in this procurement. The

administrative record shows that the arbitrary distinctions made by DoD during the technical

evaluation are not sufficient to overcome AWS's nearly ▇▇▇▇▇▇ price advantage.

400.     But for DoD's erroneous and unsupported evaluation judgments and price-technical tradeoff, DoD would have concluded that AWS's proposal was technically superior to Microsoft's under each of the non-price evaluation factors, which would have forced DoD to select the offeror that was *both* technically superior and lower priced. This tradeoff analysis necessarily would have resulted in award to AWS.

**COUNT FOUR**
**(Bias, Bad Faith, Improper Influence, and/or Conflict of Interest)**

401.     Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

402.     DoD is required to conduct government business "in a manner above reproach and . . . with complete impartiality and with preferential treatment for none." 48 C.F.R. § 3.101-1. Moreover, federal procurement law underscores that "[t]ransactions relating to the expenditure of public funds *require the highest degree of public trust and an impeccable standard of conduct. The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest* in Government-contractor relationships." *Id.* (emphases added).

403.     After DoD resolved the initial improprieties in the implementation of its corrective action through the issuance of Amendment 0009, the scope and form of DoD's corrective action with respect to Pricing Scenario 6 appeared designed to facilitate a fair and impartial corrective action on remand. DoD, in effect, had a clean slate from which it could reevaluate proposals in accordance with the RFP and remove any semblance of bias, bad faith, or improper influence from the evaluation process. And, AWS and Microsoft could finally compete on a level playing field with a common understanding of the Price Scenario 6 requirements. The debriefing materials and

167

administrative record, however, reveal that the execution of DoD's corrective action was anything but fair and impartial.

404.    Prior to the original award, President Trump repeatedly made clear to the highest echelons of DoD, including those directly responsible for overseeing the JEDI award, his desire that AWS not receive the JEDI Contract. DoD's reevaluations on remand reveal that DoD continued to succumb to presidential pressure to steer the JEDI Contract away from AWS, and that the re-award was the product of bias, bad faith, improper influence, and/or conflicts of interest.

405.    The administrative record reveals that DoD officials in charge of the JEDI procurement, including the SSEB Chair and the Advisor to the SSA, met with senior White House officials to discuss the JEDI program. After the White House obstructed meaningful investigation of these and other contacts between the White House and DoD concerning the JEDI procurement, the DoDIG concluded that it "could not definitively determine the full extent or nature of interactions that administration officials had . . . with senior DoD officials regarding the JEDI Cloud procurement," and therefore could not rule out that President Trump had interfered with the JEDI procurement to the detriment of AWS.

406.    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. During the remand period, the SST was aware of additional statements from President Trump that reinforced the bias and bad faith toward Amazon that plagued the initial award decision. These SST members were also aware of and considered the numerous other instances of the President's interference in independent government functions. And, although the TEB members certified that they did not review or consider AWS's protest filings or news coverage of the JEDI bid protest, the reevaluations, in fact,

reflect an attempt at a point-by-point refutation of AWS's protest grounds based on the Contracting Officer's relaying "areas of focus" to the TEBs, which were taken exclusively from AWS's original protest grounds. Moreover, none of the members of the SSEB, PEB, SSAC, or SSA certified that they had not reviewed or considered the earlier protest filings.

407.    The post-remand administrative record shows that President Trump's anti-Amazon rhetoric again had its intended effect and that DoD's actions are impossible to explain in the absence of bias, bad faith, and/or undue influence from President Trump. After DoD amended the solicitation on remand to conform to Microsoft's noncompliant proposal, AWS, not Microsoft, emerged as the lowest priced offeror. DoD then distorted its technical evaluations heavily in Microsoft's favor to preserve the award to Microsoft notwithstanding its higher price. Indeed, the one technical reevaluation that DoD completed before learning of AWS's lower price, and which DoD found ███████████████████████████████████, was later eroded at the eleventh hour by the SSAC—senior SST members more immediately susceptible to the influence of political pressure—on erroneous grounds to ensure the JEDI Contract remained with Microsoft.

408.    The reevaluations revealed that the members of the SST on remand were motivated to maintain the award to Microsoft, in whole or in part, by bias. Through his public statements and explicit and implicit directives to senior DoD officials, President Trump made known his unapologetic bias against Amazon and Mr. Bezos and his fervent desire that AWS not be awarded the JEDI Contract. The reevaluations show that the DoD officials charged with exercising their independent and impartial judgment on remand instead, consciously or unconsciously, adopted the President's bias as their own and crafted their evaluations and award decision to reach a pre-determined outcome of maintaining the award to the President's preferred offeror, Microsoft. In addition, the reevaluations demonstrate that, on remand, DoD was biased in favor of preserving

the status quo—award to Microsoft. DoD's biased evaluations, and the resulting award decision, were arbitrary, capricious, and unlawful. *See* 5 U.S.C. § 706(2)(A).

