███████████████████████████

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

| | |
|---|---|
| AMAZON WEB SERVICES, INC., | Case No. 19-1796 |
| Plaintiff, | Judge Patricia E. Campbell-Smith |
| v. | |
| UNITED STATES OF AMERICA, by and through the U.S. Department of Defense, | ████████████ |
| Defendant, | |
| and | **FINAL REDACTED VERSION** |
| MICROSOFT CORPORATION, | |
| Intervenor-Defendant. | |

## INTERVENOR-DEFENDANT MICROSOFT CORPORATION'S
## RENEWED MOTION TO DISMISS, IN PART, THE AMENDED COMPLAINT

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................................1

II.   QUESTION PRESENTED .........................................................................................3

III.  FACTUAL BACKGROUND .......................................................................................3

     A.    DoD Awards The JEDI Cloud Contract To Microsoft, And AWS
          Responds By Filing Its First Untimely Protest Alleging Bias ...............................4

     B.    AWS Vigorously Objects To DoD's Proposed Corrective Action
          On Bias Grounds .....................................................................................................6

     C.    DoD's Inspector General Finds No Evidence of Improper
          Influence On The JEDI Source Selection Team .....................................................8

     D.    The Court Approves The Remand, But AWS Fails To Protest
          Alleged Bias In DoD's Corrective Action ............................................................10

     E.    AWS Files Another Post-Award Protest Alleging Bias Based On
          Information That It Knew Before The End Of The Corrective
          Action ....................................................................................................................13

IV.   ARGUMENT .............................................................................................................15

     A.    *Blue & Gold* Bars A Post-Award Protester From Challenging
          Procurement Defects That It Could Have Raised Prior To The
          Award ....................................................................................................................16

     B.    AWS Waived Its Allegations Of Bias, Bad Faith, Improper
          Influence And Conflicts Of Interest......................................................................20

     C.    Dismissing Count IV On Waiver Grounds Vindicates *Blue &*
          *Gold*'s Policy Goals ............................................................................................28

V.    CONCLUSION ..........................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adams and Associates, Inc.,*
  B-417120; B-417125, 2019 CPD ¶ 21, 2019 WL 245909 (Comp. Gen. Jan.
  16, 2019) ..............................................................................................................19, 21

*ANHAM FZCO v. United States,*
  144 Fed. Cl. 697 (2019) ...................................................................................... *passim*

*Blue & Gold Fleet, L.P. v. United States,*
  492 F.3d 1308 (Fed. Cir. 2007).......................................................................... *passim*

*Ceres Gulf, Inc. v. United States,*
  94 Fed. Cl. 303 (2010) ................................................................................................28

*COMINT Sys. Corp. v. United States,*
  700 F.3d 1377 (Fed. Cir. 2012)...............................................................................17, 21

*Commc'n. Constr. Servs., Inc. v. United States,*
  116 Fed. Cl. 233 (2014) ...........................................................................................18, 21

*Concourse Grp., LLC v. United States,*
  131 Fed. Cl. 26 (2017) .............................................................................................18, 22

*CRAssociates, Inc. v. United States,*
  102 Fed. Cl. 698 (2011), *aff'd,* 475 Fed. App'x 341 (Fed. Cir. 2012)
  (unpublished) ......................................................................................................18, 19, 21

*Dimare Fresh, Inc. v. United States,*
  808 F.3d 1301 (Fed. Cir. 2015)......................................................................................8

*Inserso Corp. v. United States,*
  961 F.3d 1343 (Fed. Cir. 2020)......................................................................... *passim*

*Jacobs Tech. Inc. v. United States,*
  131 Fed. Cl. 430 (2017) .....................................................................................19, 27, 28

*Oracle Am., Inc. v. United States,*
  144 Fed. Cl. 88 (2019), *aff'd,* 975 F.3d 1279 (Fed. Cir. 2020)...............................6, 27, 28, 29

*Peraton Inc. v. United States,*
  146 Fed. Cl. 94 (2019) .....................................................................................16, 19, 22, 24

## STATUTES

28 U.S.C. § 1491(b)(3) ...............................................................................................16, 29

## REGULATIONS

4 C.F.R. § 21.2(a)(1) ..................................................................................................17, 19

## OTHER AUTHORITIES

Annie Palmer and Amanda Macias, *Pentagon watchdog says White House didn't influence decision to deny Amazon $10 billion cloud contract*, CNBC (Apr. 16, 2020, 11:31 A.M.), https://www.cnbc.com/2020/04/15/pentagon-watchdog-says-white-house-didnt-influence-jedi-contract-decision.html................10

ExtremeTech Staff, *Microsoft Azure is Used by 95 Percent of Fortune 500 Companies. Learn to Use Their Cloud Services Now,* Extreme Tech (Mar. 11, 2020, 1:50 P.M.), https://www.extremetech.com/deals/307468-microsoft-azure-is-used-by-95-percent-of-fortune-500-companies-learn-to-use-their-cloud-services-now ..........................................................................................................1

https://www.usaspending.gov/search/d01f64545a521a75243c15f1b4467f99 ..............................27

Paul McLeary, *Navy Takes First Big Step To Cloud, Pushing Logistics To Amazon's Service*, Breaking Defense (Aug. 23, 2019, 5:12 P.M.), https://breakingdefense.com/2019/08/navy-takes-first-big-step-to-cloud-pushing-logistics-to-amazons-service/.....................................................................27

U.S. Dep't of Defense, Secretary of Defense Esper Media Engagement En Route to Sydney, Australia (Aug. 2, 2019), https://www.defense.gov/Newsroom/Transcripts/Transcript/Article/1925072/secretary-of-defense-esper-media-engagement-en-route-to-sydney-australia/...............................................................................................................5

Mary Jo Foley, *Pentagon's inspector general says Microsoft's JEDI cloud win should stand*, ZDNet (Apr. 15, 2020), https://www.zdnet.com/article/pentagons-inspector-general-says-microsofts-jedi-cloud-win-should-stand/ .......................................................................10, 12

## I.   INTRODUCTION

After a thorough reevaluation, the Department of Defense ("DoD") has again selected Microsoft's proposal for award in the Joint Enterprise Defense Infrastructure ("JEDI") Cloud procurement.  DoD chose Microsoft, a leader of the technology industry for over forty years, based upon its finding that Microsoft offered a superior technical solution which represents the best value to DoD.  In selecting Microsoft's cloud solution, Azure, DoD joins many of the world's largest and most successful corporations, including ninety-five percent of the Fortune 500.[1]  As one of the largest companies in the world—and a recognized market leader in cloud computing in both the public and private sectors—Microsoft has the technical expertise, resources and know-how to deliver this critical service to DoD.

Yet, for the *second* time in this procurement, Amazon Web Services ("AWS") bitterly contests DoD's decision, refusing to accept that another company could prevail in head-to-head competition.  Instead, AWS persists in its full-fledged assault on the integrity of the JEDI source selection team, continuing to peddle the unprecedented theory that DoD's civil servants were all incapable of conducting a fair and honest evaluation because they have been "consciously or unconsciously" swayed by statements and tweets that President Trump made well before DoD made the first award to Microsoft in October 2019.  ECF No. 236 ("Am. Compl."), ¶ 408.

These baseless allegations have been thoroughly investigated by DoD's Office of Inspector General ("OIG") and definitively dispelled in its exhaustive April 15, 2020 report, which spans more than 200 pages.  The OIG found *no evidence* that any member of the JEDI source selection

---

[1] ExtremeTech Staffing, *Microsoft Azure is Used by 95 Percent of Fortune 500 Companies. Learn to Use Their Cloud Services Now* (Mar. 11, 2020, 1:50 p.m.), https://www.extremetech.com/deals/307468-microsoft-azure-is-used-by-95-percent-of-fortune-500-companies-learn-to-use-their-cloud-services-now.

team was biased or improperly influenced by the President.  The far more plausible explanation for AWS's failure in the JEDI competition is the one that the Government has offered all along: Microsoft offered a superior technical solution.  But this Court need not address the merits of AWS's bias claims because they fail for a more fundamental, threshold reason: They are untimely under *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007).

