**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| AMAZON WEB SERVICES, INC., | Case No. 19-1796 |
| Plaintiff, | |
| | Judge Patricia E. Campbell-Smith |
| v. | |
| UNITED STATES OF AMERICA, by and through the U.S. Department of Defense, | |
| Defendant, | **FINAL REDACTED VERSION** |
| and | |
| MICROSOFT CORPORATION, | |
| Intervenor-Defendant. | |

**INTERVENOR-DEFENDANT MICROSOFT CORPORATION'S REPLY IN SUPPORT OF ITS RENEWED MOTION TO DISMISS, IN PART, THE AMENDED COMPLAINT**

██████████████████████████████████████████████████████

## TABLE OF CONTENTS

I.  INTRODUCTION ...............................................................................................1

II. ARGUMENT ......................................................................................................3

    A.  AWS Cannot Rewrite The History of This Litigation And Its Bias
         Allegations ................................................................................................4

    B.  Count IV Is Waived Under *Blue & Gold* ................................................8

         1.  Count IV Alleges That The Entire Procurement Was Infected By
            Bias, And Is Not Merely A Challenge To The Reevaluation ......................9

         2.  A Pre-Award Protest Asserting Bias Would Have Been Justiciable .........14

         3.  Count IV Challenges A Patent Procurement Defect.................................17

         4.  Addressing Count IV Would Frustrate *Blue & Gold*'s Policy Goals ........18

         5.  AWS Has No Excuse For Sitting On Its Rights ........................................20

III. CONCLUSION ..................................................................................................20

<span style="background:black">████████████</span>

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adams & Associates, Inc.,*
  B-417120; B-417125, 2019 CPD ¶ 21, 2019 WL 245909
  (Comp. Gen. Jan. 16, 2019) ........................................................................................9

*ANHAM FZCO v. United States*,
  144 Fed. Cl. 697 (2019) ............................................................................................12

*ATSC Aviation, LLC v. United States*,
  141 Fed. Cl. 670 (2019) ............................................................................................14

*Bannum, Inc. v. United States*,
  779 F.3d 1379 (Fed. Cir. 2015)................................................................................18

*Blue & Gold Fleet, L.P. v. United States*,
  492 F.3d 1308 (Fed. Cir. 2007)........................................................................ *passim*

*Boeing Company v. United States*,
  968 F.3d 1371 (Fed. Cir. 2020)................................................................................11

*Caddell Constr. Co. v. United States*,
  111 Fed. Cl. 49 (2013) ..............................................................................................14

*CBY Design Builders v. United States*,
  105 Fed. Cl. 303 (2012) ............................................................................................17

*Ceres Envt'l Servs., Inc. v. United States*,
  97 Fed. Cl. 277 (2011) ...................................................................................9, 11, 18

*Ceres Gulf, Inc. v. United States*,
  94 Fed. Cl. 303 (2010) ..............................................................................................15

*COMINT Sys. Corp. v. United States*,
  700 F.3d 1377 (Fed. Cir. 2012)............................................................................13, 20

*Commonwealth Edison Co. v. United States*,
  46 Fed. Cl. 158 (Fed. Cl. 2000) .................................................................................5

*Concourse Grp., LLC v. United States*,
  131 Fed. Cl. 26 (2017) ..............................................................................................12

*CRAssociates, Inc. v. United States*,
  102 Fed. Cl. 698 (2011) .................................................................................11, 12, 19

*Doron Precision Sys., Inc. v. FAAC, Inc.*,
   423 F. Supp. 2d 173 (S.D.N.Y. 2006) ...................................................................4

*Draken Int'l, Inc. v. United States*,
   120 Fed. Cl. 383 (2015) .............................................................................13

*Eskridge Rsch. Corp. v. United States*,
   92 Fed. Cl. 88 (2010) ..............................................................................16

*iAccess Technologies, Inc. v. United States*,
   143 Fed. Cl. 521 (2019) ............................................................................14

*Inserso Corp. v. United States*,
   961 F.3d 1343 (Fed. Cir. 2020)..................................................10, 11, 17, 18

*Itility, LLC v. United States*,
   124 Fed. Cl. 452 (2015) ............................................................................17

*Jacobs Tech., Inc. v. United States*,
   100 Fed. Cl. 179 (2011) .........................................................................15, 16

*Jacobs Tech. Inc. v. United States*,
   131 Fed. Cl. 430 (2017) .........................................................................14, 19

*Mundo Verde Pub. Charter School v. Sokolov*,
   315 F. Supp. 3d 374 (D.D.C. 2018) ...................................................................4

*Oracle Am., Inc. v. United States*,
   144 Fed. Cl. 88 (2019), *aff'd*, 975 F.3d 1279 (Fed. Cir. 2020).............................................19

*Per Aarsleff A/S v. United States*,
   829 F.3d 1303 (Fed. Cir. 2016)....................................................................18

*Peraton Inc. v. United States*,
   146 Fed. Cl. 94 (2019) .......................................................12, 13, 15, 19

*Sotera Def. Sols., Inc. v. United States*,
   118 Fed. Cl. 237 (2014) ............................................................................14

*Square One Armoring Serv., Inc. v. United States*,
   123 Fed. Cl. 309 (2015) ............................................................................16

*Synergy Sols., Inc. v. United States*,
   133 Fed. Cl. 716 (2017) ............................................................................11

## RULES

Fed. R. Evid. 201(b)..................................................................................4

**REGULATIONS**

48 C.F.R. § 9.504(a)........................................................................................................................19

## I.      INTRODUCTION

From the start of this litigation, Amazon Web Services ("AWS") has made the sensational allegation that extraordinary interference in this procurement by President Trump destroyed the source selection team's ability to conduct a fair and honest competition.  Microsoft's motion to dismiss showed that AWS has known about this purported bias—which allegedly infected the entire procurement—for more than a year.  *See* ECF No. 238 at 5, 18, 24, 30.  In its Opposition ("Opp."), AWS pivots to assert that it trusted the Department of Defense ("DoD") to conduct the remand without bias, and that the basis for its renewed bias claims "arose based on *new* information that AWS learned following the re-award decision and through its review of the debriefing materials and supplements to the administrative record."  Opp. at 18 (emphasis added).  AWS's explanation for its failure to file a timely pre-award protest is implausible and pretextual, and should be rejected.