409. Alternatively, the reevaluations revealed that the members of the SST on remand were motivated to maintain the award to Microsoft, in whole or in part, by bad faith. Based on public and private messaging from President Trump, the evaluations and remand award decision reveal that DoD officials engaged in a coordinated effort at the President's directive to preclude AWS from winning the JEDI Contract by deliberately engineering disparate, unreasonable, and illogical evaluations of AWS's proposal in comparison with Microsoft's, with the specific intent of falsely making Microsoft's proposal appear superior. The SST deliberately deviated from the RFP's evaluation criteria to protect the existing award to Microsoft. DoD's bad faith evaluations, and the resulting award decision, were arbitrary, capricious, and unlawful. *See* 5 U.S.C. § 706(2)(A).

410. Alternatively, the reevaluations revealed that the members of the SST on remand were motivated to maintain the award to Microsoft, in whole or in part, by improper and undue political influences, pressures, and considerations. On remand, the evaluations and the affirmation of the award to Microsoft demonstrate that President Trump's pattern of retribution against government employees who act contrary to the President's wishes shaped the conduct of the DoD officials responsible for the JEDI remand evaluations and award decision. This environment motivated the DoD procurement personnel to maintain the award to Microsoft to avoid adverse employment repercussions. DoD's improperly influenced evaluations, and the resulting award decision, were arbitrary, capricious, and unlawful. *See* 5 U.S.C. § 706(2)(A).

411. In addition, on remand, DoD failed to avoid an actual or apparent conflict of interest in violation of 48 C.F.R. § 3.101-1. In particular, the SSEB Chairperson's and the SSA Advisor's

contemporaneous participation in political meetings about the JEDI procurement with high-ranking White House officials while serving as members of the SST for that same procurement violates the FAR's requirement that government officials avoid "even the appearance of a conflict of interest."

412. Because DoD's determination to maintain the award to Microsoft was the product, in whole or in part, of bias, bad faith, improper influence, and/or conflicts of interest, and because DoD failed to give fair consideration to AWS and to treat it impartially in violation of 48 C.F.R. § 3.101-1, DoD's award decision was arbitrary, capricious, an abuse of discretion, and not in accordance with law. AWS was prejudiced by DoD's conduct because, absent bias, bad faith, improper political influence, and/or conflicts of interest, DoD would have set aside the original award to Microsoft and determined that AWS presented the best value to the government.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully asks this Court to enter judgment in its favor and against Defendant and to:

A. Declare that DoD's rejection of AWS's proposal and re-award to Microsoft is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

B. Continue to enjoin DoD and Microsoft from commencing performance on the JEDI Contract pending reevaluation and a new award decision;

C. Direct DoD to reevaluate proposals or, in the alternative, reopen discussions with Microsoft and AWS, solicit and reevaluate revised proposals, and make a new best value decision;

D.     Direct DoD to replace the Source Selection Team responsible for the reevaluation

of proposals or, in the alternative, responsible for reopening discussions with Microsoft and AWS,

soliciting and reevaluating revised proposals, and making a new best value decision;

E.     Award to AWS its proposal costs; and

F.     Grant such other relief as the Court deems appropriate.

Dated:        October 23, 2020              Respectfully submitted,

By:   _____

Kevin P. Mullen
MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., NW
Washington, DC  20006-1888
Telephone: 202.887.1500
Facsimile: 202.887.0763

*Attorney of Record for Plaintiff
Amazon Web Services, Inc.*

*Of Counsel:*

J. Alex Ward                          Andrew S. Tulumello
Sandeep N. Nandivada                  Daniel P. Chung
Caitlin A. Crujido                    GIBSON, DUNN & CRUTCHER LLP
Alissandra D. Young                   1050 Connecticut Ave., NW
MORRISON & FOERSTER LLP               Washington, DC  20036-5306
2000 Pennsylvania Ave., NW
Washington, DC  20006-1888            Theodore J. Boutrous, Jr.
                                      Richard J. Doren
                                      Eric D. Vandevelde
                                      GIBSON, DUNN & CRUTCHER LLP
                                      333 South Grand Ave.
                                      Los Angeles, CA  90071-3197

172

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing SEALED AMENDED COMPLAINT

with the Clerk of the Court for the United States Court of Federal Claims by using the CM/ECF

system on October 23, 2020, and that a copy of the foregoing was served this day on all parties

via the Court's CM/ECF system.

Kevin P. Mullen