AWS's allegations are not new.  The bias, bad faith, improper influence and conflicts of interest claims that comprise Count IV of AWS's Amended Complaint are based on information that AWS knew well before DoD's first *and* second award decisions.  AWS's continuing theory of this procurement is that it has always been "tainted" by the President's "pervasive," "systemic," "extraordinary," and "unprecedented" bias and improper influence on DoD's acquisition workforce—"seemingly without interruption"—since at least the summer of 2019.  Am. Compl. ¶¶ 13, 20, 368.  AWS had every opportunity to raise its bias claims *before* DoD spent several months evaluating revised proposals and selecting a new awardee.  Indeed, the Government and Microsoft moved to dismiss the bias and conflicts-of-interest claims in AWS's original complaint because AWS had failed to raise them before the *initial* award.  ECF Nos. 132, 133.  *Blue & Gold* and its progeny mandate that these claims—which were indisputably based on information AWS "knew, or should have known," *Inserso Corp. v. United States*, 961 F.3d 1343, 1350 (Fed. Cir. 2020)—had to be raised in a timely pre-award protest.  *Blue & Gold*, 492 F.3d at 1313.

AWS has no excuse for its delay.  When the Government first moved this Court to remand the case so that DoD could initiate the corrective action, AWS strenuously opposed the remand on the grounds that the forthcoming corrective action would inevitably be biased and "gerrymander[ed]" in favor of Microsoft.  ECF No. 181 at 2; *see also* ECF No. 197.  In response, this Court explicitly told AWS that it would "have an opportunity to raise [its bias allegations]

should it elect to make a timely challenge to any corrective action [DoD] takes." ECF No. 203 at 4. Yet, AWS ignored the Court's invitation and instead sat on its rights.

If AWS had raised its bias allegations in a timely pre-award protest, this Court could have adjudicated those claims before DoD spent many months evaluating—and then reevaluating—the proposals. If AWS had persuasively shown bias, this Court could have directed DoD to replace its allegedly-biased source selection team, *before* DoD and the offerors expended the months of time and effort associated with the corrective action, which involved numerous proposal submissions and amendments to the solicitation. The Court also would have resolved AWS's objections before DoD twice disclosed Microsoft's price to AWS in post-award debriefings. AWS's serial "wait and see" approach to litigating its bias claim is directly at odds with *Blue & Gold*'s policy of discouraging strategic, untimely protests.

AWS is abusing the bid protest process and this Court's mandate to expeditiously resolve procurement challenges by raising untimely allegations that are designed to distract from the real issue in this procurement: the technical superiority of Microsoft's market-leading cloud computing solution. This Court should reject AWS's gamesmanship and dismiss the bias claims.

## II.     QUESTION PRESENTED

Whether AWS's allegations of bias, improper influence, bad faith and conflicts of interest are waived as untimely under *Blue & Gold* and should be dismissed.

## III.    FACTUAL BACKGROUND

The JEDI procurement reflects DoD's commitment to acquiring a modern enterprise cloud computing solution that leverages commercial technologies to support the agency's national-security mission and empower the warfighter in today's data-driven conflicts. Am. Compl. ¶ 26. Cloud computing offers easily scalable computing capacity with essential security advantages, and it minimizes disruption from lack of connectivity at the "tactical edge"—battlefields and other

remote areas around the world where maintaining the military's technological advantage is vital. *See id.* ¶¶ 27, 39.  DoD envisions the JEDI Cloud at the heart of its shift to a modern enterprise cloud, which is critical to national defense.  *Id.* ¶ 27.

### A.    DoD Awards The JEDI Cloud Contract To Microsoft, And AWS Responds By Filing Its First Untimely Protest Alleging Bias

On July 26, 2018, DoD issued its final Request for Proposals (RFP) for the JEDI procurement.  Am. Compl. ¶ 27.  On September 5, 2019—a little over a year later—the parties submitted their final proposal revisions ("FPRs").  AR Tabs 367, 387.  On October 25, 2019, DoD awarded the JEDI Cloud contract to Microsoft.  Am. Compl. ¶ 95.

Six weeks later, AWS filed a post-award protest challenging DoD's selection of Microsoft for the JEDI award.  Counts V, VI, and VII of that complaint made the remarkable claim that the award should be set aside because (according to AWS) it had long been clear that the *entire* JEDI Cloud procurement process was biased against AWS.  *See* ECF No. 1 ("Compl.").  Specifically, AWS claimed that "President Trump has made no secret of his personal dislike for Mr. Bezos, Amazon, and the *Washington Post*, or of his express desire to harm them," dating back to "before he even was elected President."  Compl. ¶ 15.

The basis for AWS's extensive bias allegations rested solely on public information that AWS characterized as "widely known to everyone" prior to DoD's award to Microsoft.  Compl. ¶ 13.  AWS claimed that President Trump's interference in JEDI "[has] been on full display for the whole country to see" via "very public comments" and tweets.  *Id.* ¶¶ 18, 175.  Among other things, AWS cited a July 18, 2019 press conference in which the President claimed he had been getting "tremendous complaints" about the JEDI procurement and said he "[would] be asking [DoD] to look at [the JEDI procurement] very closely to see what's going on."  *Id.* ¶¶ 20, 95.  According to AWS, that press conference "[made] clear to DoD (and the world) that [the President] did not want

AWS to get the JEDI Contract." Compl. ¶ 94. Shortly thereafter, on July 22, AWS noted that the President tweeted television coverage "decrying the JEDI Contract as the 'Bezos bailout.'" *Id.* ¶ 20. AWS also pointed to public reports that, in August 2019, the President directed the new Secretary of Defense, Mark Esper, to conduct an independent review of the JEDI procurement. *Id.* ¶ 21.[2]

In Count V of its initial Complaint, AWS alleged that "President Trump's bias against AWS improperly influenced DoD officials responsible for the JEDI solicitation, undermined the procurement process, resulted in an unreasonable evaluation, and unfairly deprived AWS of the JEDI award." Compl. ¶ 220. As a result, AWS alleged, the award was made in bad faith and so was arbitrary and capricious. *Id.* ¶¶ 219-23. In Count VI, AWS alleged various statutory and regulatory violations flowing from the alleged bias, including extraordinary allegations that because of President Trump's statements, DoD selection officers violated the prohibition on participating in a procurement in which a selection officer has a "financial interest" (here, allegedly, the officials' interest in "continued employment"). *Id.* ¶¶ 224-29. In Count VII, AWS alleged that the bias resulted in a breach of the implied contract of good faith and fair dealing. *Id.* ¶¶ 230-34.

Notably, AWS had never made any of these allegations during the entire fifteen-month procurement process leading up to the award. In fact, AWS had *defended* the procurement against bias allegations brought by Oracle, an offeror that was eliminated from the competition before

---

[2] Secretary Esper later clarified that the White House had "not directed [him] to do" the review, and that he had decided to reexamine the procurement on his own, as he would do "with any program that raised this much consternation." U.S. Dep't of Defense, *Secretary of Defense Esper Media Engagement En Route to Sydney, Australia* (Aug. 2, 2019), https://www.defense.gov/New sroom/Transcripts/Transcript/Article/1925072/secretary-of-defense-esper-media-engagement-en-route-to-sydney-australia.