AWS did not learn about the President's allegedly improper influence only after the re-award to Microsoft.   Rather, AWS's Amended Complaint—like its original Complaint—repeatedly asserts that it has known about President Trump's influence on the procurement throughout this litigation.  *See, e.g.*, Am. Compl. ¶ 18 ("President Trump's grip on DoD has manifested itself throughout the JEDI procurement.");  *id.* ¶ 80 (alleging President Trump's animosity to be "long standing and well known");  *id.* ¶¶ 80–92 (alleging bias based on President Trump's actions prior to 2019 JEDI award);  *id.* ¶¶ 357–73 (alleging a purportedly "corrupt environment" based on allegations pre-dating award to Microsoft following the corrective action).

AWS now contends that, despite knowing of President Trump's allegedly improper influence over the JEDI procurement, it was entitled to assume that DoD would eliminate that bias in the corrective action, including by replacing the source selection team.  Opp. at 35-36.  But that is *not* what AWS assumed at the time.  In fact, AWS objected to DoD's proposed remand as an

1

attempt to "gerrymander the corrective action" to allow DoD to "ensure the eventual award of the contract to Microsoft." ECF No. 181 at 2, 9. AWS *itself* later explained that it opposed the remand because it believed "the corrective action was likely to result in another contract award based on politics and improper influence and not based on the relative strengths of the two offerings."[1]

Indeed, AWS's own allegations emphasize that the President's public statements *before* the corrective action tainted the entire procurement and biased all DoD officials against AWS. *See, e.g.*, Am. Compl. ¶¶ 13, 395 (arguing that the "President's interference in DoD's procurement decisions has been pervasive" and "destroyed the requisite impartial discharge of the procurement process," making it impossible for DoD to conduct a "fair and equal" evaluation); *id.* ¶ 368 (asserting that President Trump's public conduct before the corrective action "confronted [DoD evaluators] with the inescapable understanding that their jobs and reputations would be jeopardized by failing to acquiesce to the President's stated desires"). AWS even alleged that President Trump's record—based on facts AWS knew before the corrective action—put "*squarely in doubt the presumption of regularity and good faith* that these government personnel typically enjoy." *Id.* ¶ 373 (emphasis added). And although AWS claims that it believed DoD would somehow eliminate this all-pervasive bias in the corrective action, AWS's Amended Complaint makes clear that it knew DoD had conclusively *rejected* the notion that there was bias to eliminate. *Id.* ¶ 354 (noting that DoD embraced the Office of Inspector General ("OIG") Report's rejection of the bias assertions); *see also* ECF No. 140 at 9-18.

AWS's public statement made immediately after learning of DoD's decision to re-award the contract to Microsoft likewise confirms that the grounds for its bias claims did *not* come to

---

[1] Ex. 1, AWS Public Sector Blog Team, *JEDI: Why we will continue to protest this politically corrupted contract award* (Sept. 4, 2020), https://aws.amazon.com/blogs/publicsector/jedi-why-we-will-continue-protest-politically-corrupted-contract-award/.

light only after reviewing the debriefing materials.  Shortly after the award was announced—and five days *before* AWS received a *single* document explaining the basis for the decision—AWS publicly denounced the new award as the "biased" and "politically corrupted" product of "targeted political cronyism" and "blatant political interference." Ex. 1.

The reality is that AWS knew the factual basis for Count IV's bias allegations before the *first* award to Microsoft, and well over a *year* before the second one.  If AWS thought that DoD needed to take steps to address purported bias in the reevaluation, it should have sought that relief in a pre-award protest, just as this Court suggested when granting the remand.  *See* ECF No. 203 at 4.  AWS's failure to do so means that Count IV is barred under *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007).  If allowed, AWS's "wait and see" approach to litigating bias would let any disgruntled offeror disrupt an unfavorable procurement outcome by pursuing drawn-out, post-award litigation of bias claims even in cases where—as here—the offeror clearly knew the factual predicate for its claim prior to award.  AWS's conduct is offensive to the core policies underlying *Blue & Gold*.  AWS had ample opportunity to raise its bias claim, but instead consciously chose not to bring a pre-award protest, notwithstanding the risk of waiver.  The Court should not let AWS escape the consequence of that decision.

## II.   ARGUMENT

AWS plainly knew the factual predicates for its bias allegations before the close of DoD's corrective action.  Yet, AWS attempts to avoid waiver by asserting that it "learned for the first time" in the debriefing materials and the administrative record that the entire source selection team was biased against AWS and intent on "reach[ing] a pre-determined, politically expedient re-award to Microsoft."  Opp. at 8.  This false narrative is betrayed by AWS's many prior statements and pleadings consistently alleging pervasive corruption of the JEDI source selection process from beginning to end.  Nothing about the corrective action could have led AWS to reasonably believe

that DoD would somehow resolve that alleged bias.  AWS's arguments against waiver should all be rejected because they are premised on a distorted narrative of the events in question.