AWS.  In response to Oracle's timely pre-award protest, AWS described the procurement process as "entirely rational" and denied "any bad faith on the part of the actual agency decision-makers."[3] Both this Court and the Federal Circuit agreed and rejected Oracle's bias allegations.  *See Oracle Am., Inc. v. United States*, 144 Fed. Cl. 88, 101 (2019), *aff'd*, 975 F.3d 1279 (Fed. Cir. 2020).

Because of AWS's failure to raise its bias allegations before submission of final proposals on September 5, 2019—or at any time before the initial award—the Government and Microsoft both moved to dismiss Counts V, VI, and VII of AWS's original complaint as untimely under *Blue & Gold*.  ECF Nos. 132, 133.  As DoD and Microsoft explained in their motions, AWS had submitted its final proposal on September 5, 2019, without sounding any notes of concern or asking for any inquiry or investigation into any possible bias affecting the selection process.  Only *after* DoD selected Microsoft on October 25, 2019—upsetting AWS's expectation that it would prevail—did AWS suddenly invoke the President's public statements to assert far-reaching, highly dramatized bias allegations to undermine the integrity of the procurement.

**B.    AWS Vigorously Objects To DoD's Proposed Corrective Action On Bias Grounds**

The Court never ruled on the *Blue & Gold* motions because, on March 6, 2020, it granted AWS's motion for a preliminary injunction on unrelated technical grounds having to do with DoD's evaluation of Factor 5, Price Scenario 6.  *See* ECF No. 164.  Shortly thereafter, on March 12, 2020, the Government filed a motion requesting that the Court remand this case to the agency "to reconsider certain aspects of the challenged agency decision" in light of the Court's order granting the preliminary injunction.  ECF No. 177 at 1.  The Government explained that DoD's

---

[3] AWS's Response To Oracle America, Inc.'s Supplemental Motion For Judgment On The Administrative Record And Cross-Motion For Judgment On The Administrative Record (AWS Oracle Response) at 5-22, *Oracle Am., Inc. v. United States*, 144 Fed. Cl. 88 (Fed. Cl. 2019) (No. 18-1880C), ECF No. 88 at 10, 14, 35, 52.

intended corrective action would include issuing a solicitation amendment and accepting limited proposal revisions related to Factor 5, Price Scenario 6. The Government further stated that DoD would reevaluate those revised proposals, and "reconsider its award decision in response to the other *technical* challenges presented by AWS." *Id.* at 2 (emphasis added). The Government did not provide the details of its proposed corrective action, but it told the Court that it intended to issue an RFP amendment and to accept "limited proposal revisions" as to Price Scenario 6. *Id.*

AWS strenuously opposed the Government's request for remand and condemned DoD's planned corrective action as yet another manifestation of anti-AWS bias. For example, AWS asserted that the proposed remand "fail[ed] the tests of rationality and fairness" and "suggest[ed] that DoD seeks to take whatever corrective action is necessary to reaffirm its prior award to Microsoft." ECF No. 181 at 1-2. Even though DoD had not yet released the details of the revised solicitation, AWS predicted that DoD's amended RFP requirements "would irrationally benefit only Microsoft" and objected that the proposed corrective action had "not been formulated evenhandedly." *Id.* at 6, 8. AWS complained to this Court that the corrective action was improperly "gerrymandered" to allow Microsoft a "do-over" and that the results were pre-ordained. *Id.* at 2, 8-9. AWS also claimed that DoD's corrective action was "consistent with its past efforts to improperly steer (and now preserve) the award to Microsoft." *Id.* at 9.

The Government's response noted that AWS's challenge to the proposed remand was entirely premature, and reflected "merely speculation and innuendo based on little more than the fact that it was not previously selected for award." ECF No. 185 at 6. As the Government stated, "AWS's true goal [wa]s to have this Court prejudge a pre-award protest that AWS has not yet filed, challenging the terms of a solicitation amendment that the agency has not yet issued." ECF No. 199 at 16. Microsoft made the same point, noting that AWS should wait until DoD released

██████████████████████████████████████████

the details of the corrective action to reassert its bias claims.  Specifically, Microsoft emphasized

that, once DoD amended the RFP to implement corrective action, "*AWS … [would] have every*

*right to bring a pre-award bid protest challenging the corrective action.*"  ECF No. 198 at 4

(emphasis added).

### C.      DoD's Inspector General Finds No Evidence of Improper Influence On The JEDI Source Selection Team

On April 15, 2020—before this Court ruled on the Government's remand request—the

DoD Office of Inspector General ("OIG") issued a public report analyzing allegations that the

JEDI Cloud procurement and source selection was improperly influenced, including by pressure

from the White House against awarding the contract to AWS.[4]  The OIG investigation was

conducted by a multi-disciplinary team that interviewed 80 witnesses.  Twenty-five of those

witnesses related to the source selection and included (1) DoD senior executives who were the

most likely to have had direct contact with the White House; (2) witnesses from multiple DoD

offices involved in the procurement at differing levels; (3) the source selection team; and (4) the

procuring contracting officer, who helped execute the procurement and award the contract.  OIG

Report at 4-5.  The investigation also considered numerous presentations and briefing documents

prepared for Secretary Esper and White House officials between June 10 and September 23, 2019.

Crucially, the OIG's detailed investigation did not find evidence of any intervention,

improper influence, or pressure, either directly or indirectly, on the DoD personnel making the

JEDI source selection decision.  *Id.* at 7, 115-19, 123.  Indeed, the OIG Report noted that the

---

[4] DoD OIG, Report on the Joint Enterprise Defense Infrastructure (JEDI) Cloud Procurement, Apr.
13, 2020, at 3 ("OIG Report").  Ex. 1.  This publicly available report is both referenced and quoted
in AWS's Amended Complaint (*see, e.g.*, ¶¶ 352-56), and subject to judicial notice.  *Dimare Fresh,
Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) ("We may also look to 'matters
incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of
public record.'" (citation omitted)).

identities and involvement of most of the personnel involved in the source selection process were unknown to White House staff and senior DoD officials. *Id.* at 119. None of the witnesses the OIG interviewed said they felt "any outside influence or pressure for or against a particular competitor" as they made their decisions on the award of the contract. *Id.* at 7, 119. These witnesses also told the OIG that "public statements from the President and 'media swirl' about the contract did not directly or indirectly influence the integrity of the procurement process or the outcome of the JEDI Cloud source selection," and the OIG found no evidence that they did. *Id.* at 7, 123. In a sampling of DoD personnel responses to questions regarding improper influence, the OIG Report included these instructive statements:

- The Chief of Staff to the Secretary of Defense said: "[The] DoD procurement process is designed to weed out outside influence, and I know that the leaders here highly value ethical, appropriate conduct of these contracts." *Id.* at 117.

- The Cloud Computing Program Manager (CCPM) stated that to assert that the President influenced the procurement in a way that disadvantaged Amazon was "completely ridiculous" and "almost insulting." *Id.* at 118.

- A chairperson of one of the proposal evaluation factor teams said that the notion that the President influenced the source selection was "laughable," and that they had been instructed to be "ethical sentinels, and that we should not only hold ourselves to the highest standards of this Department but that we should hold each other to them." *Id.*

The OIG concluded that the evidence demonstrated that the DoD personnel who evaluated the contract proposals and awarded Microsoft the JEDI Cloud contract "*were not pressured regarding their decision on the award of the contract by any DoD leaders more senior to them, who*

██████████████████████████████████████████

may have communicated with the White House." *Id.* at 7, 119 (emphasis added).  Commenting upon the OIG Report's conclusions, DoD stated that the Report should "close the door on the media and corporate-driven attacks on the career procurement officials who have been working tirelessly to get the much needed JEDI cloud computing environment into the hands of our frontline warfighters while continuing to protect American taxpayers."[5]

The OIG Report refuted AWS's claim that the entire JEDI procurement was tainted by bias and bad faith.  For that reason, AWS sought to publicly discredit the Report.  An AWS spokesperson told the press that "[t]his report doesn't tell us much," and that "it's clear that this report couldn't assess political interference because several DoD witnesses were instructed by the White House not to answer the IG's questions about communications between the White House and DoD officials."[6]  AWS simply ignored the OIG Report's key finding that there was no improper conduct in the JEDI evaluation and no improper influence by the White House, or any senior DoD officials, on the evaluators or others directly involved in the selection process.