### A.      AWS Cannot Rewrite The History of This Litigation And Its Bias Allegations

AWS's argument rests on the notion that the presumption of regularity afforded to government officials kept it from protesting bias in the remand process.  According to AWS's Opposition, it only discovered the bias alleged in Count IV on September 9, 2020, when it received "*the debriefing materials* reveal[ing] . . . that DoD's re-evaluations and re-award decision were driven . . . by . . . bias and bad faith."  Opp. at 14-15.  Moreover, AWS claims that it "believed that DoD would address its bias and improper influence concerns" during the corrective action, and it was not until AWS discovered "material and prejudicial errors" in the remand record that it concluded that the reevaluation, too, was tainted by bias.  *Id.* at 14.

This revisionist history is nonsense.  Throughout this case, and well before the remand, AWS has repeatedly contended that President Trump's public actions irretrievably tainted the entire procurement with bias.  DoD has consistently denied AWS's bias allegations, so AWS could not have reasonably expected that DoD would address such unfounded bias concerns in the corrective action.  AWS seems to forget that it objected to DoD's proposed remand as "consistent with [DoD's] past efforts to improperly steer (and now preserve) the award to Microsoft."  ECF No. 181 at 9.  And, lest there be any doubt of AWS's actual view of corrective action when it was sought, AWS later described how it "objected" to DoD's proposed remand because it believed "the corrective action was likely to result in another contract award based on politics and improper influence and not based on the relative strengths of the two offerings."  Ex. 1.[2]

---

[2] In ruling on a motion to dismiss under Rule 12(b)(6), "a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'"  *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) (quoting Fed. R. Evid. 201(b)); *see*

████████████████████████████████████████████████████████

As Microsoft and the Government have explained, DoD's Amendment 0007, which began the corrective action process, gave no indication that DoD intended to address AWS's bias allegations.  *See* ECF No. 238 at 15 (citing AR Tab 591); ECF No. 237 at 7-8.  DoD's stated purpose for remand was to "reconsider[] the *technical* evaluations that AWS has challenged" and to "reconsider[] its award decision."  ECF No. 177 at 3 (emphasis added); *see also* ECF No. 185 at 10 (noting that DoD would "reconsider its award decision in response to all of the *technical* challenges presented by AWS" (emphasis added)).  And although AWS asked the Court to direct DoD to "address all errors" alleged in the Complaint, ECF No. 181 at 7, the Court refused to do so.  AWS thus had no reason to believe that DoD's corrective action would address anything other than the specific technical issues described in DoD's remand motion.

AWS's claim that it thought DoD would change the evaluation process based on its bias allegations is particularly specious given DoD's reaction to the OIG Report published days before the Court ordered the remand.  The Report concluded that not a *single* member of the source selection team was improperly influenced.  *See* ECF No. 238-1, Ex. 1, at 7, 119.  As AWS notes in the Amended Complaint, DoD responded by embracing the Report and concluding that it "vindicated DoD's award decision."  Am. Compl. ¶ 354.  The OIG Report is further reason to reject AWS's claim that it expected DoD would take affirmative steps to eliminate alleged bias.

Even less credible is AWS's claim that it expected DoD to *replace the source selection team*.  *See* Opp. at 35-36.  AWS highlights the Government's general statement—in reply to AWS's opposition to the remand—that DoD would "reconsider its decisions in light of the protest

---

*also Mundo Verde Pub. Charter School v. Sokolov*, 315 F. Supp. 3d 374, 381 n.3 (D.D.C. 2018) ("The court may take judicial notice of representations made on Plaintiff's website.").  And "it is well-established that a court need not accept as true allegations contained in a complaint that are contradicted by matters on which the court may take judicial notice."  *Commonwealth Edison Co. v. United States*, 46 Fed. Cl. 158, 160 (Fed. Cl. 2000).

allegations." ECF No. 185 at 7.  But AWS ignores that DoD expressly stated to this Court, in the

same filing, that it would "need to *reconvene* technical and price evaluators, as well as other source

selection officials" for the corrective action.  *Id.* at 13-14 (emphasis added).  DoD thus indicated

that it would use the same personnel to carry out the corrective action.  Moreover, as Microsoft

explained, the Source Selection Plan for the procurement required "[source selection] team

membership *consistency* for the duration of the selection process."  ECF No. 238 at 27 (quoting

Tab 305, AR64343 (emphasis added)).[3]  For these reasons, AWS had no basis to presume before

the remand that DoD would change its source selection team in response to the bias allegations.

AWS claims further ignorance of DoD's personnel plans by pointing to a question it posed

following Amendment 0007, asking whether DoD anticipated "any changes to the composition of

the evaluation or source selection teams."  Opp. at 35 (quoting Tab 609 at AR181611).  Because

DoD *declined to answer* that question, AWS cannot now plausibly claim that the absence of a DoD

response was tantamount to a commitment to address AWS's attacks on the integrity of DoD's

evaluators.  Indeed, AWS itself has argued—in this very procurement—that an offeror cannot wait

until after award to protest an unanswered question about a solicitation.[4]  If AWS truly thought

that the source selection team needed to be "cleansed" of allegedly-biased evaluators, it should

have filed a pre-award protest when DoD did not answer its question.

AWS's Opposition also conflicts with the explanation in the Amended Complaint for its

decision not to protest DoD's purported bias during the corrective action.  According to the

---

[3] AWS is plainly familiar with the Source Selection Plan, which it discusses in the Amended Complaint.  *See* Am. Compl. ¶¶ 61–62, 91.

[4] AWS's Amended Complaint states that it filed its agency-level protest in May 2020 because DoD failed to answer "several of AWS's clarifying questions" about Amendment 0007's technical requirements, Am. Comp. ¶ 104, and AWS itself acknowledged that a protest before the proposal deadline was necessary in order to avoid waiver under *Blue & Gold*, Tab 617 at AR181722.