**D.     The Court Approves The Remand, But AWS Fails To Protest Alleged Bias In DoD's Corrective Action**

On April 17, 2020, two days after the OIG Report was issued, this Court granted DoD's remand and rejected AWS's premature challenge to the corrective action.  *See* ECF No. 203.  In doing so, the Court agreed with Microsoft that a pre-award protest was the proper action to contest alleged bias in the remand, once DoD announced its corrective action.  The Court specifically highlighted AWS's right to bring a pre-award challenge on the bias grounds it had noted in its

---

[5] Annie Palmer and Amanda Macias, *Pentagon watchdog says White House didn't influence decision to deny Amazon $10 billion cloud contract*, CNBC Tech (Apr. 16, 2020, 11:31 A.M.), https://www.cnbc.com/2020/04/15/pentagon-watchdog-says-white-house-didnt-influence-jedi-contract-decision.html.

[6] Mary Jo Foley, *Pentagon's inspector general says Microsoft's JEDI cloud win should stand*, ZDNet (Apr. 15, 2020), https://www.zdnet.com/article/pentagons-inspector-general-says-microsofts-jedi-cloud-win-should-stand/.

opposition, stating that AWS would "have the opportunity to challenge any corrective action proposed by the agency at a later time, once defendant has reevaluated plaintiff's various challenges and announced a comprehensive plan for addressing any errors." *Id.* at 4. Even more specifically, this Court expressly informed AWS that, to the extent it had concerns about the Government "unfairly attempting to tilt the playing field," AWS would "have an opportunity to raise such issues should it elect to make a timely challenge to any corrective action [the Government] takes." *Id.* AWS was thus clearly informed by the Court of its right to raise any allegations of bias in a pre-award protest of DoD's RFP amendment setting forth the particulars of its corrective action.

On April 21, 2020, four days after the Court's order granting Defendant's Motion for Voluntary Remand, DoD issued Amendment 0007 and formally announced its corrective action plan. *See* Tabs 591-96. DoD indicated that it planned to reconsider its evaluation of the offerors' technical proposals in a manner consistent with the Court's remand order and invited the offerors to submit a second final proposal revision ("FPR2") no later than May 5, 2020. *See* Tab 591 at AR181374. DoD's notice gave no indication that it intended to investigate AWS's allegations of bias, improper influence, and conflicts of interest, nor did it describe any actions DoD planned to take during the remand to remove the alleged "taint" on this procurement arising from the President's conduct. Amendment 0007 was intended to clarify DoD's storage requirements for Price Scenario 6. *See* Tab 595 at AR181509.[7]

---

[7] Amendment 0007 permitted the offerors to change their technical solutions in response to DoD's revised requirements and allowed them to make any corresponding adjustments to their price proposals that were directly impacted as a result of those changes. *See* Tab 591 at AR181374. DoD did not allow the offerors to change any other aspects of their technical or price proposals, including their price catalogs or proposed discounts. *Id.* DoD issued Amendment 0008 on April 28, 2020 to respond to questions regarding Amendment 0007. *See* Tab 605.

On May 4, 2020, prior to the deadline for FPR2, AWS filed an Agency-level protest, solely on technical grounds, to challenge a patent ambiguity it perceived in the revised technical requirements for Price Scenario 6. *See* Tab 617 (Ex. 2). Specifically, AWS sought to clarify the volume of data required in the "data warehouse storage backend" for each military base contemplated in the scenario. *Id.* at AR181719; *see also* Am. Compl. ¶ 104 (describing AWS's Agency-level protest as clarifying ambiguities in Amendment 0007). The Agency-level protest did not seek any relief whatsoever regarding AWS's claims of bias and improper influence. Despite AWS's previous assertion that DoD's supposedly "gerrymander[ed]" corrective action would only perpetuate anti-AWS bias during the remand, *see* ECF No. 181 at 2, AWS ultimately did nothing to prosecute those claims in a pre-award protest before the FPR2 deadline on May 4, 2020.

On May 14, 2020, DoD dismissed the Agency-level protest as moot when it issued Amendment 0009 to clarify the alleged ambiguity raised by AWS. *See* Tabs 640-44. Amendment 0009 instructed the offerors to either affirm that their FPR2 proposals aligned with DoD's clarification, or submit a third final proposal revision ("FPR3"). *See* Tab 642. Microsoft and AWS confirmed that their FPR2 proposals aligned with DoD's clarification. *See* Tab 647.

On June 25, 2020, DoD issued Amendment 0010 and requested a fourth final proposal revision ("FPR4") to include an explanation of the methodology the offerors used to derive the data volume for object storage proposed in response to the price scenarios. *See* Tab 663; *see also* Tab 664 at AR193509-10.[8] In response to Amendment 0010, Microsoft and AWS submitted their

---

[8] DoD requested this explanation after it discovered that AWS's FPR2 proposal introduced a new pricing assumption that had not been disclosed in its previous submissions. *See* Tab 701 at AR209958. DoD concluded that Amendment 0010 was necessary to clarify its requirements and ensure that the offerors were evaluated on a common basis. *Id.* at AR209958-59.

██████████████████████████████████████████████

FPR4 proposals on July 8, 2020.  *See* Tabs 675-700.

On August 7, 2020, DoD subsequently reopened discussions and permitted both offerors to submit a fifth and final proposal revision ("FPR5") on August 13.  *See* Tabs 704-05.  As part of reopening discussions, DoD issued an evaluation notice to Microsoft to identify an apparent clerical error in its pricing volume.  *See* Tab 706.  AWS questioned DoD's motivation for reopening discussions and asked DoD to justify why it allowed Microsoft to correct a "deficiency or significant weakness," rather than reject Microsoft's proposal and award the contract to AWS.  *See* Tab 704 at AR 209989; Tab 712 at AR210018.  Although the error in Microsoft's proposal was "clerical in nature" and "could have been resolved through the use of clarifications rather than discussions," the contracting officer "concluded that it was in the Government's best interest to briefly reopen discussions…in the interest in fairness and equality" to both offerors.  *Id.*  Despite its sharp questioning of DoD's decision to reopen discussions, AWS once again did not raise any of its allegations of bias in a pre-award protest.

After submission of the FPR5 proposals, DoD proceeded to complete its corrective action reevaluation.  On September 2, 2020, it ultimately re-affirmed its award to Microsoft.  *See* Tab 738.  Armed with knowledge of Microsoft's winning bid, AWS had lowered its total evaluated price during the remand period to overcome Microsoft's price advantage.  *Compare* Tab 738 at AR210443 *with* Tab 459 at AR176414.  Nonetheless, the Source Selection Authority determined that Microsoft's proposal was ████████████████████████████████████

██████████████████████████████████████████████

████  Tab 738 at AR210449-51.

### E.  AWS Files Another Post-Award Protest Alleging Bias Based On Information That It Knew Before The End Of The Corrective Action

On October 23, 2020, AWS filed an Amended Complaint challenging the second award to

Microsoft and alleging—yet again—that President Trump's anti-Amazon bias has tainted the JEDI procurement.  AWS's theory of presidential interference continues to be rooted in events that occurred long before the close of the bidding process—in summer 2019, months before even the initial award to Microsoft.  Am. Compl. ¶ 14.  Like the initial Complaint, the Amended Complaint alleges that the President's campaign of improper influence is reflected in his history of anti-Amazon rhetoric, his July 2019 press conference referencing "tremendous complaints about the contract with the Pentagon and with Amazon," "ominous[]" tweets by the President and his eldest son, and a "hard look" review of the JEDI procurement initiated by his newly-appointed Secretary of Defense in August 2019.  *Id.* at ¶¶ 14-15.  All of these events occurred before the close of the bidding process and even before DoD's initial award to Microsoft on October 25, 2019.  Indeed, AWS raised them in its initial Complaint.  *See* Compl. ¶¶ 14-21.