Amended Complaint, after Amendment 0009 cured "initial improprieties," DoD's corrective action "appeared . . . fair and impartial" to AWS and provided "a clean slate from which [DoD] could reevaluate proposals," such that "AWS and Microsoft could finally compete on a level playing field."  Am. Compl. ¶ 403.  This explanation is absurd, as Microsoft said in its motion to dismiss, because Amendment 0009 merely made a minor change to the solicitation's *technical* requirements and "did not do anything that could possibly remove the alleged" bias.  ECF No. 238 at 28-30.  In response, AWS has changed its story; its Opposition no longer relies on Amendment 0009 and instead points to DoD's supposed "assertions of good faith."  Opp. at 14.  These are empty contentions, where AWS's own pleadings allege that President Trump's actions—nearly all of which predate the conclusion of the corrective action—"put squarely in doubt the presumption of regularity and good faith that these government personnel typically enjoy."  Am. Compl. ¶ 373.

Also implausible is AWS's assertion that it "expected that DoD would execute the corrective action in good faith" until "the *debriefing materials* revealed" that the reevaluation was "driven . . . by the improper motivations of bias and bad faith."  Opp. at 14-15 (emphasis added).  Just *hours* after DoD announced the re-award to Microsoft—and five days *before* it received the debrief materials—AWS issued a public statement declaring that the corrective action was "nothing more than an attempt to validate a flawed, *biased*, and *politically corrupted* decision."  Ex. 1 (also denouncing re-award as the product of "targeted political cronyism" and "blatant political interference").  The statement expressly noted AWS's prior argument, in objecting to DoD's proposed remand, that "the corrective action was likely to result in another contract award based on *politics* and *improper influence*," and concluded that "[this] is exactly where we find ourselves today."  *Id.*  This statement utterly refutes AWS's contrived narrative of sudden faith in the corrective action.  It also disproves AWS's claimed reliance on the expectation that DoD would

mitigate the purported bias—and, specifically, replace the source selection team—because AWS cried bias *before* it learned that the source selection team had not been replaced.[5]

The reality is that AWS made a deliberate choice not to pursue its bias allegations during the corrective action. Now, attempting to rewrite history, AWS has shifted its allegations to escape the legal consequences of its own decision. The Court should not be misled. AWS's theory of bias is—and always has been—that "overt and escalating pressure from President Trump" (Am. Compl. ¶ 15) has created an "extraordinary environment of corruption, interference, and retribution" that has continued "seemingly without interruption throughout this bid protest." *Id.* ¶ 369. AWS could have raised these claims pre-award, as *Blue & Gold* requires, but it did not.

### B. Count IV Is Waived Under *Blue & Gold*

AWS's revisionist account of when it learned of the purported bias infects each of its five arguments against waiver. *First*, AWS is wrong to characterize Count IV as a challenge to DoD's *reevaluation* of proposals. On its face, Count IV alleges a systemic pattern of bias that, according to AWS, predates the reevaluation. *Second*, Count IV was plainly ripe and redressable before the re-award. If AWS had raised and proved its bias theory, the Court could have ordered that the allegedly compromised evaluators not participate in the corrective action. *Third*, the procurement defects alleged in Count IV were patent, not latent, because the facts establishing bias were—according to AWS—"on full display for the whole country to see" and "virtually impossible for anyone involved in JEDI to ignore." Compl. ¶¶ 18, 20. *Fourth*, allowing AWS to dress up its stale bias claim as a challenge to the reevaluation would subvert *Blue & Gold*'s core policy

---

[5] Although AWS attempts to exploit a minor distinction in how the Government and Microsoft characterize AWS's opposition to the Government's motion to remand, Opp. at 5 n.1, Microsoft and the Government agree on the most important point: AWS was well aware of the factual predicate for its bias claim at the time of the remand, and yet it failed to file the pre-award protest required by *Blue & Gold*.

rationales and incentivize losing bidders to spring forward after award to challenge unfavorable evaluations on bias grounds. *Fifth*, AWS did not have "good cause" to delay its allegations in Count IV. The crux of AWS's allegations in support of Count IV were known to AWS before the remand, before the corrective action, and before the re-award. This Court should reject AWS's arguments and dismiss Count IV under *Blue & Gold*.

### 1.   Count IV Alleges That The Entire Procurement Was Infected By Bias, And Is Not Merely A Challenge To The Reevaluation

AWS maintains that Count IV's allegations of systemic bias, bad faith, and conflicts of interest are "[c]hallenges to evaluation decisions [that] are not waivable under *Blue & Gold*." Opp. at 17. AWS is wrong. Those allegations do not challenge the execution of the evaluation. Instead, they "challenge the underlying processes by which the competition[] [was] conducted" as being "so flawed, or corrupted, that they could not yield fair and proper results." *Adams & Associates, Inc.,* B-417120; B-417125, 2019 CPD ¶ 21, 2019 WL 245909 (Comp. Gen. Jan. 16, 2019) at 3 (citing *Blue & Gold*, 492 F.3d at 1313-14). Any such "challenge to the ground rules of the bidding process after award is untimely." *Ceres Envt'l Servs., Inc. v. United States*, 97 Fed. Cl. 277, 310 (2011).

AWS's assertion that Count IV arises from the reevaluation is flatly contradicted by its own oft-repeated theory of the case—that DoD's source selection team was "consciously or unconsciously" biased due to the President's "public statements and explicit and implicit directives to senior DoD officials" that "made known his unapologetic bias against Amazon and Mr. Bezos and his fervent desire that AWS not be awarded the JEDI Contract." Am. Compl. ¶ 408. While the claims in Counts I through III depend upon the execution of DoD's technical reevaluation of proposals, Count IV hinges on the President's public comments and events pre-dating the initial award. *See id.* ¶ 14. AWS itself contends that "DoD continued to succumb to presidential

pressure" during the remand because, "[p]rior to the original award, President Trump repeatedly made clear to the highest echelons of DoD, including those directly responsible for overseeing the JEDI award, his desire that AWS not receive the JEDI Contract." *Id.* ¶ 404.