The allegations in the Amended Complaint about President Trump's purported influence over the JEDI procurement also were known to AWS prior to the corrective action.  The Amended Complaint does point to a handful of the President's actions that occurred after the initial Complaint was filed, but those actions were known to AWS well before DoD re-awarded the JEDI contract to Microsoft on September 2, 2020.  *See* Am. Compl. ¶¶ 357-73 (discussing events that occurred in 2019 and early 2020).  Moreover, these allegations are extraneous to AWS's bias claim and represent general political criticism of the President rather than anything specific to the JEDI procurement.  *See id.* (alleging, for example, that President Trump fired the Secretary of the Navy in November 2019 over a personnel dispute).

Count IV of the Amended Complaint seeks to overturn the award to Microsoft based on AWS's claims of bias, bad faith, improper influence and conflicts of interest, all of which stem from its allegations of presidential interference.  *Id.* ¶¶ 401-12.  AWS argues that the second award

to Microsoft is tainted because "DoD continued to succumb to presidential pressure"—the same pressure that allegedly influenced the first award decision. *Id.* ¶ 404. Although AWS did nothing during the pre-award period to challenge the remand on bias grounds or insist that DoD change the makeup of its source selection team, AWS complains that the civil servants responsible for reevaluating the offerors' proposals "on remand were nearly identical to the members who made the original source selection decision." Am. Compl. ¶ 406. AWS alleges that these same evaluators once again "engaged in a coordinated effort at the President's directive to preclude AWS from winning the JEDI Contract." *Id.* ¶ 409; *see also* Compl. ¶¶ 221-22. In addition, AWS asserts that two members of the source selection team had actual or apparent conflicts of interest simply because they met with White House officials—a fact disclosed in the OIG Report released before DoD announced the specifics of its corrective action. Am. Compl. ¶¶ 335, 441. Based on the allegations in Count IV, AWS now seeks relief from this Court that would direct DoD to replace all of the allegedly biased and conflicted members of the source selection team. *Id.* at 172.

## IV. ARGUMENT

AWS's renewed bias allegations are untimely under *Blue & Gold*. Despite its vigorous opposition to the Government's allegedly biased remand proposal (*see* ECF No. 181), and this Court's clear instruction to file a pre-award protest once DoD had "announced a comprehensive plan" for its corrective action (ECF No. 203 at 4), AWS waited to raise its bias allegations until *after* DoD had completed the corrective action and re-awarded the contract to Microsoft. Particularly given that it was on notice of the timeliness issues highlighted by the first round of dismissal motions, AWS's failure to raise its bias allegations before the award, as the Court instructed, is entirely unjustified. AWS's bias allegations in the Amended Complaint should be dismissed.

████████████████████████████████████

A.    ***Blue & Gold*** **Bars A Post-Award Protester From Challenging Procurement Defects That It Could Have Raised Prior To The Award**

In its landmark *Blue & Gold* decision, the Federal Circuit for the first time expressly recognized a waiver rule for bid protests brought in this Court, holding that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007). The waiver rule implements the directive in the Court's jurisdictional statute to "give due regard to . . . the need for expeditious resolution" of bid protests. 28 U.S.C. § 1491(b)(3).

The Federal Circuit reasoned that the waiver rule was needed to "prevent[] contractors from taking advantage of the government and other bidders" by deliberately choosing to remain silent about a clear solicitation defect and then, after award to a competitor, strategically raising it to restart the bidding process. *Blue & Gold*, 492 F.3d at 1314. After all, as this Court has recognized, "it is fundamentally unfair for offerors to postpone their challenge to a solicitation, sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive [an] award." *Peraton Inc. v. United States*, 146 Fed. Cl. 94, 102 (2019) (Campbell-Smith, J.) (internal quotation marks omitted).

The Federal Circuit also explained that the *Blue & Gold* waiver rule parallels—and reinforces—the waiver rule governing bid protests before the GAO, set forth at 4 C.F.R. § 21.2(a)(1). *Blue & Gold*, 492 F.3d at 1314-15. That regulation specifically provides that protests based on the underlying ground rules of a competition must be brought prior to the close of the bidding process. Like GAO's timeliness rule, *Blue & Gold*'s waiver rule promotes fairness and efficiency in the competitive process by preventing a contractor from staying silent only to later

raise an alleged defect in an effort to restart the bidding process when it potentially has increased knowledge of its competitors. *Id.* at 1314.

The Federal Circuit later made clear that *Blue & Gold*'s waiver rule applies not merely to challenges that could have been raised before the close of bidding, but to "all situations in which the protesting party had the opportunity to challenge a solicitation before the *award* and failed to do so." *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012) (emphasis added). As the court explained, "[t]he same policy underlying *Blue & Gold*"—discouraging the strategic, untimely assertion of procurement challenges—"supports its extension to *all pre-award situations*." *Id.* (emphasis added). The court refused to allow the protester to "come forward with [its objections] to restart the bidding process, and get a second bite at the apple." *Id.* at 1383 (internal quotation marks omitted).

Recently, in *Inserso Corp. v. United States*, the Federal Circuit confirmed that the *Blue & Gold* waiver rule applies to all defects in a procurement that the plaintiff "knew, or should have known" about prior to award, not just those that appear within the express terms of the solicitation. 961 F.3d 1343, 1350 (Fed. Cir. 2020). In that case, Inserso alleged that offerors who had competed in both the full-and-open and small business set-aside pools of a multiple-award procurement were given an unfair advantage when the agency disclosed certain information in debriefings to offerors in the full-and-open pool before the small business pool contracts were awarded. *Id.* at 1346-47. The Court of Federal Claims denied Inserso's organizational-conflict-of-interest ("OCI") claim, finding no prejudice, and Inserso appealed.

The Federal Circuit affirmed, but on a different ground: Inserso had waived its ability to challenge the disclosure of information under *Blue & Gold*. According to the Federal Circuit, "Inserso should have challenged the solicitation before the competition concluded because it *knew,*

*or should have known*, that [the agency] would disclose information to the bidders in the full-and-open competition at the time of, and shortly after, the notification of awards." *Id.* at 1350 (emphasis added). Inserso could not simply "rely on DISA to decide to delay the debriefing," given that *Blue & Gold* recognizes "the need for interested bidders to call the agency's attention to solicitation problems of which they reasonably should be aware." *Id.* Instead, Inserso should have protested before the award—that is, "before [the agency] had already expended considerable time and effort evaluating bidders' proposals." *Id.* at 1350, 1352.

The Federal Circuit's *Inserso* decision explicitly affirmed this Court's longstanding application of the waiver rule to OCI claims known to the complaining party before the close of bidding. *Inserso Corp.*, 961 F.3d at 1349 (noting that the Court of Federal Claims "has correctly applied [the *Blue and Gold* waiver] rule in organizational-conflict-of-interest cases"). In *Concourse Grp., LLC v. United States*, 131 Fed. Cl. 26 (2017), for example, the Court applied *Blue & Gold* to an OCI claim that the protester had failed to raise "prior to the award of the contract despite the opportunity to do so and its easy access to the knowledge upon which it now relies." *Id.* at 30; *see also Commc'n Constr. Servs., Inc. v. United States*, 116 Fed. Cl. 233, 264 (2014) (applying *Blue & Gold* to waive an OCI claim, raised post award, where it was known to the plaintiff before bids were submitted). And in *CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698 (2011), *aff'd*, 475 Fed. App'x 341 (Fed. Cir. 2012) (unpublished), the Court explained that "the rationale of *Blue and Gold* leads to the conclusion that a contractor should not be allowed to protest an agency's failure to identify and mitigate an OCI when the contractor knew about the alleged OCI from the start, but failed to assert it, via protest, prior to the award." *Id.* at 712.