AWS ignores its own factual predicate for Count IV's bias allegations to evade *Blue & Gold*. AWS argues that those allegations "arose based on new information that AWS learned following the re-award decision and through its review of the debriefing materials." Opp. at 18. But as explained above, AWS's assertions in that regard are implausible. Indeed, in its objection to the remand, AWS insisted that the forthcoming corrective action would be "gerrymander[ed]" in favor of Microsoft. ECF No. 181 at 2. And, as noted, AWS publicly announced that it would "continue to protest this politically corrupted contract award" five days *before* its post-award debriefing began. Ex. 1; *see supra* at 2-4. It is thus simply not true that AWS needed to review the debriefing materials to assert the allegations of systemic bias in Count IV.

Nor is there merit to AWS's contention that the *Blue & Gold* rule only applies to defects in a solicitation's "terms." *See* Opp. at 21-23. AWS's attempt to distinguish *Inserso Corp. v. United States*, 961 F.3d 1343 (Fed. Cir. 2020), (Opp. at 22) falls flat. *Inserso*'s challenge—that "DISA should not have conducted the debriefing for the full-and-open completion before the small-business competition closed"—was not a challenge *to the solicitation*, as nothing in the solicitation indicated that the procurement's small-business and full-and-open competitions would conclude (and be debriefed) at different times. *Id.* at 1351. Rather, just as AWS here knew of the grounds for its bias claim long before the reevaluation commenced, *Inserso knew* that the full-and-open competition ended earlier than the small-business competition—and knew that fact "*before the [small-business] competition concluded*." *Id.* at 1350 (emphasis added). The *Inserso* Court found that because Inserso "knew, or should have known," of the allegedly improper debriefing

10

███████████████████████████████████████████████████████████

disclosures prior to the award, it "forfeited its right to raise its challenge by waiting until awards were made." *Id.* at 1352.  The same rule mandates dismissal of AWS's Count IV here.[6]

Consistent with the Federal Circuit's approach in *Inserso*, this Court has repeatedly rejected the argument that *Blue & Gold* applies only to defects in a solicitation's "terms."  For example, in *Synergy Sols., Inc. v. United States*, this Court explained that there is no meaningful "distinction between perceived defects in the solicitation versus perceived defects in the evaluation process," and that *Blue & Gold* applies to any procurement defect that could have been "raised and resolved prior to the contract award."  133 Fed. Cl. 716, 740 (2017).  In addition to *Synergy*, "[a] number of [other] cases [have held] that arguments that should have been raised prior to an award are waived, even if they do not relate to ambiguities or errors in the solicitation."  *CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 712 n.12 (2011) (collecting authorities).  The Federal Circuit ratified those authorities when it explicitly confirmed that this Court "has correctly applied [the waiver] rule in organizational-conflict-of-interest ["OCI"] cases" including cases where, as here, the predicate for the claim includes facts which are extrinsic to the solicitation.  *Inserso*, 961 F.3d at 1349 (citing *Ceres Envt'l*, 97 Fed. Cl. at 310).

AWS fails to meaningfully distinguish this Court's other pre-*Inserso* decisions that barred untimely post-award OCI claims.  *See* Opp. at 22-23.  AWS incorrectly argues that the OCI claims at issue in *CRAssociates* and *Concourse* were waived because they were "based on the Government's failure to amend the terms of the solicitations to address concerns about alleged

---

[6] The Federal Circuit's decision in *Boeing Company v. United States*, 968 F.3d 1371 (Fed. Cir. 2020), which involved a post-award claim under the Contract Disputes Act ("CDA"), does not support AWS's position either.  The *Boeing* Court found that in the context of a CDA claim, the patent ambiguity doctrine, rather than *Blue & Gold,* applies to arguments about the interpretation of established "contract terms."  *Id.* at 1378.  *Boeing* did not, however, restrict the scope of *Blue & Gold* in the context of a bid protest to defects in the "terms" of a solicitation.  In fact, the Court specifically recognized that *COMINT* extended *Blue & Gold* to all pre-award situations.  *Id.*

conflicts of interest arising out of the close relationship between the agencies and the incumbents." Opp. at 23 (citing *CRAssociates*, 102 Fed. Cl. at 712-13; *Concourse Grp., LLC v. United States*, 131 Fed. Cl. 26, 29-30 (2017)).   Nothing in those decisions turned on the agencies' refusal to amend their solicitations; instead, those cases applied *Blue & Gold* because the protesters knew of the factual predicates for their OCI claims before the contract award.   In *Concourse*, for example, the Court held that the protester waived its OCI claims arising from the incumbent contractor's allegedly close relationship with the agency where the protester "knew or should have known" of the relationship "well before the contract award" based on publicly-available documents and information.   131 Fed. Cl. at 30; *see also CRAssociates*, 102 Fed. Cl. at 712 (barring OCI claim alleging that a competitor obtained inside information from its prior contract performance). Likewise, AWS here knew the factual basis for its bias allegations prior to award based on well-publicized information cited throughout its pleadings.

AWS also fails to grapple with how the *Blue & Gold* waiver rule applies "when a bidder fails to object to an error in the scope of a corrective action prior to a new award."   *ANHAM FZCO v. United States*, 144 Fed. Cl. 697, 718 (2019).   AWS attempts to distinguish *ANHAM* because, here, DoD "never suggested that [it] would implement a remand infected with bias."  Opp. at 32. This is twisted logic and, in any case, *ANHAM* itself holds that, unless the agency makes clear that its corrective action will address a particular protest ground, a protester must challenge the agency's *failure* to address that ground in its corrective action plan before the corrective action is completed.   *ANHAM*, 144 Fed. Cl. at 719.   Here, despite asking, AWS received no confirmation that DoD would address its many allegations of a biased evaluation team.   Yet AWS failed to preserve and "actively prosecute" those claims in a pre-award protest as required under *Blue & Gold*.  *Peraton Inc. v. United States*, 146 Fed. Cl. 94, 103 (2019).