In addition to OCI claims, this Court has dismissed allegations of bias and bad faith where the protester's attempted maneuvering would subvert *Blue & Gold*'s core policies. In *Peraton*, the

protester sought leave to file a "supplemental complaint" alleging bias in the agency's revised corrective action and, simultaneously, to stay the Court's consideration of those allegations until after the corrective action was complete and the contract was re-awarded. 146 Fed. Cl. at 102. This Court rejected the plaintiff's "litigation strategy," holding that "the rationale behind the waiver rule established by *Blue & Gold Fleet* forecloses the 'wait and see' approach [the protester] proposes." *Id.* at 101-102. Specifically, the Court found that, given the protester's failure to "actively prosecute" its bad faith claims, they were "barred by the precedential guidance of *Blue & Gold Fleet*." *Id.* at 104; *see also Jacobs Tech. Inc. v. United States*, 131 Fed. Cl. 430, 447 (2017) (allowing pre-award bias allegations challenging the Army's corrective action where the Court noted that the same bias claim brought after award would be untimely and waived under *Blue & Gold*). Similarly, GAO has applied its analogous waiver rule, 4 C.F.R. § 21.2(a)(1), to bar untimely allegations of systemic bias that were known to the protester prior to award because such claims are "essentially untimely challenges to the fundamental ground rules [of] the procurement[]." *Adams and Associates, Inc.*, B-417120; B-417125, 2019 CPD ¶ 21, 2019 WL 245909 (Comp. Gen. Jan. 16, 2019) at 2 (citing *Blue & Gold*, 492 F.3d at 1313-14).

This Court has also made clear that the *Blue & Gold* waiver rule applies "when a bidder ***fails to object to an error in the scope of a corrective action prior to a new award***." *ANHAM FZCO v. United States*, 144 Fed. Cl. 697, 718 (2019) (emphasis added) (citing *XPO Logistics Worldwide Gov't Servs. LLC v. United States*, 134 Fed. Cl. 783 (2017), *aff'd*, 713 F. App'x 1008 (Fed. Cir. 2018)). In *ANHAM*, the plaintiff claimed that the agency had improperly failed to consider certain defects in a competitor's proposal during a corrective action following a partially sustained GAO protest. The Court held that the plaintiff had waived its claims under *Blue & Gold* because—even though the plaintiff "was fully aware" of these alleged defects prior to corrective

action—it failed to challenge the scope of corrective action prior to award. *Id.* at 718-19, 721. The Court concluded that the plaintiff "impermissibly 's[a]t on its rights' by failing to object to [the agency's] prior treatment [of those issues] before the second contract award, and has now waived its right to do so." *Id.* at 722 (quoting *Blue & Gold*, 492 F.3d at 1314).

> **B.    AWS Waived Its Allegations Of Bias, Bad Faith, Improper Influence And Conflicts Of Interest**

For more than a year, AWS has asserted that the entire JEDI procurement has been tainted by a relentless campaign of interference by President Trump.  It has alleged that the President's statements and actions have "consciously or unconsciously" swayed DoD's evaluators to favor Microsoft out of fear that selecting AWS would put their jobs in jeopardy.  Am. Compl. ¶ 408. AWS's theory is based upon events that pre-date the initial award to Microsoft, and that— according to AWS itself—were "widely known to everyone," "would have been virtually impossible for anyone involved in JEDI to ignore," and were "on full display for the whole country to see."  Compl. ¶¶ 13, 18, 20; *see also* Am. Compl. ¶ 14.  AWS has repeatedly cited these events as the factual underpinning for its claim—now comprising Count IV of the Amended Complaint— that the JEDI procurement is fundamentally corrupted and incapable of yielding a fair result.

If AWS believed that the President's statements or actions tainted DoD's evaluators with bias or a conflict of interest, it was required to raise those allegations in a timely pre-award protest. The *Blue & Gold* waiver rule "exists in recognition of the need for interested bidders to call the agency's attention to solicitation problems of which they reasonably should be aware."  *Inserso*, 961 F.3d at 1351.  It dictates "that a contractor should not be allowed to protest an agency's failure to identify and mitigate [a conflict] when the contractor knew about the alleged [conflict] from the start, but failed to assert it, via protest, prior to the award."  *CRAssociates, Inc.*, 102 Fed. Cl. at 712.  Moreover, where the "the factual predicates for [a protester's] bias and retaliation allegations

were reasonably known to the protester" before award, those claims are "quintessential challenges to the ground rules of the procurement[] that [must] be challenged prior to the closing dates for proposals" under *Blue & Gold* and GAO's analogous regulation. *Adams and Associates*, 2019 CPD ¶ 21 at 2-3 (dismissing the protester's "sweeping assertion that no [agency] personnel would fairly and impartially evaluate its proposals"); *see also Commc'n Constr.*, 116 Fed. Cl. at 264 (barring a conflict of interest claim where the plaintiff knew the factual predicate for the claim, but did not "raise [it] until after it was denied the award").

Here, as evidenced by its own pleadings, there can be no serious dispute that AWS "knew, or should have known"—since at least the summer of 2019—the factual basis for its extensive allegations of bias, bad faith, improper influence and conflicts of interest. *Inserso*, 961 F.3d at 1350. Those claims are all inextricably linked to the President's highly-publicized statements in July 2019 and other well-known events, such as Secretary Esper's review of the procurement in August 2019. *See* Am. Compl. ¶ 14. AWS was undoubtedly aware of these events in real time before the first final proposal submission deadline on September 5, 2019 and the initial award to Microsoft on October 25, 2019. Although AWS "had ample time and opportunity to raise its objections" to the President's alleged interference in a timely pre-award protest, it "chose instead to wait and see whether it would receive an award of the contract." *COMINT*, 700 F.3d at 1383. By failing to raise those claims prior to the *initial* award to Microsoft, AWS waived them under *Blue & Gold*. *See, e.g.*, *Concourse*, 131 Fed. Cl. 26, 30 (2017) (dismissing the plaintiff's allegation "that the Army and the incumbent's 'unusually close' relationship gave rise to multiple OCI claims" because the plaintiff "knew or should have known" of this fact prior to award).

After failing to raise its bias allegations in a timely pre-award protest prior to the initial award, AWS then inexplicably took the same "wait and see" approach *again*, and failed to raise

its claims before DoD re-awarded the contract to Microsoft.  In *Peraton*, this Court expressly held that a plaintiff must "actively prosecute" a claim of bad faith before it allows an agency to proceed with its corrective action and a new award decision.  *Peraton*, 146 Fed. Cl. at 103.  As the Court explained, *Blue & Gold* means that a plaintiff cannot "have its cake and eat it too" by "seeking to preserve without prosecuting a challenge to [an agency's] corrective action."  *Id.* at 102.  Indeed, the protester in *Peraton* recognized that its claim would be waived if not raised in a pre-award protest—hence its attempt to "hold its place in line" with a "supplemental complaint" in a maneuver that conflicted with the underlying logic of *Blue & Gold.  Id.* at 101-02.