AWS's contention, buried in a footnote, that *Peraton* "has nothing to do with waiver" (Opp. at 23 n.4) is specious.  There, this Court held that the protester's bad faith claim was "barred by the precedential guidance of *Blue & Gold*" because the protester failed to actively prosecute it before the agency completed its corrective action.  *Id.* at 103.  Here, AWS—just like the protesters in *ANHAM* and *Peraton*—consciously decided to allow corrective action to go forward without asserting its bias claim in a pre-award protest.  That impermissible "wait and see" approach is explicitly "foreclosed by the guidance furnished in [*Blue & Gold*]."  *Id.* at 101-02.

Notably, AWS fails to cite a single on-point authority supporting its case.  AWS's reliance on *Draken Int'l, Inc. v. United States*, 120 Fed. Cl. 383, 393 (2015), is misplaced.  In that case, the protester filed a pre-award challenge alleging that it was prejudiced by a "delay in the procurement process coupled with the solicitation requirements" for two different aircraft types, which caused offerors to incur greater than anticipated expenses due to the delay in the agency's award decision. *Id.* at 393.   The Court dismissed the protester's independent objection to the solicitation requirements as untimely because the protest was filed after the proposal deadline, but the Court adjudicated the protester's separate pre-award objection to the agency's allegedly unreasonable delay, which the protester alleged rendered the "*selection process*" "defective and anticompetitive."  *Id.* at 391, 393 (emphasis added).  *Draken*'s interpretation of *Blue & Gold* is thus entirely consistent with *COMINT*'s holding that the waiver rule applies to "*all* pre-award situations."  *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012) (emphasis added).  AWS's other authorities meet the same fate, as none involves a post-award protest where the protester knew of the alleged defect prior to submission of proposals.[7]

---

[7] In *ATSC Aviation, LLC v. United States*, 141 Fed. Cl. 670, 695 (2019) (Opp. at 22), "the 'evaluative error was not evident before the final award.'"  *iAccess Technologies, Inc. v. United States*, 143 Fed. Cl. 521, 531-32 (2019) (quoting *ATSC*, 141 Fed. Cl. at 694).  Similarly, in *Caddell*

███████████████████████████████████████████████████████

*Blue & Gold* applies here for a simple reason: AWS knew the key facts underlying the bias alleged in Count IV well before DoD re-awarded the JEDI contract to Microsoft.  AWS's *post-hoc* recharacterization of Count IV challenging bias that first appeared in the remand record is flatly contracted by AWS's own allegations, and it does not save AWS from waiver.

### 2.    A Pre-Award Protest Asserting Bias Would Have Been Justiciable

AWS contends that *Blue & Gold* cannot bar Count IV because (1) AWS lacked standing to raise its bias claim in a pre-award protest, and (2) the claim would have been unripe before the evaluation results were known.  *See* Opp. at 24-32.  AWS's ripeness argument relies on the same flawed premise as its *Blue & Gold* argument: that Count IV *only* challenges bias insofar as it manifested *in the reevaluation*.  And when that false premise is removed, it is clear that AWS's challenge to systemic bias in the JEDI procurement was ripe before the re-award.

Where, as here, a protester alleges that a procurement is fundamentally tainted by bias or conflicts of interest, it has sufficient standing—and a legal obligation—to raise those allegations in a pre-award protest.  AWS's arguments about ripeness fail because this Court has repeatedly found that pre-award bias claims are ripe *before* award, and subject to the *Blue & Gold* waiver rule if they are not timely prosecuted.  *See Jacobs Tech. Inc. v. United States*, 131 Fed. Cl. 430, 436-38 (2017) (holding that pre-award bias claim ripened after the agency "announced its decision to take corrective action," even though it had not yet made an award); *Jacobs Tech., Inc. v. United States*, 100 Fed. Cl. 179, 182 n.4 (2011) (finding a pre-award protest ripe, in part, because the *Blue & Gold* waiver rule extends to challenges to the "solicitation process," including OCI violations);

---

*Constr. Co. v. United States*, 111 Fed. Cl. 49 (2013), the Court found no waiver after noting that "the record [did] not establish that plaintiff had sufficient information to raise its claims prior to the submission of . . . proposals."  *Id.* at 76.  And in *Sotera Def. Sols., Inc. v. United States*, 118 Fed. Cl. 237 (2014), there was no "protestor that possessed knowledge of an alleged procurement defect" and yet "waited for the results of an evaluation process before protesting the alleged defect."  *Id.* at 255.  AWS's cases are inapposite.

see also *Peraton*, 146 Fed. Cl. at 103 (noting that, before award, the court potentially "could have reached the merits of any bad faith claim in the context of the [agency's] revised corrective action," but "that option was foreclosed" by the protester's failure to prosecute its claim).

An objection to corrective action "need not challenge precise terms in the amended solicitation in order for this Court to have pre-award bid protest jurisdiction." *Ceres Gulf, Inc. v. United States*, 94 Fed. Cl. 303, 316 (2010). The Court has jurisdiction to decide a pre-award protest asserting bias or OCI claims where "[t]he agency is poised to make the award" and the protester has "no indication" that the agency plans to correct the alleged bias. *Jacobs*, 100 Fed. Cl. at 179. Like the protester in *Jacobs*, AWS knew that DoD was prepared to make a new award but had no indication that DoD planned to investigate, evaluate or mitigate the bias that allegedly infected the JEDI source selection team. *Id.* at 183 (holding that the protester's "PIA and OCI claims [were] ripe for adjudication" where it was "reasonable to conclude that [the agency] made the decision not to conduct [an]…investigation" of those claims before award). Here, of course, AWS knew that the DoD OIG had conducted an investigation and concluded that its systemic bias claim had no merit. *See supra* at 5-6. AWS would have had standing to contest that conclusion and assert its claim in a pre-award protest, and those claims would have been ripe.