Here, AWS has not even done that much; instead, it brazenly attempts to litigate its bias allegations *after* the corrective action despite its failure to raise them in a timely pre-award challenge.  AWS even filed an agency-level protest with DoD, but it limited its protest grounds to questions about the "data warehouse storage backend" for the military bases involved in Price Scenario 6.  Tab 617; Ex. 2.  Nothing in AWS's agency-level protest, or in any other filing following the announcement of the corrective action, raised any challenge to the bias that (under AWS's own theory) irretrievably tainted the procurement—until now, when the corrective action is complete and AWS has again lost.  This tactic is *directly* forbidden by *Blue & Gold. Id.*

Like *Peraton*, this Court's decision in *ANHAM* is similarly clear that a protester must actively prosecute claims where it is "fully aware before award of the factual assertions underlying [the claims] and [the agency's] treatment of them" and knows that the agency's corrective action plan will not address a defect it alleges in the procurement.  *ANHAM*, 144 Fed. Cl. at 721.  The plaintiff in *ANHAM* argued that the agency's responsibility determination was flawed because it "ignored and failed to investigate ominous statements made to [the agency] by a State Department official" bearing on the awardee's integrity and business ethics.  *Id.* at 722.  The Court held that

███████████████████████████████████████

the plaintiff waived this claim, in addition to others, because it "was aware of the State Department official's comments prior to the second award decision and did not object to the depth of [the procuring agency's] investigation thereof" until *after* the second award. *Id.*

Similarly, here, AWS was fully aware of the President's comments and did not protest the scope of corrective action to ensure that the "taint" of the President's alleged influence was eliminated, mitigated, or even investigated on remand. AWS made no effort to ensure that DoD's allegedly "conflicted" evaluators were removed from the procurement or otherwise "cleansed" of the President's bias such that they could conduct a fair reevaluation of proposals on remand. AWS now belatedly complains—*after* the award decision that followed remand—that DoD used "nearly identical" personnel to conduct the reevaluation. Am. Compl. ¶ 406. Once DoD announced its corrective action, AWS had no reason to assume that DoD had any intention of removing evaluators or further investigating during the remand period AWS's dubious interference claims. *See Inserso*, 961 F.3d at 1351 (protester could not "reasonably rely on [the agency]" to protect it from potential prejudice "where nobody had called the issue to [the agency's] attention"). AWS's assumption was particularly unreasonable in light of DoD's Source Selection Plan—disclosed to AWS in the initial AR—which directed the Source Selection Authority to "ensure the highest level of team membership consistency for the duration of the selection process." Tab 305, AR 64343.

Even before Amendment 0007 initiated the corrective action, AWS knew that the DoD OIG thoroughly reviewed AWS's claims and concluded that not a *single* member of the source selection team was improperly influenced.[9] The OIG Report put AWS on clear notice that, going

---

[9] This fundamental conclusion, supported by scores of witness interviews and review of relevant documentation, cannot just be dismissed by AWS's attacks on the White House's decision to invoke the "presidential communications privilege" for certain limited communications. Am. Compl. ¶ 353. AWS does not even attempt to refute the Report's findings.

into the corrective action period, DoD continued to believe that there was no bias in the JEDI procurement. And when opportunities arose for AWS to contest that conclusion, it "impermissibly sat on its rights" and—once again—waived the bias claims now reflected in Count IV, which all stem from the President's alleged interference. *ANHAM*, 144 Fed. Cl. at 722.

AWS knew exactly what it had to do to preserve its bias challenge to the corrective action. In response to AWS's allegations of bad faith in its opposition to the voluntary remand, the Court's order clearly explained that AWS would "have an opportunity to raise such issues should it elect to make a timely challenge to any corrective action defendant takes." ECF No. 203 at 4. Despite that invitation, AWS chose not to press its allegations of systemic bias in the procurement when it could have raised them in a pre-award challenge to DoD's corrective action. That AWS went mute after the corrective action was announced suggests an intention to fashion unsupported, extreme allegations and hold them in reserve just in case it could not win the competition on the second try. AWS's gamesmanship is "foreclosed by the guidance furnished in [*Blue & Gold*]." *Peraton*, 146 Fed. Cl. at 102.

Faced with obvious waiver problems, AWS has tried to plead around *Blue & Gold* by suggesting that the "extraordinary environment of corruption, interference, and retribution" that it has bitterly complained about for a year was somehow wiped away by the issuance of Amendment 0009. Am. Compl. ¶¶ 368, 403. AWS maintains that Amendment 0009 miraculously created "a clean slate from which [DoD] could reevaluate proposals in accordance with the RFP and remove any semblance of bias, bad faith, or improper influence from the evaluation process." *Id.* ¶ 403. But Amendment 0009 simply made minor changes to the wording of highly technical

requirements.[10]  Amendment 0009 did not do anything that could possibly remove the alleged

"overt and escalating pressure from President Trump" that AWS claims only "intensified" during

corrective action.  Am. Compl. ¶¶ 15, 17.  Amendment 0009 does not excuse AWS's failure to

raise its bias allegations in a pre-award protest.

AWS's post-hoc characterization of Amendment 0009 stands in stark contrast to the sky-

is-falling assertions that AWS made *before* DoD undertook its corrective action.  In its opposition

to the Government's remand motion, AWS complained that "DoD's proposed corrective action—

*i.e.*, amending the RFP's Price Scenario 6 requirements, permitting only limited proposal revisions

in response to the amended requirements, and re-evaluating the revised proposals—would enable

Microsoft to resurrect its eligibility while depriving AWS of a reasonable opportunity to revise its

proposal in response to changed requirements."  ECF No. 181 at 2.  Then, AWS argued that DoD's

decision to limit proposal revisions to Price Scenario 6—a limitation that Amendment 0009 *did*

*not remove*—was "specifically designed to preserve the status quo by allowing Microsoft to

remedy the error this Court identified as defective, and would not ensure a rational and fair

reconsideration of proposals for the JEDI award."  *Id.* at 3.  At the time, AWS also argued that

"DoD's proposed corrective action fails to address in any meaningful way how it would resolve

the technical issues AWS has raised," pricing issues aside—another supposed flaw that DoD did

not remedy in Amendment 0009.  And, when DoD gave AWS a glimpse of its proposed corrective

action in its reply in support of its remand motion, AWS was so incensed that it filed a *sur-reply*,

arguing that DoD "has plainly tailored its corrective action to cure the deficiency identified by the

Court and ensure Microsoft's existing proposal is eligible for award."  ECF No. 197 at 7.  It strains

---

[10] In its entirety, Amendment 0009 stated that, "[t]o the extent Price Scenario 6 required offerors
to assume the scenario is replicated at 10 bases or 100 bases, 1 [petabyte] of data must be stored
in the data warehouse storage backend on Day 1 for each base."  Tab 643.

credulity for AWS now to assert that, prior to the remand, it viewed the corrective action as a "clean slate." Am. Compl. ¶ 403. The only explanation for that incredulous allegation is AWS's desperate attempt to circumvent *Blue & Gold*.

Moreover, AWS cannot evade *Blue & Gold* waiver by attempting to cast supposed errors in the corrective action as "the latest manifestation" of presidential bias (Am. Compl. ¶ 12) where it has maintained, for more than a year, that the President's interference fundamentally corrupted this entire procurement. While AWS attempts to cloak its latest bias allegations in the reevaluation results, AWS's pleadings make clear that it has known about the alleged facts underlying those bias claims since long before the *initial* award, and certainly before the *second* one. *See Inserso*, 961 F.3d at 1350 (protester must raise errors about which it "knew, or should have known" prior to award).