AWS fails to distinguish the relevant precedents, including *Jacobs* and *Peraton*, which squarely apply *Blue & Gold* to bias and bad faith claims made in the context of corrective action. *See* Opp. at 30-31. Instead, AWS's position on standing and ripeness merely reformulates its meritless contention that Count IV objects to the "execution" of corrective action, as opposed to an underlying defect in the integrity of the procurement. For precisely this reason, AWS's heavy reliance on this Court's decision in *Square One Armoring Service, Inc. v. United States*, 123 Fed. Cl. 309 (2015), is misplaced. The protester in *Square One* claimed that "GSA's decision to

reprocure the Solicitation is merely a pretext for affording [the awardee] an additional opportunity to correct its proposal," without citing any factual predicate for its allegation.  *Id.* at 329.  The Court found such "hypothetical arguments about future events that [might] or [might] not occur" too contingent for any review.  *Id.*  Here, by contrast, the key elements of Count IV were undisputedly known to AWS long before re-award, and *Square One*'s ripeness holding does not apply to AWS's systemic bias claim.

The same is true of *Eskridge Research Corp. v. United States*, 92 Fed. Cl. 88 (2010).  The protester there raised claims regarding "potential improprieties in the re-evaluation process," without "any facts" in support.  *Id.* at 94.  AWS's bias claim does not rest upon "contingent future events that may not occur" in the re-evaluation process.  *Id.*  Rather, AWS decided to sit on its claims regarding the bias allegedly infused by President Trump rather than raise them in a pre-award protest.  Allegations that merely anticipate improper agency action, like those at issue in *Square One* and *Eskridge,* are "quite different" from cases like this one, where the protester is demonstrably aware of a factual basis to challenge "announced corrective action that does *not* include an action that the protestor argues is necessary for a proper procurement."  *Jacobs*, 100 Fed. Cl. at 183 (distinguishing *Eskridge*).

Despite AWS's attempt to show otherwise, it cannot rely upon the presumption of good faith to excuse its untimely protest.  *See* Opp. at 29-30.  The presumption of good faith is an evidentiary standard that protesters must overcome to prove the merits of a claim that the Government acted in bad faith.  *See Square One*, 123 Fed. Cl. at 329 (holding that the protester's "unsubstantiated allegations . . . do not approach the well-nigh irrefragable proof necessary to overcome the presumption that government officials act in good faith").  This evidentiary presumption has never been applied as a shield that protesters can "rely on" to evade their legal

obligation—under *Blue & Gold*—to raise pre-award bias challenges when they "knew, or should have known" of the facts establishing the purported bias. *Inserso*, 961 F.3d at 1340. Indeed, it would make no sense to allow AWS to exploit the presumption when a core theory of its case, evident from the original Complaint, is that President Trump's public statements and actions irretrievably tainted the JEDI procurement from the start. *See supra* at 4-8.[8]

### 3. Count IV Challenges A Patent Procurement Defect

AWS argues that it did not waive Count IV because there was no "patent error in the corrective action that would have charged AWS with a duty to act." Opp. at 33. AWS's contention is inconsistent with the facts, the law and common sense.

First, as explained above, AWS cannot plausibly contend that it thought DoD's corrective action would remediate its claims of systemic bias among DoD's evaluators. AWS has asserted that bias since its original Complaint, and it did not seek removal of the allegedly corrupt evaluators in the corrective action, even though: (1) the Government told this Court during the remand briefing that DoD's evaluators intended to reconvene and reevaluate proposals; (2) DoD did not commit to changing any of the evaluators in Amendment 0007 or in response to AWS's question concerning that amendment; (3) DoD's source selection plan required consistency among the evaluators; and (4) the DoD OIG Report—released before the terms of the corrective action were announced—concluded that no JEDI evaluator was improperly influenced. *See supra* at 5-6. Under these circumstances, "[t]he law and facts made patent" that DoD would not change the

---

[8] AWS also surfaces an argument it made in opposition to Defendants' first round of motions to dismiss: that AWS's bias claims would not have been ripe prior to the re-award because, until then, there was no "final agency action" for AWS to challenge. Opp. 24-25. But as Microsoft explained during the last round of motion-to-dismiss briefing, "the Tucker Act does not superimpose a 'final agency action' requirement onto its broad grant of bid protest jurisdiction to the Court of Federal Claims." ECF No. 175 at 16-18 (citing *Itility, LLC v. United States*, 124 Fed. Cl. 452, 461 n.12 (2015) and *CBY Design Builders v. United States*, 105 Fed. Cl. 303, 336 (2012)).

evaluators or remediate any of the purported bias.  *Inserso*, 961 F.3d at 1350.