AWS's Amended Complaint contains a deluge of allegations concerning President Trump and his conduct during the remand. These have scant relevance to the JEDI procurement and for the most part occurred *before* the corrective action was completed. For example, AWS points to the appointment of so-called "White House loyalist" Michael Cutrone to vet incoming DoD officials. But Mr. Cutrone was appointed in May 2020, months before DoD re-awarded the contract to Microsoft on September 2, 2020. Am. Compl. ¶ 359. Similarly, AWS points to a December 2019 border wall contract award to the President's supposedly-preferred bidder (*id.* ¶ 365), the November 2019 firing of the Secretary of the Navy (*id.* ¶ 361), the February 2020 firing of witnesses who testified against President Trump at his impeachment hearing (*id.* ¶ 359), the April 2020 demotion of the DoD's Acting Inspector General (*id.* ¶ 370), and the President's handling of the COVID-19 pandemic (*id.* ¶ 369). While included in AWS's obviously overwrought Amended Complaint, all of these actions were known to AWS well before DoD re-

███████████████████████████████████████████████████████████

awarded the contract to Microsoft on September 2, 2020.[11]

AWS cannot salvage its untimely bias allegations by the self-serving contention that it only realized that bias had infected the procurement when DoD disclosed the outcome of the second evaluation. *See, e.g.*, Am. Compl. ¶¶ 339-51. It is well-settled that alleged "errors in an evaluation process do not alone suffice to demonstrate bad faith or permit discovery." *Jacobs Tech.*, 131 Fed. Cl. at 455; *see also Inserso*, 961 F.3d at 1350 (offeror must protest all procurement errors about which it "knew, or should have known" prior to the award). AWS cannot rely on purported errors in the remand evaluation to maneuver around *Blue & Gold* where the alleged motivation for bias claimed in Count IV continues to rest entirely upon the President's prior public statements and alleged improper influence.

This Court has adjudicated *pre-award* protests alleging bias and conflicts of interest because such claims are analogous to a challenge to the "scope" of corrective action and are justiciable before the agency makes a new award decision. *See, e.g.*, *Jacobs Tech.*, 131 Fed. Cl. at 448; *Oracle*, 144 Fed. Cl. at 120-25 (deciding plaintiff's pre-award conflict of interest claims). In *Jacobs*, for example, the Court decided a pre-award bias claim where the plaintiff sought injunctive relief to replace the allegedly-biased evaluators with "new, unbiased procurement officials to perform a fresh evaluation." *Jacobs Tech.*, 131 Fed. Cl. at 443. The Court held that

---

[11] Notably, AWS does not allege that it has lost out on any *other* federal government contracts as a result of the President's supposedly limitless anti-Amazon bias—and it is a matter of public record that AWS repeatedly *won* such awards. A simple query of federal government spending data shows that AWS has received 60 government contracts and hundreds of government subcontracts since January 1, 2017. *See* https://www.usaspending.gov/search/d01f64545a521a7 5243c15f1b4467f99. And just last year, AWS worked with the U.S. Navy to move its 72,000 users onto an AWS cloud system as part of "a three-year, $100 million effort." Paul McLeary, *Navy Takes First Big Step To Cloud, Pushing Logistics To Amazon's Service*, Breaking Defense (Aug. 23, 2019, 5:12 P.M.), https://breakingdefense.com/2019/08/navy-takes-first-big-step-to-cloud-pushing-logistics-to-amazons-service/. This simply reinforces what the Government and Microsoft have argued all along: AWS only complains of bias when it loses.

this bias claim was ripe, in part because forcing the protester to wait until after the award was made would expose it to waiver under *Blue & Gold*. *Id.* at 447; *see also Ceres Gulf, Inc. v. United States*, 94 Fed. Cl. 303, 317-18 (2010) (holding that protester's challenge to corrective action was ripe for review because it would be untimely under *Blue & Gold* if brought after the new award). Similarly, in *Oracle* (involving the same JEDI procurement), the Court was "fully prepared to enforce the agency's obligation to redo part or all of [the] procurement if the CO's conclusion that there was no impact" from the alleged conflicts "was unreasonable in any respect." *Oracle*, 144 Fed. Cl. at 120. Unlike the plaintiffs in *Jacobs* and in *Oracle*, AWS failed to timely raise its allegations of bias and conflicts of interest. It therefore waived its right to assert those claims in a post-award protest.

C.     **Dismissing Count IV On Waiver Grounds Vindicates *Blue & Gold*'s Policy Goals**

Finding waiver in this case serves the established policy purposes underlying *Blue & Gold*. The Federal Circuit recently affirmed this policy rationale, stating that, "[e]nforcing our [*Blue & Gold*] forfeiture rule implements Congress's directive that courts 'shall give due regard to ... the need for expeditious resolution' of protest claims" and "serves the interest in reducing the need for the inefficient and costly process of agency rebidding after offerors and the agency have expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation." *Inserso Corp.*, 961 F.3d at 1352 (quoting 28 U.S.C. § 1491(b)(3)) (other internal quotation marks and citation omitted). AWS's conduct—sitting on its rights (twice), waiting to see if it won the award (twice), and then finally unveiling bias claims in response to defeat (twice)—is precisely what *Blue & Gold*'s waiver rule is intended to prevent.

If AWS had timely raised the allegations in Count IV in a pre-award protest, its claims would have been ripe for review, and AWS could have pursued the same relief it now seeks—

███████████████████████████████████████████████

replacement of the entire source selection team—*before* DoD reevaluated proposals. *See* Am. Compl. at 171. If it succeeded in proving its claims, the corrective action would have proceeded without the wasted time and expense that AWS's postponement strategy now threatens. There would have been no need to re-award the contract to Microsoft, adjudicate AWS's bias claims, and then potentially conduct a *third* evaluation—after Microsoft's pricing had once again been disclosed. Instead, AWS spurned this Court's explicit instructions that AWS could "raise such issues" in "a timely challenge to any corrective action [DoD] takes" (ECF No. 203 at 4) and flouted the integrity of the bid protest process.

Beyond frustrating "the need for expeditious resolution" of bid protests, AWS's tactics also undermine the Court's ability to resolve protests while "giv[ing] due regard to the interests of national defense and national security." 28 U.S.C. § 1491(b)(3). Military leaders have concluded that "[p]roviding DoD with rapid access to an enterprise cloud, one which provides elastic computing power and storage, is vital to U.S. national security." *See* ECF No. 161-4 (Lt. Gen. Shwedo Decl.), ¶ 8. U.S. adversaries are rapidly accelerating their development of cloud technology to modernize and enhance their military capabilities. *Id.* ¶¶ 9-10. In the *Oracle* litigation, AWS itself argued against any delay in this procurement "because of the pervasive national security interests and related concerns that permeate this critical DoD procurement." AWS Oracle Response at 5-22. AWS's failure to actively prosecute its bias claims—as required under *Blue & Gold*—should not further elongate resolution of this protest or delay DoD's delivery of the JEDI Cloud to the Nation's warfighters, who "need this capability now" to support their national-security mission. ECF No. 161-4, ¶ 12. Those claims should now be dismissed.

## V.    CONCLUSION

For the reasons set forth above, Microsoft respectfully requests that the Court dismiss Count IV of AWS's Amended Complaint because it is waived under *Blue & Gold*.

Dated: November 6, 2020

*Of Counsel*:

LATHAM & WATKINS LLP

Abid R. Qureshi
Roman Martinez
Anne W. Robinson
Dean W. Baxtresser
Genevieve Hoffman
Riley Keenan
Margaret Upshaw

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
(202) 637-2200 (Telephone)
(202) 637-2201 (Facsimile)

Respectfully submitted,

ROGERS JOSEPH O'DONNELL, P.C.

By: /s/*Robert S. Metzger*
    Robert S. Metzger (Attorney of Record)

    Jeffery M. Chiow
    Neil H. O'Donnell
    Lucas T. Hanback
    Stephen L. Bacon
    Deborah N. Rodin
    Cassidy Kim
    Eleanor M. Ross

    875 15th Street N.W., Suite 725
    Washington, D.C. 20005
    (202) 777-8952 (Telephone)
    (202) 347-8429 (Facsimile)

    *Attorneys for Intervenor-Defendant,*
    *Microsoft Corporation*