Second, AWS badly misconstrues the law when it asserts that bias was not patent because the President's statements "did not modify the terms of the solicitation." Opp. at 34.  In bias and OCI claims, a "patent error" is one that "involves an obvious procurement procedure which [the protester] knew was being applied and chose not to challenge prior to submitting its proposal in the recompetition." *Ceres Envt'l*, 97 Fed. Cl. at 310.  For the reasons set forth above, it was obvious that DoD did not intend to change its evaluators or take other remedial action, and there was no plausible basis for AWS to assume otherwise.  If AWS thought that new evaluators needed to be installed to ensure a fair and honest reevaluation, "it had an obligation to raise this argument prior the closing date for receipt of proposals." *Id.*

Third, there is no merit to AWS's contention that it exercised "reasonable and customary care" to discover the alleged error.  Opp. at 35 (citing *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1313 (Fed. Cir. 2016)).  AWS's question in response to Amendment 0007 about the makeup of DoD's remand source selection team does not satisfy its strict obligation under *Blue & Gold* to formally object to a patent error.  That question did not express dissatisfaction with or objection to the composition of the source selection team—it merely asked whether DoD anticipated changes. Tab 609 at AR181611.  In any event, the Federal Circuit has held that "mere notice of dissatisfaction or objection is insufficient to preserve [a protester's] defective-solicitation challenge" in the absence of a formal pre-award protest at the agency-level, GAO or this Court. *Bannum, Inc. v. United States*, 779 F.3d 1379, 1380 (Fed. Cir. 2015).  AWS failed to bring any such protest here as required under *Blue & Gold*.

### 4.   Addressing Count IV Would Frustrate *Blue & Gold*'s Policy Goals

AWS's assertion that it could not protest bias until it saw whether the "proof [was] in the [evaluation] pudding" is antithetical to *Blue & Gold*'s waiver rule.  Opp. at 37.  *Blue & Gold*

dictates "that a contractor should not be allowed to protest an agency's failure to identify and mitigate [a conflict] when the contractor knew about the alleged [conflict] from the start, but failed to assert it, via protest, prior to the award." *CRAssociates*, 102 Fed. Cl. at 712.  AWS's "wait and see" approach is exactly what *Blue & Gold* forbids.

Contrary to AWS's contention that addressing claims of bias before award would be "premature, time-consuming, and fruitless" and "defeat *Blue & Gold*'s goal of promoting efficiency," (Opp. at 37), pre-award protests properly raising bias claims avoid the need for time consuming, after-the-fact-litigation involving potentially disruptive discovery into issues that the Government could have investigated and addressed in the first instance.  *See, e.g.*, *Peraton*, 146 Fed. Cl. at 103 (rationale behind the *Blue & Gold* waiver rule includes preventing the risk of "restart[ing] the bidding process' once an award has been made [which] may provide an advantage to the protestor who lies in wait," and allowing for protests to be litigated in a timely fashion). When bias claims are timely raised, the Government can investigate and take appropriate action to "[a]void, neutralize, or mitigate significant potential conflicts," including removing any tainted evaluators, "before contract award" as required by regulation.  48 C.F.R. § 9.504(a); *see also* *Jacobs*, 100 Fed. Cl. at 182–83 (citing 48 C.F.R. § 9.504(a) as support for finding a pre-award OCI claim ripe for review).  The Court can review contracting officer OCI determinations, as it did earlier in this procurement.  *See Oracle Am., Inc. v. United States*, 144 Fed. Cl. 88 (2019), *aff'd*, 975 F.3d 1279 (Fed. Cir. 2020).  And, if necessary, the Court can order the procuring agency to mitigate any bias or conflict before the evaluation concludes.  *See Jacobs*, 131 Fed. Cl. at 443 (finding bid protest jurisdiction over protester's request for "an injunction directing the [agency] to . . . appoint new, unbiased procurement officials").

AWS is also wrong to assert that pre-award litigation of bias claims "would result in a

flood of litigation." Opp. at 37. *Blue & Gold* has long been the law of the Federal Circuit, and it is hardly novel to apply it here. Any finding that AWS waived these bias claims would have no impact on any other case in which the alleged basis for bias is not so known publicly and in advance as here. AWS has been complaining about bias for over a year; allowing it to "save" its bias concerns for an after-the-fact fishing expedition for evidence of that bias is untenable. It would eviscerate *Blue & Gold* if any disappointed offeror in AWS's position could wait until after award and obtain a post-award "do-over."

### 5. AWS Has No Excuse For Sitting On Its Rights

AWS makes a final claim that—even if *Blue & Gold* does apply to Count IV—AWS should be excused for not earlier raising its bias claims because it was "impracticable" for it to do so before it received the debriefing materials, and because doing so would lead to an inequitable result. Opp. at 38. But AWS had more than enough time and opportunity to challenge bias in a pre-award protest. *See COMINT*, 700 F.3d at 1382. AWS could have raised Count IV before the initial award, in its opposition to the proposed remand, in response to Amendment 0007, or in the intervening four months before the second award. AWS chose—at each of these points—not to pursue its bias claims, and its decision had nothing to do with practicality. Allowing AWS to sit on its rights would allow future protesters to recast any bias claim as a challenge to the agency's evaluation—even when facts establishing the purported bias were widely known long before the evaluation commenced. That approach would undermine *Blue & Gold*'s policy objectives.

## III. CONCLUSION

For the reasons discussed above and in Microsoft's opening Motion, the Court should dismiss Count IV as waived under *Blue & Gold*.

████████████████████████████████████████

Dated: December 1, 2020

*Of Counsel:*

LATHAM & WATKINS LLP

Abid R. Qureshi
Roman Martinez
Anne W. Robinson
Dean W. Baxtresser
Genevieve Hoffman
Riley Keenan
Margaret Upshaw

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
(202) 637-2200 (Telephone)
(202) 637-2201 (Facsimile)

Respectfully submitted,

ROGERS JOSEPH O'DONNELL, P.C.

By: /s/*Robert S. Metzger*
Robert S. Metzger (Attorney of Record)

Jeffery M. Chiow
Neil H. O'Donnell
Lucas T. Hanback
Stephen L. Bacon
Deborah N. Rodin
Cassidy Kim
Eleanor M. Ross

875 15th Street N.W., Suite 725
Washington, D.C. 20005
(202) 777-8952 (Telephone)
(202) 347-8429 (Facsimile)

*Attorneys for Intervenor-Defendant,*
*Microsoft Corporation*